UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| **RICHARD E. KAPLAN,** ) | |
| ) | |
|        **Plaintiff** ) | |
| ) | |
| v. ) | Civil No. 05-144-B-H |
| ) | |
| **FIRST HARTFORD** ) | |
| **CORPORATION** and ) | |
| **NEIL ELLIS,** ) | |
| ) | |
|        **Defendants** ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW PART 2: REMEDY**

The question here is remedy: What should this Maine corporation's minority shareholder recover upon a judicial finding of oppression by a director/controlling shareholder? I conclude that the remedy is a compulsory buy-out of the minority shareholder, with his shares valued as of the day he filed his Complaint.

**Procedural History**

After a bench trial, I ruled in April 2007 that a director and 43% shareholder (Ellis) of a Maine publicly held corporation (First Hartford Corporation, "FHC") had engaged in oppressive conduct with respect to a minority shareholder (Kaplan). I concluded that the minority shareholder was entitled to relief under a provision of Maine's Business Corporation Act, 13-C M.R.S.A. § 1434. Findings of Fact and Conclusions of Law at 44 (Docket Item 81). Because the parties focused the trial on liability, I did not then determine what remedy was

appropriate for the oppression. Instead, I asked for further briefing on that issue and, if necessary, additional evidence. Id. at 46. I did observe that, as of that point, minority shareholder Kaplan did not seek FHC's outright dissolution. Id. at 44.

FHC asked me to modify my findings of fact and conclusions of law, to make explicit that neither dissolution nor appointment of an independent receiver would be an appropriate remedy. Def. FHC's Mot. for Additional Findings at 1 (Docket Item 84). I denied that motion in May, declining to limit available alternatives at that time. Order on Def. FHC's Mot. for Additional Findings of Fact and Conclusions of Law (Docket Item 92).

Next, the parties filed their briefs on the appropriate remedy. FHC and Ellis both asserted that FHC should buy out minority shareholder Kaplan "to the extent [FHC] has the financial capacity to do so." Def. FHC's Position on Remedies at 1 (Docket Item 93). FHC proposed the following sequence:

> first, "an order by the Court that Plaintiff shall sell the Richard Kaplan Shares, at their fair value, to FHC";
>
> next, "appropriate discovery" on the subject of fair value;
>
> then, designation of experts and depositions;
>
> finally, a hearing on fair value.

Id. at 2. If FHC should be financially unable to buy out Kaplan, then "the Court may be required to consider other remedies which would necessitate a subsequent hearing." Id. at 3. Kaplan mostly agreed. Kaplan asserted that a purchase by either FHC or Ellis was "the most equitable path to disentanglement. . . . Absent

2

judicial intervention ordering such a buy-out, minority shareholders have no remedy." Pl.'s Br. on Remedies at 2 (Docket Item 95). Kaplan wanted to retain the option of dissolution, but only if I determined that an FHC or Ellis buy-out was "not feasible." Id. at 3, 12-13. Indeed, Kaplan took the position that "the Court could now [i.e., at the time of that briefing] order a buy-out at fair value, with fair value to be determined." Id. at 19.

As a result of such statements, I concluded in June 2007 that "there is conceptual agreement on the general form of relief to be ordered (buy-out of the plaintiff Kaplan if the defendant First Hartford Corporation ("FHC") is financially capable)." Procedural Order of June 14, 2007 (Docket Item 99). At the lawyers' request, I scheduled a conference of counsel. At the conference, they produced an agreed-upon scheduling order but informed me that they had not been able to agree on the date for a valuation. Instead, they proposed to undertake discovery, hoping that a practical valuation date would emerge on which they could all agree, but reserving the possibility that if they failed to agree, I would have to make a legal ruling on what was the appropriate valuation date.

Unfortunately, discovery thereafter bogged down (more accurately, it did not occur), and at a later conference of counsel they informed me that they could not agree on a valuation date at all, and that I would have to make a ruling on the correct valuation date. I therefore ordered briefing on what the valuation date should be (and also ordered discovery to go forward). Procedural Order of October 4, 2007 (Docket Item 110).

