UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | No. 05-144-DBH |
| FIRST HARTFORD CORPORATION | ) | |
| and NEIL ELLIS, | ) | |
| | ) | |
| Defendants | ) | |

**JOINT MOTION IN LIMINE OF FIRST HARTFORD
CORPORATION AND NEIL ELLIS TO EXCLUDE THE TESTIMONY OF
PLAINTIFF'S PURPORTED EXPERT, GUILLIAEM AERTSEN**

Defendants First Hartford Corporation ("FHC") and Neil Ellis hereby move to exclude the testimony of Guilliaem Aertsen, the expert witness designated by the Plaintiff, Richard E. Kaplan ("Kaplan" or "Plaintiff"). As one of the authors of the "handbook" that Mr. Aertsen exclusively relied upon to make his calculations and analysis definitively states, Mr. Aertsen failed to employ the proper methodology in determining the fair value of FHC. Accordingly, the testimony of Mr. Aertsen should be excluded because his opinions are not based on the proper application of a reliable, accepted methodological foundation and thus are inadmissible under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

**I.     BACKGROUND**

In Kaplan v. First Hartford Corporation, 522 F. Supp. 2d 275 (D. Me. 2007), this Court ordered FHC to purchase the Kaplan shares at their "fair value" based on its prior finding that he was an oppressed shareholder. The Court also found that September 15, 2005 was the

{W1095302.1}

proper date as of which the fair value of Kaplan's shares should be determined.

On March 28, 2008, the Plaintiff disclosed Guilliaem Aertsen as his expert witness to testify as to the fair value of Plaintiff's shares. The March 28, 2008 disclosure purports to be based on Aertsen's use of a single analytical approach - "enterprise income capitalization"- to determine the value of FHC as of September 15, 2005." (See Pl. Expert Disclosure, dated March 28, 2008, at 2, attached as Exhibit 1.) Plaintiff served a Supplemental Expert Disclosure dated June 6, 2008, which stated that Mr. Aertsen will also testify on the financial ability of FHC to purchase the Plaintiff's shares. (See Pl. Supp. Expert Disclosure, dated June 6, 2008, attached as Exhibit 2.) In the Supplemental Disclosure, Mr. Aertsen also discussed two other valuation methodologies: net asset value and stock market price (Id.); Mr. Aertsen ascribed no weight to either.

In Mr. Aertsen's opinion, the "total FHC equity value" was $48,268,862 or $15.66 per share on September 15, 2005. However, these calculations concerning the "fair value" of FHC are so unreliable as to make his testimony irrelevant and inadmissible. As demonstrated below, Mr. Aertsen's conclusions are based upon an incorrect application of the enterprise discounted cash flow model set forth in McKinsey & Company's *Valuation, Measuring and Managing the Value of Companies*.[1] Further degrading the reliability of Mr. Aertsen's opinions is his misapplication of the McKinsey model to a mix of unverified, inaccurate data and unfounded assumptions, while he ignores contrary, reliable and accurate information which had been made available to the Plaintiff in discovery. As a result, Mr. Aertsen's calculation of "fair value" is nothing more than speculation. This Court should bar any testimony by Mr. Aertsen.

---

[1] There is no dispute that the McKinsey model is a reliable and generally accepted tool for valuing a business.

{W1095302.1}

**II.     ARGUMENT**

Under the Federal Rules of Evidence, this Court is required to perform a "gatekeeper" role with respect to expert testimony.  See Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments.  Rule 702 of the Federal Rules provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Id.  The Supreme Court has established a two-part inquiry by which trial judges must determine the admissibility of expert testimony: (1) whether the reasoning or methodology rests on a reliable foundation; and (2) whether it is relevant to the task at hand.  Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)); see also Kumho Tire, Co. v. Carmichael, 526 U.S. 137 (1999)) (Daubert applies to non-scientific expert testimony.)).  Thus, reliability and relevance are the hallmarks of the Daubert analysis.

