1           UNITED STATES DISTRICT COURT

2                DISTRICT OF MAINE

3    _____

4    RICHARD E. KAPLAN,                CIVIL ACTION

5              Plaintiff        Docket No:  05-144-P-H

6

7        -versus-

8                                 Trial Day 5

9    FIRST HARTFORD CORPORATION
     and NEIL ELLIS,
10            Defendants
11    _____

                 Transcript of Proceedings
12
     Pursuant to notice, the above-entitled matter came on
13   for **Trial** held before **THE HONORABLE D. BROCK HORNBY,**
     United States District Court Judge, in the United
14   States District Court, Edward T. Gignoux Courthouse,
     156 Federal Street, Portland, Maine, on the 25th day of
15   July 2008 at 9:06 A.M. as follows:

16   Appearances:

17   For the Plaintiff:  Thomas C. Newman, Esquire
                         Sarah A. McDaniel, Esquire
18
     For the Defendant
19   First Hartford:     John B. Nolan, Esquire
                         Peter W. Culley, Esquire
20                       Gavin G. McCarthy, Esquire

21   For the Defendant
     Neil Ellis:         Joseph H. Groff, III, Esquire
22
     Amicus:             Robert W. Frank, Esquire
23
                  Lori D. Dunbar, RMR, CRR
24              Official Court Reporter

25        (Prepared from manual stenography and
              computer aided transcription)

```
 1                       I N D E X

 2   Witness                Direct  Cross  Redirect  Recross

 3   Timothy Riddiough          3     54      --       --

 4   Nancy Fannon              86  183, 186   --       --

 5   David Harding            205     --      --       --

 6   Richard E. Kaplan        218     --      --       --

 7   Guilliaem Aertsen        227     --      --       --

 8

 9

10                     E X H I B I T S

11   Number          Description           Page/Admit

12   Defendant's

13       33          Income Statement          85

14       34          Consolidation             85

15       35          Consolidation             85

16       36          Mortgage Loans            85

17       38          Consolidation             85

18       40          Consolidated Statements   85

19       41          Fannon Report             85

20       48          Rothberg E-mail          224

21

22

23

24

25
```

1                    (Open court)

2           THE COURT:  Good morning, finally sunshine.

3    Welcome back to federal court.  Dr. Riddiough, you're

4    still under oath.  Mr. Nolan, you may continue your

5    examination.

6           MR. NOLAN:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8    BY MR. NOLAN:

9    Q.    All right, Mr. Riddiough, I think we -- when we

10   ended last evening we were just about through on the

11   market valuation of the First Hartford shares.  Again,

12   you -- what was the end result of your calculations on

13   that value?

14   A.    Sure, on the market value I used the last traded

15   share price as of September 15th, 2005, which was $3.25

16   per share.

17   Q.    And is the market valuation that you did a going

18   concern value?

19   A.    Yes, it is.

20   Q.    All right.  And in performing the Delaware block

21   analysis that you did, I think you testified you did

22   two other -- you used two other methodologies,

23   investment value and net asset value; is that right?

24   A.    That's correct.

25   Q.    Is the investment value work that you did, was

1    that related to valuing First Hartford Corporation as a

2    going concern?

3    A.    Yes, it is.  Yes, it was.

4    Q.    And finally on the net asset value analysis and

5    calculations that you did, did that look at First

6    Hartford Corporation as a going concern?

7    A.    No, it did not.  That by definition is a

8    liquidation valuation approach.

9    Q.    And I've been using the term going concern value;

10   what does that mean to someone like you?

11   A.    Well, that means you're dealing with a firm, in

12   this case a publicly traded firm, with management in

13   place that's -- that was the task that was assigned,

14   and to value minority equity interests in that firm, in

15   that publicly traded firm.

16   Q.    When you say minority equity interest, what do

17   you mean?

18   A.    Exactly what I said, which is, for example, the

19   share price, the shares are the traded shares that I

20   examined, the shares that traded in the marketplace, up

21   through September 15th were trades between minority

22   shareholders.

23   Q.    And is that generally the case in the marketplace

24   or in this type of analysis or does it depend?

25   A.    It is, and it's -- it is, it's typically what

1    happens, and it's relevant in this case because we're

2    conducting an analysis of fair value of Mr. Kaplan's

3    shares and he is a minority shareholder.

4    Q.    Now, you mentioned management.  What's the

5    significance of management in valuing a company on a

6    going concern basis?

7    A.    Well, again, there is -- my understanding is

8    there was previously some discussion about management

9    in this case, and the assignment, as I understood it,

10   was that management was going to continue to run the

11   firm even under a finding of oppression; and,

12   therefore, with management in place -- there's no major

13   changes in the operating or financing policies of the

14   firm is basically the bottom line.

15   Q.    Was that your assumption?

16   A.    That's correct.

17   Q.    All right.  And would that assumption have taken

18   into account, for example, any guarantees of

19   indebtedness by one of the principals?

20   A.    Well, I -- it took into account the totality, I

21   think looking at management and the firm as a package

22   deal, if you will.

23   Q.    All right.  Now, the next leg on the Delaware

24   block stool was I believe you testified investment

25   value; is that correct?

1    A.    Yes, investment value came next.

2    Q.    Would you explain --

3          THE COURT:  Mr. Nolan, would you pull the

4    microphone down?  We're in kind of a cave here and

5    sometimes we're having trouble hearing you.

6          MR. NOLAN:  I'm sorry, I tend to mumble, Your

7    Honor.

8          THE COURT:  Thank you.

9    BY MR. NOLAN:

10    Q.    Would you explain to the Court, please, what you

11    did to determine -- first of all, would you explain to

12    the Court what investment value means, what that prong

13    of the Delaware block method is, as you understand it?

14    A.    Yes, it's looking at the cash flows of -- of the

15    firm, in this case First Hartford Corporation as a

16    whole, projecting out those cash flows that the firm

17    generates into the future, and discounting those cash

18    flows to the present to determine a present value, in

19    this case of the equity shares.  And the present value

20    of the discount rate is an appropriate, risk-adjusted

21    rate of return applied at a weighted average cost of

22    capital applied at the firm level.

23    Q.    Is that what you did?

24    A.    That's what I did.

25    Q.    All right.  And would you explain to the Court

1    how you did that.

2    A.    Yeah, sure.   Three basic steps.   There's a

3    shorthand method for using multipliers that gets you to

4    the discounted cash flow, a long stream of income.   And

5    what one does in that case is -- step one is to

6    determine the next year's expected cash flow,

7    stabilized for the firm, in this case on equity, not on

8    the assets as a whole but on the equity interest, based

9    on a measure called FFO, funds from operation.   So step

10   one is to determine the stabilized cash flow.

11         Step two is to capitalize that cash flow up at

12   an appropriate rate.   If you invert the capitalization

13   rate that becomes what's called a multiplier.   It's

14   very important that the multiplier reflect the risks of

15   the cash flows that you're valuing and then one

16   multiplies -- takes that multiplier, multiplies --

17   takes the multiplier, multiplies the stabilized cash

18   flow to come up with an estimate of firm value, in this

19   case the equity interest in First Hartford Corporation.

20   Q.    And how did you determine what the stabilized

21   cash flow is?

22   A.    I looked at four years' worth of income for First

23   Hartford from 2004 through 2007 and looked at income --

24   after-tax income from operations.   Excluded -- again,

25   the number we looked at, which is the standard in the

1    industry, in the real estate industry for REITs, real

2    estate investment trusts and real estate operating

3    companies, which is called funds from operation.  We

4    ended up using an adjusted funds from operation number,

5    but basically -- the basic idea is to take after-tax

6    income, exclude depreciation.  In this case -- and

7    there's a few other more minor exclusions, some

8    amortization and so forth, but in this case we deviated

9    from the standard definition of funds from operation to

10   recognize the cash flows that First Hartford generates

11   from the sale of assets since that's part of their core

12   operating business.

13   Q.    And First Hartford Corporation is not a REIT.

14   A.    That's correct.

15   Q.    And REIT is an acronym for real estate investment

16   trust; is that correct?

17   A.    That's correct.

18   Q.    And what is a real estate investment trust?

19   A.    It's a -- it's basically a creature of the tax

20   code.  It's a firm -- typically when we're referring to

21   REITs, and in this case certainly when I refer to

22   REITs, I'm referring to publicly traded companies.  But

23   they're firms that don't pay any taxes at the entity

24   level, and in return there are certain restrictions

25   that they have to comply by for not having to pay

1    taxes.   Most REITs I'm looking at what are called

2    equity REITs in this case.   These firms again are

3    publicly traded and they hold commercial real estate

4    assets.   More specifically I'm going to be looking at

5    firms that hold retail assets so that they're

6    comparable with First Hartford.   If I may, can I -- I

7    didn't finish my previous answer --

8    Q.    I'm sorry, yes.

9    A.    -- on the methodology --

10   Q.    Yes.

11   A.    -- for the stabilized cash flow.

12   Q.    Yes, please.

13   A.    So I looked at four years' worth of cash flows,

14   from 2004 through 2007, taking after-tax income,

15   recognizing gains from the sale of assets, excluding

16   depreciation, adding -- accounting for a few other

17   items as well along the way, to try to be fair about

18   pluses and minuses that are coming in over that time,

19   took an average of that four years.   We actually -- we

20   ended in 2007, fiscal year 2007, which ends April 30th,

21   2007, which means that for that final year we were

22   looking into the future as of the valuation date.   We

23   did that.   There's a foundation for that in the

24   literature to do that.   You're looking at -- you're

25   supposed to be forming expectations about the next

1    year's cash flow.  It's appropriate if you've got a

2    short-time series of cash flows to look forward if the

3    next year's income is reflective of what you think

4    expectations are.  So we did these -- some historical

5    cash flows and then basically one year forward cash

6    flow to obtain an average to estimate a stabilized cash

7    flow for First Hartford Corporation.  So that was step

8    one.

9    Q.    What was step two?  And then I want to go back

10   and talk a little bit about each of these steps.

11   A.    I'm sorry?  I didn't hear the question.

12   Q.    What was step two?

13   A.    Okay, step two was then to -- and let me also say

14   that again for step one, when one is doing investment

15   value for publicly traded firms, you -- one aggregates

16   cash flows across the entire firm.  You don't look at

17   the cash flows piecemeal.

18   Q.    I think I'm going to --

19   A.    You -- okay, so I just wanted to make that point.

20   Q.    Okay, I'm going to withdraw that question about

21   step two.

22          You said that you used -- looked at the years

23   2004 through 2007.

24   A.    Correct.

25   Q.    And did you -- why didn't you use the years

1    before 2004?

2    A.    Cash -- the income was much lower in those years

3    leading up to 2004, didn't suggest that the income was

4    stabilized.  We ended up using some fairly high-income

5    years once you add back in sales of assets.

6    Q.    Prior to 2004 did First Hartford have a series of

7    years where there were losses?

8    A.    That's correct.

9    Q.    Okay.  And --

10   A.    And one could characterize them as cash flow

11   constrained.

12   Q.    Pardon me?

13   A.    One could characterize the firm as being cash

14   flow constrained.

15   Q.    Now, would you refer to Exhibit 4 to your report,

16   which is Exhibit 45?  That's in the back, Your Honor.

17              What does Exhibit 4 show, Mr. Riddiough?

18   A.    It basically shows the detail underlying the

19   method that I just described for determining the

20   stabilized cash flow for First Hartford Corporation.

21   So it shows the years 2004 through -- fiscal years 2004

22   through 2007, starting with adjusted income or loss

23   after tax, adding back depreciation, adding back

24   amortization, which are standard add-backs, to

25   determine what's called funds from operation.  Note

1    that this is also after interest on the debt, so this

2    is a -- this is valuing equity interest of the firm.

3    Q.    And --

4    A.    Line D is -- I'm sorry.

5    Q.    Go ahead.

6    A.    Line D is gain on the sale of real estate, the

7    net gain after tax of First Hartford Corporation in

8    those years, and that's where we deviated from the

9    standard definition of funds from operation to

10   recognize First Hartford's operating policies of

11   selling assets.  And then there's recognizing some

12   minority interests and equity income from other sources

13   as well.  And then Line G is where we end up with

14   what's called adjusted funds from operation.

15          There was one other sort of major adjustment

16   here, which is that in 2006 First Hartford Corporation

17   effectively refinanced most or all of their mortgage

18   debt, and they incurred about a half a million dollars

19   of transaction costs associated with that and we -- we

20   added that expense back in.  So we actually inflated

21   funds from operations to recognize this one-time

22   expense and benefit.

23   Q.    Again the purpose for coming up with this

24   exercise to create a funds from operation, what was the

25   purpose of that?

1   A.    Again, that's step one in this valuation

2   exercise, the shorthand valuation exercise, which is to

3   value First Hartford Corporation in a discounted cash

4   flow approach at the firm level.

5   Q.    But this is not a -- I think you said funds

6   from -- there's a difference between funds from

7   operation and a regular definition of cash flow,

8   adjusted cash flow.

9   A.    Yes, this is a -- funds from operation is a

10  standard term created by the National Association of

11  Real Estate Investment Trusts to help analysts and

12  investors understand how to value -- basically how to

13  value the companies.  So in the industry analysts often

14  talk about funds from operation and multiples of funds

15  from operation to estimate what the value of companies

16  are.

17  Q.    In layman's terms are you taking the First

18  Hartford data and adjusting it so that you can use it

19  to compare against a universe of REITs?

20  A.    That's correct.

21  Q.    In your opinion was that the best way to come up

22  with an investment value for this firm, for First

23  Hartford?

24  A.    Yes, it was, and that's -- that's -- so at this

25  point in step one, just to be clear, we haven't gotten

1  to the real world yet.  We are just dealing with First

2  Hartford Corporation and their -- their profitability.

3  Q.    All right.  Let's --

4  A.    And maybe if I could finish -- just finish this

5  table quickly just for completion, which is that Line G

6  then is what we refer to as adjusted funds from

7  operation; again, that differs from the standard

8  definition only in that we add back -- it's basically

9  Line D is the major difference, adding back gains on

10  sales of real estate.  Then we take an average across

11  those four years to -- so the adjusted FFO number that

12  we will be using in the analysis is 2,281,559.  And

13  then from there we're just basically converting it to a

14  per share basis.

15  Q.    Okay.  Now, is this number before tax or after

16  tax?

17  A.    It's after tax.

18  Q.    All right.

19  A.    Which is the appropriate way to deal with it.

20  Q.    Excuse me?

21  A.    It's after tax, which is the appropriate method

22  for valuing firms.

23  Q.    Okay.  Did you do any tax analysis yourself?

24  A.    No, not really.  Other -- I -- nothing

25  independently.

1    Q.    Okay.  And Exhibit D --

2    A.    I relied on First Hartford's financial

3    statements, and then in the third analysis I relied on

4    Mr. Lyons, who did a tax analysis.

5    Q.    Who's Mr. Lyons?

6    A.    My understanding is he was an expert hired by

7    First Hartford Corporation to conduct some tax analysis

8    on the firm.

9    Q.    And you relied --

10   A.    As -- when -- as liquidated.

11   Q.    Did you rely on Mr. Lyons' tax analysis?

12   A.    I did.

13         MR. NOLAN:  Just for the record that's D44,

14   Your Honor.  We're not offering it.

15   BY MR. NOLAN:

16   Q.    Let's now get back to this funds from operation.

17   Did I understand you correctly to say that you added

18   back the financing costs?

19   A.    Yes, I mentioned in 2006, if you look at -- it's

20   in a footnote here, Footnote F, there's an indication

21   that there was some refinancing costs assoc -- that's

22   embedded in -- embedded in the equity income or loss on

23   consolidated subsidiaries, so that's where it showed

24   up.

25   Q.    So you added those costs of that back into the --

1    into your --

2    A.    We felt that was fair, yes, there was -- there

3    was expenses one time, but then there were -- for the

4    refinancing obviously there were some benefits that

5    were difficult to account for, so we assumed that the

6    benefits and the expenses offset one another.  And

7    again what this did was the -- the effect was to

8    increase the adjusted FFO number.

9    Q.    Was that appropriate to do in your opinion?

10   A.    In my opinion, yes.

11   Q.    And that actually -- does that actually tend to

12   raise the value?

13   A.    Yes.

14   Q.    Now, the second step was what?

15   A.    Okay, the second step was then to determine a

16   multiplier, a multiple that one applies to that

17   stabilized cash flow number.  That in a nutshell was

18   the second step.

19   Q.    And tell the Court, please, how you did that.

20   A.    Sure.  Effectively what you're -- what one is

21   doing there is applying an appropriate weighted average

22   cost of capital across the entire firm, also recognize

23   implicit growth in the adjusted FFO over time.  And one

24   has to appropriately -- so it's a weighted average cost

25   of capital for the firm or a discount rate, and that

1    has to reflect the risks specific to the firm across

2    the entire firm.

3            What I did was what -- what's generally done

4    is one compares the firm that you're valuing with other

5    firms and the multiples of those firms.  And we ended

6    up -- or I ended up with Analysis Group -- working with

7    Analysis Group, but I ended up focusing on real estate

8    investment trusts, which are a little bit different for

9    First Hartford Corporation, because there were not

10   other real estate operating companies that were similar

11   enough to First Hartford Corporation to use as

12   comparables, so instead I used real estate investment

13   trusts as comparables.

14           Again, these are publicly traded firms that

15   hold ownership interests in commercial real estate.

16   These are retail -- I focused only on 31 companies that

17   hold retail property, and so I looked at a group of 31

18   companies, hold retail assets, took their multiples,

19   their adjusted FFO multiples, apples to apples with the

20   way that First Hartford was done, and then adjusted

21   using statistical analysis, regression analysis,

22   adjusted the -- the adjusted FFOs for these REITs to

23   reflect the risks of First Hartford Corporation.  And

24   do you want me to -- do you want me to stop there or

25   keep going?

1    Q.    Why don't you stop for a second.  You identified

2    31 REITs that had certain characteristics?

3    A.    That's right, we wanted to have comparables to

4    First Hartford Corporation.  First Hartford Corporation

5    primarily owns shopping centers, retail, and so we

6    wanted the -- we wanted to match that.  That seemed to

7    be the most important thing to match, so we chose

8    REITs, real estate investment trusts, that held retail

9    property throughout the United States.

10   Q.    And are those listed on -- in your report on

11   Exhibit 5, those 31 REITs?

12   A.    Yes, they are.

13   Q.    And is certain information relating to those

14   REITs listed on Exhibit 5?

15   A.    That's correct.

16   Q.    And is that data that was collected under your

17   direction?

18   A.    That's correct.

19   Q.    And you analyzed the data.

20   A.    I looked over the data, yes.

21   Q.    Okay.  Now, what did you -- what conclusions did

22   you draw from that data that's on Exhibit 5?

23   A.    Sure.  Let me describe a little bit more the

24   method, and then I'll get to the conclusions, if it's

25   okay.

1   Q.    Fair enough.

2   A.    The -- these firms, even though they're

3   comparable to First Hartford, they do differ in their

4   risk characteristics, so one has to adjust.  Using the

5   statistical analysis I adjusted the FFOs to try to get

6   an apples-to-apples comparison with First Hartford

7   Corporation.  And the adjustments were along four

8   dimensions reflecting differences in risks across the

9   firms.  One was leverage; two was the size of the firm;

10  three was the kind of retail property that was held by

11  these REITs relative to First Hartford Corporation, for

12  example, the difference between freestanding -- small,

13  freestanding retail properties and malls; and finally

14  the location of the assets.  All four of those factors

15  matter, are generally recognized as mattering in terms

16  of affecting the multiples that are generated by

17  companies.

18          So we adjusted -- the bottom line is we

19  adjusted -- we looked at these 31 companies and we

20  adjusted the FFOs to reflect characteristics -- the

21  risk characteristics of First Hartford Corporation,

22  again along those four dimensions, debt, size, type of

23  retail property held, location, and then generated a

24  multiple for First Hartford Corporation.  That's the

25  end of the methodology part, summarized.

1    Q.    Fair enough.

2    A.    And if you'd like, the output of the model, the

3    statistical model, can be seen in Exhibit 6.

4    Q.    Okay.  Why don't you explain Exhibit 6, then, to

5    the Court.

6    A.    Sure, it's basically the outcome of a regression

7    analysis.

8    Q.    What's a regression analysis?

9    A.    It's statistical analysis where you're fitting

10   data, basically lineally fitting data, recognizing that

11   certain variables will affect the variable that you're

12   interested in.  In this case the variable we're

13   interested in is an adjusted FFO multiple, and so

14   that's the thing on the left-hand side of the equation.

15   On the right-hand side of the equation then are the

16   factors that affect the variable we're interested in.

17   And those factors are stated there in Exhibit 6, the

18   natural logarithms of the assets, which is basically

19   the size variable, the debt ratio, so the debt ratio,

20   the location of the REIT, so that's recognizing

21   locational factors, and then fourthly the kinds of

22   retail property held by the REIT.  So what one can see,

23   the interpretation of the numbers that you see in

24   Exhibit 6, is that larger firms you can see that the

25   estimate on the log of the assets is positive.

1    Q.    What's the significance of that?

2    A.    Basically that says that larger firms have higher

3  multiples, they're less risky, which is what one would

4  expect.  That's very consistent with the literature.

5  Try to move down through the table.

6    Q.    Move down to the debt -- what is the significance

7  of the debt ratio?

8    A.    Sure.  Higher debt ratio means that the equity is

9  riskier, higher leverage means riskier equity, which

10  means a lower multiple, so that's a standard -- that's

11  a standard result, very well known in the literature.

12  More risk, higher required return, basically what that

13  says.

14    Q.    And then the next item is REIT is located in the

15  northeastern United States.

16    A.    Right, so -- and that's -- First Hartford is

17  located in the northeastern United States, so that

18  indicates that firms located -- retail REITs located in

19  the northeastern United States trade at lower multiples

20  than firms that aren't located in northeastern United

21  States.

22    Q.    Then it says --

23    A.    There are some reasons that may be the case.

24    Q.    What do you think the reasons are?

25    A.    Well, the northeastern U.S. retail tends to be a

1    little more fragmented in terms of ownership than it is

2    in other parts of the country where it's more

3    consolidated, so in -- it's basically a monopoly power

4    pricing thing.  So there's more competition, you may

5    not be able to command the kinds of prices and rents

6    and so forth that you would in an area outside the

7    northeast where you might have more monopoly power.

8    That's basically what I think is going on.  I've had --

9    when I was at MIT I had some students study this, so

10   that's consistent with what we found there.

11   Q.    And the fourth variable is REIT classified as

12   investing in shopping centers and/or regional malls.

13   A.    Right, so First Hartford Corporation invests in

14   shopping centers as opposed to standalone retail

15   property, so firms that have -- invest in shopping

16   centers and regional malls tend to trade at higher

17   multiples, roughly an additional factor of two in the

18   multiple.  That makes sense because shopping centers

19   and malls have multi-tenanted, there tend to be fewer

20   of them, they're more valuable relative to

21   freestanding.  So that's a natural expected result as

22   well from the model.

23          The stars next to each -- so that's the four

24   variables.  The stars indicate that each of those

25   variables, all four variables, are statistically

1   significant, which means they matter in explaining the

2   adjusted FFO.  So they matter, they have the expected

3   size, and they're the kind of variables one would

4   normally -- that have been used and one would use to

5   adjust to get -- to adjust firms to get to an adjusted

6   FFO number.  You can also -- the thing called the R

7   squared or the adjusted R squared tells you the

8   significance of the overall model, so it's about point

9   6.  And the closer it is to one, you're explaining

10  lots -- you're explaining everything if it's one; if

11  it's zero you're explaining nothing.  An R squared of

12  about point 6 means that you're explaining quite a bit

13  of the variation in adjusted FFO and that's a good fit,

14  suggests that it's a good model.

15  Q.    Okay.  And there is the term constant; would you

16  explain what that means?

17  A.    There's also a constant, just, you know,

18  algebraically there's a constant term also.  And it's

19  estimated as --

20  Q.    And the N refers to the 31?

21  A.    31 firms, correct.

22  Q.    So in your opinion what was the next step in the

23  model after the regression analysis was completed?

24  A.    So with this model, with this regression model,

25  then one plugs in the actual natural logarithm of the

1   assets held, the size of First Hartford Corporation,

2   you plug that into the model, multiply that logarithm

3   of the assets times point 531.  Then you -- then you

4   take the actual debt ratio of First Hartford

5   Corporation, plug that in, multiply that by the

6   coefficient of minus point 139.  The next one was the

7   REITs located, that's what's called a dummy or an

8   indicator variable, First Hartford's located in the

9   northeastern United States, you plug in a one, that

10  reduces the adjusted FFO by 1.384.  You plug in a one

11  finally on the last variable because First Hartford

12  Corporation invests in shopping centers, and that adds

13  1.964, and then you add in the constant and out pops a

14  multiple from the model, and the multiple we calculated

15  was 4.1.

16  Q.    And then when you have that multiple what did you

17  do next?

18  A.    Final step is straightforward, which is to take

19  that multiple of 4.1, multiply it by the stabilized

20  cash flow number of 2 million -- it's on Exhibit 5,

21  2 -- Exhibit 4, sorry.  Take 4.1, multiply it by the

22  2,281,559, or you could take the 4.1 and multiply it by

23  Line J, which is the adjusted FFO per share, 74 cents

24  per share times 4.1, and then you end up with an

25  estimated value of the shares using the investment

1    value approach.  And that came out to be $3.05 a share,

2    which is very close, within 10 percent.  I think it's

3    6 percent of the share price.

4    Q.    All right.  And the fact that the numbers came

5    out close, does that -- did that have any significance

6    to you?

7    A.    Yes, it did, in the sense that it tended to

8    validate or reinforce the share price number, which

9    is -- which I think is the most reliable number by far

10   in terms of calculating fair value.

11   Q.    And the third methodology that you employed was

12   net asset value.

13   A.    That's correct.

14   Q.    Would you explain to the Court what you did in

15   calculating net asset value.

16   A.    Yes, in a nutshell the approach there is to --

17   it's basically the liquidation value of the firm, so

18   it's the asset value of the firm net of all transaction

19   costs, including taxes, associated with a liquidation,

20   basically a breakup value of the firm.

21   Q.    Okay.  Now, you said that was a -- after taxes.

22   A.    That's correct, after taxes.

23   Q.    And --

24   A.    And other transaction costs associated with

25   breaking up the firm, as best we could estimate.

1    There's a -- a lot going on when one has to break up a

2    firm, and there's probably a number of other hidden

3    costs that we weren't able to account for.  We did the

4    best -- we did the best -- myself and the Analysis

5    Group did the best we could in terms of estimating the

6    value, the breakup value.

7    Q.    And in broad terms what was -- what was the

8    methodology that you used?

9    A.    Sure, it's -- it's first to -- First Hartford

10   owns real estate assets, so first it was to estimate

11   the equity value associated with the real estate

12   assets; and secondly, recognize equity interests

13   associated with real estate-related kinds of assets,

14   options, the CVS contract and so forth; and then

15   finally recognize the value of the net cash position of

16   the firm.  Again -- and involved with that is to -- is

17   to recognize and subtract out the debt interest.  So

18   you first estimate the value of the assets, you

19   subtract off debt that's associated with that,

20   transaction costs associated with liquidation, and then

21   also taxes associated with liquidation.  But basically

22   there's three main parts, which is the -- which is the

23   real estate, real estate-related assets, and then the

24   net cash position, net.

25   Q.    And again, is net asset value -- the net asset

1    value a reflection of a going concern value?

2    A.    No, it's not.  And again, that's an important

3    distinction and it -- and let me just say it's an

4    important distinction and it required an adjustment.

5    Again, we're -- the valuation exercise is to recognize

6    First Hartford as a going concern, the minority equity

7    interest in the firm.  The breakup value, the net asset

8    value, does not recognize -- the basic approach does

9    not recognize the minority interest part of First

10   Hartford Corporation, so that's an additional step that

11   came at the end of the valuation exercise.

12   Q.    Now, what was the first step in this analysis?

13   A.    The first step was to estimate the asset values

14   of the real estate owned by First Hartford as of the

15   valuation date.

16   Q.    And how did you do that?

17   A.    Well, basically I relied on some -- on a report

18   that was generated by Ms. Konikoff where she valued

19   most of the assets held by First Hartford Corporation

20   as of September 15th, 2005.

21          MR. NOLAN:  And, Your Honor, that expert

22   report is No. D43.

23   BY MR. NOLAN:

24   Q.    You relied on Ms. Konikoff's work in doing this

25   part of the valuation?

1    A.    I did.

2    Q.    And you have confidence in her as a real estate

3    professional?

4    A.    Yeah, I looked at the -- I read through the

5    report and I looked at her qualifications.  She's an

6    adjunct at NYU; she's involved at a high level with the

7    Appraisal Institute; she seemed eminently qualified to

8    me.

9    Q.    And what is your understanding of what

10   Ms. Konikoff did that you relied on?

11   A.    My understanding is that she took existing

12   appraisals on the assets when they existed and examined

13   those appraisals for accuracy as well as updated the

14   appraisals to incorporate new information if that was

15   necessary as well.

16   Q.    All right.  And at this stage of your analysis

17   are you taking taxes into account?

18   A.    No, I'm not.

19          THE COURT:  Taking what into account?

20          MR. NOLAN:  Taxes, income taxes.

21   A.    I am not, no.

22   BY MR. NOLAN:

23   Q.    I thought you said at some point that you did

24   take taxes into account?

25   A.    I did later, that's a later step.

1    Q.    Okay.  So after you -- what was the next step

2    after you took the -- used the review appraisals that

3    Ms. Konikoff prepared?

4    A.    If I could refer the Court to Exhibit 8, that

5    outlines the basic -- the basic steps.

6    Q.    Just before you get to that, does Exhibit 7 show

7    the appraisals that you relied on?

8    A.    Oh, yes, I'm sorry, that's the -- that's the

9    place to start.

10   Q.    What is Exhibit 7, sir?

11   A.    It identifies ten real estate assets owned by

12   First Hartford Corporation as of September 15th,

13   commercial real estate assets.

14   Q.    All right.  And there's a Footnote 1; what is

15   Footnote 1?

16   A.    It says there's no appraisal for the North Adams

17   property.

18   Q.    Okay.  And is it your understanding that there

19   were existing appraisals that Ms. Konikoff reviewed for

20   properties No. 1 through 10?

21   A.    I --

22         MR. NEWMAN:  Excuse me, I'm going to object at

23   this point.  We didn't object to the identification of

24   Ms. Konikoff's report and the fact that this witness

25   relied upon it, but it's hearsay that isn't being

1   produced and we didn't object to the admission of that,

2   it's not being offered, so I would object to having

3   this witness report what he thinks Ms. Konikoff did in

4   that appraisal.  It's one thing to rely upon the

5   results, which he's done, but another thing to start

6   reporting what he thinks Ms. Konikoff did in that

7   appraisal analysis, so I object.

8            MR. NOLAN:  This item is in evidence, Your

9   Honor.  It's part of an exhibit that came in without

10  objection, and I think he's entitled to explain to the

11  Court what his understanding is since he relied on the

12  information on Exhibit 7.

13           THE COURT:  The Konikoff report is in

14  evidence?

15           MR. NOLAN:  No, this Exhibit 7 is in evidence,

16  and I'm asking him to --

17           THE COURT:  He can give his understanding; I

18  will allow argument as to the weight of that.  He can

19  give his understanding.

20           MR. NOLAN:  Thank you, Your Honor.

21  A.   I'm sorry, could you restate the question,

22  please?

23  BY MR. NOLAN:

24  Q.   Would you explain to the Court what is shown on

25  Exhibit 7 and what you relied on?

1    A.   Yes, there's ten real estate assets owned by

2    First Hartford -- or where they have an ownership

3    interest at least in those assets, with an appraisal --

4    with a valuation on the asset itself listed under the

5    column marked appraisal, as well as the date -- the

6    appraisal date and the appraisal source.  So in -- of

7    the ten properties Ms. Konikoff provided a valuation

8    for seven.

9         For the Lubbock shopping center she, and

10    therefore I, relied on the CB Richard Ellis appraisal.

11    In that case First Hartford only has roughly a

12    2 percent interest in that asset, so any adjustments

13    that one would make probably would not make very much

14    difference.  And then there was no appraisal on -- no

15    original appraisal on North Adams, and Bangor was sold

16    in 2006 and there was some profit that was recognized

17    associated with that asset accounted for separately.

18    Q.   Okay, now, what was the exercise -- the purpose

19    of this first step or -- withdraw that question.

20         What would you call this first step in the

21    calculation; does it have a name?  What were you trying

22    to determine?

