1

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE


RICHARD E. KAPLAN,             )
                              )
         Plaintiff            )
                              )  Civil Action
V.                            )  Docket No. 05-144-P-H
                              )
FIRST HARTFORD CORPORATION    )
and NEIL ELLIS,               )  Trial Day 4
                              )
         Defendants           )
_____

Transcript of Proceedings


Trial
            Pursuant to notice, the above-entitled matter came on for

held before THE HONORABLE D. BROCK HORNBY, United States
District Court Judge, in the United States District Court,
Edward T. Gignoux Courthouse, 156 Federal Street, Portland,
Maine, on the 24th day of July at 9:12 a.m. as follows

            Appearances:
            For the Plaintiff:     Thomas C. Newman, Esq.
                                   Sarah A. McDaniel, Esq.
            For the Defendant
            First Hartford:        John B. Nolan, Esq.
                                   Peter W. Culley, Esq.
                                   Gavin G. McCarthy, Esq.

            For the Defendant
            Neil Ellis:            Joseph H. Groff, III, Esq.

            Amicus:                Robert W. Frank, Esq.


            Daphne G. Estes, RPR/CP
            Court Reporter

2

INDEX

Witness:  Guilliaem Aertsen

| Examination by: | Page |
|---|---|
| Mr. Newman | 33, 225 |
| Mr. Nolan | 131, 228 |
| Mr. Groff | 209 |

Witness:  Timothy Riddiough

| Examination by: | Page |
|---|---|
| Mr. Nolan | 233 |

1          JUDGE HORNBY:  Good morning.  It looks like

2     you made it over before the downpour.  Nobody

3     looks totally soaked.  Welcome to a foggy, wet day

4     in July.

5          This is civil number 05-144, Richard Kaplan

6     versus First Hartford Corporation and Neil Ellis.

7     This is a continuation of the trial that we began

8     some months ago.  As counsel know, this is the

9     remedy phase, specifically the valuation phase.

10          I've granted Attorney Frank's motion to

11     appear as amicus curiae with the limitations that

12     were described in his brief on behalf of certain

13     other shareholders.  And I noted, in doing so,

14     that I expected that the counsel will be able to

15     work out the confidentiality issues that have been

16     raised.  Unless I hear otherwise, I'll assume

17     that's being taken care of.

18          I have two other motions before me, that I

19     should address at the outset, filed on behalf of

20     the Defendants, joint Motion in Limine to exclude

21     the testimony of Mr. Aertsen.

22          Oh, I didn't have the court reporter sworn,

23     who is a contrary reporter.  I was told I should

24     have.  I apologize.

25          (Whereupon the Court reporter was sworn in.)

```
 1          JUDGE HORNBY:  I have a joint Motion in
 2     Limine by First Hartford and Ellis to exclude the
 3     expert testimony of Mr. Aertsen, and then a later
 4     motion to exclude the testimony of Mr. Aertsen
 5     that has to do with a second supplemental and
 6     rebuttal expert disclosure.
 7          I'm going to deny both those motions, but let
 8     me explain what that means in the context of this
 9     case.  I am, of course, deeply aware of my
10     obligations under the Dow Behr Joinder Cumberland
11     of cases to act as a gatekeeper in terms of expert
12     testimony.
13          This is, however, a bench trial.  There is no
14     jury for us to be concerned about.  The timing of
15     the motion is such that I don't at this point have
16     the response in opposition of the Plaintiff.
17          I've decided that the best course is to go
18     ahead and to allow the testimony to come in.  This
19     could be considered what years ago the lawyers
20     would call a de bene admission of testimony, which
21     is to say that the judge later determines what
22     role the testimony should have.  And that could
23     mean either that the Defendants persuade me that
24     the methodology is so flawed that I should not
25     consider it at all; or that they persuade me that
```

1       it's flawed to some degree, and I discount the

2       testimony, give it reduced weight; or that the

3       Plaintiff persuades me that it should not be

4       discounted or excluded at all and that I give it

5       full weight.

6          Because it's a bench trial, because everyone

7       is assembled, I conclude the best thing to do is

8       to go ahead and allow the testimony to come in,

9       and then to consider the arguments as to what role

10      it has in this proceeding.  That's really with

11      respect to the first motion.

12         With respect to the second motion, there are

13      similar issues at stake, with one additional

14      wrinkle, and it is this:  If, at the conclusion of

15      the hearing that we have over the next couple of

16      days, the Defendants believe they've been

17      prejudiced by the late second supplemental and

18      rebuttal disclosure, I will entertain at that time

19      a motion as to appropriate remedy in light of

20      fairness, which might include, for example,

21      holding the record open for an additional limited

22      testimonial proceeding or affidavit or deposition,

23      or might result in excluding it at that time.

24         But, again, the ruling is I'll permit it to

25      go forward with the examination and

1        cross-examination, and at the end of the hearing

2        the Defendants can address me, if they choose to,

3        on whether any additional remedy is needed.

4            So, counsel, with those rulings in advance, I

5        believe we're ready to proceed.  Does either -- do

6        any of the parties wish to make an opening

7        statement?  Does the Plaintiff?

8            MR. NEWMAN:  We do, Your Honor.  There was

9        one preliminary issue that Mr. Groff wanted to

10       raise.

11           JUDGE HORNBY:  All right.  Mr. Groff?

12           MR. GROFF:  Your Honor, there is also, I

13       guess, in this hearing possibly the issue of

14       ability to pay.  We've discussed this with Mr.

15       Newman, and it is a very difficult issue to

16       address in this hearing without an understanding

17       of what the company would theoretically be paying.

18           And so I don't think either side, if you look

19       at the exhibits, is really talking about ability

20       to pay until the Court determines what the company

21       has to pay.

22           And so that's -- it's a Catch-22 there, Your

23       Honor, and our suggestion would be that this be

24       bifurcated; that if, in fact, the Court comes

25       down -- comes with a value, then the parties

1          attempt to work that out.  If it can't be worked

2          out and the company can't pay, then that issue

3          would be right, and perhaps other issues would

4          then be right, too, as to what -- what -- where

5          else the company -- that you should be looking.

6              But to do that in this hearing, before we

7          determine a value, would just be, quite frankly, a

8          waste of the Court's time; and, secondly, we would

9          have -- nobody would really be knowing what

10         evidence to present.

11             JUDGE HORNBY:  Mr. Culley, do you join in

12         that?

13             MR. CULLEY:  Yes, Your Honor.

14             JUDGE HORNBY:  Mr. Newman?

15             MR. NEWMAN:  Yes.  We've discussed with

16         counsel, and, frankly, agree, Your Honor, with

17         such a wide range in the experts' opinions of fair

18         value, that until the Court makes that

19         determination, First Hartford would be putting in

20         evidence all over, and the timing of that, too.

21         So we would agree.

22             JUDGE HORNBY:  You referred to my seeing

23         exhibits, counsel.  I just wanted to make clear, I

24         have Plaintiff's exhibits that were delivered

25         yesterday, but no Defense exhibits.

1          MR. McCARTHY:  We have an extra copy for the

2      court.

3          JUDGE HORNBY:  Bring it up here, please.

4          I think that's a reasonable position to take,

5      and, therefore, I will defer the question of the

6      company's ability to pay.  And what I will direct

7      right now is that within one week of the close of

8      this hearing, that counsel propose a schedule by

9      which time you will either resolve that question,

10     there is no question about it, or propose when and

11     how the Court should hear that second part.

12         Is that agreeable, Mr. Newman?

13         MR. NEWMAN:  Yes, Your Honor.

14         JUDGE HORNBY:  Is that agreeable to Defense

15     counsel?

16         MR. GROFF:  Yes, Your Honor.

17         JUDGE HORNBY:  Thank you for raising that,

18     Mr. Groff.  Mr. Newman, I'll hear your opening

19     statement.  And I'm going to turn to my computer.

20     I'm not ignoring you, but just turning to where

21     I'm going to do word processing.

22         MR. NEWMAN:  I understand.

23         Your Honor, before opening, we've submitted a

24     consolidated exhibit list for the valuation

25     hearing.  I did want to address that I've

1          conferred with counsel, and would offer at this

2          time in evidence new exhibits:  Plaintiff's 107

3          through Plaintiff's 164 inclusive.  And I

4          understand there is no objection from Defense

5          counsel.

6               MR. GROFF:  No objection on behalf of Mr.

7          Ellis.

8               Also, Your Honor, with the understanding --

9          it is our understanding that Mr. Newman is

10         reviewing a limited number of Defense exhibits,

11         and we expect that there will be reciprocity of --

12         in large part of this in an effort to speed along

13         the trial.

14              MR. CULLEY:  First Hartford takes the same

15         position, Your Honor.

16              MR. NEWMAN:  The only issue is whether or not

17         their request was filed within the ceiling.  We've

18         noted in the exhibit list those that have been

19         marked or were stamped confidential subject to

20         protective order.

21              MR. CULLEY:  Your Honor, I thought we had

22         discussions with your office about working out

23         arrangements to see that the confidential

24         documents are filed under seal.

25              MR. NEWMAN:  Okay.  It hadn't gotten to me.

```
 1          But in the case for those marked confidential, we

 2          do offer them under seal.

 3              MR. CULLEY:  Yes, Your Honor.

 4              JUDGE HORNBY:  The exhibits are admitted as

 5          proposed, 107 through 164.  I will rely on counsel

 6          to examine them in a recess to make sure that they

 7          comply because, once they're admitted, they then

 8          become otherwise public documents that are

 9          available for anyone from the news media or anyone

10          else to consult.

11              So they are admitted.  It's up to counsel to

12          make sure that they're properly -- noted those

13          that are sealed.

14              MR. NEWMAN:  With respect to Defendants'

15          exhibits, Your Honor, although they're up there,

16          we are going to need to review with counsel,

17          similar to our rebuttal disclosure we received

18          last night, amended disclosures in the form of

19          errata sheets and an opportunity to review those.

20          I told counsel I'd go through them with them.

21              JUDGE HORNBY:  Well, I assume you will, and I

22          think the condition that was attempted to be

23          attached was that you would be reasonable in terms

24          of your response.

25              MR. NEWMAN:  Understood from the get-go, Your
```

1    Honor.

2        Okay.  Your Honor, in looking at First

3    Hartford Corporation, a couple of key points.  I

4    think it's important to note that First Hartford

5    Corporation operates essentially two businesses.

6    One is the owning and operating so-called

7    operating properties or real properties that

8    produce rental income.  And much like a real

9    event -- a real estate investment trust, they own

10   a portfolio of properties that produce rental

11   income.

12       But they also have a second business, which

13   is the development business, development side.  So

14   they're engaged in the management, construction,

15   finance and development of projects, which makes

16   them very much different from a REIT.

17       And one of the -- one of the key components

18   the Court is going to need to examine here is

19   whether or not in the valuing of the business --

20   in forecasting the future income, in valuing the

21   business, whether that should be before or after

22   tax.

23       And I would refer the Court to Exhibit 114

24   which is in evidence, which shows a Rule 1006

25   summary of tax returns from 2000 through 2007 and

1        shows that First Hartford Corporation does not pay

2        income tax.  They have a net operating loss

3        carried forward which rolls forward year to year,

4        and, in fact, replenishes, in part, from high

5        levels of depreciation against the real estate,

6        and, in part, because of their high expenses in

7        the development activity.

8            And so I'll be addressing that with Mr.

9        Aertsen, but we have put in evidence all the First

10       Hartford tax returns from 2000 through 2007.  And

11       in that summary, Exhibit 114, shows the NOL carry

12       forward or carry over, shielding what little

13       income they have.  Even in big years of gains on

14       sale of properties, very large and operating loss

15       carried forward.

16           So as a result, Mr. Aertsen, when he's valued

17       the income of the enterprise, has done it before

18       tax, without reduction before income taxation.  Of

19       all years, there's only one year from 2000 to

20       2007, in which First Hartford paid any tax at all,

21       and that was when an alternative income tax kicked

22       in for fiscal year ending April 30, 2004, all

23       summarized in Exhibit 114 with the underlying tax

24       returns already in evidence in Exhibits 107

25       through 113.

```
 1              I think the reason I'm addressing the issue
 2         of the two businesses in the opening, Your Honor,
 3         is that it's important when all of the experts
 4         testify because the two defense experts have
 5         compared First Hartford to REIT's, Real Estate
 6         Investment Trust.
 7              A big difference, though, between a real
 8         estate investment trust and First Hartford is as a
 9         C Corp with a controlling shareholder and
10         management, First Hartford does not have to and
11         does not generally pay dividends.  They don't
12         distribute the value.  They don't distribute the
13         free cash flow to shareholders.  They reinvest in
14         the business; or, as the Court has already found,
15         pay large bonuses to management; or, as the Court
16         has already found, use it for -- to assist Mr.
17         Ellis' other operations or businesses.
18              So if you look at the dividend history, the
19         first dividend in 22 years was in 2006, just a
20         year before we tried the liability case back in
21         November of 2006, when they paid 10 cents on a
22         share compared with the substantial cash flows
23         coming into the business, which they instead are
24         either using for their own benefit of management
25         or reinvesting.
```

1          The reason I call that to the Court's

2     attention is that when you look at the REIT's,

3     substantial difference in that comparison, but one

4     way of looking at the value of First Hartford

5     Corporation is the forecasted income streams and

6     the cash to do their -- for shareholders if they

7     were distributed as opposed to reinvesting.

8          So when we look at those comparison to REIT'S

9     the Defense has brought up, we suggested a model

10    which looks at the dividend paying capacity of

11    First Hartford, not the actual dividend pay.

12         For the base valuation -- basic valuation Mr.

13    Aertsen performed, his method is a discounting

14    cash flow analysis, so-called enterprise

15    discounting cash flow model.

16         An important issue to address, which is a

17    legal issue, which is that the valuation for

18    purposes of the minority shareholders' vital

19    remedy is a valuation of the enterprise, not a

20    value of what someone would pay for that minority

21    share.

22         The case law that's been brought to the

23    Court's attention back in earlier hearings will

24    be, of course, brief in a post hearing briefing,

25    but it's those decisions that we're addressing the

1    appraisal rights by the law court which found that

2    there should be no discount for minority

3    ownership, no discount for lack of marketability,

4    and it's now been codified in the appraisal rights

5    statute.

6         So the task of the Court in valuation under

7    appraisals rights, and we argue by analogy because

8    there is no definition of fair value, the

9    valuation of the entire enterprise to which the

10   aggrieved shareholder is entitled to his or her

11   portion of the share.

12        The reason I want to call that to the Court's

13   attention is that it makes irrelevant valuations

14   based upon what someone would pay for just that

15   minority share.

16        It's essential here, it really applies to

17   First Hartford because the control that -- that

18   control element is everything.  Management of Mr.

19   Ellis decides where that cash of the organization

20   is going to go, where the value is going to go.

21   It's not just the shareholders.

22        I thought that it might be helpful, then, if

23   I just did a brief opening, direct the Court to

24   Exhibit 162, and actually ask the Court to pull it

25   up, and I'll just do a brief overview of the

1       valuation methodology.  It's the small binder,

2       Your Honor.

3            JUDGE HORNBY:  Go ahead.

4            MR. NEWMAN:  Mr. Aertsen, in valuing First

5       Hartford Corporation, applied methodology which is

6       a going concern income approach called an

7       enterprise discounting cash flow model.  He

8       developed that basically as a banker and a lender

9       for Bank of Boston, and also with reference to a

10      text -- a text which I'll describe.

11           What 162 lays out, all of the operations of

12      First Hartford Corporation.  We look at the top,

13      Your Honor, the first series of operations, the

14      so-called operating properties.  This is the

15      portfolio of real estate properties that First

16      Hartford owns and operates that generate cash --

17      that generate cash in the form of rental income.

18           What Mr. Aertsen has done here to value them,

19      instead of performing, himself, a discounted cash

20      flow analysis from the actual rents and figures,

21      appraisers have already done that.  For purposes

22      of lending, MAI appraisals were performed by

23      highly qualified appraisal companies, appraisers,

24      for the lenders lending to First Hartford for

25      these properties.  And that's what's referenced on

1        the exhibit in each of the appraisals.

2            JUDGE HORNBY:  So are you saying that the

3        evidence I am going to hear is going to tell me

4        that those appraisals were all based upon a

5        discounted cash flow analysis rather than

6        comparables?

7            MR. NEWMAN:  No.  It's a mixed approach, Your

8        Honor.  It's a blending.  Each one of them looked

9        at three components:  A cost approach, comparable

10       sales, and an income capitalization approach.  And

11       they even went so far as to do both a direct

12       capitalization, taking one year's pro forma

13       income, applying the appropriate cap rate, and a

14       discounted cash flow where they project --

15       forecast out 10 years and apply a discount rate,

16       and then blend it.

17           But through each of the appraisals, the value

18       of an operating property comes from its ability to

19       generate income.  And so in almost every case with

20       the appraiser we're finding we'll look at some

21       comparables, but what's most valuable to us is

22       confirming the capitalization rate, and they

23       really relied upon the income capitalization

24       approach.

25           So although the valuations used by Mr.

1       Aertsen here are the appraised values, the basis

2       for that in his analysis was the forecasting of

3       future cash flows.  And he did not redo the

4       appraisals.  He did not attempt to redo that work.

5            So with operating properties, the asset

6       market price is the forecasting of income.  It's a

7       situation where, with an operating property, the

8       asset value is the income value.  They're one in

9       the same.

10           Against all of the valuations found for the

11      operating property by the appraisals, Mr. Aertsen

12      then, of course, deducted all of the debt.  And we

13      tried to shape up this Exhibit 162, Your Honor,

14      like an evidence rule 1006 summary with reference

15      to all the underlying financial records or data.

16           So the list down the left of operating

17      properties is followed by a reference to the

18      appraisal.  The appraisal value is found, the

19      square footage of the property, and the debt, as

20      well as First Hartford's equity interest because

21      for some of the properties they don't own 100

22      percent, particularly with some of the

23      unconsolidated subsidiaries, but they own only a

24      50 percent interest.

25           The notes to the right-hand column are the

1    references by Bates stamp number or deposition

2    exhibit of the very documents which show either

3    the appraisal or where we found with First

4    Hartford's records the debt at the time of

5    valuation, the mortgage debt.

6        In some cases they had a debt schedule from

7    4/30/06 which had to be worked back to the

8    valuation date.  In some cases they had a debt

9    schedule that Mr. Greenwald can produce that

10    showed a record of that date.  That's what each of

11    those notes are in the right of that column.

12        So we have the underlying records which are

13    now in evidence referenced there.  These are

14    referenced by Bates stamp number rather than

15    exhibit number, but what we did in the exhibits is

16    we followed by each appraisal the debt.  So just,

17    for example, the Court doesn't have to look, but

18    if we go down through the exhibits, each case

19    after appraisal we put the debt exhibits

20    immediately afterward.

21        So that's operating properties which generate

22    rental income.  That's an eighth revenue stream

23    for First Hartford, but it's a -- weighed against

24    that are some substantial expenses on the

25    development side and the developer revenue stream.

1          Before I move to those, Your Honor, I'm

2     sorry, of the operating properties there was one

3     with no appraisal, that's the North Adams

4     property.  At the very bottom of operations it

5     says Main Street Parkade, retail North Adams.  You

6     notice that there's no appraisal, and there are

7     notes over in the right of how Mr. Aertsen

8     computed that.

9          With the absence of an appraisal, he had to

10     use an alternative method of comparable properties

11     in the geographic area that were appraised, and

12     did it by square foot comparable analysis; a

13     methodology specifically referenced in the

14     McKinsey text which he's used in his lending

15     practice and business ventures for decades.

16          I point out North Adams because the

17     significantly -- the two Defendants' experts

18     assign no value to North Adams, even though it was

19     under way, had been purchased, had mortgage

20     financing, lease-ups had begun because it was

21     represented to them by management that the value

22     was less than the debt -- or equal but less than

23     the debt, and there was no appraisal.

24          Mr. Aertsen substituted, in lieu of

25     appraisal, a square foot methodology comparison;

1          by that meaning, take in value of appraised

2          comparable properties that First Hartford owns in

3          the area and applying those appraised values on a

4          pro rata basis.

5              Next under other operating units, there was

6          one project for which they had a contract.  So it

7          was supposed to be an operating property.  Bangor

8          Parkade was a leasehold purchase contract, which

9          was a contract in place for the sale of a property

10         in place at the time -- actually a bit before the

11         valuation date, and they had the estimates that

12         the cash were going to flow from that from the

13         very first closing.

14             The actual cash in gain obtained from that

15         was much greater than what's shown in Mr.

16         Aertsen's valuation, which was just the immediate

17         value of the contract from the first closing

18         that's going to occur for part of it, which, in

19         fact, occurred in March of 2006.

20             The next entry is an entirely different

21         revenue stream and expense stream.  The management

22         development construction finance identifies the

23         development operation of First Hartford

24         Corporation.  Worksheet 1, behind Exhibit 162,

25         which Mr. Aertsen identified the revenues and

1    expenses looking at three-year historical data

2    directly from First Hartford Corporation's 10-K

3    for the year ending 4/30/2005, before the

4    valuation date, looking back three years, and had

5    the historical data of revenue and expenses.

6    Specifically excluded from this is any revenue or

7    expenses relating to the operating properties.

8         If we look at the 10-K, you see under

9    revenues large numbers for the rental income from

10   those properties.  That's not included here.

11   That's not included under the development

12   operation.  Similarly, expenses related to the

13   properties, not included here.

14        So it's a valuation of looking back three

15   years historical data, of the net gains or

16   predicted cash flow, looking at the history for

17   this operation.  This operation includes sale of

18   projects, and that's shown under -- if we look

19   under revenues, your net gains of real estate,

20   it's just the net gain.  We can look at the 10-K,

21   and these numbers all come directly from their

22   financial records in the 10-K.

23        From that operation, Mr. Aertsen then

24   forecast taking the average 10 year cash flow, and

25   that's the schedule of prospective cash flow, is

1    behind worksheet 2, which runs out a discounted

2    cash flow spread just like the appraisals do for

3    the operating properties, but this is for the

4    development activity.

5        Revenues under the development business

6    include not just the gains on sales of projects

7    developed for sale, but they receive management

8    fees, management income.  They also receive

9    service income.  For example, service fees from

10    CVS for a development contract they have, and

11    other development activity.

12        Then next proceeding in the analysis and

13    methodology, Your Honor, is putting a value to the

14    non-operating assets, the value of excess cash.

15    That's shown on worksheet 2, which is just

16    basically the liquid assets minus the current

17    liabilities showing the excess cash.  The

18    forecasted value of the cash is cash.  So it's

19    not -- there is no spread out of 10 years.  It's

20    just that cash figure.

21        Similar to the other two non-operating assets

22    and value.  These figures were taken right off

23    the -- right from the First Hartford Corporation

24    financial statements in their 10-K and it's

25    referenced on the exhibit.

```
 1                JUDGE HORNBY:  Now, I don't know if my copy
 2        reflects the entire exhibit, but I don't have a
 3        separate schedule of prospective cash flow that's
 4        attached to worksheet number 1.
 5                MR. NEWMAN:  You're looking at Exhibit 162,
 6        Your Honor?
 7                JUDGE HORNBY:  Yes.
 8                MR. NEWMAN:  It should be behind worksheet
 9        number 2.
10                JUDGE HORNBY:  Yes.  Thank you.
11                MR. NEWMAN:  My apologies.  I think I skipped
12        over worksheet number 2.
13                JUDGE HORNBY:  Go ahead.  I'm there.
14                MR. NEWMAN:  I'll give the Court a moment.
15                JUDGE HORNBY:  That's fine.  Go ahead.
16                MR. NEWMAN:  Okay.
17                Worksheet number 2, which we skipped over,
18        Your Honor, was just a value of the excess cash.
19        Again, those figures are taken directly from the
20        10/31/05 10-Q which are referenced.  Then
21        similarly, value the tax shield, and the value of
22        other non-value operating assets taken directly
23        from the 10-Q.
24                For the value of the tax shield, they --
25        First Hartford has put a value for their continued
```

1    net operating loss, which would be -- because it's

2    replenishing, a value if they grew, if they

3    expanded even beyond.

4         Mr. Aertsen didn't project growth.  If you

5    look at his 10-year revenue stream, he just kept

6    it flat, did not project growth.  But if they were

7    to grow and expand, they'd have more value, and

8    they'd also have this shield which would shield

9    more income.

10        So they value that on their balance sheet at

11   this figure of the $2,730,000.  That's what First

12   Hartford put on the value of that.  And the value

13   of the other non-operating assets are cash

14   deposits and escrows, prepaid and deferred

15   expenses, which First Hartford says in their 10-K,

16   Hartford development expenses, and specifically

17   says in their 10-K that should any property then

18   actually be -- should a project actually be

19   developed, it will be reclassified.

20        So that by their own description of a 10-K,

21   these amounts under deposits, escrows, prepaid and

22   deferred expenses are just for development

23   activity where they've actually expended the funds

24   and already put it into development projects so

25   that you could expect that return from that cash.

1         And finally, Your Honor, is the Corporate

2    Center costs, which are the general

3    administrative, have to be subtracted from all.

4    There's no way from First Hartford's financial

5    accounting to distinguish which of the Corporate

6    Center costs apply to management of the operating

7    properties and what percentage of the Corporate

8    Center costs they're applying to the development

9    activity, although it would be common that the

10   greater portion would be the development activity.

11   There's no break-out, so it's just subtracting all

12   the costs Corporate Center.

13        For example, they have a corporate office

14   building.  They have to pay for that.  They

15   have -- you know, general administrative.  All

16   their fees, expenses, their litigation expenses.

17   What they pay -- I mean, their fees.  Everything

18   is included here, and we just used the figures

19   from their financial reporting with no

20   adjustments.  So there are no changes, no

21   adjustments.

22        Adding all of the forecast and income streams

23   from these operations, totals the 48,268,862 at

24   the bottom, and just divided by the total

25   outstanding share for a total per share value.

1      So that's the issue I want to address in

2    opening, Your Honor.

3      JUDGE HORNBY:  Thank you very much, Mr.

4    Newman.

5      Do the Defendants wish to make an opening?

6      MR. NOLAN:  Good morning, again, Your Honor.

7    I thank you for allowing me to participate.  I

8    won't take up much of your time.  I know we're

9    pressed for time to complete this hearing.

10      JUDGE HORNBY:  Good morning.

11      MR. NOLAN:  Plaintiff still has the burden of

12    proof in this case, and, as best I can determine,

13    he's going to attempt to meet that burden of proof

14    through Mr. Aertsen.

15      And we've been at this longer than you have,

16    and seen these books of papers and poured through

17    them, and I really don't envy your task because

18    the gap between the numbers is at this point is

19    quite large.

20      Ms. Fannon has a value per share of $2.79.

21    Mr. Aertsen has a value per share of $15.46.  You

22    put that in a different frame of reference, that

23    contrast is a $9 million value against the $48

24    million value.  When you have numbers that are

25    that far apart, something is off somewhere, and

1       I'm sorry to say that I expect we'll try to

2       persuade you, as Mr. Newman will try to persuade

3       you where the errors lie, and you'll have to do

4       that.  And as I said, I don't envy you that task.

5              You're going to hear from three experts, Mr.

6       Aertsen, and Professor Riddiough from Wisconsin,

7       and Ms. Fannon from Portland.  They each went at

8       this a bit differently, and I think that you will

9       have to judge for yourself the validity of what

10      they say.

11             As far as Mr. Aertsen is concerned, he told

12      us at his deposition that he relied on a book that

13      we have come to know and love as the McKinsey

14      valuation texts.  And he said that's the only way

15      to value the company, in his opinion, and that,

16      yes, he followed the methodology.

17             When he was examined on that, he did

18      something, and -- but I think that we will

19      demonstrate to you whatever he did, it wasn't what

20      McKinsey said.  And McKinsey depends, as do all

21      these other methodologies, all other valuation

22      methodologies, depend on a lot of analysis and

23      digging and work.

24             And I know from our side of the table, the

25      effort and the time and the resources that were

1    put into producing the reports and testimony by

2    Professor Riddiough and by Ms. Fannon.

3         At his deposition, and this is the last thing

4    I'm going to say about Mr. Aertsen's work at this

5    point, I asked him how much time he had spent on

6    this.  And I met Mr. Aertsen not only at his own

7    deposition, which was in Boston which we were

8    taking that day, I met him on at least one other

9    occasion, perhaps two, in which -- there were two

10   before that.  It was Mr. Riddiough's deposition

11   and also a deposition of Stuart Greenwald that

12   took place at First Hartford Corp back in March.

13        And I was very surprised to learn that he had

14   only spent 32 hours -- or he said he had billed 32

15   hours as of the date in June that I took his

16   deposition.

17        And with a company of the complexity -- it's

18   there on Exhibit 162 -- there are -- I'm up 15

19   operating subsidiaries, all of which have tax

20   returns, financial statements, profit and loss,

21   balance sheets, all of which, according to

22   McKinsey, you have to look at.  And it's not

23   sufficient just to take a number that's on a 10-K

24   and plug it in and say, well, this is going to

25   be -- I'm going to take this as the debt number

1          for this company.

2              What McKinsey counsels and requires is that

3          you have to build what's called free cash flow,

4          and you don't find that on a balance sheet.   It

5          requires digging into the basics of the company

6          and making calculations, putting some things in,

7          taking other things out, thinking about it, and

8          evaluating.   That is a theme that runs through the

9          textbook that's -- unfortunately we have it here.

10         It's about this thick.

11             And it's not possible to have done that in 32

12         hours.   We've seen Mr. Aertsen's work product.

13         We've brought it in a box, and I didn't see any

14         analysis in there.   I didn't see any evidence of

15         doing the tasks that McKinsey requires, and,

16         indeed, it's pretty apparent this morning, as Mr.

17         Newman just admitted, he didn't do it.

18             He just took appraisals -- real estate

19         appraisals, which are -- Your Honor, I raise this

20         point when you asked Mr. Newman a question.   He

21         took those real estate appraisals and said I'm

22         going to use real estate appraisals and that's

23         free cash flow.   And the cap rates that the real

24         estate appraisers use, I'm going to say that those

25         are the weighted loss of capital.   And that's what

1    he did.  And there was no more analysis, there was

2    no more thinking, there was nothing more than

3    that.  And that's one of the fundamental reasons

4    why we filed the motion that's also being

5    considered.

6         So I ask you to keep that in mind as we

7    listen to the testimony over the next few days,

8    and you're going to have to decide whether this is

9    a $2 stock or a $15 stock.

10        Thank you.

11        JUDGE HORNBY:  Thank you, Mr. Nolan.

12        Mr. Groff, anything else?

13        MR. GROFF:  Your Honor, very briefly.  I just

14   wanted the Court to understand that on behalf of

15   Mr. Ellis, that this is obviously a very important

16   case to him, not only personally, but his life has

17   been tied up in this company.

18        I think the Court, at the conclusion of this

19   trial, will find that Mr. Ellis gave absolute,

20   unbridled help and instructed everyone in the

21   company to give unbridled help to attempt to

22   establish a value.

23        This is not a case where there's one expert

24   and another expert, and somewhere in the middle,

25   you meet.  This is a case where the differences

1      are stark.  This is also a case that -- and I

2      would like the Court to consider this through this

3      trial, that if it was so easy in 30 hours to value

4      this company, that would make this company, at the

5      time, a buy of anyone's lifetime.

6           The stock price is a consideration here.

7      Investors are not stupid, and you will find that

8      the stock price and the actual value of this

9      company, as in the vast majority of situations in

10     the United States, have some connection.  You will

11     see when there's one sale of property, the stock

12     price goes up.  The stock market responded.

13          So I would ask the Court to consider all

14     these -- all these matters, but I would

15     particularly ask the Court to take cognizance of

16     the fact that First Hartford and Neil Ellis have

17     done everything possible to make sure that all the

18     information that anybody could possibly want out

19     of -- concerning this company for valuing it, has

20     been -- will be provided to this Court in this

21     hearing.

22          JUDGE HORNBY:  Thank you, Mr. Groff.

23          Mr. Newman, you may call the Plaintiff's

24     first witness.

25          MR. NEWMAN:  Your Honor, I would like to call

1      Mr. Guilliaem Aertsen.

2           JUDGE HORNBY:  Mr. Aertsen, come right up

3      here to the witness box.  Please step right up

4      there where the chair is and remain standing while

5      you are sworn.

6           (Whereupon the witness was sworn in.)

7           CLERK OF COURT:  Please state your name,

8      spelling your last name.

9           THE WITNESS:  My name is Guilliaem Aertsen,

10     last name spelled A-e-r-t-s-e-n.

11          JUDGE HORNBY:  You need to stay right close

12     to the microphone, so you might want to pull your

13     chair forward or move the microphone.

14          Go ahead, Mr. Newman.

15          MR. NEWMAN:  Thank you, Your Honor.

16          DIRECT EXAMINATION OF GUILLIAEM AERTSEN

17     BY MR. NEWMAN:

18  Q.  Good morning, Mr. Aertsen.

19  A.  Good morning.

20  Q.  Can you please describe for the Court your

21     educational background, where you went to college?