In the most recent briefing, minority shareholder Kaplan intimates that he does not really join in the request to have me choose a valuation date now, Pl.'s Br. on Valuation Date and Scope of Hr'g at 2 (Docket Item 112), and that my doing so might amount to an advisory opinion.[1] He then takes the position that the valuation date should be "the date of the decree," id. at 1, close to when he is "cashed out of his shares." Id. at 6-7. He also steps back from any commitment to a buy-out remedy, saying that he "reserved any argument about which remedy is most appropriate." Id. at 1 n.1. FHC asks for a valuation date that is either the day before the date Kaplan filed his Complaint, or the date on which I determine that oppression first existed. Def. FHC's Mem. of Law on Valuation Date and SEC Acknowledgments at 1 (Docket Item 111). Ellis, the 43% shareholder, has not filed a brief on this issue.

I now conclude that FHC must buy Kaplan's shares. I also conclude that the appropriate valuation date is the day Kaplan filed his Complaint, i.e., September 15, 2005. If I am later persuaded that FHC cannot financially accomplish the purchase, then Ellis must buy the shares. If neither FHC nor Ellis can buy the shares, then I will proceed to consider dissolution. But if dissolution results in a lower payment to Kaplan, I will consider holding Ellis responsible for the difference, since Ellis controls information about FHC, the value of its real estate portfolio, and his own assets and, as I have found previously, he has

---

[1] It is not an advisory opinion. It is a ruling of law in the course of trial (now the remedy phase) that will affect what evidence is admitted on remedy.

regularly mingled his own assets with those of FHC.  I will not permit Ellis to determine, *post hoc,* which date is most beneficial to him.

## ANALYSIS

When a shareholder shows that those in control of a Maine corporation have acted oppressively, judicial dissolution of the corporation is appropriate.  13-C M.R.S.A. § 1430(2)(B).  However, a court may also grant different relief "that in its discretion it considers appropriate," 13-C M.R.S.A. § 1434(2), including an order that "the corporation or . . . other shareholders" "purchase at their fair value . . . shares of any shareholder."  13-C M.R.S.A. § 1434(2)(A).

I now exercise that discretion under section 1434(2) to declare that a buy-out is the appropriate remedy.  In my original findings of fact and conclusions of law on liability, I expressed my reluctance to order dissolution of this publicly held corporation. Findings of Fact and Conclusions of Law at 44 n.55.  All the parties agreed some months ago that buy-out is the preferred remedy, notwithstanding Kaplan's recently cooling ardor.  Buy-out makes sense because it allows an oppressed shareholder like Kaplan to escape the oppression and recover his investment, yet simultaneously allows this publicly held corporation to continue for the benefit of its other shareholders who are content with Ellis's management practices.  See Douglas K. Moll, Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation, 54 Duke L.J. 293, 309 (2004).  Buy-out by the corporation is the preferred outcome, since it spreads equitably the benefit of Kaplan's shares.  But if for some reason FHC is unable to execute the buy-out, then controlling shareholder Ellis shall do so, since

he is the one responsible for the oppression and has regularly mingled his assets with those of FHC.

The next issue, then, is the date as of which Kaplan's shares should be valued. The statute is silent except to leave it clearly within the judge's discretion.[2] The three options proposed by the parties are: the date I issue the decree (as close as possible to the date as of which the shares are to be transferred); the day before the filing of the Complaint; or the date of oppression.

The premise for relief of any sort is that Ellis has been oppressing Kaplan. See 13-C M.R.S.A. § 1430(2)(B). I do not choose the date he started the oppression for two important reasons: first, Kaplan did not demonstrate that he wanted out as of the date Ellis began the oppression (a minority shareholder may decide to put up with oppression at least for a time because of the corporation's future prospects); second, my oppression finding was based upon a "pattern" of behavior, not upon any single act or transaction, and it is difficult to select a particular starting date. I also do not choose the date of the final decree