The reliability of a proposed expert's testimony depends on whether the expert's methodology has or can be tested, whether it has been subject to peer review, the potential error rate of the methodology and the level of acceptance of the expert's method within the discipline.  Beaudette, 462 F.3d at 25.  While the trial court has a degree of flexibility in assessing whether an expert's opinion is reliable, the burden remains on the expert to "vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data is consistent with the standards of the expert's profession."  Zachar v. Lee, 363 F.3d 70, 76 (1st Cir. 2004).  Simply put, if there is a flaw in the expert's methodology, data or application of the methodology to the data, then his conclusions are similarly flawed.

      A.      <u>Mr. Aertsen's Calculation of the "Fair Value" of FHC is Methodologically Unreliable and Based on Erroneous or Unverified Data</u>

In his Supplemental Disclosure and deposition, Mr. Aertsen claimed to have calculated the "fair value" of Kaplan's FHC stock by following the "enterprise discounted cash flow model for a multibusiness company as a going concern" set out in McKinsey & Company's *Valuation, Measuring and Managing the Value of Companies* (hereinafter "McKinsey Text"). (Pl. Supp. Expert Disclosure at 3.) During his deposition, Mr. Aertsen stated that the McKinsey Text, particularly Chapter 5, was the sole basis of his "fair value" calculation. (<u>See</u> G. Aertsen Depo. Tr. at 33-34, 71-72, 110-11, 160, attached as Exhibit 3.) Specifically, when speaking of the McKinsey book, Mr. Aertsen testified as follows:

> This is the handbook that I have used all of my professional career to calculate in a corporate finance way equity. It is the intellectual framework which comes from Martin Miller and Franco Modigliani who are noble laureates in the sixties later made into practical application by Joel Stern at Stern Stewart, who is our professor in this, and subsequently made its way into virtually all aspects of corporate finance. There isn't anything that I have done since being engaged in this that doesn't involve some aspect of this activity.

(<u>Id.</u> at 33-34.) Mr. Aertsen further testified that the enterprise discounted cash flow model (hereinafter "DCF"), as described on page 104 of McKinsey, is "the way to do it if you want to find the proper value for the equity." (<u>Id.</u> at 72.) Mr. Aertsen cited no other authority to support his "fair value" calculation.

Despite Mr. Aertsen's claim that he implemented the McKinsey DCF analysis as outlined in that text, even a cursory review of his calculations and methodology shows that he did anything but. As David Wessels, co-author of the McKinsey Text and Professor of Finance at the Wharton School of the University of Pennsylvania, succinctly states, Mr. Aertsen's work did not properly apply the principles in the McKinsey Text and his methodology was unlike any that Dr. Wessels has seen. (Declaration of David Wessels ("Wessels Dec.") at 2, filed contemporaneously herewith). Moreover,

Mr. Aertsen's methodology and calculations are further flawed in that he employed improper methods in calculating the free cash flow and weighted cost of capital of FHC and its subsidiaries, failed to use real income and expense data, and improperly ascribed a value to FHC's North Adams property. (See Declaration of Paula Konikoff ("Konikoff Dec"), filed contemporaneously herewith.) Any one of these serious errors is sufficient to preclude Mr. Aertsen's opinions on the value of FHC.

       1.    *Double Counting and Divergence from McKinsey DCF Analysis*

As Dr. Wessels states, Mr. Aertsen improperly combined two methods of valuation, comparable transactions (as outlined in Chapter 11 of the McKinsey textbook) and DCF (as outlined in Chapter 5 of the McKinsey textbook). (Wessels Dec. at 3.) The comparable transactions model of valuation involves "the value of individual assets at their market value." (Id.) Imbedded in the "market value" of an asset, however, is the cash flow stream of that asset. (Id.) Thus, the discounted free cash flow of an asset cannot be added to the market value because it results in a significantly inflated value of that asset, and ultimately the entire business. (Id.) Nevertheless, Mr. Aertsen has tried to do just that. (Id. at 3-4.)