23    A.   Again, we're -- the idea here is to determine the

24    breakup value, the liquidation value of First Hartford

25    Corporation, and one -- one needs to do that more or

1    less on an asset-by-asset basis, at least with the

2    major -- the major assets.  So we're trying to identify

3    each major asset individually, attach a value to it.

4    We're working towards a net equity value because that's

5    the interest that we're valuing here.  So we're

6    starting with the asset value, we're going to work

7    towards an equity value, recognizing the transaction

8    costs along the way associated with breaking the firm

9    up.

10   Q.    Then you were about to explain to the Court

11   Exhibit 8 to your report.

12   A.    Yes.

13   Q.    And please explain Exhibit 8 to the Court.

14   A.    Okay, so if you look at Exhibit 8, the numbers

15   that are on Exhibit 7 for appraisal are copied on to

16   the column in Exhibit 8 marked appraisal value,

17   Column A.  And then the next step is to subtract off

18   the mortgage balance to get a gross equity interest.

19   Then the next column -- for each of these assets.  Then

20   the next column is to subtract off the cost of sales,

21   which was assumed to be 2 percent, which is pretty

22   standard in the business.  So that's 2 percent of the

23   asset value in Column A.

24          Then if you're going to sell this thing, this

25   was a conservative assumption, these mortgages we

1    assumed or I -- I assumed, we -- we doing the analysis

2    assumed that they would be a -- that the mortgages

3    could be assumed by the new owner at either a half

4    percent or 1 percent of the mortgage balance.  In

5    reality this was conservative leading to higher values

6    than one would obtain otherwise, because in reality

7    most of the mortgages would have to be defeased or paid

8    off because there's guarantees associated with them and

9    other -- other things specific to First Hartford

10   Corporation.  And if these mortgages were in fact

11   defeased, which would probably be the case, the

12   defeasance costs would probably be significantly higher

13   than what we have listed here.  But for simplicity

14   we -- for simplicity we assumed -- and to be

15   conservative we assumed an assumption fee of a half to

16   1 percent of the mortgage balance, depending on what we

17   saw in the contract language.

18              So if you take -- then the next column, E, is

19   to take Column A, subtract off B, subtract off C,

20   subtract off D to get the -- what's called the net

21   asset value, which is the net equity interest in the

22   asset.  And then the final step is to multiply the

23   ownership stake that First Hartford Corporation has to

24   obtain their equity interest, their net equity

25   interest, in each of these assets.  And we get down

1    to -- when you add everything up you get to just under

2    $20 million.

3          Now, there's two exceptions, the North

4    Adams -- to this valuation -- there's two exceptions to

5    this valuation methodology.  North Adams we did not

6    recognize any value.  I did not recognize that because

7    my understanding is is that this asset is mostly

8    vacant, requires significant costs to fully tenant, and

9    has a high mortgage balance.  So in other words, the

10   value of the asset is below -- less than the value of

11   the debt, it's got a negative equity interest, and

12   therefore I recognized zero value for North Adams.

13         And then Bangor shopping center, that was --

14   the 5 million 7 is to recognize the -- as best we could

15   a good estimate of the sales value associated with --

16   to First Hartford the sales value associated with

17   Bangor.  So that's not based on any sort of appraised

18   value; that's based on actually sales data for the

19   5 million 7.  And then you add everything up for the

20   ten major assets and that's a number that's just under

21   $20 million.  So that gets us to the -- to the value of

22   the real estate assets net of transaction costs but

23   before taxes.  So we still have not accounted for

24   taxes; this is pretax.

25   Q.    And there are some other items at the bottom, the

1    options and other contracts?

2    A.    Yeah, this is what I mentioned in terms of some

3    of the other real estate-related assets, so it was an

4    attempt to value these other six assets.

5    Q.    And Roswell, what's Roswell?

6    A.    Roswell's a property -- I don't remember the

7    details on Roswell, other than it's a -- it's a

8    small-ticket item of about $50,000 value.  I don't

9    remember the details on Roswell.

10   Q.    Perhaps if you looked at Footnote 3 to your --

11   A.    It's land.

12   Q.    It might refresh your recollection.

13   A.    Right, it's land, I forget where it's located.

14   There's no appraisal on the property, so we're relying

15   on Realtor estimates of a hundred thousand.  It's a

16   small value.

17   Q.    Okay.  And also we've heard some testimony

18   yesterday about Edinburg, Texas, and there was a

19   reference in the options and other contract section of

20   Exhibit 8 entitled Rio Grande -- would be Grande, I

21   guess -- Rio Grande shopping center, Edinburg, Texas,

22   $50,000, that's Footnote 4.

23   A.    That's the option that they paid as of the date.

24   The discussion yesterday was based on all kinds of

25   information that came in after the valuation date.

1    Q.    All right.  But they have -- your

2    understanding -- is it your understanding that First

3    Hartford on -- had paid $50,000 as of September 15th

4    for an option to purchase that property?

5    A.    That's correct.

6    Q.    And you valued that at cost as of September --

7    A.    As of the option cost.  One has to keep in mind

8    that it's just only an option.  One has to -- in order

9    to realize the value associated with that option, land

10   to put a building on it, one has to -- a firm has to

11   incur significant costs to make that asset productive.

12   And so to go beyond the $50,000 cost at this stage, at

13   that stage in 2005, would be highly speculative.

14   Q.    All right.  So then you have not -- this number

15   at the bottom, then, total First Hartford pretax net

16   asset value, 19,934,587?

17   A.    That's correct.

18   Q.    So that's the pretax net asset value, correct?

19   A.    Correct, associated with real estate and real

20   estate-related assets.

21   Q.    And actually, if you look at Exhibit 9, is there

22   further explanation of the -- what you call the options

23   and other contracts?

24   A.    It's partly -- partly a replication of what you

25   see on Exhibit 8 in the footnotes, but it does provide

1    a little bit more detail as to the assumptions.  For

2    example, the CVS asset has cancellation clauses, you

3    know, these are the kinds of assets that are specific

4    to the firm, that if you liquidate -- if one liquidates

5    it's very difficult to redeploy assets like this.  So

6    the value -- the value of CVS is very specific to

7    management, current management team, would likely

8    have -- highly likely have zero value in liquidation.

9    And I would note that the income flow associated with

10   CVS is recognized in the investment value approach when

11   we're valuing the firm as a going concern.

12   Q.    All right, then, after you determine the pretax

13   net asset value of those assets, what was the next step

14   in your analysis?

15   A.    The next step can be seen on Exhibit 10, which is

16   to recognize the net -- net cash position of First

17   Hartford.  The -- would you like me to continue?

18   Q.    Yes, please.

19   A.    And basically this -- this exhibit needs to be

20   updated, but there is -- there was a roughly reported

21   $5 million in cash, some other deposits and escrows.

22   Again, I relied on Analysis Group to pull this

23   information together for me off financial statements,

24   First Hartford financial statements.  And you add

25   everything up in terms of some detail, you know, again,

```
 1    some of these there's liabilities associated, there's

 2    deferred expenses and so forth that will be lost in a

 3    liquidation.  You add everything up and you get a net

 4    cash position of 5,235,908.  This was as of the date

 5    that the original report was prepared; there needs to

 6    be an errata associated with that number.

 7    Q.    We'll get to that in one minute, please.  I

 8    notice on Exhibit 10 there's something called deposits,

 9    escrows, prepaid and deferred expenses, and the number

10    on the 10-Q as of 10/31/05, and there was testimony

11    about this yesterday, 3,494,942.  Did you make

12    adjustments to that?

13    A.    Yes.

14    Q.    Why did you make adjustments to that, sir?

15    A.    Again, this is primarily cash out the door,

16    capitalized up as an asset.

17    Q.    Why do you capitalize it as an asset or why is it

18    on the financial --

19    A.    Because the GAAP accounting, accounting

20    principles, require that to match terms.  But the cash

21    is out, you're recognizing these prepaid expenses as an

22    asset, but because the cash is out the door if you

23    liquidate the firm you will not recover that asset on

24    the balance sheet.  So one needs to recognize that and

25    subtract out those assets.
```

1    Q.    And GAAP --

2    A.    So that's what I do in those line items below the

3    3 million 494.

4    Q.    And the word GAAP, G-A-A-P, generally accepted

5    auditing principles?

6    A.    Accounting principles.

7    Q.    Now, you -- these numbers, then, in parentheses,

8    a series of six in the adjustments column, those are

9    deductions from that 3 million 494?

10   A.    Correct.

11   Q.    And you thought that was the appropriate way to

12   value that particular item on the balance sheet?

13   A.    It seems obvious to me, yes.

14   Q.    And there are certain other adjustments that you

15   made that are listed in the footnotes?

16   A.    Correct.

17   Q.    All right.  On Exhibit 10?

18   A.    Correct.

19   Q.    And then, turning briefly to the errata sheets,

20   did you make a further adjustment to net cash?

21   A.    Yes, I did.

22   Q.    And that's shown on the first page of the errata

23   sheet, which I believe is 45A?

24   A.    That's correct.

25   Q.    Would you explain to the Court what you -- what

1   you did on the adjustment in that cash?

2   A.    Yes, it came to my attention in early June that

3   there was a -- with the net cash there was $4 million

4   basically drawn down from a -- on a construction loan

5   that ended up -- ended up in the cash balance showing

6   up as an asset, which was recognized in the original

7   analysis, but the liability associated with the

8   drawdown of $4 million was not recognized.  So this

9   is -- this is a recognition of the liability that

10  matches up with the cash flow, the $4 million.  So

11  that's the real material number here in this exhibit,

12  this errata.

13  Q.    And there are two other adjustments or three

14  other adjustments that you made.

15  A.    Right.  More minor adjustments, again, this

16  was -- I did not focus on these; these were adjustments

17  that we required to be made, oversights or small

18  mistakes made in the valuation analysis.  Again I

19  relied on Analysis Group to -- further details.

20  Q.    And did you carry through these adjustments that

21  you made into your final determination of net asset

22  value per share?

23  A.    I did.

24  Q.    All right.  Let's then get back to the -- back to

25  the process that you followed.  Once you -- withdrawn.

1           After you considered the net cash and

2     investments and other items, what did you do next?

3     A.    The -- what I did next was -- can be seen on

4     Exhibit 11.  Basically I had accounted for all of the

5     breakup value, liquidation value of First Hartford

6     Corporation up until the tax liability associated with

7     the breakup, so the final step was to make an estimate

8     based on the asset values associated with the sale of

9     the firm is to estimate the taxes that would be

10    associated with the sale.  So that can be seen on

11    Exhibit 11, the estimate of the tax -- tax consequences

12    of the sale.  Again, I relied on an expert that was

13    retained by First Hartford Corporation for these

14    numbers.

15    Q.    And you -- and that was Mr. Lyons?

16    A.    That was Mr. Lyons.

17    Q.    And he is a tax practitioner, and you saw his

18    report and did you rely on it?

19    A.    I read his report, he's a tax expert, his

20    qualification -- he looks qualified to me, and I relied

21    on it, yes.

22           MR. NOLAN:  Your Honor, that will be D44 for

23    the record.

24    BY MR. NOLAN:

25    Q.    And did you -- you knew that -- or maybe you

```
 1   didn't, I should ask you the question.  Did you know
 2   that First Hartford Corporation had net operating
 3   losses on its balance sheet?
 4   A.    I did during the course of the analysis, yes.
 5   Q.    And nevertheless you chose to do a tax analysis
 6   for this firm based on this hypothetical liquidation?
 7   A.    Absolutely, yes.
 8   Q.    Is that required?
 9         MR. NEWMAN:  Objection, Your Honor.  The
10   witness has said he relied upon this hearsay report
11   that's not in evidence.  There's no foundation for this
12   witness that a tax expert performed any tax analysis.
13         MR. NOLAN:  I'm asking -- I'm simply asking
14   whether it's required in this methodology to take taxes
15   into account.
16         THE COURT:  Overruled, you can answer.
17   A.    I'm sorry, could you restate the question?
18   BY MR. NOLAN:
19   Q.    In performing -- in using the methodology that
20   you used to determine net asset value, is it required
21   to determine the tax effects --
22   A.    Yes.
23   Q.    -- of the liquidation?
24   A.    Yes, it's standard valuation methodology.
25   Q.    And you actually requested that tax analysis be
```

```
1    done and you reviewed it and relied on it, correct?

2    A.    Correct.

3    Q.    And is the tax effect for state and federal taxes

4    shown on Exhibit 11 that you relied on?

5    A.    That's correct.  And let me add that the

6    $8 million carry loss forward that was discussed in

7    some depth yesterday and that existed --

8              MR. NEWMAN:  Excuse me, Your Honor.

9              THE COURT:  There's no question pending.

10   BY MR. NOLAN:

11   Q.    Sir, what are the numbers for state taxes shown

12   on Exhibit 11?

13   A.    2,276,025.

14   Q.    And federal tax?

15   A.    7,351,082.

16   Q.    And taking into -- calling to your attention

17   again the fact that there was a net operating loss

18   shown on the balance sheet for First Hartford in its

19   quarterly report for the period I think it's

20   October 31st, 2005, what's your understanding of what

21   happened to that NOL?

22             MR. NEWMAN:  Objection, Your Honor,

23   foundation.  This witness has not performed any tax

24   analysis.

25             MR. NOLAN:  He can certainly --
```

1          MR. NEWMAN:  Excuse me, Mr. Nolan.  Simply

2    relied upon the report, which is hearsay.  There's no

3    foundation.

4          THE COURT:  I understand these are just

5    numbers; he can explain what he believes the numbers

6    reflect.  The objection is overruled; it will go to

7    weight and argument.

8    A.    The -- I'm sorry, repeat the question, please.

9    BY MR. NOLAN:

10   Q.    What's your -- in layman's terms, what happened

11   to the NOL that was on the books?

12   A.    That was incorporated into the tax analysis, so

13   the 7,351,082 number accounts for the $8 million of

14   loss carryforward, so it's -- it's accounted for in

15   this analysis.  Nevertheless, there still is a

16   significant -- highly significant tax liability

17   associated with this liquidation.

18   Q.    All right.  Even after taking into account the

19   NOL.

20   A.    The $8 million of NOL, still have over $7 million

21   of tax liability.

22   Q.    All right.  And then I -- then, I take it,

23   looking at Exhibit 11, did you subtract the taxes from

24   the pretax net asset value?

25   A.    That's correct.

1    Q.    Okay.  And then did you add back the net cash and

2    investments as adjusted by the errata sheet?

3    A.    That's correct, so in Exhibit 11 you would take

4    Line 4, the net cash investments, they're shown over --

5    a bit over $5 million, and you reduce that by

6    approximately $4 million.

7    Q.    All right.  And then is that -- and then that

8    leads you to the tax -- after tax net asset value?

9    A.    That's correct.

10   Q.    And then you divide that by the number of shares

11   and it gives you a share price.

12   A.    That's correct, so roughly 11 -- again, once you

13   account for the 4 million dollar reduction in liability

14   on the cash side, it's approximately 11 million --

15   11,500,000, and then one can divide by the number of

16   shares outstanding to get a post-tax, per-share value

17   of liquidation value for First Hartford Corporation,

18   and this is prior to my final adjustment, but --

19   Q.    Okay.

20   A.    And that number -- that number is on the errata

21   sheet, and I believe it's 3.65 per share.

22   Q.    All right.  And on the errata sheet and on

23   Exhibit 11 there's a term NAV, before minority

24   discount.  What do you mean by minority discount, sir?

25   A.    Well, again, the valuation exercise was to value

1    First Hartford Corporation as a going concern with

2    management in place, and Mr. Kaplan's -- fair value of

3    Mr. Kaplan's shares, which is a minority equity

4    interest in the firm.  And the liquidation or NAV

5    approach does not recognize the minority equity

6    position in the firm.  It -- effectively it's an

7    appraisal approach that assumes that these assets are

8    sold whole, with full control to an owner on an

9    asset-by-asset basis, no assumption about these

10   belonging to a firm, any going concern.  So the owner

11   is going to have full control over the asset; there's

12   no discount associated with it.  So I made a

13   determination for my valuation methodology to be

14   logically consistent, again from an economic

15   standpoint, putting the law aside for the moment.

16   Q.    You understand that the law arguably takes a

17   different position on this issue.

18   A.    I understand that.  But again the -- the approach

19   is transparent in terms of I show the before, the --

20   the value before the adjustment, and I show the value

21   after the adjustment.  But in my opinion to value

22   these -- this interest in the way that it's supposed to

23   be valued, the way that I was instructed to value, one

24   needs to account for, recognize the minority equity

25   position that Mr. Kaplan has in First Hartford.  And so

1    one has to make an adjustment, it's -- it's a standard

2    methodology to make this adjustment in many other

3    states, and there's plenty of literature out there.

4    And as a consequence I did make one final adjustment

5    for the minority position.

6    Q.    And what was the -- what was the amount of that

7    adjustment?

8    A.    The -- that changed with the errata, but it's --

9    basically on a per-share basis you can see it on the

10   errata sheet, the revised numbers go from 3.65 per

11   share down to 2.74 per share.  That -- effectively

12   that's taking a 25 percent discount off of the

13   preminority share, so it's all post tax, before the

14   minority interest is accounted for, multiply by 25 --

15   point 25, subtract that number off and you have the net

16   number of 2.74.

17   Q.    And you weighted -- just to recap, you weighted

18   the three results.

19   A.    Yes, I did, in terms of the final estimate of

20   fair value, yes, I weighted all three results.

21   Q.    Okay.  And I think you testified to your reasons

22   for your weightings yesterday, and I won't have you go

23   into that.

24         And the -- your final opinion is shown on the

25   second page of 45A; is that correct?

1   A.    That is correct.

2   Q.    And that number is $3.08?

3   A.    That's correct.

4   Q.    And based on your experience and training and the

5   analysis and thought that went into your assignment, is

6   that your best opinion?

7   A.    That's my opinion, $3.08.

8   Q.    Now --

9   A.    Per share.

10  Q.    I'd like to just go back to the investment value

11  analysis that you did for a moment.  There are

12  different ways of doing an investment analysis?

13  A.    There are different ways of doing investment

14  analysis, but there are standard methods, there's --

15  there are limits within which one can conduct that

16  analysis based on standard methodologies,

17  well-recognized methodologies.

18          THE COURT:  Have we admitted this exhibit?

19  The book's behind him on the cart.

20  BY MR. NOLAN:

21  Q.    Sir, are you familiar with Exhibit 159A?

22  A.    I am.

23  Q.    What is 159A?

24  A.    It's the book that's been referred to as the

25  McKinsey book or I've heard it referred to as the

1    McKinsey report.  I think that was a report on sexual

2    behavior in the United States.  It's actually the

3    McKinsey book.

4    Q.    That was the Kinsey --

5          THE COURT:  There's no Mc in front of the

6    Kinsey report.

7          THE WITNESS:  That's correct, yes, sorry about

8    that.

9          MR. NEWMAN:  Is that a Freudian slip?

10         MR. NOLAN:  I didn't know the difference.

11   BY MR. NOLAN:

12   Q.    And have you -- have you -- do you use that book?

13   A.    I have not used that book; it's not a standard

14   textbook in academia.

15   Q.    But it does have a use -- but does it have a use

16   in business?

17   A.    Yes, yes, my understanding is it's widely used in

18   business.

19   Q.    And we heard talk of something called the

20   enterprise investment or enterprise discounted cash

21   flow analysis.  Was that -- is that something that's

22   similar to what you did?

23   A.    Are you talking about -- specifically are you

24   referring to yesterday or --

25   Q.    Yes, yes, I am.

1  A.   The label applied to Mr. Aertsen's analysis

2  yesterday?

3  Q.   Yes.

4  A.   I'm familiar with what Mr. Aertsen did.

5  Q.   And you talked about some principles that the

6  McKinsey book is based on.  What principles are those?

7  A.   Well, it's a -- it's a book about valuing --

8  well, it's the title, Valuation:  Measuring and

9  Managing the Value of Companies.  So it's methods --

10      THE COURT:  It's not clear to me the witness

11  has read the book, he said it's not widely used --

12      MR. NOLAN:  He said he's familiar with it.

13      THE COURT:  Have you read the book?

14      THE WITNESS:  I haven't read the book.

15  BY MR. NOLAN:

16  Q.   There are two Nobel laureates, Modigliani and

17  another gentleman, did they have something to do with

18  discounted cash flow studies?

19  A.   Well, Mr. Aertsen's cited them and there's a

20  textbook apparently -- Modigliani was a former

21  colleague of mine at MIT, he's a Nobel prize winner

22  that he worked on -- that he produced and I'm familiar

23  with his textbooks, yes.

24  Q.   And are those principles of -- of use of

25  discounted cash flow?

1          MR. NEWMAN:  Objection, Your Honor, to at this

2    point leading, foundation.  Late disclosure is one

3    thing, this is total nondisclosure; we haven't seen any

4    of this.

5          MR. NOLAN:  I'll withdraw the question.

6    BY MR. NOLAN:

7    Q.    You sat here and heard the testimony yesterday?

8    A.    I did.

9    Q.    Did you understand what Mr. Aertsen was doing?

10   A.    Not really.  It was not -- it was -- it was a

11   very mixed-up approach and in my opinion seriously

12   flawed.  He had -- he basically was mixing two

13   different valuation methods in his approach.

14   Q.    What two different methods was he mixing?

15   A.    He was mixing a liquidation NAV approach where he

16   was valuing the assets individually, and then he was

17   attempting to account for the merchant development

18   portion of the company and doing that on an investment

19   value basis, where you aggregate cash flows across the

20   entire firm and then -- and then discount those cash

21   flows to determine a value.  That is -- the mixing of

22   those two approaches is very nonstandard, to say the

23   least.

24          In addition, there was no -- again, what

25   you're doing with the investment value is valuing a

1    going concern, a firm, a company, not the individual

2    assets owned by the company, and there was -- from what

3    I can tell there was no attempt made by Mr. Aertsen to

4    recognize the appropriate cost of capital or discount

5    rate associated with the real estate assets from an

6    investment value standpoint.  So there was a mixing of

7    approaches -- sorry.  There was a mixing of approaches

8    and there was a lack of analysis and sensitivity to the

9    differences in the cost of capital associated with

10   individual properties that are privately held with full

11   control and the cost of capital associated with assets

12   held by a firm -- publicly traded firm as a going

13   concern.

14   Q.    One final question, sir.  Your valuation was as

15   of September 15th, 2005; is that right?

16   A.    That's correct.

17   Q.    And if you were doing the valuation today, would

18   you expect the valuation to be the same or different?

19   A.    Different, for sure.

20   Q.    And are you familiar with current conditions in

21   the real estate markets?

22   A.    I'm generally familiar, yes.

23         MR. NEWMAN:  Object again, this is -- this is

24   a nondisclosure; we don't even have a late disclosure

25   on an opinion as to current real estate conditions.

1          MR. NOLAN:  We got one yesterday, Your Honor.

2    It wasn't disclosed.

3          THE COURT:  He can answer the question; you

4    can argue about the significance later.

5    A.    I'm sorry, can you reask the question?

6    BY MR. NOLAN:

7    Q.    From a high-level point of view, what's the state

8    of the real estate market, and ask you to focus on the

9    retail real estate market?

10   A.    Sure.  Commercial real estate is going through a

11   difficult period right now.  Values relative to where

12   they were, say a year ago, have -- there really is very

13   much of a lack of trade, nobody is -- it's too strong

14   to say nobody, but there's very little -- very few

15   transactions happening in the market today.  The ones

16   that are happening are happening at roughly 15 to 20

17   percent value below where they were a year ago.

18   There's basically no liquidity in the market, almost no

19   liquidity, meaning that there's no financing

20   availability.  The financing that was available up

21   until a year ago through Wall Street, securitized

22   market, that's completely disappeared.  And then with

23   all the recent turmoil that's happened in the financial

24   sector the traditional sources of financing, insurance

25   companies, banks, they have stepped back and it's

1    either -- and this is on good assets for good firms,

2    they've stepped back and there's very little financing

3    available period now.  Nothing in the securitized

4    sector, and it's much more difficult than it was even a

5    couple months ago through traditional lending sources.

6              MR. NOLAN:  Thank you, I have nothing further,

7    Your Honor.

8              THE COURT:  Take the morning recess, Counsel,

9    then return for cross-examination, thank you.

10                   (A recess was taken.)

11             THE COURT:  Mr. Groff, do you have additional

12   questions?

13             MR. GROFF:  No additional questions on direct.

14             THE COURT:  Thank you.  Mr. Newman,

15   cross-examination?

16             MR. NEWMAN:  Thank you, Your Honor.  I want to

17   check first to make sure this microphone is working.

18             MR. GROFF:  Part of the problem is everybody's

19   eyes are so bad we can't read the mute.

20                   CROSS EXAMINATION

21   BY MR. NEWMAN:

22   Q.    Good morning, Professor Riddiough.

23   A.    Good morning.

24   Q.    Professor Riddiough, for your work in this case

25   you were first contacted by the Analysis Group; is that

1    right?

2    A.    That's correct.

3    Q.    And the Analysis Group is -- has an operation in

4    Boston?

5    A.    Correct.

6    Q.    And you've been retained and actually paid by the

7    Analysis Group for your work on this case; is that

8    right?

9    A.    I don't know that that's true, no.

10   Q.    Your checks -- you've been paid for this -- in

11   this case, right?

12   A.    I'm sorry?

13   Q.    You've been paid for your work in this case?

14   A.    I have.

15   Q.    And the checks come from the Analysis Group.

16   A.    The checks come from the Analysis Group.  I don't

17   know where -- you know, clearly there's other monies

18   involved but the checks that I've been -- the checks

19   that I have received have come from the Analysis Group.

20   Q.    And in terms of your development of work on the

21   case, the documents you reviewed, were delivered to you

22   by the Analysis Group?

23   A.    I -- I don't know that for a hundred percent

24   certainty, but a number of the documents were, yes.

25   Q.    And in preparing the report the Analysis Group

1   assisted in composing parts of the report; is that

2   right?

3   A.    Under my direction, yes.

4   Q.    First Hartford Corporation trades on the Pink

5   Sheets on the electronic over-the-counter market,

6   right?

7   A.    Correct.

8   Q.    That's not an exchange, is it?

9   A.    No, that's not correct.  It is an exchange.

10   Q.    Well, they -- the Pink Sheets over-the-counter

11   market is not a listed stock exchange, is it, sir?

12   A.    It's not listed in the sense that the New York

13   Stock Exchange is listed or the Amex or the NASDAQ.

14   It's considered an over-the-counter market but it's an

15   exchange trading market.

16   Q.    And you've defined -- for purposes of reliance

17   upon the market price, you've told us that, the more

18   liquid the market, the more justified its reliance on

19   market price to the exclusion of other factors; is that

20   right, sir?

21   A.    That's correct.

22   Q.    And for your assignment in this case you've told

23   us that you sought to value a minority share, not to

24   value the entire equity value of the enterprise, First

25   Hartford; is that right?

1    A.    That's correct, I'm valuing -- the exercise that

2    I undertook was to value minority equity stake in the

3    firm.

4    Q.    And you justify reliance upon the stock market

5    price based upon an analysis of the liquidity of the

6    market; is that right?

7    A.    It's the -- when there's traded share prices,

8    when money's changing hands, when there's

9    investment-backed expectations associated with a price,

10   where money is changing hands in an arm's length

11   manner, it's a terrific indicator of the value.

12   Q.    As you say in your report you base that reliance

13   upon an analysis that the more liquid the market the

14   more justified the reliance on the market price to the

15   exclusion of other factors; is that right, sir?

16   A.    That's correct, but I go beyond that, I say more.

17   Q.    Of course, you have a lengthy report, we don't

18   question that.

19         You testified on direct examination, Professor

20   Riddiough, that you defined the liquid market as one

21   where a shareholder can convert a position to cash

22   within a reasonable time; is that right?

23   A.    That's approximately correct.

24   Q.    And in your report you say the standard

25   definition of liquidity is the ability to convert an

1    asset to cash.

2    A.    More or less correct.

3    Q.    And by contrast you say you would define an

4    illiquid market as one where it's difficult to convert

5    an asset to cash; is that right?

6    A.    Again, it's taking some liberties with the

7    statement, but there's more liquidity and less

8    liquidity, so generally speaking it's hard to quibble

9    with your remark but it's -- you know, it needs a

10   little bit of qualification.

11   Q.    And in fact those are the exact words you gave us

12   at your deposition; isn't it, sir?  Do you have a

13   transcript with you there?

14   A.    No, I don't, not with me.

15            MR. NEWMAN:  Permission to approach, Your

16   Honor?

17            THE COURT:  Yes.

18   BY MR. NEWMAN:

19   Q.    Professor Riddiough, I'm showing you a copy of

20   your deposition taken on June 11, 2008.  I would direct

21   your attention, sir, to transcript Page 63.

22   A.    Okay.

23   Q.    Beginning Line 16.  Do you have it, sir?

24   A.    I see it, yes.

25   Q.    And you told us that in your words, quote, I

1   would define an illiquid market as one where it's

2   difficult to --

3            THE COURT:  Slow down, slow down.

4            MR. NEWMAN:  Excuse me, sir.  Poor Lori, I'll

5   make that much slower.

6   BY MR. NEWMAN:

7   Q.    And you told us, sir, that you would define an

8   illiquid market as one where it's difficult to convert

9   an asset to cash.  Is that right?

10  A.    That's what my answer was, yes.

11  Q.    Now, you know in the trading of First Hartford

12  Corporation stock that on the date of valuation, the

13  9/15/2005, there were no trades at all; isn't that

14  right?

15  A.    It may be right.

16  Q.    In fact, in the weeks preceding there were

17  numerous weeks, weeks and weeks, for which there were

18  no trades whatsoever in First Hartford company stock;

19  isn't that right?

20  A.    Again, the stock is --

21            THE COURT:  That's a yes or no, sir.

22  A.    Are there weeks?  I don't know that weeks went

23  by, but there could be.

24  Q.    Would you turn, sir, to Plaintiff's Exhibit 79,

25  which is right behind you, sir, on the cart in the

1    first binder.  Right there.  79, Counsel.  Do you have

2    it, Professor Riddiough?

3    A.    I have it in front of me, yes.

4    Q.    Okay.  Plaintiff's 79 shows daily trading

5    activity in the First Hartford company stock beginning

6    on April 25th, 2005; do you see that?

7    A.    I do.

8    Q.    And if you turn through Pages 2 and 3 it will

9    bring you up to September 15, 2005?

10   A.    Yes, I see that.

11   Q.    You look from -- just for a representative

12   period, look on April 25th, 2005, on Page 1?

13   A.    Yes, I see it.

14   Q.    You see there are no trades at all.

15   A.    Yes, I see it.

16   Q.    It wasn't until June 1st, 2005, that there were

17   any trades of First Hartford company stock; isn't that

18   right?

19   A.    Well, yes, it shows that in between -- starting

20   on April 25th to -- it's cut off here, I can't see

21   it -- but I assume this is June 31st, 2005, there were

22   no trades, that's what this shows.

23   Q.    If we turn to the next page --

24            THE COURT:  I think for the record you mean

25   May 31st is as I read it?

1          THE WITNESS:  Yes, May 31st.

2          THE COURT:  Okay.

3          MR. NEWMAN:  That's correct.

4          THE WITNESS:  Thank you.

5    BY MR. NEWMAN:

6    Q.    Turn to the second page, Professor Riddiough,

7    continue to show the trading activity through the

8    months of June, July, August 2005.  You see that, sir?

9    A.    I do.

10   Q.    And you can see weeks went by for which there

11   were no trades at all; isn't that right?

12   A.    I see that, yes.

13   Q.    And on the date of valuation there was no trade

14   in First Hartford company stock.

15   A.    That's what this is showing.

16   Q.    As you told us yesterday, a week after the

17   valuation date, September 22nd, 2005, the Lehman

18   Brothers attempted to move 36,000 shares of First

19   Hartford company stock and could not find a buyer for

20   that in the market and had to instead negotiate with

21   First Hartford company for First Hartford to buy back

22   the stock; is that right?

23   A.    I don't think that's correct.

24   Q.    First Hartford -- for the Lehman shares you told

25   us yesterday on your direct examination that they did

1    not obtain an arm's length transaction in the market

2    but instead sold the shares back to First Hartford

3    Corporation; isn't that right?

4    A.    That's correct.

5    Q.    And then you showed us a chart which is your

6    Exhibit 2 to your report.  I'll give you a moment.  Do

7    you have that, sir?

8    A.    I'm having trouble finding Exhibit 2.  Just give

9    me a moment, please.  Yes, I found it.

10   Q.    In your Exhibit 2 you described that the volume

11   of trading activity is roughly 5,000 shares a month?

12   A.    Based on this data, yes.

13   Q.    And at the rate of 5,000 shares a month it would

14   take a year to move 60,000 shares, isn't that true, in

15   the market?