22  A.  I graduated from Harvard College in 1970, and then

23     the rest of my education came from my actual work

24     experience.  It included courses that I was

25     involved in during that work practice.

1  Q.   What was your degree at Harvard College?

2  A.   It was a BA with honors in history.

3  Q.   And please describe for us your work experience

4       following your graduation from Harvard.

5  A.   Well, my first job was with the U.S. Senator from

6       Massachusetts, Ed Brook.  I worked for him for

7       three years.  Then I got married, and then I

8       joined the First National Bank of Boston in its

9       training program, which was two years, and would be the

10      equivalent of an executive MBA; included accounting,

11      financial analysis, legal aspects of the credit markets,

12      and actual experience as an apprentice working for

13      various units of the bank.

14           When I completed that, I was assigned to one

15      of the commercial lending units, and began my

16      career as a loan officer, subsequently was

17      promoted ultimately to vice-president, at which

18      time I got involved in other activities of the

19      bank beyond commercial lending.

20 Q.   Describe for us, please, your commercial lending

21      experience.  What were your roles and duties and tasks?

22 A.   Well, it was basically providing the bank's lending

23      products to customers.  In my case that was in New

24      England, and I focused initially on high tech companies

25      during the '70's and '80's; and we would provide credit

1          facilities, we would provide a broad range of

2          commercial services to customers.

3               We were responsible for underwriting credit.

4          We were responsible for -- which we had to go to

5          credit committee with our proposals, for loans,

6          and we were also responsible for the whole

7          relationship with the customer, providing

8          financial advice to them.

9     Q.   What kind of customers, what areas -- what kind of

10         clients did you work with?

11    A.   Well, these were corporations, large and small.  Some

12         unsecured credits, some secured credits.  They would be

13         public companies, they would be private companies, but

14         they were all commercial.

15              In my case, most of them, for this time in my

16         career, were located in New England.

17    Q.   Could you describe for us your continued career and

18         advancement at Bank of Boston?

19    A.   In the early '80's I was asked to go to our work-out

20         area, which is the area of the bank that deals with

21         problem loans that are made.  And as a percentage of

22         every bank's activities, it includes problem loans and

23         managing them.  And at that time the leadership of the

24         bank wanted officers to have experience in this

25         activity.

1          So I went -- I was promoted into a position

2      called division executive which had unit

3      responsibility, and I dealt with companies that

4      were -- whose risk ratings, which is how banks

5      rate their loans, had fallen into a criticized

6      category, which meant that there was something

7      wrong with the company.  And if it continued to

8      deteriorate, that it would create a non-accrual or

9      a charge-off for the bank.

10          And our job was to work with the officers in

11     the company to find solutions to correct that

12     situation so that the borrower could continue to

13     have a satisfactory rating.

14          During this period of time was -- after a

15     couple of years of this, was when the real estate

16     problems began to emerge in the late 1980's, and

17     they became very serious, as I think everybody

18     knows.  We went through that period for banks, and

19     they were very serious for our bank, and I had

20     focused exclusively on real estate problem loans.

21     I set up the restructured real estate group for

22     the bank, which was a new group, to deal with all

23     the problems on real estate credits.

24          At that time I think our exposure to the real

25     estate industry was several billion dollars, and

```
 1          so we managed through those --
 2     Q.   Can you tell us the time frame, Mr. Aertsen?
 3     A.   This would have been the '88, '89, '90 time frame.
 4     Q.   Okay.
 5     A.   As we began to work our way out of them, we decided
 6          the -- the bank decided to stay in the loan business.
 7          I then took over the real estate group for the bank,
 8          ran that, and then --
 9     Q.   I'm sorry, what did you mean when you say you took
10          over --
11     A.   I became the head of the real estate practice for the
12          Bank of Boston.
13     Q.   But what was the real estate -- this was the commercial
14          real estate department?
15     A.   Yes, commercial real estate.  It was a major group in
16          the bank lending group with customers all over the
17          country, and I did that for a couple of years.  And
18          then the bank reorganized, and I was asked to run the
19          bank's capital markets -- global capital markets
20          activity worldwide for the bank.
21             That's when I got my Section 7 securities
22          license.  That's when we began using this
23          particular -- or prior edition of the McKinsey
24          book, although we'd had a course from the Stern
25          Stewart school earlier, that the book was now out,
```

```
 1            and we began using that as part of our Series 7
 2            because banks were permitted to underwrite debt
 3            securities for customers and provide debt advice.
 4            So that was what our capital's group did.
 5   Q.   Let ask you.  The time frame, when did you -- while at
 6        the Bank of Boston, when did you come to take a Series
 7        7 license?
 8   A.   That would have been in 1995.
 9   Q.   Okay.  And what was the course work that you took in
10        connection with that while at the Bank of Boston?
11   A.   Well, it was relying on -- it was a course that relied
12        on a textbook; that is the McKinsey textbook that you
13        have.
14   Q.   Just a moment, Mr. Aertsen.  I want to direct your
15        attention to the exhibit Plaintiff's --
16   A.   I don't have the exhibit.
17   Q.   They are right behind you, sir.
18            JUDGE HORNBY:  What number?
19            MR. NEWMAN:  159.
20   A.   I'm not sure which I should be looking at.
21            JUDGE HORNBY:  Why don't you go and help him.
22   A.   159?
23   Q.   I'm sorry, Mr. Aertsen.  Look back here.
24                  (Discussion off the record.)
25   Q.   Mr. Aertsen, do you have Exhibit 159?
```

```
 1    A.   Yes, I do.

 2    Q.   What is that?

 3    A.   This would be an excerpt from the book that -- what is

 4         it used?  I believe it was actually an earlier edition

 5         of this, but this is the same book.

 6    Q.   Mr. Aertsen, I'm going to show you what we've marked

 7         159A and ask is this the fourth edition or current

 8         version of the McKinsey text you were referring to?

 9    A.   Yes, it is.  It is the current version.  The one we

10         used was an earlier version.

11    Q.   Can you describe for us, what was the course that you

12         took that you told us was taught by Joel Stern in

13         connection with your work at Bank of Boston in 1995?

14    A.   Well, the course you're referring to actually occurred

15         earlier in the early '80's.

16    Q.   All right.

17    A.   And at that time the bank decided that its officers, in

18         addition to knowing about lending, needed to know more

19         about capital markets and corporate finance.  So the

20         bank retained a fellow named Joel Stern from the Stern

21         Stewart Consultancy in New York to come to the bank,

22         and we selected a group of officers, of which I was

23         one, to partake in this course.

24    Q.   And the time frame of this was the late '80's?

25    A.   This would have been in the -- I don't remember the
```

1           exact date, but in the early 1980's.

2     Q.    Is Mr. Stern referenced in that McKinsey --

3     A.    Yes, he is.

4     Q.    Exhibit 159?

5           What was his role in --

6     A.    Well, he was one of the first people to promote the

7           idea of discounted cash flow modeling to determine

8           enterprise value.  And that if you found that value and

9           deducted the amount of debt claims, that you'd be left

10          with equity value of the firm or the enterprise.

11    Q.    How did this arise in your work -- in the lending work

12          of Bank of Boston?  What was the issue?

13    A.    Well, it had a -- a -- an application in virtually

14          everything we did.  If we were trying to determine the

15          loan-to-value ratios, the collateral value of

16          underlying assets, we would use this -- this strategy

17          to understand how to value that.

18          If we were valuing debt securities, we would

19          learn how to apply this technology.  If we were

20          advising customers on ways to finance their

21          operations -- again, we had to be familiar with

22          this type of methodology.

23    Q.    And when you say this type of methodology, please

24          describe it.

25    A.    Well, again, it's valuing a firm based on the cash

```
1          flows of its operating units, based on the value of

2          certain assets on its balance sheet, looking at its

3          debt and equity ratios and determining fair value of

4          the firm.

5     Q.   And did you use this McKinsey text in your work at Bank

6          of Boston --

7     A.   Yes.

8     Q.   -- that you can -- not the McKinsey text.

9               Did you use the methodology of the discounted

10         cash flow analysis in your work at Bank of Boston?

11    A.   Yes.  It's baked into everything.  It was particularly

12         helpful during the real estate problem years, because

13         before 1988 it was standard practice in banks to simply

14         rely on the cost of constructing the real estate to

15         value it; and that the impression was that there would

16         always be a long-term lender or a pension fund to take

17         you out, and so that as long as you managed the cost

18         properly, within certain ranges, that that would --

19         that would be sufficient.

20              But we learned, when we overbuilt as much

21         commercial real estate as we did, that cash flows

22         is a much better indicator of value, meaning the

23         net income of properties.

24              We were one of the first banks to apply the

25         cash flow methodologies to valuing real estate in
```

```
1           the country, and it's one of the reasons why we

2           started lending again once we understood what we

3           had and continued on in the lending practice in

4           the real estate business.

5    Q.     In your work at Bank of Boston, as a lender, how did

6           you use the enterprise discounted cash flow model to

7           value a business?  What was the context that you used?

8    A.     Well, I remember one of my customers, right after I

9           took the Joel Stern's course -- in fact, it was the

10          example that -- each person who attended the course had

11          to bring a company as an example, and my example was

12          Wang Laboratories where we are the lead banker.  We

13          understood the application of the discounted cash flow

14          methodology.

15              At that time they were contemplating, say, a

16          lease-back on their manufacturing facility in

17          Tewksbury, Massachusetts, and they wanted to do

18          the sale lease-back, but they wanted to compensate

19          the party that was doing the sale lease-back not

20          with cash, but with warrants into the company's

21          stock.

22              And so working -- we were asked to be the

23          advisor -- Bank of Boston, myself personally, to

24          be the corporate finance advisor on this

25          transaction to Wang, and we used this methodology
```

1          to value the stock, and it was accepted by

2          Winthrop Financial, which was the syndicator of

3          the sale lease-back at the time of their

4          compensation.

5               That was the first time I actually used this

6          in practice.

7     Q.   Can you describe some other contexts in your lending

8          work, or other commercial work at Bank of Boston, in

9          which you had to use an enterprise discounted cash flow

10         technique in valuing a business?

11    A.   Well, in all of our corporate finance activities, while

12         I was running the corporate finance activity, one in

13         particular I -- I remember was Westinghouse.  When it

14         was liquidating its businesses, one of its businesses

15         was its land development business in Florida, and we

16         represented the buyer of these assets, which is

17         something that became Westinghouse Properties, Inc.,

18         WPI, in Florida.

19              They formed a partnership with MacArthur

20         Foundation, which was the largest land owner at

21         the time, and our task, in addition to being the

22         senior lender, was to arrange for the mezzanine or

23         subordinated debt financing for this transaction.

24              And we used this methodology, the basic cash

25         flow methodology to value the assets, place the

1    Defendant and provide the financial advice on the

2    acquisition.

3  Q.  Was the methodology successful in terms of the loan

4    pay-back?

5  A.  Well, it was at the time, yes.  The transaction was

6    completed.

7  Q.  In terms of companies that you had to use this

8    methodology to value to make loans, what was your

9    experience with the success of the method in terms of

10   forecasting future cash flows in terms of the ability

11   of the pay-back on the loan?

12 A.  I think if you look at the practices of all commercial

13   banks in commercial real estate lending, prior to 1989

14   versus what happened after the new legislation on bank

15   lending practices, which included the cash flow

16   methodology for determining loan value, you see that

17   the loan loss experience for all the commercial

18   lending -- I'm not talking now about the residential

19   problems that we have today.  I'm talking about the

20   commercial lending.

21       Because they use cash flow values, because

22   they use appraisals now that have cash flow values

23   embedded in them, the loan-to-value ratios are

24   much more secure and founded in the actual cash

25   flows of the property.  And that's why the loss

1      experience has been much lower for the whole

2      industry after this than before.

3  Q.  You mentioned appraisals.  What was your experience in

4      your work -- commercial work at Bank of Boston with MAI

5      appraisals?

6  A.  Well, the -- there's a market difference based on what

7      the experience was before 1988, say, when cost

8      approaches were used versus afterwards.  Afterwards the

9      appraisal groups began to use the discounted cash flow

10     methodology coupled with the income capitalization

11     approach, coupled with a cross indexing to market

12     comparables to look at the income coming out of these

13     properties, both potential and also the stabilized

14     income on the properties -- stabilized to create a

15     basis upon which lenders could lend.

16         And you can see that in the case with First

17     Hartford because the total value of the enterprise

18     value of all their real estate that are listed as

19     operating properties is around $150 million, and

20     lenders have lent approximately 106 million, I

21     think is the number, against those properties,

22     based on the valuations that are produced by the

23     appraisals.

24         Now, within the industry, I would say that

25     the CB Ellis Whittier Partners' appraisals that

1      represent the valuations that the lenders have

2      used in this case really represents the gold

3      standard of appraisers.

4           I'm very familiar with their work.  They have

5      very sophisticated people, well trained in the

6      practice of appraising, and the methodology is

7      very familiar with the type of properties that are

8      represented here in this portfolio and can be very

9      well relied on to determine value.

10           Separately, I use the CB Ellis group whenever

11     I can for properties where I'm making my own

12     investment, and for when I do underwritings where

13     I'm presenting a valuation to potential investors.

14     I like to have a group that is as well known and

15     highly regarded as CB Ellis Whittier Partners

16     represented.

17   Q.   Thank you, Mr. Aertsen.

18           Let's pick up --

19   A.   Are we through with this book?

20   Q.   Yes, you can put that down.

21           Do you have the McKinsey text, though, Exhibit

22     159A?

23   A.   Yeah.

24   Q.   I want to pick up -- I believe it was 1995 that you

25     took the Series 7 license, and I want you to please

1        describe for the Court your continued career at the

2        Bank of Boston and following.

3   A.   Well, when I was running the capital markets group, all

4        of the management and the officers involved providing

5        the type of corporate advice that we were giving, we

6        were required to take and pass the Series 7 securities

7        broker dealer license, which I did.

8            As part of that, there was extensive course

9        material that you had to read in preparation.

10       There's a formal group -- I can't remember their

11       name now -- that came to the bank and provided

12       this information, and one of the required reading

13       materials was this -- not this book, but the one

14       preceding it.

15  Q.   When you say this book, sir, what are you referring to?

16  A.   Well, I'm talking about the McKinsey Company volume.

17  Q.   And you're pointing to Exhibit 159A?

18  A.   159A, yes.

19  Q.   In 1996 did you take on the role of the bank's global

20       asset management?

21  A.   Yeah.  Banks reorganize a lot, and after I was --

22       finished my tour on the capital markets, I -- the bank

23       reorganized.  One of its groups was called Global Asset

24       Management, which was a worldwide look at all of its

25       asset management.  It's private banks, it's money

1          management activities, and all of its -- throughout the

2          United States and its trust operations, and also in

3          Argentina and Brazil and Europe and in Asia, and I was

4          asked to take over responsibility for all of that.  And

5          at that time I became a member of the policy council,

6          which is the management committee of the bank.

7    Q.    In your work as the head of the bank's global asset

8          management, what work did you have that involved

9          valuing companies, valuing businesses?

10   A.    Well, when I was also doing this function, which is

11         that of asset management, I was also involved in all of

12         the bank's approval committees, including the

13         investment group that did private capital, private

14         equity, and served on various approval committees.

15              And all of the applications for credit or for

16         equity or for securities underwriting, all

17         followed the discounted cash flow methodologies

18         and their presentation format.  We wanted to know

19         how the company was going to pay its loan back,

20         how it was going to service the debt.  If we

21         placed it with third parties, how it was going to

22         provide a deterrent on equity if we were -- if we

23         were going to make a private equity investment.

24   Q.    Mr. Aertsen, I want to continue, did there come a time

25         when you became involved with founding the

1          Massachusetts Housing Investment Corporation?

2     A.   Yes.  Back in 1991, when credit was very difficult to

3          come upon, there was a very significant problem in all

4          states that had to do with the affordable housing

5          industry because they were not getting the credit they

6          needed and the production of housing was off, and the

7          groups that were involved in this were fighting with

8          each other.

9               So the president of Bank of Boston at that

10         time, and the president of State Street Bank at

11         that time, asked myself for Bank of Boston and

12         David Spina from State Street Bank, to set up the

13         Mass Housing Investment Corp, which was a bank

14         owned -- an insurance company owned entity that

15         was to provide credit specifically to the

16         affordable housing market.

17              So I was a cofounder of that when it started.

18         I was the vice-chairman, and David Spina was the

19         chairman, and we built the business first as a

20         lender, and then we began to syndicate the tax

21         equity credits for low-income housing.  And then

22         subsequently there was a new product that came out

23         called new market tax credits which were available

24         that extended the tax credit market into

25         commercial activities, all in low income

```
 1          neighborhoods.  And Mass Housing Investment Corp
 2          became the largest provider of tax credit equity
 3          and new market credit equity in Massachusetts, and
 4          is today.
 5    Q.    Besides making loans, did you have any activity in
 6          bringing in equity investors?
 7    A.    Well, I -- I'm chairman of the board.  I set the agenda
 8          for the board's table.  One of those agendas is that we
 9          do approve all of the loans and credits after they've
10          gone through the prospective credit committees so that
11          the board sees exactly what we are doing.  And all of
12          those presentations rely on the proof coming up that
13          the property can service its obligations using this
14          basic methodology.
15    Q.    When you say this basic methodology, what are you
16          referring to?
17    A.    The discounted cash flow methodology.  It's the same
18          type of analysis embedded in the appraisals.
19    Q.    In making loans, in attracting investors, in making
20          investment decisions, when you value companies did you
21          rely upon MAI appraisals?
22    A.    Yes, we did.
23    Q.    And did you incorporate --
24    A.    Yes, I did.  As a matter of fact, all bank lending
25          requires -- on real estate requires an appraisal for
```

```
 1          valuation.  It's not an option.
 2     Q.   Sir, we left off with you at the Bank of Boston near
 3          the -- when did you leave Bank of Boston?
 4     A.   In 1998.
 5     Q.   What happened?
 6     A.   I left the bank, and I set up Aertsen Ventures, which
 7          is my own venture capital investment company.  And I
 8          engage in small and medium sized business activities
 9          with that -- with that vehicle.
10     Q.   What kind of business activities?
11     A.   Well, in some cases we'll start a company.  In some
12          cases I'll buy a company.  And in some cases I'll come
13          in as a co-investor in an existing company.  They
14          typically run the gamut of companies that I know
15          something about from my experience in the Bank of
16          Boston.
17               So some of them will be software related.
18          One of them is a company that has business
19          distressed assets.  Another one does real estate
20          advisory work, and another one is -- a major one,
21          is I'm a co-managing partner for a major portfolio
22          of real estate in the Boston area, commercial real
23          estate.
24     Q.   And this may sound repetitive, but in making investment
25          decisions with your company, in valuing companies to
```

```
 1        make a decision whether to acquire an interest or

 2        acquire a company, what methodology do you use to value

 3        the company?

 4   A.   Well, we use -- we use the discounted cash flow

 5        methodology.  In the case of real estate, most times we

 6        will use a capitalization of a stabilized income

 7        approach, a variation of the discounted cash flow.

 8   Q.   And in that context, do you use the MAI real estate

 9        appraisals?

10   A.   Yes.  Including those of CB Ellis, which is a preferred

11        one.

12   Q.   Explain what you mean, sir.  You said CB Ellis?

13   A.   In other words, I -- I like to see them in the

14        valuation process because they're very good at what

15        they do.

16   Q.   You like to see who, sir?

17   A.   CB Ellis Whittier Partners.

18   Q.   You described earlier your experience with them.

19   A.   Yes.

20   Q.   For how many years have you worked with the CB Ellis

21        appraisal group?

22   A.   Well, I've known them for -- since I was involved in

23        real estate, so it goes back 20 years.  And I knew them

24        extensively at Bank of Boston, and today they appraise

25        the properties in the portfolio that I'm a co-managing
```

1          general partner of.

2              Most of the -- these are institutional grade

3          properties, and the lenders use them, and in

4          situations where I'm a managing underwriter and

5          real estate is involved and to the extent I can

6          get the attention of them, as they're typically

7          small deals, I like to have them involved.

8     Q.   Mr. Aertsen, you described Aertsen Ventures, your

9          current business.  What is AGS Realty Advisors?

10    A.   That's three people, including myself, former business

11         partners of people I knew at Bank of Boston, who formed

12         a company to do specifically advice -- holders of --

13         owners of single properties, whether they should hold

14         onto them or sell them.  And then if they decide to

15         sell, we help them implement that decision.

16    Q.   Does any of that work include buying distressed loans?

17    A.   No, sir.  That's another company called Premier

18         Capital.

19    Q.   Could you describe Premier Capital for us?

20    A.   Premier Capital is a private company that is controlled

21         by investors who I knew when I was at Bank of Boston,

22         in particular the principal is somebody who I used to

23         work for at Bank of Boston.  When I left the bank, I

24         became an investor and principal of the firm.

25              What they do --

1    Q.   You mean the firm Premier Capital?

2    A.   Yeah, Premier Capital.

3    Q.   Yes.

4    A.   What Premier does, is it buys fully charged-off

5         commercial loans that are sold at auction by commercial

6         banks, and we buy them in pools.

7              Typically -- a typical pool might sell for

8         somewhere between 15 and 20 cents on the face

9         amount of the original loan.  The original loan

10        probably was in the several hundred thousand to $2

11        million range for each one.  Typically these were

12        failed commercial enterprises.  Most often there

13        is real estate kicking around somewhere and a

14        personal guaranty.

15             What we attempt to do when we buy them is to

16        settle them as quickly as we can and hope to get

17        somewhere between 40 and 50 cents on the dollar,

18        on average, across the board.  This is done with

19        equity, no debt.

20   Q.   And what role does valuing a business and the

21        techniques you describe play in work with Premier

22        Capital?

23   A.   Well, we go and look at the bank files, and we have to

24        do a calculation of how we're going to get our

25        investment dollars back.  So we do a cash flow analysis

1        on each individual asset.

2  Q.  For how many years have you been using the McKinsey

3        text as a model of methodology for cash flow analysis

4        in the businesses?

5  A.  Well, before the McKinsey text we were using the Joel

6        Stern methodology.  As I explained, Wang Laboratories

7        was the first time I formally applied it.  That would

8        have been, say, in '81 or '2.  And since that time,

9        I've used it extensively in all of my activities at the

10       bank and outside of the bank.

11  Q.  Mr. Aertsen, in just general terms, can you describe

12       for us what is the enterprise discounted cash flow

13       valuation method?

14  A.  Well, the enterprise value would be the value of all of

15       the income streams coming to the company, plus

16       assets -- hard assets on its balance sheets that are

17       such -- such as excess cash.  And you would determine

18       that value, the enterprise value, and then you would

19       look at the claims against those -- that value, and you

20       would take away the debt claims, and you end up with

21       the equity value because the debt and the equity claims

22       should equal the enterprise value.

23  Q.  I direct your attention, then, Mr. Aertsen, to

24       Exhibit -- Plaintiff's 162 -- P-162.

25          Mr. Aertsen, were you asked to perform the

```
 1         valuation of First Hartford Corporation as of a

 2         valuation date of December 15, 2005?

 3    A.   Yes, I was.

 4    Q.   Can you describe for the Court, please, how you went

 5         about that, and describe your valuation.

 6    A.   Well, I think you can -- if I go through the various

 7         elements on this sheet, I can -- I can answer your

 8         question.

 9             The first is --

10    Q.   When you say this sheet --

11    A.   I'm talking about --

12             JUDGE HORNBY:  Excuse me.  You can't talk at

13         the same time as each other.  The court reporter

14         has to get everything down.  So wait until the

15         lawyer is done.  He'll wait until you're done.

16             THE WITNESS:  Thank you, Your Honor.

17    Q.   Referring to Plaintiff's 162, Mr. Aertsen, can you

18         describe for us how you went about conducting your

19         valuation?

20    A.   Well, as you mentioned at the beginning in your opening

21         statement, I view the company as two business

22         activities.  One is the ownership and operation of a

23         stabilized income property portfolio, which would be

24         represented by the operation names that are at the top

25         of the list.  These are the income properties, some of
```

```
 1          which they own 100 percent of and some of which they
 2          own 50 percent of, and one of which they own a small
 3          percentage of.
 4               And so I segregated those.  When I was first
 5          looking at this assignment, I wasn't sure what type of
 6          information would be available.  But as soon as I saw
 7          Ellis Whittier Partners doing the appraisals on behalf
 8          of partners, that was -- and that these were reasonably
 9          current appraisals.
10               Generally if they're -- in the case of
11          realtor properties, they can be a little bit
12          longer, but generally within a year or so, year
13          and a half of the valuation date, because of the
14          long-term leases involved, the appraisals would be
15          valid and can be relied on because, again, they're
16          commissioned by the lenders who are looking to
17          value and lend real money back to the company.
18               So that would be the top grouping.  And then
19          one --
20    Q.    While we're there, I wanted to ask you to look at one
21          of the appraisals to understand how you used the
22          appraisal or why you relied upon that rather than doing
23          your own cash flow analysis --
24    A.    Okay.
25    Q.    -- of the property.
```

1              I direct your attention to Plaintiff's 131.

2              MR. NEWMAN:  Plaintiff's 131, Your Honor,

3         would be one of the larger binders there, which is

4         the CB Ellis appraisal of Putnam Parkade.

5    A.   Yes, I have 131.

6    Q.   Directing your attention to page 35 of Exhibit P-131.

7         First of all, what is Exhibit P-131, Mr. Aertsen?

8    A.   Well, this is a -- is called a self-contained report,

9         which means that all of the information that you need

10        to come to a conclusion on value is contained within

11        the walls of the report.  It's all explained for you.

12   Q.   When you say the report, you mean the CBRE appraisal?

13   A.   Yes.

14   Q.   Okay.  What I wanted to ask you about, turning to page

15        35, is what is the appraisal methodology, in your

16        understanding, as a commercial evaluator?

17   A.   Well, what you want to see is not just one method, but

18        several.  And they should -- they don't always

19        necessarily equal each other, but there should -- the

20        rationale, if there are differences, should be well

21        understood and well known.

22             And the first is a cost approach, is that

23        simply the cost associated with building --

24        acquiring the land and building the value out.

25        The comparable sales approach, which is the second

1        one, compares a particular property that is the

2        subject of appraisal with other comparable

3        properties.  This is extremely important

4        triangulation methodology because you want to see

5        that there are other -- these properties, by the

6        way, are all institutional quality properties.

7        It's a very substantial marketplace in the country

8        and within each region for these types of

9        properties, and they're -- knowing what comparable

10        properties have -- are trading for is a very

11        important part of this analysis.

12            The -- so that's the sales comparison

13        approach.  Then you have the income capital --

14        capitalization approach, and what you're doing

15        there is you're taking the stabilized income of

16        the first year of stabilized income -- or whatever

17        year they're measuring, but in this case it's a

18        stabilized year, and they're capitalizing that

19        income to create a value.

20            Using a cap rate that is established in the

21        marketplace, you have to think of cap rates

22        as -- as you would a posted rate or a stock price.

23        These are published rates for A, B, and C

24        properties of different categories that the

25        appraiser will access and determine the correct

| | | |
|---|---|---|
| 1 | | capitalization rate for this type of property |
| 2 | | based on their knowledge and understanding of how |
| 3 | | this property fits into the -- all of the other |
| 4 | | properties of its class. |
| 5 | | You contrast that to the discounted cash |
| 6 | | flow, which is also included in the appraisal, |
| 7 | | which is an assessment of the particular income |
| 8 | | stream in this property, all of its rent, all of |
| 9 | | its expense, to get to a number called a net |
| 10 | | operating income.  And that's forecasted out over |
| 11 | | a 10-year period and discounted back at a discount |
| 12 | | rate. |
| 13 | | Included in that discounted cash flow |
| 14 | | analysis is an exit for the property, or it |
| 15 | | presumes a sale at the end of the 10th year -- or |
| 16 | | year 11.  And to do that you take the then net |
| 17 | | operating income, and you capitalize that at a |
| 18 | | capitalization rate and discount that back as |
| 19 | | well. |
| 20 | Q. | The bottom of -- |
| 21 | A. | Finally -- if I could just complete this -- there's an |
| 22 | | insurable value.  It wouldn't apply to land, but it |
| 23 | | does apply to the building improvements, and you just |
| 24 | | want to make sure that the insurance industry has a |
| 25 | | view toward the value of the property as well. |

1    Q.    I direct your attention, then, to page 43.

2          The second paragraph describes that under the

3          income capitalization approach, that both the

4          discounted cash flow and direct capitalization

5          techniques are used in this appraisal.

6    A.    Yes.

7    Q.    What's the difference between the two?  Why are both --

8    A.    Well, in one case you're creating a market value by

9          capitalizing a stable -- one year of stabilized income.

10         And in the other approach you're looking at that year

11         plus the next 10, looking at all of the component parts

12         and how they affect this property.

13         For example, if you have a property in the

14         Northeast and it has heavy snow removal costs that

15         a property in Florida wouldn't have, that's going

16         to affect the cash flows, just to pick one

17         example.  Or you might have a property that has

18         very high property tax rates versus another area

19         which would be lower.

20         All of these things influence the valuations.

21         If a property is older versus newer -- it's an

22         older property, it would typically have a higher

23         capitalization.  The higher the cap rate, the

24         lower the value.  The lower the cap rate, the

25         higher the value.  So you're looking at all of

```
 1            these attributes, and you're comparing one to the

 2            other.

 3                 And somebody who is familiar with this type

 4            of activity can very quickly sift through this and

 5            see that all of these pieces fit together to

 6            create the value.  At the end of the day, the

 7            appraiser is going to look at all of these and

 8            effectively do that for you, is going to weigh the

 9            various approaches to determine what he believes

10            is the right one.

11                 In the case at CB Ellis Whittier Partners,

12            those people, I have come to believe, based on my

13            own experience, are as good at it as anybody in

14            the industry.

15                 JUDGE HORNBY:  Is this a good time for the

16            first recess?

17                 MR. NEWMAN:  Yes, Your Honor.

18                 JUDGE HORNBY:  We'll take a 15 minute recess.

19                 (Break taken from 10:40 a.m. 10:55 a.m.)

20                 JUDGE HORNBY:  Mr. Newman, you may continue.

21                 MR. NEWMAN:  Thank you, Your Honor.

22       Q.   Mr. Aertsen, before the break we were looking at

23            Plaintiff's Exhibit 131, which was the CB Ellis

24            appraisal of the Putnam Parkade, and I wanted to direct

25            your attention to page 52.
```

1   A.   Excuse me, which page?

2   Q.   Page 52.  I'm sorry, let me get my microphone on.

3        Page 52, Mr. Aertsen.  Do you have it there?

4   A.   Yes, I do.

5   Q.   It says discounted cash flow analysis at the top.

6   A.   Yes.

7   Q.   Okay.  I wanted you to walk us through the discounted

8        cash flow analysis, the appraisal for the Putnam

9        Parkade property.

10  A.   Well, page 52 is a listing of all of the appraiser's

11       assumptions that they use in valuing the property.  So

12       you would have a start date, the 10 year analysis --

13       it's a fiscal year, the type of software they use.

14       Then they do the growth assumptions -- the growth that

15       they're expecting, and the income expense growth, the

16       inflation from the CPI, and the growth on the real

17       estate taxes which are critical variables.

18       Then you look at the market rates per square

19       foot of the anchor tenant.  An anchor tenant is

20       usually the largest tenant.  In a power type

21       center, they would be very large relative to total

22       square feet.  In a neighborhood center, you

23       typically would not have them quite as large, but

24       they're typically an important tenant because they

25       drive who else is going to locate in the property.

1

2   Q.   Can you describe for us or give us an example, the

3        difference between a power center and a neighborhood

4        center?

5   A.   Well, they're a function of their size and

6        configuration.  But at one end you would have a mall,

7        which is typically enclosed and has all the stores

8        enclosed and sometimes in multi-levels.  They would be

9        the largest.

10        And at the other end of the market you would

11       have the strip center, which is typically -- and

12       by the way, in a mall most of the tenants would be

13       national or regional recognized names as tenants.

14        In a strip center, which would be the

15       smallest type, you would find typically non-credit

16       tenants, non-name brand tenants, laundromat, a

17       local market, local liquor store, somebody takes

18       care of your pets, that type of thing.  And

19       typically they are much smaller.