---

[2] The current Maine Business Corporation Act, enacted in 2002, is based on the revised Model Business Corporations Act. Section 1434, however, does not track the language of the corresponding provision of the Model Act. See generally James B. Zimpritch, Maine Corporation Law & Practice §§ 14.11[a], 14.12[d] (2d ed. 2004). Under the Model Act, in an involuntary dissolution suit initiated by a shareholder, the corporation or one or more shareholders can halt the dissolution proceeding by electing to purchase at their fair value the shares owned by the petitioning shareholder. Model Business Corp. Act Ann., § 14.34(a). If the corporation invokes this election provision, the court must dismiss the dissolution petition. Model Business Corp. Act Ann., § 14.34(f). The Model Act instructs the court to determine the fair value of the petitioner's shares as of the day before the date on which he or she filed the dissolution petition. Model Business Corp. Act Ann., § 14.34(d). Rather than adopt the Model Act's election provision, the Corporate Law Revision Committee, the arm of the Maine Bar Association that drafted the 2002 law, retained section 1123 of the 1971 Maine Business Corporation Act. It became § 1434 of the current law. Section 1123 of the 1971 Act was modeled after § 12-22.23 of the South Carolina code. Proposed Maine Business Corporation Act, Comment to § 11-23 (West, n.d.). See also S.C. Code Ann. § 33-14-310 (2006) (current codification). The South Carolina Reporters' Comments explain that the
*(continued next page)*

6

concerning the ultimate stock transfer for two reasons: first, this explicitly is *not* a dissolution remedy, in which each stockholder gets the pro rata value of the liquidated assets as they are distributed, but instead an alternative to dissolution under 13-C M.R.S.A. § 1434 (I have stated my reluctance to dissolve this public corporation that has many other shareholders); second, valuation as of the final decree is very impractical. Valuation will require expert analysis of the company's assets, and the value will change over time, up or down. I cannot arrange for the experts' reports (which will undoubtedly conflict), the hearing, my decision, and the exchange of the check and stock all to occur on, or even close to, a single date.

Instead, I choose the date that the Complaint was filed for the following reasons.[3] That is the date when Kaplan finally became perturbed enough about Ellis's oppression to file a dissolution lawsuit demonstrating his desire to separate himself from the corporation.[4] If the corporation's success thereafter waned, it would be unfair to make Kaplan share in its decline since he has done all he could to extricate himself. But if its success thereafter improved, it is fair to deprive him of that success because he had already made his decision to get out.[5] The

---

relevant provision of the South Carolina code was included "to continue the explicit statement of the court's inherent equitable powers." S.C. Code Ann. § 33-14-310 (2006) (Reporters' Comments).
[3] If there is some argument that the very filing of the Complaint affected the value, the value shall be determined as of that date but as of a time before the Complaint was filed.
[4] Professor Moll supports the date of filing as the presumptive valuation date because it can be "deemed to reflect the 'unofficial' end of a plaintiff's shareholder status." Moll at 373. He also says that the shareholder should generally have the option of choosing the oppression date instead, id. at 374-76, but he acknowledges that this "date of oppression" argument is inapplicable when, as here, "the alleged acts of oppression do not result in an ouster from management participation." Moll at 375 n.308. Moreover, Kaplan has not requested that I use the date of oppression.
[5] Other cases have recognized such factors in selecting a valuation date. See, e.g., Torres v. Schripps, Inc., 776 A.3d 915, 925 (N.J. Super. Ct. App. Div. 2001) ("The decrease in the corporate value from February to September was not due to plaintiff's efforts, but may have been due to defendant's lack of experience in managing the corporation. Because plaintiff was terminated, it *(continued next page)*

7

investment value of his shares after that date can be recognized, at least crudely, in pre- and post-judgment interest from the date he filed his Complaint. See 2 O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members: Protecting Minority Rights in Squeeze Outs and Other Intracorporate Conflicts, § 7:21 at 7-148 (Thomson/West 2005); Harry J. Haynsworth, The Effectiveness of Involuntary Dissolution Suits as a Remedy for Close Corporation Dissention, 35 Clev. St. L. Rev. 25, 45-46 (1987).

Originally, the parties told me that discovery might lead them to agreement on a valuation date as a practical, not a legal, matter. That has turned out not to be the case. What I do not want to permit, now, is manipulation of my decision. The major part of this corporation's assets is real estate. The real estate market can be, and has been, subject to significant fluctuations. I have chosen a date that does not permit Kaplan to gain if the corporate assets should improve, or lose if they should decline.[6] Similarly, I do not want Ellis to control the date so that he can choose what is financially best for him. Should he assert in the future that neither FCH nor he can financially purchase the Kaplan shares once they are valued, and that I must dissolve the company instead, I will be very suspicious that he has taken that new position because it has turned out that dissolution

---

was fair not to ascribe the losses to plaintiff."); Hughes v. Sego Int'l Ltd., 469 A.2d 74, 77 (N.J. Super. Ct. App. Div. 1983) (adopting as the stock valuation date the date the plaintiff was fired, rather than the later date of the judgment for dissolution, because the increase in the corporation's value between the two dates "could not be attributed to [the] plaintiff's efforts").