Specifically, "Mr. Aertsen includes both the individual market valuations of FHC's properties (which reflect the capitalization of future cash flows) AND a discounted stream of cash flows." (Id. at 4.) Mr. Aertsen forecasts the future cash flow of FHC by averaging roughly three years of historical profits. (Id. at 4). Included in the historical profits, however, is a $6.458 million gain resulting from the sale of a property. (Id.; see Worksheet No. 1 to Pl. Supp. Expert Disclosure.) Mr. Aertsen's forecasted future profit, purportedly used by him to calculate FHC's discounted free cash flow, therefore, includes projected profits from the sale of property. The projected profit from the sale of property, however, is already included in the market value of that property. (Id.) Thus, Mr. Aertsen's valuation, which includes both discounted cash flow calculations and individual

market values of FHC's properties, twice accounts for the projected future profits from the sale of property.  The result is a significantly inflated "fair value" of FHC.  (Id.)

Mr. Aertsen's valuation clearly disregards the principles set out in the McKinsey Text, resulting in an unreliable "fair value" calculation.  (Id. at 4.)  Since Mr. Aertsen relies exclusively on the McKinsey Text, his failure to follow its methods undermines his entire analysis.  Thus, Plaintiff cannot meet his burden of demonstrating that "the expert's conclusions have been arrived at in a...methodologically reliable fashion."  U.S. v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002).

### 2. *Failure to Consider Tax Consequences and Other Non-Equity Claims*

Mr. Aertsen's erroneous methodology distorts the value of FHC by failing to consider any state and federal tax obligations of the company.[2]  According to the McKinsey Text upon which Mr. Aertsen exclusively relies, taxes must be deducted from the value of an asset. (Wessels Dec. at 4.) Indeed, Mr. Aertsen blithely testified that he "assumed that FHC's Net Operating Loss Carrying Forward ("NOL") of approximately 8 million dollars would offset any future taxes.  (G. Aertsen Dep. Tr. at 130.)  Mr. Aertsen admitted that he made no attempt to calculate the amount of future taxes and, therefore, has no basis for assuming that the approximately $8 million NOL would be a sufficient offset.  (Id. at 130-31.)  Also, Mr. Aertsen's analysis ignores additional claims of approximately $4 million relating to FHC's obligations to a tenant in Bangor, Maine.  (Wessels Dec. at 4.) This omission is inconsistent with the McKinsey Text which requires that "such claims need to be carefully identified and accounted for in determining the value of equity of a company."  (Id.)  Mr. Aertsen's failure to reduce the value of FHC in light of future taxes and existing non-equity claims violates the methodology set out in the McKinsey Text.[3]  Because Mr. Aertsen did not properly

---

[2] As a "C" corporation, Mr. Aertsen testified that FHC would be taxed on gains at ordinary income rates.  (See G. Aertsen Dep. Tr. at 53.)

[3] Mr. Aersten recognized but did not account for the costs of sales, taking the curious position that those costs would be paid by "the Company." (G. Aertsen Dep. Tr. at 45.)

follow the McKinsey method, the only authority he claims to have consulted and relied upon, his analysis and opinions are, at best, speculative and should be excluded from trial. See Baldwin v. Bader, No CV-07-46-P-H, 2008 U.S. Dist. LEXIS 23435, *11-13 (D. Me. March 24, 2008) (excluding expert testimony as to the value of personal guaranties of corporate debt because the treatise upon which the expert relied did not support his methodology).