16   A.    You know, if one simply divides 60 -- where did

17   the 60,000 number come from?

18   Q.    I'm asking you just a hypothetical.

19   A.    Just a hypothetical, you're saying if you have

20   60,000 shares and you average roughly 5,000 shares per

21   month, you divide that, you obtain 12 months, that's

22   all you obtain.  It doesn't mean that that would take

23   12 months to move those shares.

24   Q.    Could take longer, but at the rate of 5,000

25   shares a month it's going to take you a year to move

1   60,000 shares in the market; isn't it?

2   A.    I mean, it's a hypothetical that really doesn't

3   make any sense, but, you know, if you want to -- if you

4   want to take 60,000 and divide it by 5,000 on a monthly

5   basis and claim that that implies that it's going to

6   take a year to sell 60,000 shares, I mean, at some

7   level there's some logic to it, but I don't agree with

8   your conclusion.

9   Q.    Professor Riddiough, another factor in assessing

10  the liquidity or the ability of the shareholder to

11  convert share to cash is the -- is the flow, the number

12  of shareholders owning shares in the market; isn't that

13  right?

14  A.    It's a measure, yes.

15  Q.    And in fact an important measure is the degree of

16  concentration of ownership as opposed -- whether

17  there's widely dispersed ownership of shares or whether

18  a few shareholders own a substantial portion of the

19  market shares; isn't that true?

20       MR. NOLAN:  Object to the form of the

21  question, Your Honor.

22       THE COURT:  Well, it's leading, but it is

23  cross.  What's the basis of the objection?

24       MR. NOLAN:  It seemed to have several

25  components that made it a compound question, I believe.

1           THE COURT:  Just a moment.  Do you understand

2     the question?

3           THE WITNESS:  I'd like to have it repeated,

4     please.

5     BY MR. NEWMAN:

6     Q.    Professor Riddiough, the concentration of

7     ownership of shares is certainly a factor in evaluating

8     the liquidity of the market for shares; isn't that

9     true?

10    A.    It could be.

11    Q.    And if you had a market where a situation where

12    for a corporation four families own approximately

13    80 percent of all the shares, that would be a very

14    highly concentrated degree of ownership, wouldn't it?

15    A.    It's a kind of -- I can't disagree that it's

16    concentrated, but again if one looks at -- I mean, the

17    shares that are --

18    Q.    That was the only question.

19    A.    Okay.

20    Q.    I want to turn next, Professor Riddiough, to your

21    net asset valuation.  You have in front of you first

22    your Exhibit 7?

23    A.    Yes, I do.

24    Q.    Exhibit 7 you begin by identifying the First

25    Hartford operating properties?

1    A.    Yes.

2    Q.    And then you carry that over to your Exhibit 8?

3    A.    Okay.

4    Q.    Exhibit 8 you -- I'll give the Court a chance to

5    get the exhibit.

6              THE COURT:  I have it.

7    BY MR. NEWMAN:

8    Q.    When you totalled up or assessed the properties,

9    you relied upon the appraisals of Miss Konikoff, in one

10   case the CB Richard Ellis; is that right?

11   A.    To a large extent, yes.

12   Q.    For the North Adams property you assigned no

13   value.

14   A.    Correct.

15   Q.    And as I understand it from your deposition, you

16   didn't take any steps yourself to develop an assessment

17   for valuation for the North Adams operating property;

18   is that right?

19   A.    I don't think that's correct.

20   Q.    I understand management told you that the value

21   of the property was equal or less to the debt on the

22   property at the time of the valuation; is that right?

23   A.    That is more or less true, yes.

24   Q.    And you didn't take any further steps yourself to

25   apply a methodology to develop a valuation or appraise

1    the value -- or any methodology to valuate North Adams

2    property beyond that; isn't that right, sir?

3    A.    The valuation speaks for itself, zero value

4    assigned to it, and I state exactly in the report

5    what -- the steps that I took to identify value.

6    Q.    After hearing from management their opinion that

7    it did not have value that exceeded the then-existing

8    mortgage debt, you took no further steps to value the

9    property; isn't that right, sir?

10   A.    That's basically correct.

11   Q.    Now, when you performed your net asset valuation,

12   you were assuming a hypothetical sale of the assets of

13   First Hartford Corporation; is that right?

14   A.    That's what the exercise requires.

15   Q.    In fact, those assets as of the valuation date

16   were not sold and there was no plan to sell, isn't that

17   true, as far as you know?

18   A.    As far as I know.

19   Q.    Then you took a deduction for federal and state

20   income tax based upon an analysis of tax consequence

21   performed by someone else, right?

22   A.    That's correct.

23   Q.    You didn't perform any tax analysis yourself in

24   your valuation.

25   A.    No, they're sufficiently complicated so that it

1   was prudent to rely on somebody who had significant

2   expertise on tax.

3   Q.    As you say in your report, notwithstanding Maine

4   law, you took a deduction for a minority discount

5   because you felt that was appropriate.

6   A.    That's correct.

7   Q.    I want you to turn, please, to your Exhibit 10.

8   A.    Okay.

9   Q.    Exhibit 10 is your continuing work on the net

10  asset valuation, you assessed the net cash in

11  investments for the company as of the valuation date,

12  right?

13  A.    Exhibit 10 is to make an assessment to assess the

14  net cash position, correct.

15  Q.    And this is the exhibit you attached to your

16  report that you produced in March of this year.

17  A.    It's attached to my report.  I don't remember the

18  exact date, but I believe you on the date.

19  Q.    And if we look at the entries for cash, cash

20  equivalents, investment market and securities and

21  investment in affiliates, $5,040,757, do you see that?

22  A.    Yes, I do.

23  Q.    You have a note down below under that column

24  reported letter A, says you got these figures as

25  reported in First Hartford's 10-Q as of 10/31/05,

1    Pages 3 and 4; do you see that?

2    A.    I see it.

3    Q.    That's the same First Hartford 10-Q that we

4    examined yesterday in Plaintiff's Exhibit 118; isn't

5    it?

6    A.    I don't remember the exact -- I remember the

7    discussion yesterday, you know, around this issue, so

8    I -- I don't have the -- I don't know the details for

9    sure, but I'll believe you on the details on the

10   exhibits, et cetera.

11   Q.    Why don't you grab right behind you Plaintiff's

12   Exhibit 118.

13          MR. NEWMAN:   Permission to approach, sir, I'll

14   help the witness find it.

15   BY MR. NEWMAN:

16   Q.    Let me find it for you, Professor, right here,

17   because it's behind the larger binder.

18          Sir, I provided to you Plaintiff's Exhibit

19   118, which is the First Hartford Corporation 10-Q for

20   October 31st, 2005.  Do you have that, sir?

21   A.    I believe so, yes.

22   Q.    And in your notes you -- to Exhibit 10 you say

23   that was the source of your information for the cash,

24   cash equivalents, investment securities and the like;

25   do you see that?

1   A.    I do.

2   Q.    And this is Plaintiff's 118, 10/31/05 10-Q, is

3   where you got these figures, right?

4   A.    If this is the 10-Q, yes.

5   Q.    Okay.

6   A.    More or less, yes.

7   Q.    Now, on direct examination with Mr. Nolan you

8   said you needed to make changes to Exhibit 10 and you

9   provided what you called an errata sheet?

10  A.    Yes.

11  Q.    Is that right?

12        MR. NEWMAN:  And that's, Your Honor,

13  Exhibit 45A.

14        THE COURT:  Yes.

15  BY MR. NEWMAN:

16  Q.    And I believe you testified this morning that

17  some new information came to your attention and you

18  prepared this errata sheet in early June of this year?

19  A.    That's correct.

20  Q.    Okay.  What new information; who brought it to

21  your attention?

22  A.    Initially it was the first -- the officers of

23  First Hartford Corporation.

24  Q.    Who contacted you?

25  A.    It was -- it was -- actually I first became aware

1    of this issue at the morning of the deposition, my

2    deposition in Boston.

3    Q.    Your deposition was taken in Boston on June 11 of

4    this year, right?

5    A.    I don't remember the exact date but it was June.

6    Q.    And before your deposition someone from First

7    Hartford called to your attention that the information

8    on their 10-Q was in error?

9         MR. NOLAN:  Objection, that mischaracterizes

10    the testimony.

11         THE COURT:  It's a question he can answer yes

12    or no.

13    A.    I'm sorry, can you repeat the question, please.

14    BY MR. NEWMAN:

15    Q.    On the morning before your deposition who from

16    First Hartford Corporation spoke to you about making

17    changes to your report?

18    A.    Nobody spoke to me about making changes to my

19    report.  All -- all -- there was a report to me that

20    morning that the -- that there was a 4 million dollar

21    liability that was missed associated with that, and

22    that was the end of the conversation.

23    Q.    Who from First Hartford spoke to you before your

24    deposition, sir?

25    A.    I don't remember.

1    Q.    Well --

2    A.    I don't remember exactly how I -- there was folks

3    from First Hartford in the room and then Mr. Nolan and

4    the other gentlemen as well, but there was some

5    discussion about this fact.

6    Q.    But who told you that the figures on your

7    Exhibit 10 that you took from First Hartford's public

8    reporting 10-Q document needed to be changed?

9    A.    Nobody told me that it needed to be changed.

10   Somebody stated a fact.

11   Q.    Who was it that stated that fact to you?

12   A.    I honestly don't remember exactly.

13   Q.    Well, we then took your deposition that day; you

14   never called -- you never made any changes to your

15   Exhibit 10, did you?

16   A.    You -- you didn't ask me about it.

17   Q.    I certainly asked you about your opinion in your

18   report.

19   A.    I -- again, it was a fact that came to light.  It

20   was difficult to know what to do with that fact at that

21   point in time; there wasn't enough time really to

22   incorporate that information into the analysis.  I was

23   not asked directly about that kind of change, and it

24   just never came up.

25   Q.    Do you know why it wasn't until 5:00 o'clock P.M.

1    on the day before this hearing that your errata sheet

2    marked as Exhibit 45A was produced to us?

3    A.    I -- I don't know why -- anything about timing.

4    Q.    When did you prepare this errata sheet that's

5    been marked Defendant's 45A?

6    A.    I don't know; I'm not quite sure when I prepared

7    it.

8    Q.    You said sometime in early June.

9    A.    No, I did not prepare it in early June.  I became

10   aware of the information in early June.

11   Q.    You became aware of the information the morning

12   before your deposition?

13   A.    I became aware of information about $4 million of

14   a liability that may have been missed.  That's what I

15   became aware of.

16   Q.    And you can't tell us who told you that?

17   A.    I don't remember; I honestly don't remember.

18   Q.    Was it one of the lawyers or one of the First

19   Hartford company officers?

20   A.    I really don't remember.

21   Q.    Who prepared the errata sheet that's now been

22   produced and marked as Defendant's 45A?

23   A.    Analysis Group did.

24   Q.    Who from Analysis Group prepared the errata

25   sheet?

1    A.    I'm not sure.  It was likely Gaurav Jetley, but

2    I'm not a hundred percent sure.

3              Are we done with this binder?

4    Q.    Yes, sir, you can put it back in the cart.

5              Sir, I want to turn next, please, to your

6    investment value analysis.

7    A.    Okay.

8    Q.    For your investment value analysis, you attempted

9    to do an analysis of the cash flows of First Hartford

10   Corporation and then find comparable metrics or

11   multiples in the market by comparing to a selection of

12   real estate investment trusts; is that right?

13   A.    That's approximately correct.

14   Q.    And I want to turn first to your Exhibit 4, sir,

15   where you develop the cash flow of First Hartford

16   Corporation for which you developed that metric.  Do

17   you have Exhibit 4 in front of you, sir?

18   A.    I do.

19   Q.    For your -- for your exercise to evaluate the

20   cash flow available for First Hartford Corporation you

21   went through an analysis of a funds from operation

22   adjusted as you thought appropriate for this -- for

23   First Hartford's business operation; is that right?

24   A.    You're mixing the terms cash flow and funds from

25   operation.  This is an analysis of funds from operation

 1   and then adjusting those funds from operation.

 2   Q.    Funds from operation is a term often used for --

 3   by analysts and investors in evaluating a REIT because

 4   they wanted to assess the likely cash return on an

 5   investment with a real estate investment trust; is that

 6   right?

 7   A.    It's a -- the phrase cash return, I'm just not

 8   quite sure what to do with that phrase.  If you would

 9   be a little more precise, it's a little bit too loose,

10   I think.

11   Q.    Funds from operation as used in evaluating REITs

12   is the net income adding back depreciation, right?

13   A.    It's essentially income after interest on the

14   debt, adding back depreciation and a few other more

15   minor things, yes.

16   Q.    Depreciation's added back because that's a

17   noncash expense and would not reduce the cash flow for

18   the business, right?

19   A.    That's the idea, basic idea.

20   Q.    And then for your adjusted funds from operation

21   for First Hartford Corporation you also added back in

22   gains on the sale of real estate.

23   A.    That's correct, which increased the number

24   significantly.

25   Q.    That's because for First Hartford the ongoing

1    purchase and sale of real estate represents a primary

2    component of their business.

3    A.    That's an important component of their business.

4    Q.    Now, sir, you testified on direct that you, when

5    you put in figures for income for First Hartford

6    Corporation, you did it after tax; is that right?

7    A.    Yes, it's -- everything is on an after-tax basis.

8    Q.    You didn't perform yourself, however, any tax

9    analysis of First Hartford company's operations, did

10   you?

11   A.    Again, I relied on -- to pull these numbers

12   together I relied on Analysis Group for the details,

13   and my understanding is is that everything is after

14   tax.  So there was a tax analysis done, yes, under my

15   direction.

16   Q.    What was the tax analysis?

17   A.    Again, we're reporting numbers -- adjusted income

18   or loss after tax.  Also the capitalized -- or, I'm

19   sorry, the gain on sale of real estate assets was

20   reported after tax.

21   Q.    Earlier you referred to Mr. Lyons' report, but

22   that was only in connection with the net asset

23   valuation, correct?  Mr. Lyons didn't perform any

24   analysis of the funds for operation tax, did he?

25   A.    Mr. Lyons' task was to conduct a tax analysis

1  associated with a hypothetical sale of the assets of

2  First Hartford Corporation, which was a different

3  exercise than this.

4  Q.    So Mr. Lyons' report doesn't address any of the

5  tax implications of your adjusted funds from operation

6  valuation, does it?

7  A.    Not directly, no.

8  Q.    And in performing an -- in coming up with the

9  figures for this adjusted funds from operation you

10  yourself did not examine any of the income tax returns

11  for First Hartford Corporation, did you?

12  A.    I relied on Analysis Group to do that analysis.

13  Q.    And you don't know if they did either, do you,

14  sir?

15  A.    They did, yes, we had that discussion.

16  Q.    Sir, you don't know if anyone from Analysis Group

17  evaluated or examined First Hartford company's

18  historical tax returns and assessed the impact of the

19  net operating loss carryforward, do you?

20  A.    No, I do know that for a fact.

21  Q.    You haven't disclosed that anywhere in your

22  report, have you, sir?

23  A.    That particular fact?

24  Q.    Right.

25  A.    In that way, I don't know.  I believe it's been

1    disclosed in one way or the other in terms of the

2    documents that have been relied upon to produce this

3    report.

4    Q.    Certainly it's not in your report, is it, sir?

5    A.    What -- certainly what is not in my report?

6    Q.    An analysis of the net operating loss carryover

7    and how it would impact whether First Hartford

8    Corporation pays tax on the cash flow you show in

9    Exhibit 4.

10   A.    Please repeat the question.

11   Q.    There's nothing in your report that discloses any

12   analysis of the net operating loss carryover and how it

13   would impact whether First Hartford company's going to

14   pay tax on the cash flows you described in Exhibit 4.

15   A.    No, that's incorporated into this analysis right

16   here.

17   Q.    By someone in the Analysis Group somehow.

18   A.    Again, a team working under my direction

19   incorporated that into the analysis, correct.

20   Q.    But that's not anywhere in your report or the

21   exhibits to your report, is it, sir?

22   A.    That's not correct.  The effects of the loss

23   carryforward are there in these numbers.

24         THE COURT:  Counsel, I can read the report.

25   Let's move on.

BY MR. NEWMAN:

Q.    Now, to evaluate the -- your adjusted funds from operation, you chose four years of First Hartford Corporation, 2004 through 2007?

A.    Correct.

Q.    And you chose to exclude the year 2003 because you believe that First Hartford's cash flows had not yet stabilized at that point?

A.    If you go before 2004 it was -- the situation was a little more difficult, generally speaking.

Q.    And in your opinion the years 2004 through 2007 were representative of what you could forecast for future cash flow for First Hartford Corporation?

A.    They might even be optimistic which, you know, is conservative from my perspective, but that's -- you know, one has data and one does the best they can with the data.

Q.    And for the four-year average, if we look on your Exhibit 4 at Line G, you came up with a figure of $2,281,559.

A.    As an average over those four years, correct.

Q.    And then you went through an exercise to arrive at a multiple by comparison to other REITs against which you would multiply that cash figure to derive an investment value; is that right?

1   A.   The -- when you said other REITs, I'm not -- I'm

2   a little confused by your reference to other REITs.

3   Q.   I misspoke, sir, I didn't mean -- you chose a

4   selection of 31 REITs to develop a multiple against

5   which you'd apply to this cash figure of the average

6   adjusted funds from operation for First Hartford; is

7   that right?

8   A.   I used real estate investment trusts, yes, to

9   help me come up with a multiple.

10   Q.   If we return to your report at Paragraph 29.

11   A.   Okay.

12   Q.   Your Exhibit 5 shows a summary of the comparable

13   REITs you selected, right?

14   A.   Yes, I believe so.

15   Q.   And the results of your work shows that as of the

16   end of September 2005, for the 31 retail REITs you

17   selected as comparable, they -- based upon the metrics

18   you examined, the multiples for those comparable REITs

19   range from 8.2 to 18.4 with an average of 12.9; is that

20   right?

21   A.   That's what it says, yes.

22   Q.   But you then performed a regression analysis

23   developed for this case to arrive at the multiple that

24   you felt appropriate to use for First Hartford

25   Corporation; is that right?

1    A.    The -- the --

2    Q.    Sir --

3    A.    I don't quite agree with that statement, no.

4    Q.    After examining the REITs and determining the

5    range of multiples, you developed a model that is

6    estimated using multiple regression analysis, right?

7    A.    That's correct.

8    Q.    And you developed -- I'm sorry, sir, and you

9    displayed that model for multiple regression analysis

10   in Exhibit -- your Exhibit 6, right?

11   A.    I believe you but let me just check the exhibit,

12   if I can find it.  The output of the model is stated in

13   Exhibit 6, correct.

14   Q.    And this model, this multiple regression analysis

15   model you developed, is one you developed this year for

16   this case; is that right, sir?

17   A.    But --

18   Q.    Sir, can you answer that question?

19   A.    I developed the model with reference -- I have --

20   if I can just expand just a little --

21   Q.    Sir, the question --

22        THE COURT:  Answer the question yes or no,

23   sir, or it's not a yes or no answer.

24   A.    It's not a yes or no answer.

25   BY MR. NEWMAN:

1    Q.   The regression model that you described in

2    Exhibit 6 is one that you developed this year for this

3    case; isn't that true, sir?

4    A.   That's correct, the model was developed for this

5    case this year.

6    Q.   It's not a model that you've published in any of

7    your academic work, is it?

8    A.   Parts of the model I have published, yes.

9    Q.   But not the regression model you used in this

10    case, sir; isn't that true?

11    A.   The situation is different in this case from the

12    other -- the other parts of it, but the -- the factors

13    that are incorporated in this model are based on -- are

14    well founded, based on significant research both in the

15    general corporate finance investment area as well as

16    research that's been conducted specifically with real

17    estate investment trusts.

18    Q.   Sir, if you could please return to your

19    Paragraph 29 in your report where you described the

20    range of multiples?

21    A.   Yes, sir.

22    Q.   Do you have that in front of you?

23    A.   I do.

24    Q.   For the comparable REITs that you selected, you

25    found that the multiple ranged from 8.2 to 18.4 with an

1    average of approximately 12.9; is that right?

2    A.    That's correct.

3    Q.    After the regression analysis that you did for

4    this case, you selected a multiple of 4.1.

5    A.    Correct.

6    Q.    If you took just the average multiple from the

7    REITs of 12.9 and applied it to the adjusted funds from

8    operation average that you found, $2,281,559, you'd get

9    a value of approximately $30 million, wouldn't you?

10   A.    That's a hypothetical that I -- I just can't buy

11   into at all.  That's completely inappropriate.  To

12   suggest that that would be appropriate is -- I can't

13   agree with.

14   Q.    Professor Riddiough, I hadn't got to the point of

15   asking you to agree with it yet; but looking at your

16   analysis, there's no question that the range of

17   multiples for the comparable REITs you selected ranges

18   from 8.2 to 18.4 with an average of 12.9, no question

19   about that, right?

20   A.    But that's unadjusted for --

21   Q.    Sir, there's no question about that, that you

22   found --

23   A.    There's no question about that.

24   Q.    And the average multiple, 12.9, applied against

25   what you found for the adjusted funds from operation

1    for First Hartford would produce an equity value of

2    $30 million; isn't that true, sir?

3    A.    You can do the math and I'll believe you, but

4    it's not appropriate.

5            MR. NEWMAN:  Just a moment, Your Honor.

6        Thank you, Your Honor.

7            THE COURT:  Thank you, Mr. Newman.  Redirect?

8            MR. NOLAN:  Your Honor --

9            THE COURT:  You meant you're done.

10           MR. NEWMAN:  Yes.

11           THE COURT:  Thank you.

12           MR. NOLAN:  No, thank you.

13           THE COURT:  All right, Mr. Groff?

14           MR. GROFF:  No, Your Honor.

15           THE COURT:  Thank you, Professor Riddiough,

16   you can step down.  Just leave the exhibits there,

17   unless you brought anything of your own, just leave

18   them there, thank you.

19           THE WITNESS:  Thank you.

20           THE COURT:  Thank you.  Counsel, I think some

21   of those came out of an exhibit book, perhaps put them

22   back together.

23           MR. NOLAN:  Sorry for the huddle.

24           THE COURT:  That's all right.  Do you need a

25   recess?

```
 1              MR. NOLAN:  Can we take a minute?

 2              THE COURT:  Take a five-minute recess.

 3                    (A recess was taken.)

 4              THE COURT:  I apologize for the delay.  Let me

 5     make a disclosure.  When I was telling my wife last

 6     night who the witnesses were in this case, she

 7     mentioned that Ms. Fannon's firm has been a subtenant

 8     as to one office of her firm for a few months ending at

 9     the end of June when my wife's firm moved out to its

10     own business; is that an accurate description?

11              THE WITNESS:  Yes, and we took over their old

12     space.

13              THE COURT:  All right.  So I just disclose

14     that to counsel.

15          Would you please stand and be sworn?  I don't

16     think we've met, have we?

17              THE WITNESS:  No.

18              THE CLERK:  Please raise your right hand.  Do

19     you solemnly swear that the testimony you shall give in

20     the cause now in hearing shall be the truth, the whole

21     truth, and nothing but the truth, so help you God?

22              THE WITNESS:  I do.

23              THE CLERK:  Please be seated and pull yourself

24     right up to the microphone close.  State your name and

25     spell your last name.
```

1           THE WITNESS:  It's Nancy Fannon, F as in

2    Frank, A-N-N-O-N.

3           THE COURT:  Go ahead, Mr. Culley.

4           MR. CULLEY:  Good morning, Your Honor.  As a

5    preliminary matter I would like to offer into evidence,

6    I believe without objection because Mr. Newman and I

7    have just discussed it, Defendant's 33, 34, 35, 36, 38,

8    40, and 41.  With respect to 41, Your Honor, I would

9    like to substitute what we've previously submitted to

10   the Court a new copy of the report, because through my

11   fault and not Ms. Fannon's it was not complete and

12   somewhat in a poor state of organization so --

13          THE COURT:  Any objection to those?

14          MR. NEWMAN:  No objections, Your Honor.

15          THE COURT:  All admitted without objection.

16          MR. CULLEY:  Thank you, Your Honor.  I

17   apologize, it doesn't have holes punched, we can take

18   care of that.

19          Your Honor, there's one other exhibit that

20   Mr. Newman and I have discussed which is 42, which are

21   some errata pages.  I don't want to offer that at this

22   time because I want to confirm with Ms. Fannon and with

23   Mr. Newman that what we have is in fact what should be

24   part of the errata, so we can do that at lunch time.

25                   (Continued on next page.)

```
 1              DIRECT EXAMINATION

 2    BY MR. CULLEY:

 3    Q.    Would you state your name for the record, please?

 4    A.    Yes, Nancy Fannon.

 5    Q.    Where do you reside, Ms. Fannon?

 6    A.    I reside in Cumberland, Maine.

 7    Q.    And where is your place of employment?

 8    A.    Portland, 100 Commercial Street.

 9    Q.    What is your employment?

10    A.    I'm a business appraiser.

11    Q.    How long have you been involved in business

12    appraisal?

13    A.    About 20 years, 21 years.

14    Q.    What is the name of the firm that you are

15    employed at at the present time?

16    A.    Fannon Valuation Group.

17    Q.    Would you tell the Court your education and

18    background that has led up to your becoming involved in

19    the financial valuation business?

20    A.    I received a degree in accounting from the

21    University of Massachusetts in 1980.  After that I went

22    to work as a tax and audit staff member and remained in

23    private accounting for about seven years.  I came to

24    work at KPMG Peat Marwick as a tax manager and

25    immediately began doing business valuations there and
```

```
 1    then began to undertake training in business valuation.

 2    Over the years I continued my education in business

 3    valuation, various courses.

 4    Q.    Are you a CPA?

 5    A.    Yes, I am.

 6    Q.    When did you obtain your CPA certification?

 7    A.    About nine months, I believe it was, after I

 8    began at Peat Marwick, which was 1987.

 9    Q.    And did KPMG then either merge with another firm

10    or did you leave another firm and become involved with

11    another accounting firm?

12    A.    Yes, several years later KPMG bought out the

13    local practice and became Baker Newman Noyes, also

14    merged with former Portland office of Ernst & Young.

15    Q.    Did you begin your business valuation work when

16    you were at Baker, Newman & Noyes?

17    A.    Well, I actually began it as soon as I began

18    working at the firm, I can't remember if it was '86 or

19    '7, but immediately when I began working there I

20    started doing both tax and business valuation work.

21    Q.    At what point did business valuation become your

22    full-time professional employment?

23    A.    It was probably about 12 years ago that I

24    completely switched my focus over.  Up until that time

25    it was sort of a rainbow.
```

1   Q.     When did you leave Baker Newman to start your own

2   firm?

3   A.     Four years ago.

4   Q.     Do you have any professional credentials or

5   professional certifications in the field of business

6   valuation?

7   A.     Yes, I do.

8   Q.     Can you tell the Court what those are?

9   A.     Yes, I can.  I'm -- I'm certified by the American

10  Society of Appraisers.  I have an ASA designation,

11  which is Accredited Senior Appraiser.  I'm also

12  certified by the Institute of Business Appraisers, I

13  have the MCBA, which is their highest level

14  designation.  I also have the highest level designation

15  by the ASA, and I'm also certified by the American

16  Institute of Certified Public Accountants as an ABV,

17  Accredited Business Valuator.

18  Q.     Were those last three credentials that you just

19  described something that you have to take a test in

20  order to receive certification?

21  A.     Yes, there's some varying requirements for each

22  of them.  Generally they require a combination of

23  course work study, tests, and experience in the field.

24  The ASA requires a significant amount of experience, at

25  least five years experience.  The MCBA actually

1    requires 10 years experience in the field.

2    Q.    Before you became mostly involved with business

3    valuation, your certified public accounting work

4    involved taxation?

5    A.    Yes.

6    Q.    Describe for the Court, if you would, briefly,

7    what Fannon Valuation is and what it does?

8    A.    We're a five-person firm.  We focus solely on

9    business valuation and commercial damages.  We do

10   business valuations primarily in the context of either

11   shareholder disputes, which would be shareholders

12   buying each other out, typically in some kind of a

13   dispute context, shareholder oppression and dissent

14   cases.  We do some divorce work; we do a fair amount of

15   estate and gift tax work.  We also do some merger

16   acquisition work.  And then a good part of our work is

17   also commercial damage work as well.

18   Q.    Do you also engage in teaching as part of your

19   role in business valuation?

20   A.    Yes, I do a lot of teaching.

21   Q.    Could you explain just to the Court some of the

22   teaching that you are involved in?

23   A.    I teach business valuation, I give probably

24   anywhere between -- in any given year anywhere between

25   10 and 20 lectures at national conferences, seminars,

1    and so forth.  I also do a lot of Webinars, and those

2    presentations are to any combination of my peers, a lot

3    of them are to my peers.  I also teach lawyers, judges,

4    IRS agents.

5    Q.    What are some of the organizations where you give

6    these lectures or talks?

7    A.    Legal organizations like bar associations, I've

8    spoken in front of some judges' groups, I speak in

9    front of lots of state societies of CPAs.  I give

10   presentations at all of the national conferences of the

11   business valuation organizations that I mentioned

12   earlier.  I'm typically on their national conference

13   agendas.

14   Q.    Have you published works in various journals or

15   periodicals?

16   A.    Yes, I have.

17   Q.    Would you tell the Court what those are?

18   A.    Yes.  We have four leading journals in the

19   business valuation field.  I'm actually on the

20   editorial boards of all four of them, and I frequently

21   publish in all four of those journals.

22   Q.    Have you -- are you a regular columnist for

23   Business Valuation Review?

24   A.    Yes, I am.  That's the publication of the

25   American Society of Appraisers, and it's the only truly

1    peer-reviewed journal that we have.  And I'm actually

2    the only person that's been asked to write a regular

3    column for that journal.

4    Q.    Have you also published textbooks?

5    A.    Yes, I have.

6    Q.    What textbooks have you published?

7    A.    I have two textbooks that I've published on my

8    own.  One of them was in -- together with a woman who

9    works for me.  I published a textbook on the valuation

10   of pass-through entities, and it's the only textbook in

11   our field on taxable versus nontaxable entities and how

12   you value those entities.  I also published a textbook

13   on how to properly use transaction data when you value

14   entities.  And then I've been a contributing author to

15   a number of textbooks.

16   Q.    Have you been a contributing author to anything

17   authored by Shannon Pratt?

18   A.    Yes, I have.  I contributed to a textbook called

19   Taxes -- Taxes and Value Procedure Law and Perspective,

20   which he and tax court Judge David Laro wrote together.

21   I've also been a technical reviewer of several

22   textbooks that he's written.

23   Q.    Did you write the foreword to the most recent

24   Shannon Pratt volume, Valuing a Business?

25   A.    Yes, I did.

1    Q.    Have you been a technical reviewer for other

2    business valuation textbooks?

3    A.    Yeah, well, the ones I just mentioned, yes.  The

4    other one that I was a technical reviewer of was a book

5    called Standards of Value, which was by Shannon Pratt

6    and Jay Fishman and another fellow whose last name is

7    Morrison -- Bill Morrison.  And that -- that textbook

8    was about the proper standards of value in different

9    contexts, like fair market value, fair values, et

10   cetera, and I technically reviewed the chapter on fair

11   market value in that book.

12   Q.    Did you recently receive an award from the

13   American Institute of CPAs?

14   A.    Yes, I did.

15   Q.    What was that?

16   A.    It's called the Hall of Fame Award.  I was

17   awarded that in 2007.

18   Q.    Approximately how many valuations have you done

19   of corporate stock over your career?

20   A.    Somewhere between 6 and 700 valuations.

21   Q.    How many of these have involved real estate?

22   A.    Probably about half.

23   Q.    During the course of those valuations have you

24   had occasion to read and review real estate appraisals?

25   A.    Yes.

1   Q.    Is that something you commonly do?

2   A.    Regularly do that, yes.

3   Q.    Have you testified as an expert in business

4   valuation in courts of either this state or around the

5   country?

6   A.    Yes, I have.

7   Q.    On approximately how many occasions?

8   A.    Probably about 60 times.

9   Q.    Have you testified in --

10   A.    Including depositions, testimony in depositions.

11   Q.    Have you testified in this very courtroom?

12   A.    Yes, I have.

13   Q.    Would you just generally describe what valuation

14   theory requires, what it involves?

15   A.    Valuation requires an understanding of the

16   interest that you're valuing, whether that interest is

17   a stock interest or an entire company.  And in order to

18   gain an understanding of the interest you're valuing

19   you have to understand it from both an operational

20   perspective and a financial perspective.  Value itself

21   is about -- typically about -- primarily about three

22   things, cash flow, growth, and risk.  So when we value

23   a company or an interest, everything we do is really

24   about endeavoring to understand what things drive cash

25   flow, growth, and risk.  So we undertake an examination

1    of all of the things that influence those three things,

2    which means looking at the company's -- everything we

3    can learn about the company that influences those

4    things, the industry that they're in, how economic

5    factors influence the company, how their financial

6    performance would influence those things, and so forth.