20        And then in between you would have

21       neighborhood and community centers, and then the

22       power center, which you would typically have a

23       very large tenant.  Home Depot would be typical of

24       the type of tenant that would go into a power

25       center.

```
 1            What we're talking about here in these

 2            properties are neighborhood centers --

 3            neighborhood community centers.

 4     Q.     When you say these properties, you're referring --

 5     A.     I'm talking about the properties in the portfolio that

 6            we're examining here, the operating income properties.

 7     Q.     First Hartford portfolio?

 8     A.     Yes.

 9     Q.     Okay.

10     A.     So you would have the market rate for the anchor, and

11            then the in-line space would be the other tenants, and

12            then the operating expenses expressed as a dollar per

13            square feet B or C.  You see those $10, 16 and 347.

14            And then below that you have leasing assumptions that

15            you -- that you have the tenant reimbursements.

16            These are typically trip -- three N's is

17            triple net lease, which means that the tenant

18            pays -- in addition to the base rent, they pay

19            virtually all of the expenses relating to their

20            space:  The taxes and insurance and things of that

21            sort they would pay, common area maintenance,

22            their annual escalators and leases.

23            These leases are typically longer term and

24            every several years their base rent would go up.

25            And so all of these statistics relate to how the
```

1      property is going to be leased-up.  And these

2      are -- and then the general assumption below that

3      is -- the typical model is the 10 year model and

4      exit, assuming a sale -- to get a residual value,

5      and the ARGUS is a common type of software that

6      they would use.

7          Going on.  This is a self-contained

8      appraisal, so all -- virtually all of -- not

9      virtually.  All of the assumptions that the

10     appraisers are going to use are articulated here.

11     There's assum -- I don't know how much detail you

12     want me to go through, but the next chart on page

13     53 are the growth rates that you see.

14         They've given you the assumptions to this

15     particular property, but now they're going to talk

16     about the growth rates.  Generally in community

17     centers, neighborhood centers, these are all

18     published information, core paths and RERC.

19     They're listed on the summary of growth rate

20     charts of people who keep these databases so

21     they're readily available for appraisers to use.

22     CB Ellis Whittier Partners keeps their own

23     database as well.

24         Then you move on to financial assumptions,

25     which would be your discount rates.  I mentioned

```
 1            earlier that there are basically three rates that

 2            you want to keep in mind when you keep an

 3            appraisal.  The first is the income capitalization

 4            rate which is a way of converting a stabilized

 5            year of income into a market value.

 6                 Then there's the discount rate, which is the

 7            topic of this chart on page 54, that shows the

 8            discount rate is applied to discounting the 10

 9            year cash flows back and including the exit

10            value -- residual value in year 11 back to the

11            present value.

12    Q.    On page 54?

13    A.    Yes.

14    Q.    Could you describe for us, how is the discount rate

15            arrived at and how is that applied?

16    A.    Well, it's an appropriate -- you have here the discount

17            rates for types of properties based on the national

18            investor survey.  Again, these are institutionally

19            invested in properties with institutional quality

20            lenders, institutional quality investors.  So the

21            discount rates --

22    Q.    When you say these, what are you referring to?

23    A.    All of these properties in this portfolio.  Commercial

24            real estate of this type, generally across the country,

25            are all viewed in a consistent way based on the type of
```

```
 1        discounted cap rates that you use.  They don't reflect

 2        the First Hartford Corporation's cost of capital, they

 3        reflect the properties' cost of capital as a trading

 4        asset.

 5             So this is a marketplace that's established.

 6        The appraiser places this type of -- this

 7        property, particularly in the context of the

 8        industry, and that's how they choose the cap rate,

 9        the discount rate, and the exit cap rate.

10   Q.   Okay.  We're still on discount cash flows, so if you

11        could describe next how the -- how the discount rate is

12        used.

13   A.   The discount rate is the rate that is used to bring

14        back the 10 years plus the exit value, the residual

15        value of the property in the 11th year, assuming it's

16        sold, brings it back to a present value, which is the

17        value of the property.

18             That's contrasted to the alternate way of

19        doing it, which is to look at the stabilized year

20        capitalization rate.

21             Typically these -- the -- in a general way,

22        based on my experience, the cap rate value is

23        usually a little bit higher than the discounted

24        cash flow valuation.

25             The exit cap is usually a bit higher than the
```

1     cap rate used in the stabilized year because

2     you're out 10 years and you have more rates.

3     That's a general rule of thumb I use.

4  Q.  When you say exit cap, at the bottom of page 54 there's

5     a reference to terminal capitalization.

6  A.  That's what I'm referring to, the exit cap.

7  Q.  What is a terminal capitalization?

8  A.  The presumption is to create a residual value for the

9     property at the end of the 10 years.  It is assumed the

10    property is sold at a value created by its then net

11    operating account.

12       So, whereas, if you're -- if you're using the

13    captain list income approach, you're looking at

14    the first stabilized year in this analysis and

15    capitalizing that.  In a discounted cash flow

16    analysis you're discounting back all of the

17    operating income over 10 years, but you're also

18    discounting back the 11th year terminal value of

19    the property, which presumes that it is sold for

20    its then operating income value, and that has its

21    own separate capitalization rate.

22       That is typically because of the fact that it

23    is out in time, there's more risk, that cap rate

24    is typically higher, remembering that the higher

25    the cap rate that you use, the lower the value you

1       will get for the market.

2   Q.  Okay.  Continuing on the discounted cash flow analysis,

3       Mr. Aertsen.  On the bottom of page 55 there's a

4       reference to pro forma operating statement, which is

5       attached to the following page.  If you turn to page

6       56 --

7   A.  Yes.  This is the -- this is a common format for

8       determining what is called the net operating income.

9       It's actually the line a little bit above the bottom,

10      which is the cash flow before debt service and taxes.

11  Q.  What page are you on, sir?

12  A.  I'm on page 56.

13  Q.  Okay.

14  A.  This is -- goes out 10 years.  You can see the -- they

15      do an 11th year to -- that's the year they're going to

16      use -- apply the terminal cap rate to; but each of

17      these years is based on the leases and all the

18      assumptions that the appraiser is using for this

19      particular property.

20          So he's looked at all the rent rolls, all the

21      leases and the property taxes, and all of the

22      information that relate to this property, and they

23      prepared the scheduled cash flow based on that

24      information.  And you can see at the top the base

25      rent that the tenant pays.  The next section is

```
 1          the -- are called expense reimbursements which are
 2          the -- the cost of the property, the taxes, and so
 3          on, that the tenant has to pay to get to a total
 4          gross revenue line, which is a little bit less
 5          than halfway down.  They make a vacancy assumption
 6          to get to an effective growth revenue, which is
 7          halfway down.
 8               Then you deduct from that all of the -- the
 9          specific operating expenses to get to a net
10          operating income line.  And then you also have
11          some very important items called leasing and
12          capital costs, which is the reinvestment that you
13          have to make in the property because properties
14          need to be reinvested in, otherwise they build up
15          deferred maintenance.
16               So you want to know what the leasing and
17          capital costs are which are listed, and it gets
18          you to effectively a free cash flow number at the
19          bottom.
20     Q.   That work you just described, and all the details, the
21          factors and information you described that the
22          appraisers had to use to develop a discounted cash flow
23          analysis, did you redo that work for the First Hartford
24          properties?
25     A.   No, I didn't feel I had to because this -- this is so
```

```
 1          well done in these appraisals, and because it's relied

 2          upon by lenders to lend to this property.

 3              In other words, it's my practice that if the

 4          appraisal is ordered by the lender who is going to

 5          provide the funding, and if it's done by an

 6          extremely competent appraisal group such as this

 7          group is, and --

 8     Q.   When you say this group, sir, you mean --

 9     A.   The CB Ellis Whittier Partners group is known to be one

10          of the best in the industry.  I believe they are the

11          best.

12     Q.   Okay.

13     A.   That these are -- there's nothing that I could do that

14          would improve on the result that they are achieving.

15          In other words, I couldn't add value to this.  This is

16          what I would do in situations where I'm presenting to

17          investors to invest with me in properties.  This is how

18          I invest in properties.  This is a very reliable

19          number.

20     Q.   When you worked as the lender and in commercial real

21          estate at Bank of Boston, did you rely upon the

22          appraisals rather than conducting your own

23          investigation in free cash flow analysis?

24     A.   Well, first of all, in a general way, the bank rules

25          after 1991 require that all real estate loans have an
```

1    appraisal attached to it.  I do expect my officers to

2    be knowledgeable about the properties when we have loan

3    relationships to customers beyond the appraisal.

4         In other words, I want them to know the

5    principals.  I want them to understand what's

6    happening with the company because we're providing

7    a broad range of advice.  In terms of providing

8    asset value, when you have appraisals done of the

9    quality of this type, then these can be relied on,

10   and I would rely on them, and I would expect my

11   officers to rely on them as well.

12   Q.   I want to direct your attention, continuing still on

13        Exhibit P-131, the Putnam Parkade appraisal, page 58.

14        Do you see the heading that begins Market

15        Extraction --

16   A.   Uh-huh.

17   Q.   -- Under Direct Capitalization?

18        You referenced earlier that the appraisal --

19        they also did a sales comparison approach in

20        addition to the income capitalization analysis,

21        and I want to direct your attention, Mr. Aertsen,

22        to the section that reads, with this section we

23        will estimate an appropriate capitalization rate

24        based upon pertinent information from recent

25        shopping center sales since shopping centers are

1           acquired principally, if not solely, based on

2           their income.  The primary benefit from these

3           sales is the stated relationship between net

4           income and sales price expressed as a going in

5           capitalization rate.

6                Do you see that?

7    A.   Yes.

8    Q.   What does that mean, going in capitalization rate?

9    A.   Well, that's the -- that's the stabilization rate of

10          the first year of stabilization, and they -- I

11          mentioned earlier that you take that year and you apply

12          a capitalization rate to it to get a market value, as

13          opposed to the terminal capitalization of the 11th year

14          income.  This is the first year -- stabilized year

15          going in.

16   Q.   And that's used for the comparable sales?

17   A.   Well, actually, I think the mark -- the income

18          capitalization is probably the most prevalent way the

19          real estate is bought and sold today because people

20          buying real estate can do their own cash flows, but the

21          sellers want to get the income out that's there in

22          place, and it will be up to the new buyer to reposition

23          tenants or make investments or do other things to add

24          additional value down the road.

25                So it's important to know how these all relate to

 1          each other:  Income capitalization, comparable sales,

 2          and discounted cash flow.  But at the end of the day,

 3          the income cap is a very important valuation part of

 4          the equation.

 5     Q.   Okay.  Sorry, I heard the microphone.  I was trying to

 6          figure out who was buzzing.

 7          JUDGE HORNBY:  That's interference we get

 8          from truckers or somebody going by.

 9          MR. NEWMAN:  Thank you, Your Honor.  I

10          thought maybe I had this too loud.

11     Q.   All right.  Mr. Aertsen, does the appraisal, then,

12          reconcile the income capitalization approaches you just

13          described, the direct capitalization and discounted

14          cash flow analysis?

15     A.   Yes.  That's the role of the appraiser, to do that.

16     Q.   I direct your attention to page 61 of Exhibit P-131.

17          Do you have that in front of you, sir?

18     A.   Yes.

19     Q.   What is the conclusion of income capitalization

20          approach at the bottom?

21     A.   Well, they're showing that the direct capitalization

22          method creates a value of 7.15 million, and that the

23          discounted cash flow analysis shows a value of 7.3, and

24          that in the appraiser's assessment of all of the

25          information that's in this report, concludes that the

 1          reconciled value is 7.25 million.

 2     Q.   And I want to direct your attention to page 63 of the

 3          Putnam Parkade appraisal.

 4               What is that reconciliation value?

 5     A.   I'm sorry which --

 6     Q.   Page 63.

 7     A.   Oh.  Well, again, they're repeating the -- they're

 8          looking at the sales comps, the income approach.  They

 9          determined that the cost approach -- that typically you

10          would find that in an older center.  It's not

11          applicable.

12               And at the bottom is their final market value

13          conclusion, as is for the lease fee, which is the

14          land and the improvements.  As of September 10,

15          2004, $7,200,000.

16     Q.   At the bottom of the summary of value conclusions on

17          page 63, it shows a reconciled value of 7,200,000 for

18          the Putnam Parkade setting.

19     A.   Yes.

20     Q.   Is that the figure you used for valuing that property?

21     A.   Let me look -- make sure it is.

22     Q.   Directing your attention back to Plaintiff's 162.

23     A.   Yes, it is.

24     Q.   Okay.  Mr. Aertsen, you can put away that binder with

25          Exhibit 131, put it back in the cart.

```
1              If you take the small binder that will have,

2       I think, just 162.

3  A.   (Witness complying.)

4  Q.   I want to return, then, and have you describe for the

5       Court, with respect to the operating properties portion

6       of the First Hartford business, then how you went about

7       valuing the operating properties.

8  A.   Well, I start on the left, which is a description of

9       the company that match up to the tax information that

10      is reported on the tax returns, just so I can get a

11      mapping of where things are.

12 Q.   When you say, sir, the company, you mean the subsidiary

13      of First Hartford Corporation?

14 A.   Yes.  Each ownership entity, yes.  Typically the

15      operating properties will be in their own -- what I

16      would expect to find is that each property is in its

17      own discrete partnership or limited liability company

18      that holds it, and then that, in turn, rolls up into

19      First Hartford Corporation, sometimes through an

20      intermediary.  So I wanted to understand that.

21             So you see the parent and the operating

22      company, and then the tax -- and then I start with

23      the -- just -- this is for reference purposes

24      because I am accepting the appraised value, but

25      where I just wanted to understand the net
```

1           operating income was flowing in this portfolio.

2           So that's the first column, around 10.9.

3               Again, this is a reference check.  The

4           appraised values are the next column of

5           151,000,000.  Then you have the appraisal dates,

6           the cap rates that were used, the square feet.  In

7           one case -- two cases you have acres because it's

8           land, some indication of appraised value per

9           square foot, the amount of debt that's on the

10          property, the total equity, which is the

11          difference between the appraised value and the

12          debt, and that gets you the equity value.  And

13          then I looked for First Hartford's interest in the

14          property to come to a First Hartford Corp equity

15          interest in those properties.

16   Q.    Okay.  Going down the list of operating properties, was

17         there one for which you did not have an appraisal?

18   A.    Yes.  That would be the last one on the list, Main

19         Street NA Parkade, known as North Adams.

20   Q.    Okay.  How did you go about, then, conducting the

21         valuation --

22   A.    Well, we had --

23   Q.    -- for North Adams?

24   A.    The perspective here that we had is from my Bank of

25         Boston days, but I also use it now in other activities,

1          but we were confronted with a very substantial

2          portfolio of properties where we did not have

3          appraisals; and we did not have accurate or any, in

4          some cases, property information.  These were

5          properties that were distressed.  They were -- some of

6          them were in -- what are called OREO, other real estate

7          owned, by banks and it was a serious problem for the

8          bank.

9               So what we would do, was to estimate the

10         value of the property by using a market comp.  We

11         would compare a property where we didn't have the

12         information to a property where we did, and what

13         we found was that -- that in hindsight, having

14         looked back on that analysis, that it really

15         proved to be really quite accurate in most

16         instances.  Not in every instance, but in most

17         instances.

18              So that's the approach that I used here, and

19         I took for North Adams.  I took three other

20         properties in this portfolio, same ownership, same

21         type of property, ran in there somewhat different

22         graphics that they basically run from northeastern

23         Connecticut up through the Connecticut River

24         Valley, West Springfield, and into North Adams and

25         into the western part of Massachusetts.

```
 1    Q.   What were the three operating properties --

 2    A.   Putnam, Plainfield, and West Springfield.

 3    Q.   Mr. Aertsen --

 4    A.   And I took the --

 5    Q.   Mr. Aertsen, I just ask you to let me finish my

 6         question.

 7    A.   Okay.

 8    Q.   So, again, we don't -- she's good, but that's quite a

 9         workout.

10         So what were the three properties, sir, that you

11         used?

12    A.   I used Putnam, Plainfield, and West Springfield.

13    Q.   Are those indicated in the notes to the right of your

14         entry for North Adams?

15    A.   Yes, they are.

16    Q.   Okay.  And what did you do?

17    A.   I took the square foot values in the properties where

18         we had the appraisals and known values and I averaged

19         them and I applied them to the North Adams property.

20         But I also -- recognizing that North Adams

21         was -- had vacant space in it, rather than take

22         the debt that was outstanding, I took the

23         committed amount of debt, which is the unused

24         commitment, which is about $2 million more than

25         what was outstanding because that's what is going
```

1         to cost to com -- to tenant improve and to occupy

2         those spaces, based on the information I had at

3         the time.  And I added the unused commitment to

4         the amount of loan outstanding; i.e., the

5         commitment amount, which is also evidenced in the

6         10-K's, and applied that to come to equity value.

7              This asset also has a participate mortgage

8         lender, which has an interest in the cash flows

9         and the sale value.  So you have to adjust the

10        equity value based on that contract, and that's

11        how I came up with the value.

12 Q.   Mr. Aertsen, do you have the McKinsey text there that

13        we marked Exhibit No. 159A?

14 A.   Yes, I do.

15 Q.   In terms of this methodology of comparable -- on a

16        comparable square foot basis that you just described, I

17        want to ask you if there's a source or basis for that

18        for the use of that methodology in the absence of

19        appraisal in the McKinsey text, and direct your

20        attention to page 338 of Chapter 11.

21 A.   Okay.  Yes, there it is.  It's in the middle of the

22        page.

23 Q.   Why don't you read it for us, sir.

24 A.   Let me find the -- identifying these assets in an

25        outside valuation is nearly impossible unless there are

1      specifically --

2           JUDGE HORNBY:  Slow down.  Slow down.

3           THE WITNESS:  Sorry.

4  A.  -- in a company's footnotes, therefore, including their

5      value separately as a non-operating asset is often

6      limited to internal valuations.  For real estate --

7      excess real estate, use the most recent appraisal value

8      when available.  Alternatively, estimate the real

9      estate value either by using an appraisal multiple such

10     as a value per square meter or by discounting expected

11     future cash flows from rentals at the appropriate cost

12     of capital.

13  Q.  Which method did you apply?

14  A.  Well, I used the comparable methodology in comparing

15     the value per -- in this case, square foot.

16        I would also point out that --

17          MR. GROFF:  Objection, Your Honor.

18           JUDGE HORNBY:  There is no question.

19          MR. NEWMAN:  I'm sorry, you need to wait for

20     a question.

21          THE WITNESS:  Okay.

22  Q.  You described how you arrived at the value.  How did

23     you determine the debt for value of the property?

24  A.  I explained that.  Are you talking about North Adams?

25  Q.  Yes.

```
 1   A.   Yes, I use the committed amount of the facility which
 2        was reported in their 10-K as opposed to the
 3        outstanding amount that is also reported in the 10-K.
 4   Q.   But I ask you to turn to the 10-K for the year 4/30/05
 5        to describe that for us, Mr. Aertsen.
 6   A.   I have no idea where that is.
 7   Q.   I'll find that for you in a moment, Mr. Aertsen.  It's
 8        going to be Exhibit Plaintiff's 116.  Do you have
 9        Exhibit 116?
10   A.   Yes, I do.  Do you have a page number?
11   Q.   Just a moment.  Yes.  Look at page 52.
12   A.   Yes, I have that.
13   Q.   Do you have that in front of you?
14   A.   Uh-huh.
15   Q.   So we're on Plaintiff's Exhibit 116, which is the First
16        Hartford 10-K for fiscal year ending 4/30/05, page 52.
17            Does that show the debt schedule for North Adams,
18        Mass that you were referring to?
19   A.   Yes.  That's the second line down.
20   Q.   And would you describe for us the committed amount
21        versus the existing amount for the mortgage?
22   A.   Well, if you look at the second to the last column, it
23        says 7,861,784, which is 7 million 861, is the current
24        outstanding balance in the mortgage; but the face
25        amount of the mortgage is 10 million 581, which is a
```

```
 1         higher number, and that's the amount available.

 2    Q.   Let's slow down for just a moment.  Show us -- show the

 3         Court which column you were describing.

 4              JUDGE HORNBY:  I have it.

 5              MR. NEWMAN:  I'm sorry.  Thanks.

 6    Q.   Mr. Aertsen --

 7    A.   Okay.

 8    Q.   -- what does the amount, the 10,581,000, reference?

 9    A.   Well, that's the committed amount of the loan as

10         opposed to what's outstanding.  That's a higher number

11         that's available to fund the remaining cost of bringing

12         this product -- this property to lease-up.

13    Q.   And was that a factor relevant to your valuing the

14         North Adams' property?

15    A.   It's very important because you need to consider the

16         remaining cost of leasing the property up in order to

17         get the potential value out of leasing the property.

18    Q.   So when you subtracted debt from the valuation of the

19         value of the property of North Adams that you just

20         described, did you use the higher full commitment

21         amount?

22    A.   Yes, I did.

23    Q.   And what was the net, then?

24    A.   Well, the value is subscribed to -- when you say net, I

25         assume you mean the First Hartford equity?
```

1    Q.   I'm sorry, yes.

2    A.   It's 1,946,840.  It's listed on the bottom right-hand

3         column -- or the right-hand lowest number of the

4         property valuations of First Hartford equity, where it

5         says North Adams.

6    Q.   So you can talk into the microphone, Mr. Aertsen, take

7         the entry for North Adams from left to right.  Under an

8         appraisal value, you first show the $13,974,298.

9              Do you see that?

10   A.   Yes.

11   Q.   And that's the figure you arrived at using the

12        comparable square foot methodology you just described.

13   A.   That's correct.

14   Q.   Then you -- following across, it looks like you then

15        subtracted debt of the $10,581,000; is that right?

16   A.   Yes.

17   Q.   And that's the higher commitment amount you just showed

18        us on the 10-K, which was the amount that was available

19        from the lender but had not yet been used at the time

20        of the valuation.

21   A.   That's correct.

22   Q.   And that would be the full amount of the debt once they

23        fully built out and completed the project?

24   A.   Yes.

25   Q.   Okay.  But then if you take the 13,974 the 10,581,

1      that's a -- that's roughly $4 million.  How is it that

2      you arrived at the First Hartford equity value of

3      $1,946,649?

4   A.   Well, then you have to look to the participating

5      mortgage terms.

6   Q.   I direct your attention to the notes on the far right

7      column for North Adams, Mass.  Can you just describe

8      what you're referring to when you talk about the

9      participating mortgage commitment?

10   A.   Well, the participating mortgage lender is entitled to

11      cash flow, and on a percentage basis, and to a portion

12      of the sale proceeds if and when sold.  So you need to

13      factor that in when you determine First Hartford's

14      equity value because you must consider the terms of the

15      participating mortgage debt.

16   Q.   Okay.  Now, for North Adams, Mass, did you have a pro

17      forma of net operating income or the kinds of details

18      we just looked at in the appraisals in order to do your

19      own net cash flow for the --

20   A.   Not in the detail that I would require if I were going

21      to do it in a method such as they use in the appraisal.

22      So I find -- my experience is that this approach is

23      more accurate.

24   Q.   Did you have consolidation statements that showed

25      the --

1    A.    Well, there are some property information, but it's not

2          in sufficient detail.  In order to do this, you would

3          need to have a detail that would be the type of detail

4          that we went through in the Putnam appraisal for the

5          income and expenses for the property, which I did not

6          have.

7    Q.    Okay.  Bringing your attention back to Plaintiff's 162.

8          You could put the 10-K down.

9                Do you have Plaintiff's 162 in front of you?

10   A.    Yes.

11   Q.    Continuing down with your valuation of First Hartford,

12         the next entry is the subtotal for value of operating

13         properties.

14               Can you describe that for the Court?

15   A.    I'm sorry, which line are you referring to?

16   Q.    The subtotal value of operating properties.

17   A.    Yes.  The important one is the -- well, if you go

18         across the line, you can see the total MAI appraisal,

19         just the sum total of that.  The total values of the

20         appraise is that 151,000,000; the total debt,

21         105,000,000; the total equity, 45,000,000; and then

22         based on the percentage interest, you would arrive at

23         the First Hartford Corp share of the total equity,

24         which is that $21,489,315.

25   Q.    And that was for the operating --

```
 1    A.    For the operating properties.

 2    Q.    What's the next element in your valuation under First

 3          Hartford?

 4    A.    Well, then I looked at the Bangor Parkade, which was

 5          under sale contract.  So my purpose there was to value

 6          the contract that was in place as of the valuation

 7          date.

 8    Q.    Tell us how you did that.

 9    A.    Well, it started with looking at the contract itself,

10          and there's an exhibit for that -- sales contract.  I

11          think the amount of the contract was $31,000,000.  I

12          don't have the exhibit number.

13    Q.    Mr. Aertsen, I can direct your attention to Plaintiff's

14          141.  Take a moment to get it.

15    A.    Yes.  P-141 is the contract dated December 8, 2004,

16          total purchase price $31,378,121.

17    Q.    Okay.  Is this the contract that you were valuing

18          referencing Bangor Parkade?

19    A.    Yes.

20    Q.    Okay.  And in terms of an expected cash flow analysis

21          for valuing this contract, just describe for us your

22          methodology.

23    A.    Well, I then looked at the financial reporting for that

24          fiscal year that the contract closed, which would have

25          been the 10-Q for October of 2005, and the 10-K for the
```

```
 1          three years of -- the 10-K for 2006.  And I also looked

 2          at an audit memorandum that was part of the 2005 10-K

 3          reporting process.  I don't have the exhibit number for

 4          that.

 5     Q.   I want to direct your attention to Plaintiff's Exhibit

 6          120.

 7     A.   What was the number?

 8     Q.   120.

 9               When you have it, Mr. Aertsen, page 32.

10     A.   This is the 2006 10-K, but there was an audit

11          memorandum associated with the 2005 reporting.

12     Q.   Okay.  Just a moment.

13               Mr. Aertsen, stay on the -- following your

14          methodology, we'll look at the bottom memorandum

15          first.  If you take out Plaintiff's Exhibit 142 --

16          hold onto that exhibit.  Take out Plaintiff's 142,

17          if you've got the space for it there.

18     A.   Yes, I now have it.

19     Q.   Do you have Plaintiff's 142?

20     A.   Uh-huh.

21     Q.   What is this?

22     A.   This is a significant accounting and audit issue for

23          this client, memorandum dated April 30th, 2005.

24     Q.   And is there a reference to management's prediction of

25          estimated profit?
```

1   A.   Yes.  On page -- well, it's 3 of 7.  FHC's last four

2        digits are 9732.  Basically the third page in.  The

3        second item down is an estimate of the profit.

4   Q.   What did management estimate for their total profit on

5        the Bangor Parkade?

6   A.   $10 million.

7   Q.   10 million?

8   A.   Yes.

9   Q.   Did you then look to confirm whether they were actually

10       able to gain on the first closing?

11  A.   Yes.  Remembering that there were multiple closings on

12       this, and I was valuing first closing.

13  Q.   Is this contract -- Mr. Aertsen, is this contract

14       covering a number of parcels that would be closed at

15       different times?

16  A.   Well, this type of contract requires certain benchmark

17       requirements to be met before enough value is created

18       to trigger a closing event.  So the first closing is

19       the one that I value.

20  Q.   Okay.  I'm going to direct your attention to -- just

21       one moment.

22  A.   I believe there's a settlement sheet and a footnote in

23       the --

24  Q.   Uh-huh.

25  A.   -- 10-K.

```
 1    Q.   Do you have Plaintiff's 120 there?

 2    A.   Yes.

 3    Q.   That's the First Hartford 10-K for 4/30/2006?

 4    A.   Yes.

 5    Q.   I want to direct your attention to page 32 of Exhibit

 6         P-120, and to the top of the page of the sale --

 7    A.   Yes.

 8    Q.   Could you read that for us?

 9    A.   Sale of real estate.  Company recognized -- recognizes

10         sale of real estate revenue upon the transfer of

11         total --

12              JUDGE HORNBY:  Hold on.  Slow down.

13    Q.   You have to read more slowly, Mr. Aertsen.

14    A.   I'm sorry.  When substantially all performance

15         requisites have been fulfilled.  2006, the company sold

16         property under construction held for sale in Bangor,

17         Maine, the book value of $21,318,139, for a sale price

18         of $26,736,977.

19    Q.   Was that the -- when you said earlier that you looked

20         for confirmation that the contract sale is projected

21         and gone through, is that what --

22    A.   Yes.  This is what they reported in the fiscal year

23         April -- ending April 30th, 2006.

24    Q.   I'm going to direct your attention to Plaintiff's 158,

25         Mr. Aertsen.
```

```
 1                    (Discussion off the record.)
 2   A.   Okay.  I have it.
 3   Q.   What is P-158?
 4   A.   Well, this is the Chicago Title and Trust Title Company
 5        settlement sheet disbursing the proceeds from the first
 6        closing out of the contract for Bangor.
 7   Q.   Now, earlier when you looked at the purchase contract
 8        that you valued, it was for a higher amount of
 9        31,378,000?
10   A.   Right.
11   Q.   Is this just one of the partial closings?
12   A.   Yes.  This is the closing that I was referring to, the
13        first closing.
14   Q.   Okay.  What was the cash-out to First Hartford from
15        this closing on the Bangor Parkade?
16   A.   Well, the total money transmitted to net proceeds to
17        seller is on the second page, number 7, $8,646,242.31.
18   Q.   But what had you valued this gain on the Bangor
19        contract?
20   A.   Well, I had estimated the gain to be approximately 5.2
21        million.
22   Q.   And when we just looked at the report in the 10-K, what
23        did First Hartford report as the gain?
24   A.   Well, the financial statements, the 10-K reports that
25        the gain was 5.4 million.
```

```
 1   Q.   5.4?

 2   A.   Yes.

 3   Q.   But then upon the closing settlement, they actually

 4        received cash of 8,600,000?

 5   A.   Well, they would receive more cash than the gain.  They

 6        would receive -- recover other costs that they had

 7        beyond the gain.

 8             MR. NEWMAN:  At least I was clear of the

 9        microphone, Your Honor.

10   Q.   Okay.  Mr. Aertsen, let's get -- having gone through

11        all of those exhibits, then, I want to bring you back

12        to Plaintiff's 162, describing then how you valued the

13        Bangor Parkade contract.

14   A.   Yes.  I took my estimate of value of 5 million 250, the

15        actual amount was 5 million 4.  That's the gain in the

16        contract.  Since it closed in, I believe it was

17        February, I discounted it back by six months to the

18        value date -- the valuation date using a 14 percent

19        discount rate.

20   Q.   Okay.  How did you arrive at the determination of using

21        a 14 percent discount rate to discount this cash flow

22        for First Hartford?

23   A.   That's what I was using for the company's cost of

24        capital.

25   Q.   Can you describe for the Court how you arrived at 14
```

1   percent discount rate?

2 A. For the purp -- for recognizing that the capital costs

3   in the income property portfolio are different than the

4   First Hartford Corporation, what I looked at for First

5   Hartford Corporation was some market comparable.  And

6   also using the traditional way of building into a

7   discount rate that is used in the McKinsey book, I

8   started with the -- the risk free rate, the 10 year

9   treasury bill from the time the valuation time, which I

10   believe was 4.26.  I added 500 basis point equity risk

11   premium for valuing equity to that, and I used a market

12   beta for this company's stock measuring the volatility

13   of this company's stock against the volatility of the

14   market in general of a two.

15    So you'd multiply the risk premium by two,

16   and add the risk-free rate, and you get rounded a

17   14 percent discount rate.  To get the beta, I

18   looked at two comparables.  One was Kimco, which

19   is a -- about as close as you can get to a pure

20   play retail center operator based in New York,

21   REIT, that has a beta of 1.15, and then I looked

22   at Trump, which is -- some people would say is the

23   pure development play, and he has -- his company

24   has a beta of 2.57, and settled on 2 as a blend

25   between the two.

1   Q.   What do you mean when you say a pure development play?

2   A.   Well, he's -- he develops property for sale.

3   Q.   Okay.  And the other -- the other comparable that you

4        used to arrive at the beta?

5   A.   Is an income property REIT called Kimco.

6   Q.   Why did you choose those two to try to arrive at an

7        appropriate beta?

8   A.   Well, I was looking at both activities of the company.

9        I -- some would argue that the discount rate could be

10       higher, but that's the one I chose, based on my

11       experience.

12  Q.   Now, what -- just so we're oriented, when you use a

13       discount rate, what does the higher rate reflect

14       compared to a lower discount rate when valuing a

15       company?

16  A.   Well, the higher the discount rate the more perceived

17       risk and the lower the value you get.  But I was using

18       this rate both to discount the income streams, as well

19       as the expenses.

20  Q.   Now, how does this discount rate of 14 percent that you

21       arrived at for First Hartford Corporation's activities

22       compare to the discount rates used by the appraisers

23       per the underlying operating properties?

24  A.   Well, it would be significantly higher than the

25       values -- the rates used by the appraisers.

1    Q.   Why is that?

2    A.   Because the income property portfolios have much less

3         risk in it than the overall risk in First Hartford

4         Corporation.  So you would expect to see a higher

5         discount rate applied to the holding company, First

6         Hartford Corporation, than the appraisals that apply to

7         each individual income property.

8    Q.   If you had applied a lower discount rate, would that

9         have resulted in a higher valuation?