[6] It is apparent from Kaplan's brief that his advocacy of the decree date is premised on a belief that it will yield him a higher recovery. Pl.'s Br. on Valuation Date and Scope of Hr'g at 6 ("the buy-out alternative should not yield less value to Plaintiff than dissolution"). However, he also advocates some judicial discretion to adjust the amount (presumably in the fear that a declining market could make the decree date value less attractive). Id. at 7.

would give Kaplan less (perhaps because the value of the corporate assets declines in the meantime) and that it is simply a new stage of oppressive conduct on the part of Ellis.[7] FHC's dissolution remains an available option if ultimately I cannot enforce an order to have FHC and/or Ellis buy out Kaplan. But if I am compelled to dissolve the corporation, and if the result is that Kaplan obtains less than he would in the buy-out that I have ordered, I will consider treating any difference as an amount that Kaplan should recover from Ellis, to be subtracted from the amount to which Ellis would otherwise be entitled as his pro rata share in such a dissolution.

* * * * *

There is one separate issue. Under a previously entered confidentiality order, the parties agreed to limited third party disclosures of certain discovery materials designated "CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER." Under the terms of the confidentiality agreement, experts hired by the parties or their lawyers are permitted to review these confidential documents, provided that the experts certify their compliance with the confidentiality order by signing the Acknowledgment and Agreement to Be Bound. Confidentiality Order at 5 (Docket Item 17); Acknowledgment and Agreement to Be Bound (Docket Item 19). Now FHC wants Kaplan to provide directly to FHC all such forms, as they are executed. Def. FHC's Mem. of Law on Valuation Date and SEC Acknowledgments at 5. That could unnecessarily reveal workproduct if Kaplan has disclosed these materials to

---

[7] This is a particular concern because I am familiar, from the trial, with the difficulty of tracing Ellis's and his various corporations' assets.

9

consultants or experts whom Kaplan does not expect to call at trial. See Fed. R. Civ. P. 26(b)(4)(B).

FHC maintains that it needs the information in order to comply with Securities and Exchange Commission ("SEC") regulations concerning insider information and trading, but it has not presented me with any regulations that require a court to do what it is proposing. Regulation FD may require FHC to make public disclosure of material nonpublic information made to a holder of FHC's securities, but only if the disclosure is made "under circumstances in which it is reasonably foreseeable that the person will purchase or sell the . . . securities on the basis of the information." 17 C.F.R. 243.100(b)(1)(iv). Further, the regulation is clear that it does not apply to disclosures made to "a person who expressly agrees to maintain the disclosed information in confidence." 17 C.F.R. 243.100(b)(2)(ii). The existing confidentiality agreement is an express agreement to maintain the information in confidence. It certainly is not "reasonably foreseeable" that a person who signs the Acknowledgment and Agreement to Be Bound would purchase or sell FHC's securities on the basis of information conveyed through receipt of confidential documents.

In any event, it seems to me that there is a simple solution to this impasse. I **ORDER** that Kaplan file with the court, *in camera* and under seal, the certificates as they are signed. Then, if there is later some issue about someone purchasing stock (this stock is very thinly traded; it should not be difficult to determine whether anyone other than Ellis is buying stock), documentation will be available if there is a need for its disclosure.

Finally, FHC argues that it needs to know "the number and type of individuals" who receive the discovery documents in order to determine whether it must file a Form 8-K with the SEC. Def. FHC's Mem. of Law on Valuation Date and SEC Acknowledgments at 6. FHC provides no explanation for this assertion—it fails to explain which discovery documents or recipients might implicate the Form 8-K requirement, and it cites no authority in support of its request. In the absence of some persuasive explanation, I will not impair Kaplan's workproduct privilege by ordering him to supply the Acknowledgments directly to FHC.

**SO ORDERED.**

**DATED THIS 7TH DAY OF NOVEMBER, 2007**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**