Mr. Aertsen has not applied the valuation techniques in McKinsey at all, but has, instead, employed a new methodology of his own making, one that is unknown in the valuation field and has not been peer tested. (Wessels Dec. at 2.) See Beaudette, 462 F.3d at 25; CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 888 F. Supp. 192, 199 (D. Me. 1995) (admitting expert testimony so long as the "testimony will be based on information provided by CMM's principals of a type that financial experts typically use in calculating profit and loss"). Mr. Aertsen offered nothing tending even to suggest that his methodology is an appropriate way to determine the "fair value" of a corporation such as FHC. See Reali v. Mazda Motor of America, 106 F. Supp. 2d 75, 77-78 (D. Me. 2000) (excluding expert testimony where the plaintiff failed to produce any evidence supporting the expert's methodology).

In a recent and remarkably similar case, Baldwin v. Bader, *supra*, the United States District Court for the District of Maine excluded a portion of an expert's testimony on business valuation where the expert's opinions were not supported by the professional literature upon which he based his methodology. 2008 U.S. Dist. LEXIS 23435, *11-13 (D. Me. March 24, 2008). In so doing, the court in Baldwin noted that (1) the treatise relied upon by the expert accounted for increases to a guaranty fee but it did not allow for a subtraction of net borrowing from the equity costs as performed by the expert; (2) the treatise endorsed a methodology for calculating a guaranty fee for long-term and unsecured debt, but the

defendant company had substantial short-term debt that was not proven to be unsecured; and (3) the methodology in the treatise applied by the expert was particular to medium-sized to larger companies and the defendant corporation was a small company. Id. at *9-12.

Mr. Aertsen's testimony, like the expert testimony in Baldwin, is not supported by the literature he relies upon. Similarly, Mr. Aertsen references no other authority to support his methodology. In this circumstance, preclusion of the expert's testimony is the only proper course as the proffer constitutes nothing more than unreliable and speculative evidence.

### 3. *Improper Use of Appraisals*

Mr. Aertsen's opinions are further undermined by his use of *pro forma* amounts of income and expense data in the appraisals rather than using the actual expense and revenue numbers available to him. Mr. Aertsen conceded as much during his deposition.

> Q. Did you verify the MAI NOI against actual numbers?
> A. No. We asked for those, and I was told they were unavailable.
> ***
> Q. Okay. Is it your testimony that you never saw the actual rent figures for any property?
> A. Well, I did. I used the ones that were in the appraisals.
> Q. Did you ever look at any actual rent figures?
> A. I assumed the ones that are in the appraisals were the actuals.

(G. Aertsen Dep. Tr. at 81-84.) In claiming that individual property detail was not available to him, Mr. Aertsen apparently forgot the discussion about actual income and expense data set out in FHC's consolidating forms and statements made at Mr. Greenwald's deposition, which he attended. (See Declaration of Stuart Greenwald ("Greenwald Dec."), filed contemporaneously herewith.)

Mr. Aertsen's reliance on unverified financial information contained in the appraisals impacts the admissibility of his ultimate conclusions. See Irvine v. Mudrad Research Lab., 194 F.3d 313, 321 (1st Cir. 1999) (excluding expert testimony not based on sufficient facts or data); Rivera-Cruz v. Latimer, Biaggi, Rachind & Godreau, LLP, No. 04-2377 (ADC), 2008 U.S. Dist. LEXIS

{W1095302.1}

8

46562, *21-22 (D. P.R. June 16, 2008) (same). Moreover, it is contrary to accepted practice in the appraisal industry to rely on unverified numbers when actual data is available. (Konikoff Dec. at 4-5.) Compare Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) (admitting expert testimony that is based on facts reasonably relied upon by others in the field). Indeed, Mr. Aertsen's assertions to this Court in this case demonstrate that reliance on appraisals alone is insufficient to calculate the value of property assets. In his May 4, 2007 Affidavit filed with this Court, Mr. Aertsen stated that "in order to obtain a reliable estimate of the value of the underlying properties" one would need to consider not only an independent appraisal, but also "[t]he income and expense data for each property and any projections used to generate discounted cash flow calculations" and "[a] list of the tenants of each property and a summary of the lease terms for each tenant." (Aertsen Affidavit at 3, filed May 7, 2007, Document. No. 90-2.) Under the case law, accepted practice in the appraisal business and Mr. Aertsen's own apparent standards, his valuations of FHC's operating properties and his "fair value" determination are unreliable because he failed to review the actual income and expense information or the tenant information for each property, all of which was readily available.