7    Q.    And do these factors have an influence on the

8    market price of shares of stock?

9    A.    Yes, absolutely.

10   Q.    And why is that?

11   A.    Because -- well, those are the same things that

12   investors consider when they're pricing stock.  They

13   consider how the industry is performing, they consider

14   how the economy is going to -- is acting at a certain

15   time, and they consider the company's performance both

16   operationally and from a financial perspective.

17   Q.    Investors in a business looking to access the

18   cash flow of that business?

19   A.    Investors seek to access both cash flow and

20   growth in value.

21   Q.    What are the business valuation methods that you

22   employed in this case?

23   A.    Well, typically a company is valued one of three

24   ways, either by an income approach, a market approach,

25   or a net asset value approach, and those three ways

1    come out of those three things that I said influence

2    value, cash flow, growth, and risk.  Those three things

3    are expressed in those three ways that we value

4    companies, and I looked at all three of those ways to

5    value First Hartford.

6    Q.    Is that what you normally do when you're valuing

7    a business, that is, utilize those three valuation

8    approaches?

9    A.    Yes.

10   Q.    What -- what is the standard or the definition

11   that you employed in valuing First Hartford?

12   A.    Fair value.

13   Q.    And can you define that for the Court as you use

14   that term?

15   A.    Um-hum.  A fair value is generally understood to

16   be the going concern value of the firm, and as I

17   understand that term it generally means that you're

18   valuing the entire firm using all of the available

19   methods that you would consider for valuing the going

20   concern value.  And it's without regard to minority or

21   marketability discounts against the interests or

22   against the company.

23   Q.    Would you explain for the Court what you did in

24   undertaking your valuation in this case?  And by that I

25   mean at the first instance what information you

1    obtained in order to allow you to do your valuation.

2    A.    Um-hum, well, one of the first things I did is

3    provide you with a document request, and we received in

4    response to that an enormous amount of documents.    I

5    think my -- not I think, I know my document -- my pile

6    of documents is probably about 10 feet tall that I have

7    in my office.    We didn't use all of those documents in

8    our actual preparation of the value of this company.

9          What we did use in the valuation is a

10   combination of operational and financial documents that

11   we obtained, some of it from the company itself and

12   some of it from research that we did on our own about

13   the industry and the market.    We used financial

14   documents, some of which were publicly available, for

15   example, 10-K information, 10-Q information.    We had --

16   we had the appraisals, both the original appraisals

17   that were prepared for the bank that had been already

18   talked about today, we also had the review appraisal

19   that was prepared by Paula Konikoff.    We had

20   information on the debt of the company that we used.

21         After we had worked with the financial data of

22   the company for quite awhile, as well as gotten an

23   understanding of the operations of the company, we paid

24   a visit to the company and had quite a lot of questions

25   that we asked them about their operations and sought to

1    gain some more documents to gain a better understanding

2    about what it is that they did.

3    Q.    When you say we, who are you referring to?

4    A.    Actually sort of the royal we.  It was -- I paid

5    a visit to the company.  I also had two staff people

6    who assisted me, primarily one, Laura Pfeiffenberger is

7    a staff person who worked at my direction on this case.

8    Q.    Up to and including the time you prepared your

9    report but stopping at that point, do you know how many

10   hours Fannon Valuation spent in doing the valuation

11   that culminated in your report?

12   A.    Yes, I believe it was 367 was what I tabulated.

13   Q.    In reviewing financial information to do an

14   evaluation, is it sufficient in your mind to use only

15   publicly available information such as 10-Ks and 10-Qs,

16   or is it necessary to go behind those documents?

17   A.    It's necessary to go behind those documents, if

18   you truly want to understand what's going on with the

19   company and understand what's underlying the data

20   that's presented in their 10-Qs and their 10-Ks.

21   Q.    As a result of the information you obtained and

22   the visit you made, what did you learn generally about

23   the activities of First Hartford?

24   A.    First Hartford has a combination of activities,

25   as you've already heard a lot about.  Their activities

1    break down as follows:  They have eight operating

2    properties.  Four of those properties are owned 50/50

3    with other partners.  So they don't have sole

4    discretion to control those properties.  One of those

5    properties they only have a 1.99 percent interest in.

6    They're -- in my opinion they're highly leveraged,

7    they're leveraged to the point of a hundred percent of

8    the book value of the property, about 75 percent of the

9    fair market value of the property.  They have two

10   properties that are held for development and

11   operations.  They have two properties that are held for

12   future development.  And then they have some

13   development activities; the most significant at the

14   valuation date was the Bangor Mall project.  And then

15   the other development projects that they had were very

16   early stage and high risk at that point.

17   Q.    When you value a real estate company, are there

18   certain risks that you have to assess as part of your

19   valuation?

20   A.    Yes, yes, and we endeavor to understand what it

21   is that you need to consider in a particular company

22   for the risks that are facing that company.  And in

23   this particular company we look at the industry, we

24   look at comparable companies, and we look at what the

25   company itself considers for risks.  So we determine

1  what those risks are and then we look and see how do

2  those risk factors affect First Hartford.  So the risks

3  that we considered in this report were things like

4  tenancy and renewals, success of their key tenants,

5  rental rates, their competition for properties,

6  geographic diversification, the complexity of the

7  company, regulatory risks, interest rate risks, things

8  like that.

9  Q.    And then what aspect of your valuation is

10  affected by your assessment of these risks?

11  A.    As I indicated earlier, when we're looking at a

12  company, the primary things that -- and this is true of

13  any company -- the primary things that influence value

14  are those three factors I mentioned.  It's cash flow,

15  growth, and risk.  And risk is expressed primarily

16  through either capitalization rates or market

17  multiples.  So we're looking at these variables to see

18  how they affect either cash flow or a rate of return or

19  market value or how they affect growth.  So that's why

20  we look at these factors.

21  Q.    Specifically the First Hartford, what were some

22  of the risks that you identified that became important

23  in your valuation?

24  A.    Well, they were the ones that I just listed.  The

25  first -- the first one that we looked at was the

1    tenancy and renewal risks, and the way that that played

2    out was we looked at the Konikoff appraisals and saw

3    some of the changes that she talked about in her

4    appraisal from the original appraisal reports.

5    Q.    And did you identify certain specific tenancy and

6    renewal risks that were important to you?

7    A.    Yes.

8    Q.    What were those?

9    A.    From the original appraisal that had been done

10   she identified, for example, in Putnam Parkade,

11   compared to some of the other properties --

12          MR. NEWMAN:  Excuse me, Your Honor, I didn't

13   realize, I'm going to move to strike the recitation of

14   the Paula Konikoff report.  Certainly there's been an

15   adequate foundation for reliance upon the report but

16   not for describing its contents.  That's hearsay, we

17   object to it, they've not offered it into evidence for

18   that reason.

19          MR. CULLEY:  Well, Your Honor, as you know,

20   under the rule an expert witness is entitled to rely

21   upon information that is not necessarily admissible at

22   trial if it forms the foundation of the --

23          THE COURT:  Mr. Newman's not challenging the

24   reliance; he's challenging the contents of the

25   information.

1        MR. CULLEY:  Well, it seems to me that if --

2    if the witness is going to use that information the

3    witness is entitled to at least what was significant to

4    the witness from those reports.  We're not offering it

5    for the truth but for what was significant to

6    Ms. Fannon in doing her valuation.

7        THE COURT:  Well, I will allow her to testify

8    as to what was significant to her, but I'll certainly

9    entertain argument as to the significance of the

10   absence of the reports themselves and the truth of

11   their contents.

12       MR. NEWMAN:  Then move to strike the last

13   testimony and ask for a new question, Your Honor.

14       MR. CULLEY:  I can take care of that, Your

15   Honor, if you want me to.

16       THE COURT:  It's being withdrawn and re -- and

17   new question.

18   BY MR. CULLEY:

19   Q.    After -- in your review of Ms. Konikoff's

20   appraisals, was there information that was significant

21   to you in assessing risk and then formulating your

22   valuation?

23   A.    Yes, there was.

24   Q.    Would you testify solely what you found to be

25   significant in your review.

1    A.    Yes.   There were some original appraisals that

2    had been done for the bank.   From the date that those

3    appraisals had been done there were some changes in the

4    condition of the properties, of some of the properties,

5    that Ms. Konikoff noted.   And that was the reason why

6    she came up with some different --

7              MR. NEWMAN:   Objection, Your Honor, move to

8    strike, giving the reason for the appraisal.

9              THE COURT:   Well, my ruling stands.   I'm going

10   to let her answer, but I'm admitting it for the

11   purposes of this witness' reasoning, and I will let you

12   argue to me whether I should consider --

13             MR. NEWMAN:   I misunderstood the Court's

14   ruling.

15             THE COURT:   Go ahead.

16   BY MR. CULLEY:

17   Q.    What were those things that were significant to

18   you with respect to tenancy and renewal?

19   A.    Okay.   One of the properties, Cranston Parkade,

20   was facing -- at the valuation date of 9/15 was facing

21   two vacancies, and they had lost significant tenants

22   taking up 8,000 square feet in the property.   So the

23   cash flows were reduced, and that changed the valuation

24   of the property.

25   Q.    Was there anything with respect to Putnam

1    Parkade?

2    A.    Yes, in Putnam Parkade there was no anchor tenant

3    in that property, so the capitalization rate was

4    changed because it was deemed to be a more risky

5    property.  There was another facility, the Katharine

6    Gibbs facility, where the cash flow was affected

7    because there had been a dispute with a tenant over

8    costs relating to -- I believe it had something to do

9    with environmental costs, and it resulted in a very

10   small reduction in the value.  More significantly,

11   there was some property that had been treated as land

12   in the previous appraisal that turned out to be a pond

13   so it couldn't be built upon, and also part of the

14   property was being used as parking and could also not

15   be built upon.  So she reduced the value for that.  And

16   further the tenant there, although this is subsequent

17   to that, the tenant there has subsequently decided to

18   leave that property entirely.  The other thing was on

19   the Main Street Parkade property, at the date of the

20   valuation that property was only 23 percent occupied.

21   Q.    Is that the property that's known as North Adams

22   also?

23   A.    Yes, yes, and I -- and I know that Mr. Aertsen

24   testified it was 70 percent occupied, but actually it

25   was only 23 percent occupied at the valuation date, and

1      in fact it's still not fully occupied.

2              THE COURT:  I don't -- is she testifying from

3      her own knowledge?

4      A.    I'm --

5      BY MR. CULLEY:

6      Q.    Are you personally familiar with the status of

7      North Adams?

8      A.    Yes, yes, the 10-K actually --

9              THE COURT:  Is this part of the disclosure,

10     that she has personal knowledge of it?

11             MR. CULLEY:  I think she's merely restating

12     what's contained in the 10-K that's in evidence, Your

13     Honor.

14     A.    Yes, that's actually in the 10-K, that the

15     property itself was only 23 percent occupied.

16     Q.    Are there also some regulatory risks that arise

17     in your valuation?

18     A.    Yes, with respect to the Trolly Barn property.

19     Q.    Just so we understand, is this taken from Paula

20     Konikoff's appraisal, so this was something that was

21     significant to you in your work?

22     A.    Yes, in fact, yes, all of these that I'm talking

23     about were from Paula Konikoff's except for the last

24     property that I mentioned, the Main Street Parkade.

25     Q.    What was the regulatory risk that you identified?

1   A.    In the Trolly Barn property land that had been

2   believed to be zoned for retail use was not zoned for

3   retail use, and the appraiser believed that it was

4   unlikely to gain rezoning.  So it was valued at less in

5   the Konikoff appraisal.

6   Q.    In addition to the risks you've just identified,

7   are there generally risks of ownership that you take

8   into account in doing an appraisal or a valuation?

9   A.    Yes, some other risks -- we identified many risks

10  related to real estate.

11  Q.    Let me just stop you.  Are these separate and

12  apart from what you learned from the real estate

13  appraisals?

14  A.    Yes, this is based on our own research of the

15  real estate industry that we did.

16  Q.    What are those risks?

17  A.    Okay.  There are many risks that we identified in

18  our report, but a couple of the ones that we

19  highlighted are many non-core investments don't

20  generate any cash flow in their first years of the

21  investment, and that's an important one to note because

22  they do engage in some of these development kinds of

23  properties.  And also during recessions the value of

24  commercial real estate can fall by as much as

25  20 percent or more, and we know that we're in a tough

1   real estate market now.

2   Q.    Is there also something called interest rate

3   risk?

4   A.    Yes, that's another risk that was listed in First

5   Hartford's 10-K, in the industry research that we did,

6   and in all of the guideline companies, the comparables

7   that we looked at as well, all talked about interest

8   rate risk.  And in fact, as of the valuation date,

9   interest rates had been rising -- had begun rising

10  again and had been rising since 2000 -- well, had been

11  turning upward 11 times since June 2004, the Federal

12  Reserve Board had raised interest rates again, and that

13  certainly would affect real estate value.

14  Q.    And how does it affect the real estate value?

15  A.    Well, it would serve to reduce real estate value;

16  it has an effect on the value.

17  Q.    As the cost of borrowing increases it affects the

18  value of real estate?

19  A.    Correct.

20  Q.    Did you utilize the three approaches to valuation

21  in this case that you testified about earlier?

22  A.    Yes, I did.  And then within those three

23  approaches to value I mentioned the income approach,

24  the market approach, and the asset approach.  Then

25  within the market approach I -- I used three different

1    methods.  I used a guideline public company method, I

2    also used a transaction method, which is evidence of

3    sales of entire companies, and then I also used the

4    stock price.

5    Q.    Now, let's start with the income approach.

6    You've already identified some of the general -- the

7    general business of First Hartford.  Were there other

8    things that were reported to you just generally as you

9    began this approach with respect to First Hartford's

10   operations?

11   A.    Yes, one of the things that I -- that I had to

12   think about is how do you think about this company's

13   operations and how would you break it down for an

14   income approach.  And I believe that if someone was

15   going to buy this company they would -- or

16   operationally you think about it for what they have for

17   recurring operations and then what they have for

18   nonrecurring or occasional operations.

19         And this company has a -- what I'll call a

20   built-in revenue and expense structure, so that's one

21   bucket that I would think about.  And that built-in

22   revenue and expense structure is made up of their

23   operating properties, all of those properties that they

24   rent, get rental income from, net operating income, and

25   then they also have the general administrative and

1    overhead and development costs.  And then they also

2    aside from that have development activities.  So those

3    were the two buckets to be valued in this exercise.

4    And they have to be treated somewhat differently.

5    Q.    Did First Hartford make statements in the 10-Ks

6    with respect to their profitability that was

7    significant to you?

8    A.    Yes, they did.  They repeatedly said in their

9    10-K that they would not be profitable but for their

10   occasional sales of real estate.  And in fact those

11   statements were, as we'll see, those statements are

12   evidenced in the long-term view of the company, the

13   short-term view of the company, and of our analysis of

14   their profitability and income position.

15   Q.    When you're doing an income approach, do you take

16   into account in any way the effect of taxes?

17   A.    Yes, absolutely.

18   Q.    And explain for the Court what you do in respect

19   to taxes.

20   A.    A corporation and investors and capitalization

21   rates and market multiples all include income taxes in

22   them, whether or not a company has a net operating

23   loss.  To simply assume that a company has a net

24   operating loss and you don't have to think about it

25   anymore is a much too simplistic approach.  You

1   actually have to do the calculation, see how the taxes

2   bear out, and then to the extent that there's a benefit

3   of an NOL you would take that against the tax effect.

4   Q.    In preparing for your testimony today, have you

5   prepared some chalks or some exhibits to use to present

6   your testimony?

7   A.    Yes.

8   Q.    Are those taken from the exhibits to your report?

9   A.    Yes, they are.

10  Q.    So that what we will show are summaries of

11  information, all of which can be found -- the source of

12  all of which is in the exhibits to your report?

13  A.    That's right.

14  Q.    I'd like to show you this first chalk which is

15  captioned First Hartford historical --

16          MR. NEWMAN:  May I just be heard very briefly?

17          MR. CULLEY:  Sure.

18          MR. NEWMAN:  We have reviewed --

19          THE COURT:  Have or have not?

20          MR. NEWMAN:  Have reviewed the chalks and

21  understand from Mr. Culley they're being used simply as

22  an illustrative aid because in fact there's content not

23  disclosed in the exhibits, and we have agreed they can

24  be used today.

25          MR. CULLEY:  What I will do, Your Honor, with

1    the Court's permission, and counsel has agreed, is at

2    the conclusion mark as an exhibit all of these chalks

3    so they will be part of the record of the Court.

4              THE COURT:  Fine, thank you.

5              MR. CULLEY:  And, Your Honor, I don't know if

6    you need to dim the lights or if it -- I'll leave that

7    up to you.

8              THE COURT:  You can look at your screen if you

9    prefer or at the big screen.

10             THE WITNESS:  I'll look at the big screen.

11   BY MR. CULLEY:

12   Q.    With respect to your income valuation approach,

13   could you explain the significance of the information

14   that's contained in this chalk?

15   A.    Yes, the first thing that I am looking at here is

16   a historical perspective of the company's -- I'm

17   starting with their operating income, so we're looking

18   back three years back to April 30th, '03, and then

19   moving forward through April 30th, '05, and then I'm

20   also presenting the quarter ending July 31st, '05.  And

21   I'm going down to the operating income line.

22             And I think the thing that's significant to

23   note here is that from their operations, which is the

24   result of operating their properties that they lease

25   out, in each of these years their income from

1    operations has actually been a loss, it's point 2, you

2    know, in '03 point 9 -- and this is in millions,

3    point 9 in '04 and point 7 in 2005.  In the quarter

4    ended July 31st, '05, they had an operating loss of

5    $2.4 million.  That was somewhat boosted by this item

6    right here; they had a loss on early retirement of debt

7    of a million and a half dollars.  You can also see that

8    their rental income has increased over this period as

9    some additional properties have come on line and begun

10   to be leased out.

11   Q.    Do you understand this concept of a loss on early

12   retirement of debt?

13   A.    Yes.

14   Q.    What is that?

15   A.    Those are defeasance costs that they have to pay

16   if they refinance the debt early.

17   Q.    So some commercial mortgages have a penalty

18   payment if the mortgage is retired before its maturity?

19   A.    That's right.

20   Q.    Is this chalk solely reflective of the operating

21   income, that is, not from any development activities?

22   A.    That's right.

23   Q.    Did you also look at similar information during

24   this time period for development activities?

25   A.    Yes, then if you move down the income statements,

1    the historical income statements, the next thing you

2    would see, and this simply flows down the income

3    statements, is you can see the income from their

4    development activities for the last three and a quarter

5    years.  And in the fiscal year ending April 30th, '04,

6    they sold a property that was called Mt. Olive, and

7    they had a gain of six and a half million dollars.  A

8    couple significant things to note about the sale of

9    this property was it was the first property that they

10   had sold since 1998.  I'm calling it in that little box

11   the sell-off period ended in 1998; I'm going to expand

12   on that comment in a little bit.  But that was the

13   first property that they sold.

14          I think the other significant thing to note

15   about that gain is that, although they're showing a six

16   and a half million dollar gain, the gain is calculated

17   on GAAP accounting; and GAAP, generally accepted

18   accounting principles, accounting requires us to do

19   many things that are purely by accounting convention

20   but don't really reflect economic reality.  In fact,

21   the debt on that property was a couple million dollars

22   more than the cost that we're showing there for the

23   property.  So the cash flow that they actually got out

24   of that property was quite a bit more.

25   Q.    And is that something that you see fairly

1    frequently both with First Hartford and other entities,

2    that when they account for the gain from a sale they

3    are using their cost basis but the reality is that

4    often the debt on the property exceeds the cost basis?

5    A.     Yes, because they've already pulled out a lot of

6    the value of the property and used it to invest in

7    other activities.

8    Q.     And does this chart tell us that for fiscal year

9    4/30/05 and the quarter ending 7/31/05 there was no

10   financial activity with respect to the development of

11   the sale of the properties -- excuse me, with respect

12   to the sale of the properties?

13   A.     Correct.

14   Q.     And then taking the -- the two pieces here that

15   we've just looked at, did you then do some kind of a

16   wrap-up or comprehensive analysis?

17   A.     Yes, and this is just again continuing on down

18   how the audited financial statements appear, it starts

19   with the operating loss, it accumulates net profit or

20   loss here, there's some other income and income tax

21   consequences here, and then this comprehensive income

22   or loss is just the total bottom line income or loss of

23   the company.  So you can see the only year that they

24   actually had income here was the year that they did

25   sell Mt. Olive.

1  Q.    Now, once you have then analyzed the income that

2  is evident from the financial records of the company

3  when you're doing an appraisal, do you then do

4  something that's called normalization of income?

5  A.    Yes.

6  Q.    First tell us what it is and then I'm going to

7  ask you why you do it.

8  A.    Normalization of income is when we look at the

9  financials and pull them apart, we get beneath them and

10 say, what's going on underlying all of these numbers,

11 and are they really what -- what a buyer could extract

12 from these numbers or on an arm's length basis.

13 Q.    And you mentioned this before, in your valuation

14 here were you looking at First Hartford or valuing

15 First Hartford as a single entity that would be

16 purchased by some other entity or someone else?

17 A.    Well, I was looking at it from the perspective of

18 a going concern on an arm's length basis.  So I was

19 looking at the total company on a going concern with --

20 with all expenses normalized to a fair market value

21 basis.

22 Q.    And not what someone might pay for a share of

23 stock of First Hartford.

24 A.    Correct.

25 Q.    Now, why is this normalization of income

1   important in doing a business valuation?

2   A.    Because I'm getting to the -- because in getting

3   to the fair market value I want to normalize all of the

4   expenses to their fair value of those expenses.

5   Q.    And is that in part because if you look at a two-

6   or three-year period sometimes there are either

7   expenses or revenue in that period that would not be

8   anticipated to occur over time?

9   A.    Well, it could be that, but the other thing you

10  want to make sure is that all of the expenses are fair

11  and stated at an arm's length.

12  Q.    And what kind of expenses might not be fair?

13  A.    Things like you want to look at intercompany

14  charges, you want to look at owner's compensation and

15  make sure that's properly stated, things like that.  It

16  tends to be different from company to company what you

17  might find.

18  Q.    And I think we'll get to this in more detail,

19  but -- later, but could you just explain for the Court

20  some of the items you identified that you felt should

21  be removed from the balance sheets to normalize income?

22  A.    The way that I approached -- if I could talk

23  about the way I approached it and identified the items

24  in this company, I looked at every subsidiary of First

25  Hartford and each individual company's profit and loss

1    statement, and I looked at their financial information

2    for a two-year period and what comprised their income

3    and expenses.

4            For the operating properties I used the net

5    operating income that the appraiser had used in the

6    real estate as an arm's length indication of what each

7    of those operating properties could be expected to

8    generate.  And that's only eight of the companies that

9    they have.  They have many more companies than that.

10           For each of the other companies I looked at

11   them on an individual basis to their income and

12   expenses and tried to determine what a -- fair income

13   and expenses were for -- and balance sheet items were

14   on an individual company basis.  I made a few other

15   what I would call material normalization adjustments.

16   For example, I removed the legal charges associated

17   with this lawsuit.

18   Q.    You mean the legal fees for this case?

19   A.    Yes, um-hum.  There was also a settlement in the

20   financial data for a lawsuit with Wal-Mart that had a

21   million dollars of income.  Something like that would

22   clearly be a nonrecurring item, so I removed the

23   lawsuit settlement net of the legal charges associated

24   with that lawsuit.  I also made an adjustment to

25   owner's compensation.  I did a study of compensation

 1   based on comparable salary data and made an adjustment

 2   to owner's compensation of about $370,000.

 3   Q.    And was that an adjustment that -- because you

 4   believe that the compensation that would be paid to

 5   these offices if the company were bought would be

 6   increased?

 7   A.    Yes, I did.

 8              THE COURT:  Probably lack of use or unless you

 9   pulled the plug.  The projector is still on; it may be

10   the screen.  There you go.

11       Counsel, do you want to take a luncheon break?

12              MR. CULLEY:  This would be a convenient time.

13   We're up and running, but this would be a good time.

14              THE COURT:  Let's take an hour and return at

15   1:30.

16                  (A lunch recess was taken.)

17              THE COURT:  Mr. Culley, you may continue your

18   examination.

19              MR. CULLEY:   Thank you, Your Honor.

20   BY MR. CULLEY:

21   Q.    Ms. Fannon, when we broke I believe we were about

22   to discuss the normalized income, which is on the chart

23   that's on the screen.  And I think you had described

24   the process, but tell us, if you would, what this chart

25   reflects.

1    A.    This chart reflects the rollup of all of the

2    operating and -- well, all of the subsidiaries of First

3    Hartford which roll up to the consolidated financial

4    statements after I've made my normalization

5    adjustments.  And I've summarized them here by

6    combining them into three columns.  The three columns

7    are the sum of the operating subsidiaries, which I've

8    combined those subsidiaries that operate real estate

9    for rental income purposes.  The next column is other

10   operations, which is the overhead, home office, and

11   development cost centers.  I've totalled those into the

12   normalized consolidated income column.

13         Then I've added adjustments for subsidiary

14   interests, and those are the sum of the interests that

15   they own with other partners.  So this would be PSO,

16   Cranston BBT and Dover, and then come to a total First

17   Hartford income on a normalized basis.  So they got

18   total revenues there of 7.7 million, operating income

19   of 3.1 million, interest expense of 2.9 and net profit

20   of point 2.

21   Q.    Now, is this for a one-year period immediately

22   prior to September 15th, 2005?

23   A.    Yes.

24   Q.    Then just generally what use do you make of this

25   information going forward in your valuation?

1   A.    I use this information then to forecast for my

2   income approach.   I also use it as a basis for my

3   market approach.

4   Q.    And is there some information that would help you

5   to put this year in perspective, having to do with

6   prior years?

7   A.    Yes.  Yeah, I don't want to just look at that

8   information in a vacuum, because I've made all of these

9   normalization adjustments and come up with a one-year

10  forecast, if you will, for what the income of this

11  company is.   And I've done that looking at some net

12  operating income for some of the companies, I've

13  normalized some figures, and I've looked at -- in the

14  most immediate periods I've looked at 2004 and 2005.

15        But I want to gain a longer-term perspective

16  on what this company has done.   So on this slide I've

17  looked at their income since 1999.   And I'll go into in

18  a minute why I went back to 1999.   But on this chart

19  I've showed their revenues and their income from 1999

20  through 2005.   And we can see once again in this entire

21  seven-year period here 2004 was the only year in this

22  seven-year period that they had a sale of property.   So

23  in that period -- and again I'm thinking of the

24  context, how does my point 2, again in millions,

25  compare to the historical perspective for what I'm

1    using for income.  If I include the gain, point 3 is

2    the average historical income over the entire

3    historical period.  If I --

4    Q.    Excuse me, if you include the gain from

5    Mt. Olive?

6    A.    Yes, in the seven-year period.  If I exclude the

7    gain, then their income, their operating income over

8    that entire historical period, is actually a negative

9    point 5, and I came up with a positive point 2.

10   Q.    Negative point 5 would be a half a million dollar

11   loss on average?

12   A.    That's right, excluding their gains.  And this

13   statement is really quite consistent with what the

14   company has said all along in their 10-K, which is, we

15   won't make money except for the occasional sales of

16   property.

17   Q.    You were here yesterday when Mr. Aertsen

18   testified, correct?

19   A.    Yes.

20   Q.    And did you hear him say that his valuation

21   assumes that the company will continue to generate

22   additional net operating loss to replace the ones

23   consumed?

24   A.    He -- yes, he did say that.

25   Q.    And they're creating more net operating loss

1    every day?

2    A.    Yes.

3    Q.    Do you believe that to be the case?

4    A.    Well, they are actually losing money from

5    operations here.  But this is from actual operations

6    that they're losing, except for when they sell

7    properties.

8    Q.    So what does Mr. Aertsen's assumption mean, then?

9    A.    Well, he -- he's using it in the context of

10   taxes, and he's using it to explain why you don't have

11   to recognize taxes, which I quite disagree with that

12   assertion.

13   Q.    You just showed us a period from 1999 forward.

14   Did you even go back earlier than that for -- to get a

15   long-term historical view of First Hartford's

16   performance?

17   A.    Yes, I did.  I actually went back to 1994 because

18   I thought it was important to put it in a much

19   longer-term view to see what the company's done over an

20   even longer history.  And again, I like to look at a

21   long operating cycle for a company.  In First

22   Hartford's case, what they've done over the long

23   period -- over a long period is, if you go back to

24   1994, for the period 1994 through 1999 they had

25   extremely high debt relative to their assets, and you

1    can see their equity was -- in 1994 was actually

2    negative 23 million.

3         They went through a period of bankruptcy here.

4    So they had a high sell-off period of selling off

5    properties, and the reason that they were doing this is

6    because they were attempting to dig themselves out of

7    this very high negative equity position that they were

8    in.  The only reason in fact that they were able to

9    have these high levels of debt relative to the property

10   was because Mr. Ellis was guaranteeing the debt, as he

11   in fact continues to do to this day.

12        But -- and over this period of time, through

13   their reduction in property, their property went from

14   27 million down to 7 million or a net reduction of 21,

15   and their debt went from 35 million down to 10 million

16   for a net reduction of 25 million.  So they went from

17   an equity position of 23 million negative to 6 million

18   negative, which is hardly a healthy position, but that

19   pretty much ended the deep sell-off time period there.

20   They stayed around negative 6 million in equity all the

21   way up until 2003, really didn't improve much, until

22   this one single sale here of Mt. Olive when they got it

23   up to negative 1 million in equity.

24   Q.   You mentioned Mr. Ellis' guarantees.  Did the

25   fact that Mr. Ellis was regularly guaranteeing the debt

1    of First Hartford have an impact on your valuation?

2    A.    Yes, certainly.

3    Q.    What was the impact of that?

4    A.    Well, it's fairly unusual for owners of

5    businesses to guarantee debt in the manner that he's

6    done so.  When they do guarantee debt they usually get

7    something in exchange, like stock options or warrants

8    or some form of remuneration.  And I certainly wouldn't

9    assume that an owner would continue to do that, either

10   without compensation or just do it indefinitely.  And

11   this was something I inquired about during the course

12   of my valuation.

13   Q.    Now, at this point after you had done this

14   analysis, were you ready to determine a capitalization

15   rate?

16   A.    Yes.

17   Q.    And how did you go about determining a

18   capitalization rate?

19   A.    I used a weighted average cost of capital, which

20   is a combination of a debt and equity rate, but in fact

21   this company is really almost entirely funded by debt.

22   I indicated before that they had -- on a book basis

23   they were a hundred percent leveraged.  So I ended up

24   coming up with a 4.14 percent capitalization rate,

25   which is an extremely low weighted average cost of

1   capital.  And the reason it was so low and they were

2   allowed to have such a low rate was because of their

3   high use of debt, which was enabled by the shareholder

4   guarantees.

5   Q.    And what use did you make to that

6   capitalization -- of that capitalization rate?

7   A.    Well, now that I had the income of the company

8   and I had my capitalization rate, again I had

9   calculated this as a weighted average cost of capital,

10  which means we capitalized the income before debt.  Our

11  weighted average cost of capital is applied to the

12  income before equity and debt holders.  So we're

13  applying it actually to operating income here.

14  Q.    Excuse me, if I can just stop you there.  That

15  operating income is prior to the payment of interest?

16  A.    That's right, because we're valuing income to all

17  capital sources, which is all equity and debt holders.

18  Here we're applying income tax because we're

19  recognizing the significant tax benefit that the debt

20  affords the company.  The company gets significant tax

21  benefits from the use of debt.  So we're recognizing

22  those benefits here.  And that gives us an invested

23  capital value of $51 million, and again this is of the

24  recurring sources of income and expenses, the built-in,

25  permanent sources of income and expenses to the

1    company.  The debt that is associated with those

2    sources of income and expenses is $54 million, so from

3    those -- that built-in capital structure there's

4    actually a negative value attached, which again is

5    consistent with what they've said, we will not have

6    value on our ordinary sources of income; it will be on

7    the occasional sales of property.

8    Q.    So applying the capitalization rate to the

9    adjusted income, you get this indicated value; is that

10   correct?

11   A.    Yes.

12   Q.    And what again is the indicated value?

13   A.    That's the indicated value of the equity.  We

14   have to subtract out the debt from the invested capital

15   value to get the equity value.

16   Q.    And when you say indicated value, for valuation

17   purposes, that is the value of the equity in the -- the

18   value of the assets of the company.