10   A.   It would have resulted in a higher value.

11   Q.   In other words, if you would apply the same discount

12        rates that the appraisers use for the operating

13        properties, would your valuation have shown higher?

14   A.   Yes, it would.

15   Q.   Mr. Aertsen, I want you to have available to you now

16        Exhibit P-116?

17        THE WITNESS:  Could you read back my last

18        answer?

19        (Whereupon the requested testimony was read back.)

20   Q.   Do you need to correct that answer?

21   A.   Well, I'm just -- I can't remember exactly what I said,

22        but, generally speaking, the higher the discount rate,

23        the lower the value you're going to get.  So that's

24        clear.  I can't remember what I said before that.

25   Q.   Okay.  Mr. Aertsen, I want to turn next to, then,

```
1          the -- Plaintiff's 162, the next element, next

2          operation you value for First Hartford, which

3          identified here as the management development

4          construction finance operating unit.

5     A.   Yes.

6     Q.   Okay.  Can you describe that for the Court and tell us

7          how you went about valuing that operation?

8     A.   Well, in addition to the income properties, the company

9          is directing a tremendous amount of cash into this

10         activity, and it is evidenced by investments they

11         make.  A very significant one is Edinburg.  Rockland is

12         another one.  Their activities with CVS as a preferred

13         site developer.  Their construction business, and their

14         management activities, as well as their financial

15         activities.

16              And this would be under the heading of a

17         merchant building activity, as opposed to an

18         income property ownership -- stable income

19         property ownership business.

20              So what I attempted to do here was to

21         bifurcate that activity, and value it in its own

22         accord.  And to do that I looked at the financial

23         reporting, and I removed -- I included in that

24         analysis the income and expenses from the

25         activities that I just mentioned, but I
```

1        specifically excluded the property rental income

2        and the property expense that relates to the

3        income property activities.  And I also excluded

4        the equity in earnings that they derived from

5        their non-consolidated properties, which are

6        effectively the 50 percent joint ventures, so I

7        could get to a number on a revenue and expense

8        that would relate -- that would not double count

9        the operating property revenue and expenses, but

10       instead focus on the activities that I just had

11       mentioned.

12   Q.   On Plaintiff's 162, did you itemize that revenue and

13       expense stream for the development activity just

14       described?

15   A.   Yes.  Its called worksheet number 1, which was

16       basically pulled from 4/30/05 10-K, page 22.

17   Q.   Okay.  I'm going to ask you for a moment there -- I

18       want to direct your attention to worksheet 1, but also

19       ask you to pull up Exhibit 116 that I asked you to have

20       available.

21   A.   116.

22   Q.   I'll help.

23           MR. NEWMAN:  With the Court's permission,

24       I'll come help him find it.

25           JUDGE HORNBY:  Yes.

```
 1                        (Discussion off the record.)

 2    A.    Yes.  Page 22 of the 2005 10-K.

 3    Q.    If we look at the top of worksheet 1 to -- for

 4          valuation in Plaintiff's 162, there's a reference to

 5          the 4/30/05 10-K for First Hartford on page 22.

 6               Do you see that, sir?

 7    A.    Yes.

 8    Q.    Do you now have that 10-K --

 9    A.    Yes.

10    Q.    -- which is Exhibit 116, page 22 in front of you?

11    A.    Yes.

12    Q.    I want to give a moment for the Court to --

13               JUDGE HORNBY:  I have it.

14               MR. NEWMAN:  Thank you, Your Honor.

15    Q.    So in worksheet 1, what are you showing here?  What did

16          you look at for revenue and expense figures?

17    A.    Okay.  Well, what's missing from worksheet 1 are the

18          rental income, which would be from the 10-K, third line

19          down under revenue, which for 2005 would be 4 million

20          7; 2004 would be 2 million 3; and for 2003 would be a

21          million 379.

22    Q.    Are you looking now, sir, at page 22 of the 10-K?

23    A.    Yes.

24    Q.    Under revenues -- and this 10-K for fiscal year ending

25          April 30, 2005, shows the prior three years, does it
```

```
 1          not?

 2    A.    Yes.

 3    Q.    And is this where you got the revenue and expense

 4          figures for your worksheet 1?

 5    A.    Yes.

 6    Q.    And if we go down under revenues, first line is for

 7          sale of real estate, second line for construction,

 8          third line rental income.

 9              Is that the line you said that you exclude

10          rental income?

11    A.    Yes.  Those would be the direct property rental income.

12          That would be what would appear in the appraisals

13          already.  So if I included that, I, in effect, would be

14          double counting.

15    Q.    When you say the appraisals, you mean the appraisals

16          for the operating companies --

17    A.    Yes.

18    Q.    -- of First Hartford --

19    A.    Yes.

20    Q.    -- that you described earlier?

21    A.    Yes.  Also excluded -- I'm sorry.

22    Q.    Go ahead.

23    A.    Ask me a question.

24    Q.    I'd like you to describe for the Court how you arrived

25          at the revenues that you included on worksheet 1 for
```

```
 1          what you've described as the development and

 2          development manage construction finance activity of

 3          First Hartford Corporation.

 4     A.   Well, by removing the rental income, by removing the

 5          equity earnings of the affiliates on the expense side,

 6          by removing the operating property expense, which is

 7          the third line down, which reads -- the numbers are a

 8          million 997 in 2005, a million 231 in 2004, and 956,000

 9          in 2003.  Leaving the rest -- also I removed the

10          property taxes that you see down below, 718, 175, 155.

11          I removed for the moment G and A expenses, general

12          administrative from this analysis, but I include them

13          later as the cost of the Corporate Center.  And I also

14          removed depreciation and amortization as non-cash.  And

15          the resulting revenues and expenses are listed in

16          worksheet 1 for those years.

17     Q.   Just to sum up for the Court, could you itemize, from

18          page 22 of the 10-K that we're looking at in Exhibit

19          P-116, the revenues and expenses that you excluded

20          because they were attributable to the operating

21          properties that you --

22     A.   Yes.  I just went through this.

23               JUDGE HORNBY:  You're overlapping again.

24     Q.   -- that you already --

25     A.   Thank you, Your Honor.
```

1   Q.   I'll try to speak up.

2            Mr. Aertsen, could you please itemize for

3        us -- I know you've described it, but I'd like an

4        itemization so it's clear since we've tended to

5        interrupt each other -- and I apologize.

6            From the page 22 of the 10-K that we're

7        looking at in Exhibit P-116, itemize for the

8        Court, please, the revenues and expenses that you

9        excluded from your valuation on worksheet 1 of the

10       management development operation of First Hartford

11       because they're attributable to the operating

12       properties.

13  A.   Okay.  If you take the 2005 year, and this would apply

14       to 2004 and 2003, the first exclusion is the rental

15       income of 4,749,693.

16           Second exclusion would be the equity and

17       earnings of affiliates, which would be 389,294 on

18       the revenue side.  On the expense side I excluded

19       the operating -- what's listed as operating cost,

20       which is 1,997,896, and the property taxes, which

21       was $718,365.

22           I also excluded general administrative

23       expense 1,782,750, and I excluded depreciation and

24       amortization of $890,429.

25  Q.   Why did you exclude the general administrative expense?

1    A.    Because I'm including them later as -- in the cost of

2          the Corporate Center activity.

3    Q.    Is that because the general administrative could apply

4          to both the supervision of the operating properties, as

5          well as --

6    A.    Yes.

7    Q.    -- the development?

8          MR. NOLAN:   I object to leading at this

9    point.

10         JUDGE HORNBY:   It is leading.

11   Q.    Mr. Aertsen, why did you separate the cost of corp --

12         why did you separate the general and administrative

13         expenses and include that as a deduction under the cost

14         appropriate center?

15   A.    Well, my attempt was three things.  First was to

16         exclude operating property income and expense so that

17         there would be no double counting.  The second was to

18         have a relationship between the remaining revenues and

19         expenses to look at the development side of the

20         merchant building side of the business, revenue matched

21         to expense.  And the third is to isolate the G and A

22         expenses so that they're in one place as a Corporate

23         Center cost.

24   Q.    And for the G and A expenses, did you include all of

25         those general and administrative expenses --

1  A.  Yes, I did.

2  Q.  -- under the cost of Corporate Center?

3  A.  Yes, I did.

4  Q.  For valuing what you've described as the merchant

5      builder business under management development

6      construction finance operation line, can you please

7      describe for the Court, then, how you completed that

8      valuation.

9  A.  Okay.  Well, there's an important number to note, which

10     is that in 2004 there was a sale of the so-called Mount

11     Olive property.  In this particular financial statement

12     they list that sale as a discontinued operation, and it

13     shows at the bottom of the page of 2004, the middle

14     column under the title on the left, net gain, the net

15     gain.

16     JUDGE HORNBY:  What was the page number?

17 A.  Page 22.  There's a line that says net gain.  The

18     second line up from the bottom, and that's the gain on

19     the sale of the Mount Olive property.  That is not a

20     listed property in the operating list of properties,

21     and it's -- is included as a revenue.  It's net of all

22     costs associated with the sale.

23     So it's the pure gain.  And the purpose of

24     doing this analysis is to then average the income

25     and the expenses for those three years, and do a

1          present value calculation.

2                Now, there are two -- I don't know where they

3          are in the report here, but there are two versions

4          of that analysis.  One shows a discount of the

5          revenues only related to this activity, and the

6          other shows the net of the revenues against the

7          direct expenses of that activity.  The result is

8          the same.

9                When I presented it earlier, I thought it

10          might be easier for people to understand if I did

11          it the former way because it was easier to track

12          against the financials.  But since it created

13          some -- apparently some confusion, I ran it in a

14          different way, although the bottom line is the

15          same.

16                But you're averaging the revenues and the

17          expenses and discounting it back over 10 years at

18          a 14 percent discount rate.

19                I should add that the residual value was

20          using the same 10 year -- once you determine the

21          10 year present value, you simply put that back

22          out at the 11th year as the continuation of that

23          cash flow into the future.

24     Q.   Plaintiff's 162, at the last -- do you have that in

25          front of you, Mr. Aertsen?

```
1    A.    Yes.

2    Q.    The last attachment.

3    A.    Yes.

4    Q.    Schedule of prospective cash flow.

5    A.    Yes.

6    Q.    For the management development construction finance

7          operating unit?

8    A.    Yes.

9    Q.    Describe that for us.

10   A.    This actually is the -- is similar to the appraisal

11         present value format, different titles, but this is the

12         same analysis, only presented in a different way, to

13         worksheet 1 and the value created.  What we see the

14         average on the top lines, the total revenue and above

15         that the actual categories for the average for 2003 and

16         2005 is the -- you'll see the title 2003, 2005.  That's

17         the actual average of 3,295,261.

18              And then I've forecasted that out over the

19         10-year horizon by -- I've not included any growth

20         in there.  I've simply assumed that the business

21         is a steady state business at the level that they

22         average in the first three years.  And I do the

23         same thing below for the expenses, and then you

24         get the cash flow, and the discounted value of

25         that cash flow.
```

```
 1              If you look to the termination value of the
 2         column at the very end where it says 15 million
 3         840, that's simply a repeat of the first 10 years
 4         put out as the -- as the termination value of the
 5         cash flows as if it goes to infinity.  And you're
 6         bringing that 15 million, plus each of those $3
 7         million figures at a 14 percent discount rate.
 8    Q.   And, again, what discount rate do you apply?
 9    A.   14 percent.
10    Q.   The one you described earlier?
11    A.   Yes.
12    Q.   While we're on these worksheets, did you do the same
13         analysis for the cost of the Corporate Center?
14    A.   Yes, I did.
15    Q.   Referring -- directing your attention to worksheet 1,
16         can you describe that for us?
17    A.   For the Corporate Center costs, you see it's the last
18         topic before the conclusion.  So it says Corporate
19         Center costs, and there I took the average of the
20         Corporate Center costs for the same three years --
21         2003, 2004, 2005 -- I averaged them, and I used the
22         same -- you can see them on the bottom of the schedule
23         of prospective cash flow worksheet, the last in the
24         section, the same analysis of that.
25              It was applied to the cash flow from the
```

```
 1          business, I applied to the Corporate Center, only

 2          in this case there is no revenue, but just

 3          expense.  And the total discounted value of the

 4          Corporate Center cost is 8,327,235.

 5     Q.   Mr. Aertsen, looking at worksheet 1, Exhibit 162.

 6     A.   Yes.

 7     Q.   Do you see at the bottom the line reads, expenses

 8          included in valuation of cost of Corporate Center?

 9     A.   Yes.

10     Q.   Is that the general administrative expenses?

11     A.   Yes.

12     Q.   Does that come from the -- page 22 of the 10-K we just

13          looked at?

14     A.   Yes, it does.

15     Q.   Exhibit P-116?

16     A.   Yes.

17     Q.   Then if you look at the schedule of prospective cash

18          flow, did you do the same 10-year discounted cash flow

19          analysis for the --

20     A.   Yes, I did.

21     Q.   Did you apply the same 14 percent discount rate?

22     A.   Yes, I did.

23     Q.   Now, why -- why did you choose three years of

24          historical data to forecast cash flow from the

25          management development and operation?
```

1    A.    Well, if you look at any one year, you're not going to

2          get a good result because it's just one year.  In

3          this -- you can do that in an operating income property

4          because you have a stabilized income, but here you have

5          different things coming and going each year.

6                So you need to average a representative group

7          of years.  So I chose three years.  Each has

8          different elements.  There's one sale, which would

9          then be -- you carry that forward.  You assume

10         that every three years or so they would have a

11         property sale, which I think is reasonable in this

12         situation.  And so you would average three years.

13               I would say to you that that is a standard

14         that I've used.  I was taught at Bank of Boston in

15         the training program, and have used it ever since

16         in everything I do, three years back, minimum five

17         years forward, is what is minimally expected.

18         Going forward five years in appraisals you would

19         use 10, but going back is three years, is the

20         proper time frame.

21   Q.    Did you take any steps to look at the financial results

22         for First Hartford after the valuation date to check --

23   A.    Yes, I did.

24   Q.    -- to check your forecast of cash flow from the

25         management and business development operation?

1    A.    Yes, I do that to make sure that I'm -- I'm not off

2          base.

3    Q.    And what did you do?  What were the results?

4    A.    Well, if you look at 2007, the -- using the same

5          techniques, in the first year of my -- of my analysis,

6          the actual results for 2007 actually exceed the value

7          that I've created -- the actual free cash flow from the

8          merchant development business, where it's in year one

9          3,036,918 where it says free cash flow, that number is

10         actually somewhere in the $3.3 million range.

11   Q.    For what time period?

12   A.    For 2000 -- for the year 2007, which would have been

13         the first year of my forecast here.  They actually had

14         a better result.

15   Q.    And what -- what development activity that's producing

16         value are you aware of, based upon your examination for

17         First Hart --

18   A.    Well, my --

19               JUDGE HORNBY:  Hold on.  Please let him

20         finish.

21   Q.    You're very quick.  You know where I'm going, but we

22         still need to let each other finish.

23               What development activity of First Hartford that's

24         continued since the valuation date are you aware that

25         relate to this operation unit you've described as the

```
 1            management, development, financial construction,

 2            operating unit of First Hartford?

 3    A.      Well, in addition to the servicing they were getting

 4            from their CVS contract, they were selling the

 5            remaining out-parcels for the Bangor -- the remainder

 6            of that contract, which were not included in my

 7            contract value, but they were subsequently sold.

 8    Q.      And what other projects?

 9    A.      I'd have to look at the schedule to see.  I don't have

10            it in front of me.

11    Q.      Did you examine the work in the Edinburg project for

12            which there is an appraisal?

13    A.      Yes.  Now, that would not be reflected in 2007, but one

14            of the things that has given me great comfort in this

15            valuation analysis is Edinburg.

16                 When you think of Edinburg and you look at

17            the appraisals, which were done after the

18            valuation date, but in confirming this, you're

19            talking about a project of 130 acres, potential

20            development of a million square feet, which would

21            be roughly equal to the entire existing operating

22            portfolio.

23                 And so when that project comes through at

24            some point between now and 2010, it's going to

25            have a major impact on the cash flows in a
```

```
 1          positive way above what I'm forecasting here.
 2              MR. NEWMAN:  Your Honor, perhaps this would
 3          be an appropriate time for the noon break?
 4              JUDGE HORNBY:  Sure.  How are we doing in
 5          terms of scheduling?
 6              MR. NEWMAN:  Still on track for finishing in
 7          two days.
 8              JUDGE HORNBY:  Let's take a lunch recess.
 9          We'll take an hour.  We'll return in one hour.
10              (Break taken from 12:07 p.m. to 1:10 p.m.)
11              JUDGE HORNBY:  Welcome back.  Mr. Newman, you
12          my continue.
13              MR. NEWMAN:  Thank you, Your Honor.
14     Q.   Mr. Aertsen, please turn your attention to Plaintiff's
15          P-162 that we were working with, your valuation
16          spreadsheet.
17     A.   Yes.
18     Q.   Before the lunch recess we had concluded, I believe,
19          your description of the valuation of the management
20          development construction finance operation, and I
21          wanted to ask you to proceed to describe for the Court,
22          then, your valuation of the -- what you described as
23          the non-operating assets.
24     A.   Well, they're listed on the left-hand side of the going
25          concern value, and there are three categories:  Excess
```

1        cash, a tax shield, and the value of the other

2        non-operating assets.

3   Q.   And what's the line for other non-operating assets?

4   A.   Well, these are -- these are --

5   Q.   I just ask you to identify, not to describe it just

6        yet.  You have an entry to the right of it.

7   A.   Yes.  And the entries of those three categories are --

8        you want me to go to the middle section?

9   Q.   I'll ask a better question.

10  A.   Okay.

11  Q.   With that much confusion, that could not have been a

12       good question.

13          I wanted to have you just go through and

14       describe for the Court how you value what you

15       describe as the non-operating value assets.  Let's

16       start with the value excess cash.

17  A.   Okay.  That's the cash position determined by looking

18       at the working capital, that working capital position,

19       when you take all of the current assets and you

20       subtract out all of the current liabilities, so that's

21       what's left over.

22          Typically that would -- is available to

23       either pay a dividend or to make an investment

24       decision to reinvest in some other activity.

25  Q.   Please turn to worksheet 2, then, which you reference

```
 1           next to the entry for value of excess cash, and
 2           describe for us, what is worksheet 2?
 3   A.      Yes.  That's my calculation from the October 31, 2005,
 4           balance sheet, and it shows four categories of assets:
 5           Cash, market ability securities, accounts, and notes
 6           receivable and due from related parties and affiliates
 7           for a total of $6,063,072.  And then the current
 8           liabilities would be accounts payable, a million 4;
 9           accrued liabilities, 400,000.  I'm rounding.  Accrued
10           cost of derivatives, 75,000; preferred income, 204,000;
11           and due to related parties and affiliates, 84,000; for
12           a total current liability of 2.2 million, and the
13           difference between the current assets and the current
14           liabilities would be $3,850,861.
15   Q.      For the figures on worksheet number 2, the cash assets
16           and liabilities that you just described, what was
17           the -- what was the source reference for that?
18   A.      There are 10-Q -- First Hartford's 10-Q for October 31,
19           2005.
20   Q.      I direct your attention to what we've marked as
21           Plaintiff's Exhibit 118, which should be near you on
22           the bench there; and ask you if you'd turn your
23           attention, please, Mr. Aertsen, to --
24   A.      Which is that number?
25   Q.      Plaintiff's 118.  It looks like someone has put the
```

1       binders back.

2    A.  I didn't.

3    Q.  On Plaintiff's 118, I'm looking at the top of your

4        worksheet 2, and you reference the 10/31/05 form

5        10-Q --

6    A.  Yes, I have that.

7    Q.  -- which we marked as Plaintiff's 118 so it's pages 3

8        and 4, sir.

9    A.  Yes.  This would be the October 31, asset side, 2005.

10       The first column on the left -- I mean, the first

11       column of numbers, the left-hand column, and you can

12       see the categories there.

13   Q.  So for the figures on your worksheet 2, they came

14       directly from First Hartford's 10-Q for October 31,

15       2005?

16   A.  Yes.

17   Q.  Now, in your experience, in corporate finance work, do

18       you rely upon the company's public financial statements

19       and records?

20   A.  Yes, I do.

21   Q.  And in your experience, has it been -- have you been

22       able to reasonably trust that the -- a company's public

23       financial records will be accurate?

24   A.  Yes, as of the date.

25   Q.  Okay.  Continuing on under your valuation spreadsheet,

1          Plaintiff's 162, the next non-operating asset you value

2          is the value of tax shield.

3              Do you see that?

4    A.    Yes.  This is the balance sheet value ascribed to

5          this -- the deferred tax item that shows up on the

6          10/31/05 10-Q.

7    Q.    Tell us what page on the 10-Q we'll find that in

8          Exhibit 118.

9    A.    It's the same page that I was on before.

10   Q.    Page 3?

11   A.    Yes.  And it's listed as the last item, deferred tax

12         assets, net valuation allowance of 800,000.

13   Q.    What is the figure that First Hartford valued the tax

14         shield on their balance sheet?

15   A.    $2,730,000.

16   Q.    Now, tell us how this tax shield, which is identified

17         on the 10-Q, is a deferred tax asset.  Why is that part

18         of the valuation of the companies?

19   A.    Well, in this particular situation it's my assessment

20         that -- from looking at the tax returns for many years

21         prior, going back to 2000, I believe, there's no tax

22         paid.

23              And in looking further, the reason for this

24         is that they own a very significant operating

25         property portfolio, which is a depreciating

1          property tax base that is generating tax losses,

2          coupled with their normal First Hartford Corp

3          operating expenses.  And when you combine the two,

4          it creates a situation where they're not paying

5          current taxes, and they're generating that

6          operating loss carried forward.

7               And so when I looked at the income streams

8          from this company, not only did I not apply a tax

9          rate to it because they have a history of not

10         paying taxes, but at the end of any forecast

11         period there's still going to be a residual net

12         operating loss carried forward.

13              And you can see that as you look forward or

14         back in the balance sheets, whatever period you

15         choose, there will be this balance sheet item,

16         which is the management's estimates of the amount

17         they're going to consume in future periods.

18              Since my forecast does not show any growth in

19         the revenue streams, I made the determination that

20         it was appropriate to not only not show a tax

21         assessment on the income, but also to show this

22         balance sheet item as an amount that would be

23         available to support growth if it occurred in the

24         future.

25              The other things I would say about it is that

1        at some point, if the company does grow, and if,

2        for example, they realize on the value of

3        Edinburg, it's possible that they will exhaust

4        the -- they would have taxable income in the

5        future, but I'm not forecasting that.

6  Q.   You're in --

7  A.   If they did have taxable income, you would apply a tax

8        rate, and you would probably exhaust the NOL, if, for

9        example, Edinburg was realized during the forecast

10       period.  But I'm not forecasting that.

11  Q.  What do you mean, sir, when you say I'm not forecasting

12       that?

13  A.  My -- in my discounted cash flow analysis I went

14       through with you, I'm only forecasting the steady

15       state, which presumes that the company continues to

16       operate under its current business model and continues

17       to generate additional NOL's to replace the ones that

18       have been consumed.

19  Q.  So I direct your attention to Exhibit -- Plaintiff's

20       114.  It's in the small binder, Mr. Aertsen --

21  A.  Oh, okay.

22  Q.  -- on the cart.  You can leave that larger binder out.

23       We'll be returning to it.

24  A.  Okay.  Yes.  I'm at 114.

25  Q.  What is Plaintiff's 114?

1    A.    Well, this is a schedule depicting, at the end of the

2          fiscal year on the left, the application of the net

3          operating loss carried forward and the carry over,

4          which you see in the second to -- to the right-hand

5          column, is the carry over net operating loss that they

6          carry over into subsequent years.  And the total tax on

7          the final column, there was one year when they had a

8          small tax that was due.

9    Q.    If we look at the entry for 4/30/2005, do you see that

10         in the left-hand column?

11   A.    Yes.

12   Q.    There's a reference to P-111, which is the actual

13         exhibit of the tax return.

14   A.    Yes.

15   Q.    And you see the total income shown on the tax return,

16         $5,011,835.

17             Do you see that?

18   A.    Yes.

19   Q.    Then what does it show for that year, the actual

20         taxable income before the NOL?

21   A.    You're talking about what's in the third column?

22   Q.    Yes.

23   A.    Yes.  A million 916,888.

24   Q.    And then the carry over is what the next column is.

25         That's another carry over NOL, that operating loss from

```
 1          the year before?

 2   A.     Yes.

 3   Q.     And they paid no taxes.

 4   A.     Well, the 6 million is after the application applied to

 5          the total income.  So it consumed NOL.  And that

 6          typically happens when a property is sold because

 7          you're showing the gain as income.

 8   Q.     What I'm looking for to ask you, then, if you turn to

 9          the next year, fiscal year ending 4/22/2006, it shows

10          that they had total income of $11,505,291, but a

11          taxable income before application of the net operating

12          loss of only $326,7666 and then the carry over NOL is

13          larger than the year.  See the $8,038,950?

14   A.     Yes.

15   Q.     How is it that in the operation of the NOL, the net

16          operating loss for First Hartford is increasing from

17          fiscal years 2005 to 2006?

18   A.     Because it has expenses and depreciation that are in

19          excess of what is consumed to offset taxes for that

20          year.  So it gets carried over in subsequent years.

21   Q.     So as a result, did you adjust or deduct for federal

22          income taxes when you forecast free cash flow for your

23          analysis of First Hartford Corporation?

24   A.     No.  Since I was forecasting a continued steady state,

25          I forecast that the state that it existed in in the
```

```
 1          prior year should continue into the future years.

 2    Q.    I want you to return, please, to Plaintiff's 162, your

 3          valuation spreadsheet.

 4                Do you have that in front of you, sir?

 5    A.    Yes.

 6    Q.    The next item under non-operating assets, you identify

 7          as the value of other non-operating assets which you

 8          identify as deposits, escrows, prepaid and deferred

 9          expenses.

10                Do you see that, sir?

11    A.    Yes.

12    Q.    And directing your attention back to Exhibit 118, which

13          is the First Hartford 10-Q for 10/31/05.

14    A.    Okay.  Which is -- that tab was?

15    Q.    It's Plaintiff's 118.

16    A.    Yeah.  Yes.

17    Q.    Do you have page 3, sir?

18    A.    Yes.

19    Q.    Can you show us where the figure is on First Hartford's

20          10-Q for 10/31/05 that you used for this entry?

21    A.    It's the fourth line up from the bottom, deposits,

22          escrows to be paid, and deferred expenses.

23    Q.    Okay.  Sir, can you describe for us, how is it that

24          that asset on the balance sheet is an income generating

25          asset in your analysis?
```

1    A.    Well, my understanding of this account is that it

2          relates to properties that are in a pre-development

3          state, meaning it's an investment they make in assets

4          that are not included and operating properties or

5          properties under construction; and that when -- when

6          these properties are -- move into a construction

7          account, that these balances move over with them.

8              Ultimately they get recovered from funding

9          from loans or the sale of the property or just

10         from depreciation of the asset over time.

11   Q.    Could you give us an example of a deferred, a prepaid

12         expense here?

13   A.    Well, if they have an option or they -- on property

14         such as the property, and there's a fee associated with

15         it in Texas or if they have architectural or legal fees

16         relating to a property that they have under contract,

17         these costs would end up in these accounts.

18   Q.    Sir --

19   A.    The deposits on those activities --

20   Q.    I'm sorry, I interrupted you.

21   A.    If they put deposits on those activities.

22   Q.    When you say those activities, are you referring --

23   A.    Redevelopment activities.

24   Q.    Please look at Plaintiff's 120, which is First

25         Hartford's operation 10-K for fiscal year ending April

1       30, 2006.

2   A.   Yes.

3   Q.   And turn to page 32, please.

4            I want to direct your attention to the entry

5        at the bottom of page 32 where there's a heading

6        Deferred Expenses.

7   A.   Yes.

8   Q.   Earlier you described -- you had an understanding of

9        what the balance sheet referenced -- or the balance

10       sheet item for deferred expenses, escrows, and deposits

11       and the like referred to, and I want to read you the

12       entry on page 32 of their 10-K.

13           Quote, expenditures directly related to real

14       estate under consideration for development are

15       deferred and included in deposits, escrows,

16       prepaid and deferred expenses in the consolidated

17       balance sheets.  These costs would include

18       optional payments, attorney's fees, architects and

19       engineering fees, consultants, et cetera, but only

20       to the extent they're from outside sources.  If

21       development of the real estate commences, all of

22       the accumulated costs are reclassed to properties

23       under construction in the consolidated balance

24       sheets.

25           Do you see that, sir?

1    A.    Yes.

2    Q.    Was that what you were referring to when you said you

3          had an understanding of what the balance sheet items --

4    A.    Yes, yes.

5    Q.    Mr. Aertsen, returning -- you can put that binder down

6          for me.

7    A.    (Witness complying.)

8    Q.    Returning to your valuation spreadsheet for the going

9          concern, Plaintiff's 162.

10         What was next step in your valuation?

11   A.    Well, then you have the last remaining item, which is

12         that the Corporate Center costs, which we discussed

13         earlier, which is the present value of their G and A

14         expenses.  Do you want me to go through that again?

15   Q.    No.

16   A.    Okay.

17   Q.    And then describe how you concluded the valuation.

18   A.    Well, then you simply add up the items in the column

19         under FHC equity, and deduct from those, so you have

20         the 21,489,000 of property value, the Bangor contract

21         of 4.9 million, the present value of the management

22         development and construction finance of 20.1 million,

23         the excess cash of 3.8 million, the tax shield of 2.7,

24         the other non-operating assets of 3.49, and you deduct

25         from that the Corporate Center costs and you come to a

1        value of $48,268,862.

2    Q.  And then you arrived at the per share value?

3    A.  Then you divide that by the number of shares

4        outstanding on September 15, '05, and you get the

5        number of $15.66 per share.

6    Q.  Now, Mr. Aertsen, what is your opinion, then, as to the

7        fair value of the entire enterprise, equity value --

8        equity value of First Hartford Corporation as of

9        September 15, 2005?

10   A.  The fair value of First Hartford's equity is

11       $48,268,862.  And a value per share based on the

12       3,083,000 shares outstanding would be $15.66 per share.

13   Q.  Now, Mr. Aertsen, did you also perform a net asset

14       valuation for First Hartford?

15   A.  Yes, I did.

16   Q.  I want to direct your attention to Plaintiff's Exhibit

17       164.

18          Does Plaintiff's Exhibit 164 reflect your net

19       asset value of First Hartford?

20   A.  Yes, it does.

21   Q.  Could you walk us through the net asset valuation and

22       describe how it differs from the going concern

23       valuation that you've just described earlier?

24   A.  Well, first of all, nothing changes with respect to the

25       value of the operating properties.  Those are valued

1       the same way either way.  That's the value at which

2       somebody would buy them.

3           I do add the First Hartford's Corporate

4       Center office building in Manchester, Connecticut,

5       which I had excluded before because that's the

6       property that would then be sold; and I use the

7       appraised value net of debt for that.

8           The Bangor Parkade, under other operating

9       units, this contract amount, 5 million 2, is the

10      same, but I used -- instead of a 14 percent

11      discount rate, I used a 35 percent discount rate,

12      which reflects a venture return, if some third

13      party were to come in and buy this asset as of the

14      valuation date as opposed to the company's

15      internal cost of capital.  This would be a third

16      party buying that asset.  And I used a venture

17      return of 35 percent for the discount.  So that

18      number would be lower than what I show on the

19      going concern value.