After repeatedly stating that he had employed McKinsey's DCF analysis, Mr. Aertsen admitted that he had used his version of the McKinsey DCF for most of the properties held by FHC subsidiaries, except the North Adams Parkade for which he claimed not to have net operating income flow. (G. Aertsen Dep. Tr. at 96-101.) For the Main Street NA Parkade in North Adams, Mr. Aertsen conceded that he did not consider free cash flow, but instead employed what he called a "market comparable approach," finding the value of the North Adams property to be almost $14 million. (Id.; Exhibit B to Pl. Supp. Expert Disclosure.)

Moreover, Mr. Aertsen's method for calculating the value of North Adams based on

"comparable transactions" is erroneous.  To calculate the square footage value of the North Adams property, Mr. Aertsen took the appraisal values of FHC's Plainfield, Putnam and West Springfield properties, calculated the per square foot value of each, and divided the sum of those values by three.  (Id.)  Once again, Mr. Aertsen's methodology is flawed because using the simple sales comparison approach noted above to value income producing property is not an accepted method of appraisal.  (See Konikoff Dec. at 4.)  Mr. Aertsen improperly assumes that the North Adams property is directly comparable to Plainfield, Putnam and West Springfield, even though "real estate professionals know that comparability is based on factors other than purely physical attributes, as stated in the CBRE appraisal reports" upon which Mr. Aertsen relies.  (Id.)  Mr. Aertsen failed to consider the leasing status or occupancy rate of the "comparable" properties despite the fact that North Adams had a high vacancy rate as of September 15, 2005.  (Id.)  Mr. Aertsen's improper use of a comparable transactions model and his selection of dissimilar properties demonstrates the unreliability of his method and his conclusions.

Mr. Aertsen's attempts to value FHC's operating properties by using invalid comparables in the case of North Adams and misuse of the McKinsey model are examples of the practice of filling in "an evidentiary vacuum with principles and methods." Downeast Ventures, LTD. v. Washington County, No. 05-87-B-W, 2007 U.S. Dist. LEXIS 14733, *11 (D. Me. March 1, 2007).  Failure to compile and analyze properly the real "data" to support his conclusions means that Mr. Aertsen's testimony does not pass muster under Rule 702 and should be excluded.  Id. at *10-11.

### III.   CONCLUSION

For the reasons stated herein, FHC and Neil Ellis respectfully request that this Court preclude Mr. Aertsen from testifying as an expert in this matter.

Dated this 10th day of July 2008.

                                                  RESPECTFULLY SUBMITTED,

/s/  Peter W. Culley
Peter W. Culley
Gavin G. McCarthy
Pierce Atwood LLP
One Monument Square
Portland, ME 04101
(207)-791-1100
pculley@pierceatwood.com

/s/ John B. Nolan
John B. Nolan
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275-0100

*Attorneys for Defendant*
*First Hartford Corporation*

/s/ Joseph H. Groff, III
Joseph H. Groff III
Jensen Baird Gardner & Henry
Ten Free Street, P.O. Box 4510
Portland, ME  04112
jgroff@jbgh.com

*Attorney for Defendant Neil Ellis*

## **CERTIFICATE OF SERVICE**

      I hereby certify that I filed the foregoing with the Court's CM/ECF service, which will distribute copies to all counsel of record.

DATED:  July 10, 2008

                                              /s/  Peter W. Culley
                                              Peter W. Culley
                                              Pierce Atwood LLP
                                              One Monument Square
                                              Portland, ME  04101
                                              (207) 791-1100

                                              *Attorneys for Defendant*
                                              *First Hartford Corporation*