19   A.    Of the recurring sources of income and expenses;

20   we're not quite done yet.

21   Q.    Okay.  We're not talking assets, I misspoke,

22   right?

23   A.    Yes.  Yes, and now we have to go to the

24   development activities they had in place.

25   Q.    But before we do that, when you take this

1   indicated value and then factor in the debt of the

2   company, it indicates that there's a negative equity of

3   about $3.4 million?

4   A.    Yes.

5   Q.    Then what's the next step?

6   A.    Okay.

7   Q.    The value of the development activities?

8   A.    Yes, now we consider the development activities

9   that the company had in place at the time.

10   Q.    And if I can just interrupt, this is that

11   separate piece.  Now we focused on the money -- or the

12   revenue and the expenses that relate to the operating

13   companies, which are those properties that they own and

14   lease.

15   A.    Yes.

16   Q.    Correct?  And now we're focusing on the piece of

17   the company that engages in development activities for

18   perhaps future sale.

19   A.    Right.  So --

20   Q.    And here you're valuing these development

21   activities as an asset?

22   A.    Yes, I'm valuing them as I believe an investor

23   would view them.  An investor would say -- well, some

24   of these are simply property, these are the occasional

25   things that the company does that I believe it's very

1    difficult to attach an ongoing value to them.  And in

2    fact if you look at the company's stock price over

3    time, you can see that there's sort of this ongoing

4    value, and then when a sale is announced stock price

5    jumps up, and then after the sale occurs it goes back

6    down again.  And this is a pattern that you can see in

7    the stock prices of companies, and in fact you can see

8    it in the stock price of First Hartford.

9    Q.    So then the sum total, the value of these

10   development activities as of September 15th, 2005, if

11   we can just go back to that one, the value of the --

12   the total of these development activities as of the

13   valuation date was $11 million?

14   A.    Yes, and I particularly want to point out that it

15   includes the income tax asset.  Because we recognized

16   taxes, we need to also -- because we recognized the

17   deduction for taxes we want to recognize the full

18   benefit of the tax asset as well.  So we're adding that

19   back here.

20   Q.    What does the option shares refer to?

21   A.    That's the proceeds that the company would have

22   recognized upon the exercise of the stock option.

23   Q.    Then -- now that we have these totals, let's go

24   to the next slide.  What do we have here?

25   A.    This is just the summation of the two parts of

1   the business, the summation of the income approach and

2   the development activities, to get a total value from

3   the income approach.

4   Q.    So is this income approach the -- essentially the

5   same thing as a discounted cash flow approach?

6   A.    It's a capitalization of the income approach,

7   which is nothing more than a derivation of the discount

8   cash flow approach, yes.

9   Q.    So it can be done in lieu of cash flow, you can

10  use income and basically achieve the same quality of a

11  result?

12  A.    Yes, you can.

13  Q.    And does it indicate that from the standpoint of

14  the income approach that the company had a total value

15  of $7.6 million?

16  A.    Yes.

17  Q.    Now, then, did you next go to the market

18  approach?

19  A.    Yes, I did.

20  Q.    And just explain again from the standpoint of the

21  market approach, there were three components to that,

22  as I understand it?

23  A.    Yes, I used three methods.  I used a guideline

24  public company approach, I used a transaction approach,

25  which is transfers of entire interests in business, and

1    I used the stock price of the company.

2    Q.    And with respect to the transaction approach,

3    what were you comparing in the transaction approach?

4    A.    To sales of entire companies, entire real estate

5    companies.

6    Q.    Let's first discuss, then, the guideline

7    approach.

8    A.    In the guideline public company approach we seek

9    to find companies that are similar to First Hartford

10   operationally, and then we also do financial

11   comparisons of the companies.  So first we look to find

12   a peer group to First Hartford, and we found that peer

13   group in REITs and more specifically in retail REITs.

14   So we compare them --

15   Q.    What do you mean by a retail REIT?

16   A.    A company that operates in the retail segment,

17   REITs for real estate investment trusts.  And we look

18   to find as similar group of operating characteristics

19   as we can.  And we identified I believe it was 18

20   REITs.

21   Q.    Now, are there some differences between First

22   Hartford and a REIT that you had to take into account?

23   A.    Yes, there are.  REITs are required to distribute

24   90 percent of their profits, which First Hartford

25   obviously hasn't done over time, excluding capital

1    gains, I should say.  So we consider that in

2    determining our multiple, although I will say that if a

3    company doesn't distribute out their cash flow then

4    they retain the cash flow, and that retention of cash

5    flow leads to value.  And we can also see that in First

6    Hartford's stock price over time, and we'll look at

7    that in a little bit.  REITs are exempt from federal

8    tax, which First Hartford is not, so we had to take

9    that into account.  REITs generally have a greater

10   allocation of their income from operating properties,

11   so we considered that difference in the allocation in

12   how we developed our multiple.  We developed our

13   multiple based on the operating property income and

14   then added the other activities to our value

15   indication.  So all of those differences can be

16   accommodated by peer-accepted methods that we used.

17   Q.    So once you identified these REITs that you think

18   have some similar characteristics to First Hartford, do

19   you then look at specific financial characteristics of

20   First Hartford and compare those with those same

21   financial characteristics of the REITs?

22   A.    Yes, yes, once we have identified the pool of

23   comparable companies that we want to use to develop

24   multiples from, the next thing we have to do is

25   determine how similar is First Hartford to these REITs,

1    and we do that on the basis of a financial comparison,

2    once we're satisfied we've got a good operational group

3    of companies.  So we develop a number of financial

4    metrics.  We look at profitability ratios, we look at

5    debt ratios, and we look at investment ratios.  So we

6    calculate these ratios for the group of REITs and we

7    made a range of these ratios, kind of low to high.

8    Then we calculate these same ratios for First Hartford,

9    and we see where these ratios for First Hartford falls

10   within the ratio for the REITs.  You can -- and you can

11   do this comparison of where they fall either on a

12   percentile basis or on a regression kind of analysis,

13   as Mr. Riddiough used in his report.

14   Q.    Which type of analysis did you use?

15   A.    We did it based on a percentile kind of analysis.

16   Q.    So are these 18 REITs that you identified, did

17   they range in value or is there a range of value for

18   those REITs?

19   A.    There's a range of value and there's a range of

20   multiples that are produced by those value indications.

21   Q.    And in doing that do you -- as part of that

22   process do you go back and look at the First Hartford

23   normalized income?

24   A.    Yes, once we've developed where First Hartford

25   falls compared to the REITs and then selected our

1    multiple accordingly, then we have to figure out what

2    to apply it to, apply our multiples to, from First

3    Hartford's financial data.

4    Q.    This is the same chart that you -- we looked at a

5    little while ago; is that right?

6    A.    That's right.

7    Q.    This has the basic information that you used in

8    doing this comparison?

9    A.    Yes.

10   Q.    And then could you explain the metrics that you

11   used to value First Hartford compared to these REITs?

12   A.    Right, so we started with their normalized

13   income, and then we had three multiples that we wanted

14   to take a look at.  One is we wanted to calculate --

15   and we were always calculating market value of invested

16   capital, which is -- as we were calculating it, it was

17   equity plus debt.  So we calculated EBITDA multiples,

18   which is earnings before interest, taxes, and

19   depreciation.  We calculated revenue multiples and we

20   calculated multiples of operating assets.  We

21   calculated those for all of the REITs, and then that

22   meant we had to calculate the same thing for First

23   Hartford so that we had the metrics to apply the

24   multiples to.

25   Q.    So just so we understand, then, you would take

1    the EBITDA and determine the ratio of First Hartford's

2    EBITDA to its total value?

3    A.    We would determine the ratio of the REITs' EBITDA

4    to total value, come up with a multiple, and apply that

5    multiple to First Hartford's EBITDA.

6    Q.    And then the same with revenue and the same with

7    book operating assets?

8    A.    Yes.

9    Q.    And so, having done that, what are the multiples

10   that you determined from your comparison with the

11   REITs?

12   A.    Well, could I explain the two different levels

13   that we applied it to?

14   Q.    Please.

15   A.    Because we used two different levels of revenue

16   of each of the metrics.  We decided to look at two

17   different ways of applying the multiple.  One I'm

18   calling here normalized consolidated income; the other

19   I'm calling total First Hartford income.

20          The normalized consolidated income accumulates

21   First Hartford's income in the same manner that the

22   audited financial statements would accumulate First

23   Hartford's income.  As I indicated before, GAAP

24   accounting principles require the accumulation of

25   financial data, not necessarily the same way that we

1    might always like to use it.  Irrespective of that

2    fact, that's the data that investors see in the 10-Ks

3    when they view them, and often times multiples do get

4    calculated off of that data.  So we used an

5    accumulation in that manner for one set of

6    calculations.

7            Then we did it one other way.  This total

8    First Hartford column looks through the financial data

9    of all of the subsidiaries and simply sums it up of all

10   the subsidiaries, as if GAAP didn't really apply, and

11   says what would all of the income be if it simply

12   flowed straight through to First Hartford.  So we

13   calculated it on both of those bases.  And in doing it

14   that way I felt provided us with a range of value from

15   the market methods.

16   Q.    So then when we go to the REITs that you are

17   comparing, you have two sets of metrics that you're

18   using, correct?

19   A.    Two sets of calculations, yes.

20   Q.    Right, okay.  And then let's go to the next

21   slide, which is -- well, you explain what this is,

22   please.

23   A.    So now here -- so here is the as consolidated and

24   here is the total subsidiary as if all the subsidiaries

25   were flowing right through.  So if we go through the as

1    consolidated, I start with the EBITDA that I had

2    calculated, and then here is the multiple against

3    EBITDA that I calculated from the REITs.  And I

4    selected this multiple based on where First Hartford

5    fell compared to the group of guideline REITs.  And

6    then I did the same thing for the revenue multiple

7    applied to First Hartford's revenue and for their

8    operating assets.

9    Q.    And when you say you did it compared to how First

10   Hartford fell with these REITs, what were you comparing

11   from First Hartford to these REITs to make that

12   comparison?

13   A.    I was comparing their financial metrics, for

14   example, their profitability ratios compared to the

15   REITs, their operating ratios, their debt ratios.  So

16   if their profitability was in the 10th or 25th

17   percentile, then they would be at the lower range

18   compared to if they were in the 75th or 90th

19   percentile, so they would get a lower weighting of the

20   multiple.

21   Q.    Okay, then, the -- explain the three lines under

22   value indications.

23   A.    Um-hum.  Then I weighted the indications here and

24   came up with indication of value from which I had to

25   subtract the debt that was associated at that level,

1    and then I had to add cash.  I'm adding cash because my

2    market value of invested capital doesn't include cash.

3    One of the things we did when we calculated market

4    value of invested capital is I deducted cash and

5    investments, and I did that because it can vary so much

6    from one REIT to another.  So I subtracted it from the

7    REIT indicators, and then I added First Hartford's

8    actual cash here.

9    Q.    If you go -- excuse me, go back up in that column

10   where you have weight and then you have the numbers to

11   the right?

12   A.    Yes.

13   Q.    You have the $33,199,000 under that first line?

14   A.    Yeah.

15   Q.    Is that basically an average of the three value

16   indications over on the left?

17   A.    That's right.

18   Q.    All right.  Continue on, then, I'm sorry.  You

19   subtracted out the debt and then you added back in the

20   cash, and then what does that produce?

21   A.    Well, this produces -- from the as-consolidated

22   method of doing this, it produces a value indication

23   from this permanent -- permanent activities of First

24   Hartford.  And again we're talking about the operating

25   real estate and the built-in expense structure of a

1    million 825.

2    Q.    And is the reason you did that because these

3    REITs really don't engage in development work so you

4    are valuing the operation side of First Hartford and

5    comparing that to the REITs?

6    A.    Yes, it's -- but it also encompasses their cost

7    structure that they have built in as well.  So part of

8    that cost structure is their overhead, their general

9    administrative overhead, and some development as well

10   people built into that permanent cost structure.  And

11   to that I have to add the development assets that were

12   in place at that time, and again this includes that tax

13   asset that I was talking about earlier.

14   Q.    And those are those same development assets that

15   were on a slide we just looked at a few minutes ago

16   which valued those assets as of September 15th.

17   A.    Right.  So for this method I get a value

18   indication of 12,831.  I run through the same

19   calculation here on the flow-through method and get

20   10 million 109.

21   Q.    And the difference is primarily because the

22   consolidated financials require generally approved

23   accounting methods and the total subsidiary does not

24   have those same requirements?

25   A.    Right, it's two different ways of looking at

1    their financial data.

2    Q.    Okay.  So then we have a value of 12,831,000 for

3    the consolidated approach and 10,109,000 for the total

4    subsidiary approach?

5    A.    Yes.

6    Q.    And then what do you do with those numbers?

7    A.    Well, the next thing I have to do is think about

8    the tax implications, tax differences between First

9    Hartford company and the REITs that I've just compared

10   them to.  First Hartford company is a C corporation

11   that's subject to double taxation.  If they incur a tax

12   and then if they distribute out any income, their

13   shareholders then incur a second level of tax.

14   REITs --

15   Q.    Just let me interrupt you.  You say double

16   taxation, basically those dollars get taxed twice.

17   A.    That's right.

18   Q.    Once for the corporation and once for the

19   individual shareholder.

20   A.    Yes, either by virtue of a -- that their

21   shareholders have to pay a dividend tax or they have to

22   pay a capital gains tax.  REITs by comparison only --

23   their shareholders only bear one level of tax because

24   REITs are exempt from corporate tax, and actually many

25   states also exempt REITs from corporate tax.  I

1   actually have a state tax in here for the REITs.

2   Q.    Can I just interrupt you for a moment, too.

3   Where did -- the $175,629 of income, where did that

4   come from?

5   A.    This is the net income all the way down.

6   Q.    Of First Hartford?

7   A.    Of First Hartford, the net income all the way

8   down.

9   Q.    And for the REIT you just took that number for

10   comparison purposes to show the impact of the different

11   tax treatments between a C corp and a REIT?

12   A.    Yes, what I'm really trying to get to is what is

13   the differential between these two, and I'm using these

14   for demonstrative purposes of how you calculate the

15   difference.  This model that I'm using here is a model

16   that was used by the Delaware Chancery Court in a case

17   called Delaware Radiology versus MRI.  It was used in

18   the valuation of an S corporation versus a C

19   corporation, which has actually the mirror opposite tax

20   implications as this case.  So what I did is I took

21   that model and I flipped it upside down to use it for

22   this particular case.

23         What we're trying to do here is say, if this

24   is the income, how much cash actually flows all the way

25   down in each case to an investor's pockets and what's

1    the differential, depending on whatever the dividend is

2    in either case.  It may not be 90 percent, but whatever

3    it is, how much flows down to an investor's pockets and

4    how much of a detriment or benefit is there from one

5    form of ownership compared to the other form of

6    ownership.  So that's what this is recognizing.

7    Q.    Okay.  And you have a 14 percent premium, which

8    means the REIT actually pays out 14 percent more than

9    the C corp?

10   A.    Yes, yeah, the amount of cash that ultimately

11   flows through is 14 percent more, which means -- if you

12   flip that calculation upside down it means the First

13   Hartford has a detriment relative to a REIT of

14   12 percent.

15   Q.    So 95,000 is $14,000 more -- is 14 percent more

16   than 83,000, but 83,000 is 12 percent less than 95,000?

17   A.    Yes, yes, that's right, yes.  Now, this -- this

18   whole concept is very well accepted in the pass-through

19   entity valuation, and again this is just flipping this

20   model upside down for the facts that we have here.

21   Q.    Now, having done that, do you then apply this tax

22   adjustment to your guideline public company method?

23   A.    Right.  So all I'm doing here is I'm taking the

24   two value indications we saw two slides ago and I'm

25   applying that 12 percent to each indicator, and then

1    I'm averaging these two to get to my final conclusion

2    of 10,082,000 from the guideline public company method.

3    Q.    So doing the guideline public company method,

4    then, you determined First Hartford has a value of

5    $10,082,000?

6    A.    Yes.

7    Q.    And then finally with respect to this approach

8    you use the -- well, not finally, excuse me, this is

9    the market approach, so the next method is the

10   transaction method?

11   A.    Yes, yes, which are both market approaches.

12   Q.    And just explain again the difference between

13   the -- what you just did, the guideline public company

14   method and the transaction method.  What's the

15   difference between those two?

16   A.    Both of them are market approaches.  They're both

17   taking transaction prices from the market.  The

18   guideline public company method is taking the trading

19   prices of stocks that are trading in the marketplace

20   and taking their implied market value, essentially by

21   taking the trading price times the number of shares

22   outstanding to come to a market cap, capitalization for

23   the company.  The transaction method, sometimes called

24   guideline merged and acquired method, is taking sales

25   of companies in the market, where a hundred percent of

1    the company has sold.

2    Q.    So these are actual sales, then, of companies.

3    A.    Yes.

4    Q.    And how do you find that information?    Where does

5    that exist?

6    A.    It's in published databases.    There's a number of

7    databases that exist that we subscribe to.

8    Q.    And did you look for particular types of

9    companies in finding companies to use this transaction

10    method for?

11    A.    Yes, we did.

12    Q.    What kind of companies do you look for?

13    A.    We narrowed our selection to the same kinds of

14    companies that we were looking for for the guideline

15    public company method, so we were looking for the same

16    profile that I described earlier.

17    Q.    How many transactions did you identify and over

18    what period of time?

19    A.    We identified 21 transactions from '97 to 2007.

20    Q.    And then did you do a similar kind of metric

21    calculation?

22    A.    Yes, it was very, very similar to what I

23    described before.    So, again, we calculated how First

24    Hartford compared to the guideline companies -- or I'm

25    calling them guideline companies because we also call

1    them guideline companies in this method -- but to the

2    companies that transacted.  So we looked at First

3    Hartford's EBITDA to revenue, EBITDA to total assets,

4    and revenue to total assets, and then here's the ranges

5    of each of those metrics for the companies that

6    transacted.  We also -- and then these are the

7    multiples for the companies that transacted that we

8    selected.

9           We also selected a smaller subgroup of the

10   larger group based on some qualitative factors that we

11   identified, and then from our overall analysis we

12   determined that First Hartford fell somewhere in the

13   25th percentile to the median of the group of

14   multiples.  So we selected an average of the

15   25th percentile in the median.

16   Q.    So the First Hartford metrics, then, if that's

17   the right term, are those found in the white line at

18   the top?

19   A.    Right there.

20   Q.    And then what you did is find where the -- those

21   numbers fall in the range for these transaction

22   companies?

23   A.    Yes.

24   Q.    And then what did you do once you had the range?

25   A.    Well, once we had the range and we selected our

1   multiple, then we applied the multiples in very much

2   the same manner that we did for the guideline public

3   company method.

4   Q.    Is that shown on the next chart?

5   A.    Yes.  It's very much the same method.  The only

6   difference here is that we don't have the adjustment

7   for the tax adjustment because in this instance we

8   assume that First Hartford would be acquired by the

9   REIT and the tax differential wouldn't exist anymore.

10  Q.    And what did the -- what conclusion did you get

11  when you did this transaction analysis?

12  A.    $9.6 million.

13  Q.    As the imputed value to First Hartford?

14  A.    Yes.

15  Q.    And then finally did you look at the stock price?

16  A.    Yes, we did.

17  Q.    What did you find when you looked at the stock

18  price?

19  A.    We found that it was 10 million -- yes,

20  $10 million.

21  Q.    And how did you arrive at that figure?

22  A.    Well, we looked at what the stock had been

23  trading at right at the valuation date or right around

24  the valuation date, which we considered to be a

25  relevant indicator of value.

1    Q.    Why did you consider it to be a relative

2    indicator of value?

3    A.    Well, if you look at the literature on valuation,

4    it tells you that, even if there are only a few

5    transactions of stocks, it can be a relevant indicator

6    of value, and here we had a time period where there

7    were in excess of -- actually it was around 6,000 a

8    month shares of stock that were transacting in the

9    market, so we considered that a very relevant

10   indicator.

11   Q.    Now, Mr. Aertsen testified that the value of

12   First Hartford was many times over its stock value.

13   Are there situations where the stock price, the price

14   that's traded on the open market, can exceed the value

15   of a company?

16   A.    Are there situations?

17   Q.    Yeah.

18   A.    Sure.

19   Q.    And what are the circumstances that can lead to

20   an overvaluation in the stock market?

21   A.    Sometimes there can be exuberance in the market

22   for various reasons.

23   Q.    Did you look at the stock price both before and

24   after the valuation date?

25   A.    Yes.

1   Q.    What did you find, if anything, that was of

2   significance?

3   A.    That it was significantly lower before the

4   valuation date and that it dropped off after the

5   valuation date.  The valuation date was kind of a -- a

6   peak, they had had the announcement of the sale of

7   Mt. Olive which caused a real spike in the value, and

8   then there was the announcement of the sale of Bangor,

9   which had another peak with it, and then it dropped

10  back again but not to the previous levels because there

11  was the, you know, reinvestments on other properties

12  which held it up.

13  Q.    Okay.  We'll talk more about these three values

14  you determined from the market approach in a little

15  bit.  But let's now focus on the net asset value

16  approach.  And just generally explain to the Court the

17  role or the function of the net asset value in doing a

18  valuation of a going concern.

19  A.    In the context of a going concern, a net asset

20  value appraisal may not be relevant at all, because

21  it's -- it really isn't indicative of the going concern

22  value of a company.  The context that I considered it

23  relevant is, one, in the off chance that a liquidation

24  may be necessary then you would consider to some

25  relatively minor degree the liquidation value of the

1    assets.  The second context that an investor would

2    consider it is to what degree you could gain liquidity

3    out of the assets, for example, to the extent of

4    gaining additional refinancings out of the assets.  So

5    that's the context I considered it.

6    Q.    In doing the net asset value did you look at

7    First Hartford's balance sheet?

8    A.    Yes.  So this is the top half of their balance

9    sheet, here's their assets.  They had -- now, this is

10   actually their July 31st balance sheet which I rolled

11   forward to September 15th, but I started with July 31

12   because that was the balance sheet that was the last

13   published balance sheet that was known as of the

14   valuation date, September 15th, known as the valuation

15   date.  So they had cash of $800,000; we're going to

16   talk a little bit more about the deposits and prepaids

17   in a little bit.  They had 11.8 million of property

18   under construction; that was the Bangor project.  Total

19   property and equipment as 42 million on a book value

20   basis, this is their tax asset that was booked -- again

21   by accounting convention was booked at $2.3 million,

22   for total assets of $50.3 million.

23   Q.    And then did you look at the liabilities?

24   A.    I did.  On the liabilities side their

25   construction loans payable, they had at that date out

1   on Bangor $5.9 million, other liabilities out, they had

2   about $40 million in other liabilies, and stockholder

3   equity of 3.3 million.  And then those -- just a

4   snapshot of all of that put together.

5   Q.    Is there a summary that you put together?

6   A.    Yes, this is the summary, so you can see their

7   total current assets is 4.8, their total property and

8   equipment was 42.8 million against total long-term

9   liabilities of 45.8, so they were pretty fully

10  leveraged at that point again with the negative equity.

11  Q.    Now, once you had the information from the

12  balance sheet for the quarter ending July 31st, 2005,

13  did you make some adjustments to that to roll it

14  forward to September 15th, 2005?

15  A.    Yes, yes, I did.

16  Q.    Does this sheet reflect it?

17  A.    No, this is actually my adjustments to fair

18  market value --

19  Q.    Okay.

20  A.    -- as of July 31st.

21  Q.    This is before you did the reconciliation up to

22  July -- up to September 15th?

23  A.    Yes.

24  Q.    And would it -- is it appropriate to discuss this

25  now, this valuation here?

1    A.    Yes.

2    Q.    So explain what this chart is, and start with the

3    column on the far right-hand side, please.

4    A.    This is the column we just looked at where we got

5    the assets of $50 million and the liabilities of

6    50 million with the equity of $3.3 million.  These are

7    all of the adjustments of those assets to their fair

8    market value.  So just going down -- to get to what the

9    adjusted fair market value of the balance sheet is as

10   of July 31st, 2005, of course I couldn't -- you can't

11   do it directly to September 15th because we don't have

12   a September 15th, 2005, balance sheet.  So cash just is

13   what it was at that date.

14   Q.    So in other words, the cash did not require any

15   adjustment from your perspective?

16   A.    Not at -- correct, it did not, right.

17   Q.    And then the next item is accounts receivable,

18   and that apparently required some adjustment?

19   A.    Right, if I could just stay on cash for just a

20   moment.

21   Q.    Sure.

22   A.    I understand that there was -- there's been

23   discussion about more cash coming in than this amount.

24   There was -- there was additional cash that came in on

25   I believe it was either October 30th or October 31st

1    that related to the Bangor property that was committed

2    to be paid out to a tenant related to the Bangor

3    property.

4    Q.   We can discuss that -- we'll discuss that, I'll

5    ask you about that in a few minutes.

6    A.   Okay.  So anyway, this is what the cash was, so I

7    made no adjustment to it.  The accounts receivable had

8    to -- the adjustment there had to do again with another

9    GAAP adjustment that I made.  In the 523,000 figure

10   that you see there, by GAAP accounting convention

11   they're required to record something that's called

12   straight-line rents, and that means that they record

13   rents on a straight-line basis, even if that's not what

14   they -- how they actually receive them over the life of

15   the loan.  So this is -- this adjustment is to record

16   rents on the basis of how they -- what the receivable

17   actually is for the rents.  And I did this by going

18   back to the individual subsidiaries of each individual

19   company in adjusting those rents.

20   Q.   And, excuse me, just generally, is the reason you

21   do this because general -- the GAAP principles do not

22   really reflect the financial picture that a buyer might

23   want to take of a company?

24   A.   Correct, yes.

25   Q.   Okay.  Why don't you continue on, then, and

1    identify the adjustments that you make.

2    A.    Okay.  Then this line, deposits, escrows, prepaid

3    and deferred expenses, contained in this number right

4    here are a number of assets that would not be

5    realizable to -- on -- well, on a going-concern basis

6    or to a seller, and remember for the limited purpose

7    we're using this balance sheet is in the unlikely event

8    that the company was actually liquidated.  There are

9    many assets in here that are things like prepaid

10   commissions.  And what that represents is dollars being

11   paid, the money's already being spent and it's being

12   amortized over time.  That doesn't represent an asset

13   you can sell.  It's just again an accounting convention

14   for money that's been spent in the past that accounting

15   convention doesn't allow you to expense it all at once.

16   It causes you to expense it over the life of the asset.

17   That's not worth anything.  It's gone.  So those

18   amounts were written off.  All of those deferred

19   expenses were written off.  And that's the bulk of

20   what -- those kinds of deferred costs is the bulk of

21   what was written off in those amounts.

22   Q.    So instead of there being $3,473,000 of an asset,

23   you determined that 1.8 million should be written down

24   or reduced to turn that asset into a 1.65 million

25   dollar asset.

1   A.    Yes, that's right.

2   Q.    Continue on to the next adjustments that you want

3   to discuss.

4   A.    Okay.  The next one here is the capital gains.

5   Q.    And why did you skip over the two above that?

6   A.    Because they're just totals.

7   Q.    Oh, I see, okay.  Those are the totals of the

8   previous --

9   A.    Oh, I'm so sorry, no, this is the adjustment to

10   the property and equipment value based on the real

11   estate appraisals.

12        This amount right here is the sum of

13   9.8 million in capital gains taxes that was provided in

14   the report that Stuart Lyons had prepared.  It's also

15   1.7 million in transaction costs, and it is also

16   1.1 million which represents a priority payment related

17   to Cranston BBT which would have to be paid over to the

18   other partner upon a sale of the property.

19   Q.    Can I stop you there.  You mentioned Mr. Lyons.

20   You reviewed Mr. Lyons' report in this case, right, as

21   to the tax consequences here?

22   A.    Yes.

23   Q.    And did you find it to be a -- to your mind an

24   accurate assessment of the tax consequences?

25   A.    Yes.

1          MR. NEWMAN:  Objection, Your Honor.

2          THE COURT:  I will allow this on the same

3    basis previously in terms of her opinion, but you can

4    argue the significance of the fact that it's not

5    introduced.  Go ahead.

6    BY MR. CULLEY:

7    Q.    You've had a number of years of experience as a

8    tax partner in an accounting firm, correct?

9    A.    Yes.

10   Q.    Did you do your own calculations to see if you --

11   if Mr. Lyons' calculations seemed to be accurate?

12   A.    Yes, I had done a -- I had been keeping a rough

13   calculation of the capital gains tax.

14   Q.    And having done your own calculations, you found

15   his calculations to be accurate?

16   A.    Yes, I did.

17   Q.    All right, continue on, then, with the next

18   adjustment.

19   A.    Okay, this adjustment right here is for the

20   investment in the affiliates, and this represents the

21   proportionate share of the interests that First

22   Hartford owns, the fair market value of the

23   proportionate share that they own in Dover and

24   Cranston.  And on the Dover and Cranston subsidiary

25   statements their fair market value adjustments are

1    posted to the property.  So that's where their fair

2    market value comes through.

3         CP, their investment in CP is a little bit

4    different.  100 percent of CP's property assets and

5    equipment flows through all throughout their balance

6    sheet, even though they only have 50 percent of it

7    also.  So this removes the minority interest, the

8    50 percent interest to the CP, to get it on the same

9    basis as the 50 percent interest here.

10         This next adjustment is to remove the tax

11    asset, and I remove it here because it's already

12    considered in the capital gains tax that's calculated

13    there.

14         The final adjustment that I make here is to

15    remove other liabilities.  This is due to distributions

16    that were made in excess of basis of the affiliates.

17    And I -- I just discovered within the last day or two

18    that this amount here that I left over on the balance

19    sheet actually should have been closed out to equity,

20    which would have reduced the equity by another

21    $940,000, would have lowered the equity by about

22    $940,000.

23    Q.   So, then, those calculations after adjustments

24    from the consolidation balance sheet of 50 million

25    result in a -- well, excuse me, total liabilities and

1    equity of 65 million, correct?

2    A.     Yes.

3    Q.     Then what did you do with that figure?

4    A.     Well, it's the equity figure that's the important

5    figure for valuation purposes.

6    Q.     Well, let's go to the next slide because I just

7    want to -- again, you went through this, but again

8    explain again where the 12.6 million dollar adjustment,

9    what its components are.

10   A.     Well, it's the capital gains tax of 9.8 million.

11   Q.     And that is an assumed tax, right, that would

12   have to be paid if all these properties were sold?

13   A.     Yes, again for the purpose that the net asset

14   value fits in this appraisal and for the weight we're

15   giving it, if you're assuming liquidation of these

16   assets then you have to assume the capital gains tax,

17   which a 9.8 million is an appropriate calculation.

18   Q.     And then how did you arrive at the figure of

19   $1.7 million for assumed selling costs if the

20   properties were liquidated?

21   A.     That represents about -- it was about 1-1/2 or

22   2 percent on the properties as they sold.

23   Q.     And why 1-1/2 to 2 percent?

24   A.     Because that was about typical, typical in the

25   industry.

1  Q.   In your experience involved in valuing properties

2  you've found over the years that selling costs of

3  properties of this type range from 1 to 2 percent?

4  A.   That was actually from Stuart Lyons' report and

5  from management.

6  Q.   And did you believe that to be accurate and

7  reasonable?

8  A.   I believed it was reasonable; it's what they told

9  me.

10  Q.   And then there's a priority payment that's

11  referred to there.  Could you explain what that is?

12  A.   Yes, the -- Cranston required that there be a

13  priority payment to their partner if the property sold

14  over a certain amount within a given amount of time,

15  and it was over that amount and the calculation would

16  have required a 1.1 million payout to that partner

17  based on the valuation of Cranston.

18  Q.   And then did you come up with an adjusted balance

19  sheet to 9/15/05?

20  A.   Yes, the last thing I did is I -- I looked at

21  the -- again, we didn't have a balance sheet at

22  September 15th, 2005.  We did have the next 10-Q,

23  though, which was October 31st, 2005, so I looked at

24  the change in the equity between July 31st, 2005, and

25  October 31st, 2005.  I essentially took half of it,

1    after taking into consideration the changes in the

2    debt, and booked that.  And then I also added in the

3    proceeds that they would have received from the option

4    shares, on the exercise of the option shares, to come

5    up with a value of a net common based on this method of

6    13.3 million.

7    Q.    And the total stockholders equity of 12-eight,

8    that comes off that adjusted balance sheet we were just

9    referring to.

10   A.    Yes.

11   Q.    So your view of the liquid -- excuse me, the net

12   asset value of the company is $13,337,000?

13   A.    Yes.

14   Q.    So have you now, then, gone through the three

15   methods and determined a value for each of the three

16   methods as well as the three components of the market

17   approach?