20          The cash is the cash.  That doesn't change.

21      And the other operating asset, I also assume that

22      that has value, but to a third party would use a

23      35 percent discount rate as opposed to the

24      company's -- First Hartford Corporation's 14

25      percent.

```
 1              So the two -- the real estate operating

 2         properties would be the same at 21.4.  You have an

 3         office building that wasn't included before of

 4         $138,000.  You have the purchase contract for

 5         Bangor, and the pre-development, if you will,

 6         exposure that would be both the same numbers, but

 7         using a different discount rate of 35 percent and

 8         the cash stays the same.

 9              So the result is a net asset value of

10         $31,417,595.  Again, divided by the total number

11         of shares outstanding as of the valuation date,

12         creates an equity value for First Hartford

13         Corporation on a net asset value basis of $10.19

14         per share.

15    Q.   For the Bangor Parkade contract, and for the value of

16         the deposits, escrows, and other prepaid development

17         activity amounts, you applied, you say, a 35 percent

18         discount --

19    A.   Yes.

20    Q.   -- rate, as opposed to the 14 percent discount rate you

21         applied on the going concern for First Hartford?

22    A.   Yes.

23    Q.   Can you explain in some greater detail why the

24         difference?

25    A.   Well, presumably these assets in a -- if the company
```

```
 1            were to liquidate, would be sold to a third party, and

 2            a third party would be looking for, my opinion, a

 3            venture type return on these assets.  So the discounted

 4            value would be lower, and the discount rate would be

 5            higher.

 6    Q.     And for the -- how is it that a third party would gain

 7            value purchasing the asset you described as the

 8            deposits, escrows, prepaids and deferred expenses?

 9    A.     Well, for example, in the case of Edinburg, that would

10            have quite a lot of value to another developer, such as

11            the Simon Property organization.

12    Q.     Referring to what, the deposit on land of the project?

13    A.     The option or -- I'm not exactly sure what they had at

14            that point, but whatever -- whatever arrangement they

15            had to acquire that parcel, 130 acres, would have

16            significant value.

17    Q.     And is the -- that type of deposit on the Edinburg

18            land, the type of entries under the prepaid deposits,

19            escrows, expenses, and the like?

20    A.     Well, whatever arrangement they had at the time to

21            control that site would have value in this account,

22            yes.

23            MR. NEWMAN:  If I could have just a moment,

24    Your Honor.

25            JUDGE HORNBY:  Yes.
```

```
 1                    (Discussion off the record.)

 2            MR. NEWMAN:  Permission to approach, Your

 3       Honor.

 4  Q.   Mr. Aertsen, somewhere up -- here we go.

 5            Exhibit -- the book -- the text we've marked

 6       159A, can you just tell us again what that is?

 7  A.   That's the fourth edition of the valuation textbook

 8       that was published by -- authored by the -- McKinsey

 9       and company.

10  Q.   And is that the text that you referenced in performing

11       the -- is that the edition of the text that you used in

12       performing the valuation for First Hartford

13       Corporation?

14  A.   The -- this is the -- I've used, at one time or

15       another, all of the volumes that have been produced.

16       This is the most current volume.  I can't specifically

17       say that this is the volume that I used for everything

18       I did in my analysis, but the themes are the same, and

19       the elements of what I did are included in this volume.

20  Q.   In performing your valuation of First Hartford

21       Corporation, did you rely upon your years of experience

22       and training in the commercial lending and finance

23       world with your years at Bank of Boston and your other

24       commercial ventures?

25  A.   Yes.  Extensively.
```

```
 1            MR. NEWMAN:  At this time, Your Honor, we
 2       would offer the McKinsey text we've marked as
 3       Exhibit 159A, unless there is an objection.  The
 4       only thing that's in evidence previously are some
 5       selected chapters photocopied.
 6            MR. NOLAN:  No objection.
 7            MR. NEWMAN:  Since it has --
 8            MR. GROFF:  No objection, Your Honor.
 9            JUDGE HORNBY:  It's admitted.
10            MR. NEWMAN:  It has to remain with the Court
11       anyway, so we thought we might as well put it in.
12  Q.   Mr. Aertsen, one last thing.  I had neglected to ask
13       you, in going through your experience, about your
14       position with New England Realty Associates.
15            I'd ask you to describe for the Court what
16       your position is and what the company does.
17  A.   New England Realty Associates is a master limited --
18       public master limited partnership.  It's ticker is NEN.
19       It's traded on the American exchange.
20            Since, I think 2002, I've been a board member
21       of the -- general partner of this company.  And
22       since, I think, about the same time, I've been
23       chairman of the audit committee.
24            MR. NEWMAN:  Thank you.  Your Honor, at this
25       point we've concluded the direct examination of
```

```
 1          Mr. Aertsen.  Of course, there will be

 2          cross-examination, but I wanted to just make it

 3          clear that we would request to reserve the

 4          opportunity for rebuttal -- to call Mr. Aertsen in

 5          rebuttal, specifically the exhibits and the

 6          supplemental rebuttal disclosure.  I'd agree with

 7          Defense counsel that I would not offer that in

 8          until rebuttal and after their witnesses testify

 9          so I have not covered that.

10              JUDGE HORNBY:  Thank you.

11              Cross-examination, Mr. Nolan?

12              MR. NOLAN:  Yes, Your Honor.

13              CROSS-EXAMINATION OF GUILLIAEM AERTSEN

14     BY MR. NOLAN:

15     Q.   Mr. Aertsen, you prepared a disclosure -- actually,

16          prepared a couple of disclosures, correct, of your

17          expert testimony?

18     A.   I believe -- I'm not sure what you mean by disclosure.

19          There were a number of filings.

20     Q.   Okay.  Do you know about a document that's called

21          Plaintiff's Supplemental Expert Disclosure?

22     A.   Yes, I believe I'm familiar with that.

23     Q.   And that -- that was the second in a series of

24          disclosures?

25     A.   I'm not sure which number it was, but I do remember it.
```

1   Q.   In any event, you prepared all those yourself, correct?

2   A.   The -- I believe the final versions were done by the

3        law firm, but I produced the information that's in them

4        and the wording, yes.

5   Q.   Did you tell us at your deposition, sir, that you

6        actually wrote each of those documents?

7   A.   Yes.  Again, the final version I think was done on the

8        legal -- by the law firm, but it was my words.

9   Q.   All your words?

10  A.   Yes.

11  Q.   Okay.  And in the second one, you purported to value

12       First Hartford Corporation using three separate

13       approaches, correct?

14  A.   I used the enterprise valuation going concern, I used

15       the net asset value, and I looked at the stock

16       valuation.

17  Q.   Okay.  And in reaching your final opinion, you didn't

18       give any weight to the net asset value approach,

19       correct?

20  A.   No, I did not.

21  Q.   And you didn't give any weight to the stock?

22  A.   No, I did not.

23  Q.   And you do know that First Hartford Corporation is a

24       publicly traded company?

25  A.   Yes, I do know that.

```
 1    Q.   And it has been for all periods of time that certainly

 2         relate to this litigation, correct?

 3    A.   That's correct.

 4    Q.   All right.  And people can buy and sell the stock as

 5         they please, right?

 6    A.   That's true, yes.

 7    Q.   And you think that the stock of First Hartford

 8         Corporation is worth something north of $15 a share?

 9    A.   Yes, I do.

10    Q.   And in the course of your review of the stock trades

11         for First Hartford Corporation, what was the highest

12         price of the stock that you saw?

13    A.   I don't remember exactly, but it was somewhere in the

14         3's.

15    Q.   Do you recall what the lowest was?

16    A.   Somewhere in the 2's.

17    Q.   And you looked at the period from roughly 2004 to

18         today?

19    A.   I know I looked at periods around the time of the

20         valuation date.  I did, at one point, look at the stock

21         trades through Morningstar, and I don't remember

22         exactly the time frame.

23    Q.   When is the last time you looked at the stock price?

24    A.   I don't remember.

25    Q.   Okay.  Now, you told the Court this morning, and in
```

```
 1          your disclosure, that you used the enterprise discount

 2          cash flow model for multi-business companies and going

 3          concerns using the McKinsey and company valuation book,

 4          fourth edition, chapter 5.

 5               That was the basis for your analysis,

 6          correct?

 7    A.    Well, I -- I brought to bear my experience as well.

 8               MR. NOLAN:  If I could have a moment to speak

 9          with counsel?

10               JUDGE HORNBY:  Yes.

11                    (Discussion off the record.)

12    Q.    Do you have Defendants' Exhibit 46 up there, sir?

13    A.    Which one?

14    Q.    46.

15               MR. NOLAN:  They haven't seen these yet.

16               MR. NEWMAN:  This is that issue I was talking

17          about.

18               JUDGE HORNBY:  Yeah.  No problem.

19                    (Discussion off the record.)

20               MR. NOLAN:  I believe that there is no

21          objection to Exhibits 47 and 52, Your Honor.

22               JUDGE HORNBY:  They are being offered?

23               MR. CULLEY:  They're being offered.

24    Q.    Do you have 46 in front of you, sir?

25               JUDGE HORNBY:  Just a minute, 46 and 52 have
```

1          been admitted by agreement?

2               MR. NEWMAN:  Yes, Your Honor.

3               JUDGE HORNBY:  Okay.  46 and 52 are admitted.

4          Go ahead.

5               MR. NOLAN:  Thank you, Your Honor.

6     Q.   46 is Plaintiff's Supplement Expert Disclosure; is that

7          correct, sir?

8     A.   Yes, it is.

9     Q.   That's something you wrote?

10    A.   Yes.

11    Q.   It's typed on Mr. Newman's word processing system, but

12         you wrote it?

13    A.   Yes, it is.

14    Q.   And every word of that is accurate and true?

15    A.   I believe so, yes.

16    Q.   Okay.  And turning to the top of page 2, sir, going

17         concern value, which is the first approach that you

18         took --

19    A.   Yes.

20    Q.   -- in valuing the company --

21    A.   Yes.

22    Q.   -- you say the share price value of First Hartford

23         Corporation as of September 15th, 2005 --

24    A.   I'm sorry, which page are you on?

25    Q.   Two.

1   A.   I'm -- I must not be on the same page.

2   Q.   Exhibit 46.

3   A.   In Exhibit -- page 2 -- I can't see your reference.

4        Yes, okay.  Fine.

5   Q.   You see that first sentence, sir?

6   A.   Yes, I do.

7   Q.   And it says the share price value of First Hartford

8        Corporation as of September 15, 2005, was determined

9        using the enterprise discounted cash flow model for

10       multi-business companies as a going concern, and you

11       reference the McKinsey book, fourth edition, chapter 5,

12       correct?

13  A.   Yes.

14  Q.   And is that what you did?  Did you use that

15       methodology?

16  A.   I used the multi-business valuation methodology that is

17       described in that chapter, yes.

18  Q.   And you used that 100 percent, and you used it

19       accurately, correct?

20  A.   I applied it as it's described in there, yes.

21  Q.   Okay.  And is it not true that the first step in that

22       analysis is to value the company's operations by

23       discounting free cash flow from operations at the

24       weighted average cost of capital?

25  A.   Yes, it is.

1   Q.   Is that the first step?

2   A.   Yes.

3   Q.   Did you ever do that?

4   A.   Yes, I did.

5   Q.   How did do you that?

6   A.   I used the appraisal values.

7   Q.   So using an -- a real estate -- you're talking about

8        the real estate appraisal?

9   A.   I'm talking about the operating income part of the

10       business.

11  Q.   Sir, I asked you a question.

12            Did you value the company's operations by

13       discounting free cash flow from operations at the

14       weighted average cost of capital?  Did you ever do

15       that yourself?

16  A.   Did I ever do it myself?

17  Q.   Yes.

18  A.   Well, I --

19  Q.   Did you or didn't you?

20  A.   I relied on appraisals for part of the analysis.

21  Q.   So the answer to my question is no, you didn't do that;

22       isn't that right?  You did something else.

23  A.   The way you describe it, yes, I did.

24  Q.   What I just read to you can be found on page 104 of

25       156-A.  156-A is the book.

1   A.   I'm sorry, which --

2   Q.   Your book.

3   A.   Yes.

4   Q.   Okay.  You want to open up the page?

5        JUDGE HORNBY:  It's actually 159A, Counsel.

6        MR. NOLAN:  I'm sorry.

7   Q.   Page 104.

8   A.   Page 104.  Yes, I'm on page 104.

9   Q.   And that talks about the four steps that are required

10       to utilize the McKinsey method?

11  A.   Yes.  And I believe they were all done in the analysis.

12  Q.   Okay.  My first -- my first question, I read to you

13       paragraph 1, correct?  Did I read it correctly to you?

14  A.   Yes.

15  Q.   Okay.  And you didn't do that, you did something else.

16  A.   Well, I believe I did what is in 1.  I used an

17       appraisal, but -- I did value the company's operations,

18       but I used an appraisal.

19  Q.   But you didn't discount free cash flow, did you?

20  A.   I did for the development side of the business, and the

21       appraisers did for the operating income side of the

22       business.

23  Q.   Okay.  How did the appraisers discount free cash flow

24       of this -- of each of these operating companies, sir?

25  A.   They -- there's a -- a discounted cash flow piece in

```
 1        each one of the appraisals that does just that.

 2   Q.   And was that discounting free cash flow from

 3        operations?

 4   A.   Of the particular real estate, yes, it was.

 5   Q.   And what is the definition of free cash flow from

 6        operations, according to McKinsey?

 7   A.   Well, it's the cash available after you pay all of the

 8        related expenses of that particular unit.

 9   Q.   And under McKinsey, that includes taxes, correct?

10   A.   It includes taxes, yes.

11   Q.   Okay.  Now, just so we understand what we are talking

12        about in terms of operating companies.  In your -- in

13        Exhibit 46, Exhibit D, that's in the back, the various

14        operating companies are set out.

15   A.   I'm sorry, which exhibit are you referring to?

16   Q.   Your disclosure, 46.  We're talking about your

17        disclosure.

18   A.   I'm sorry, I was looking at something else.

19             MR. NEWMAN:  Counsel, 46 or 52?

20   A.   Yes.

21   Q.   And all the -- we've been through this before on direct

22        examination using another identical Plaintiff's

23        exhibit, correct?

24   A.   Yes.

25   Q.   Listing all of the operating companies?
```

1    A.   Yes.

2    Q.   And those are operating companies that are real

3         businesses, correct?

4    A.   Yes.

5    Q.   And they have financial statements attached to them?

6    A.   You're talking about each real estate property?

7    Q.   I'm talking about -- for example, the first one,

8         Plainfield Parkade Corp.

9    A.   Yes.

10   Q.   That's a real business, correct?

11   A.   Yes, it is.

12   Q.   And it has financial statements?

13   A.   It has -- well, I used the cash flows that are included

14        in the appraisals --

15   Q.   Sir.

16   A.   -- in this analysis.

17   Q.   Sir, please.  Does Plainfield Parkade Corporation have

18        a financial statement?

19   A.   I believe it does, yes.

20   Q.   And you've seen it, correct?

21   A.   I've seen -- I've seen -- when you say financial

22        statement, you mean -- can you describe what you mean

23        by a financial statement?

24   Q.   A statement of income and expenses, profit and loss,

25        however you want to say it.  An income statement and a

```
 1          balance sheet.
 2    A.    There's -- yes, I believe in all the material there
 3          were those, yes.
 4    Q.    Okay.  And there are tax returns for that company?
 5    A.    I haven't seen tax returns for Plainfield -- each one
 6          of the sub -- no.
 7    Q.    What tax returns have you seen?
 8    A.    I've seen the corporate tax return for First Hartford
 9          Corporation.
10    Q.    And each of those -- withdrawn.
11              That's for First Hartford Corporation and all its
12          con --
13    A.    It's subsidiaries, yes.
14    Q.    And the tax return information for each of the
15          subsidiaries is included in that, is it not?
16    A.    Yes, it is.
17    Q.    As is the financial statement for each of those --
18    A.    Yes, there are.
19    Q.    Sir, you've seen that, correct?
20    A.    Yes.
21    Q.    Sir, do you have Defendants' Exhibit 67 there?
22              MR. NEWMAN:  Defendants' or Plaintiff's?
23              MR. NOLAN:  Plaintiff's -- no, Defendants.
24    A.    Yes.
25              MR. NOLAN:  This is another one you don't
```

1          know about yet, Your Honor.

2                  MR. NEWMAN:  No objection.

3                  MR. NOLAN:  I move to admit Defendants'

4          Exhibit 67 into evidence.

5                  JUDGE HORNBY:  That's without objection?

6                  MR. NEWMAN:  I agree.

7     Q.   What is Defendants' Exhibit 67, sir?

8     A.   This is an e-mail from myself to Tom Newman dated

9          Tuesday, June 26th, 2007.

10    Q.   And that relates to another e-mail from Mr. Newman to a

11         Mr. Gordon of Gordon Associates and Mr. Aertsen, which

12         is you, correct?

13    A.   Yes.

14    Q.   And the -- what Mr. Newman was inquiring -- by the way,

15         who is Mr. Gordon?

16    A.   I don't know who Mr. Gordon is.

17    Q.   You never heard of Mr. Gordon?

18    A.   I don't know who he is.

19    Q.   Okay.  Do you know why you would be getting an e-mail

20         addressed to you and him in this case?

21    A.   I have no idea.

22    Q.   And Mr. Newman is talking about a draft discovery

23         request that is designed to obtain information

24         necessary for an appraisal of the fair value of FHC's

25         shares and FHC's ability to and means for generating

```
 1            the cash necessary to purchase minority shares, and

 2            they ask each of you to please review carefully and

 3            provide any additions or revisions to ensure that these

 4            discovery requests secure all of the information you'll

 5            need for that purpose; is that correct?

 6   A.   Yes.

 7   Q.   Okay.  And your response to Mr. Newman's inquiry is set

 8            forth in the e-mail that you sent back, correct?

 9   A.   Yes.

10   Q.   Okay.  And at that time, which was June 26th, 2007, you

11            were intending to do the analysis that's set out in the

12            McKinsey book, right?

13   A.   That is correct.

14   Q.   Okay.  And you were going to value the company's

15            operations by discounting cash flow, and you were

16            asking for all the information necessary to do that,

17            right?

18   A.   That's correct.

19   Q.   And, for example, you asked for tax returns, internally

20            prepared financials for First Hartford and each

21            subsidiary, and for each property -- underlined for

22            each property, correct?

23   A.   I'm not sure these are my underlines, but yes.

24   Q.   I mean, there are some -- there are underlines that

25            look like they're part of the text, correct?
```

```
 1   A.   Yeah.  I -- all I can say is I wrote this section.

 2             JUDGE HORNBY:  What I'm looking at doesn't --

 3        looks like they're added after the e-mail was

 4        sent.

 5             MR. NOLAN:  I've got one that has both, Your

 6        Honor.

 7             JUDGE HORNBY:  You're right, I see one that

 8        has -- you're right.  I do see one.

 9             MR. NOLAN:  Thank your, Your Honor.

10   Q.   With respect to each property, as opposed to the entity

11        holding, we will need a detailed property P and L,

12        balance sheet, and cash flow statement.

13             Do you see that?

14   A.   Yes, I do.

15   Q.   And you wanted to have the real estate tax bill and the

16        insurance binders.

17   A.   Yeah.

18   Q.   You wanted a lease abstract.

19   A.   Yes.

20   Q.   Okay.  In fact, you never looked at a single lease

21        relating to any of these properties, did you?

22   A.   No, I actually did look at them.

23   Q.   Which ones?

24   A.   When I first got the disclosure documents, I did go

25        through them.
```

```
 1   Q.   You looked at the leases?

 2   A.   I did look at the leases, yes.

 3   Q.   You read them all?

 4   A.   Not all of them.

 5   Q.   Do you know what a kick-out clause is?

 6   A.   In a lease?

 7   Q.   Yes.

 8   A.   It depends on the lease.

 9   Q.   Well, is there such a term as kick-out clause in the

10        real estate business?

11   A.   Yes, there is.

12   Q.   What does it mean, generally speaking?

13   A.   Well, it's rights that either the tenant or the

14        landlord has to get rid of the tenant.

15   Q.   And did you run across any such clauses in any of the

16        leases that you looked at?

17   A.   I don't remember specific ones, no.

18   Q.   Do clauses such as that have an influence on value?

19   A.   Yes, but that's going to be incorporated in the

20        appraisal value.

21   Q.   So the answer to my question is yes.

22   A.   Yes, it does.

23   Q.   Okay.  And you take that into account for whoever is

24        doing the DC -- the enterprise DCF under the McKinsey

25        method, takes that into account when they're doing
```

```
 1          their analysis, right?

 2   A.    Yes, they would.

 3   Q.    Okay.  You also asked for appraisals.

 4   A.    Yes, I did.

 5   Q.    Okay.  And you didn't know that the appraisals had

 6          already been produced at that time?

 7   A.    I had no idea what had been produced when I wrote this

 8          memo.  This is very early on.

 9   Q.    Okay.  And you say, finally make sure we get full

10          disclosure of any personal guarantees, loans,

11          investments by the principals or any parties related to

12          them.

13   A.    Yes.

14   Q.    Did you get that?

15   A.    I believe they were all included in the disclosure

16          documents.

17   Q.    Okay.  So you had access, ultimately, to all of the

18          information that you requested.

19   A.    No, not -- no, I did not.

20   Q.    You didn't?

21   A.    No.

22   Q.    Well, do you know whether or not all of this

23          information was produced?

24   A.    I had -- I had specifically requested a property detail

25          information of the type that's included in the
```

```
 1            appraisals, and I -- to my knowledge, I never received

 2            that.

 3     Q.     Well, you don't know what was received -- withdrawn.

 4                  You don't know what was actually delivered by

 5            First Hartford Corporation in response to the

 6            disclosure request, do you?

 7     A.     I don't know all of that, no.  But for what I was

 8            looking at, I did not have it.

 9     Q.     But actually, you did -- you actually participated in

10            selecting the documents that were produced, correct?

11     A.     Well, I asked for -- this was my memo that asked for

12            certain documents.

13     Q.     In fact, you and Mr. Newman came down to Manchester and

14            were given access to a large room full of documents,

15            and you went through them and requested various

16            documents to be copied, correct?

17     A.     That is correct.

18     Q.     And you did do that once or more than once?

19     A.     I believe we did it once.

20     Q.     Then you came back another time for the dep -- you

21            personally came back for Mr. Greenwald's deposition as

22            well.

23     A.     That's correct.

24     Q.     And that's the second trip.

25     A.     No, I -- I don't remember if I made two or one.
```

1    Q.   And you got more documents the second time as well.

2    A.   Yes, there were more documents.

3    Q.   And that was in March of this year?

4    A.   I believe so, yes.

5    Q.   And did you also, in addition -- and you look --

6         withdrawn.

7              Looking at the second paragraph on page 104.

8              JUDGE HORNBY:  Which exhibit?

9    A.   I'm sorry, which --

10   Q.   159A, the book again.

11   A.   I'm sorry, I'm not with you.

12             JUDGE HORNBY:  Back at the book.  Do you have

13        the book?  McKinsey.

14   Q.   McKinsey.

15   A.   Oh, okay.

16   Q.   And you've had that -- you've used that book your

17        entire career, correct?

18   A.   No, I haven't used this book my entire career.  I've

19        used -- I've -- at one time or another I've used

20        various volumes that are included in the series.  This

21        book is a more recent volume.

22   Q.   Okay.  But it's -- it's edition four.

23   A.   Yes.

24   Q.   Okay.

25   A.   You asked me if I used it my entire career.  The answer

```
 1         is no.

 2    Q.   All right.  You used the predecessor volumes over your

 3         entire career.

 4    A.   Yes.  And actually even before the first volume, the

 5         basic themes from Joel Stern I've used.

 6    Q.   Joel Stern.  Who is Joel Stern?

 7    A.   He's one of the people who is referenced in this book.

 8    Q.   Did he write a book?

 9    A.   He may have.  I don't know.

10    Q.   Did you attempt to value the non-operating assets?

11    A.   Yes, I did.

12    Q.   And you've told us about that this morning.

13    A.   Yes.

14    Q.   Now, did you identify and value all the non-equity

15         financial claims, which is step 3 in this analysis?

16    A.   I believe I did, yes.

17    Q.   And how did you do that?

18    A.   I researched all the mortgage debt for all the

19         properties, and I have included all the other payables

20         that -- in the working capital calculation.

21    Q.   Is that the sum and substance of what's referred to as

22         non-equity financial claims?

23    A.   That's what I believe it to be, yes.

24    Q.   Non-equity financial claims include, among others,

25         fixed and floating rate debt, pension shortfalls,
```

```
1          employee options, and preferred stock?

2     A.   That's correct.

3     Q.   That's what it says in the text, correct?

4     A.   Yes.

5     Q.   Where in your analysis does it show you included

6          employee options?

7     A.   Well, I don't believe they vested.

8     Q.   Pardon me?

9     A.   I don't believe they vested.

10    Q.   Did you look at employee options?

11    A.   I looked in the financial statements.

12    Q.   Okay.  And what did you determine?

13    A.   They hadn't vested.

14    Q.   When did they vest?

15    A.   After the valuation date.

16    Q.   What date did they vest?

17    A.   I don't remember the date.

18    Q.   Because they vested, at least you think they vested

19         after that date, you didn't have to take that into

20         account?

21    A.   I did not, no.

22    Q.   If you did take it into account, what would you have

23         done?

24    A.   I would have included it in my analysis.

25    Q.   And how would you have done that?
```

1    A.   Then I would have increased the number of shares.

2    Q.   Is that all you would have done?

3    A.   Well, I -- I'd have to look again to see -- at the

4         words of how the options are described.

5    Q.   How the options are described?

6    A.   It would increase -- it would increase the number of

7         shares outstanding.

8    Q.   Okay.  And my question is a different question, sir.

9              How would you analyze, and how would it

10        affect your analysis that you did in valuing these

11        options?  How would you go about doing it?  Would

12        you just add the number of options to the total

13        number of shares?

14   A.   Then I would look at the option agreements and see.

15   Q.   And you didn't look at them?

16   A.   Well, they hadn't vested, so I went on to other things.

17   Q.   You never looked at the option agreements?

18   A.   Well, I relied on the footnotes in the financials.

19             JUDGE HORNBY:  That's a yes or no, sir.

20             Did you look at the option agreements?

21             THE WITNESS:  No, I did not.

22   Q.   And did you examine the financial statements?

23   A.   Yes, I did.

24   Q.   Did you read them cover to cover?

25   A.   I read the ones that -- the 2005 -- I believe the 2004

```
 1           and the 2005, the 2006, the 2007 fiscal years, and I

 2           read the 10-Q for October 2005.  I remember those.

 3    Q.     And did you read them cover to cover?

 4    A.     I read all of them, yes.

 5    Q.     And you did take into account everything that was in

 6           those in coming up with your analysis?

 7    A.     I tried to, yes.

 8    Q.     Now, is it true that the appraisals that you're relying

 9           on for at least some of the -- for valuing, at least,

10           some of the operating entities was based on something

11           called net operating income?

12    A.     Yes.

13    Q.     Okay.  What's net operating income?

14    A.     That's the difference between the excess of revenues

15           over expenses in the property.

16    Q.     How does that term relate, if at all, to the term free

17           cash flow?

18    A.     That would be the free cash flow from the property.

19    Q.     The terms are synonymous; is that right?

20    A.     I believe so, yes.

21    Q.     What's the basis for that statement?  Do you have any

22           support for that?

23    A.     Well, if you look at the definitions of net operating

24           income and the statements of net operating income that

25           are included in the appraisal reports, they refer to --
```

```
 1          they refer to -- I believe, they refer to a free cash

 2          flow term there, but it's after all of the applicable

 3          expenses relating to the property.

 4    Q.    Before taxes?

 5    A.    Before -- well, after real estate taxes, but before

 6          income taxes.

 7    Q.    Okay.  And actually, the numbers that you use in the

 8          appraisals were for determining net operating income,

 9          those were pro forma statements of net operating

10          income, weren't they?

11    A.    Well, the appraisers looked at all of the information

12          on all the properties.

13    Q.    You assume the appraisers did that.  You didn't talk to

14          the appraisers.  You don't know what they did.  All you

15          did is read their report, correct?

16    A.    That is correct.

17    Q.    And the title that the appraisers put in their report

18          when they were referring to net operating income was

19          pro forma, correct?

20    A.    That is correct.

21    Q.    What does pro forma mean?

22    A.    That is forecasting the future, which is what a

23          discounted cash flow does.

24    Q.    But pro forma also means that there are certain

25          assumptions that were made, right?
```

```
 1    A.   Yes.  We've gone through that this morning.  There's an
 2         assumption CPU's.
 3    Q.   And if you held up those numbers that are in that pro
 4         forma against the actual financial experience of each
 5         of these operating companies, the numbers would be
 6         different, wouldn't they?
 7    A.   That's not necessarily true, but it could be, yes.
 8    Q.   And the real answer is you don't know whether it's true
 9         or not, did you, because you didn't do that.
10    A.   When I find appraisals of the quality that were
11         produced of the time frames near the valuation date, I
12         do rely --
13              JUDGE HORNBY:  Excuse me.  The question is
14         did you do that.
15    A.   I'm sorry.  I misunderstood the question.
16    Q.   Sir, did you take the -- we've established that you had
17         the actual numbers for income and expenses for each of
18         the operating companies.
19    A.   I had -- I had numbers, but they were not in the form
20         that I needed to compare to the values that were
21         created in the appraisals.
22    Q.   Sir, we'll get through this quicker if you -- just try
23         to answer my question.
24              My question is, you had the actual numbers
25         for each item of income and each item expense for
```

```
1          each of the operating companies, correct?
2     A.   I had some numbers, yes.
3     Q.   You had all of the numbers, didn't you?  They were made
4          available, you just told me.
5     A.   No, I don't believe they included, for example, the
6          reserves for each property for capital investment.
7     Q.   Okay.  My question had to do with operating expenses
8          and operating income.
9     A.   The reserves for capital expenses are included in the
10         calculation of net operating income and the free cash
11         flow from the properties.
12    Q.   I'm sure they are, but my question was limited -- we'll
13         talk about the reserves later.  My question was limited
14         to the operating expenses and the operating income.
15         You had the real numbers.
16    A.   I had numbers.  They were in the format that are in the
17         appraisal.
18    Q.   Okay.
19    A.   And I viewed the appraisals as being more reliable.
20    Q.   And do you know whether or not the appraisers had the
21         real numbers?
22             Did the appraisers have the real numbers for
23         the period ending --
24    A.   They wouldn't issue the appraisal if they didn't start
25         with the real numbers.
```

1    Q.   I'm sure they started with some numbers, sir.

2         Did they -- the property had experience after

3         the time of the appraisal, did it not?

4    A.   Yes, it does.  But the appraisal was done as of a

5         certain date, and it does make assumptions, as anybody

6         would, as to what the future has in store.  And the

7         best person who is going to look at those and make an

8         assessment is the appraiser.

9    Q.   Okay.

10        JUDGE HORNBY:  Counsel, I think I understand

11        this.

12        MR. NOLAN:  Okay.  Thank you, Your Honor.

13   Q.   Can you open up the textbook to page 164?

14   A.   To which page?

15   Q.   164.

16   A.   (Witness complying.)

17   Q.   Sir, do you see a definition of free cash flow on that

18        page?  Is there a definition of free cash flow on that

19        page?

20   A.   Let me just see.  Free cash flow equals net operating

21        profit less adjusted taxes, plus non-cash operating

22        expenses minus investment and invested capital.

23   Q.   Okay.  And you think that's the same thing as net

24        operating income?

25        JUDGE HORNBY:  What was the page number

```
 1         again?

 2              MR. NOLAN:   164.

 3              JUDGE HORNBY:   Okay.

 4    A.   If you're talking about the net operating income as

 5         used in the appraisals, you would take the net

 6         operating income, and you would -- it doesn't include

 7         depreciation or amortization, and it does include

 8         investments in the capital investments in the property.

 9    Q.   Okay.  Sir, going out -- back to your disclosure,

10         Exhibit 46, you --

11    A.   I'm sorry, 46?

12    Q.   D-46.  And, again, you are talking about valuation.

13              What does weighted average cost of capital

14         mean?

15    A.   That's the average cost of the debt and equity that are

16         included in the capital structure of a company.

17    Q.   And is that the same thing as a capitalization rate?

18    A.   No.

19    Q.   Okay.

20    A.   But a capitalization --

21    Q.   Sir, you've answered my question.  Thank you.

22              And in order to properly perform the McKinsey

23         report, you have to discount free cash flow at the

24         weighted average cost of capital, correct?

25    A.   If you use the discounted cash flow, you would use a
```

```
 1          discount rate to discount the --

 2    Q.    Sir --

 3    A.    -- added weighted average cost of capital.

 4    Q.    -- I'm not making myself clear.

 5              The McKinsey report, step 1, requires

 6          discounting of free cash flow at the weighted

 7          average cost of capital --

 8    A.    That's correct.

 9    Q.    -- correct?

10    A.    Yes.

11    Q.    Did you value -- did you make a calculation or an

12          analysis of the average cost of capital for each of the

13          operating companies?

14    A.    No.  I relied on the appraisal.

15    Q.    And you could have -- you could have done that,

16          couldn't you?

17    A.    Yes, I could make my own assessment.

18    Q.    Okay.  And what's the definition of the average cost of

19          capital?

20    A.    Well, it's -- given a capital structure, it is the debt

21          rate times the percentage of the capital structure, and

22          then the equity rate times its capital structure, and

23          you blend the two.

24    Q.    Okay.  And for each of the operating companies there

25          was a balance sheet, right?
```

```
 1    A.   Are you talking about each of the real estate

 2         properties?

 3    Q.   I'm talking about each of the operating companies in

 4         your disclosure and in your exhibits.

 5    A.   Yes.

 6    Q.   Exhibit 46.

 7    A.   Yes.

 8    Q.   And you could look at the balance sheet and determine

 9         how much cash there was and how much equity, correct?

10    A.   Yes, that's correct.

11    Q.   And you could determine, to the basis point, what the

12         cost of debt was, correct?

13    A.   That's correct.

14    Q.   Did you?

15    A.   No.  I used the appraisals.

16    Q.   Okay.  So the answer to my question is you didn't

17         determine the average -- you didn't determine the cost

18         of debt to capital for each of these operating

19         companies.  You did not do that.

20    A.   I relied on the appraisals' value.

21    Q.   All right.  And likewise, you didn't make any attempt

22         to determine the average cost of the equity capital,

23         did you, for each of the operating companies?

24    A.   That's -- that is implicit in the discount rates and

25         implicit in the capitalization rates used by the
```

1          appraisers.