18   A.    Yes.

19   Q.    And what's the next step?

20   A.    Well, the next step, then, is to combine them and

21   determine what weight to give to each of the methods.

22   Q.    And just explain that weighting process, what

23   takes place as a business valuation expert to weight

24   those various values.

25   A.    Well, I look at the information that each of them

1    is telling me.  I -- I typically set them up like this.

2    The market approach I think by and large is telling me

3    pretty much the same information, they're all coming

4    out around $10 million.  So I gave them all the same

5    weight.  I also think the information from the income

6    approach is relevant, so I weighted that equally with

7    the market approach.  I gave considerably less weight

8    to the net asset value approach, because again I think

9    in a going concern appraisal it has a less important

10   role to play so that when it's all weighed out only has

11   I believe it's about 11 percent overall weight, whereas

12   the two other methods weigh about 44 percent each.

13   Q.    And once you've done that, then, what is the --

14   then that weighted value that you determined of First

15   Hartford?

16   A.    $9.3 million.

17   Q.    And then you divided that -- or divided the

18   number of shares into that amount?

19   A.    Yes, I first increased the shares by the shares

20   that were committed in the stock option plan to get the

21   fully diluted shares of 3.3 million shares to come up

22   with a per share price of 2.79 a share.

23   Q.    So that is your opinion, having gone through the

24   various valuation methods and weighted them as a per

25   share value of a hundred percent of the stock of First

1     Hartford?

2     A.     Per -- well, that's my per share value, yes.

3     Q.     But the $9.3 million is the figure we should be

4     looking at.

5     A.     Yes.

6     Q.     I'd like to ask you some questions about

7     Mr. Aertsen's appraisal.  You heard his testimony here

8     today, correct?

9     A.     Yesterday.

10    Q.     Yesterday, I'm sorry, right.  And from his

11    testimony did it appear as though he had reviewed the

12    volume of material that you had reviewed?

13          MR. NEWMAN:  Objection, Your Honor.  I'm going

14    to object to that question, calling for speculation.

15          THE COURT:  Sustained.  I heard his testimony.

16    BY MR. CULLEY:

17    Q.     Okay.  When Mr. Aertsen opined that the stock was

18    undervalued by about 80 percent, did you believe that

19    to be a realistic assessment?

20    A.     No, not at all.

21    Q.     And why not?

22    A.     Well --

23          MR. NEWMAN:  Objection, Your Honor, I don't

24    object -- I'm sorry to interrupt but, you know, this is

25    asking for an open-ended narrative, no way to know the

1    basis for the question, just what's your take on

2    Mr. Aertsen's opinion.

3            THE COURT:   Overruled, you may answer.

4    A.    If that were true in a publicly listed stock,

5    anyone in the market could have had the properties

6    appraised, anyone could have -- if his method was in

7    fact a valid method, which I seriously disagree that it

8    is, anyone could have duplicated that methodology.  The

9    properties are all listed in the 10-K, and the

10   methodology that he uses uses nothing more than

11   information that's available in the 10-K.  It would be

12   very transparent and easily -- easy to duplicate.  So

13   it begs the question, then, why wasn't the stock priced

14   up like that, why wasn't there a run on the stock.

15   Q.    Do you believe that using a three-year historical

16   average of income is appropriate in doing a valuation

17   of a company such as First Hartford?

18   A.    Appraisers do sometimes use historical

19   information like that, but the only reason you use

20   historical information or weighted average or weighted

21   average historical information is to get a prophecy for

22   the future, because valuation is always a prophecy of

23   the future.  So to the extent that any information that

24   you're using historically overstates something or

25   misstates something, then it's not appropriate to use

1    that information.  So the information that Mr. Aertsen

2    used overstated or overemphasized the extent to which

3    this company experiences gains from sales of property.

4    Q.    Have you done a summary of what Mr. Aertsen's

5    testimony was with respect to the valuation?

6    A.    Yes.

7    Q.    Can you just briefly explain to the Court what

8    you've done with this chart?

9    A.    Well, this is just very simply a summary of the

10   method that he used, and I can talk about each piece,

11   but the summary is his real estate value is

12   $21.4 million, which he -- he calls an enterprise

13   income valuation.  He then added assets to that, and

14   that net working capital, tax shield, he's calling them

15   nonoperating assets and liabilities, so he added these

16   balance sheet assets to his enterprise income

17   valuation.  And then he adds to that another

18   capitalization of income, sources of revenue and

19   expenses, to get to value of other for $11.7 million.

20   He then adds Bangor to get to a total valuation of

21   $48.2 million.

22   Q.    And which of the -- well, let's start with the

23   total real estate.  Do you and Mr. Aertsen agree as to

24   the total value of the real estate?

25   A.    No.

1   Q.    And how do you differ with Mr. Aertsen?

2   A.    I believe we have a slide.

3         MR. CULLEY:  We have a little glitch here,

4   Your Honor, if we can perhaps pass on that and get back

5   to it in a minute.

6   BY MR. CULLEY:

7   Q.   Let me ask you to take a look at 161B.  No. 161,

8   plaintiff's exhibit.

9         THE COURT:  You may have the slide.

10        MR. CULLEY:  There we are, thank you.

11  Q.   Okay, let's go back to that.

12        MR. NEWMAN:  Excuse me, Mr. Culley, that's not

13  in the package you gave me.

14        MR. CULLEY:  It isn't?  Your Honor, could we

15  have just a minute?

16        THE COURT:  Turn your microphone off unless

17  you want us all to hear you.

18        MR. CULLEY:  I don't care if you hear me or

19  not, Your Honor.

20        MR. GROFF:  You've heard worse.

21            (Discussion off the record.)

22  Q.   Ms. Fannon, would you look at this chart, and

23  we'll start with the 21 million dollar value that

24  Mr. Aertsen ascribed to the real estate.

25  A.    Yes, he had --

1    Q.    And I assume you have made some adjustments here

2    to get at what you believe is the adjusted total real

3    estate value?

4    A.    Yes.

5    Q.    Could you explain them, please.

6    A.    Yes, he began with $21.5 million.  I -- the first

7    thing I have listed is difference in value of operating

8    properties, and these are primarily the differences

9    between the original appraisals that were done and the

10   appraisals done by Paula Konikoff.  Then I have

11   differences in value of nonoperating properties.  These

12   are -- this is in part Konikoff appraisals, and there

13   is also -- the differences in the Main Street Parkade

14   property is included in this.

15   Q.    When you say differences in the Main Street

16   Parkade property, you heard Mr. Aertsen testify that he

17   determined the value of the Main Street Parkade

18   property by multiplying the square footage by I think

19   $106 a square foot?

20   A.    Yes.

21   Q.    Okay.  And you don't believe that is an accurate

22   representation of the value of Main Street Parkade?

23   A.    Correct.

24   Q.    And why not?

25   A.    Well, the three properties that he compared it to

1    were fully leased out, and he used an average of those

2    three properties.  And at the valuation date Main

3    Street Parkade was only 23 percent leased out and still

4    had a significant amount of work left to do on it.

5    Q.    Do you know what the amount due on the mortgage

6    for Main Street Parkade was as of September 15?

7    A.    About $7.8 million.

8    Q.    Did you ascribe any value to Main Street Parkade

9    over and above the $7.8 million?

10   A.    No.

11   Q.    What's the next adjustment that you made?

12   A.    The next adjustment is the capital gains tax

13   liability of $9.8 million.

14   Q.    And why did you determine that there should be a

15   capital gains tax liability?

16   A.    Because that would be the value that would go

17   against the properties as he valued them from the real

18   estate appraisals.  And then the selling costs of

19   1.7 million, priority payment on Cranston, total

20   adjustments of 17.6, for a total adjusted real estate

21   of $3.8 million.

22   Q.    So the selling costs and the priority payment

23   were those items that you discussed a short time ago

24   with respect to these properties; is that right?

25   A.    Yes, the 21.4 million valuation that Mr. Aertsen

1    came up with, he described that as an enterprise income

2    capitalization method, and indeed it was of the real

3    estate property itself.  It was not, however, a

4    valuation of the stock of First Hartford company.  And

5    I think that was a great deal of confusion that he had

6    in his appraisal.  And he talked many times about

7    valuing the asset as if it was the same as valuing the

8    stock of the company, and in fact it's not the same as

9    valuing the stock of the company.

10   Q.    So your opinion, then, as I understand it, is

11   that the adjusted real estate value, the real estate of

12   First Hartford, is $3.8 million?

13   A.    Yes.

14           THE COURT:  In a liquidation, is that correct?

15           THE WITNESS:  Yes.

16           THE COURT:  I don't understand this, because

17   we've got the Cranston priority payment, are we talking

18   only net asset value?

19           THE WITNESS:  This would be in a liquidation

20   which was the value he presented, although he's calling

21   it an enterprise income value.

22           THE COURT:  But your numbers here are as of

23   liquidation.

24           THE WITNESS:  Yes.

25   BY MR. CULLEY:

1    Q.    And is that because -- well, did you take into

2    account the revenue that these properties would

3    generate in your income approach analysis?

4    A.    Yes, if -- yes, if you're going to do an

5    enterprise income calculation then you need to take in

6    the entire enterprise income calculation that would be

7    of the corporation, which means you've got not just the

8    net operating income of these properties but the other

9    costs of these properties as well, as well as the

10   actual capital structure of this company, not just the

11   capital structure that is hypothetical embedded in

12   these real estate appraisals but the capital structure

13   of the actual company itself.  So you consider the --

14   the costs associated with overhead and the development

15   costs, you'd consider taxes and you'd consider the

16   company's actual capital structure, none of which he

17   considered in -- and all of those elements would be

18   necessary in an enterprise income capitalization.

19             MR. CULLEY:  Does that clarify the --

20             THE COURT:  Yes.

21   BY MR. CULLEY:

22   Q.    Did you also limit the other balance sheet assets

23   and liabilities that Mr. Aertsen discussed?

24   A.    Yes, I did.  These are the next three items down,

25   I started with net working capital.  Net working

1    capital is the sum of cash, accounts receivable, and

2    then it's the sum of -- it's actually the sum of

3    current assets minus current liabilities on the balance

4    sheet.  And he used the October 31st, 2005, balance

5    sheet to do this.  One of the issues with using that

6    balance sheet is at the very end of October the company

7    received 4.3 million loan proceeds on the Bangor

8    property that was due to a tenant -- that was due to be

9    paid out to a tenant on the Bangor property and was in

10   no way at all excess cash of the company.  And in fact

11   there was a corresponding liability in the debt of the

12   company that was tagged with this.

13        Now, the way that you can see that this is

14   evident is, if in fact they just had this excess cash

15   sitting on their balance sheet, you would see a

16   corresponding bump up in their equity of the company.

17   But in fact that didn't happen.  The equity of the

18   company in fact went down between July 31st, 2005, and

19   October 31st, 2005.  So there was a corresponding

20   liability, and in fact the cash didn't even exist at

21   September 15th.

22   Q.   Let me ask you about that.  The information that

23   Mr. Aertsen used was from the 10-Q of October 31, 2005;

24   is that your recollection?

25   A.   Yes.

1  Q.   Was the cash -- the $4,200,000 payment received

2  as of September 15th, 2005?

3          MR. NEWMAN:   Objection, foundation, Your

4  Honor.   There's been no foundation for -- showed a lot

5  of lenience on this for disclosure, this hasn't even

6  been disclosed, not late, not ever, until these slides,

7  and there's no evidence this witness has any

8  information --

9          MR. CULLEY:   I can clear the foundation, Your

10 Honor.

11 BY MR. CULLEY:

12 Q.   Ms. Fannon, did you review the financial records

13 of First Hartford, particularly those in the summer and

14 fall of 2005?

15 A.   Yes.

16 Q.   And did you in reviewing those financial records

17 see records that reflected receipt of the 4.2 million

18 dollar payment?

19 A.   Yes.

20 Q.   And what did that review -- what did those

21 records reveal to you?

22          MR. NEWMAN:   Objection, Your Honor, hearsay.

23 We don't have those records; they haven't been

24 produced; we don't know what records she's referring

25 to.   There's no foundation.

1            THE COURT:  The challenge this is not

2    previously disclosed.

3            MR. CULLEY:  Well, can I have a moment, Your

4    Honor?

5            THE COURT:  Yes.

6    BY MR. CULLEY:

7    Q.    Well, could I just ask where -- where in the

8    records it was located?

9    A.    I asked the company about it.

10   Q.    Did you review the records?

11   A.    I didn't see the loan document.  I asked them.

12           THE COURT:  Is the question withdrawn?

13           MR. CULLEY:  Can I have a moment, Your Honor?

14   Let me try it another way, Your Honor.

15           MR. NEWMAN:  Has the question been withdrawn?

16           MR. CULLEY:  Yes.

17           MR. NEWMAN:  Ask to move to strike the prior

18   testimony.

19           THE COURT:  The question and answer withdrawn,

20   go ahead.

21   Q.    You determined, Ms. Fannon, that there was

22   $833,000 of cash as of September 15th, 2005, correct?

23   A.    Yes.

24   Q.    Okay.  And how did you make that determination?

25   A.    That's what was on the balance sheet of

1    September 15th -- September 31st, 2005.

2    Q.    And if the 4.2 million dollar payment that

3    Mr. Aertsen discussed had been received prior to

4    September 15th, 2005, would you have expected to see it

5    in those records you reviewed?

6    A.    I would -- this is where I would have seen it.  I

7    would have seen it in the increase of the equity.  If

8    in fact it was an excess asset, I would have seen it in

9    the increase in the equity of the company between

10   July 31st and October 31st, 2005.  And in fact there

11   was no corresponding equity that would indicate any

12   excess asset.

13   Q.    All right.

14          THE COURT:  There was an earlier answer which

15   I wonder was in error, which is that it was on the

16   balance sheet of September 31st, 2005.  That can't be

17   right, and I don't know whether there's a September 30

18   balance sheet we haven't seen, whether that meant July

19   or -- let's clarify.

20   BY MR. CULLEY:

21   Q.    There's no September 31st.

22   A.    October 31st is when it appeared, yes.

23          MR. CULLEY:  Thank you, Your Honor.

24   Q.    Let's turn to the next item on this chart, the

25   tax -- the tax shield.  How did Mr. Aertsen treat that

1    in his testimony?

2    A.    He also recognized the benefit of the tax shield,

3    which on the October 31st balance sheet was

4    $2.7 million.  He added that, which would be double

5    counting it.  In the first instance he didn't take any

6    tax deduction at all, which is taking a benefit of the

7    NOL by just ignoring taxes, and then added the tax

8    asset on top of that.  You certainly wouldn't both not

9    take taxes and add the tax benefit at all.

10   Q.    And then finally the value of the other

11   nonoperating assets, do you believe that those had a

12   value of $3.4 million as of September 15th?

13   A.    No, I had -- as we went over on the other balance

14   sheet when we reviewed it, it had a significantly lower

15   value once you removed the assets with no realizable

16   value.  I believe it was -- I don't have it handy, but

17   it was considerably less than that, once you removed

18   the amortizable -- amortizable assets.  The other thing

19   that was in there as well was there were pending

20   projects that had been abandoned, so I removed those

21   pending projects as well.

22        The bigger picture, though, about particularly

23   the 3.8 million and the $3.4 million that are included

24   here, Mr. Aertsen has called his valuation method an

25   enterprise income capitalization method.  And he has

1    also called these assets nonoperating assets.  These

2    are -- current assets and liabilities are assets that

3    are used in the production of income.  And when we

4    value a company, we either do it by virtue of the

5    income it produces or by virtue of its assets.  When

6    assets are used in the production of income, you don't

7    count both their income valuation and their asset

8    valuation.  You pick them up either in one place or the

9    other.  So to pick them up both in the income approach

10   in his valuation of the net operating properties and

11   the capitalization of the development properties and

12   here is clearly double counting the value of these

13   assets.  So in my view this $10 million should be zero,

14   because he's double counting them.

15           MR. CULLEY:  Your Honor, could I approach the

16   witness briefly and would like to look at -- have the

17   witness look at Plaintiff's 162.  And that should be in

18   one of those books behind you.

19           THE COURT:  I apologize for that interference.

20   I don't know why we're getting so much today.

21   A.    I have it.

22   BY MR. CULLEY:

23   Q.    You have Plaintiff's 162 in front of you?

24   A.    Yes.

25   Q.    And you recall this was the exhibit that

1    Mr. Aertsen used in his testimony yesterday?

2    A.    Yes.

3         THE COURT:  Would you pull the microphone

4    down, please?

5         THE WITNESS:  Sorry.

6    BY MR. CULLEY:

7    Q.    Now, with respect to the real estate value, we

8    just discussed that, his 21 million dollar figure and

9    your figure is $3.8 million or something close to that?

10   A.    Yes.

11   Q.    Let's focus, then, on the -- not the Bangor

12   Parkade but this present value of $3,036,918 average

13   free cash flow, and that appears to come from the

14   Worksheet No. 1, which is attached or is behind

15   Exhibit 162?

16   A.    Yes.

17   Q.    And as I understand it, Mr. Aertsen determined

18   that average free cash flow by averaging the total

19   revenues on Worksheet 1 of 1.3 million for 2005,

20   7 million for 2004, and 1.4 million for 2003?

21   A.    Yes.

22   Q.    Do you believe that is an appropriate method of

23   determining free cash flow as Mr. Aertsen did?

24   A.    No.

25   Q.    And why not?

1   A.   If we could go to the next slide.  So what he's

2   done here is he's taken the -- this average of

3   3,036,000 and what he's calling his average sources of

4   other income, essentially taking every revenue category

5   off of the balance sheet but those that he says are

6   associated with operating properties.  He subtracts or

7   shows as a negative general administrative expenses and

8   capitalizes that.  In essence it ends up coming up with

9   a value for development activities of $11 million,

10  which I don't believe is a proper way to go about doing

11  that.  In his revenue average he's got some of the

12  following things.  You can see on --

13  Q.   What I'd to do, Ms. Fannon, I'd like to go back

14  to this exhibit.

15       MR. CULLEY:  I'm sorry, Your Honor, for lights

16  up and lights down.

17  BY MR. CULLEY:

18  Q.   But I think it would be easier to follow if we go

19  back to 162, and specifically Worksheet 1 in 162 --

20  A.   Okay.

21  Q.   -- which is the basis for the $3,036,000 of free

22  cash flow; is that a fair statement?

23  A.   Yes.

24  Q.   And with respect to those revenue items that

25  Mr. Aertsen uses to come up with this average, are

1    there revenue items there that you believe should not

2    be included?

3    A.    Yes, I mean, just to pick out a couple things,

4    for example, in 2005 is included the $807,950 that the

5    company received in the Wal-Mart settlement net of

6    legal fees, which wouldn't be something that you would

7    expect on an ongoing basis.  That's certainly not

8    something -- he's labeled this revenue from management,

9    development, construction, and finance.  And that

10   certainly wouldn't be something that would be an

11   ongoing item in that category.

12         He's also included here gain from derivatives,

13   which is essentially a mechanism that they have for

14   their -- it's an interest rate swap that they have on

15   their debt on their net operating properties, and it's

16   meant to keep their debt at a level state, as relates

17   to their operating properties, which really belongs

18   with the operating properties.  But not only that, you

19   can see the gains here, in the immediate next period

20   it's a significant loss, in fact.

21   Q.    What's a significant loss?

22   A.    The gain on derivative.  It switches over to a

23   loss.

24   Q.    How about with respect to this other, the 532,000

25   in 2003?

1    A.    Um-hum, that has to do with management fees

2    received on Lubbock.  And if you -- if you remember we

3    were looking at the long-term view of First Hartford.

4    They had -- and up through 2003 they had a very

5    significant negative equity, it was around negative

6    6 million right through 2003, and they were very

7    strapped for cash up through that point in time.  So

8    Hartford Lubbock, because they had excess cash, despite

9    the fact that they had an agreement with First Hartford

10   to pay a 4 percent management fee, which is very

11   typical, they were paying an extra management fee into

12   First Hartford.  In 2004 they sold Mt. Olive and they

13   had sufficient cash for operations.  So they went --

14   they went back and resumed their agreement again and

15   began only paying the management fee pursuant to the

16   terms of the agreement.  So the management fee went

17   from 532 back to the amount that was pursuant to the

18   terms of the agreement, but despite that the larger

19   management fee was included as if it was one of the

20   recurring items again.

21   Q.    And the biggest item of revenue in all these

22   three years, of course, is the sale from Mt. Olive,

23   correct?

24   A.    Correct.

25   Q.    First of all, was there a gain of $6.4 million

1    from the sale of Mt. Olive?

2    A.    That wasn't the cash flow that they were going to

3    recognize from that.

4    Q.    And given the historical view that you have

5    demonstrated here of First Hartford from your

6    opinion -- in your opinion as someone valuing this

7    business, is there reason to believe that every three

8    years there will be a sale of a property resulting in a

9    multimillion dollar gain to First Hartford?

10   A.    No.

11   Q.    And why not?

12   A.    Because it wasn't their historical pattern and it

13   wasn't their intention.

14   Q.    And from your view of the status of First

15   Hartford when you valued it, did you see anything in

16   the pipeline other than Bangor that might result in

17   that kind of a sale?

18   A.    No.

19   Q.    Mr. Aertsen assumes that there was an average

20   free cash flow of over $3 million a year.  You did

21   actually a net income valuation, is that right, as

22   opposed to free cash flow?

23   A.    Yes, that's right.

24   Q.    And what did you determine the net -- average net

25   income was over that period of time?

1   A.    Well, I did an income approach on the operating

2   properties, not -- he's got the development properties.

3   Q.    Okay.  Let's go back to the first page of 162.

4   And you have already commented on the tax shield, I

5   believe.  And the other nonoperating assets you believe

6   should be zero; is that right?

7   A.    If you're considering this an income

8   capitalization method all the way through, then it

9   should be zero.  If -- if you're considering it -- I

10  mean, it's sort of this mixed hybrid sort of method, so

11  I'm not quite sure which you would appropriately

12  attempt to pick up.  If you're going to adjust the

13  assets to what they ought to be, then the assets ought

14  to be significantly less; and these what he's calling

15  nonoperating assets that are really operating assets

16  ought to be adjusted to their proper value, which is

17  much lower than what he's got them listed for here.

18  Q.    Now, please look at Worksheet 2 of Exhibit 162.

19  And is it correct that this is the worksheet that

20  determines that, as stated on the first page of the

21  exhibit, that there was $3.8 million of net working

22  capital?

23  A.    Yes.

24  Q.    And Mr. Aertsen apparently uses net working

25  capital and excess cash interchangeably?

1          MR. NEWMAN:  Objection, Your Honor, asking the

2     witness to speculate.

3               THE COURT:  Sustained.

4     BY MR. CULLEY:

5     Q.    On Worksheet 2 there is a figure of excess cash

6     of $3.85 million, right?  Is that correct?

7     A.    Yes.

8     Q.    And on the first page of the exhibit there is

9     the -- the reference of working -- net working capital

10    of $3.8 million.

11    A.    Yes.

12    Q.    Would you assume those are one in the same?

13    A.    Yes, yes, he is using it --

14    Q.    Turning your attention back to Worksheet 2, note

15    that -- it appears as though this Worksheet 2 is as of

16    the quarter ended on October 31, 2005?

17    A.    Yes.

18    Q.    And as of October 31, 2005, some six weeks after

19    the valuation date, Mr. Aertsen reports that it was

20    $5 million in cash.

21    A.    Yes.

22    Q.    As of September 15th, 2005, how much cash was

23    there?

24              MR. NEWMAN:  Objection, Your Honor, we've

25    already established she has no foundation for that.

1          THE COURT:  Are we back to what the management

2     told her?

3          MR. CULLEY:  No, this is as of September 15th,

4     2005.

5          MR. NEWMAN:  The only thing she knows is what

6     management told her.  She testified that she used the

7     July 31st 10-K and made no adjustments forward.

8          THE COURT:  Try to lay a foundation, but I

9     thought we'd been through this, Mr. Culley.

10    BY MR. CULLEY:

11    Q.   All right, as of --

12         MR. NEWMAN:  Is the question withdrawn?

13         MR. CULLEY:  Yeah, I'll withdraw the question.

14    Q.   You reviewed the records of the company up

15    through September 15th or through July 31st?

16    A.   July 31st.  And then I looked at the --

17         MR. NEWMAN:  Excuse me, there's no question,

18    move to strike.

19    Q.   What did you look at after that?

20    A.   Then I looked at the October 31st 10-Q in order

21    to make my adjustments through September 15th.

22    Q.   And did the October 31st 10-Q provide any

23    information with respect to cash?

24    A.   It provided information in terms of what would

25    have happened to the net equity, which would inform the

1    total change in all of the assets and liabilities

2    between those two dates.

3    Q.    Thank you.  You mentioned in response to some

4    earlier questions about fluctuation in the stock price

5    of First Hartford?

6    A.    Yes.

7    Q.    And was that significant to you in doing your

8    valuation?

9    A.    Yes.

10   Q.    Can we go to that chart?  What does this chart

11   show?

12   A.    This shows First Hartford's stock price from 1998

13   through -- the last date on there is May 4th, 2008,

14   although I think it actually goes to pretty much the

15   present.  And you can see that this really corresponds,

16   if you recall the long-term historical view that we

17   were looking at earlier today, this is the period of

18   time back here, right up until here, the company was

19   digging itself out of bankruptcy until right here.  The

20   stock price was around a quarter right here.  Right up

21   through this period in time it had 6 million -- the

22   company had 6 million in negative equity.

23         Right here is when the company announced their

24   plans to sell Mt. Olive.  So what happened on that

25   event is the stock price went up.  Right around here is

1    when they sold -- announced Bangor and the stock price

2    stayed up there.  Here is our valuation date, so we're

3    right at the peak here on our valuation date.  And now

4    you can see that the stock price has come down.

5    There's been no other announcements or sales.

6           This coming down of the stock now hasn't

7    nearly returned to the lower levels it was before, this

8    reflecting the reinvestments of capital that the

9    company has had back into the company, you know,

10   holding the stock price up there.  But what this

11   informed me of was, when the company makes an

12   announcement of the sale, the stock market reacts to

13   those occasional announcements of property.  So this

14   helped me determine the method that I was going to use,

15   because this is how the market has reacted to their

16   announcements of sales.

17           MR. CULLEY:  Your Honor, I need a moment.  I

18   don't know if you want to take a short recess at this

19   time or not, but I -- I'm mostly if not all done.

20           THE COURT:  We can take the afternoon recess

21   at this time.

22           MR. CULLEY:  I would appreciate that, yes.

23           THE COURT:  We'll do that.  15 minutes.

24               (A recess was taken.)

25           MR. CULLEY:  I have no further questions, Your

1      Honor.

2              THE COURT:  Mr. Culley.  Mr. Groff?

3              MR. GROFF:  Thank you, Your Honor.

4                      CROSS EXAMINATION

5      BY MR. GROFF:

6      Q.    Ms. Fannon, do you have Plaintiff's Exhibit 118

7      up there, which is the form 10-Q for the period ended

8      October 31st, 2005?

9      A.    Yes.

10     Q.    And during the course of your engagement in this

11     case, did you have occasion to review the form 10-Q for

12     the quarter ended October 31st, 2005?

13     A.    Yes, I looked at it.

14     Q.    And could you turn to the page after Page 15, the

15     page after that has a 17 on it, but Page 16 just

16     doesn't have a number.

17     A.    Okay.

18     Q.    And the top of the page has Item 2, management's

19     decision and analysis of financial condition, results

20     of operations continued.  Are we on the same page?

21     A.    Yes.

22     Q.    And could you look at Footnote 2, Subparagraph 2

23     under Item 2?  Could you read that?

24     A.    The entire amount of purchase obligation for

25     Bangor and Cranston projects, of which 4,026,000 is a

1  tenant construction allowance, which was drawn on the

2  construction loan and included in cash, it will be paid

3  in December.

4  Q.    Is that the cash number that you were talking

5  about --

6  A.    Yeah.

7  Q.    -- when you were talking to Mr. Culley?

8  A.    Yes, it is.

9  Q.    And you saw this item.  You had access to this

10  form.

11  A.    I had access -- I talked with management about

12  it.

13  Q.    Thank you.

14  A.    I certainly have a 10-Q.

15  Q.    And this paragraph supports your position?

16  A.    Yes.

17        MR. NEWMAN:  Objection.

18        THE COURT:  Sustained as to the last question

19  and answer.

20  BY MR. GROFF:

21  Q.    Now, Miss Fannon, after you were engaged to

22  perform the task that you performed, were the officers

23  of First Hartford completely cooperative in providing

24  any materials to you you requested?

25  A.    Yes.

1  Q.    And what is the totality of time that you believe

2  you've spent attempting to value this company?

3  A.    To the time I issued my report?

4  Q.    In total.

5  A.    To now?

6  Q.    Since -- let's just go to when you issued your

7  report.

8  A.    It was about 367 hours.

9  Q.    Would you have been able in your view to properly

10 value this company in a time period 30 to 60 hours?

11 A.    No.

12 Q.    Now, Mr. Aertsen testified -- he indicated that,

13 although he hoped Mr. Ellis would live forever, that he

14 believed it was possible the estate might guarantee the

15 debt of this public company.  Do you recall that

16 testimony?

17 A.    Yes.

18 Q.    Do you believe that assumption is a valid

19 assumption upon which to base any appraisal?

20 A.    No, absolutely not.

21           MR. GROFF:  That's all I have, Your Honor.

22           THE COURT:  Thank you, Mr. Groff.  Mr. Newman.

23           MR. NEWMAN:  Thank you, Your Honor.

24                (Continued on next page.)

25

```
 1                      CROSS EXAMINATION

 2    BY MR. NEWMAN:

 3    Q.    Good afternoon, Ms. Fannon.

 4    A.    Hello.

 5    Q.    Ms. Fannon, you've performed a lot of business

 6    valuations in your career.

 7    A.    Yes.

 8    Q.    And you've evaluated many different types of

 9    businesses.

10    A.    Yes.

11    Q.    But I understand from your deposition that you've

12    never had an opportunity to perform a business

13    valuation of a REIT, of a real estate investment trust.

14    A.    That's right.

15    Q.    And you also told us that you've never performed

16    a valuation of a business which, like First Hartford,

17    owns a portfolio of operating companies like a REIT but

18    also is involved in developing properties for sale; is

19    that right?

20    A.    I think what I said is I couldn't recall any at

21    the time.

22    Q.    You haven't recalled any since then, have you?

23    A.    I did remember one.

24    Q.    What one is that?

25    A.    It was a --
```

1          THE COURT:  Will you pull the microphone

2    closer?

3    A.    Yeah, I recall one, it was a construction

4    enterprise in New Hampshire.  Do I need to give the

5    name?

6    BY MR. NEWMAN:

7    Q.    That's fine.  At least at your deposition none

8    had come to mind, and you now have thought of just the

9    one.

10   A.    Yes.

11   Q.    I want to turn to --

12          MR. NEWMAN:  Permission to approach to show an

13   exhibit.

14   Q.    There was some reference earlier in your direct

15   examination to the McKinsey valuation text that was

16   marked Exhibit 159A; do you recall that?

17   A.    In my direct there was?

18   Q.    Just a reference to it.  Let's put it this way.

19   Showing you now the text that we've marked

20   Exhibit 159A.

21   A.    Yes.

22   Q.    This is the Valuation:  Measuring and Managing

23   Value of Companies by McKinsey & Company.

24   A.    Yes.

25   Q.    You didn't use this in your valuation.

1    A.    No.

2    Q.    And generally you don't use this text in your

3    valuation, do you?

4    A.    No.

5    Q.    As I understand your testimony, and I'll back up,

6    you've never used the McKinsey text in valuing a

7    business, have you?

8    A.    No.

9    Q.    You testified on direct that in performing your

10   valuation for the Main Street Parkade North Adams

11   property you assigned no value.

12   A.    No net value, correct.

13   Q.    And I believe you testified, though, that as of

14   the valuation date you believed that it was only leased

15   up -- 23 percent leased?

16   A.    Yes.

17   Q.    But in fact it was the July 31st -- strike that.

18         In fact, the April 30, 2005, 10-K that was

19   marked Exhibit I believe Plaintiff's 116 was the

20   document that showed the 23 percent leasing; is that

21   right?

22   A.    I believe that's right.

23   Q.    And by a year later, April 30, 2006, the 10-K

24   shows 73 percent leasing of the North Adams property;

25   isn't that right?

1     A.    I would have to see it.

2     Q.    Okay, let's take a look.  If you could turn to

3     Plaintiff's Exhibit P120 behind you, Ms. Fannon.

4     A.    I have it.

5     Q.    Okay.  If you would turn to Page 6.

6     A.    I've got it.

7     Q.    Plaintiff's P120, which is the form 10-K for

8     period ending April 30, 2006, do you see the listing

9     for North Adams, Mass., shopping center?