2     Q.   So the answer to my question is no, you didn't do it.

3     A.   I did not do an independent review, no.

4     Q.   Did you do anything, other than read the appraisals,

5          sir, in terms of your analysis on discounted cash flow?

6          Did you do anything else?

7     A.   With respect to the operating properties?

8     Q.   Yeah.

9     A.   I did review the material that was sent that I

10         received.  But at the end of the day the appraisals

11         were used by me to determine the value of the operating

12         properties because I deemed them to be the most

13         reliable.

14    Q.   All right.  And you deemed the work of CB Richard Ellis

15         to be equivalent to what is described starting on page

16         106 of Exhibit 159A, the process for valuing --

17    A.   Yes, I do.

18    Q.   And you thought that CB Richard Ellis, for example, had

19         thoroughly analyzed the past for each of those

20         companies?

21    A.   Yes, I do.

22    Q.   And what's the basis for that?

23    A.   Because they know that lenders are going to lend money

24         to this company based on these valuations.

25    Q.   Do they ever make mistakes?

```
1   A.   I'm sure everybody makes mistakes.

2   Q.   The appraisals are wrong sometimes?

3   A.   Appraisals can be wrong sometimes.

4   Q.   Actually, you're in business for -- or one of your

5        businesses trades on wrong appraisals, right?

6   A.   I think the types of loans that I buy don't have

7        appraisals.

8   Q.   I thought you bought charged-off bank loans?

9   A.   I do.

10  Q.   And I thought you told the Judge that every real estate

11       loan had to have an appraisal.  Did you tell him that

12       this morning?

13  A.   Yes.

14  Q.   And you buy charged-off real estate loans.

15            MR. NEWMAN:  Excuse me, I'm going to object

16       to interrupting the witness.  He's trying to

17       answer.

18            JUDGE HORNBY:  These are yes or no questions.

19       You can explore on redirect.

20  Q.   You buy real estate loans, correct?

21  A.   There happens to be real estate behind us, but the

22       primary borrower is commercial credit, and they do not

23       need real estate appraisals.

24  Q.   So these are not properties -- charged-off loans

25       against real estate?
```

 1    A.    They include real estate, but the primary borrower was

 2          a corporation, and it was -- these are loans made to

 3          the corporation.

 4    Q.    Well, by definition there had to be a lien on the real

 5          estate, right?

 6    A.    Not necessarily.

 7    Q.    Are these businesses still in business?

 8    A.    No.  Most of the businesses are defunct, and you just

 9          have a collection of assets.

10    Q.    Including real estate?

11    A.    Excuse me?

12    Q.    Including real estate?

13    A.    Yes.

14    Q.    Well, how do you collect on real estate if you don't

15          have a lien on it?

16    A.    Well, sometimes you have an unsecured claim, and you

17          behave accordingly based on the unsecured nature of

18          your claim.

19    Q.    Okay.  And it's true, is it not, that starting on page

20          106 and going on for 30 or 40 pages -- I'm looking at

21          the McKinsey book again -- that tells how to go about

22          doing the enterprise DCF process?

23    A.    Yes, it describes the process.

24    Q.    Okay.  And there are a lot -- there are some equations

25          in there, for example on page 122, about valuing free

1          cash flow?

2     A.   Let me get to the page, if I could.

3               Yes.

4     Q.   Did you go through that step?

5     A.   Well, this is the unleveraged cost of equity.  This is

6          the adjusted present value, usually used when capital

7          structures change.  You have -- how much do you want me

8          to go through this?

9     Q.   I asked, did do you any of this, sir?

10    A.   No, I did not apply this formula.

11    Q.   And did CB Richard Ellis?

12    A.   No, they did not apply this formula.

13    Q.   Did they apply any of the formulas that are set out in

14         that section of the book?

15    A.   In this particular section, I don't believe they did,

16         no.

17    Q.   Okay.  And that's because they were doing something

18         else.  They were doing real estate appraisals.

19    A.   They were doing a discounted cash flow on the

20         properties.

21    Q.   Okay.  We had one real -- one of the operating

22         companies, North Adams, correct, and you did something

23         else for North Adams?

24    A.   Yes, I did.

25    Q.   What was it that you did again?  How did you value --

1    A.    I used a comparable analysis.  By not having an

2          appraisal, I did not have sufficient information on the

3          property to do my own assessment of value, so I used

4          what I've -- an acceptable practice, and one that I've

5          used many times before, which is to do a comparable

6          analysis by looking at the square foot of other

7          properties in the portfolio that are similar and --

8          and -- and doing an average of those values.

9    Q.    And I think you told Mr. Newman that that process was

10         acceptable under the McKinsey book.

11   A.    Well, it talks about market comps and comparing square

12         feet, but this is a practice that I have used,

13         particularly when I was at Bank of Boston in the

14         work-out area, which proved to be quite accurate.

15   Q.    Okay.  And as I understand it, you take properties that

16         you think are comparable, and you take the first square

17         foot, and you apply that to another property that you

18         think is comparable.

19   A.    Yes.

20   Q.    And you said you had some information about North

21         Adams.  What information did you have, sir?

22   A.    Well, it's Main Street NA.  There's some balance sheet

23         and P and L information, but it's -- it's not of the

24         type that I would use to do a detailed property

25         analysis for reasons that I mentioned to you before.

1    Q.    What are the reasons?

2    A.    Well, for example, it does not include the capital

3          reserves and other capital investment you need to make.

4          It doesn't include the specific allocation of common

5          area expenses as part of the revenue stream.

6    Q.    How much revenue did Main Street NA Parkade have in

7          2005?

8    A.    I'd have to look.  I don't remember exactly.

9    Q.    Did it have any?

10   A.    Yes, it did.  I do believe it had positive net

11         operating income.

12   Q.    And how many -- how much occupancy did it have?

13   A.    It was somewhere in the low 70's.

14   Q.    Low 70's?

15   A.    I believe so, yes.

16   Q.    And do you know how much net operating income there

17         was?

18   A.    It was somewhere around $20,000.

19   Q.    For the whole year?

20   A.    For the whole year.

21   Q.    Okay.  And if you apply $20,000 using a cap rate, what

22         would you get?

23   A.    Well --

24   Q.    What would you get?

25   A.    If you apply an 8 percent cap, you get a value of

1           $160,000.

2      Q.   Okay.  And this was a start-up project at the time,

3           correct?

4      A.   Well, it was leasing up.

5      Q.   Pardon me?

6      A.   It was leasing up.

7      Q.   Okay.  And the properties that you compared it to were

8           all leased up?

9      A.   That's correct.

10     Q.   They were fully leased, were they not?

11     A.   Yes, they were.

12     Q.   And what was their net operating?

13     A.   It was higher.

14     Q.   Significantly higher.

15              Which three did you apply, compare --

16     A.   Putnam, Plainfield, and West Springfield.

17     Q.   So according to your sheet, Plainfield had 591,000 of

18          net operating income?

19     A.   Yes.

20     Q.   Putnam Parkade had 571,000?

21     A.   Yes.

22     Q.   And West Springfield had 1,034,000.

23     A.   That's correct.

24     Q.   And you thought that those were -- and you divided that

25          by the square foot, those three numbers, and you took

1         that and applied that to North Adams?

2    A.   Yes, I did.  But that's not all I did.

3    Q.   What else did you do?

4    A.   I deducted the amount of the committed facility that is

5         available to get the property to full lease-up.

6    Q.   Okay.

7    A.   Which is exceeding the amount of debt that is

8         outstanding on the property at the time.

9    Q.   And Main Street Parkade was -- I think you said was a

10        participating mortgage?

11   A.   There were two participating mortgages, I think.

12   Q.   What does that mean?

13   A.   That means that the lender has rights to cash flow and

14        to proceeds of sale.

15   Q.   So the lender had the right to the 20,000?

16   A.   In this particular case, the lender had a right to the

17        cash flow --

18   Q.   Okay.

19   A.   -- during the lease-up period.

20   Q.   Okay.  And, sir, on September 15th, 2005, how much

21        could you sell that piece of property for in

22        Springfield?

23   A.   Well, considering the amount of debt, I believe the

24        number in there is a million 9.

25   Q.   A million 9 over the debt?

```
 1   A.   That's the equity value.

 2   Q.   Okay.  You're telling this Court that you could sell

 3        North Adams for roughly $15 million?

 4   A.   Well, the equity -- it's a million 9 over the debt.

 5   Q.   That's half the equity, right?

 6   A.   Yes.

 7   Q.   Okay.  So you're thinking a property in the middle of

 8        North Adams -- do you know what the condition of the

 9        property was?

10   A.   Yes.  It was -- it needed to be significantly improved.

11        That's why they were investing in it.

12   Q.   Well, is that all you know about the condition of the

13        property?

14   A.   Well, I know that Staples and Peoples were in there,

15        and they -- they're usually attracted to decent

16        centers.  So there was investment going on.  The

17        property had leased significantly during the course of

18        2004 and 2005.

19   Q.   All right.

20   A.   So there is no reason to believe that it was not going

21        to continue to lease-up.

22   Q.   Okay.  Now, I think you also told us this morning

23        that -- I'm changing gears here.

24             You take great comfort in Edinburg as a --

25        what did you say, supporting your valuation or
```

```
 1         something like that?
 2    A.   Well, I think that's a significant development.
 3    Q.   What's your understanding of Edinburg?
 4    A.   That it's somewhere between 8 or 900,000 and a million
 5         square feet.  It's been permitted, but there's pre-
 6         leasing.  There are lender commitments.  It's what's
 7         disclosed in the 2007 annual report in the first
 8         quarter of 2008.
 9    Q.   And when did that come out?
10    A.   Just recently.
11    Q.   And you think that that's going to be a home run, I
12         take it?
13    A.   I think that's a significant property.  I can't tell
14         you whether it's going to be a home run.  I do know
15         that Simon thinks enough of it to have a five year
16         right of first offer on it.
17    Q.   And that's not something that Simon got as a result of
18         a lawsuit?
19    A.   In any event, they have a five year right of first
20         offer.
21    Q.   Is the real estate market good now?
22    A.   Is it good now?
23    Q.   Retail property.
24    A.   Yeah, for retail properties.
25    Q.   Everything is great?
```

```
 1   A.   Not everything, no.

 2   Q.   Well, anything good?

 3   A.   Well, real estate is a cyclical business.

 4   Q.   Okay.

 5   A.   These are 25 year recovery assets.  Over 25 years

 6        values can go up a bit and come down a bit.

 7             MR. NOLAN:  Excuse me, Your Honor.

 8             JUDGE HORNBY:  Yes.

 9                  (Discussion off the record.)

10   Q.   Now, sir, turning back to your disclosure and the

11        exhibits thereto.  There was some talk this morning

12        about the sale of Mount Olive.

13   A.   Yes.

14   Q.   What was the sale of Mount Olive?

15   A.   That was a shopping center in New Jersey that was sold.

16   Q.   When was it sold?

17   A.   I believe it was 2004.

18   Q.   And a profit was made, correct?

19   A.   That's correct.

20   Q.   And it's true that once Mount Olive was sold, it went

21        off the balance sheet, obviously, correct?

22   A.   It was -- I believe it was in the year that it was

23        reported it was listed as a discontinued operation.

24   Q.   What does discontinued operation mean?

25   A.   It means that it's not included in the continuing
```

```
 1          operations of the company.

 2    Q.    No more opportunity to make any money, correct?

 3    A.    For the parcels that were sold, that's correct.

 4    Q.    And when you -- you prepared this three-year average of

 5          historical forecast of revenue?

 6    A.    Yes.

 7    Q.    And you included the Mount Olive sale there?

 8    A.    Yes, I did.

 9    Q.    And you excluded some other matters from that

10          calculation.

11    A.    Yes.

12    Q.    And what was it you were trying to do?

13    A.    What I wanted to be sure of is that I was not double

14          counting the merchant building, the development side of

15          the business with the income profit portfolio.

16    Q.    So you were trying to value what you call the

17          merchant --

18    A.    Yes, I was.

19    Q.    Okay.  And what is that business?

20    A.    That's a business of developing -- acquiring sites,

21          developing them, and selling them.  In this particular

22          case, it would also include putting them in the income

23          portfolio if they decided to retain them for a period

24          of time.

25    Q.    Okay.  And how many sales of property have occurred in
```

1    this particular part of the business, to your

2    knowledge?

3  A.  Well, there's the ones that I see in the current

4    financials, would be Mount Olive, and then Bangor.

5  Q.  When did Bangor happen?

6  A.  That was -- that was a contract that the first closing,

7    I believe, was in February of 2006.

8  Q.  And are there any other properties that are going to be

9    sold?

10 A.  Well, there's a -- there's a pipeline of development

11    properties that includes Rockland, includes Edinburg.

12 Q.  Edinburg?

13 A.  Includes the CVS site development properties

14    activities.

15 Q.  Well, does First -- what do you mean by the CVS site

16    development?

17 A.  Well, they're a preferred developer in certain regions

18    for CVS.

19 Q.  What does that mean?

20 A.  Well, it means that CVS is looking for new sites to

21    grow their business, so they find people like First

22    Hartford Corporation to go out and do the site

23    development and create the opportunities for them to

24    become a tenant and opening new stores.

25 Q.  So it's your understanding that First Hartford builds

```
 1          these properties and then sells them?

 2   A.     Well, they can either build them, or they can find the

 3          sites and permit them and let somebody else do it.

 4          It's a fee for service.

 5   Q.     It's a fee for service, correct?

 6   A.     Yes.

 7   Q.     What's the fee?

 8   A.     I think it's been running close to a million dollars a

 9          year.

10   Q.     So much per site?

11   A.     I don't know the exact number per site.  I only look at

12          the revenue in the annual reports.

13   Q.     And do you know what share that revenue falls to the --

14          if it's profitable?

15   A.     There's service income and there's service expense, but

16          all of those service numbers include other activities,

17          so it's not necessarily easy to see how it breaks out.

18          And I also don't know the allocation of Corporate

19          Center that goes to it.

20   Q.     You don't know?

21   A.     I don't know.

22   Q.     But, nevertheless, you made a stab at valuing that

23          business.

24   A.     Well, I captured all of the income, I hope, and all of

25          the expense, and all of the G and A.  So in those
```

```
 1          categories, you would have the revenue and the expense.
 2    Q.    And the process that you followed for doing the
 3          calculation that's on -- is it worksheet number 1
 4          attached to 46?
 5    A.    I'm sorry, which --
 6    Q.    46 is your disclosure.
 7    A.    Of my disclosure.  Oh, okay.  I'm not seeing what
 8          you're referring to.
 9    Q.    Something called worksheet number 1 --
10    A.    Oh, yes.  I'm sorry.
11    Q.    -- at the back.
12    A.    Yes.
13    Q.    As that's your stab at this calculation?
14    A.    Yes.
15    Q.    At least trying to find the revenue and the income.
16          Did I hear you say you're not sure you
17          captured everything?
18    A.    Well, I think it may -- I believe that in -- in the
19          aggregate I have captured all of it.
20    Q.    And the process, as I understand it, is you took
21          numbers off the 10-K's for 2003, 2004, 2005?
22    A.    No, I believe I took them out of the 2005 10-K that had
23          the three years.
24    Q.    Had the three years going back?
25    A.    Yes.
```

1  Q.  Okay.  So you used the -- let's it say another way.

2      You used numbers that were in a certified

3      financial statement that were part of --

4  A.  Yes, I did.

5  Q.  -- a 10-K --

6  A.  Yes.

7  Q.  -- for the years 2003, 2004, and 2005?

8  A.  Yes, I did.

9  Q.  It's a true statement that you don't really know what's

10     included in any of these categories, correct?

11  A.  In terms of the specific items, in some I do, in some I

12     don't.

13  Q.  Okay.  But you've just made some kind of a judgment

14     that --

15  A.  No.  I've used the financial reporting as available to

16     shareholders of this company as reported in their

17     financial statements.  So I didn't make a judgment.  I

18     used their reporting financials.

19  Q.  Well, you made a judgment as to whether or not to

20     include a certain category in what you're calling the

21     merchant construction business.

22  A.  Yes, I did.  I assumed that the categories were correct

23     and the numbers in them were correct.

24  Q.  Okay.  And you excluded certain items --

25  A.  I did.

1   Q.   -- of income and expense.

2   A.   Yes.

3   Q.   And you told us about those before the break.

4   A.   Yes.

5   Q.   And what are non-recurring revenues?

6   A.   Well, the non-recurring revenues, number one, which is

7        a Wal-Mart settlement, not on this, but in another year

8        would be the Simon settlement.  Those are two that I

9        remember.

10  Q.   But you've carried these non-recurring all through both

11       the income and the expense settlement.

12  A.   Well, there's a pattern.  Each individual non-recurring

13       item by itself may not recur, but the concept of a

14       non-recurring item seems to appear in each year.

15  Q.   So they're random events, and you think there's a

16       pattern?

17  A.   Well, I know there's a pattern because it shows.

18  Q.   What's the pattern?

19  A.   And companies in development business, generally there

20       is this type of activity.

21  Q.   But you don't know whether the recurring or

22       non-recurring event related to an operating property or

23       to this part of the business.

24  A.   Well, I -- I -- my analysis showed that it did not.  If

25       it turns out that it did relate to an operating

```
 1          property, is included in the appraised value, then I

 2          would have erred and it should be removed.

 3     Q.   What you did include, of course, was the $6,485,395 of

 4          the proceeds from Mount Olive.

 5     A.   Well, that's the gain on sale.  It's not all proceeds,

 6          it's the gain on the sale.

 7     Q.   Net proceeds?

 8     A.   No, it's the gain.

 9     Q.   The gain.  Fair enough.

10          And you got that out of the discontinued

11          section --

12     A.   Yes, it's disclosed in the financials.

13          JUDGE HORNBY:  You're overlapping again.

14     Q.   And you thought it was reasonable to conclude that as

15          part of this calculation that you did?

16     A.   Yes, I did.

17     Q.   Do you know what First Hartford did with those funds?

18     A.   I don't know exactly, no.

19     Q.   Was that -- were those funds used, as Mr. Newman said

20          in his opening, as a reinvestment of the business?

21     A.   I believe he did, yes.

22     Q.   Okay.  And, most likely, they reinvested that in the

23          effort to build up Bangor?

24     A.   They may very well have, yes.

25     Q.   And, presumably, those funds showed up in the real
```

1      estate in Bangor, correct?

2   A.   When the company has cash, funds are fungible.  They go

3        in different places.

4   Q.   I understand that, sir.  But that value, you just

5        agreed with me, that's where the money probably went

6        and Bangor increased on the balance sheet.

7   A.   Well, I can't agree with you.  But the answer is I

8        don't know where the money went.

9   Q.   Okay.

10  A.   It looks like Bangor was funded by the lender.

11  Q.   So it was funded by the lender?

12  A.   By the drawings under the line of credit, the mortgage

13       loan that was in Bangor.

14  Q.   What's your basis for that statement?

15  A.   Because the balances have been increasing.

16  Q.   Well, there's been a lot of work going on, hasn't

17       there?

18  A.   Yes.

19  Q.   How much money had to be invested by First Hartford

20       Corporation to build out Bangor?

21  A.   Well, there are some amounts.  Typically loan to value

22       would be 80/20 or 75/25 or even 70/20 equity versus

23       debt.

24  Q.   Let's take a step back.

25            The deal on Bangor, and we can come up with that

1       contract.  We talked about that this morning -- or you

2       talked about it -- was that a contract to purchase the

3       property with various milestones, correct?

4    A.  That's correct.

5    Q.  And the milestones were reached by First Hartford, in

6       essence, leasing and building up the property.

7    A.  That's correct.

8    Q.  Properties.

9    A.  Yes.

10   Q.  More precisely in Bangor, correct?

11   A.  That's correct.

12   Q.  And that required an investment of capital.

13   A.  Yes.  They're investing in all their properties all

14      time, presumably.

15   Q.  Okay.  And all of their properties -- those investments

16      are all captured in your valuation of all those

17      properties, correct?

18   A.  Yes, it is.

19   Q.  Okay.  And so some of that money that you're calling

20      the real estate -- the real estate proceeds from Mount

21      Olive, that went and is in the balance sheet already

22      and now you want to use it again, right?

23   A.  I don't believe I used it again.

24   Q.  Okay.  You're sure that's not double counting?

25   A.  What I didn't -- what I believe I did not double count

```
 1            was the income and the expenses of any of the operating
 2            properties versus any of the income and expenses that
 3            are shown in the management development.  Where they
 4            choose to reinvest moneys is in a different equation,
 5            but since we're discounting income streams to create
 6            value, I don't believe I double counted.
 7                 If there is any double counting, it was
 8            unintentional.  And if it's brought to my
 9            attention, I will remove it.
10    Q.    Did you read the affidavit that Professor Wessels filed
11            in this case?
12    A.    Yes, I did.
13                 MR. NEWMAN:  Objection, Your Honor.  We moved
14            to strike those affidavits.  That motion -- the
15            motion to ask for a hearing is here in evidence.
16            Witnesses will never be called here, was denied by
17            the Court.  So I did not proceed with a motion to
18            strike those affidavits, but I object to any
19            questions on those.
20                 JUDGE HORNBY:  I denied the motion on the
21            motion that I will evaluate the testimony, and the
22            methodology used.
23                 MR. NEWMAN:  Right.
24                 JUDGE HORNBY:  If he's read -- I guess I'm
25            not understanding the objection.
```

```
 1              MR. NEWMAN:  The objection, Your Honor, is we
 2     were faced with that motion, and, of course, had
 3     to review what was submitted with it.  But what
 4     was submitted were hearsay affidavits from people
 5     who had never been disclosed, won't be testifying
 6     here, and if we had to proceed with it we'd move
 7     to strike those affidavits.
 8              JUDGE HORNBY:  I didn't understand that we
 9     were hearing the truth of the affidavit.  I
10     thought we were heading in the direction of this
11     witness' assessment.
12              Are you objecting to that?
13              MR. NEWMAN:  I object to bringing it in.  Of
14     course, he can be asked a hypothetical question.
15     I just object to it being offered.
16              JUDGE HORNBY:  I don't understand it's being
17     offered.  If there's a question pending about the
18     affidavit --
19              MR. NEWMAN:  On that basis I'll withdraw the
20     objection.
21              JUDGE HORNBY:  Okay.  Thank you.
22              MR. NOLAN:  Just so the record is clear, I
23     have not received any motion to strike any
24     affidavit or indeed any response.
25              JUDGE HORNBY:  What Mr. Newman said is he
```

```
 1          would have moved to strike had he not said I was

 2          denying your motion at the outset of the hearing

 3          this morning.

 4               But my intention all the way through was that

 5          the arguments are all preserved.  You can go ahead

 6          and ask the question.  Whether the affidavit can

 7          be admitted is a separate question.

 8     Q.   My question, you read Mr. Wessels' --

 9     A.   Yes, I did.

10     Q.   You read it carefully, didn't you?

11     A.   I did, yes.

12     Q.   Because he was calling your whole effort into serious

13          question.

14     A.   Yes, he did.

15     Q.   Okay.  And actually, he said you were wrong.

16     A.   If he --

17               MR. NEWMAN:  Objection.

18               JUDGE HORNBY:  Sustained.

19               Now are you trying to ask the contents of the

20          affidavit?

21               MR. NEWMAN:  Your Honor, if I could be heard.

22               JUDGE HORNBY:  I sustained your objection.

23          Do you want me to revisit?

24               MR. NEWMAN:  I was talking about -- no, I do

25          not want to revisit that.  For that reason, Your
```

```
 1          Honor, I'll be very happy to sit down.
 2               THE WITNESS:   Could I ask a question of the
 3          Court?  At some point in the not too distant
 4          future --
 5               JUDGE HORNBY:  Let's do it now.  We'll take
 6          an afternoon recess.
 7               (Break taken from 2:44 p.m. to 3:02 p.m.)
 8               JUDGE HORNBY:  You may continue, Mr. Nolan.
 9               MR. NOLAN:  Thank you, Your Honor.
10     Q.   I'd just like to go back to North Adams for a moment,
11          sir.
12               I think you, in justifying your use of the
13          average per square foot net operating income -- is
14          that roughly a description of what you did?
15     A.   I used the average per square foot values.
16     Q.   And you relied on --
17     A.   Talking about North Adams?
18     Q.   Yes.
19     A.   Yes.
20     Q.   And as an effort to justify that, to legitimize it, you
21          referred, again, to the 159A, the valuation -- McKinsey
22          valuation?
23     A.   I think there's a section in there that talks about it.
24     Q.   But actually you quoted it out to the Court.  It's on
25          page 338.
```

1    A.    Yes.

2    Q.    And the part you quoted out says alternatively estimate

3          the real estate value either by using an appraisal

4          multiple such as a value per square meter or by

5          discounting future expected cash flow from rentals at

6          the appropriate cost of capital.

7    A.    That is part of the quote, yes.

8    Q.    That's what you referred to to justify what you did.

9          That's from page 338 of the book.

10   A.    Yes.

11   Q.    Do I have it right?  Why don't you look at it.

12   A.    I'm sorry, can you give me the page number again?

13   Q.    338, I think.

14   A.    Yeah.  I'm sorry, can you read the section again?

15   Q.    It says, alternatively, estimate the real estate value

16         either by using an appraisal multiple such as value per

17         square meter or by discounting expected future cash

18         flows from rentals at the appropriate cost of capital.

19   A.    Yes.  I used the value in this case per square foot.

20   Q.    Would you tell the Court, please, what's the title in

21         italics of that section in which that sentence is

22         contained?

23   A.    Excess Real Estate and Other Underutilized Assets.

24   Q.    North Adams wasn't excess real estate or was an

25         underutilized asset.

```
 1    A.   No, but it's also -- you're right.  Correct.

 2    Q.   And what does -- let's emphasize that point.  Let me

 3         read the last sentence, and see if you agree with me.

 4              Of course, be careful to exclude any -- then

 5         the word in italics again -- operating real estate

 6         from these figures because that value is

 7         implicitly included in the free cash flow

 8         projection and value of --

 9    A.   That is correct, yes.

10    Q.   So you used a stray sentence in the middle of an

11         inapplicable section.

12              JUDGE HORNBY:  Argumentative, counsel.

13    A.   No, I didn't.

14    Q.   Thank you.

15              You agree with me that North Adams is not

16         excess real estate.

17    A.   I don't know how the company refers to it.  It's listed

18         on my list as an operating income property.

19    Q.   So by definition, it's not excess or underutil --

20    A.   I would not consider it excess, no.

21    Q.   Now, McKinsey requires you to carefully analyze and

22         consider all non-equity claims, correct?

23    A.   Yes.

24    Q.   Okay.  And a class of non-equity claim is a debt.

25    A.   Yes.
```

1   Q.   And there are other obligations that businesses have

2        that fit the definition of non-equity claims.

3   A.   That's correct.

4   Q.   And what steps did you take to identify all the

5        non-equity claims, apart from looking at the debt side

6        of the balance sheet?

7   A.   Well, I used the footnotes as well.

8   Q.   Okay.  All of the footnotes?

9   A.   I used the footnotes as well, yes.

10  Q.   Okay.  Now, do you agree with the statement in the

11       McKinsey book on page 343 that, if necessary, you

12       should take into account any special circumstances that

13       could affect shareholders' ability to capture the full

14       market value of the company's assets?

15            For example, if the company has announced I

16       will sell off a non-operating asset in the near

17       term, you should deduct the estimated capital

18       gains taxes, if any?

19  A.   I'm sorry, which page are you reading from?

20  Q.   343.

21  A.   And which paragraph are you referring to?

22  Q.   Starts off if necessary, talks about the --

23  A.   On 343?

24  Q.   I'll find that for you in a minute.  I think I have the

25       wrong page here.  Let me just go at it a different way.

```
 1              You didn't consider taxes, did you?

 2    A.   I did consider taxes.

 3    Q.   And your view is that First Hartford is never going to

 4         pay taxes.

 5    A.   My view is that they haven't paid taxes in any material

 6         way on their federal tax returns.  From all the tax

 7         returns I saw, and I continued to assume that in my

 8         calculations of the forecasted value.

 9    Q.   Going forward forever?

10    A.   At no growth.

11    Q.   At no growth?

12    A.   Yes.

13    Q.   Well, how was it that the company -- will the company

14         be profitable in the future?

15    A.   Well, they -- the answer is they can have profits and

16         still not pay taxes.

17    Q.   But you're assuming no growth.

18    A.   I assumed in my forecast that there would be no growth.

19    Q.   And when you say no growth, do you mean no growth in

20         the balance sheet?

21    A.   I mean -- I'm discounting the income streams.

22    Q.   So you're saying the income streams are going to stay

23         the same?

24    A.   From the -- yes.

25    Q.   Forever?
```

1    A.    Well, the appraisals assume there is growth in net

2          operating income.  But the assumption I made is that --

3          all that considered, that the operating expenses, plus

4          the depreciation in the company would exceed that

5          amount, and that that would continue into the future.

6          Therefore, they would not run out of net operating loss

7          carry forward.

8    Q.    So that operating will be a continuing operat --

9    A.    Yes, that's what I said.

10   Q.    What's the basis for that assumption?

11   A.    It's what has happened in the past, so I continue that

12         into the future.

13   Q.    But eventually, depreciation runs out, doesn't it?

14   A.    In the long run, and over time, given a finite group of

15         properties, the answer is yes, they will become fully

16         depreciated.

17   Q.    As the properties get sold, of course, they go into

18         the -- into that category, that takes them off the

19         balance sheet.

20   A.    Yes.

21   Q.    And eventually you run out of properties to sell,

22         right?

23   A.    Yes, that's true.

24   Q.    And when does that happen?

25   A.    Well, assuming -- you have to assume that they stop

1        investing.

2   Q.   Well, are they getting more cash?

3   A.   Yes.

4   Q.   Of necessity they're growing if they're replacing

5        property.

6   A.   Well, they are reinvesting, and I assume that the

7        income from that reinvestment would stay the same as it

8        has in the past.  That's how I did my valuation.

9   Q.   And you think that's a good thing.

10  A.   I'm saying that's what I did for my valuation.

11  Q.   Okay.  And you did that really because you didn't want

12       to face any tax liability.

13  A.   That's not true.

14  Q.   We talked at your deposition -- I'll withdraw that

15       question.

16            Now, sir, we discussed at your deposition the --

17       what you refer to as the excess cash.

18  A.   Yes.

19  Q.   And you told me, and you told the Court, that you

20       looked at the Q's and the K's for the relevant period.

21  A.   Yes, I did.

22  Q.   Which of the 10-Q's did you refer to when you

23       calculated the excess cash?

24  A.   I used the closest one to the valuation date, which is

25       October of 2005.

1    Q.    Now, there's a footnote -- or there's a note in that

2          10-Q, correct?

3    A.    There are many footnotes in it.

4    Q.    Do you recall the footnote that talks about the money

5          that had been drawn down on the Bangor construction

6          loan, the $5 million?

7    A.    Yes, I do.

8    Q.    Okay.  The $5 million was included in that cash item,

9          correct?

10   A.    That's correct.

11   Q.    And in the note it says that the $4,026,00 of that $5

12         million was obligated to be paid to a tenant in

13         December -- was going to be paid to a --

14   A.    That's correct.

15   Q.    Okay.  And did you take that into account?

16   A.    Yes, I did.

17   Q.    And how did you take that into account?

18   A.    Well, I looked forward at two things.  One was a

19         settlement sheet at the end of the first closing, and I

20         saw that in addition to the -- to the gain, they also

21         recovered additional funds equal to at least their

22         investment in the property.  And I also looked at their

23         cash position at the end of April, and it exceeded the

24         cash position in October.

25   Q.    Okay.

1   A.   I also noted that there was no payable obligation for

2        this, so I presumed that moneys were recovered in

3        addition to the gain from the sale of property from

4        subsequent payments under the contract.

5   Q.   Okay.  What did that have to do with your determination

6        of what the amount of excess cash should have been on

7        September 15th?

8   A.   The excess cash position I've outlined in my analysis

9        of 3.8 million, which is that a working capital

10       asset -- the net working capital, excuse me.

11  Q.   On Exhibit No. 46, value of excess cash, you have

12       $3,850,000, correct?

13  A.   Yes, that's correct.

14  Q.   And you insisted on putting that -- even though you

15       knew that $4 million was due to the tenant in December

16       and the money had been taken down just before the end

17       of the quarter and was to be paid just after the end of

18       the quarter and you didn't take into account that $4

19       million obligation?

20  A.   I did take that into account.  I assume that it was

21       recovered as part of the transaction on the sale.