10    A.    Yes.

11    Q.    Do you see the -- of the total of 131,833 square

12    feet --

13    A.    Yes.

14    Q.    -- all but 35,237 feet by that time had been

15    leased; is that right?

16    A.    Yes.

17    Q.    Okay.  Without holding you to the precision of

18    the math, that's approximately 73 percent leased up by

19    April 30, 2006.

20    A.    I'll take your word for it.

21    Q.    And when you testified earlier about the leasing,

22    the figure of 23 percent really refers to what the

23    lease-up was as of April 30, 2005; isn't that right?

24    A.    Yes, that would be when they listed it in the

25    last 10-K, yes.

1   Q.   Between April 30, 2005, and April 30, 2006, First

2   Hartford was leasing up the property at North Adams,

3   Mass.

4   A.   Yes.

5   Q.   And as of the valuation date, September 15, 2005,

6   you really don't know what the status of that lease-up

7   was as of that date, do you?

8   A.   I would assume somewhere between.

9   Q.   Somewhere between -- certainly not the 23 percent

10   that it was only in April 30, 2005.

11   A.   Correct.

12   Q.   I wanted to look also for the North Adams

13   property at the mortgage loan commitments that were in

14   place, and I believe in that same binder

15   Exhibit Plaintiff's P116.

16   A.   I'm sorry, I won't be so quick to put it away

17   next time.

18   Q.   No, it's my fault.

19   A.   116 again, you said?

20   Q.   Yes.  Plaintiff's P116, which is the 10-K for

21   April 30, 2005, at Page 52.

22   A.   Yes.

23   Q.   Do you see the listing for the North Adams

24   property?

25   A.   Yes.

1    Q.    Now, you testified correctly, I believe, that as

2    of the April 30, 2005, 10-K where you show the

3    23 percent leasing, the debt on the property -- strike

4    that.

5            If we look at the entry for North Adams,

6    Mass., on Page 52 it shows that the actual amount of

7    the mortgage debt at the time was the 7 thousand

8    861,000 dollar figure; do you see that?

9    A.    7,861,000, yes.

10   Q.    But the -- in place even as early as April 30,

11   2005, months before the valuation date was a commitment

12   for the full mortgage financing of 10,581,000; do you

13   see that?

14   A.    That was the face, yeah.

15   Q.    That shows First Hartford had in place the

16   mortgage construction financing to do the improvements

17   and build out the property.

18   A.    They did available, yes.  They hadn't drawn it

19   down yet by that date.

20   Q.    Okay.  But in your valuation did you not -- there

21   was no appraisal for North Adams.

22   A.    That's right.

23   Q.    And you didn't yourself take any steps to conduct

24   a valuation of the North Adams operating property; is

25   that right?

1    A.    That's right.  Am I all set?

2    Q.    Yes, thank you.

3          You have your report there with you?

4    A.    Yes.

5    Q.    I wanted to ask some questions about your income

6    approach valuation, so if you have the C and D exhibits

7    handy.

8    A.    Yes.

9    Q.    When you -- I'll give you a moment to get there.

10   Let me know when you have it.

11   A.    I have it.  Do you mean C1 and C2?

12   Q.    I wanted you to have them available to you when I

13   ask you questions.  And actually I guess I can begin by

14   directing your attention to your Exhibit C2.  It's --

15   I'll give the Court a chance to locate it.

16   A.    He didn't bring a magnifying glass.

17   Q.    I have one if you need it.  Remembering from the

18   deposition, I brought this.  Should the Court need it,

19   it's available.

20         THE COURT:  I have to find the exhibits.

21         THE WITNESS:  Could I just make a note,

22   there's both exhibits and appendices, and the exhibits

23   precede the appendices.

24         THE COURT:  That's what I just discovered,

25   thank you.  I have it.

1    BY MR. NEWMAN:

2    Q.    Ms. Fannon, does Exhibit C2 lay out the summary

3    of all the elements that you included in your income

4    approach valuation?

5    A.    Yes.

6    Q.    First issue I wanted to address is that, as you

7    testified, after developing the figures for the income

8    of First Hartford and making the normalizing changes or

9    adjustments that you made, you then applied a -- an

10   income tax deduction at a 33.6 percent income tax rate?

11   A.    Yes.

12   Q.    In performing your evaluation, you didn't perform

13   an analysis of the impact of the net operating loss

14   over the years on First Hartford's income, did you?

15   A.    I -- I guess define over the years.  I was using

16   a single period capitalization method, so I did over

17   the year that I did the capitalization period for, yes.

18   Q.    You -- you had one tax return that you looked at,

19   for one year.

20   A.    Most significantly I looked at the 2005 tax

21   return; the rest were in the file, yes.

22   Q.    Well, when we took your deposition and you

23   brought your file, in your file was only the single tax

24   return for fiscal year ending April 30, 2005; isn't

25   that right?

1    A.    Yes.

2    Q.    And in performing your income approach you

3    assumed that against the income of First Hartford would

4    be applied a 33.6 percent income tax; is that right?

5    A.    I assumed it was an appropriate deduction to

6    take, yes.

7    Q.    And you didn't reduce, modify, or adjust the

8    amount of that tax with respect to any application of a

9    net operating loss carryover, did you?

10   A.    Oh, yes, I did.

11   Q.    Well, in this tax return you did the -- or,

12   excuse me, in your income approach in C2 you figured

13   out the income and then applied the full 33.6 percent

14   income tax deduction, didn't you?

15   A.    Right, and then I took the full benefit of the

16   NOL tax asset against it.

17   Q.    Okay, that's a different question.  So let's get

18   down to that.  You show some value of a tax shield down

19   below under your listing of other assets.

20   A.    Yes.

21   Q.    Okay.  So -- but staying with the income that you

22   capitalized, you didn't make any modification of that

23   for application of a net operating loss, did you?

24   A.    Yes, I did.

25   Q.    Let me ask you the question.  Direct your

1  attention to the top box of your Exhibit C2.

2  A.    Yes.

3  Q.    You have that in front of you?

4  A.    Yes.

5  Q.    You arrived at an income figure from the various

6  sources you described for First Hartford.

7  A.    Right.

8  Q.    And then against that income you applied a

9  33 percent tax.

10  A.    Correct.

11  Q.    You hadn't made any adjustments at that stage for

12  any net operating loss, did you?

13  A.    No, nor would I there.

14  Q.    Okay.  Then later on you did, though, add in a

15  benefit for the tax shield of the $2.3 million, right?

16  A.    Correct.

17  Q.    Okay.  When you performed the analysis of income

18  for First Hartford Corporation, still on your

19  Exhibit C2, you came up with it showing as a net

20  operating loss, right?

21  A.    Yes.

22  Q.    And when you performed your income approach, one

23  of the things you told us is that it's only by the sale

24  of development properties that First Hartford

25  Corporation shows a net profit; is that right?

1   A.    That's been their history, yes.

2   Q.    And that but for the sale of development

3   properties First Hartford Corporation operates at a

4   loss.

5   A.    That's been their history because -- yes.

6   Q.    So First Hartford's raison d'etre seems to be

7   development properties for sale; would you agree with

8   that?

9   A.    No, I wouldn't at all.  No, they have two

10  activities, and as I described the way they organize

11  themselves, they have operating properties and then

12  within their corporate structure they also have their

13  corporate cost center, which includes their development

14  personnel as part of their permanent cost structure.

15  And then they use those development personnel towards

16  their development properties.

17  Q.    So First Hartford operates essentially two

18  businesses, one like a REIT, owning and operating a

19  portfolio of income-producing properties.

20  A.    Yes.

21  Q.    And secondly as a development company, with a

22  development business.

23  A.    Yes.

24  Q.    Real estate development activity.

25  A.    Yes, they have real estate development property.

1    Q.    And when you performed your income approach, you

2    included all of the income from the operating

3    properties and from those operations and you included

4    all the expenses or subtracted or deducted all of the

5    expenses of First Hartford, including the expenses of

6    the development activity, right?

7    A.    Well, that's part of their permanent cost

8    structure, permanent income and cost structure, yes.

9    Q.    I'm not arguing with you; I'm just trying to

10   understand what you did.  So for your income approach

11   you included all of the income from the operating

12   property side of the business, and you included all of

13   the expenses of First Hartford for both the operating

14   properties and for the development activities, right?

15   A.    Yes.

16   Q.    But you didn't include any of the revenue from

17   the development activities from the sale of properties

18   in your income approach, did you?

19   A.    I treated that separate.  I included the revenue

20   from those properties, as I demonstrated for the

21   revenue as the properties that they had actually going

22   on at the time, for the projects that they had going on

23   at the time.

24   Q.    Okay, projects.  But when you assessed the

25   revenue and the expenses --

1    A.    Yes.

2    Q.    -- you didn't include in revenue any revenue from

3    gains on sale of properties, did you?

4    A.    No, and --

5    Q.    And you explained to us at your deposition that

6    you considered that a nonrecurring event and that it

7    would not be appropriate to include gains on sales of

8    properties; is that right?

9    A.    It would not be appropriate to include it in

10   their recurring capital structure because of the

11   occasional sales that they have, that's right.

12   Q.    Okay.  And so as a result, not including any

13   gains on sales of properties, when you arrived at the

14   income to be capitalized in your income capitalization

15   approach you actually had a negative number.

16   A.    That's right.

17   Q.    And if we look at the top of C2 we can see that

18   in your analysis you arrived at an average income

19   figure of -- and this is from your report, top of C2 --

20   the $2,121,501?

21   A.    Yes.

22   Q.    You then capitalized that at a capitalization

23   rate of 4.1 percent?

24   A.    Yes.

25   Q.    Generating a capitalized value -- capitalized

1    income value of the $51,305,798?

2    A.    Yes.

3    Q.    And from that you subtracted the debt, which was

4    in excess of 54 million, correct?

5    A.    Correct.

6    Q.    Showing a negative value of 3 -- I have to get

7    the magnifier.

8    A.    3.3 million.

9    Q.    Approximately 3.3 million, okay.

10         On the issue of capitalization rate, you

11   already described for us how you arrived at the

12   capitalization rate in your income capitalization

13   approach of 4.1 percent.  If you were to use a

14   multiplier rather than a cap rate for this exercise, a

15   4.1 capitalization rate translates into approximately a

16   24 multiple?

17   A.    Yes.

18   Q.    A 24 multi -- strike the last question, thank

19   you.

20         Then after capitalizing the negative income

21   you just described, you then went in and added a value

22   of specific projects or assets in place as of the

23   valuation date.

24   A.    That's right.

25   Q.    Miss Fannon, if you could please turn to your

1    Exhibit D2.

2    A.    Yes.

3    Q.    D2 is the exhibit for your market approach of the

4    guideline to public properties; is that right?

5    A.    Yes.

6              THE COURT:   Is that B2 or D2?

7              MR. NEWMAN:   D as in dog, Your Honor.

8    BY MR. NEWMAN:

9    Q.    Are you able to read the copy of D2 that you

10   have, Ms. Fannon?

11   A.    I believe so.

12   Q.    Okay.   D2 shows information for the 18 real

13   estate investment trust companies that you used as

14   comparables for this guideline to public properties

15   valuation model?

16   A.    Yes.

17   Q.    Then you selected these 18 REITs that you

18   believed were comparable at least in part to First

19   Hartford Corporation?

20   A.    Correct.

21   Q.    Comparable in the sense that they had the owning

22   and operating a portfolio of real estate properties

23   comparable.

24   A.    Yes.

25   Q.    And for these 18 REITs that you selected, one of

1    the -- one of the value metrics that you identified was

2    the dividend yield.

3    A.    I don't believe so.  I calculated the dividend

4    yield, but I didn't calculate it as a multiple.

5    Q.    I realize that you didn't use that as a multiple

6    comparison so I'll ask a better question.

7          Did you determine the dividend yield actually

8    being paid by each of these 18 REITs?

9    A.    Oh, yes, I did.

10   Q.    And you included that on your chart here.

11   A.    Yes, I did.

12   Q.    And the REITs have to pay out a certain amount of

13   their net income in order to maintain their federal

14   income tax exempt status as a REIT; is that right?

15   A.    Yes.

16   Q.    And that -- REITs have to pay out 90 percent of

17   net income, correct?

18   A.    Correct.

19   Q.    But in fact they often pay much more than that

20   because the definition of net income includes

21   depreciation, and they actually have cash flow that

22   could substantially exceed net income to distribute,

23   right?

24   A.    Yes.

25   Q.    That's why we heard earlier -- that's what we

1      heard earlier from Professor Riddiough, that a funds

2      from operation cash flow analysis is often performed by

3      analysts in evaluating REITs; is that right?  You're

4      familiar with that?

5      A.     Yes, I am.

6      Q.     Okay.  So a dividend yield, then, is a percentage

7      that shows the percentage of cash paid out in dividends

8      by the REIT as a percentage of their market

9      capitalization.

10     A.     Yes.

11     Q.     So if you had a 5 percent dividend yield you knew

12     what the dividend cash figure was, you'd know what the

13     market capitalization figure would be.

14     A.     Right.

15     Q.     Now, on your 18 REITs that you selected as shown

16     as Exhibit D2, you show for them the average and median

17     dividend deals over on the right.

18     A.     Yes.

19     Q.     You might remember this or you may need to see

20     it, but the average dividend yield that you show for

21     these 18 REITs was a 5 percent dividend yield; is that

22     right?

23     A.     Yes.  I'm sorry, I said yes before I could see

24     the number.  Let me just find it.

25     Q.     My offer remains if you want the magnifier.

1           THE COURT:  Either that or longer arms.

2    A.    And you're on the average?  Yes, I found it.

3    BY MR. NEWMAN:

4    Q.    Yes.  And does your exhibit show that -- for the

5    18 REITs an average dividend yield of 5 percent?

6    A.    Yeah, that's the average.

7    Q.    And the median dividend yield for these 18 REITs

8    was also 5 percent.

9    A.    Sure, yes.

10          MR. NEWMAN:  If I could have just a moment,

11   Your Honor.

12          THE COURT:  Yes.

13          MR. NEWMAN:  Nothing further, thank you, Your

14   Honor.

15          THE COURT:  Thank you, Mr. Newman.

16          MR. NEWMAN:  Thank you, Ms. Fannon.

17          THE COURT:  Any redirect?

18          MR. CULLEY:  No additional questions, Your

19   Honor.

20          THE COURT:  Mr. Groff?

21          MR. GROFF:  No additional questions, Your

22   Honor.

23          THE COURT:  Thank you very much, you may step

24   down.  Leave the exhibit there except the things you

25   brought yourself.

1          MR. CULLEY:  Your Honor, I intend to mark the

2     charts, the chalks that we used, but we ended up a hard

3     copy short so I need to get that.

4          THE COURT:  That's fine.

5          MR. CULLEY:  If I can just defer to do that

6     and I'll do that before we close today.

7          THE COURT:  That's fine.  Mr. Nolan?

8          MR. NOLAN:  Thank you, Your Honor.  Call

9     Mr. Harding.

10          THE COURT:  You can come across, sir, watch

11     the cords so you don't trip.

12          THE CLERK:  Please remain standing, raise your

13     right hand.  Do you solemnly swear that the testimony

14     you shall give in the cause now in hearing shall be the

15     truth, the whole truth, and nothing but the truth, so

16     help you God?

17          THE WITNESS:  I do.

18          THE CLERK:  Please be seated, pull yourself

19     right up close to the microphone.  State your name and

20     spell your last name for the record.

21          THE WITNESS:  My name is David Harding,

22     H-A-R-D-I-N-G.

23          THE COURT:  Go ahead, Mr. Nolan.

24               (Continued on next page.)

25

```
 1                       DIRECT EXAMINATION

 2    BY MR. NOLAN:

 3    Q.     Mr. Harding, you've previously testified in this

 4    case?

 5    A.     Yes, I have.

 6    Q.     And what is your position at the present time at

 7    First Hartford Corporation?

 8    A.     Vice president and director.

 9    Q.     And what is your responsibilities as vice

10    president?

11    A.     I handle all the financings and property

12    management function reports to me.

13    Q.     Are you familiar with the property that's been

14    described in this case as North Adams?

15    A.     I am.

16    Q.     And have you -- how long have you been familiar

17    with that property?

18    A.     Since we got involved with the property in 2004.

19    Q.     And would you describe as of September 15th,

20    2004, the condition of the property?

21    A.     The property was about 130,000 square feet and

22    included a large, empty, former Kmart of approximately

23    a hundred thousand square feet and some smaller shop

24    space of some 30 or 40,000 feet.  The shop space was

25    substantially leased and the Kmart was totally empty.
```

1   The Kmart was in deplorable condition, had been empty

2   for four or five years and hadn't been maintained

3   properly, and the property was in need of an entire

4   rehaul.

5   Q.    And how much on a rough percentage basis as of

6   September 15th was actually rented to tenants?

7   A.    I think it was in the 20s, 23 percent, something

8   like that, the same number that was pulled out of the

9   April '06 report.

10  Q.    All right.  Now, as of September 15th, 2005, was

11  there a mortgage on the property?

12  A.    Yes.

13  Q.    What was the amount of the mortgage?

14  A.    A little over 7.8 million.

15  Q.    And since the property was rented during the

16  fiscal year that ended April 30th, 2006, did you

17  collect rent?

18  A.    Could you repeat the question?

19  Q.    Did the company collect rent?  There were tenants

20  there, right?

21  A.    Yes, there were.

22  Q.    Did the company have expenses?

23  A.    Yes.

24  Q.    Did the amount of rent exceed the amount of the

25  expenses?

1   A.   Yes.

2   Q.   By how much?

3   A.   Approximately $20,000.

4   Q.   And what was the rate on the mortgage during that

5   period of time?

6   A.   The mortgage was a cash flow mortgage in which

7   any property -- any cash flow above the operating costs

8   was payable to the lender as interest, so the interest

9   was $20,000.

10  Q.   $20,000 was paid to the lender?

11  A.   Yes.

12  Q.   Did you calculate what the return to the lender

13  was?

14  A.   It was about 25, 26 basis points, one quarter of

15  one percent.

16  Q.   Pardon me?

17  A.   About one quarter of one percent.

18  Q.   Now, you say that First Hartford Corporation

19  purchased the property in 2004; did First Hartford have

20  any equity in that property?

21  A.   Actually purchased it in early '05, but we got

22  involved in managing it for the lender before they took

23  a deed back in lieu and before we arranged for the

24  transfer of the property to us, so --

25  Q.   Excuse me.  Who took a deed in lieu?

1   A.    Protective Life, who we acquired it from, took a

2   deed in lieu to foreclosure from the former owner and

3   subsequently transferred title to us at their cost.

4   Q.    And did First Hartford invest any cash in that

5   property then?

6   A.    No, Protective Life gave a 100 percent purchase

7   money mortgage plus a commitment for the anticipated

8   cost to reposition the property.

9   Q.    And let's just move forward to today.  Are there

10  more tenants in the property today?

11  A.    Yes, we made good progress but -- yes.

12  Q.    What's the rough percentage of the --

13  A.    It's in the 70s, in the 70 percent rented range.

14  Q.    As of today?

15  A.    Yes.

16  Q.    And what's the balance on the mortgage at the

17  present time?

18  A.    It's over 12-1/2, 12-six, 12-eight, somewhere in

19  there.

20  Q.    And have -- since 2005 has First Hartford

21  invested any money in it?

22  A.    No, all of the redouble costs have been funded by

23  the lender.

24  Q.    And what is to your knowledge -- withdrawn.

25        Is there any operating income from that

1   property at the present time?

2   A.    Yes, with the current occupancy the income would

3   be around $600,000.

4   Q.    And that's being paid to the mortgage?

5   A.    Yes, it's either being paid to the mortgage

6   lender or occasionally the -- because the balance of

7   the mortgage has gotten so high the lender has

8   suggested that we not send the money to them that would

9   have been accrued on interest and apply it to

10  additional development costs because of the cost

11  overruns.

12  Q.    Does First Hartford have any equity in the

13  property?

14  A.    We have no cash equity in the property.

15  Q.    And does it have any value to First Hartford?

16  A.    The property has value but in my opinion it's not

17  as much as the debt.

18  Q.    And 600 on 12 million 5 is roughly --

19  A.    Roughly 5 percent, something like that.

20  Q.    Pardon me?

21  A.    Approximately 5 percent.

22  Q.    Now, Mr. Aertsen testified yesterday about some

23  properties I think he used the phrase gave him some

24  comfort or -- and I think he also said that they would

25  provide value in the future.  I think he mentioned two,

1   at least, that I can recall.  Rockland was one and

2   Edinburg was another.  Would you tell the Court,

3   please, what Rockland is?

4   A.    Rockland Place, apartments in Rockland,

5   Massachusetts, is a 204-unit, low-income housing

6   project that we are in the final stages of redeveloping

7   under a low-income housing tax credit program.

8   Q.    Where's the property located?

9   A.    Just south of Boston in Rockland, Mass.

10  Q.    And does First Hartford own that property?

11  A.    We are one of two general partners.

12  Q.    And what -- what is the percentage ownership of

13  that property that First Hartford has?

14  A.    We own one half of point 1 percent of the

15  property.

16  Q.    One half of one tenth of one percent of the

17  property?

18  A.    That's correct.

19  Q.    Is that the only equity interest you hold?

20  A.    Yes.

21  Q.    If we were expressing that as a decimal, would

22  there be four zeroes or five zeroes?

23  A.    I'm -- I would have to put it on a piece of

24  paper.

25  Q.    All right.

1    A.    It's a very nominal percentage of the ownership.

2    Q.    And is the property rented?

3    A.    We're -- we have about 16 or 17 vacancies.  We're

4    approaching self-supporting occupancy; we're not quite

5    there.

6    Q.    Does the property support itself?

7    A.    Not yet, but we believe it'll be doing that in

8    the next few months.

9    Q.    And does First Hartford have any equity in that

10   property?

11   A.    No, the equity was put up by the lending partner.

12   Q.    Now, let's turn to Edinburg.  Is it Edinburg or

13   Edinburg?

14   A.    Edinburg.

15   Q.    Edinburg, Texas.  During the first week of

16   September -- withdrawn.

17         Did First Hartford purchase an option to buy a

18   portion of -- a certain piece of property in Edinburg,

19   Texas, around the first week of September of 2005?

20   A.    Yes, we did.

21   Q.    Okay.  And what did you pay for that?

22   A.    $50,000 option fee.

23   Q.    And what was the property?

24   A.    It was the -- it was 70 acres of the currently

25   planned 120-acre development.

1    Q.    Okay.  And you paid $50,000 for that.  Were there

2    any -- did you have any permits?

3    A.    No, we did not.

4    Q.    What did you have?

5    A.    We basically had an option that gave us time to

6    figure out whether or not we could attract enough

7    tenants to make a development viable and give us time

8    to see if we can get the back 50 acres under control,

9    which we thought would be important for planning a

10   successful development on the site.

11   Q.    And let's forward to today, July of 2008.  And

12   leaving aside the events of this week in southeast

13   Texas, could you tell the Court, please, what the

14   status of the property is in terms of the progress from

15   an option on 70 acres in September of 2005 to where the

16   company sits today with respect to that property?

17   A.    Sure, we later got control of the back 50 acres,

18   and we proceeded to get planning together for a

19   development and did some site planning to get a million

20   square feet, more or less, on the site in various

21   configurations.  We were able to attract an anchor

22   tenant.

23   Q.    Who's the anchor tenant?

24   A.    Penney's, J. C. Penney's.

25   Q.    J. C. Penney's?  Did you sign a lease with J. C.

1    Penney's?

2    A.    Yes, we did.

3    Q.    What's the annual rent on that lease?

4    A.    $10 a year.

5    Q.    $10 a foot?

6    A.    $10 a year for their site.  It's a ground rent.

7    It's a ground rent.  They -- they are renting -- we're

8    not building the building; we're just leasing the area

9    for them to build their own building.

10   Q.    And it's $10 a year?

11   A.    $10 a year, yes.

12   Q.    Do you have other tenants?

13   A.    Yes, we do.

14   Q.    And is the property open and in business?

15   A.    No, we expect the first tenant would be J. C.

16   Penney to open, and we are hoping that's going to occur

17   next week or the week after, depending on the weather.

18   I'm a little concerned, they were originally scheduled

19   for August 1st; I haven't heard whether the hurricane

20   is going to delay the opening slightly or not.

21   Q.    Are there -- do you have other leases signed?

22   A.    Yes, we do.

23   Q.    And those tenants will follow?

24   A.    Yes.

25   Q.    Is the space for those tenants being constructed

1    at the present time?

2    A.    Yes, it is.

3    Q.    Is there a mortgage on the property?

4    A.    Yes, there is.

5    Q.    What's the amount of the mortgage?

6    A.    Currently there's an outstanding balance of about

7    $33 million.

8    Q.    Is that construction mortgage?

9    A.    Yes, it is.

10   Q.    Does First Hartford have any cash equity in the

11   property?

12   A.    No, the mortgage is a participating mortgage,

13   which basically it's a joint venture where the

14   insurance company, Protective Life, funds a hundred

15   percent of the costs and we split the cash flow and

16   profits.

17   Q.    Do you know what the expected income from these

18   tenants is going to be, the ones that you have signed

19   up at the present time?

20   A.    I believe the -- the base rents for the leases we

21   have signed now are somewhat under $2 million but close

22   to $2 million.

23   Q.    Does the company maintain a projection as to what

24   the net operating income is likely to be from time to

25   time as you go along through this process?

1   A.    Yes.

2   Q.    And would you tell the Court, please, what the

3   estimate of the net operating income is likely to be --

4   A.    We expect --

5   Q.    -- given where you are now.

6   A.    With the current tenants, when they come on

7   screen and start paying, which will occur between now

8   and the first quarter of next year as the stores are

9   finished and they get around to opening, the net income

10  should grow to about a million and a half dollars a

11  year, maybe a little bit more but not much more.

12  Q.    And at that point what do you project the

13  mortgage balance to be?

14  A.    I think the $33 million will grow to about

15  40 million to fund the finishing up of the improvements

16  for this phase and the tenant reimbursement for Academy

17  that's required.

18  Q.    And what would -- with that money this net -- net

19  income, would that go to the mortgagee?

20  A.    Yeah, that'll be applied to the interest on the

21  debt.

22  Q.    What's the interest rate on the debt?

23  A.    I believe it's in the 6, low 6s, 6 and an eighth,

24  I think.

25  Q.    If my math is any good you said it was about a

1    million and a half dollars, the net?

2    A.    Yeah, about a million and a half net operating

3    income.

4    Q.    On $40 million that's something like 3-1/2,

5    3-3/4 percent, round numbers?

6    A.    I'll take your word for it.

7    Q.    Is it less than 6 percent?

8    A.    Yes, the interest on the mortgage will be 2 to

9    2.4 range, I guess, 2.4 million.

10    Q.    What's the long-term plan?

11    A.    The long-term plan is hopefully to find

12    additional tenants to build out additional phases so we

13    can amortize the total land cost and the

14    infrastructure, to get the first phase up over a larger

15    area, and to get to break-even and hopefully in a few

16    years to positive cash flow.

17    Q.    And what's the status of leasing at the present

18    time?

19    A.    Scary.

20    Q.    What you do you mean, scary?

21    A.    The only lease we've done the last year is

22    Academy.  For the past year we -- the retailers are

23    getting more and more scarce, and people who had

24    indicated that they were ready to commit to us have

25    backed away.  And we've had no real substantive leasing

1    progress except for Academy in the last year, and we

2    don't see a lot of -- over the next six months I think

3    we'll be lucky to sign maybe one or two more leases, if

4    things go well, won't get us back to the break-even

5    point.

6    Q.    At this point when do you project to achieve

7    break-even?

8    A.    I don't have any projections.  I don't have a

9    good crystal ball.  Need another probably half a

10   million square feet at least for break-even.

11   Q.    And this most recent tenant, what was the name of

12   it?

13   A.    Academy was the last --

14   Q.    What is Academy?

15   A.    A sporting goods store.

16   Q.    How much space did they take?

17   A.    80,000 square feet.

18   Q.    So you need 500,000 more to break even?

19   A.    I think, I haven't run the numbers recently, but

20   I believe that's about the right amount, yeah.

21          MR. NOLAN:  That's all I have, thank you, Your

22   Honor.

23          THE COURT:  Thank you.  Mr. Groff, any

24   questions?

25          MR. GROFF:  No, Your Honor.

1          THE COURT:  Cross-examination, Mr. Newman?

2          MR. NEWMAN:  No questions, Your Honor.

3          THE COURT:  Thank you, Mr. Harding, you may

4     step down.  Mr. Nolan?

5          MR. NOLAN:  I have one more brief witness.

6     I'd like to call Richard Kaplan to the stand, please.

7          THE COURT:  Richard Kaplan.

8          THE CLERK:  Please remain standing and raise

9     your right hand.  Do you solemnly swear that the

10    testimony you shall give in the cause now in hearing

11    shall be the truth, the whole truth, and nothing but

12    the truth, so help you God?

13         THE WITNESS:  I do.

14         THE CLERK:  Please be seated, pull yourself

15    right close to the microphone.  State your name and

16    spell your last name for the record.

17         THE WITNESS:  Richard Kaplan, K-A-P-L-A-N.

18         THE COURT:  All right, Mr. Nolan.

19                    DIRECT EXAMINATION

20    BY MR. NOLAN:

21    Q.   You're the plaintiff in this case, Mr. Kaplan?

22    A.   Yes.

23    Q.   And you recall that your deposition was taken

24    actually in this courthouse back in January of this

25    year?

1   A.    Yes.

2   Q.    And I may -- I'm going to ask you some questions,

3   and it may be necessary for you to refer to your

4   deposition transcript and that's Exhibit D47.  Do you

5   have it, sir?

6   A.    May I get my glasses?

7   Q.    Sure.

8         Mr. Kaplan, I'm going to ask you just a few

9   questions on a very limited topic, and the topic is a

10  telephone call that you testified about relating to

11  possible sale of your stock.  Do you recall that --

12  that testimony?

13  A.    Yes, I do.

14  Q.    Have you had a chance to look at your deposition

15  recently?

16  A.    Yes.

17  Q.    Okay.  As I understood it from your testimony, a

18  telephone call was made to you by someone who left a

19  voice mail on your machine, correct?

20  A.    Yes.

21  Q.    You didn't know that person.

22  A.    No.

23  Q.    And I also understand that you then asked

24  Mr. Rothberg to return the call?

25  A.    Yes.

1    Q.    And did -- to your knowledge did Mr. Rothberg

2    return the call?

3    A.    Yes.

4    Q.    And I believe you testified at your deposition,

5    this is at Page 26, that he, Mr. Rothberg -- this is

6    Line 7, do you have that open, sir?

7    A.    Yes.

8    Q.    Do you see it there?

9    A.    I do.

10   Q.    Okay.  He did not talk to a person and reported

11   back to me and that's the end of it.  Is that your

12   testimony at the time?

13   A.    Yes.

14   Q.    Okay.  And since that time have you had the

15   opportunity to -- and I'll refer you to Exhibit 48,

16   which is the next item past your deposition transcript.

17   Do you see there are two copies of e-mails, the first

18   one from Larry Kinnane to Robert Rothberg and the

19   second one from Robert Rothberg; do you see those?

20   A.    Yes.

21   Q.    And the second one, which has a Bates stamp on

22   the bottom K-REM-00065, was addressed to you; was it

23   not, sir?

24   A.    Yes.

25   Q.    And do you now recall receiving that e-mail?

1    A.    Yes.

2    Q.    And it turns out that the individual that called

3    you was a man named Michael O'Brien?

4    A.    I don't recall -- I don't recall his name but --

5    Q.    Just let me ask you a simple question, sir.  You

6    recall receiving Mr. Rothberg's e-mail?

7    A.    Yes.

8    Q.    And you knew or at least Mr. Rothberg had told

9    you that Mr. O'Brien either directly or indirectly was

10   interested in purchasing some stock, a block of stock?

11   A.    No.

12   Q.    You didn't understand that from that e-mail.

13   A.    Mr. O'Brien was not interested in purchasing --

14   Q.    I said --

15   A.    Mr. O'Brien was not interested, somebody he was

16   representing --

17   Q.    Okay.

18   A.    -- reportedly was interested in buying stock.

19   Q.    And the date of this e-mail was March 31st, 2004?

20   A.    That's what it appears to be.

21   Q.    Okay.  And did you see Miss Fannon's slide up on

22   the board that marked the date of the announcement of

23   the sale of Mt. Olive?