22  Q.   And that transaction took place when?

23  A.   In February.

24  Q.   That's not what you said at your deposition, though,

25       did you?

```
 1   A.   I don't remember what I said at my deposition.

 2   Q.   I asked you at your deposition, and that's on page

 3        121 --

 4             MR. NOLAN:  A moment, Your Honor.

 5                  (Discussion off the record.)

 6   Q.   Sir, would you just look at page 121 and 122.

 7   A.   Yes, I'm looking at it.

 8   Q.   And I asked you at your deposition how did you take

 9        that account, referring again to that $4 million.

10             Do you see that?

11   A.   On 121?

12   Q.   Yes, sir.  Line 18 -- line 17.

13   A.   Yes.

14   Q.   And I said, how did you take that account.  And you

15        said, I relied on the management reporting on the

16        balance sheet as a true and correct statement of the

17        excess cash position as of the valuation date -- as of

18        the balance sheet date.

19   A.   Yes.

20   Q.   And the next question I ask you, it didn't matter to

21        you that cash was going out the door in December?  Your

22        answer was, the company's cash is always coming in and

23        going out.  Then I said, I see.  And you said, but the

24        fact is that as -- the fact is, as of that date, that

25        is the excess cash position on the balance sheet.
```

```
 1          Question, would it have been fair for you to analyze
 2          the $26 million used for tenant improvements?  It's not
 3          my job to analyze.  That's management.
 4              That's what you said back in June.
 5    A.    Yes.
 6    Q.    Okay.  And did you ever look at any minutes of board of
 7          directors' meetings of First Hartford Corporation?
 8    A.    I don't remember any.  I do remember the audit
 9          memorandum that I referred to this morning.
10    Q.    And we did talk about stock options, and it's your
11          understanding that as of September 15th, 2005, the
12          stock options had not vested.
13    A.    That's my understanding.
14    Q.    And you did not adjust any of your calculations for
15          stock options?
16    A.    That's correct.
17    Q.    And if they had vested, then you would have had to
18          change your calculation; is that right?
19    A.    I would have -- if they had vested, then it -- I
20          probably would have done something else, yes.
21    Q.    Well, you would have done, I assume, what is in the
22          book -- the McKinsey book that tells you how to deal
23          with stock options, doesn't it?
24    A.    Well, I assume that they hadn't vested, so I don't
25          know.
```

```
 1   Q.   My question is a different one, sir.  If it had, you

 2        would have followed the McKinsey book.

 3   A.   Well, I would have read -- I would have gone further

 4        and read the option agreement and made whatever was an

 5        appropriate adjustment, in my opinion.

 6   Q.   But my -- employee stock options are covered.

 7   A.   It is included in a chapter in the book, yes.

 8   Q.   And that would have affected your valuation?

 9   A.   It may have, yes.

10   Q.   You never visited any of the properties owned by First

11        Hartford?

12   A.   Not specifically, no.  I've been to the towns, but I

13        have not visited the specific properties.

14   Q.   You haven't seen any of the properties?

15   A.   I actually may have seen some of them because I've been

16        to these towns, but I didn't go specifically as a

17        result of this case.

18   Q.   Did you assume that the appraisers had?

19             JUDGE HORNBY:  I didn't hear the question.

20   Q.   Did you assume that the appraisers had gone to visit

21        each of the properties?

22   A.   I don't know whether they did or not.

23   Q.   Would that have been important to do?

24   A.   I -- again, I relied on the appraisals.  Included in

25        the appraisals, generally the appraiser will visit the
```

1       property.

2   Q.   So, for example, if one of these operating companies

3        had something that was called excess land and it turns

4        out to have been a pond, would this have been something

5        you would have liked to have known?

6   A.   I assume it would have been picked up in the appraisal.

7   Q.   Now, you told us that part of your experience has been

8        in the real estate business.

9   A.   Yes, it is.

10  Q.   And you're a member of a board of -- the general

11       partner of a public company?

12  A.   Yes, I am.

13  Q.   And you're also a general -- a co-general partner in

14       another real estate venture in Boston?

15  A.   Yes, I am.

16  Q.   What's the name of that venture?

17  A.   Each property has its own name.

18  Q.   So you're a general partner with somebody else in a

19       series of properties?

20  A.   Yes, I am.

21  Q.   Are they -- are they affiliated?

22  A.   They're affiliated by common ownership and individual.

23  Q.   Who is the other general partner?

24  A.   That's private information.

25  Q.   Pardon me?

1    A.    That's private information.

2    Q.    Is it Harold Brown?

3    A.    Yes, it is Harold Brown.

4    Q.    And Harold Brown controls the other company -- the

5          public company, correct?

6    A.    He controls the general partnership, yes.

7    Q.    So he controls the whole company, right?

8    A.    He's -- controls the general partner, yes.

9    Q.    And Harold Brown owns a company that is the manager?

10   A.    Yes, he does.

11   Q.    What's the name of that company?

12   A.    Hamilton Company.

13   Q.    And did you tell me about Harold Brown's compensation

14         from the New England Retail Associates Limited

15         Partnership at your deposition?

16   A.    I said he was compensated based on his receipt of

17         dividends from the company.

18   Q.    And that wasn't an accurate statement, was it?

19   A.    I believe it is accurate.

20   Q.    Well, how much money did the Hamilton Company get from

21         New England Retail Associates in 2000 --

22   A.    It gets management fees.

23   Q.    And a lot of other fees, too, right?

24   A.    It gets recovery of other legitimate expenses, yes.

25   Q.    And my question was, how much did it get in 2007, do

```
 1          you know?

 2     A.   I don't have that exact amount.

 3     Q.   And it also gets commissions on sales of property?

 4     A.   It does, yes.

 5     Q.   And it also gets a fee of a half a point on every

 6          mortgage that's outstanding?

 7     A.   It does get fees, yes.

 8     Q.   It gets that -- get a half a point?

 9     A.   I don't know the exact number.

10     Q.   That's all disclosed, correct?

11     A.   Yes, I'm sure it is.

12     Q.   But your relationship with Harold Brown isn't

13          disclosed, is it?

14     A.   My relationship with Harold Brown isn't disclosed in

15          what way?

16     Q.   The fact that you're general partners with Harold Brown

17          in -- how did you describe them, investment grade, a

18          significant portfolio?

19     A.   No, that's not disclosed in the 10-K form.

20     Q.   But you're general partners?

21     A.   Yes, we are.

22     Q.   In a multi-million dollar business?

23     A.   Yes, we are.

24     Q.   What's the total value of that so-called private

25          business?
```

```
1    A.   That's private information.

2    Q.   More than 100 million?

3    A.   That's private information.

4    Q.   You're not going to tell me, in other words.

5    A.   That's private information.

6              MR. NEWMAN:  I object on the grounds of

7         relevancy.

8              JUDGE HORNBY:  I don't know where we're

9         going, Counsel.  I'm lost.

10   Q.   Well, you've made several comments about the disclosure

11        and First Hartford Corporation.

12   A.   I don't know what comments you're referring to.

13   Q.   You filed an affidavit in this case, did you not?

14   A.   Yes, I did.

15   Q.   And that was back in May of 2007.

16   A.   I believe so, yes.

17   Q.   Okay.  And at that time you said that First Hartford

18        Corporation's product -- projects were readily salable?

19   A.   I may have, yes.

20   Q.   Is that a true statement?

21   A.   I believe they're -- the properties listed on the

22        operating income property list that I have are salable,

23        yes.

24   Q.   Are they readily salable in the national real estate

25        market?
```

```
 1   A.   I believe so.  And that is quoted in the appraisals as
 2        well.
 3   Q.   And you also told the Court that they were primarily
 4        shopping centers referred to as power centers.
 5   A.   Yes.  That was an incorrect statement.
 6   Q.   How did you get that wrong?
 7   A.   Well, I didn't know what they were until -- until I saw
 8        them -- until I actually saw the appraisals.  They are
 9        actually neighborhood centers.  I explained that
10        difference earlier today.
11   Q.   And do you believe that real estate investments are
12        illiquid, generally?
13   A.   Excuse me?
14   Q.   Do you believe that real estate investments are
15        generally a --
16   A.   Not necessarily, no, I don't.
17   Q.   Okay.  Well, does New England Realty file 10-K's?
18   A.   Yes, it does.
19   Q.   And you're aware of what's in that 10-K, and you
20        actually sign them, correct?
21   A.   As a member of the audit committee, I approve the 10-K
22        before it gets issued.
23   Q.   Do you actually sign it?
24   A.   I don't sign it, no.
25   Q.   Does somebody sign it on your behalf?
```

1    A.    Management signs it.

2    Q.    And do you believe it to be a true statement that real

3          estate investments are generally illiquid?  Let me just

4          show you the 10-K.

5                MR. NEWMAN:  Counsel, does that have an

6          exhibit number?

7                MR. NOLAN:  It's not an exhibit.

8                MR. NEWMAN:  It's not an exhibit.  I just

9          wondered.

10               JUDGE HORNBY:  Trying to impeach the witness

11         on the statement that real estate is not generally

12         illiquid.

13               MR. NEWMAN:  It's not marked, but --

14               MR. NOLAN:  I'll mark it if you like.

15               MR. NEWMAN:  We'll let it go.

16               JUDGE HORNBY:  I don't know that you

17         introduced the exhibit:

18               MR. NOLAN:  That's exactly what I'm going to

19         do, sir.

20   Q.    I'm showing you page 6, sir.

21   A.    Well, they use the term investments here, and I'm

22         talking about the properties themselves.  And, yes,

23         real estate goes through cycles.  And this is a general

24         risk assessment to investors warning them of conditions

25         prevalent in the real estate industry.

1                It's also my information, belief, and

2        experience that properties of the type held by

3        First Hartford listed on the operating properties

4        list are, in fact, salable in today's market

5        condition, and were at the time of the valuation

6        date.

7    Q.  Okay.  And some of the properties that New England

8        Realty owns are very similar to the properties that

9        First Hartford own.

10   A.  Some of them are, yes.

11   Q.  Are New England's readily salable?

12   A.  I believe they are, yes.

13   Q.  Would you agree to have something --

14   A.  Because --

15   Q.  Let me finish my question.

16               Why would you agree to have something like

17       that in your --

18   A.  Because these are warning investors that real estate

19       investments -- their investment in the company can be

20       illiquid.

21   Q.  So you tell investors one thing, and you tell the Court

22       something else?

23   A.  No, I don't tell investors one thing and the Court

24       another.

25               MR. NOLAN:  A moment, Your Honor, please.

```
 1              JUDGE HORNBY:  Yes.

 2   Q.   Now, you were here when I made the response to Mr.

 3        Newman's opening statement?

 4   A.   Yes.

 5   Q.   And you did say at your deposition that as of the date

 6        of that deposition, which was Friday, June 13th, you

 7        have spent approximately 32 hours on this project?

 8   A.   That's what I billed for the project.

 9   Q.   Is there a difference between the hours you put in and

10        what you billed?

11   A.   Yes.  I do general reading and research, and I don't

12        include that in my billing rate.

13   Q.   You don't charge for that?

14   A.   No, I don't.

15   Q.   Okay.

16   A.   Not in this case.

17   Q.   Well, this is the only case you've ever worked on,

18        right?

19   A.   That's not true.

20   Q.   On what other cases were you an expert witness?

21   A.   Well, as a -- when you say case I've worked on, and

22        then you describe it as an expert witness, this is my

23        first expert witness case.

24   Q.   Okay.  And you have relationships in other lawsuits; is

25        that what you're saying?  You had a role in other
```

1          lawsuits?

2     A.   I generally will -- where I have investments in

3          companies and if they can use my experience in a way

4          that's helpful, then I offer that up.  I don't charge

5          for that service.  I'm an investor in the company.

6     Q.   So how much time did you actually spend on this case?

7     A.   I would say probably twice what I've billed.

8     Q.   Sixty hours?

9     A.   Yeah, probably something like that.

10    Q.   Okay.  And you told me you looked at all of the public

11         filings for three years -- three years in total?

12    A.   I looked at the public filings, yes.

13    Q.   How long did it take you to read the public filings?

14    A.   I can't give you an estimate.  I've read them several

15         times.  There are restatements in all of these so you

16         have to be careful when you read them.  So I took extra

17         time.  I can't give you the number of hours.

18    Q.   And you said you read all the leases?

19    A.   I looked at the leases.  I didn't read all of them, no.

20    Q.   Did you read any of them?

21    A.   I believe I read some of them, but I've relied on the

22         appraisals.

23    Q.   How many leases were there?

24    A.   Excuse me?

25    Q.   How many leases are there, about 250?

```
 1   A.   Well, each property probably has 10 to 15, times the

 2        number of properties.

 3   Q.   Okay.  You read all the appraisals?

 4   A.   I did read all the appraisals, yes.

 5   Q.   Did you analyze them?  Did you check the figures?  Did

 6        you do anything?

 7   A.   I read appraisals all the time, and I felt they were

 8        thorough.  But I also know who wrote them, and they are

 9        known to be very thorough.

10   Q.   Okay.  And we established that you didn't check them

11        against actual numbers.

12   A.   I've looked at the actual numbers.

13        JUDGE HORNBY:  That's been asked and

14        answered, Counsel.  Let's not go back to this.

15   Q.   Okay.  And in your opinion, you ascribe no weight to

16        the stock price of the company.

17   A.   Not for the purpose of determining fair value, no.

18   Q.   And equally, you did not ascribe any value at all to

19        net asset value?

20   A.   Not for the purpose of determining fair value.

21   Q.   Why was it that you did not ascribe any value to either

22        of those?  Did you have different reasons for each one?

23   A.   Yes, I did.

24   Q.   Would you tell us the reason?

25   A.   Well, with respect to the stock price, the stock is --
```

1       I believe is deeply discounted reflecting management

2       control and the fact that they don't pay a dividend,

3       just to state two issues.  Those are significant

4       discounts off fair value.

5           The fact that they're holding real estate in

6       a C Corp.  The fact that the marketplace that they

7       trade their shares is very liquid, are also

8       included.  With respect to the net asset value,

9       while I think that fairly values the real estate,

10      the operating real estate properties, I do not

11      believe it gives full value to the value of where

12      they're investing the money, which is in the

13      development side of the business.

14  Q.  And you don't think that development business could be

15      sold?

16  A.  I think that there are elements of the development

17      business that can be sold.  I think there are people

18      who buy it and I have said that in my analysis, but it

19      doesn't give full value to it the way -- the ongoing

20      value the way a going concern would.

21  Q.  Okay.  The last question I have is as -- has to do with

22      your valuing -- I want to get the exact terminology

23      that you used -- non-operating assets, deposits,

24      escrows, prepaid expenses, and so forth.

25  A.  Yes.

1    Q.    You think somebody would pay money for those?

2    A.    Yes.  Particularly if they include the Edinburg

3          property.

4    Q.    Well, what steps did you take to determine that the

5          Edinburg -- the Edinburg property, as of September 15,

6          2005, was in that category?

7    A.    I believe they had an interest in an option or an

8          interest in property at the time.  I don't remember

9          exactly, but I believe it was somewhere in that number,

10         and I think -- I think that if you look at the

11         situation today, you see that there's significant value

12         there.

13   Q.    Well, there may or may not be depending upon what

14         happens.  There was an option in September 30th of

15         2005.

16   A.    Well, that appraisal done in -- in 2000 -- shortly

17         after they made the big investment for $17 million, it

18         reflects --

19   Q.    That was well after September 30th.

20   A.    Yes, it was.

21   Q.    Let's talk about September 15th, 2005.

22   A.    Yes.

23   Q.    Did First Hartford Corporation have an option in

24         Edinburg?

25   A.    I believe it did, yes.

1   Q.   Okay.  And do you know where in the -- on the asset

2        side of First Hartford that option resided?

3   A.   It should be in the -- I believe it was in the

4        deposits, escrows, and prepaid account.

5   Q.   What makes you think that?

6   A.   I don't remember exactly where I got the information.

7   Q.   Isn't it true that prepaid expenses, and the like, are

8        merely an accounting convention?

9   A.   Well, I relied on what the footnotes say, and I believe

10       that all of those relate to properties in a pre-

11       development stage.

12  Q.   Sir, my question is, isn't a prepaid expense -- for

13       example, if you pay a real estate commission, or if you

14       make an expenditure, the GAP -- do you know what GAP

15       is?

16  A.   Yes.

17  Q.   What's GAP?

18  A.   Generally accepted accounting principles.

19  Q.   And don't generally accepted accounting principles make

20       you put that on your balance sheet, and it disappears

21       over time?

22  A.   Well --

23  Q.   That is a yes or a no, please.

24  A.   I don't know.  You're -- the way you characterize it is

25       not my understanding of it.  Maybe you could rephrase

1      your question.

2   Q.   A prepaid expense is money that's gone, by -- by

3        definition, money that's paid and is out the door?

4   A.   Prepaid expense was money that was paid in advance of

5        when it would -- an accounting convention it would

6        normally be due, yes.

7   Q.   Right.  And it -- the accounting convention requires

8        that to be shown on the balance sheet, and it goes away

9        over time, correct?

10  A.   Yes.  To the extent that that relates to properties

11       under development, it has value.

12  Q.   And what investigation did you do to determine what was

13       in the category of prepaid expenses?

14  A.   Well, I relied on management statements in their

15       financial statements as to what those accounts were.

16  Q.   And what was it specifically that led you to conclude

17       that you ought to value those at 100 cents on the

18       dollar?

19  A.   That's what management valued them, and their

20       accountants approved, and GAP.  They have to be carried

21       at cost, and that's the fair value at that time for

22       those assets.

23           MR. NOLAN:  Thank you, sir.

24           JUDGE HORNBY:  Thank you, Mr. Nolan.  Mr.

25       Groff?

```
 1            MR. GROFF:  I will try to be brief.
 2            CROSS-EXAMINATION OF GUILLIAEM AERTSEN
 3       BY MR. GROFF:
 4    Q.  What calculations did you do to assume that there will
 5        always be a tax loss and that none of the tax credit
 6        will be used?
 7    A.  I'm not sure what you mean by calculations.
 8    Q.  Is it -- how did you determine that?
 9    A.  I looked at the past history of the company and
10        determined that they were not paying taxes, and I
11        assume that -- that in the formulas I used, which we
12        went over this morning, that in -- in looking at the
13        forecasted cash flows, and if they weren't growing
14        those cash flows, that the condition that existed in
15        the past would continue into the future.
16    Q.  All right.  If they sell one of the operating
17        properties -- in your Exhibit 162 you have listed under
18        operations numerous properties, correct?
19    A.  That's correct.
20    Q.  If they sell one of those properties or numerous of
21        those properties, have you calculated what the tax
22        would be?
23    A.  I assume that they were not going to sell those
24        properties, the purpose of my going concern analysis,
25        so I did not do that.
```

1   Q.   In your going concern analysis, if the company needed

2        cash to pay off a shareholder, wouldn't it have to sell

3        something?

4   A.   Not necessarily.

5   Q.   Because you believe that -- you believe that the

6        company could borrow more money, correct?

7   A.   They could raise capital elsewhere.  They could borrow

8        money.  They could sell properties.  They can -- they

9        have excess cash.  They can do a lot of things.

10  Q.   And my question is, if they sell any of these

11       properties under operations, there's a tax consequence,

12       correct?

13  A.   Yes, there would be.

14  Q.   And if the company sells many of these properties under

15       operations and -- you know, your equity value is listed

16       there.  Let's assume for a second that's right.  Have

17       you done any calculations to demonstrate what the tax

18       bill would be for doing that?

19  A.   No, because I didn't forecast that they would.

20  Q.   Okay.  If, in fact -- so you're assuming that this tax

21       credit will never be used; is that right?

22  A.   No.  It's being used everyday.  It's being consumed,

23       but they're creating more everyday as well.

24  Q.   All right.  But you're assuming it will stay at about

25       the same level; isn't that what your testimony was?

1    A.   I assume no growth other than what they do.  And under

2         a no growth plan, I assume it stays in a steady state,

3         yes.

4    Q.   All right.  And if it stays in a steady state, and

5         there's no -- and the company is not sold and

6         continues, why is that a value?

7    A.   Because in addition to the fact that they're not paying

8         taxes, they're generating new -- and it's available to

9         support -- if there were to be future growth it's

10        available.  So it's an excess value on the balance

11        sheet.

12   Q.   So the only way it happens, in your view, is if the

13        company somehow doesn't have to sell any of the

14        operating properties, and continues to be in the exact

15        same position it is now.  In other words, basically the

16        same size, basically the same level of profitability.

17        That's the assumption of why you believe there's a tax

18        asset.

19   A.   First of all, I assume they did not sell any of the

20        operating properties, but I did assume that they would

21        sell properties that would be developed.  An example of

22        that would be Edinburg.

23             Now, if Edinburg is sold, given the values

24        that are -- that seem to be emerging there, a

25        million square feet, clearly that sale would

```
 1          trigger -- would probably exhaust the NOL if it

 2          were sold in its entirety.  And given an equity

 3          allocation of First Hartford, it would probably

 4          exhaust the NOL; however, you would be getting

 5          significantly additional revenues.  And even if

 6          you apply the tax, it would -- it would enhance,

 7          not deteriorate, the enterprise value of the

 8          corporation.

 9     Q.   And, sir, you have, sitting here today -- and I don't

10          mean to be disrespectful, but you really have no clue

11          how Edinburg is going or how any other possible

12          development in the future is going, do you?

13     A.   I've read the appraisals on Edinburg, so I do have a

14          clue about it, according to the appraisal reports.

15          I've also read the statements in the company -- its

16          financial statements regarding it, and I do know that

17          Simon has a right of first offer, and Simon would not

18          entertain that unless they felt the property had value.

19               So I disagree with your comment that I don't

20          have a clue.

21     Q.   In your Plaintiff's Exhibit 162, you have the company

22          basically divided into operations and then development,

23          correct?

24     A.   I have an operating income property list, and I have a

25          development business, yes.
```

```
 1   Q.   All right.  And you value, as ongoing concerns, those

 2        two separate things, correct?

 3   A.   Yes, I do.

 4   Q.   And you value the development side -- or you value the

 5        operating properties at $21,489,315.

 6   A.   That's correct.

 7   Q.   And you ascribe about the same value, 20 million

 8        something, to the development side of the business; is

 9        that right?

10   A.   That's before you get to the operating -- the overhead

11        expense.

12   Q.   Yes, I understand.  I'm just talking about the two.

13   A.   Yes.

14   Q.   And the development -- as to the development income,

15        would you agree with me that what you've done is you

16        take -- there's been -- there was one sale in the

17        three-year period here, and you assume that there is

18        going to be -- and you take an average of the three

19        years, and you assume that there's going to be sales of

20        property in the future on the development side,

21        forever, that's going to provide that same level of

22        income, correct?

23   A.   I assume that approximately once every three years that

24        a property approximately the size of Mount Olive will

25        be developed and sold, which is about the cycle for
```

```
 1        those types of properties.  And given the investment

 2        that this company is making in the development side of

 3        the business, I think that's a reasonable assumption to

 4        make.

 5   Q.   And what is the investment, in your view, they're

 6        making in that side of the business in dollar amounts?

 7   A.   It's the available cash flow from the operating side of

 8        the business, from the gains on sale, and from the

 9        distributions they get from their affiliate -- their

10        equity owned affiliate companies.

11             All of that number is approximately $4

12        million, on average, and that is plowed back into

13        the business.  And companies that do that

14        consistently get results, and it's appropriate to

15        measure that output.

16   Q.   Is it your view that if they sold one -- and your view

17        is they will never sell any of these operating

18        properties.

19   A.   I didn't say that they would never sell them.  I

20        haven't assumed that they have to achieve the results

21        and the value that I've created.

22   Q.   And you've assumed that they will find opportunities,

23        and even -- in the whole history of this company, how

24        many properties have been sold?

25   A.   I don't know in the whole history of the company.  What
```

1       I do know --

2  Q.   But didn't you go back until -- back in the '90's and

3       the early 2000's to see if, in fact -- how the

4       development side of this business has done

5       historically?

6  A.   I looked at the prior three years as being -- as being

7       precursor of the future.  I looked at the pipeline that

8       they have, and in particular Edinburg, and I felt that

9       the assumptions I made in the cash flow analysis were

10      reasonable.

11  Q.   All right.

12  A.   I think Edinburg alone has the potential of achieving,

13      because of the size of it, what their entire income

14      property portfolio is at this point in time.

15  Q.   So your basis for projecting developmental income, in

16      large part, is -- on September 15th, is based upon the

17      readings you've done about Edinburg?

18  A.   No, it's not -- that's not correct.  That's not what

19      I'm saying.  I'm saying if you look at the prior three

20      years and you look at the company's investments,

21      including Edinburg, but everything all considered, that

22      that -- I believe that the forecasted cash flow from

23      management development is appropriate.

24  Q.   What other --

25  A.   At service income they have management fees, and they

```
 1          have the development opportunities.

 2    Q.    What other property, as of September 15th, 2005, do you

 3          believe would be -- realize gain and be sold under your

 4          concept of the development company, that part?

 5    A.    Well, there's Rockland, is another potential.

 6    Q.    Potential?

 7    A.    Yes.

 8    Q.    Do you have any -- any indication or enough information

 9          to value that as of September 15th, 2005, that

10          potential?

11    A.    I didn't value it exactly as you described as of that

12          date, no.

13    Q.    In fact, you didn't describe any potentials.  You

14          didn't come to a value for any of those potentials as

15          of September 15th, 2005, did you?

16              That's just a yes or no.

17    A.    I didn't -- I did not value specifically --

18    Q.    Thank you.

19    A.    -- any of those potentials.

20    Q.    Now, in buying future properties, or attempting to buy

21          properties, have you concluded that Mr. Ellis, at his

22          age, will continue to personally guaranty every

23          development dollar the company borrows?

24    A.    I didn't make an assumption about that.

25    Q.    Well, implicit in your valuation or your theory of this
```

1          whole development concept is that they have the ability

2          to continue to buy property, correct?

3    A.    Yes, that's correct.

4    Q.    And you're well aware of the fact, are you not, that,

5          to buy property, Mr. Ellis has had to give his personal

6          guarantees?  You're aware of that, aren't you, from

7          your review of this company?

8    A.    Yes, his guarantees are used.

9    Q.    Right.  And so do you anticipate -- well, let's not be

10         crude about this, but do you anticipate that Mr. Ellis

11         is going to live forever?

12   A.    I didn't make any assumption.  I hope he does live

13         forever.

14   Q.    Yes.  And you hope -- and if he lives forever, you're

15         then assuming that he will, until the day he dies,

16         continue to personally guaranty the loans so the

17         company going forward, correct?

18   A.    Well, in cases like this, based on my experience, I

19         assume that Mr. Ellis has trustees and has an estate,

20         and that -- and that the operating properties which --

21         where he would provide, as the majority owner in

22         control, typically provides limited guarantees,

23         operating guarantees if you call them, for these

24         properties; but that in his absence that there be

25         sufficient resources which support his guaranty which

```
 1           would be available to satisfy lenders going forward,

 2           and that they would be somebody -- trustee or somebody

 3           in place to take care of it.

 4    Q.     You're just making assumptions.  You have no knowledge

 5           of this whatsoever, do you?

 6    A.     I'm making assumptions based on my experience in the

 7           industry.

 8    Q.     Do you have any experience with Mr. Ellis' estate?

 9    A.     I don't know anything about his estate.  I'm making

10           assumptions based on my general knowledge of people

11           operating in the industry.

12    Q.     So you're just guessing, right?

13    A.     I'm not guessing.

14    Q.     Now, you have never, ever been qualified as an expert

15           witness for a legal purpose in any courtroom in this

16           country, have you?

17    A.     I don't believe I have, no.

18    Q.     So when you talk about your experience, you're talking

19           about your experience in a non-legal realm.  You're

20           talking about your experience with you either owning

21           part of the company or working for the Bank of Boston,

22           correct?

23    A.     It's my industry experience from owning property, from

24           making investments, and from being involved in

25           activities at the Bank of Boston, yes.
```

```
1    Q.   If somebody was to come in and buy this -- did you

2         analyze or create an -- some type of document that

3         would demonstrate what would happen if somebody wanted

4         to come in and buy this company and there was no longer

5         a person that was willing to personally guaranty loans

6         so that the company could borrow?

7    A.   Well, for example, if we acquired the company --

8    Q.   My question was yes or no.  Have you done that?

9    A.   No, I haven't done that analysis.

10   Q.   In your deposition you said it took about 32 hours, you

11        charged for, to come up with Plaintiff's Exhibit 162,

12        correct?  Somewhere in that area.

13   A.   My billing was 32 hours.  The number of hours I spent

14        producing that, probably more, yes.

15   Q.   All right.  But less than 60?

16   A.   Probably, yes.

17   Q.   And the vast majority of the information was either the

18        appraisals or material that was publicly available,

19        correct?

20   A.   That's correct.

21   Q.   Now, explain to me why -- if the stock price is around

22        $3 a share, why you would not personally, in a company

23        that you're valuing this high, think that that was a

24        tremendous buying opportunity?

25   A.   Well, first of all, I've explained the reasons why the
```

1    stock price does not reflect the fair value of the

2    stock, and that is that it's in a liquid market.  They

3    don't pay a dividend, which is management's decision,

4    and there's a discount for control, which is -- usually

5    in a company like this, around 30 percent.

6         So the stock price does not reflect, in my

7    opinion, the fair value.  And as long as

8    management controls -- it's a very risky

9    proposition to try to gain control in an illiquid

10   marketplace, such as the pink sheet market of a

11   company of this type.

12   Q.   But you have enough confidence in management that, in

13   accord with your theory, they are going to be able, on

14   the development side of this business, basically out of

15   whole cloth, to come up with an income stream from

16   developing and selling properties for years and years,

17   correct?

18   A.   I think that my valuation -- if all they did was stop

19   after Edinburg, they would -- they would more than make

20   the value that I've represented here, plus the

21   operating properties.

22   Q.   All right.  And that is -- it's your opinion from --

23   how long have you read anything about Edinburg, total

24   amount of time spent reading anything about Edinburg?

25   A.   I've read the appraisals, and I've read the financial

```
 1       reports.

 2   Q.  All right.  And total, maybe 45 minutes in your life?

 3   A.  That's -- that's --

 4   Q.  Half hour?

 5   A.  -- that's a very serious understatement.  I've spent

 6       time reviewing these.

 7   Q.  Edinburg.

 8   A.  Edinburg, yes, I've spent more than 45 minutes

 9       reviewing.

10   Q.  And so basically other than Edinburg, are you opining

11       that there are actually -- it's good management that

12       will allow the continual finding and developing of

13       these properties?

14   A.  I think you have an organization here that includes a

15       board of directors, a team of people that are seasoned

16       in the real estate business, and that in their absence

17       there will be others who will come along.

18   Q.  All right.  And in this particular case, if, in fact, a

19       large minority shareholder was bought out, where would

20       the money come from to then develop -- number one,

21       where would the money come from.  But number two, would

22       that not strip the company of cash that would allow the

23       company to continue in development activities?  Isn't

24       it a Catch-22?

25   A.  No, I don't believe so for a company with an asset base
```

```
 1              of this size and development opportunities that are
 2              available to it that has an assets base of$150 million.
 3              Plus Edinburg and the stuff that's in the pipeline, I
 4              do believe -- the cash position and the receivables
 5              that they have now from Simon, I do believe that
 6              there's a way for them to -- I haven't done the
 7              complete analysis because we're not ready at that stage
 8              yet, but I do believe, my experience, that a company
 9              this size can find the money to do that, and they can
10              raise money, too.
11    Q.        In the continuum of a company that is not very
12              leveraged, sort of in the middle leveraged, or very
13              leveraged, where do you put this company?
14    A.        Well, the loan-to-value ratio is based on 106 million
15              against the properties, put it right within the range
16              of what you would expect to see for an income property
17              portfolio.
18    Q.        So you do not believe this is a heavily leveraged
19              company?
20    A.        No, I do not.
21    Q.        And is -- did you -- and that is based upon -- is there
22              anything in writing that you -- any calculation that
23              you've done in writing?
24    A.        It's right on my sheet.  You can see the debt, you can
25              see the value, and I know the lending practices of the
```

```
 1          lenders, Barkley's, Protective Life.  Other seasoned

 2          lenders lend, and this is within the ranges that they

 3          would do.

 4              If you look at the value of the debt relative

 5          to the book value of assets, you can come to a

 6          conclusion that there was a lot of leverage.  But

 7          if you look at the values based on the appraisals,

 8          which is the fair value of these properties, then

 9          the loan-to-value ratios are very appropriate, and

10          I would not characterize the company being

11          over-leveraged.

12   Q.     So the bottom line is you think this company could go

13          out and continue everything it does right now and

14          borrow more money without Mr. Ellis' guarantees?

15   A.     I didn't say without his guaranty or somebody's

16          guaranty.

17              They've been refinancing properties all

18          along.  In fact, they --

19   Q.     I don't think there is a question pending.

20   A.     Okay.  I'm sorry.

21              MR. NEWMAN:  Your Honor, I do want to object

22          to that interruption.

23              JUDGE HORNBY:  The answer is finished.

24              MR. NEWMAN:  All right.

25   Q.     And, sir, just so we're clear, in your analysis what
```

```
 1          people, other shareholders in this company, have paid

 2          for their stock at various times -- different prices at

 3          various times, has -- is absolutely no factor at all

 4          for you in the value of this company as of September

 5          2005?

 6     A.   I don't understand your question.

 7     Q.   You have given the fact that people have bought this

 8          stock at different times for different prices, and that

 9          the stock is approximately -- has moved, but has stayed

10          in a range, but a varying range over the years.  You

11          give that fact that there's a market for this stock no

12          weight whatsoever.

13     A.   The only time there was --

14     Q.   That's simply a yes or no.

15     A.   I don't give weight to the stock, no.  It's in a liquid

16          market, and there's a huge discount from fair value

17          based on the reasons I mentioned earlier.

18     Q.   Are you -- are you treating this company and giving no

19          value whatsoever to the stock, are you valuing this

20          stock like it's -- like it was a closely held company,

21          rather than a public company?

22     A.   I'm valuing it as I would a company that's traded in

23          the pink sheet marketplace, where trades, such as the

24          Lehman trade, of any size needs to come back to the

25          company as the buyer of last resort because there's no
```

1      other market for it.