24   A.    Yes.

25   Q.    Do you recall what that date was?

1    A.    No.

2    Q.    Was it about -- was it about March of --

3    A.    It may have been.

4    Q.    Anyway, Mr. O'Brien's friend who runs money was

5    interested in buying a block of First Hartford stock;

6    that's the message you got.

7    A.    Yes.

8    Q.    And according to Mr. Rothberg's e-mail, the

9    market price was $1.80 and he was interested in

10   something at $2, correct?  That's what the e-mail says.

11   A.    No, that's not what it says, sir.

12   Q.    It said he -- what does the e-mail say, sir?

13   A.    It says he was pretty sure that his friend might

14   be willing to pay $2.

15   Q.    Well, would be willing to pay $2, right?  Does it

16   say would rather than might, sir?

17   A.    He was pretty sure, sir.

18   Q.    His friend --

19   A.    Doesn't say will, doesn't say he would, he says

20   he's pretty sure.

21   Q.    What it actually says is would and it doesn't say

22   might, correct?

23   A.    It's not a yes or no answer.

24   Q.    Excuse me, sir?

25   A.    I don't see that as a yes --

1    Q.    Why don't we try it this way.  Why don't I read

2    it and you can tell me if I'm reading it correctly.

3          He said he was pretty sure his friend would be

4    willing to pay $2.  Did I read that correctly?

5    A.    Yes.

6    Q.    Okay.  Did you follow up with that?

7    A.    Excuse me?

8    Q.    Did you follow up with that?

9    A.    No, I did not.

10   Q.    You weren't interested in selling your stock.

11   A.    Didn't think about selling the stock.

12   Q.    Pardon me?

13   A.    We were in the middle of litigation, sir.  I did

14   not contemplate selling any stock.

15   Q.    So you didn't follow up on this.

16   A.    I just answered that.

17   Q.    Okay.  And have you ever tried to sell your

18   stock?

19   A.    Have I ever tried to sell my stock?

20   Q.    Yes.

21   A.    No.

22   Q.    Have you ever approached the company to try to

23   buy -- to buy your stock, to buy you out?

24   A.    No.

25   Q.    At any price.

1    A.    Only in settlement discussions, sir.

2    Q.    All right.

3            MR. NOLAN:  Your Honor, I would offer

4    Exhibit 48, the second page, the Rothberg e-mail.

5            MR. NEWMAN:  Your Honor, just to make clear,

6    we object to offers for minority shares on the grounds

7    of relevance because of our view of what the proper

8    valuation is.  Otherwise no objection.

9            THE COURT:  The exhibit is admitted, 48 Page 2

10   is admitted, and I will have counsel argue its weight.

11           MR. NOLAN:  Thank you, Your Honor.

12           THE COURT:  Mr. Groff, anything from you?

13           MR. GROFF:  No, Your Honor.

14           THE COURT:  Mr. Newman, anything from you?

15           MR. NEWMAN:  No.

16           THE COURT:  Thank you, Mr. Kaplan, you may

17   step down.

18           MR. NOLAN:  We're complete, Your Honor.

19           THE COURT:  I'm sorry?

20           MR. NOLAN:  We're done.

21           THE COURT:  You're done, thank you.  Any

22   rebuttal?

23           MR. NEWMAN:  Yes, Your Honor.

24           MR. NOLAN:  Your Honor, I'd like to raise that

25   point you made yesterday.

1          THE COURT:  Conference call?  Which has been

2     canceled, I've taken care of that.  Which point?

3          MR. NOLAN:  The point about us having a

4     chance -- I don't know whether you wanted me to talk

5     about this now or later, about we just got the

6     disclosure on that and we got -- we did buy the --

7          THE COURT:  Counsel, I guess I'm not sure, you

8     need to remind me.  Did you want to talk between

9     yourselves or want to argue to me?

10          MR. NOLAN:  I think he wants to go forward and

11     I would prefer -- I would request the time that you

12     said that you would consider granting us to -- in that

13     one week to --

14          THE COURT:  I understand, now I'm with you.

15     What I said was that I planned to hear the testimony

16     today and if at the end of it you thought you needed

17     more time that I would allow it, yes.

18          MR. NOLAN:  I'm alerting you to that.

19          THE COURT:  Thank you, go ahead.

20          MR. NEWMAN:  Your Honor, we call in rebuttal

21     Mr. Aertsen.

22          THE COURT:  Come forward, sir.  You're still

23     under oath, go ahead and be seated.

24          MR. NEWMAN:  Your Honor, at this point the

25     only exhibit that we have which has not been previously

1    marked is the supplemental disclosure that was -- of

2    Mr. Aertsen, the second supplemental and rebuttal

3    disclosure, which we've now marked as

4    Exhibit Plaintiff's 169, I need to offer that -- put

5    that in evidence.  I understand there's no objection.

6          MR. NOLAN:  Actually, I think we do object to

7    it.  We don't believe that this is rebuttal but --

8          THE COURT:  Well, I guess there's two or three

9    questions here.  One, I'm going to allow defense

10   additional time if it needs it.  Whether it's rebuttal

11   or not I can't tell until I hear it or see it,

12   unfortunately.  But the third question is do we need to

13   admit the supplemental disclosure or are you going to

14   ask the witness questions about it?  Usually the

15   disclosure is by way of discovery to prepare for the

16   trial.

17         MR. NEWMAN:  I understand.  I will offer it at

18   the end, Your Honor, because defendants have put in all

19   their reports, they put in all their other disclosures,

20   but I'll ask the questions first.

21         MR. GROFF:  Your Honor, just so the record's

22   clear that Mr. Ellis also objects that this is relevant

23   and proper rebuttal and believes that at this point in

24   time you should be furnished with the disclosure so at

25   least you can have a general understanding of what this

1    testimony is.

2             THE COURT:  Thank you, Mr. Groff.

3    Nevertheless, in the interest of moving this matter

4    along, since it is a bench trial, I'm going to go ahead

5    and hear the testimony.  I'll hear that argument later.

6             MR. GROFF:  Thank you.

7                      DIRECT EXAMINATION

8    BY MR. NEWMAN:

9    Q.    Mr. Aertsen, behind you is the binder with

10   exhibits.  I want to turn you first to

11   Exhibit Plaintiff's 162, which is in the small binder.

12   A.    Yes.

13   Q.    This afternoon Ms. Fannon, Nancy Fannon, was

14   asked a series of questions about your evaluation, and

15   the issue I wanted to address was the issue on the

16   nonoperating assets you've identified on

17   Plaintiff's P162.

18   A.    Yes.

19   Q.    Do you recall Ms. Fannon's testimony when she

20   said on a valuation methodology that if you value on

21   approach of capitalizing income of a business that you

22   should not in the same methodology include the assets

23   that are the means of production of that income; did

24   you hear that testimony?

25   A.    Yes, I did.

1    Q.    And then she went on to opine that your inclusion

2    of these nonoperating assets were assets which were

3    means of production; do you recall that?

4    A.    Yes, I did.

5    Q.    Directing your attention to the first

6    nonoperating asset you identified, value of excess

7    cash, can you explain to the Court what -- how that

8    value of excess cash is calculated?

9    A.    Well, when I calculated the excess cash I used

10   the working capital, which meant that the current

11   assets, including cash, liquidated out all of the

12   payables that related to it; and you were left with

13   excess cash position, which would be available for

14   subsequent investment in the business or if it were,

15   say, a real estate investment trust available to pay a

16   dividend.  So it sits there waiting for management to

17   deploy it.

18            I also notice that when I -- when I looked at

19   that particular balance sheet date, understanding that

20   there was some obligations from the footnotes, we also

21   looked at the contract, the settlement contract,

22   relating to the Bangor sale and the recovery not only

23   of the profit but additional amounts.  And then of

24   course if you look again at the end of April of '06

25   there's in fact additional cash beyond this amount on

1    their balance sheet.  So I, knowing all of those

2    things, felt comfortable showing this cash position

3    where it was as of that balance sheet date.

4    Q.    Certainly a business needs to have cash, working

5    capital, to operate.

6    A.    Yes, and cash is fungible and it's there,

7    sometimes it gets invested and then you look forward to

8    see if it's replenished, and in fact in this case it

9    was.

10   Q.    So is the value of excess cash that amount of

11   cash over and above the working capital cash?

12   A.    Yes, it is, yes.

13   Q.    We have to go -- remember, I need to finish the

14   question before you start to answer.

15   A.    Yes.

16   Q.    On the -- I think she also criticized --

17   critiqued the value of the deposits and escrows,

18   prepaid and deferred expenses.

19   A.    Yes.

20   Q.    Sir, can you explain how the deposits, escrows,

21   prepaid and deferred expenses are not assets involved

22   in the production of income?

23   A.    Well, they -- what happens is they get recovered

24   either through a refinancing or a sale, and we saw

25   again from the settlement sheet that when -- these were

1    predevelopment activities and then they move into the

2    construction and then into the development assets going

3    up the balance sheet in the case of First Hartford

4    Corp.

5    Q.    Could you give us one -- a concrete example using

6    let's say a deposit to explain that, to show how it is

7    that a deposit here would be an asset that's not used

8    in the production of income but a value to income.

9    A.    Well, what I'm trying to explain is how it gets

10   recovered.

11   Q.    So give us an example, if you could, a concrete

12   example with a deposit on a property.

13   A.    Okay, so if we take Edinburg, for example, they

14   have a deposit on land, they -- then as development

15   goes forward they would then move to acquire the land

16   so there would be a follow-on investment from that.

17   And then there would be -- it goes -- bank would be

18   financing it as well.  And then at some subsequent date

19   there would be the sale of the asset, and in addition

20   to the profit getting recovered their investment would

21   also be recovered and that's how it gets recovered.

22   And you saw that in the Chicago settlement sheet where

23   the amount recovered -- the payment they received in

24   settlement exceeded the profit that we were showing on

25   Bangor, and in addition to that they recover those

1    investment dollars and that's what that is.

2    Q.    If we looked at the revenue stream that you

3    identified and the net cash flow under the management

4    development construction finance --

5    A.    Yes.

6    Q.    -- where you used the historical three-year

7    average?

8    A.    Yes.

9    Q.    When you used those did you use only the gain on

10   the sale of the property?

11   A.    Yes.

12   Q.    So you didn't show the -- in there you wouldn't

13   show the recovery of the deposits.

14   A.    I only show the gain, so the -- since they're

15   also recovering all of the costs, including that

16   deposit you're referring to, they would actually

17   receive additional money, and that's the recovery that

18   I'm talking about.

19   Q.    Mr. Aertsen, I want to direct your attention to a

20   new topic, and this is the examination of the REITs,

21   the real estate investment trusts, selected by

22   Ms. Fannon and Mr. Riddiough in their expert reports

23   and evaluations.  Following the deposition of

24   Ms. Fannon did you take an opportunity to examine some

25   of that comparative analysis to REITs?

1    A.    Yes, I did.

2    Q.    And what did you do?

3    A.    Well, what I did, this is a way of confirming the

4    value that I had established using my other method, but

5    I went and looked at the REITs in her sample and looked

6    at the average dividend payment that those sample of

7    REITs paid, which is the 5 percent.  And then I looked

8    at --

9    Q.    Let me stop you right there.

10   A.    Yes.

11   Q.    I direct your attention to Exhibit Plaintiff's

12   165.  It's in the same book.

13   A.    Yes.

14   Q.    What is 165?

15   A.    This is a schedule of the REIT comparable payout

16   ratios using the sample of REITs that were contained in

17   that report.

18   Q.    On the selection of -- how many REITs have you

19   identified here?

20   A.    There are 13.

21   Q.    And do each of these 13 REITs that you show on

22   Plaintiff's 165 come from the REITs selected by

23   Ms. Fannon and Professor Riddiough?

24   A.    Yes, they do.

25   Q.    And behind Plaintiff's 165 are a series of

1  Morningstar reports?

2  A.    Yes.

3  Q.    What are those, sir?

4  A.    Those are reports written by Morningstar analysts

5  for each of the names included in the 13-name list at

6  the beginning of this exhibit.

7  Q.    And what is the -- what are the value metrics

8  that you were looking for for each of these REITs?

9  A.    Well, REITs pay dividends, and they pay dividends

10 equal to an amount of their funds from operations,

11 which would include the net profit, which needs to be

12 paid back, paid out as a dividend, 90 percent of it, in

13 order to qualify for the dividend to be included as a

14 tax deduction and therefore exempting them from taxes.

15 But most REITs pay an additional amount over the net

16 income and as a percentage of funds from operations.

17 So the payout rate as expressed as a percentage of the

18 funds of operations is what you see in this first list.

19 So, for example, Realty Income Corporation would pay

20 86 percent of its funds from operations out in the form

21 of a dividend.  Kimco would pay 51 percent out in the

22 form of a dividend and so on down the list.

23 Q.    Sir --

24 A.    Yes.

25 Q.    Where is the source for the payout ratio for each

1    of the REITs you've identified?

2    A.    Well, they're included in the Morningstar

3    reports, and, for example, in the first one, Realty

4    Income Corporation, if you look at the last page of

5    that report, you'll see under financial health the

6    86 percent dividend payout ratio.  It's the last

7    sentence of the last chap -- the last paragraph on that

8    analysis.

9    Q.    If you would turn next, sir, to what we've marked

10   as Plaintiff's 166.

11   A.    Yes.

12   Q.    And would you describe that for the Court,

13   please.

14   A.    Yes, this is analysis showing the fiscal years

15   2004, 2005, and 2006 for First Hartford Corporation.

16   And what this is is a dividend-paying capacity analysis

17   of First Hartford Corporation.  And to do that you

18   basically go through the same analysis to determine

19   first their funds from operation.  So if you look on

20   the left-hand columns where the words are adjusted from

21   operation, sources of distributable cash, and the first

22   is the more traditional description of funds from

23   operation, which is their pretax income plus

24   depreciation.  And if you go across the line you can

25   see the negative pretax income which, by the way, is

1    what creates the tax loss and the continuing NOL in

2    First Hartford Corporation, you add back depreciation

3    and --

4    Q.    Sir, why do you add back depreciation?

5    A.    Because it's a noncash expense and it's part of

6    the description of funds from operation, net income

7    plus depreciation.

8    Q.    Is that because it's part of the available cash

9    flow?

10   A.    It's because it's available for distribution,

11   cash flow.  Then you take the gains on sales, again,

12   these are -- these are categories that real estate

13   companies would have so that the three sources of

14   available income, cash, to pay dividends are these

15   three I'm identifying.  The gain on sale, and you have

16   Bangor in 2006 of 5.4 million and you have Mt. Olive in

17   2004 of 6.6.

18          And then you have another category called

19   distributions from affiliates.  Distributions from

20   affiliates would in effect be the dividend that they

21   receive from their nonconsolidated subsidiaries.

22   And -- and as opposed to the equity in earnings, which

23   is just their share of the net profit, the

24   distributions would be the cash they actually receive

25   from affiliates.  So if you add up those three items

1    for the three years you get total distributable cash.

2    They don't pay a dividend, but it could be used for a

3    dividend, it's their paying capacity, in 2006 of 5.5

4    million, it's a negative number in 2005, and it's a

5    positive number in 2004, obviously reflecting in the

6    2006 and the 2004 year the fact that they were selling

7    real estate assets, and the gain is the principal

8    source of payment.

9         What I did was I averaged those years, 2006,

10   '05, and '04, on the right-hand side is the average,

11   4 million 103 would be the average cash available for

12   distribution for those years.  I then took my value of

13   $48 million and said, what would a 5 percent dividend

14   yield on that number require in the form of a payout

15   ratio.  And the answer is a 59 percent payout ratio on

16   the 4 million 1 average cash of $2.4 million, which you

17   see above the 48 million, would be what they would need

18   to distribute to produce a 5 percent dividend yield.

19   And the 59 percent dividend payout ratio and the

20   5 percent dividend yield are key, important elements

21   here in valuing this cash flow.

22   Q.    Mr. Aertsen, did you use this model of adjusted

23   funds from operation with a multiple of a dividend

24   yield in your valuation or as just a check on the

25   valuation you did?

1    A.    This is a check.

2    Q.    Professor Riddiough testified this morning

3    relating to his Exhibit 4 that when he did his adjusted

4    funds from operation that he also added in gains on

5    sale of real estate, but then he added a line which is

6    called equity in income of unconsolidated subsidiaries.

7    A.    Yes.

8    Q.    You did not use that but instead used

9    distribution from affiliates.

10   A.    Yes.

11   Q.    Can you explain the difference?

12   A.    Well, the equity in earnings would be the equity

13   in earnings, but the actual cash they received, in

14   effect a dividend from those subsidiaries, would be the

15   amount I showed here.

16   Q.    Is the equity in income of unconsolidated

17   subsidiaries a figure that Professor Riddiough used, a

18   cash figure?

19   A.    No, it's an accounting figure showing the equity

20   that is earned each year on those investments.  It's

21   the net -- their share of the net income, but it's not

22   necessarily cash flow to this company because if they

23   don't distribute it then it would not be cash to the

24   company.  It's only when they distribute it.

25   Q.    And is this figure that you have for distribution

1    from affiliates, you've got a note 4, actually shown on

2    the 10-K?

3    A.    Yes, it is.

4    Q.    So each of these figures -- all the figures here

5    on Exhibit Plaintiff's 166 are identified in the First

6    Hartford reporting 10-K.

7    A.    Yes, they're extracted directly from their

8    financial statements.

9    Q.    Sir, I want to direct your attention next to

10   Plaintiff's 167.

11   A.    Yes.

12   Q.    Actually, while you pull 167 I have a further

13   question on Plaintiff's 165.  I didn't mean to jump

14   around.  Can you put in front of you the first sheet on

15   that schedule of REITs, Plaintiff's 165?

16   A.    Yes.

17   Q.    Your Plaintiff's 165 shows for each of the

18   13 REITs that you have the actual payout ratio.

19   A.    Yes.

20   Q.    And that's the dividend as the percentage of

21   their funds from operation.

22   A.    That's correct.

23   Q.    And if we turn to Plaintiff's 167, for those

24   13 REITs selected from the comparable REITs identified

25   by Ms. Fannon and Professor Riddiough, did you

1   determine the low, the average, and the high payout

2   ratios for those REITs?

3   A.    Yes, I did.

4   Q.    What were they?

5   A.    I'm referring now to Exhibit P167?

6   Q.    Yes.

7   A.    And you can see at a 51 percent average --

8   Q.    Sir, before we go to the analysis I just want to

9   know where those -- where the figures came from for the

10   payout ratios.

11   A.    Oh, these all came from the financial statements,

12   and the payout ratios came from the -- from the

13   examples that I gave earlier on the -- on the --

14   Q.    Plaintiff's 165?

15   A.    Yes, 165.

16   Q.    For the REITs selected what was the lowest payout

17   ratio?

18   A.    It was Kimco at 51 percent.

19   Q.    And what was the highest payout ratio?

20   A.    The highest was Heritage Property Investment

21   Trust at 95 percent.

22   Q.    And what was the average payout ratio for all of

23   the 13 REITs?

24   A.    I believe it was right around 72 percent.

25   Q.    Okay.  Directing your attention to

1   Plaintiff's 167.

2   A.    Yes.

3   Q.    Can you tell us what you did in this model?

4   A.    Well, it's the same analysis.  In this one I run

5   it from 2004 through 2007 fiscal years First Hartford.

6   And you can see it's the same analysis and you can see

7   on the right-hand side the average is $3.3 million,

8   3,350,601, and then below at the low, 51 percent on the

9   Kimco payout ratio, you can see the average dividend

10  payout capacity of the 3 million 5 at 51 percent would

11  be a million seven.  I don't mean to confuse if I'm

12  abbreviating the numbers, so if you want me to read the

13  whole number I'll do that.

14  Q.    That's fine.

15  A.    It's a million seven, and that would give it an

16  equity value at a 5 percent dividend of 51 percent

17  payout rate of $34 million.  At the average --

18  Q.    Let's stop right there.  Would you just walk us

19  through slowly how it is that the company has a payout

20  ratio of 51 percent, what it produces in terms of

21  dividend paying capacity, and then the equity value at

22  a 5 percent dividend yield.  I would like you to walk

23  us through that a little more slowly.

24  A.    Well, again, you're talking in all of these

25  examples about an average distributable cash flow.

1    That's the amount that would be available to pay a

2    dividend from these sources of cash, if the company

3    were to pay one.  Doesn't make a comment as to whether

4    they do or not.  So that's the amount that would be

5    available.  So at a 51 percent payout rate, that

6    3-1/2 -- 3.3 million, the actual amount that would be

7    paid is a million seven.  And what you do, then, is you

8    capitalize the million seven by dividing it by the

9    dividend rate, point 05, and that gets you to the

10   equity value for the company.  And it is -- it is used

11   always by REIT analysts to determine the fair value of

12   stock as one indicator.

13         So I did it at the 51 percent low payout rate

14   for Kimco; I then did it at the average of these names

15   that would have an average dividend paying amount of

16   2 million 4, 2 million 399, and that creates an equity

17   value of $47.9 million.  And if they paid out at the

18   rate of Heritage, at 95 percent, then the equity value

19   would be $63 million.

20   Q.    The four years selected here, 2004 through 2007,

21   those are the same years that Professor Riddiough used?

22   A.    Yes.

23   Q.    And we heard on his examination that he excluded

24   the year 2003 because he thought that First Hartford's

25   income had not yet stabilized?

1   A.    Well, I -- I heard what he said.

2   Q.    What's your assessment of 2003 for First

3   Hartford?

4   A.    Well, I think that --

5            MR. NOLAN:  I object to that.

6            THE COURT:  Basis?

7            MR. NOLAN:  Excuse me, I object.

8            THE COURT:  Basis?

9            MR. NOLAN:  No foundation, no competence.

10           THE COURT:  I'm not sure I understand the

11   question.  Rephrase the question.

12           MR. NEWMAN:  I'll ask a better question, Your

13   Honor.

14   BY MR. NEWMAN:

15   Q.   Professor Riddiough had testified as to why he

16   excluded year 2003 in forecasting cash flows for First

17   Hartford Corporation, and I wanted to ask you in your

18   assessment or opinion whether that would be appropriate

19   to exclude 2003 and rather look at these other four

20   years for forecasting cash flow funds from operation.

21   A.    Well, they're obviously -- there are going to be

22   differences in this company's performance every year

23   because some years they have gains on sales and some

24   years they don't.  Some years -- but a principal

25   difference between say 2003 and 2005 is that they had

1   increased their stake in the Cranston-related

2   properties from 25 percent to 50 percent, so that will

3   be one difference.  2003 had less income, less expense,

4   it was less of a robust year, but I'm not sure it's --

5   I don't -- I can't read what Dr. Riddiough is thinking.

6   Q.    Mr. Aertsen, would you turn to Plaintiff's 168?

7   A.    Yes.

8   Q.    Did you run this evaluation on the capitalization

9   of dividend-paying capacity for the five years,

10  including the year 2003?

11  A.    Yes, I did.

12  Q.    Could you just walk us through your analysis?

13  A.    Yes, well, again, you see the same analysis, only

14  we included the year 2003.  Because 2003 was a smaller

15  year you're tacking on, you're getting less of an

16  average.  Nevertheless, if you apply the low and high

17  payout and the average payout ratios in the same way,

18  your low end would be an equity value, again always

19  assuming a 5 percent dividend of 27.6 million.  At the

20  average for the REITs it would be 38.7 million, and at

21  the high end of 95 percent it would be at 51 million,

22  using the same metrics.

23  Q.    Did you find support for this capitalization of

24  dividend-paying capacity model in the Pratt text that

25  Ms. Fannon referenced in her deposition?

1    A.    Yes, I did notice that, yes.

2    Q.    Let me show you what I've marked Plaintiff's 169.

3          MR. NEWMAN:  Your Honor, this is the

4    supplemental disclosure which has not been put in the

5    Court's notebook yet.

6          THE COURT:  I didn't understand where your --

7    what text?  I didn't catch that and neither did the

8    court reporter.

9          MR. NEWMAN:  I'll ask the another question.

10   BY MR. NEWMAN:

11   Q.    At Miss Fannon's deposition in the materials she

12   referenced a valuation methodology text by Shannon

13   Pratt.

14         THE COURT:  Oh, Pratt.

15         MR. NEWMAN:  P-R-A-T-T, and I apologize for

16   starting my walk to the witness.

17   Q.    And I've shown you what we've marked

18   Plaintiff's 169.

19   A.    Yes.

20   Q.    Is that the supplemental disclosure prepared --

21   or rebuttal disclosure in connection with this

22   capitalization of dividend methodology?

23   A.    Yes, it is.

24   Q.    What is the Pratt text that's referenced?

25   A.    There's a quote here --

1    Q.    Excuse me, sir, what is the text?

2    A.    It's a valuation textbook.  I'm not sure I

3    understand your question.

4    Q.    Could you just tell us from your rebuttal

5    disclosure the full name of the methodology text.

6    A.    The full name of the book, you want?

7    Q.    Yes.

8    A.    Oh.  I -- I don't have that right here.  Here it

9    is, I'm sorry, it's on the -- it's footnoted, it's

10    Shannon P. Pratt and Alina Niculita, Valuing a

11    Business, The Analysis and Appraisal of Closely Held

12    Companies, McGraw Hill, Pratt.

13    Q.    That's not a text that you used in your

14    valuation.

15    A.    No, it is not.

16    Q.    But did you examine that following the deposition

17    of Ms. Fannon?

18    A.    Yes, I did.

19    Q.    And is there a section there that proposed under

20    the guideline to public properties market model that

21    Ms. Fannon used, is there a reference to this valuation

22    multiple for the dividend-paying capacity?

23    MR. NOLAN:  I'm going to object, this is not

24    in evidence at this point.  We're starting to read from

25    books that --

1        MR. NEWMAN:  Actually it is.  I'll reference

2   the exhibit number.

3        THE COURT:  Where are we headed, Counsel?

4        MR. NEWMAN:  In about 90 seconds we will

5   finish.

6        THE COURT:  No, but I'm just not sure of the

7   thrust of the questioning, what's the goal here?

8        MR. NEWMAN:  Just to show -- just to reference

9   the text support for the methodology of using a

10  dividend yield capacity at this valuation.

11       THE COURT:  That Ms. Fannon used or that he

12  used, because it's in a text that she used.

13       MR. NEWMAN:  Yes.

14       THE COURT:  You can use a learned treatise to

15  ask a question, go ahead.

16       MR. NEWMAN:  Actually I'll draw the Court's

17  attention -- this Pratt text is already admitted in

18  evidence as P160, but I'll stay with this for the

19  question.

20  BY MR. NEWMAN:

21  Q.   Mr. Aertsen, can you describe for us the

22  dividend-paying or paying-capacity model that's

23  referenced in the Pratt text.

24  A.   Yes, I can read the language from it; is that

25  what you'd like?

1    Q.    I wanted you to describe for us --

2    A.    Well, it basically says that one way to value a

3    company is to look at its dividend-paying capacity

4    relative to comparables in the industry.  So if we're

5    comparing First Hartford Corporation to its comparables

6    in the industry, which has been done, then you would

7    look to the dividend-paying capacity of those

8    comparable companies and compare First Hartford's

9    dividend-paying capacity to those.  And that's exactly

10   what we've done.

11         MR. NEWMAN:  At this point, Your Honor, we

12   would offer in evidence Plaintiff's 165, 166, 167, 168,

13   and 169.

14         THE COURT:  All right, I'll reserve ruling on

15   those and hear the cross and we'll go from there.

16   Thank you.

17         MR. NOLAN:  Your Honor, we're not prepared to

18   cross.

19         THE COURT:  All right.  All right, Counsel,

20   let's then -- you can go ahead and step down,

21   Mr. Aertsen, thank you.  Leave the material there

22   unless you brought them up.  That's the proposed

23   exhibit, give that to Mr. Newman, thank you.

24         MR. NEWMAN:  This is actually the Court's

25   copy, and I'm reminded that we need to make clear that

1    we're offering this in evidence under seal.

2        THE COURT:  This is the new offer that you're

3    making, right?

4        MR. NEWMAN:  Yes.

5        THE COURT:  Hand it to the clerk, then, thank

6    you.  And it is noted proposed under seal.

7        All right, Counsel, we need to discuss how to

8    bring matters to a conclusion.  My suggestion is maybe

9    that I should step down for a few minutes and let you

10   talk and then come back and see if you can reach any

11   kind of agreement as to how to close the record on this

12   in terms of any response.  Does that make sense?

13       MR. NOLAN:  It does, Your Honor.

14       THE COURT:  We'll take a recess.  Let the

15   clerk know when you're ready, thank you.

16                (A recess was taken.)

17       THE COURT:  Counsel, I understand you all

18   enjoy this so much that you want it not to end.

19       MR. NEWMAN:  Something like that, Your Honor.

20       THE COURT:  Tell me where you stand.  The

21   clerk has told me you're having difficulties in

22   scheduling, and I said to her, which I'll pass on to

23   you, which is, you know as a bench trial I don't know

24   that -- it seems to me there are other alternatives

25   like affidavits, deposition transcripts, things of that

1    sort that might ease our process here.

2         MR. NOLAN:  We had I think settled subject --

3    you were checking -- settled with the concept of doing

4    the cross-examination and if we have any rebuttal to

5    this, do that by a video deposition and submit those to

6    the Court.

7         MR. NEWMAN:  That's agreeable, Your Honor.

8         THE COURT:  All right.  So that's -- you meant

9    that video to apply to everything; did I understand you

10   right?  Cross-examination and --

11        MR. NOLAN:  Yes, yes.  We would -- put it

12   another way, we would not need to bother you with this.

13        THE COURT:  All right.  One other question,

14   which is more important to me than to you, probably,

15   which is my good assistant here is going to be leaving

16   at the end of August to go on to more important,

17   better-paying positions.  I have the sense you're

18   talking about September; is that right?

19        MR. NEWMAN:  Because of witness

20   unavailability, yes, Your Honor.

21        THE COURT:  All right.  That's fine.

22        MR. NEWMAN:  Regrettably.

23        THE COURT:  But we do need to set a deadline.

24   We can't just let this drag on, so give me a date by

25   which I will have it.

1          MR. NEWMAN:  For the cross-examination I

2     checked with Mr. Aertsen, because of family plans and

3     trips and his daughter's wedding, September 15th is the

4     first available, that week.

5          THE COURT:  Well, again, I don't care too much

6     about the date you choose to do it.  What I want is a

7     date by which I'll have the transcript or the videotape

8     or whatever you're going to give me.

9          MR. NEWMAN:  September 30 is fine.

10         THE COURT:  September 30?

11         MR. NOLAN:  Yes.

12         THE COURT:  So by September 30 I will have the

13    final portion of the record; is that where we are?

14         MR. NOLAN:  Yes, Your Honor.

15         MR. NEWMAN:  Yes, Your Honor.

16         THE COURT:  And what should I do with the

17    pending reserved ruling on the supplemental disclosure?

18    Is that -- is this it, or do you want to wait until the

19    cross or rebuttal?  Where do we stand on that?

20         MR. NOLAN:  Why don't we await that and see

21    if -- worst case I suppose we would ask for a few

22    minutes to come in and argue that if we have to.

23         THE COURT:  All right.  So ruling is reserved

24    on the offered exhibits, and you will tell me when you

25    submit that either that the objection is withdrawn in

1    whole or in part or if not what ruling I need to make.

2    When you submit that, I suggest you should also

3    probably submit a proposed schedule for briefing.

4           MR. NOLAN:  Yes, Your Honor.

5           THE COURT:  Obviously there were no trial

6    briefs, I think that was appropriate, but I assume you

7    want to brief it, and I think it will be helpful for me

8    to have briefing.  I think Mr. Frank wants to

9    participate in that as well, and I've allowed him to do

10   that.  So submit to me a proposed schedule for briefing

11   at the same time, and if you want oral argument make it

12   known.

13          MR. NEWMAN:  So we don't have any issues

14   later, I take it the Court would like simultaneous

15   briefs and simultaneous rebuttal, as we've done in the

16   past?

17          THE COURT:  Seems to me that's reasonable.

18   Everything is on the record, you know what's going on,

19   so that would make sense.

20          MR. NOLAN:  Agreed.

21          MR. NEWMAN:  Agreed.

22          THE COURT:  Anything else?  All right, then,

23   and you'll explain to your clients what this all means

24   in terms of the closing and the pace and so on.  Thank

25   you very much.  Have a pleasant weekend.  And I want to

1    thank you very much for civil and collegial

2    presentations, I appreciate it.  Thank you.

3                    (Time noted:  5:09 P.M.)

1

2                    **C E R T I F I C A T I O N**

3    I, Lori D. Dunbar, Registered Merit Reporter, Certified

4    Realtime Reporter, and Official Court Reporter for the

5    United States District Court, District of Maine,

6    certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8    Dated:  August 5, 2008

9                    /s/ Lori D. Dunbar

10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25