2   Q.   So if I understand you correctly, then, that any

3        company that's a public company whose shares trade on

4        the pink sheets, that the trading volume and price has

5        nothing to do, in your opinion, with the true value of

6        the company?

7   A.   I didn't say that.  I said this company trading as it

8        does in the pink sheet market.  I can't speak for every

9        company.

10          MR. GROFF:  One moment, Your Honor.

11          JUDGE HORNBY:  Any re-direct?

12          MR. NEWMAN:  Very brief, Your Honor.

13          RE-DIRECT EXAMINATION OF GUILLIAEM AERTSEN

14   BY MR. NEWMAN:

15   Q.   Mr. Aertsen, would you please turn to Exhibit

16        Plaintiff's 127.

17   A.   You have to show me the book.

18          MR. NEWMAN:  With the Court's permission,

19        I'll come up and show it to him.

20          JUDGE HORNBY:  Yes.

21   Q.   Mr. Aertsen, Plaintiff's 127 is the First Hartford

22        Corporation financial record, the 10-Q for the period

23        ending January 31st, 2008; is that correct?

24   A.   Yes.

25   Q.   And could you turn, please, to page 14.

```
 1   A.   Yes.

 2   Q.   Directing your attention to the notes condensed

 3        consolidated financial statement of First Hartford,

 4        paragraph 8, do you see the subsequent event?

 5   A.   Yes.

 6             MR. NEWMAN:  Do you have it, Your Honor?

 7             JUDGE HORNBY:  Yes.

 8   Q.   I want to read to you, the First Hartford disclosed

 9        that on March 21st, 2008, the company terminated the

10        Simon litigation.  At the time of termination of the

11        Simon litigation, the company also entered into

12        separate agreements with Simon, pursuant to which

13        tenants of certain Simon properties for a period of

14        five years will not be restricted from operating stores

15        in the company's shopping center in Edinburg, Texas.

16        And the company will provide to Simon, for a period up

17        to five years, a right of first offer on any future

18        sale by the company of its Edinburg shopping center,

19        for which the company receive from Simon a one time

20        payment of $4 million.

21             Do you see that?

22   A.   That is correct, yes.

23   Q.   When you referred to financial statements, you read the

24        first paragraph relating to the Edinburg property

25        earlier in a question from Mr. Nolan and Mr. Groff, is
```

1          that what you were referring to, in part?

2     A.   Yes.

3     Q.   Now, what is Simon?

4     A.   Simon Property is the largest mall retailer in the

5          United States.

6     Q.   When you did your evaluation of the forecasted revenue

7          stream and free cash flow from the development

8          business, as you described for the Court earlier today

9          in Exhibit 162, you base that upon looking at a three-

10         year historical record; is that right?

11    A.   That's correct.

12    Q.   You didn't -- did you make, sir, any projections about

13         Edinburg in that?

14    A.   I did not make a specific projection about Edinburg,

15         but I was aware that Edinburg, from reading the

16         appraisals that were part of the original disclosure,

17         seeing the value there, but this is a subsequent

18         event --

19    Q.   All right.

20    A.   -- that I'm aware of today.

21    Q.   I just wanted to be clear.  In the three-year

22         historical figures you used, 2003, 2004, 2005, that was

23         the basis for your projected free cash flow.

24    A.   Yes, that's correct.

25    Q.   And you didn't include any speculation about what any

```
 1        future --
 2   A.   No, no.  I assume that they would continue in the
 3        future for what they were doing in the past.
 4   Q.   So when you describe the reference, did you then,
 5        afterward, as a check on your forecasted cash flow from
 6        the development business, look at the subsequent
 7        events?
 8   A.   Yes, I do.  And as -- as I do for every element of
 9        my -- if I can find future evidence to support the
10        assumptions I made early on, then I look for that.
11   Q.   So when you referred to other developments by First
12        Hartford since the valuation date, such as Edinburg,
13        was that the basis for which you were considering
14        those?
15   A.   Yes.
16            MR. NEWMAN:  Nothing further, Your Honor.
17            JUDGE HORNBY:  All right.
18            RECROSS-EXAMINATION OF GUILLIAEM AERTSEN
19        BY MR. NOLAN:
20   Q.   I didn't quite understand this.  The fact that First
21        Hartford settled a lawsuit against Simon somehow
22        validates an assumption you made as to the value of the
23        company as of September 15th, 2005?
24   A.   What I'm saying is that there's value in the
25        development pipeline, and that in subsequent
```

1        disclosures of the company that things likes this tend

2        to confirm the basic assumptions that I derived out of

3        2003, 2004, 2005.

4  Q.  What was --

5  A.  When I did those analyses, I used those years, and then

6        I looked -- and that's all I did.  I did not -- I did

7        not assume that something like Edinburg would happen.

8        But after I did them, I then look for evidence in the

9        future, because now we're in the future, to see whether

10       the original forecasts that I made were validated by

11       subsequent events.  And, in fact, they are.

12  Q.  And this would -- this event, settling a lawsuit, would

13       that be one of those non-recurring events?

14  A.  Yes, it would be one of the non-recurring events.

15  Q.  And what was the Simon lawsuit about?

16  A.  They were -- it was an infringement on tenants' rights,

17       contracts, as I understand it.  I have not read the

18       full litigation, but I'm familiar with this type of

19       litigation.

20         The fact that Simon would settle and ask for

21       a right of first offer, to me, based on my

22       experience, is an indication of value -- Simon

23       feels this site has value.

24  Q.  What does first offer mean?

25  A.  It means that if the company decides to sell, they have

```
 1         to go to Simon first.

 2    Q.   And Simon can make an offer?

 3    A.   And they can make an offer.

 4    Q.   And that's within five years?

 5    A.   And that's within five years.

 6    Q.   And the shopping center doesn't exist, as we speak?

 7    A.   As we speak here today?

 8    Q.   Yeah.

 9    A.   It does exist.  The center is not built, but the

10         permits are there and there's pre-leasing.  There is a

11         lot of activity on site.

12    Q.   Just so we're clear about Edinburg, as of the 15th of

13         September, 2005, the only interest that First Hartford

14         Corporation had in Edinburg was an option, but without

15         an obligation to buy the property.

16    A.   That is correct.

17    Q.   For which they had paid $50,000.

18    A.   That's correct.

19    Q.   And that was carried in the books, you think, in that

20         prepaid expense?

21    A.   That's what my understanding is, yes.

22    Q.   And that is based on --

23    A.   Well, that's --

24    Q.   -- assumptions?

25    A.   No.  It's based on the definition of the footnotes.  If
```

1         they put it in there as they describe the footnotes,

2         that's where it should be.

3    Q.   They prepaid -- you're talking about a prepaid expense.

4         The option price had been paid, correct?

5    A.   Yes.

6    Q.   In August of 2005?

7    A.   Yes.  But these are deferred expenses.  If you read the

8         expense -- if you read the definition, that's just the

9         account that that should be in.

10   Q.   An option, sir, is an ability you pay a certain amount

11        of money, and you have the option to do or not --

12   A.   Well, you can see the definition of deferred expenses

13        and this would fit that category, in my opinion.

14             MR. NOLAN:  Okay.  Thank you.

15             JUDGE HORNBY:  Thank you, Mr. Aertsen.  You

16        may step down.  Just leave the exhibits there.

17             MR. NEWMAN:  Your Honor, that would conclude

18        the Plaintiff's presentation on valuation subject

19        to our -- I'm not sure it's a reserved right, but

20        we have requested the right to present Mr. Aertsen

21        for rebuttal.

22             JUDGE HORNBY:  That comes later.  Thank you.

23             Mr. Nolan?

24             MR. NOLAN:  Thank you, Your Honor.  Mr.

25        Riddiough.

```
 1        MR. NEWMAN:  Well, at this point we're going

 2   to have look at the exhibits.  So if we can have a

 3   brief recess, Your Honor?  This was that issue we

 4   discussed this morning, that we need to see the

 5   Defense exhibits.

 6        JUDGE HORNBY:  All right.  We'll take a brief

 7   recess.

 8        (Break taken from 4:10 p.m. to 4:22 p.m.)

 9        JUDGE HORNBY:  Sir, please remain standing.

10        (Whereupon Timothy Riddiough was sworn in.)

11   CLERK OF COURT:  State your name and spell your

12   last name for the record.

13        THE WITNESS:  My name is Timothy Riddiough.

14   That's R-i-d-d-i-o-u-g-h.

15        JUDGE HORNBY:  Okay, Mr. Nolan.

16        MR. NOLAN:  Thank you, Your Honor.  I believe

17   we have an agreement on two more exhibits, Your

18   Honor.  Exhibit D-45 and D-45A, and I will

19   describe D-45A as it is entitled, errata for

20   Timothy Riddiough's March 28th, 2008 report, and

21   we delivered that to Mr. Newman yesterday.

22        MR. NEWMAN:  That is correct.  And in the

23   spirit of the Court's handling of the later

24   disclosures, we do not object to 45 and 45A.

25        JUDGE HORNBY:  Thank you.
```

```
1              DIRECT EXAMINATION OF TIMOTHY RIDDIOUGH

2         BY MR. NOLAN:

3    Q.   Mr. Riddiough, what do you do for a living, sir?

4    A.   I am a professor at the University of Wisconsin.

5    Q.   And would you please tell the Court something about

6         your background, sir -- your educational background.

7    A.   Sure.  I was -- I received a Ph.D. from the University

8         of Wisconsin in 1991 in real estate.

9              Do you want me to go further back than that?

10   Q.   Sure.

11   A.   Actually, I received all of my degrees from that

12        university.  I have an undergraduate degree in

13        business, in quantitative analysis and business

14        statistics.  I have a master's degree in finance, and

15        then the Ph.D. in real estate.

16   Q.   And what is your job at the present time?

17   A.   I am a full professor in the Department for Real Estate

18        at Wisconsin.  I hold a chair called the Plesko Chair.

19        I run the James A. Graaskamp Center for Real Estate at

20        the University of Wisconsin, as well.  I teach a couple

21        of courses, engage in research.  The usual things that

22        faculty members do.

23   Q.   What courses do you teach, sir?

24   A.   I teach a -- I teach -- the real estate center that I

25        run handles the administration of the MBA program, and
```

1          so I teach MBA students.  I teach them real estate --

2          basic real estate finance and investment, is the first

3          course they take in the MBA program.  I also teach a

4          course in mortgage securitization.  In the past I've

5          taught courses on valuation.  I teach Ph.D. level

6          courses occasionally.  I've taught courses in

7          microeconomics and corporate finance as well.

8     Q.   Prior to becoming a professor at the University of

9          Wisconsin, were you also a professor at MIT?

10    A.   Yes, I was.

11    Q.   What did you do at MIT, sir?

12    A.   I started there as an assistant professor in 1994.

13         They have a real estate center at MIT, and I

14         received -- I was promoted in 19 -- around 1997 to

15         associate professor without tenure, and then I was

16         tenured at MIT in the year 2000.

17    Q.   And you gave it up year later and went back to Madison,

18         Wisconsin?

19    A.   They made me an offer I couldn't refuse.  Let me just

20         say, for the record, that in terms of real estate,

21         Wisconsin is a perennial top three program along with

22         Wharton and Berkeley.  It may not be as well known out

23         on this coast, but it's a fabulous program.  It was

24         hard to refuse the offer.

25    Q.   Are you related to something -- involved with the Real

1          Estate Research Institute?

2     A.   Yes, I am.  I've been involved with them since day one.

3          They were formed in the early 1990's, as a liaison with

4          the industry, primarily on the commercial side of the

5          business, and pretty closely associated with

6          institutional investors.  I was -- I was an officer

7          with -- I was on the board of directors for many years,

8          was an officer, and then a few years ago I was a

9          founding research fellow at that organization.

10    Q.   Have you worked in the real estate industry at all?

11    A.   Before getting a Ph.D. -- that's how I was introduced

12         to real estate, was working for four years in the

13         mortgage insurance business prior to going back and

14         getting a Ph.D.  Since getting a Ph.D., I've been

15         involved in -- in the business in numerous capacities

16         as well.

17    Q.   Do you publish from time to time?

18    A.   Yes.  Yes.  I guess it -- it -- with more demands on

19         one's time it gets more difficult, but, yes, I've

20         published -- I'm approaching 50 articles that I've

21         published over my career.

22              The -- my primary area of focus -- I -- I

23         cover the spectrum.  I focus on commercial real

24         estate and address all phases of finance and

25         investment, aspects of commercial real estate so

1       you can -- one way to think about the topic area

2       is to divide real estate into publicly held and

3       privately held, and then -- and then also divide

4       it into dead interests and equity interests.  So

5       there's four different boxes one can play in from

6       a research standpoint, and I've played in all

7       four.

8   Q.  Over the years, have you been involved as a director of

9       any companies?

10  A.  A number of companies.  A publicly traded REIT.  A

11      privately held REIT.  I was on the board of a REIT

12      mutual fund.  I'm currently a senior advisor to a

13      private equity firm that invests in interests in

14      commercial real estate.  I'm also on what's called an

15      independent review committee for another firm that

16      is -- what's known as a mezzanine lender, subordinated

17      debt.  It's a quasi-board type of position.  I think

18      there's a couple more as well.

19  Q.  Okay.  And have you ever taught courses on real estate

20      appraisal?

21  A.  Yes, I have.  I've taught -- while I was a graduate

22      student, I taught one or two courses on real estate

23      appraisal.  And then my first job out of college, which

24      was at the University of Cincinnati, I taught real

25      estate appraisal as well.

1    Q.    And have you ever, yourself, valued real estate or

2          firms that own real estate?

3    A.    Yes.  Numerous times.

4    Q.    And have you ever testified as an expert witness?

5    A.    Just generally, or with respect to valuation?

6    Q.    Yes, generally.

7    A.    Yes, I have.

8    Q.    And is your CV set forth at the end of Exhibit D-45?

9    A.    Yes.  It's in appendix A of that exhibit.

10   Q.    And in addition to your CV, do you also list all the

11         publications that you've written and your previous

12         experience in consulting and as an expert witness?

13   A.    Yes, I do.

14   Q.    And always in the appendix -- withdrawn.

15         You had an assignment in this case, correct?

16   A.    I did have an assignment.

17   Q.    What was your assignment?

18   A.    I was to determine fair value for First Hartford

19         Corporation as of September 15th, 2005.

20   Q.    And do you list, also, in -- as an appendix to your

21         expert report, which is Exhibit D-45, documents and the

22         books, articles, and other sources that you relied on

23         in forming your opinion in doing your work in this

24         case?

25   A.    That's correct.  There's an exhaustive list of

```
 1        references.

 2   Q.   And do you have a copy of D-45 in front of you and

 3        D-45A?

 4   A.   I do, with the two errata sheets as well.

 5   Q.   Okay.  The errata sheets are D-45A, just to you know.

 6   A.   Okay.  45A?

 7   Q.   A, yes.

 8   A.   Okay.

 9   Q.   Now, could you tell the Court -- or give the Court a

10        summary of the opinions, and then we'll talk about how

11        you reached your opinions.

12   A.   Sure.

13            The basic idea was to approach the valuation

14        exercise using as a foundation the Delaware Black

15        method, three approaches to value, which I did.

16        The three approaches are market value, investment

17        value, and net asset value, which is also a

18        liquidation value.

19            I undertook all three exercises.  The -- I

20        placed most weight on the market value because

21        First Hartford is a publicly traded corporation,

22        and the trade to share price as of September 15th

23        was $3.25.  And that's my opinion, as is -- that's

24        based on market value.  That's the appropriate

25        value for First Hartford's -- for a share of their
```

1      stock as of that date.

2           The other -- the second investment

3      approach -- or the second valuation approach was

4      the investment value approach.  The idea there is

5      to look at a fore -- basically it's a discounted

6      cash flow method, and using a multiple of funds

7      from operations, an FFO multiple, and my valuation

8      on a per share basis using the investment value

9      approach is $3.05 per share.  The -- which I

10     accorded some weight, but much less weight than I

11     did with the market value approach.

12          The third is the net asset value or

13     liquidation approach, and the idea there is to

14     value the assets of the firm as if it liquidated

15     and sold everything off piecemeal.  Also

16     accounting for all the transaction costs and taxes

17     associated with such a liquidation, and as well as

18     non-real estate assets, cash, that sort of thing,

19     that might carry over in liquidation.  And my

20     valuation conclusion there is on a per share basis

21     that the -- that First Hartford Corporation has a

22     value indication of $2.74.

23          So with the three methods -- $3.25 for the

24     market value, $3.05 for the investment value,

25     $2.74 for the net asset liquidation value -- I

1          then applied weights.  I gave an 80 percent weight

2          to the market value approach.

3               The literature is -- relevant literature is

4          very clear that if you've got a publicly traded

5          corporation with arm's-length transactions that

6          one should accord most, if not all the weight, to

7          the market value.  So as a consequence, I did not

8          accord all the weight, I accorded 80 percent of

9          the weight to the market value because, although

10         First Hartford's stock is traded, it's a bit

11         thinly traded, but it's traded nonetheless.

12              Then the other two approaches, I determined

13         there was some information value associated with

14         them, although they were very imprecise estimates,

15         had a speculative nature to them, and I accorded

16         10 percent weights to each of those two pieces.

17              When you take a weighted average of the

18         values associated with the three different methods

19         with the weights, you get a per share price of

20         $3.18.

21              Then I wanted to account for the fact that

22         there was a 10 cent per share dividend paid out

23         roughly six months after the valuation date.  So

24         that's been returned to the shareholders already.

25         So you subtract off the 10 cents per share, and

1   the final value that I determined was $3.08 per

2   share.

3 Q. Okay.  Could you tell the Court how you went about the

4   work that underlies those conclusions that you just

5   gave?

6 A. You're talking about the work day to day?

7 Q. Yes.  What did you do?

8 A. Yes.  I worked with -- let me say, first of all, I

9   worked with an economic consulting organization called

10   Analysis Group.  It's a group I've worked with before.

11   It's an organization that the folks that work for

12   that -- for Analysis Group are primarily Ph.D.'s and

13   masters' degrees in economics.  They're very competent

14   at what they do.  They worked under my direction in

15   this case.

16 Q. What did you direct them to do, various tasks?

17 A. Various tasks.  Basically I -- I dealt with the high

18   level kinds of issues, the methodology, the logic

19   behind the approach, making sure that the value

20   conclusions were properly supported, and then I

21   utilized this team of economists at Analysis Group to

22   help me support my opinion.  They did a lot of detailed

23   analysis, again under my direction.

24 Q. And what methodology did you -- methodologies did you

25   employ, sir, in performing the tasks necessary to reach

```
 1        your conclusions?

 2   A.   Well, I think I would describe the methodologies as at

 3        a high level; the three basic approaches to value that

 4        I outlined a few minutes ago.  The market value

 5        approach, the investment approach, and the net asset

 6        value liquidation approach.  And each of those

 7        approaches has a methodology attached with it, and so,

 8        again, I wanted -- I directed the team to approach the

 9        valuation exercise appropriately.

10            I can get into -- I can get into the detail

11        of each one of these, if you'd like.

12   Q.   Yes, I would like you to do that.  And we'll just --

13        just before we do that, are the methodologies that you

14        employed in arriving at your conclusions, are those

15        standard methodologies in the field?

16   A.   Yes, they are.

17   Q.   Are they methodologies that are written about?

18   A.   Yes, they are.

19   Q.   And have they been subjected to peer review?

20   A.   These particular -- they have, in general terms.

21        One -- because any exercise requires a certain amount

22        of customization, there are certain aspects to the

23        analysis that might appear unique.  But the general

24        approach to each of these is well known, and I believe

25        well tested.
```

1    Q.    Okay.  And which of the three methods involve what you

2          call the unique -- or have unique aspects to them.

3    A.    Well, I'd say the market value approach was very

4          straightforward; that that was looking at the share

5          price, making a determination of whether the share

6          price as of the valuation date, the trades around that

7          date appeared to be -- there was nothing funny going

8          on, that they appeared to be reliable trade share

9          prices.  Beyond that, it was a pretty straightforward

10         exercise.

11              With the investment value approach, that was

12         a little bit involved because one has to come up

13         with a cost of capital -- using comparables, using

14         firms that are comparable as best you can for

15         First Hartford Corporation, you have to make

16         adjustments to those comparables to account for

17         differences in risk and other important

18         characteristics to determine appropriate

19         multiples.  So there I used what I would

20         characterize as standard adjustments, but the

21         approach we took had some unique aspects to it.

22              So that would be one place in my analysis

23         that I would describe as undertaking something

24         that was a little bit specific.

25              The NAV liquidation approach, there was a

```
 1          tremendous amount of detail associated with that,

 2          but I don't think there was necessarily anything

 3          that was non-standard.

 4    Q.    Okay.  Was it relevant to your analysis that First

 5          Hartford Corporation is a publicly held company?

 6    A.    It was central to my analysis.

 7    Q.    Why is that?

 8    A.    Well, when you've got a publicly traded corporation,

 9          you have shares that trade, in this case on the

10          exchange and arms length among shareholders, and these

11          share prices are based on investment backed

12          expectations.  Investors are putting their own money on

13          the line, and it's a -- it's an excellent indicator of

14          value.

15               There is literature that I'm aware of that is

16          associated with this that backs this, Easterbook

17          and Fischel.  I reviewed their book very closely.

18          Hirschman has a classic book on Exit Loyalty and

19          Voice.  There is another Fischel article written

20          in 1983 that discusses this that I quote in my

21          report as being relevant as well.

22    Q.    You are, are you not, aware of the fact that the

23          plaintiff in this case, Mr. Kaplan, has been determined

24          to be an oppressed shareholder?

25    A.    I'm aware of that, yes.
```

1   Q.   Now, how many -- did you determine how many outside
2        shareholders First Hartford had?
3   A.   It varies, but I believe it's something like 800ish.
4   Q.   And let's, then, move to a discussion of the market
5        value of the stock.  I'd like you to explain to the
6        Court what you did, and, perhaps if it's helpful -- and
7        I know there are some exhibits attached to your report,
8        Exhibit 45, that as you -- explain what you did and you
9        may point those out to the Court, and the rest of us
10       can follow along as well, please.
11  A.   Sure.
12  Q.   Yes.
13  A.   Would you like me just to take you through the report?
14  Q.   I'd like you to take us through the market value
15       portion.
16  A.   It starts on page 7.
17            So, actually, before the market value approach,
18       there's some foundation issues that I discuss.  We've
19       hit on a few of those.
20            In paragraph 15 of my report I talk about
21       some of the academic literature.  I quote Thomas
22       2000 about this market out concept where if there
23       exists a liquid efficient market in a company's
24       securities, a dissenting shareholder has no need
25       for an appraisal right.

```
 1              JUDGE HORNBY:  If you're going to read, you

 2         have to go slower.  The court reporter has to take

 3         it down.  But I can read it, so it would be more

 4         helpful if you can tell us some things that aren't

 5         in it.

 6              THE WITNESS:  Sure.

 7    A.   If you've got traded shares, the bottom line is that --

 8         as I mentioned earlier, you've -- that's a reliable

 9         indication of value.  You've got investment-backed

10         expectations being set in a market based on

11         arm's-length transactions.

12              Fischel talks about the fact that even

13         isolated trades, if at arms length, are a reliable

14         indicator of value.  And I also note in this

15         section that basically First Hartford is not a

16         closed corporation, in a classic sense.

17         Particularly there's traded shares, there's a

18         broad number of shareholders, and Mr. Kaplan is --

19         is an investor.  He's not involved in the

20         day-to-day management like some minority

21         shareholders are.

22    Q.   Now, Exhibit 1 to your report at the back is a

23         depiction of the number of shareholders for a period --

24         basic period of time as listed on that exhibit?

25    A.   Yes, just a moment.  Let me find it.
```

1              Yes, it is.  1997, 2006.

2    Q.   And that -- that data was based on the records the

3         corporation has to the number of shareholders?

4    A.   That's correct.  First Hartford 10-K's.

5    Q.   Now, you said, a few moments ago, that First Hartford

6         stock was traded on an exchange.  What did you mean

7         when you said that?

8    A.   It's traded on an exchange.  It's known as pink sheets.

9         It's an Internet-based, over-the-counter exchange.

10        It's the -- it's known as the Premier over-the-counter

11        exchange.  There are -- functions in certain ways like

12        other exchanges.  There are Market Makers who hold

13        inventories of stock who are willing to make a market

14        for the stock when sellers approach.

15             It has -- there's a number of smaller

16        companies generally that are listed on this

17        exchange, although there are some -- also some

18        rather large companies listed as well.

19   Q.   What sorts of large companies come to mind?

20   A.   Well, there's some foreign companies, will utilize this

21        exchange primarily.  They don't want to mess around

22        with being listed, going through the hassle of being

23        listed on the NASDAQ or New York Stock Exchange.

24   Q.   For example, some of the larger banks in Europe --

25   A.   That's correct.

```
 1    Q.   -- trade on the pink sheets?

 2    A.   That's correct.  That's my understanding.

 3    Q.   Now, did you attempt to determine the trading volume

 4         for First Hartford stock for a period of time?

 5    A.   Yes, I did.

 6    Q.   And is that shown on one of your exhibits, the trading

 7         volume?

 8    A.   Yes.  You can see that on Exhibit 2.  It shows monthly

 9         trading volume from January 2000 through September

10         2005.  And the average trading volume over that period

11         on a monthly basis was calculated as over 5,000 shares

12         of stock being traded per month.

13    Q.   And what was the source of that data?

14    A.   Bloomberg.

15    Q.   Now, the pink sheets market, is -- is there a concept

16         of liquidity in looking at another marketplace for

17         securities?

18    A.   Certainly.  Liquidity, in general, you can think of as

19         the ability to convert an asset into cash within

20         something close to its fundamental value within a

21         reasonable period of time.

22              And again, as I mentioned, First Hartford is

23         admittedly a thinly traded stock.

24    Q.   What does that mean?

25    A.   Its trading volume, by either absolute metrics or
```

```
 1            relative metrics, relative to the shares outstanding,

 2            tends to be on the low side.  So it's, admittedly,

 3            thinly traded, but it's traded, nonetheless, on an

 4            exchange that makes markets for shares of stocks.

 5                 So, you know, the next step is a conclusion

 6            regarding the liquidity of the stock, which is

 7            that there's good liquidity in these shares of

 8            stock -- not perfect liquidity, but good

 9            liquidity.

10    Q.     And in addition to transactions on the stock

11            exchange -- or on the pink sheets, excuse me, were you

12            made aware of any other -- other kinds of transactions

13            in the stock?

14    A.     In this stock?

15    Q.     Yes.

16    A.     I'm not sure -- I don't understand the question.

17    Q.     Were there any private sales that you became aware of?

18    A.     Oh, you're -- I'm aware of a Lehman Brothers sale that

19            occurred shortly after the valuation date.

20    Q.     All right.  We'll talk about that in a minute.

21    A.     Yeah.

22    Q.     Would you explain to the Court, please, what Exhibit 3

23            is to your report.

24    A.     Yes.  It's an exhibit that shows the -- from October

25            1st, 2004, through -- appears to be the end of
```

```
 1           September, it's a little bit after -- shortly after the

 2           valuation date of the 15th.  It shows the share

 3           price -- First Hartford's share price along the top

 4           there, the darker line.  Then along the bottom on the

 5           right-hand side access, we show where -- where I show

 6           the volume of the stock.

 7                And you can see on this -- and you can see on

 8           this graph that the share price, as of September

 9           15th, was $3.25.  It ranged over this period from

10           between roughly $2 a share and $4.00 a share.

11    Q.     And did you make any analysis of the trading patterns

12           in relationship to any events that occurred that

13           involved First Hartford?

14    A.     I didn't spend a lot of time on that, but certainly the

15           trading patterns were sometimes associated with

16           information events, sale of -- release of financial

17           statements, sales of assets.  You know, obviously the

18           largest blip here is -- occurred just after the

19           valuation date, and that's what's associated about the

20           Lehman's Brothers transaction.

21    Q.     What's the Lehman Brothers transaction?

22    A.     Lehman Brothers sold something like 30,000 shares of

23           stock.  I have to look back, but -- a good block of

24           stock, just after the valuation date.

25    Q.     Okay.  I was calling your attention to footnote 14 on
```

1           page 9.  Does that refresh your recollection as to the

2           detail of the Lehman Brothers transaction?

3    A.     Yes, it does.  So there were 36,892 shares sold by

4           Lehman Brothers at $250 a share.

5    Q.     And just so the record is clear, what's Lehman

6           Brothers?

7    A.     They're currently an investment bank.  There's rumors

8           they may not be around much longer, but they're hanging

9           in there.  One can characterize them as a sophisticated

10          investor.

11   Q.     Okay.  And did you conclude that this was an

12          arm's-length transaction?

13   A.     The ultimate transaction was something less than arms-

14          length.

15   Q.     Why is that?

16   A.     Well, it's my understanding that Lehman Brothers looked

17          at the market to sell their shares of stock and had

18          some difficulty, and then approached management to see

19          if management was interested in purchasing the shares

20          of stock.

21              So because management was directly involved

22          with the sale, I'd characterize it as something

23          less than arms-length.

24   Q.     But do you have any indication that Lehman Brothers was

25          anything other than a willing seller?

1    A.    I don't have any indication they were selling under

2          duress, not at this point in time.  They were -- I

3          don't know -- I don't have the information that --

4          specifically as to why they were selling their shares

5          of stock.  They -- it could be something -- I could

6          speculate, which is that they -- it could be

7          something -- they make a market for the stock, they had

8          excess inventory that they wanted to unload.  Could be

9          some other reason.

10   Q.    Okay.  And what was the value that you settled on,

11         then, for the market value as of September 15th?

12   A.    It was the listed share prices as of that date, which

13         was $3.25.  There was nothing that indicated to me that

14         that was an inappropriate value to settle on.

15   Q.    And, obviously, the Lehman price was a discount to the

16         market price, even though it happened shortly after; is

17         that fair to say?

18   A.    Yes.  That's fair.

19         MR. NOLAN:  I'm about to start something

20         else.

21         JUDGE HORNBY:  We can recess as long as we're

22         on schedule.  How are we doing in terms of time?

23         MR. NOLAN:  With this witness, I'm confident

24         that I will get him within my allotted time.

25         JUDGE HORNBY:  All right.  And, Counsel, are

```
 1          you -- I need to do a conference call at 4:00

 2          tomorrow, which will take me half an hour.  We can

 3          resume, but do you think we might be done by 4:00?

 4               MR. CULLEY:  What's the allotted time?

 5               JUDGE HORNBY:  Why don't you confer amongst

 6          yourselves and tell me.

 7                    (Discussion off the record.)

 8               MR. NOLAN:  I believe we are fine on time.  I

 9          will finish in due time.

10               JUDGE HORNBY:  We will recess for the

11          evening.  Have a pleasant evening everybody.

12               (Whereupon the Court recessed at 4:47 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       CERTIFICATE

 2            I, Daphne G. Estes, a Notary Public in and

 3       for the State of Maine, hereby certify that this

 4       day of trial was stenographically reported by me

 5       and later reduced to print through Computer-Aided

 6       Transcription, and the foregoing is a full and

 7       true record of the testimony given by the

 8       deponent.

 9            I further certify that I am a

10       disinterested person in the event or outcome of

11       the above-named cause of action.

12            IN WITNESS WHEREOF I subscribe my hand

13       this       day of            , 2008.

14       Dated at Old Orchard Beach, Maine.

15

16

17

18                       Notary Public

19       My Commission Expires
         October, 2014.
20

21

22

23

24

25
```