1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF MAINE

3    _____

4    RICHARD E. KAPLAN,                CIVIL ACTION

5              Plaintiff        Docket No:  05-144-B-H

6

7         -versus-

8

9    FIRST HARTFORD CORPORATION
     and NEIL ELLIS,
10             Defendants
     _____
11
                    Transcript of Proceedings
12
     Pursuant to notice, the above-entitled matter came on
13   for **Videotape Testimony of Guilliaem Aertsen** held
     before **THE HONORABLE JOHN H. RICH, III,** United States
14   Magistrate Judge, in the United States District Court,
     Edward T. Gignoux Courthouse, 156 Federal Street,
15   Portland, Maine, on the 24th day of September 2008 at
     9:06 A.M. as follows:
16
     Appearances:
17
     For the Plaintiff:  Thomas C. Newman, Esquire
18                       Sarah A. McDaniel, Esquire
                         Robert Rothberg, Esquire
19   For the Defendant
     First Hartford:     John B. Nolan, Esquire
20                       Peter W. Culley, Esquire

21   For the Defendant
     Neil Ellis:         Joseph H. Groff, III, Esquire
22
     Amicus:             Robert W. Frank, Esquire
23
                      Lori D. Dunbar, RMR, CRR
24                    Official Court Reporter

25         (Prepared from manual stenography and
                computer aided transcription)

1                          **I N D E X**

2     **Witness**                    **Direct  Cross  Redirect  Recross**

3     Guilliaem Aertsen             --    3, 86      11        121

4

5

6                          **E X H I B I T S**

7     **Number**            **Description**              **Page/Admit**

8     Plaintiff's

9          165             Document                     111

10         166             Document                     111

11         167             Document                     111

12         168             Document                     111

13         169             Document                     111

14    Defendant's

15         74              Glossary                      44

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2            THE COURT:  All right, good morning, Counsel.
 3   This is a continuation of the valuation hearing in the
 4   matter of Kaplan versus First Hartford Corporation, et
 5   al., Docket No. 05-CV-144-B-H.  We are here for the
 6   continued testimony, specifically the cross-examination
 7   of Mr. Aertsen, who was called as a rebuttal witness on
 8   the second day of the valuation hearings in this matter
 9   back on July 25th.  Mr. Aertsen is present.
10        Mr. Aertsen, I remind you, please consider
11   yourself to still be under oath.
12                THE WITNESS:  Yes.
13                THE COURT:  And with those preliminaries out
14   of the way, cross-examination of the witness will be in
15   order.
16                MR. NOLAN:  Thank you, Your Honor.
17                      CROSS EXAMINATION
18   BY MR. NOLAN:
19   Q.    Mr. Aertsen, we were last here I think in the end
20   of July, July 25th, and you put on your rebuttal
21   testimony -- what was called your rebuttal testimony;
22   do you recall that?
23   A.    Yes, I do.
24   Q.    Have you read that testimony?
25   A.    Yes, I have.
```

1    Q.    When's the last time you read it?

2    A.    Early this morning.

3    Q.    And do you recall that essentially there were two

4    topics of that testimony?  The first one was

5    Exhibit 162 and dealt with the nonoperating assets of

6    First Hartford Corporation, and the second was your

7    view of the dividend-paying capacity of First Hartford.

8    Do you recall those in general?

9    A.    I believe that is correct, yes.

10   Q.    Okay.  In addition to reading the testimony of --

11   excuse me, in addition to reading the transcript of

12   your testimony, did you do anything else to prepare for

13   this morning?

14   A.    I reviewed -- I just went back and reviewed the

15   prior testimonies from the prior hearings.

16   Q.    You mean the testimony of Mr. Kaplan and

17   Dr. Riddiough and Ms. Fannon?

18   A.    From the court hearing we had in July.

19   Q.    Okay.  And when did you do that?

20   A.    During the last several weeks.

21   Q.    Did you do anything else?

22   A.    No.

23   Q.    Did you read Nancy Fannon's supplemental

24   disclosure?

25   A.    Yes, I did look at those.

1    Q.    And what was your purpose in doing that?

2    A.    They were just sent to me and I was asked to

3    review them.

4    Q.    Now, do you have Exhibit 162 in front of you?

5    A.    Yes.

6    Q.    And Exhibit 162 is called enter -- going concern

7    value, enterprise discounted cash flow, paren, DCF

8    model for multi-business company; is that right?

9    A.    That's correct, yes.

10          THE COURT:  Do you have a copy of that?

11          MS. MCDANIEL:  I'll allow you to use my copy.

12   I apologize, Your Honor.

13          THE COURT:  Not at all.  Go ahead, I'm sorry.

14   BY MR. NOLAN:

15   Q.    And it's my understanding that Exhibit 162 is

16   a -- part of what you call the enterprise discounted

17   cash flow model that's set forth in the -- what we've

18   been calling the McKinsey text?  That's your position,

19   correct?

20   A.    Well, this is my enterprise discounted cash flow

21   model, and it's predicated on themes that come out of

22   the McKinsey text, yes.

23   Q.    And when you say themes, what do you mean by

24   themes?

25          MR. NEWMAN:  Excuse me, I'm going to object to

1    beyond the scope of the direct.  The only issue

2    addressed, if I -- the only issue addressed in the

3    rebuttal testimony were the issues raised by Ms. Fannon

4    relating to the nonoperating assets and whether they

5    were used in the means of production.  That was the

6    only scope that --

7              MR. NOLAN:  I disagree, you put this --

8              MR. NEWMAN:  This is reopening the cross all

9    over again.

10             MR. NOLAN:  You put this exhibit in; I think

11   I'm entitled to ask him, because my recollection of the

12   testimony is that he moved some numbers around and came

13   up with 162.  That was the purpose of putting 162 in

14   evidence.  I think I'm entitled --

15             THE COURT:  I'll overrule the objection; 162

16   was discussed on the 25th of July.

17   BY MR. NOLAN:

18   Q.    My question was, what do you mean, themes?

19   A.    These are -- these are cash flow based analyses,

20   and there are broad themes expressed in the McKinsey

21   book about the -- the composition of these that are --

22   that are -- that these are based on.

23   Q.    And in plain English, you've added some elements

24   in Exhibit 162 that are not included in the McKinsey

25   definition of enterprise free cash flow, correct?

1    A.    Well, I'm not sure.  Maybe you could tell me

2    which ones I've added.

3    Q.    Okay.  Well, maybe we can -- you can just explain

4    a couple of the entries.

5          Would you look at Exhibit 162, work sheet

6    No. 1, which is the second page.

7    A.    Yes.  Work sheet No. 1 or 2?

8    Q.    No. 1, please.

9    A.    Okay.

10   Q.    And what is work sheet No. 1?

11   A.    This is the -- for years 2003, 2004, 2005, the

12   cash flow revenues less expenses from other operating

13   units, I call it, management, development,

14   construction, finance.

15   Q.    All right.  And this other -- what's -- there are

16   two operating units, according to your view of First

17   Hartford Corporation?

18   A.    There are -- there are two businesses, if that's

19   what you mean.  There's an income property portfolio,

20   and then there is a development business which is --

21   this relates to.  There is also corporate overhead

22   expenses, and then there's other assets on the balance

23   sheet.

24   Q.    And you're familiar, of course -- and I think we

25   discussed this at length.  You are familiar with the

1    public filings of First Hartford Corporation.

2    A.    I'm familiar with some of the public filings.

3    Q.    And in fact some of the numbers on Exhibit 1 come

4    out of those public filings, correct?  That was the

5    source of your numbers?

6    A.    I believe that all of the numbers come out of --

7    in fact, they're referenced on Page 22 of the 10-K, of

8    the 4/30/05 10-K.

9    Q.    And you are familiar with the 10-K because you've

10    read it.

11    A.    Yes, I have.

12    Q.    Okay.  And it's fair to say that First Hartford

13    does not consider that it has two lines of business;

14    the 10-K says that First Hartford has one line of

15    business, correct?

16    A.    I don't believe it says that.

17    Q.    All right.  Looking now at the revenue portion of

18    Exhibit 1, you have something that you characterize as

19    nonrecurring.  What does nonrecurring mean, sir?

20    A.    Nonrecurring means for that particular item that

21    management considers it to have been a one-time event.

22    Q.    And do you know what those one-time events were

23    that you've listed for the year 2003, $262,484?

24    A.    I don't remember the specific ones; I'd have to

25    go back and look.  But they -- many of them related to

1    settlements from litigation and other activities of

2    that sort.

3    Q.    Do you know what the 137,646 for 2004 in the

4    nonrecurring line is?

5    A.    No, I don't remember.

6    Q.    Do you know what the 2005 nonrecurring revenues

7    of $807,950 --

8    A.    I don't remember them without looking back at the

9    footnotes.

10   Q.    Could those nonrecurring events be the proceeds

11   of refinances?

12   A.    I -- I would have to go back and look at the

13   financials.

14   Q.    Do you know whether or not First Hartford

15   Corporation or any of its subsidiaries refinanced any

16   obligations in 2003, 2004, or 2005?

17   A.    I'm sure that companies like this finance and

18   refinance so I'm sure they did, but I don't -- I don't

19   have the specific ones in front of me, no.

20   Q.    And is it your understanding that the proceeds of

21   refinances are a proper element for calculating free

22   cash flow?

23   A.    If -- if the proceeds of refinancings have -- are

24   net after payment of all related obligations, then they

25   can be included in free cash flow, yes.

1   Q.    And I take it you also conclude that net gains on

2   real estate sales should also be included in free cash

3   flow.

4   A.    If -- again, if they're net of all related

5   expenses and all other obligations have been satisfied,

6   then it is a net gain and it should be included in free

7   cash flow, yes.

8   Q.    And do you think that use of long proceeds from

9   real estate mortgage refinances and the sale of real

10  estates are -- and including those in revenues when

11  you're calculating free cash flow is consistent with

12  the McKinsey and company valuation text?

13  A.    If -- if -- these are revenues that come directly

14  from the company's financial reporting.  So if they're

15  booked as a revenue then -- and they're net of related

16  expenses, which are below, then it is a -- the net

17  between the revenues and the expenses would be part of

18  free cash flow, yes, in my opinion.

19  Q.    I understand that's your opinion and your

20  definition of free cash flow.  My question was a

21  different one, sir.  My question was whether your view

22  of free cash flow as set out on Exhibit 162, at least

23  on the revenue side, is consistent with the definition

24  of free cash flow in the McKinsey text.

25  A.    Well, I need to look at the definition of free

1    cash flow in the McKinsey text.  But I believe that

2    this is consistent with the overall themes in the

3    McKinsey text, yes.  I'm not sure what you're referring

4    to.

5    Q.    Well, we're coming back again to the word themes,

6    and the text, which is something that you said you have

7    relied on in all of your business career, correct?

8    A.    That's correct, yes.

9    Q.    You say you relied on it.  And until the end of

10   your testimony on Friday, that's the only text that

11   you -- the Friday, July 25th, that was the only text

12   that you referred to in your testimony both at trial

13   and at deposition, correct?

14   A.    And my own business experience, yes.

15   Q.    And your own business experience.

16   A.    Yes.

17   Q.    That's the only one you've ever used, right?

18   A.    That's the one I've referenced, yes.  It's the

19   basis of my business career, yes.

20   Q.    And some -- I guess another way of perhaps asking

21   the question and getting to the heart of this, you're

22   saying that Exhibit 162 and in particular the revenue

23   portion of this that we've discovered, you're saying

24   it's consistent with the themes in the McKinsey text.

25   A.    Well, if you can refer to a specific example in

1    the text, again, to be clear, this is a free cash flow

2    that I have derived from the 10-K of the company, and

3    it is an expression of their revenues for this -- these

4    time periods, less the expenses, and -- and I'm relying

5    on the company's reporting to tell me what their

6    revenues and expenses are.  And if -- if the revenues

7    are properly reported by the company and the expenses

8    are properly reported by the company, then the

9    difference would be an expression of the free cash flow

10   in my opinion.

11   Q.    Okay.  And -- I will leave it at that.  I'll ask

12   one more question.

13         Is the free cash flow as used in McKinsey a

14   measure of operating performance?

15   A.    I don't know what you mean by operating

16   performance.

17   Q.    You don't understand what operations of a company

18   are.

19   A.    I do understand what operations of a company are.

20   I don't know what you mean by operating performance.

21   Q.    Tell me what you think operations of the company

22   means, please.

23   A.    Well --

24         MR. NEWMAN:  I'm just going to object to the

25   form of the question.

```
 1           THE COURT:   Overruled.   Overruled.
 2    A.     The operations of the company would be the
 3    various businesses they're in.  So, for example,
 4    they're in the income property business, the operations
 5    of the income property business would be owning and
 6    operating and managing, administering commercial real
 7    estate that's -- that's fully developed, such as in
 8    their income property portfolio.  The operations of the
 9    company that relate to their management, development,
10    construction, finance activities would be reflected by
11    the operations behind these revenues and expenses
12    listed on work sheet No. 1.  So they would deal with
13    management, construction, the buying and selling of
14    real estate, the financial activities relating to the
15    management of the debt and derivatives relating to that
16    activity, and -- and all of the expense that relate to
17    those activities.  The general and administrative
18    expenses would have operations as well, such as
19    managing their corporate head office.  That's what I
20    think of operations of businesses.
21    Q.     Okay.  And First Hartford Corporation is not a
22    real estate investment trust, is it?
23    A.     It is not.
24    Q.     It is a -- it's a lot of things, but it's also a
25    C corporation, correct?
```

1    A.    It is a C corporation.

2    Q.    And what is a C corporation?

3    A.    It's a -- it's a -- it's a form of organization,

4    legal form of organization, that's shareholder based

5    and is a corporate form of ownership, as opposed to a

6    real estate investment trust or a limited liability

7    company or a limited partnership, which would be other

8    forms of ownership for commercial real estate.

9    Q.    We're going to be talking about real estate

10   investment trusts a bit this morning, and if I use

11   the -- the term REIT, R-E-I-T, all caps, will you

12   understand that to mean a real estate investment trust?

13   A.    Yes, I do.

14   Q.    And in general terms is there any difference

15   between the -- I'm not talking about structure, I'm

16   talking about the business -- is there any difference

17   in general terms of the business conducted by First

18   Hartford Corporation and the business conducted by a

19   real estate investment trust?

20   A.    There are some differences.

21   Q.    What are the differences?

22   A.    Well, there's a tax difference.

23   Q.    Okay.  Okay, anything else?

24   A.    Yes, the -- the business mix in a real estate

25   investment trust emphasizes income property ownership.

1    And in a real estate -- typically in a real estate

2    investment trust the -- these are self-administered,

3    self-advised portfolios of income properties of a

4    specific type, such as retail or apartments or hotels

5    or commercial buildings, office buildings.  But they're

6    typically income properties.  So the -- the business

7    mix of the assets and the business mix of the

8    businesses are oriented around income property

9    ownership.

10   Q.    Okay.

11   A.    As opposed to the -- a company such as this that

12   has a developmental side where it is, in addition to

13   owning income properties, is also developing,

14   constructing, and selling actively commercial

15   properties.

16   Q.    One of the businesses of First Hartford

17   Corporation is that it builds -- builds properties?

18   A.    It -- yes, it does.

19   Q.    Constructs them?

20   A.    Yes.

21   Q.    And it holds them and sells them, correct?

22   A.    Yes, it does.

23   Q.    And real estate investment -- withdrawn.

24         Then is the only distinction between the

25   business -- and I'm not talking about tax and I'm not

```
 1    talking about structure, I'm just talking about the
 2    business operations -- is that the business operation
 3    of First Hartford Corporation includes a construction
 4    factor?
 5    A.    No, REITs will construct -- many of them will
 6    construct their own, but it's more of a build and hold
 7    as opposed to a build and sell type of strategy.
 8    Q.    Okay.  But REITs build, buy, hold, and sell real
 9    estate, correct?
10    A.    They do.  But I'm saying that --
11    Q.    That's --
12    A.    Okay.
13    Q.    You've answered my question.
14          MR. NEWMAN:  I'd ask the witness be allowed to
15    finish his answer.
16          MR. NOLAN:  I think the question was answered.
17          THE WITNESS:  No, I had more to say.
18    BY MR. NOLAN:
19    Q.    Go ahead, please say whatever you want.
20    A.    The mix of -- of -- in a typical REIT is building
21    and holding for its own account.  The mix here is both
22    to do that and to build and sell.
23    Q.    You're not saying that REITs don't sell
24    properties, are you?
25    A.    No, but I'm saying the mix -- the -- this is a
```

```
 1    mix that has more balance between the build and hold

 2    and the build and sell.

 3    Q.    And what's the difference in the mix?

 4    A.    Well, in other words, the total revenues that

 5    come from the build and hold and the total revenues

 6    that come from the build and sell, the build and sell

 7    part of this business is more than you would find in a

 8    typical real estate investment trust.

 9    Q.    And how many -- how many properties has First

10    Hartford built and sold in the last 20 years?

11    A.    Well, I'm -- the years that I looked at there

12    were two major ones.  There was Mt. Olive and there was

13    Bangor.

14    Q.    And who built Mt. Olive?

15    A.    Well, the -- if I -- let me correct my statement

16    to say sell.  They acquired and sell -- when I say

17    build, it could also mean acquired and sell.

18    Q.    When was Mt. Olive acquired?

19    A.    I don't have a date for that.

20    Q.    When was it sold?

21    A.    I believe it was 2004.

22    Q.    How long did First Hartford hold that property?

23    A.    I would have to look at the --

24    Q.    The answer is you don't know.

25    A.    I don't know.
```

1   Q.    And in fact you've never attempted to find out,

2   have you?

3   A.    I -- I -- I don't have the information in front

4   of me.

5   Q.    My question was a different one, sir.  Have you

6   ever attempted to find out how long First Hartford held

7   that property?

8   A.    I -- I've looked at the financial records in this

9   company from 2002 to 2007, and if it preceded that date

10  I -- I didn't look beyond that.

11  Q.    You didn't think that was important?

12  A.    Not for the purposes of this analysis.

13  Q.    Okay, do you have Exhibit 169 in front of you,

14  sir?

15  A.    Let's see.  Yes, I do.

16  Q.    And what is Exhibit 169?

17  A.    This is my second supplemental and rebuttal

18  expert disclosure.

19  Q.    And that was dated July 21st, 2008, correct?

20  A.    Yes.

21  Q.    Did you write that?

22  A.    Yes, I did.  It was -- I just would say that it

23  was prepared -- I wrote it and it was subsequently

24  rewritten by Tom Newman's law firm.

25  Q.    When did you write it?

1    A.    Sometime before I submitted it.

2    Q.    I appreciate that, sir.  When -- do you recall

3    when you wrote it?

4    A.    I don't remember the exact date.

5    Q.    Okay.  21st of July was the Monday before the

6    court hearing, correct?

7    A.    That is correct.

8    Q.    The court hearing was the 24th and the 25th.

9    A.    Yes.

10   Q.    How long before the 21st did you write this?

11   A.    I really don't remember the date.  It may have

12   been several weeks before.

13   Q.    Several weeks before.

14   A.    Yeah.

15   Q.    And how is it that you came to write Exhibit 169?

16   A.    I don't know what you mean by how it was that I

17   came to write.

18   Q.    Did somebody ask you to write it?

19   A.    No.

20   Q.    Why did you think you were going to have a second

21   supplemental and rebuttal expert disclosure?

22   A.    I -- I was looking for a cross-check to my other

23   analysis as a way of just checking to make sure that I

24   was in the right ball park, and that's where I did

25   this.

```
 1    Q.    Did you go to Nancy Fannon's deposition?

 2    A.    I don't remember when that was.  Oh, the

 3    deposition in July.

 4    Q.    Did you go to Nancy Fannon's deposition?

 5    A.    The one in July in this courtroom, yes.

 6    Q.    Not -- not the trial, the deposition.

 7    A.    I don't believe I did.

 8    Q.    Okay.  You went to Mr. Riddiough's deposition in

 9    Boston, correct?

10    A.    Yes.

11    Q.    You didn't come to Nancy Fannon's deposition,

12    which I believe was taken here?

13    A.    Yes, I did, I'm sorry, I did go, yes.

14    Q.    Okay.  Where -- was that taken at Mr. Culley's

15    office?

16    A.    Yes, it was, I'm sorry.  Yes, I did.

17    Q.    And do you know what the date of that was?

18    A.    I don't remember the date.

19    Q.    How long before the trial was it?

20    A.    It was -- I don't remember the date.

21    Q.    How long did it take you to write Exhibit 169?

22    A.    I would say a day, maybe, two.

23    Q.    You wrote Exhibit 169 after the deposition of

24    Nancy Fannon, correct?

25    A.    I believe so, yes.
```

1   Q.    Is everything in Exhibit 169 true and accurate?

2   A.    In my opinion it is, yes.

3   Q.    And you wrote every word of it.

4   A.    I believe I did, yes.  I don't believe -- I

5   believe there may have been some additions of words

6   referencing exhibits and so on, so I can't say that I

7   wrote every word, but the substance of it is mine.

8   Q.    Okay.  Is it true that somebody thought it was a

9   good idea to use one of the guideline public --

10  publicly traded methods of valuation as a cross-check

11  of your work based on --

12  A.    A -- a --

13  Q.    -- let me finish the question -- based on themes

14  from the McKinsey text?

15  A.    I -- I decided to cross-check my analysis of the

16  multi-business valuation using the dividend-paying

17  capacity of the company.

18  Q.    Why did you do that, sir?

19  A.    Because it's a normal practice.

20  Q.    A normal practice of whom?

21  A.    To do that, to find some other method for

22  cross-checking another analysis.

23  Q.    Whose -- whose normal practice is that?

24  A.    It would be mine.

25  Q.    Okay.  And when was the last time you valued a

```
1    company starting from scratch?
2    A.    I do it all the time.
3    Q.    You've done a full analysis of a company starting
4    from scratch using the McKinsey method; is that your
5    testimony?
6    A.    It's my business to do this, yes.
7    Q.    And your business in -- what business?
8    A.    In my venture capital activities and my real
9    estate investment activities and my capacity as
10   chairman of Mass Housing Investment Corp, et cetera.
11   Q.    You value corporations.
12   A.    I look for -- I value the ability of cash flow
13   that companies produce to service whatever requirement
14   they have.  If it's a loan, it's their ability to pay
15   the loan.  If it's -- if it's an investment I'm going
16   to make, then it's the ability of the company to
17   provide a return on that investment and also to provide
18   a recovery of the capital I'm investing.
19   Q.    And did you think it was a good idea to use --
20   withdrawn.
21          Did you think it was a good idea to
22   cross-check your work after you heard the depositions
23   of Mr. Riddiough and Ms. Fannon?
24   A.    I think it was a good idea to cross-check my
25   work.
```

1   Q.    And that --

2   A.    Period.

3   Q.    But you didn't -- you didn't cross-check your

4   work until after you heard Ms. Fannon and Mr. Riddiough

5   testify, did you?

6   A.    I -- it's something I do, and if it -- the timing

7   of it was that it occurred a couple weeks prior to the

8   July -- to the July court hearing.

9   Q.    And there was some talk about the Pratt book on

10  valuing businesses at your testimony in July; do you

11  recall that?

12  A.    I think I referenced a section of it, yes.

13  Q.    Okay.  And you had never heard of the Pratt book

14  until you heard Ms. Fannon testify about it.

15  A.    That's correct.

16  Q.    And you learned at the deposition that Ms. Fannon

17  had been involved in the introduction of the Pratt

18  book?

19  A.    I have reviewed the Pratt book after Ms. Fannon's

20  testimony, yes.

21  Q.    Well, when you say you reviewed the Pratt book,

22  what do you mean?

23  A.    I -- I read through it very quickly.

24  Q.    You read through all 1100 pages of it?

25  A.    I looked at the index and I looked at appropriate

1    sections that I thought were pertinent to -- to this

2    case.

3    Q.    Which -- which sections did you think were

4    appropriate?

5    A.    Well, in particular the section that relates to

6    dividend payments.

7    Q.    Why did you focus on dividend payments?

8    A.    Because I was doing a cross-check.

9    Q.    And why did you focus on dividends?

10   A.    Because the ability of the company -- the

11   capacity -- whether they pay them or not, the capacity

12   of a company to pay dividends is a good indication and

13   cross-check on value.

14   Q.    How many different approaches to value are set

15   out in the -- in the Pratt book; do you know?

16   A.    I can't -- I'm not an expert on that book.

17   Q.    And had you ever heard of the guideline publicly

18   traded company method before you looked at the Pratt --

19   Pratt handbook?

20   A.    I've heard of many phrases called publicly traded

21   method.  I can't tell you specifically about the one

22   that's in the Pratt book.

23   Q.    The question was, sir, have you ever heard of the

24   term guideline publicly traded company method as a

25   recognized valuation method?

1    A.    No, I haven't.

2    Q.    So the first time you ever heard of that was at

3    Ms. Fannon's deposition.

4    A.    Expressed that way, yes.

5    Q.    And that -- what I just read you is one of the

6    chapters in the Pratt text, correct?

7    A.    That's correct, yes.

8              MR. NOLAN:  Does anybody recall what -- this

9    is an exhibit, I think you said, Mr. Newman?

10             MR. NEWMAN:  Chapter 11 is, yes.

11             MR. NOLAN:  And do we know what -- what the

12   exhibit number is?

13             MS. MCDANIEL:  Chapter 11 from the Pratt text

14   is P160.

15             MR. NOLAN:  Thank you very much.

16   BY MR. NOLAN:

17   Q.    Did you read all of Chapter 11, sir?

18   A.    I don't believe I did, no.

19   Q.    What did you read in Chapter 11?

20   A.    I don't remember what Chapter 11 is; I'd have to

21   look.

22   Q.    Chapter 11 called Market Approach Guideline

23   Publicly Traded Method, and I think we have a copy here

24   for you to look at.

25             MR. NEWMAN:  I have a copy of Chapter 11; it's

1    not the full Exhibit 169.

2            MR. NOLAN:  It's just part of it?

3            MR. NEWMAN:  Exhibit 169 is actually several

4    chapters of which --

5            MS. MCDANIEL:  160.

6            MR. NEWMAN:  160, excuse me.

7    A.    I'm sorry, can you ask the question again?

8    BY MR. NOLAN:

9    Q.    What part of Chapter 11 did you look at?

10   A.    It's going to take me a minute to look through

11   here.

12           Yes, on Page 294, I believe it is, there is a

13   section on capitalization of dividends or

14   dividend-paying capacity.

15   Q.    Okay.  And that's -- that's the page you looked

16   at?

17   A.    I believe so, yes.

18   Q.    Okay.  And am I correct that the purpose of doing

19   what you call this cross-check was to, as the term

20   implies, check on your original calculations?

21   A.    Yes, it was to -- to use it as a triangulation or

22   a reference point.

23   Q.    And so if -- if after you used the capitalization

24   of dividends or dividend capacity method, if you came

25   out with a number that was pretty close to what you

1    came out with when you used the themes from the

2    McKinsey book, you'd be able to say, well, I have -- I

3    have more confidence in my first conclusion because I

4    did it another way and it came out the same?  Is that

5    your thought process?

6    A.    The way you express it would not be my thought

7    process.

8    Q.    What was your thought process?

9    A.    My thought process is is that when I'm doing an

10   analysis in one way I'm looking for a second way to --

11   to confirm that the other way -- it's a way -- a

12   different way but a way of confirming what the other --

13   the other analysis was showing.

14   Q.    And of course the converse is also true; is it

15   not?

16   A.    Well, it -- it makes you look for reasons why

17   there would be differences, that's all.

18   Q.    So if the numbers using what you call the

19   McKinsey method or your version of the McKinsey method

20   and the dividend capacity method were wildly different,

21   you'd -- you'd conclude logically that one or the other

22   or both were wrong, right?

23   A.    No, I would conclude that there was a difference,

24   and I'd need to find out what the difference was.

25   Q.    Well, if -- what if the difference was like an

1    order of magnitude of 10 times, would you say there's

2    something wildly wrong?

3    A.    Well, the next step would be to find out what the

4    difference is, and then you would make a decision

5    whether one -- one process was right or one process was

6    wrong, but you would understand the difference.

7    Q.    Well, logically speaking, either one or both of

8    the processes would have to be wrong if the differences

9    were wildly --

10   A.    Well, possibly both are wrong.

11   Q.    Okay, fair enough.

12         How much time did you spend reading Page 294

13   of the Pratt text?

14   A.    I -- I don't think very long.

15   Q.    Well, how long?

16   A.    I -- I can't tell you exactly how long.  I -- I

17   didn't spend --

18   Q.    Ten minutes?

19   A.    I was looking for a reference that -- my purpose

20   is not to become an expert on the Pratt book.  I was

21   simply looking for a reference.

22   Q.    Okay.  And my question was, you read this and

23   say -- and you said, gee, this looks like a good

24   reference?

25   A.    I -- I -- I read it and -- and it took me no more

1    than five or ten minutes to read -- read that section.

2    Q.    And do you know how many different approaches are

3    contained in Chapter 11 for guideline public traded

4    company analyses, that's with an E-S?

5    A.    I can't tell you how many, no.

6    Q.    Well, why was it that you selected dividend

7    capacity?

8    A.    Because that's the section that -- that applied

9    to the analysis I was doing independent of reading that

10   book, and I wanted to see what that book had to say

11   about the analysis I was doing.  I was not relying on

12   the book in any other way than simply to look for a

13   reference.

14   Q.    And where in your prior analysis is there any

15   mention of the word dividend, any of your prior

16   testimony or any of your prior written analysis that's

17   in evidence in this case?  The word dividend does not

18   appear, does it?

19   A.    I don't believe it does, no.

20   Q.    So you decided after the deposition of Ms. Fannon

21   and Mr. Riddiough that it might be interesting to look

22   at dividends, right?

23   A.    I decided to do a cross-check, looking at the

24   dividend-paying capacity of the company.  And as part

25   of my overall review I looked at the Pratt book, which

1    was referenced in the Fannon deposition, to see what

2    references might be in there because it was -- it was

3    referenced in that -- in that deposition.  That's --

4    that's all.

5    Q.    Okay.  What's a dividend?

6    A.    It is a payment by the company either -- to its

7    shareholders, and it is both a -- it can be both a

8    return on the investment; it can also be a -- a

9    recovery of invested capital.

10   Q.    And does First Hartford pay dividends?

11   A.    It paid one, I believe.

12   Q.    And why is it that you focused on dividends for

13   this analysis?

14   A.    The cash flows that represent the capacity-paid

15   dividend can be viewed and capitalized as an indication

16   of value.  So, for example, a company that pays a

17   dividend, if it gets capitalized at the industry rate,

18   say 5 percent, then -- then that is an expression of

19   value, which is basically the analysis I did in this

20   case.

21   Q.    And apart from Page 294 of Exhibit 160, did you

22   consult any other text in preparing your supplemental

23   disclosure?

24   A.    Yes, I believe there was another textbook that

25   I -- I did the same thing.  I just -- I looked at it

1    very quickly.

2    Q.    And what's the name of that textbook?

3    A.    I don't have the name.

4    Q.    That's not --

5    A.    I didn't bring it with me.

6    Q.    That's not set forth in your disclosure, is it?

7    A.    No.

8    Q.    Did you actually have the book or did you just

9    have the chapter?

10   A.    No, I actually had the book.

11   Q.    The whole book?

12   A.    I have the book, yes.

13   Q.    When did you buy the book?

14   A.    Sometime after the Fannon deposition, I don't

15   remember the exact date.

16   Q.    And you have never attempted to value a company

17   under any of the several methods of the market

18   approach, guideline publicly traded company methods

19   that are set out in Chapter 11 of the Pratt book?

20   A.    I'm not an expert on the Pratt book.

21   Q.    I understand.

22   A.    I may have valued companies that way, but I

23   wouldn't know it unless I reviewed the Pratt book in

24   much more detail than I have.

25   Q.    And all you would have to do to be able to answer

1    that question was to have read Chapter 11 in its

2    entirety.

3    A.    I -- I would have to have become an expert on

4    that book, which I'm not.

5    Q.    Okay.  But it's fair to say you haven't read

6    Chapter 11 in its entirety; the only think you've read

7    is Page 294?

8    A.    No, I -- I told you before that I -- I did look

9    through the book in some detail, depending on the

10   sections that I felt were pertinent.  I can't -- I

11   can't sit here and tell you right now how much of

12   Chapter 11 I read, but I read more than that one page.

13   Q.    Now, one of you -- one of the -- in addition to

14   reading Page 294, another thing that you did was that

15   you looked at reports on REITs in Morningstar.

16   A.    That's correct, yes.

17   Q.    What is Morningstar?

18   A.    Morningstar is a service that provides financial

19   information in various formats to subscribers.

20   Q.    Okay.  And in fact you -- on July 20th of 2008

21   you in fact stated a list of 13 REITs to Mr. Newman.

22   A.    That's correct, yes.

23   Q.    And you also sent Mr. Newman by fax copies of

24   Morningstar reports on 13 REITs that you got off your

25   computer, correct?

1    A.    That's correct.

2    Q.    How did you select the 13 REITs?

3    A.    They were the ones that were -- that I

4    cross-indexed with Morningstar that were listed in Miss

5    Fannon's deposition.

6    Q.    Well, actually Mr. -- Mr. Riddiough referenced a

7    number of REITs, correct?

8    A.    It may -- they may have been included in that

9    list as well.  It was -- it was whatever names were --

10   were referenced in the expert witness testimony for the

11   defendant; whatever names Morningstar covered I

12   included in that list.

13   Q.    So Mr. Riddiough named 31 REITs and Ms. Fannon

14   named 18?

15   A.    I don't remember the exact number.

16   Q.    But you selected 13.

17   A.    I -- I reviewed -- what I did was I took all of

18   the names, however many there were, and I looked to see

19   which ones were covered by Morningstar, and the ones

20   that were covered by Morningstar I included on that

21   list.

22   Q.    Okay.

23   A.    That was a simple analysis.

24   Q.    So your methodology in this case, the comparisons

25   that you chose to use, were based on what were in the

1    Morningstar reference.

2    A.    The -- the names on the -- that I selected on the

3    list that I faxed back to Mr. Newman were ones that

4    were covered by Morningstar, yes.

5    Q.    Okay.  And, if -- if a REIT that had been

6    mentioned by Mr. Riddiough or Ms. Fannon was not

7    covered by Morningstar, you chose not to include it in

8    the sample that you used for creating Exhibit 169; is

9    that right?

10   A.    That's correct, yes, that's correct.

11   Q.    And each of the reports -- and I believe they're

12   in Exhibit 169, and there's a second set of that, I

13   think, in -- is it 160 -- 165, I'm not sure -- okay.

14   Each of those were printed off your computer on

15   July 20th of 2008.

16   A.    I -- they -- I printed them out.  I don't

17   remember the exact date.

18   Q.    Well, if you have one in front of you they all

19   say at the bottom http://quicktakemorningstar.com, and

20   the date July 20th, 2008?

21   A.    Yes, then that would be the date, yes.

22   Q.    Okay.  And that was a Sunday.

23   A.    It may have been.

24   Q.    Well, the 21st was the day that you said you

25   completed your second supplemental and rebuttal

1    testi -- or disclosure, and Thursday was the 24th and

2    Friday was the 25th.

3    A.    It may have been, yes.

4    Q.    Okay.  And the sole criteria for the universe of

5    REITs that you included in your second supplemental and

6    rebuttal expert testimony were your ability to print

7    them off Morningstar.  That was it.  And if they

8    weren't on Morningstar, even though they were mentioned

9    by Ms. Fannon and Dr. Riddiough, you didn't use them,

10   right?

11   A.    Well, I -- that's correct, yes, yes.

12   Q.    Okay.  And they were all available to you,

13   weren't they?

14   A.    Which?

15   Q.    All -- all of the other of the REITs that were

16   mentioned by Dr. Riddiough and Ms. Fannon, you could

17   have gone and looked for them if you wanted to?

18   A.    I -- gone to look for what?

19   Q.    Information about them.

20   A.    I'm sure they were -- there's other public

21   information.  I happen to be a subscriber to

22   Morningstar.

23   Q.    So it was convenient for you to use Morningstar.

24   A.    I'm a member of Morningstar.

25   Q.    What does that mean?

1    A.    It means that it's the service I use.

2    Q.    Okay.

3    A.    There are other services, and I'm sure that some

4    of these other names were covered by their services,

5    but I'm a subscriber to Morningstar.

6    Q.    You pay a fee to Morningstar --

7    A.    I do, yes.

8    Q.    -- to have access to their reports.

9    A.    Yes.

10   Q.    And you could have gone to EDGAR and gotten

11   financial information for each of the REITs that were

12   mentioned --

13   A.    Well, I'm looking -- I'm actually --

14   Q.    Can I finish my question?

15   A.    Yeah, yes.

16   Q.    You've got to let me finish.  Now I'm falling

17   into the trap that we talked about earlier.

18        All of the REITs that were mentioned by

19   Dr. Riddiough and Ms. Fannon were publicly traded

20   entities, correct, as far as you know?

21   A.    I -- I -- I assume they were.  I don't know that

22   they were.

23   Q.    So you could have, for example, gone on to EDGAR,

24   E-D-G-A-R, all caps, and located the financial

25   information for each of those, correct?

1    A.    I could have, yes.

2    Q.    Okay.  But you didn't.

3    A.    I elected not to, no.

4    Q.    And you also elected to use the information that

5    was available to you from Morningstar on July 20th,

6    2008, correct?

7    A.    If that's the date, yes.

8    Q.    Okay.

9    A.    That's --

10   Q.    And each of the reports that you submitted in

11   your exhibit dealt with financial information as of

12   July 20th, 2008, correct?

13   A.    The Morningstar reports were based on whatever

14   date is listed.  The financial information may have

15   been from prior periods.  I don't know what the -- when

16   the financial data --

17   Q.    Why don't we look at one of those.

18   A.    Yeah.

19   Q.    Let's look -- the first one I have in back of 169

20   is Realty Income Corporation.

21   A.    You said the first one, right?

22   Q.    First one, right behind there, first one?

23   A.    Yes, right, yes.

24   Q.    And what we're calling -- what I'm going to call

25   the Morningstar report has at the top of the page

1    Page 1 of 4; is that right?

2    A.    Yes.

3    Q.    And the date of that -- and that's an analyst

4    note, right?  Analyst note dated May 2nd, 2008, by

5    Akash, Dave, A-K-A-S-H?

6    A.    Yes, that's correct, yes.

7    Q.    A-K-A-S-H, D-A-V-E.  Do you see that?

8    A.    Yes, I do.

9    Q.    And we see a stock price as of May 2nd, 2008?

10   A.    That's correct.

11   Q.    And it says Realty Income reports, first Q, first

12   quarter?

13   A.    Yes.

14   Q.    And all the information is as of 2008, right?

15   A.    That's correct.

16   Q.    Okay.

17   A.    And --

18   Q.    There's nothing -- there's nothing on this report

19   or any of the other reports that's contained in your

20   rebuttal disclosure that deals with any information

21   from any year other than 2008; is that correct?

22   A.    Actually the -- the basis for this report is not

23   2008, it is actually the 207 (sic) annual report, which

24   is under the recommended readings.  The reports written

25   by the analysts tend to come after the publishing of

1    the financial information.  So the way Morningstar

2    works is when there's a major report that's written --

3    I mean, a major proxy or an annual report then

4    typically the report will come out months after that,

5    after they've had a chance to review.

6    Q.    Okay.  And what does it say on the first page,

7    Page 1, under the word analyst in the right-hand note?

8    Does it say -- am I reading this correctly?  Realty

9    Income reports, first quarter, Akash, Dave, May 2nd,

10   2008?

11   A.    That -- yes.

12   Q.    Is that what it says?

13   A.    Yes.

14   Q.    And by May 2nd first quarter numbers are in,

15   right, for 2008?

16   A.    Well, it says here the analyst noted -- I'm

17   trying to be careful with the words you're using.

18   Realty Income reports Q1, and -- and there was a --

19   apparently a report written by Dave Akash on 5/2/08.

20   I'm not sure what that refers to.

21   Q.    Not -- why don't you read the first sentence and

22   see if we can figure out what that refers to, the first

23   sentence of the ana --

24   A.    Yeah, were broadly in line with -- yeah, Realty

25   Income, so this was a summary of their first quarter

1    results.

2    Q.    Okay.

3    A.    Yes.

4    Q.    Realty Income reported first quarter results that

5    were broadly in line with our expectations, correct?

6    A.    Yes, right, that's correct.

7    Q.    All right.

8    A.    Yes.

9    Q.    So we're talking about Q1 of 2008 numbers in this

10   particular case.

11   A.    Right, and this is a report generated in --

12   Q.    Okay.

13   A.    Yes.

14   Q.    And can we also agree, sir, that the purpose of

15   the exercise that brings us all together is valuing

16   First Hartford Corporation as of a date in 2005,

17   September 15th to be precise?

18   A.    That's -- that is correct, yes.

19   Q.    Okay.  Yet in doing this rebuttal you chose to

20   use 2008 information?

21   A.    Yes, you're correct.

22   Q.    And you have no information in your report and

23   indeed you did not look at any information for any --

24   relating to these REITs for any year other than 2008?

25   A.    I -- I'm familiar with many of these REITs for

1    prior periods, so that's not a correct statement.

2    Q.    What's incorrect about my statement?

3    A.    There are some of them, Chelsea, for example,

4    that I'm very familiar with from other sources.

5    Q.    My question was did you look at anything else

6    other than 2008 information in preparing your

7    supplemental and rebuttal disclosure and in giving your

8    testimony on July 25th, 2008?

9    A.    The -- the supplemental disclosure is based on

10   broad experience I have in the industry.  These reports

11   from Morningstar are one part of that overall analysis.

12   So to say that all of my information came from 2008

13   time frame is not correct.

14   Q.    Do you have any information that came from 2003?

15   A.    In what -- what information are you talking

16   about?

17   Q.    Any information that's related to the opinions

18   and your testimony in the rebuttal phase of this trial.

19   A.    Yes, I'm -- I'm familiar with real estate

20   generally going back to my Bank of Boston days, and

21   every -- every day, every month, every week, I -- I

22   review real estate financial information on various

23   companies.  So I'm not limiting my analysis to just the

24   dates that are reflected on the Morningstar report.

25   Q.    So you're saying it's in your head somewhere?

1    A.    Yes, it is.

2    Q.    Okay.  And what was the dividend capacity for

3    Realty Income in 2003?

4    A.    I -- I don't have that specific information.

5    Q.    You don't have it for any -- any single one of

6    the 13 REITs that you referred to in your testimony and

7    in your report, do you?

8    A.    No, that's correct, I don't.

9    Q.    Okay.  Now, on Page 2 of Exhibit 169, in the

10   center of the page, there is a sentence that starts,

11   and I'll -- the first words are to measure the dividend

12   capacity paying of REITs.  Do you see that, five

13   lines --

14   A.    Yes, I do, yes.

15   Q.    And I'll just -- not to clutter the record, but

16   I'm going to read it.  To measure the dividend-paying

17   capacity of REITs, REIT analysts use the term funds

18   from operation, paren FFO, paren, which is equal to net

19   income excluding gains or losses from sales of property

20   and adding back real estate depreciation.

21   A.    That's correct.

22   Q.    Did I read that correctly?

23   A.    Yes.

24   Q.    And you cite to -- to a glossary of REIT terms by

25   National Association of Real Estate Investment Trusts

1    available at http://www.reit.com.

2    A.    That's correct.

3    Q.    And what is www.reit.com?

4    A.    It's in effect a Wikipedia for -- at REIT terms.

5    Q.    What's a Wikipedia?

6    A.    It's a -- it's a -- it's the Internet version of

7    the Encyclopedia Britannica.

8    Q.    And you're familiar with that -- that website?

9    A.    I am, yes.

10   Q.    And you use it regularly?

11   A.    I wouldn't say regularly but I'm familiar with

12   it, yes.

13   Q.    Okay.  And that definition is one with which you

14   agree.

15   A.    I do agree, yes.

16   Q.    Okay.  And do you agree generally with the terms

17   that are set out in that glossary?

18   A.    I do, yes.

19   Q.    All right.

20            MR. NOLAN:  73, I think.  I'm going to --

21            MS. MCDANIEL:  It's not going to be D73.

22            MR. NOLAN:  Pardon?

23            MS. MCDANIEL:  It's not going to be D73.

24            MR. NOLAN:  What's it going to be?

25            MR. NEWMAN:  It's D74 because 73 were the

1    chalks got that marked for identification.

2            MR. NOLAN:  Call it 75 or 100, if you want,

3    doesn't matter.

4            MS. MCDANIEL:  D74 will work.

5            MR. NOLAN:  Okay.  Do you need one?

6            THE COURT:  D74.

7            MS. MCDANIEL:  D74.

8    BY MR. NOLAN:

9    Q.    And I will represent to you, Mr. Aertsen, that

10   D74 is a document that is a printout from the website

11   that you referenced in the report 169.  And I believe

12   the definition of funds from operations, FFO, is

13   exactly as you quoted and I just read.

14   A.    Yes.

15   Q.    Okay.

16           MR. NOLAN:  I'm going to offer Defendant's 74.

17           THE COURT:  Defendant's 74 is offered, any

18   objection?

19           MR. NEWMAN:  No, we don't object to 74, Your

20   Honor.

21           THE COURT:  All right, it's admitted without

22   objection.

23           MR. NOLAN:  Thank you, Your Honor.

24   Q.    Now, the funds from operation, according to

25   Exhibit 74, is -- is equal to a REIT's net income

1    excluding gains or losses from sales of property and

2    adding back real estate depreciation, correct?

3    A.    That's correct.

4    Q.    And the sentence before that in Exhibit 74 says

5    that funds from operations or FFO is the most commonly

6    accepted and reported measure of REIT operating

7    performance.  Do you agree with that statement?

8    A.    Yes, it measures the ability of a REIT to

9    consistently pay dividends to investors.

10   Q.    Well, that's -- that's different than operating

11   performance, what you just said, isn't it?

12   A.    The ability of a REIT to pay a consistent

13   dividend over a long period of time is an indication of

14   operating performance.

15   Q.    Okay, fair enough.  Now, you attempted to

16   calculate what you claim to be First Hartford

17   Corporation's distribute -- ability to pay dividends,

18   correct?

19   A.    That is correct.

20   Q.    And you created Exhibit I believe it's 166.  You

21   did -- you created -- you created all of these

22   exhibits.

23   A.    I did.

24   Q.    160 --

25   A.    Yes, again, I -- when I say created, I -- I

1    created them on a spreadsheet, and then I submitted

2    them to Mr. Newman and he reformatted them on -- on the

3    sheet.

4    Q.    Okay.  And Exhibit 166, 167, and 168, correct?

5    A.    I believe those are the exhibits, yeah.

6    Q.    Now, going back to Exhibit 169, the first three

7    pages are the report, the next page is the certificate

8    of service, and the next thing is something called

9    schedule of REIT comparable payout ratios, REITs from

10   Fannon guideline companies and Riddiough-selected REIT

11   comparables.

12   A.    That's correct, yes.

13   Q.    And there are 13 of them.

14   A.    Yes, I haven't counted them but I assume that's

15   correct.

16   Q.    And there's something called payout ratio.

17   A.    Yes.

18   Q.    Where did -- what's the source of those numbers?

19   A.    Morningstar.

20   Q.    Where in the Morningstar?

21   A.    Well, they're in various places, but they

22   typically come at the end, so in the case of the

23   company you reference, Realty Income, under financial

24   health, which is on Page 4 of 4, the last section talks

25   about the dividend free cash flow payout ratio is

1    86 percent.

2    Q.    Okay.  And that's as of what date?

3    A.    That's all of -- well, the payout -- payout ratio

4    probably references a prior financial period, but the

5    date of the report is 7/20.

6    Q.    So it's ending 12/31/07; is that what we're

7    saying?

8    A.    It may be.  I don't know the -- I don't know the

9    exact date.

10   Q.    So the answer is you don't know.

11   A.    I don't know.

12   Q.    Okay.  But you chose to use it.

13   A.    I did, yes.

14   Q.    And you chose to use it in a -- it certainly

15   wasn't 2003.

16   A.    Can I -- can I elaborate and --

17   Q.    No, you can -- I'm sorry, I get to ask the

18   questions.

19   A.    Okay, very well.  Yes, these are -- these are

20   of -- these are not the same dates that we're doing on

21   the valuation for First Hartford Corporation.  I agree

22   with you on that.

23   Q.    Okay.  And they're most likely, in the case of

24   Realty Income Corp, 12/31/07.

25   A.    That may very well be, yes.

1    Q.    Okay.  And in fact for each of these --

2    withdrawn.

3          Is it your experience that most REITs are

4    calendar year entities?

5    A.    I would say yes, most companies are calendar

6    year.

7    Q.    And so we can agree that with respect to the

8    payout ratios that you list on this schedule, and I'm

9    going to just call it schedule of REIT comparable

10   payout ratios, those are all for years either 2007 or

11   2008?

12   A.    Probably, yes.

13   Q.    Okay.

14         THE VIDEOGRAPHER:  Excuse me, we need to go

15   off the record to change the tape.

16               (A recess was taken.)

17   BY MR. NOLAN:

18   Q.    Mr. Aertsen, at some point in preparing

19   Exhibit 169 and in your testimony you took those payout

20   ratios that are on the schedule we were just discussing

21   and you averaged them?

22   A.    Yes, I did.

23   Q.    Okay.  Why did you do that?

24   A.    Well, I'm -- I'm not looking for any one company;

25   I'm looking for a -- a sufficiently sized population of

1    representative sampling of REITs so I can look at an

2    average.

3    Q.    Okay.  And -- and I take it these payout ratios

4    change from time to time?

5    A.    I would say to you that in my experience the

6    payout ratios have not changed very much from the

7    industry perspective over a long period of time.

8    Q.    But individual REITs --

9    A.    They may come up --

10   Q.    -- change --

11   A.    They may, yes.

12   Q.    Some of them go to zero, don't they?

13   A.    Some of them go up; some go down.

14   Q.    Okay.  And you did a calculation -- I'm going to

15   be referring now to Exhibit 166 and 167 and 168?

16   A.    Okay.

17   Q.    You did a series of calculations.

18   A.    Yes.

19   Q.    And all of those calculations were designed to

20   determine First Hartford Corporation's dividend-paying

21   capacity, correct?

22   A.    There were -- there were two purposes to the

23   exercise.  The first was to look at specifically First

24   Hartford Corporation, at its sources of distributable

25   cash to determine its dividend-paying capacity, and the

1    second was to look over at the 13 REITs and do a

2    comparison to their dividend-paying capacity,

3    recognizing their differences between First Hartford

4    Corporation and the REITs.

5    Q.    Okay.  And the dividend -- average dividend

6    capacity of the 13 REITs in your -- in your sample was

7    59 percent of total distributable cash; is that what

8    you're saying?

9    A.    No, I believe the average for the REITs was

10   higher.

11   Q.    For the 13 REITs?

12   A.    I believe so, yes.

13   Q.    Okay.  So why is it that you use 59 percent?

14   A.    The 59 percent happens to be the number that

15   comes to the equity value at a 5 percent dividend cap

16   rate that was the number that I -- I derived from my

17   other analysis.

18   Q.    So the 59 percent number, as I understand it, was

19   backed out of your original number?

20   A.    It was a number that would -- it would take to --

21   to equal the number I came up with in the

22   multi-national value.  In other words, my question --

23   my first question was, what kind of a dividend payout

24   ratio would be required to equal the number that I came

25   up with with the -- in the other valuation analysis.

1      And that number is 59 percent dividend payout ratio.

2      Q.    So if you were solving an algebraic equation,

3      then, you solved for 59 percent and you --

4      A.    No.

5      Q.    You knew what -- you had the 5 percent number and

6      you had the number that you derived from your prior

7      methodology, and you ran the algebraic equation and

8      solved for 59 percent?

9      A.    No, that's not true.

10     Q.    What would you do, then?

11     A.    What I did was I wanted to find out what would --

12     what would the -- what was the -- there were three

13     steps to this.  The first step was to look at the --

14     the sources of dividend payments, which -- the sources

15     of distributable cash which are listed, if you're

16     looking at Exhibit Page 166 on the top left-hand

17     corner, pretax income, depreciation, gain on sale, and

18     distribution affiliates, total distributable cash, and

19     I averaged that over the time frames -- each exhibit is

20     a little different, but this one is 2004, 2005, 2006,

21     to get an average.

22            Then I wanted to know, of that number, which

23     is the average 4,103,427 on the far right-hand side of

24     Exhibit 166, what percentage of that would have to be

25     paid out in order to create a 48 million dollar

1    valuation based on a 5 percent cap rate.  And that's

2    how I did the analysis.  And it came to 59 percent.

3    Q.    Okay.  So you had the 48 million in mind.

4    A.    Yes, I did.

5    Q.    Because that's what your first number was.

6    A.    Yes, it was.

7    Q.    Under -- under -- under your version of the

8    McKinsey method.

9    A.    That's correct, yes.

10   Q.    So you knew 48 percent and you wanted to get --

11   use 5 percent.

12          THE COURT:  48 million.

13   A.    48 million.

14   BY MR. NOLAN:

15   Q.    48 million, right.  And you wanted a dividend

16   yield of 5 percent.

17   A.    I didn't want anything.  I was -- this is a

18   cross-check.  I wanted to find out what it would tell

19   me.  And what it tells me is that, based on an average

20   distributable cash over these years of 4,103,427, at

21   a -- at 59 percent payout ratio of that number at a

22   5 percent cap rate, I get $48 million.  That's what it

23   says.

24   Q.    And if the dividend capacity were zero, what

25   would the value be under that methodology?

1   A.    Under -- if the dividend capacity were zero, then

2   you -- whatever you multiply or divide by zero you're

3   going to get zero.

4   Q.    Okay, thank you.  So that does save some time.

5         At the top of the page, at the top of

6   Page 166, you have something you call adjusted funds

7   from operation, right?

8   A.    When you say page -- you mean Exhibit 166.

9   Q.    Exhibit 166.

10  A.    Yes.

11  Q.    Adjusted funds from operation, right?

12  A.    Yes, yes.

13  Q.    And your claim of -- that for the year 2006

14  adjusted funds from operation for First Hartford

15  Corporation were $5,538,212, correct?

16  A.    That's correct.

17  Q.    Why don't we look over at Exhibit 74 for a

18  minute.

19        THE COURT:  This is D74?

20        MR. NOLAN:  D74.

21  BY MR. NOLAN:

22  Q.    It's the one I just gave you, this one, sir.

23  A.    Oh, yes.

24  Q.    Mr. Newman will write 74.

25        MR. NEWMAN:  D -- D74.

```
 1   BY MR. NOLAN:
 2   Q.    Find a definition of adjusted funds from
 3   operation on D74, sir, at the top of the page?
 4   A.    Yes, this is for REITs now, we're talking about.
 5   Q.    Right.  And you're trying to compare REITs to
 6   First Hartford Corporation?
 7   A.    No, I'm doing two things.  That's one thing.  But
 8   the other thing is I'm trying to look at the
 9   dividend-paying capacity of -- of First Hartford
10   Corporation separately.
11   Q.    Okay.  And your definition of adjusted funds from
12   operations is not the same as the REIT -- REIT term
13   adjusted funds from operation.
14   A.    Well, it includes that but it includes other
15   things.
16   Q.    Okay.  But funds from op -- and you're --
17   actually nothing that you use on Page 166 has anything
18   to do with any of the definitions on D74, does it?
19   Because you use a different FFO as well, correct, for
20   First Hartford Corporation?
21   A.    I -- would you like me to explain what I did
22   or --
23   Q.    No, I'd like you to answer my questions.
24   A.    I can't answer your question because I'm not sure
25   of the terms you're using.
```

1    Q.    Okay.  You don't know what FFO means?

2    A.    I know -- FFO to me means funds from operations,

3    and if you're asking me what it means with respect to

4    REITs, then I would refer to the definition that's in

5    my testimony and the definition that's in the REIT

6    glossary that you just gave me.

7    Q.    And you use the word -- in dealing with your work

8    with respect to First Hartford Corporation you use the

9    term FFO, correct?

10   A.    I defined funds from operation in my -- in my

11   testimony for you, which is the same as the funds from

12   operation definition that's in the REIT glossary.

13   Q.    Sir, when you use the word FFO, what is your

14   definition in your -- what is the definition of the

15   term FFO in Exhibit 169 as -- in terms of First

16   Hartford Corporation?

17   A.    In terms of -- it's -- it is the REIT definition,

18   funds from operation.

19   Q.    Okay.  So, for example, when you say on Page 3 of

20   Exhibit 169, FHC FFO is negative due to the high level

21   of administrative expenses relative to revenues?

22   A.    Yes.

23   Q.    Okay.  And you're using FFO there the same way

24   it's defined in Exhibit 74?

25   A.    That's correct, yes.

1    Q.    But you're not using FF -- AFFO in the same way

2    that it's defined in Exhibit --

3    A.    Absolutely correct.

4    Q.    Okay.  And where -- where in your report or in

5    any of the exhibits would a reader know that?

6    A.    Well, let me -- let me go back to my testimony

7    here.  Which exhibit --

8              MR. NEWMAN:  Plaintiff's 169.

9    A.    169.

10             MR. NEWMAN:  Goes this way.

11   A.    I believe it's in -- to measure the

12   dividend-paying capacity --

13             THE COURT:  What page are you on?

14   A.    I'm sorry, Page 2 in the middle of the page,

15   measure the dividend-paying capacity of REITs --

16             THE REPORTER:  Excuse me, excuse me, you can't

17   read that fast.

18   A.    Okay.  To measure the dividend --

19             MR. NEWMAN:  Mr. Aertsen, I'm going

20   to interrupt.  When we read we all read way too

21   quickly.

22             THE WITNESS:  Okay.

23             MR. NEWMAN:  So why don't you start with that

24   first sentence and read slowly so the reporter can take

25   it down, please.

1    A.    Okay.  To measure the dividend-paying capacity of

2    REITs, REIT analysts use the term funds from

3    operations, which is equal to net income excluding

4    gains or losses from sales of property and adding back

5    real estate depreciation.  That's the one that has the

6    note at the bottom.  Then I go on to say, it's not

7    written here, but I'm quoting now, FHC, which not only

8    owns and operates a portfolio of real properties from

9    which it derives real income but also develops projects

10   for sale, has three sources of distributable cash flow,

11   funds from operations, net proceeds from asset sales,

12   and refinancings and distributions from nonconsolidated

13   equity interests in operating real estate properties.

14   Q.    And that sentence is also applicable to every

15   single REIT in your universe that you use, every --

16   each of those 13 REITs also has three -- also has the

17   same sources of cash flow, correct?

18   A.    They -- they do but in different proportions.

19   Q.    I'm sure that's true, sir.  But each of the REITs

20   that you list in Exhibit 169 has funds from operations,

21   correct?

22   A.    Each one has funds from operations, yes.

23   Q.    Each one has net proceeds from asset sales and

24   refinancings, correct?

25   A.    That is correct.

1    Q.    Each one of them has distributions from

2    nonconsolidated equity interests in operating real

3    estate properties.

4    A.    That is correct.

5    Q.    Thank you, sir.  But, when you're calculating

6    dividend-paying capacity for a REIT, you do not use

7    anything other than funds from operations, correct?

8    A.    That's the way most REIT analysts would view it,

9    yes.

10   Q.    Well, actually that's not true because the way

11   most analysts view it is by using the funds -- adjusted

12   funds from operations; isn't that right?

13   A.    No, actually if you go to Green Street or

14   Merrill, which are two major analysts are Fred Carr

15   that analyze REITs, they will tell you that

16   notwithstanding that definition that, for those REITs

17   that do have a development aspect to the business, then

18   they do value the cash flows coming from the

19   development side of the business.  They will tell you

20   that.  That's not -- you're not going to read that

21   there, and you're not going to -- you're not going to

22   read it in the glossary, but it -- the fact of the

23   matter is that's the way the industry works.

24   Q.    And adjusted funds from operations, according to

25   Exhibit D74, is also called cash available for

1    distribution or funds available for distribution; do

2    you see that?

3    A.    Yes.

4    Q.    Do you agree with that?

5    A.    Yes, I do, when measuring REITs.

6    Q.    Okay.  And when -- would you turn over to the

7    second page, sir, and see something called total

8    return?

9    A.    Second page of what?

10   Q.    74.

11   A.    Yes.

12   Q.    And that's a different term, that's a -- that

13   term takes into account those other income sources that

14   we -- that we discussed over and apart from operations,

15   correct?

16   A.    I'm sorry, could you repeat that?

17   Q.    I'll withdraw the question.

18         Go back to adjusted funds from operation.

19   A.    Okay.

20   Q.    In addition to excluding gains or losses from

21   sales of property, AFFO also excludes other capital

22   expenses, correct, and nonrecurring expenses?

23   A.    Yes, this is -- this is the way -- yes, it does.

24   Q.    And it also --

25   A.    I can read this, yes.

1    Q.    Okay.  And you're familiar with that.

2    A.    I'm very familiar with it.

3    Q.    And it's accurate, right?

4    A.    Yes, it is, for REITs.

5    Q.    And it also requires you to -- requires the

6    analyst to straight-line rents.

7    A.    Yes, it does.

8    Q.    And what does straight-line rents mean?

9    A.    That means that they -- if there are step-ups

10   over a period of time then they -- they show a

11   straight-line as opposed to the step-ups.

12   Q.    We mentioned before that REITs do not pay income

13   tax, correct?

14   A.    If they distribute 90 percent of their profits.

15   Q.    And all 13 of the REITs on your -- in your

16   universe distribute 90 percent, don't they?

17   A.    I believe they distribute more than 90 percent.

18   Q.    Okay.  That's all pretax money?

19   A.    That would be pretax money, yes.

20   Q.    And First Hartford Corporation is a tax --

21   taxable entity, a C corp.

22   A.    It is a taxable entity but it does not pay taxes.

23   Q.    And it's never going to pay taxes, right?

24   A.    Based on its business model it does not pay

25   taxes.

1    Q.    That's because it keeps -- when it sells a

2    property, it reinvests the money and builds a new

3    property, that's your --

4    A.    No, because it's -- it's producing a significant

5    continuing net operating loss carryforward, offsetting

6    the application of that carryforward on current period

7    income.

8    Q.    And that will go on forever?

9    A.    I don't know whether it will go on forever, but I

10   forecast that they don't pay taxes.

11   Q.    Ever.

12   A.    I don't forecast forever; I forecast for the

13   forecast period.

14   Q.    What's the forecast period again?

15   A.    It's ten years plus a residual.

16   Q.    Now, looking again at Exhibit 166, 167, and 168,

17   is it fair to say that 167 and 168 are in variance on

18   the same theme as 166?

19   A.    I'm not sure what you mean by variance on the

20   same theme.  I use the same methodology in all

21   schedules.

22   Q.    And your methodology for First Hartford

23   Corporation is to take pretax income, depreciation,

24   gains on sales, and distributions from affiliates, and

25   you sum those for each of the years.

1    A.    That is correct.

2    Q.    Then you -- then you average them over three

3    years.

4    A.    Yes.  In this -- in the case of 166 it's averaged

5    for three years.

6    Q.    And then you assume a dividend of 5 percent.

7    A.    I -- I assume a dividend yield of 5 percent.

8    Q.    And you assume an equity value of $48 million.

9    A.    That's what it -- assuming a 5 percent dividend

10   yield and assuming a 59 percent payout rate, the result

11   is 48 million.

12   Q.    Did you -- you didn't do it that way.  You

13   assumed the 5 percent and you assumed the 48 and you

14   derived the 59.

15   A.    Yes, it came 59 percent, that's correct.

16   Q.    So if you assume 24, the calculation --

17   24 million dollar equity value you would have had --

18   A.    Well, there's another schedule that shows a

19   range.  If you go to schedule 167, you'll see different

20   payout ratios and different valuations.

21   Q.    And that's because you're assuming different

22   equity values and -- assuming a constant 5 percent

23   dividend, right?

24   A.    I'm assuming a 5 percent dividend yield, yes.

25   Q.    And you're assuming different equity values.

1   A.    Well, the 5 percent dividend produces a different

2   equity value based on different dividend payout ratios.

3   Q.    Okay.  Do any of these numbers bear any

4   relationship to reality?

5   A.    I think they -- which numbers are you referring

6   to?

7   Q.    Well, let's see.  I think we do know that some of

8   the numbers on Page 166 are real only because you got

9   them from public filings.

10   A.    Well, to answer your question, all of these

11   numbers reflect the reality of what's included in First

12   Hartford Corporation's financial statements.

13   Q.    Okay.  So the pretax net income is something you

14   have -- let's make this simple.

15         You've got footnotes next to the elements of

16   what you're calling adjusted funds from operation.

17   A.    That is correct.

18   Q.    Okay.  And the source of that is listed on the

19   page, correct?

20   A.    Exactly, yes.

21   Q.    And they're all from the public filings?

22   A.    That's correct, yes.  I didn't make up any of the

23   numbers.

24   Q.    I'm not suggesting you made up anything, sir.

25         And we have agreed that the -- what you call

1    adjusted funds from operation is not adjusted funds

2    from operation as used in the Exhibit 74.

3    A.    No.

4    Q.    And, if First Hartford Corporation were a REIT,

5    the only things that you would include in adjusted

6    funds from operation would have been pretax net income

7    and depreciation, correct?

8    A.    That's not true.  If First Hartford Corporation

9    were a REIT and it was conducting the business that

10   it's conducting, I would include gain on sale and

11   distributions from affiliates, to measure the

12   dividend-paying capacity of this company in order to

13   corroborate the value that I created from the other

14   analysis.

15   Q.    All right.  And there are REITs you've testified

16   to this morning that are like First Hartford

17   Corporation in that respect.

18   A.    To my knowledge there are no REITs that are

19   exactly like First Hartford Corporation with the

20   percentage of its business in the management,

21   development, and finance that this company has, nor are

22   there REITs that have the -- the -- that are -- most

23   REITs are self-administered, self-advised, which means

24   they own a hundred percent of all their properties.

25   And so First Hartford is different in the sense that it

1    has equity interests in unconsolidated subsidiaries and

2    it also has nonwholly owned consolidated subsidiaries.

3    Q.     Okay.

4    A.     And those are significant parts of its business.

5    Q.     Now, you -- implicit in your calculation and your

6    opinion is the thought that First Hartford Corporation

7    has an annual dividend-paying capacity of $2,421,022,

8    right?

9    A.     I -- no, I -- I'm -- yes, that's -- if you look

10   at the years 2004 through 2008 and you see the total

11   distributable cash of 4 million 1 and based on a

12   59 percent payout ratio, then the paying capacity would

13   be 2 million 4.

14          THE COURT:  You meant 2004 to 2006.

15          THE WITNESS:  I mean, 2004, 2005, 2006, yes.

16   BY MR. NOLAN:

17   Q.     And implicit in that statement and in the

18   methodology that you use you assume that First Hartford

19   could make those payments at least 10 years out into

20   the future.

21   A.     No, I didn't make that assumption.

22   Q.     Why not?

23   A.     Because that's not the way this analysis works.

24   Q.     And what -- what's wrong with my statement?

25   A.     Well, I didn't make the assumption that I looked

1   ten years into the future.  I made the -- I simply made

2   the statement that, if you look at these three years,

3   if we're looking at Exhibit 166, based on the

4   distributable cash, if they had chosen to distribute

5   that cash, then that would be the payout and the payout

6   ratio.

7   Q.    Okay.  And if they had chosen to distribute that

8   cash, how long would it be before they were out of

9   business?

10  A.    Well, REITs make payouts of more than this and

11  they reinvest and they're not out of business.

12  Q.    I see.

13  A.    And so, based on all of my experience, if they

14  chose to make these payments on Exhibit 166, and -- it

15  would have some impact on -- in order to continue to do

16  that in the future they would -- it would have some

17  impact, but I can't measure that impact.  But this is

18  about dividend-paying capacity.  It's not about

19  actually paying a dividend.  They chose to reinvest

20  instead, and so you would expect that in reinvesting

21  that they will get a future return.

22          Whether they pay the dividend or not is not

23  what's relevant.  If they pay the dividend, then you're

24  looking at the total return if they -- and return of

25  capital, because a big chunk of what they're paying out

1    here is a return of capital.  If they choose to

2    reinvest it, then you would -- you would then expect in

3    the future that they would generate future return and

4    return of capital off -- off those investment dollars.

5    So I disagree with you that if they made this payment

6    it would go out of business.  They would simply be

7    returning capital and a return on the existing invested

8    capital.

9    Q.    And from your knowledge of First Hartford

10   Corporation, if they paid out this cash, they would be

11   unable to invest in new projects, could they?

12   A.    I believe they would be able to invest in new

13   projects.

14   Q.    You do, and what -- and how would they do that?

15   A.    Well, if you look at the 2006, for example, in

16   the pretax net income there's -- included in that is a

17   million dollar bonuses, $400,000 of litigation that I

18   did not remove, that could have been used instead as a

19   dividend.  If you -- if you look at the value creation

20   that goes on the company, even in the absence of

21   reinvesting, every year in retail properties the net

22   operating income increases because of the rent step-ups

23   that are implicit in the leases.  And so using a cap

24   rate you're creating additional value which can be

25   borrowed against.

1        So they're creating borrowing capacity; they

2   are returning capital as part of this dividend.  And,

3   therefore, to say that as a result of making a payment

4   like this that they would be going out of business is

5   not correct and it -- it's not consistent with what

6   goes on in the real estate industry.  So I'm

7   fundamentally objecting -- I mean, not objecting but

8   disagreeing with your thesis.

9   Q.    Okay.  Is First Hartford Corporation highly

10  leveraged?

11  A.    No, it's not.

12  Q.    Okay, what's -- what does leverage mean?

13  A.    Leverage is a function of the amount of debt

14  relative to the amount of equity capital in a company

15  and also as measured against its cash flow in terms of

16  debt service.

17  Q.    And leverage is a defined term by the -- in the

18  REIT -- the REIT definitions; is it not?

19  A.    I have to look and see if they have a definition

20  for leverage.  The amount of debt in relation to either

21  equity capital or total capital.

22  Q.    And what's -- what's the leverage of First

23  Hartford Corporation as of 2005?

24  A.    Well, if you measure -- it's approximately -- I'm

25  measuring this now against the market value of its

1    assets.

2    Q.    What you say the -- okay.

3    A.    Okay, so the total market value of its income

4    properties is approximately $150 million, and the total

5    against that -- debt against that is approximately

6    106 million.  And, therefore, the debt-to-equity value

7    is -- is around 70 percent, which is on the low end of

8    a range for a company in -- operating in this business

9    model.  REITs typically would be leveraged lower

10   because they pool their assets as opposed to finance

11   each one individually, and they use -- make extensive

12   use of preferred stock and they have revolving credit.

13   So the amount of debt against the capital would be

14   lower in a REIT, higher in this.

15        But at 70 percent I would say -- my

16   expectation would be this would -- this could go to 80

17   or 85 percent.  It's at 70 percent.  Relative to its

18   cash flow, there's about $11 million of net operating

19   income in the income properties as a total, and the

20   interest cost at an average of say 6 to 6-1/2 percent

21   means that the interest coverage is around 150 or

22   higher, which is high, way above acceptable range.

23   And -- and the principal payments, if you add those,

24   put the debt service coverage around 120, all of which

25   are within very acceptable industry ranges.

1    Q.    Okay.  And is it not true that Morningstar

2    considers any REIT that has debt and preferred stock of

3    more than 50 percent of its capital to be highly

4    leveraged and dangerous from a financial point of view?

5    A.    I don't -- I don't remember them saying it's

6    highly leveraged and dangerous.

7    Q.    Is 50 percent the -- the level at which

8    Morningstar considers a REIT worthy of a star or two?

9    A.    Well, they have a -- they have a star rating

10   system, and one of the criteria for that is the amount

11   of debt in a company, yes.

12   Q.    Okay.  Let me ask the question differently.  You

13   have 13 REITs in your universe.  Does any of them have

14   a -- have leverage of over 50 percent using the term

15   preferred stock and debt as accounting for leverage?

16   A.    I -- I assume some of them do.  I don't -- I

17   don't remember any particular one.

18   Q.    Okay.  Why don't you look at Heritage Property

19   Investment Trust; it's in the middle.

20            THE COURT:  You're on Exhibit P169.

21            MR. NOLAN:  Back to 169 again.

22   A.    Let's see, Heritage Property.

23   BY MR. NOLAN:

24   Q.    And I'm going to ask you to look at Page 4 of 4,

25   something called financial health.

1          THE COURT:  Mr. Nolan, just so the record is

2     clear, you're talking about Heritage Property

3     Investment Trust, which is the third REIT listed on the

4     schedule to Exhibit 169?

5          MR. NOLAN:  Correct, Your Honor.

6     A.    I -- I'm having trouble finding it.

7          MR. NEWMAN:  I have it, Counsel.  I have it,

8     Counsel.

9          MR. NOLAN:  Thank you.

10    A.    Okay.

11    BY MR. NOLAN:

12    Q.    See financial health, financial health is

13    improving, Heritage debt and preferred equity accounts

14    for 46 percent of capital below the 50 percent mark

15    that catches our attention?

16    A.    Um-hum.

17    Q.    What does that mean to you?

18    A.    It means exactly what it says.

19    Q.    And why does it -- why does 50 percent catch

20    their -- catch Morningstar's attention?

21    A.    Because typically in REITs they don't -- they

22    don't have a lot of -- REITs are not leveraged the

23    way -- because of their income -- nature of their

24    income property portfolio, the way limited liability

25    companies or First Hartford or limited partnerships

1     would be or -- and generally because of the way they're

2     financed.  They pool all of their assets and they

3     operate with -- within certain bands, and when they

4     exceed those bands, in the case of the REIT industry,

5     which generally operates with lower leverage than

6     companies like First Hartford, in part because they

7     don't have a development side of their business,

8     then -- then they -- it does affect ultimately their

9     Morningstar rating.  But I wouldn't by any stretch say,

10    to use your terms, that this is a dangerous condition

11    at all.

12    Q.    Well, let's use another term.  If -- in plain

13    English, if debt and preferred equity are above the

14    50 percent mark that catches the attention of

15    Morningstar, the financial health portion of a report

16    on such a REIT -- such a REIT would indicate that it

17    doesn't have good financial health, right?

18    A.    I -- I don't think that's necessarily true.  And

19    in fact in the case you mentioned it says it's

20    improving.  So REITs -- REITs generally are well

21    financed, and you don't see a huge number of REIT

22    bankruptcies, for example.  You don't, because

23    they're -- they operate in a certain range and they

24    have a stable income property portfolio and they're

25    properly financed in their industry.

1   Q.    Let's switch to something else.

2   A.    Okay.

3         THE COURT:  How are you doing on time,

4   Mr. Nolan?

5         MR. NOLAN:  I'm getting to the end, Your

6   Honor, which of course is -- I just had a couple of

7   questions to clear up on this distributions from

8   affiliates.

9   BY MR. NOLAN:

10  Q.    Going back to 166 for a minute.

11  A.    Um-hum.

12  Q.    Distributions from affiliates, do you know what

13  the source of those funds were?

14  A.    Those are funds received from the Cranston and

15  Dover properties that are the unconsolidated affiliated

16  companies.

17  Q.    And the source of those funds was what?

18  A.    From the operations of those properties.

19  Q.    Actually it was from refinancings, wasn't it?

20  A.    Well, they can be from refinancings, yes.

21  Q.    In this case in actual fact the distributions

22  from the affiliates were net proceeds of refinancings.

23  A.    Actually there -- there's one significant proceed

24  that was not -- that is netted out and could have been

25  added back, which is the 6 million dollar payment from

1    refinancing of the properties which was used to acquire

2    an additional 25 percent interest in the Cranston

3    property.

4    Q.    Now, do you think it's -- it's -- is there any

5    similarity between First Hartford Corporation and a

6    REIT?

7    A.    There's some similarities, yes.  It has -- it

8    has -- there are two major -- well, there are three

9    major differences I mentioned.  Would you like me to

10   mention them again?

11   Q.    If you'd like to.

12   A.    Okay, the first is they're organized as a C corp

13   and they're not a real estate investment trust.  The

14   second is they are not self-administered and

15   self-advised in the sense that they don't wholly own

16   and wholly operate, meaning have management over and

17   receive the management fees for, all the properties

18   they own.

19   Q.    Okay.

20   A.    And the third is they individually finance their

21   properties as opposed to pool and finance them as an

22   entity.

23   Q.    Do you know whether or not when you properly use

24   the -- the guideline company method of valuation that

25   you have to look at companies that are extremely close

1    together and if they're not you have to make

2    adjustments to make them that way?

3    A.    I -- based on my experience in the industry, I'm

4    not -- first of all, I'm not an expert in the Pratt

5    book, which is what you're referencing.  I simply

6    looked at it to -- to see what it had to say on certain

7    topics.  But I am very familiar with doing the

8    multi-business valuation analysis on companies

9    generally and on this company, and I'm familiar with

10   doing a capitalization of dividend-paying capacity.

11   And based on my industry experience this -- this

12   analysis that was done corroborated by the

13   capitalization income properly represents the -- the

14   valuation and the dividend-paying capacity of this

15   company, and they do corroborate each other.

16   Q.    Okay.  But you don't really know how to -- how to

17   do a guideline company analysis, do you?

18   A.    I -- if you're referencing to the procedures set

19   forth in the Pratt book, I can't say I'm an expert on

20   what Pratt says.

21   Q.    Okay.  But the whole thesis of your supplemental

22   and rebuttal expert disclosure and your testimony was

23   your claim that you were using that methodology, right?

24   A.    No, I didn't claim that at all.

25   Q.    So you're not using the methodology in the Pratt

1   book.

2   A.    No, I -- I simply was referencing it.

3   Q.    Okay.  So you don't know whether or not it would

4   be -- it's a true statement that, unless the guideline

5   and subject companies are extremely homogeneous in

6   their financial characteristics, the mean or median of

7   the guideline company pricing model's multiples may not

8   be the most appropriate pricing multiples for the

9   subject company.  You don't know whether or not that's

10  a true statement, right?

11  A.    Can you read -- can you read the statement

12  again --

13  Q.    Why don't we read it together.  Why don't you

14  open up the Pratt book.

15  A.    I don't have the Pratt book.

16  Q.    Well, the excerpt there, and at Page 305 there in

17  front of you.  It's a section entitled, top of the

18  page, simple reliance on average of guideline company

19  multiples without comparative analysis.  Do you see

20  that?

21        MS. MCDANIEL:  Just for the record, can I say

22  we're in P160, Chapter 11, still; is that correct?

23        MR. NOLAN:  Correct, Page 305, top of the

24  page.

25  A.    Page 305.

BY MR. NOLAN:

Q.    And I understand that's not one of the pages you read.  And also just for the record that's in a section of the Pratt book that starts on Page 2 -- 302 that's entitled common errors.

A.    Yes, I -- I can read that and I understand the issue.

Q.    You would agree with that?

A.    Yeah, I would agree with that.

Q.    And you're comparing -- when you're comparing REIT income, not to beat a dead horse, that's pretax income and First Hartford Corporation is post tax?

A.    The REITs in the -- that were in the comparative sample are paying sufficient payout ratios where they'd be paying out of -- and not paying income taxes, in my opinion, because their -- a portion of what their payout is includes depreciation if they would be exceeding 90 percent profit rule.  So I assume that all of them are not paying taxes.  In the case of First Hartford Corporation it is my testimony that, based on reviewing their tax returns, that this is a company that is organized currently based on its business model not to pay income taxes and in fact haven't.

Q.    Subject to tax, however, correct?

A.    But they are subject to tax, that is correct.

1    Q.    All right.  So it's -- is it your -- your opinion

2    that First Hartford will never pay income tax?

3    A.    I didn't -- if they grow the business, for

4    example, at some level of growth they will exhaust

5    their NOL and they will go into a tax-paying mode if

6    that -- if that happens.  I'm not forecasting that

7    they're growing, however; I'm forecasting a steady

8    state.  If they operate under the steady state --

9              THE COURT:  Mr. Aertsen, why don't you just

10   wait for the next question.

11             THE WITNESS:  Okay.

12   BY MR. NOLAN:

13   Q.    Is First Hartford Corporation better capitalized

14   than -- than any of the other -- any of the REITs in

15   your sample?  Is First Hartford's capitalization better

16   or worse?

17   A.    Well, the -- they -- they have a different

18   capital structure than the REITs do in the way I

19   mentioned to you.  But for the business that they're

20   in, they're adequately capitalized, in my opinion.

21   Q.    Are they less well capitalized than the REITs?

22   Is First Hartford less well capitalized?

23   A.    Well, they're organized differently.

24   Q.    I understand that, sir.  Are they as well -- is

25   First Hartford as well capitalized as the

1    worst-capitalized REIT in your sample?

2    A.    I -- I can't make that assessment; I can't make

3    that judgment.

4    Q.    Why not?

5    A.    Because -- because I don't know what the business

6    plans are for the REITs, and I can't tell you going

7    forward what -- what their requirements are going to be

8    and whether they need more capital or not.   I can't

9    make that judgment.   I can -- I can say that the

10   judgment I'm -- I have been asked to make and have made

11   here is that for the -- in considering the capital

12   structure of First Hartford course I believe for the

13   businesses that they're doing they're adequately

14   capitalized.   That's -- that's my opinion.

15   Q.    That wasn't my question.   My question was

16   comparing First Hartford Corporation to the REITs that

17   are in your universe, First Hartford you -- under your

18   calculation has leverage of 70 percent, correct?

19   A.    Based on my calculation, based on the debt

20   against its income properties, its leverage is

21   70 percent.

22   Q.    And based on its financial -- and based on First

23   Hartford's publicly filed and publicly audit financial

24   statements its leverage is in excess of 95 percent,

25   correct?

1    A.    Its -- on its book value.

2    Q.    In its publicly filed audited financial

3    statements, using those, the leverage is in excess of

4    95 percent, correct?

5    A.    That is correct, yes.

6    Q.    Thank you.  And that's not something that you're

7    taking into account in doing your calculations,

8    correct?

9    A.    I did take it into account.

10   Q.    Did you attempt to adjust -- make any adjustments

11   to either the REITs or to First Hartford in trying to

12   compare them?

13   A.    I -- I simply looked at -- I did two things.  I

14   looked at the dividend-paying capacity of First

15   Hartford Corporation in its own right based on its

16   capital structure, and then I simply looked at -- at

17   the dividend yield across at the REITs, at a -- at a

18   sufficient sample of REITs where I feel comfortable

19   that -- that the payout ratios of the REITs are

20   consistent with the payout ratio of First Hartford

21   Corporation, recognizing the differences that REITs

22   have with First Hartford Corporation in terms of the

23   business mix and the overall capitalization.

24   Q.    Did you read the section of Chapter 11 that was

25   devoted to selecting pricing multiples for subject

```
 1   company relative to the guideline company pricing

 2   multiples?

 3   A.     Probably not.

 4   Q.     So you didn't do any analysis like that?

 5   A.     I -- the analysis I did is -- is included in the

 6   exhibits that we've been through.

 7   Q.     And is there anything that you did, any of the

 8   analysis that you did or the work that you did that

 9   matches up in any way with anything that's in

10   Chapter 11 of the Pratt book?

11   A.     I've told you that I am -- I am not an expert on

12   the Pratt book, so I can't answer your question.

13   Q.     Do you know whether or not the procedures and

14   sources set out in Chapter 11 of the Pratt book for

15   implementing the guideline public company method of

16   valuing the equity owner -- ownership of a business is

17   widely used and accepted?

18   A.     I -- I have no basis for making that

19   determination.

20   Q.     And do you know whether or not if -- if you're

21   going to use it you have to use it very carefully;

22   would you agree with that?

23   A.     Any method that you use you need to apply

24   carefully.

25   Q.     Okay.  But you didn't -- you didn't read -- did
```

1    you look at Page 305?

2    A.    I -- I -- if I did I don't remember it.

3    Q.    Okay.  Has First Hartford ever been profitable?

4    A.    From a -- in what sense?  From a reported

5    earnings point of view?

6    Q.    Yes.

7    A.    Yes, I believe they have.  The years that they

8    sell and have gains on sales of properties.

9    Q.    And that's the only time they have a profit,

10   correct?

11   A.    I believe so, yeah.

12   Q.    Does profitability have any relationship to

13   ability to pay dividends?

14   A.    There are many partnerships in real estate that

15   never show a profit and pay a significant dividend out

16   of -- out of available cash flow because of

17   depreciation.

18   Q.    Does First Hartford Corporation have positive

19   cash flow in any year that it doesn't have a sale?

20   A.    In the -- they do require sales based on their

21   business model to -- to show profits, yes.

22   Q.    And that -- it's fairly --

23   A.    Excuse me, but that doesn't mean that they don't

24   have positive cash flow because they -- they do have an

25   extremely high expense base, and if -- it goes beyond

1    where -- what they need to run their business, in my

2    opinion.

3    Q.    Are you aware that Mr. Kaplan claimed that the

4    payment of a dividend was oppressive behavior?

5    A.    I'm not aware.

6         MR. NOLAN:  Excuse me a minute, I may be

7    through.

8    BY MR. NOLAN:

9    Q.    Implicit in your analysis both on the discounted

10   cash flow approach and the dividend capacity approach,

11   you have -- are you assuming that -- or have you

12   concluded that First Hartford Corporation for the

13   foreseeable future will have no taxable income?

14   A.    No, I didn't say that.  I -- I didn't assume

15   that.  I assumed that they would have sufficient net

16   operating loss carryforward to offset future taxable

17   income.

18   Q.    Again, that only -- that scenario will occur only

19   if First Hartford continues to create -- create new

20   properties, correct?

21   A.    What situation?

22   Q.    The fact that it will continue in business and

23   have income.

24   A.    No, they have -- they have the ability to sit

25   back on their income property portfolio and -- and --

1    and receive distributions from them.  They would have

2    to cut their expenses back, but they could do that.

3    Q.    In other words, they could just manage the

4    portfolio and sell off properties and continue

5    invest is -- in business for awhile?

6    A.    They -- they could simply manage the properties

7    they have and not sell any and continue in business.

8    Q.    But the only way they have any money to

9    distribute is from selling properties; I think we

10   established that.

11   A.    Well, they -- they would change their business

12   model and simply manage and own their income property

13   portfolio.  A lot of companies do that.

14   Q.    That would be a slow liquidation?

15   A.    Doesn't have to be a slow liquidation; they just

16   own and operate income properties.

17   Q.    And would that be a profitable venture?

18   A.    If their -- if their general and administrative

19   expenses were sized properly to the level of volume, it

20   could be, yes.

21   Q.    And you -- you made no effort to determine what

22   the company would be worth in that business model, did

23   you?

24   A.    I valued the income property portion of the

25   portfolio.

1    Q.    Is paying dividends a function of state law in

2    part, the ability of a company to pay dividends?

3    A.    I don't know what you mean by state law, no, I --

4    dividend policy is set by management, companies.

5    Q.    Will they have to comply with state law if

6    they're a corporation?

7    A.    All companies have to apply (sic) with state and

8    federal laws.

9    Q.    And do you know whether or not there is a Maine

10   statute that governs the ability of a company to pay a

11   dividend?

12   A.    I -- I'm not familiar with Maine statutes.

13   Q.    You do know that First Hartford Corporation is a

14   Maine corporation, or don't you?

15   A.    I don't know where its certificate of

16   incorporation is.

17   Q.    In -- in your business career have you ever had

18   to consider the effect of state laws on an ability of a

19   company to pay a dividend?

20   A.    No.

21   Q.    Okay.

22        MR. NOLAN:  I think that's all I have.

23        THE COURT:  All right.  Thank you, Mr. Nolan.

24   Why don't we go off the record for -- beg your pardon?

25   Why don't we go off the record for just a second.

1                    (A recess was taken.)

2           THE COURT:  Mr. Groff, cross-examination.

3                     CROSS EXAMINATION

4     BY MR. GROFF:

5     Q.    Mr. Aertsen, if you would turn to your rebuttal

6     testimony, I just have a few questions.  It would be

7     easier if you referenced it.

8     A.    Okay, that's --

9     Q.    Would you turn to Page 229?

10    A.    Let me find it first here, I'm sorry.

11          MR. NEWMAN:  It won't be in the exhibits.  He

12    means the --

13          MR. GROFF:  The rebuttal testimony.

14          MR. NEWMAN:  The hearing testimony.

15    A.    Oh, I don't have that in front of me.

16          MR. NEWMAN:  I'll have to look on with you.

17          THE WITNESS:  Okay.

18    Q.    Page 229.

19    A.    Okay.

20    Q.    Line 10.

21          THE COURT:  And this again is a transcript, of

22    course, of the July 25th proceedings.

23          MR. GROFF:  That's correct, Your Honor.

24    A.    Yes.

25    Q.    The question:  So is the value of excess cash,

1  that amount, over and above the working capital cash?

2       And the answer was:  Yes, it is, yes.

3       Correct?

4  A.    Yes.

5  Q.    Could you define what you meant in that statement

6  by working capital cash?

7  A.    If -- if you take the company's current assets,

8  which would include cash, marketable securities,

9  accounts receivable, current accounts receivables,

10 generally stuff under GAAP that would be listed as a

11 current asset, and you deduct from that the current

12 liabilities, such as accounts payable, for example, and

13 other current liabilities, then you -- and if you -- to

14 the extent that you end up in a net positive cash

15 position, then that would be excess -- net excess

16 working capital that would be available for other

17 things.

18 Q.    How liquid is that -- in your view, that excess

19 working cash -- working capital cash that you believe

20 First Hartford has during this period of time?

21 A.    Well, when you say liquid, it -- obviously it's

22 cash or near cash, which means it's generally available

23 to them in the near term.  But it doesn't mean that it

24 can't be used periodically and then come back.  So the

25 question is whether it's truly excess, meaning is --

1   is -- is there some future payment that will be

2   required, or is it at the discretion of management to

3   spend it in -- in ways that -- in a longer-term sense.

4   Q.    How long did you take to prepare your disclosure

5   for your rebuttal testimony, total time?

6   A.    I -- I don't remember the total time.  I can't

7   tell you.

8   Q.    Can you give me an estimate?

9   A.    Well, I can tell you that the total hours I've --

10  you can see the total hours I billed.  And when you say

11  the rebuttal testimony, I'm not sure what you mean by

12  that.

13  Q.    Let me be more specific.  How long did it take

14  you to do your analysis, your corroborative -- in your

15  view, your corroborative analysis using the dividend

16  capacity method?  How long did it take you to do that?

17  A.    Probably a day or two, several days, full days.

18  Q.    All right.  And you simply used the REITs that

19  you could find on Morningstar that were ever mentioned

20  by Nancy Fannon or Professor Riddiough, correct?

21  A.    No, that's not true.

22  Q.    Well, that was the universe of the REITs was --

23  A.    Well, yes, but your -- you asked me the question

24  whether in my analysis, I didn't simply use the REITs.

25  The REITs were one part of the analysis.

1    Q.    But they were the -- the REITs -- how you chose

2    the REITs were simply the ones you could find on

3    Morningstar that were mentioned by Professor Riddiough

4    or Nancy Fannon.

5    A.    I -- I -- yes, yes is the answer to your

6    question.

7    Q.    You did no analysis of any of those REITs you

8    selected yourself, correct, other than referring --

9    looking at the information that was reported in

10   Morningstar about that REIT?

11   A.    I'm generally familiar with the REIT industry,

12   and with respect to specific companies in it I'm very

13   familiar with them.  So my -- my analysis extends

14   beyond this particular case and is ongoing.  It's in

15   the past, it's in the present, and it is ongoing based

16   on my other business activities.

17   Q.    In doing your REIT dividend-paying analysis and

18   applying that in your view to First Hartford, was all

19   the information that you utilized concerning First

20   Hartford publicly available to anyone?

21   A.    Well, I -- the information I used with respect to

22   First Hartford is virtually all public information

23   because it's from their filings.

24   Q.    And the vast -- as to specifics of how you

25   calculated the dividend-paying capacity for those REITs

1    you used, even though you might have extensive

2    experience, someone else would have been able to look

3    at the Morningstar reports and come up with the same

4    numbers; is that correct?

5    A.    Which numbers?

6    Q.    For the -- analyzing the dividend capacity of the

7    measurement of how much dividends various REITs paid.

8    A.    Well, there's -- the -- with respect to the

9    13 names that I -- that were followed by Morningstar,

10   they do indicate a dividend payout ratio on those

11   names, yes.

12   Q.    Could you explain to me why, if the information

13   concerning First Hartford in your view that you used

14   was all public and the information that was critical to

15   you for the REITs, in your analysis of REITs, was

16   public, why couldn't a normal everyday investor do the

17   same thing?

18   A.    They could.

19   Q.    All right.  And is it your opinion that if a

20   regular, quasi-sophisticated investor looked at the

21   same things that you looked at, the public available

22   information from First Hartford and the Morningstar

23   reports, that they would very easily be able to

24   ascertain that this company had a net value of

25   somewhere in excess of 40 million?

1   A.    Well, first of all, the -- the one piece of
2   information that they wouldn't necessarily have are the
3   appraisals, the property appraisals, on First Hartford
4   Corporation.  But the other information they would
5   have.  And, if the -- if the investor were
6   sophisticated enough based on the types of properties
7   they have, they could come up with some estimate for
8   value.  So yes, they could, and yes, they could look --
9   anybody who's a member can look at the Morningstar
10  reports.
11  Q.    And so the only variable that you believe
12  somebody -- you might have that's unique from someone
13  else is the appraisals of real estate?
14  A.    Well, when you say unique to somebody else --
15  Q.    Unique from someone else having.  In other words,
16  an investor, a normal investor who wants to buy stock,
17  your testimony would be that investor had access to
18  every bit of information except maybe not some of the
19  appraisals.
20  A.    Well, they wouldn't -- they wouldn't have the
21  appraisals and that's -- that's very significant.
22  Q.    Now, could you explain to me why, if this company
23  is actually worth this amount of money that you claim
24  in your corroborative analysis, why this company --
25  there was no -- no effort made to buy this company out,

1    take it over, or buy -- buy stock?

2    A.    Well, then I think you're getting into the issue

3    of the Pink Sheet market that it's listed on, which has

4    its own set of circumstances.  The REIT marketplace

5    generally and the REITs and these names are all listed

6    in -- in major exchanges and this company is not.  And,

7    because of its management control issues that have all

8    been discussed before, there are reasons why nobody

9    would take a large position in this company because

10   they couldn't get control of it.

11   Q.    Now, look at Page 229, Line 21.  Is it your

12   position that all deposits, escrows, prepaid and

13   deferred expenses are not assets involved in the

14   production of income?

15   A.    Let me just read what I said here.  My opinion is

16   what I said.  Do you want me to read what I said?

17   Q.    Sure.  Let's make sure the question is framed.

18   Is it your position that all deposits, escrows, prepaid

19   and deferred expenses of First Hartford are not assets

20   involved in the production of income?

21   A.    They -- they ultimately produce income, but in

22   the stage they're in here they're predevelopment.  And

23   if your -- if your question is am I double counting

24   them with other things, the answer is no, because

25   they're not in the income property portfolio, they're

1    not in excess cash, they're not involved in any way

2    until they become like the Simon -- like the property

3    in Edinburg where they move up into a different

4    category.   So this is a separate, distinct category

5    that's not involved in the -- in my opinion in any of

6    the other cash flow analyses that I've done.

7    Q.    What happens if a deposit, escrow, or prepaid

8    expense is not recovered?

9    A.    Then it gets written off.

10   Q.    So as they sit on the books, many deposits,

11   escrows, or prepaid expenses, the company wouldn't have

12   the ability to convert those -- those things on the

13   books to cash; is that correct?

14   A.    No, they can sell them.   In fact, the -- one of

15   them, which is their -- their investment in the -- in

16   the Edinburg property, was converted a bit into cash

17   when they got the settlement payment from Simon,

18   because a portion -- a portion of the value that was

19   created in that settlement is -- is the value of the

20   Edinburg property, which was -- which was one of the

21   line items in this account.

22   Q.    Is it fair to say you might be able to realize

23   some cash but then on other things that you might not

24   be able to realize some cash?

25   A.    Well, I think that's a general statement about

1   anything.

2   Q.    If First Hartford does not sell a property in the

3   next couple years, is it -- take two years, two years

4   from now, is it your opinion that they do have the cash

5   available to pay a dividend anyway?

6   A.    I analyzed their dividend-paying capacity for a

7   band of years that is in my testimony.  I didn't

8   forecast the future.  I analyzed it for that -- their

9   dividend-paying capacity for those -- those years that

10  I analyzed.

11  Q.    You didn't answer my question, sir.  I asked you,

12  if First Hartford doesn't sell a piece of property in

13  the next couple years, two years from now would they

14  have the ability, based upon everything you have seen

15  historically, to pay a dividend?

16  A.    Yes, they would.

17  Q.    All right.  And where is that cash coming from?

18  A.    Cash comes from the sources that I mentioned

19  before.  They would obviously need to trim their

20  expenses significantly, but they can do that because

21  they have significant expenses that aren't related to

22  their underlying business, such as a payment of very

23  substantial bonuses, such as the litigation costs here,

24  so those presumably would be gone.  And they would

25  reduce their developmental overhead because they were

1    not successful in developing future properties, and

2    they would -- they would go back to a normal G and A

3    expense base, supported by the income property

4    portfolio that they have, both in terms of own

5    properties and their investment in -- in -- in their

6    joint venture properties that are not consolidated.  So

7    to say that they couldn't pay a dividend in the future

8    if they didn't develop properties is not true.  If --

9    if they continue with their very high level of expenses

10   and running the business the way they do, they do need

11   to develop properties.  That is also a true statement.

12   Q.    And in your capitalization of the dividend-paying

13   method on Page -- on Exhibit 166, if in fact the

14   company doesn't have a substantial, ongoing gain from

15   sale of property, that's -- the dividend-paying

16   capacity would be greatly reduced, correct?

17   A.    That's -- I -- I don't agree with that statement.

18   I'm saying is, is the mix would change and if they --

19   if they didn't change their expense mix the answer to

20   your question would be yes.  But most companies, when

21   confronted with a changing mix of revenue, would also

22   adjust their expenses as well.  And I've already

23   explained to you in prior questions that the company's

24   debt service is taken care of by the income of

25   properties in place and doesn't require sales of assets

1  to cover that.  So the rest are all discretionary

2  spending.

3  Q.    So you believe that the -- the company could

4  never again have a gain of -- a gain on a sale of

5  property and still have liquidity to actually pay

6  dividends.

7  A.    Under the circumstances that I mentioned before.

8  Q.    If the company was totally restructured and their

9  expenses came down significantly?

10  A.    Well, when you say totally restructured, they

11  don't really have to restructure themselves; they

12  simply have to reduce their high level of

13  administrative expense to make it consistent with

14  whatever revenues are going to be available to them in

15  the future.  But they do have a substantial income

16  property portfolio which -- which, as I've testified

17  before, has significant net operating income available

18  to pay dividends if their expense base is -- is sized

19  properly to that revenue stream.

20  Q.    All right.  And if they do have -- did you

21  compute based upon the properties that they own

22  currently, like a REIT owns property, did you do an

23  analysis of what the dividend-paying capacity would be

24  minus the sales, minus any sales, saying there's never

25  going to be a sale again?

1   A.   I -- I have looked at their debt service

2   requirements, and so the variable there would be the

3   level of expenses.  And, if you're telling me that

4   they're going to continue with very high levels of

5   bonuses and expenses relating to this litigation, then

6   I would say that their dividend capacity in the absence

7   of property sales would be diminished.  But, if you're

8   telling me that -- that their G and A and their bonus

9   and litigation expenses will be normal to the industry,

10   then I would say that they would have dividend capacity

11   at that point.  But I haven't done the specific

12   analysis.

13   Q.   So you don't know.

14   A.   I -- I can make an educated guess based on my

15   experience.

16   Q.   And when you say bonuses, you understand that

17   there was only bonuses in one year, one time, correct,

18   in 20 some years of the company's history?

19   A.   I'm -- I'm referring to the year 2006.

20   Q.   And you understand that that's a one-time event,

21   correct?

22   A.   Well, it's -- it's -- their level of G and A

23   expenses are also -- generally are high relative to the

24   industry, given the size of the asset portfolio that

25   they're managing.

1   Q.    Is it correct, sir, that for all the years you

2   analyzed debts there was a negative pretax net income?

3   A.    The negative pretax -- yes, there is.

4   Q.    All right.  And in the years that you analyzed,

5   2004 to 2006, if they actually wanted to pay a

6   dividend, is it in fact correct that they would have --

7   and -- had to borrow the money?

8   A.    No, because a big chunk of their pretax is

9   depreciation and other noncash charges, so --

10  Q.    Well, let me stop you for a second.  I'm looking

11  at Exhibit 166, and depreciation is 856,000 in -- in

12  roughly 2006, 642,000 in 2005, and 2004 it's only

13  508,000, correct?

14  A.    Yes, but you --

15  Q.    And -- and is it also correct that the gain on

16  sale for those years, which you're utilizing, was 2006,

17  5.4 million, none in 2005, in 2004, 6.6.  Is that --

18  did I read that correctly?

19  A.    Yes, you have.

20  Q.    And so, sir, isn't it in fact true that in this

21  particular case the amount of cash that is garnered by

22  adding back depreciation is not very substantial, not a

23  real substantial part of your calculation as set forth

24  in 166?

25  A.    No, it includes -- it includes the gains and

1    it -- given the level of expense base that they have

2    represented in the pretax, the cash --

3    Q.    Could you answer my question yes or no?

4    A.    I'm answering your question.  I can't answer your

5    question yes or no; it takes more than a yes or no.

6         There are three sources of distributable cash

7    that I've -- I've outlined.  There's the typical funds

8    from operation, which is pretax plus depreciation, and

9    then there is the gain on sale and then there is the

10   distributions from their nonconsolidated subsidiary.

11   You have to look at all three.

12   Q.    All right.  And so the pretax net income is

13   negative, the depreciation is the numbers that you and

14   I have just agreed to, the gain on sales are the

15   numbers you and I just discussed, and the distributions

16   from affiliates, that number is 1 million 68 -- 1.6

17   million, 2006, 229,000 in 2005, and about 1 million in

18   2004, correct?

19   A.    Yes.

20   Q.    All right.  And those distributions from

21   affiliates, do you know if that -- if they -- the

22   affiliates got that money based upon if it's equity or

23   they got -- or profits or they got that money from

24   borrowing?

25   A.    It's -- they could get it from all three sources,

1   and they can also get it from sale of assets.  In this

2   case --

3   Q.    My question is, do you know how they got it in

4   those years.

5   A.    In those years it came from a combination of all

6   three.

7   Q.    And was most of it borrowed money?

8   A.    They did a major refinancing, and in fact I did

9   not include in this calculation 6 million of

10  distribution that was used to purchase an additional

11  interest in the Cranston property.

12  Q.    Sir, my question was, was most of the money that

13  came up from distributions from affiliates borrowed

14  money?  Yes or no.

15  A.    Some of it is borrowed, yes.

16  Q.    Was most of it borrowed?

17  A.    In the year 2006 most of it was borrowed money,

18  yes.

19  Q.    Yeah.

20  A.    But that's -- that's a normal practice in real

21  estate.

22  Q.    All right.

23  A.    Normal part of the cash flows is to -- is

24  financings and refinancings, particularly in retail

25  properties where you have rent step-ups and you're

1   creating additional value given the cap rate in the --

2   in the properties every time the -- the leases are

3   stepped up in terms of rents.

4   Q.   All right.  The dividend method, capacity payment

5   method concerning REITs, are you -- are you now

6   comfortable with the fact that to utilize that method

7   with REITs in accord at least with Pratt that you

8   exclude gain -- you exclude gains on sales?

9   A.   I -- I can't reference Pratt, but I can tell you

10  that in the REIT industry analysts measure REITs based

11  on the continuing dividend payments from funds from

12  operation, which does not include the sale of property

13  and in generally way does not include the refinancing

14  of property in a material way, unlike this company.

15  Q.   Right.  So it's -- the concept for a REIT is that

16  a REIT is relatively stable, has a large number of

17  properties, has expenses that have been defined over a

18  period of time, and you can look year to year with some

19  consistency at the return the REIT would be getting on

20  those properties they're holding; is that correct?

21  A.   That is correct, yes.

22  Q.   And then, because of the tax laws with REITs,

23  they -- most of that money that they gain by that

24  operation or they make in that operation gets paid out

25  in dividends because that makes taxes paid only once.

1   A.    That is --

2   Q.    Very simplistic view, right?

3   A.    That is correct, yes.

4   Q.    All right.  And what you've done is you've taken

5   First Hartford, which is an entirely different, in your

6   view, business model, and you have tried to shoehorn

7   that into the same box, the same analysis, as the

8   dividend payment analysis method for REITs, correct?

9   A.    No, that's not true.  Would you like me to

10  explain what I did do?

11  Q.    I think -- you feel you've already adequately

12  explained what you did in your -- in your testimony so

13  far today and your exhibits?  If you have, I don't want

14  to hear it again.  Have you?

15  A.    I -- I'm happy to -- to explain to you what I

16  did.  I've answered your question no.

17  Q.    Have you -- do you believe you've adequately

18  explained it in your prior cross-examination this

19  morning and in your disclosure?

20  A.    I believe in the sum total of everything that I

21  said I've adequately explained it, yes.

22  Q.    Have you ever utilized this method to value stock

23  as an expert witness?

24  A.    No.

25  Q.    Do you know of any book or treatise that would

1    confirm that it would be appropriate to utilize this

2    dividend paying method of REITs and apply that to a

3    company that you believe doesn't operate like a REIT,

4    isn't taxed the same, doesn't have the same structure?

5    A.     Yes, I do.  In fact, I'm -- I'm --

6    Q.     Point me to -- point me to some.

7    A.     New England Realty, where I'm chairman of the

8    audit committee, is -- exactly this type of analysis is

9    used for that.

10   Q.     Point me to a treatise.

11   A.     I don't know what you mean by treatise.

12   Q.     Point me to a book, point me to something that I

13   can read.

14   A.     Well, I'm -- I'm speaking from my own experience,

15   I can't -- I can't reference books, but I do know that

16   if you go to Green Street or you go to Merrill or any

17   one of the REIT analysts they will talk about how they

18   value public partnerships, how they value REITs, and

19   one way is through a dividend capitalization rate.  And

20   the -- you know, there's -- there's nothing magic or --

21   or exotic about this type of analysis.  Dividend

22   payment rates are capitalized all the time in real

23   estate, in REITs, in -- in master limited partnerships,

24   in private trusts, in private LLCs all the time.  It's

25   the capacity of a -- an entity to pay a dividend, not

1    whether they pay but the -- the capacity to pay.

2    Some -- some companies don't pay dividends, instead

3    reinvest.  They don't -- but it's -- it's the ability

4    to pay and the ability to reinvest is what's being

5    measured.

6    Q.    Sir, can you point to me -- point out for me any

7    published material that says it is appropriate under

8    this dividend capacity method to utilize REITs and then

9    apply -- apply those numbers to C corps?

10   A.    I can't point to any specific document, no.

11   Q.    Have you ever seen it done -- approve -- have you

12   ever seen it approved, that method, by any court in

13   this country?

14   A.    I have not, no.

15   Q.    Sir, you just made this up, didn't you?

16   A.    No, I didn't.

17   Q.    Isn't this a unique --

18           MR. NEWMAN:  Object to the argument.

19           THE COURT:  Sustained.

20           MR. NEWMAN:  Particularly when Professor

21   Riddiough submitted a similar analysis.

22           MR. NOLAN:  That's -- that be stricken.

23           MR. NEWMAN:  I'll withdraw the comment, Your

24   Honor.

25           THE COURT:  All right, thank you.

1    BY MR. GROFF:

2    Q.    Do you believe that First Hartford could go to a

3    bank and borrow money right now to pay substantial

4    dividends?

5    A.    I believe that -- that First Hartford is a

6    bankable company and that it could borrow against its

7    real estate assets.  What they use the proceeds for

8    is -- is a function of management, what they decide to

9    do with the money.

10   Q.    Sir --

11   A.    But to the extent that there is excess over what

12   they currently have in place, then presumably a portion

13   of that could be used for dividends and in fact is in

14   most real estate companies.  Most real estate

15   companies, their real estate appreciates over time, and

16   particularly in retail when you're having stepped-up

17   rents and increased NOI year to year, and so borrowing

18   is part -- increased borrowing is part of the normal

19   cash flows of real estate entities.  It's not just true

20   for First Hartford; it's true in the industry

21   generally.  And so cash flow from refinancings is an --

22   is an ordinary part of business; and in fact in most

23   partnership and limited liability company agreements

24   there is a requirement to distribute proceeds from

25   refinancings and proceeds from asset sales.  There's a

1    requirement to do that.

2    Q.    Sir, I'm focusing on First Hartford right now.

3    A.    Yes.

4    Q.    If First Hartford went to their bank and said, we

5    want to borrow money, isn't it your understanding right

6    now that unless somebody cosigns on that, namely Neil

7    Ellis, they can't borrow money right now very well

8    anyway?

9    A.    Are you talking about right now -- do you mean

10   right now or do you mean about during the valuation

11   period?

12   Q.    The last year, the last year.

13   A.    They -- they -- as recently as 2006 they

14   increased significantly the financings of Dover and

15   Cranston at a much lower interest rate all on a

16   nonrecourse basis, so the answer to your question is

17   yes, they could.

18   Q.    And they paid defeasance costs, correct?

19   A.    Absolutely they did.

20   Q.    And -- and you -- do you believe that would have

21   been an appropriate thing for this company to do is to

22   borrow money to pay dividends in a substantial amount

23   as in accord with your analysis?

24   A.    Real estate companies do it all the time.

25   They -- they -- they have to provide a return to their

1    investors, and they get their money from the three

2    sources that I've identified for you in my testimony on

3    dividend-paying capacity.  And financings and

4    refinancings and -- is -- is one of those sources of

5    monies, absolutely.

6    Q.    And the largest source of money by far is gain on

7    sale, correct?

8    A.    In this company it is.

9    Q.    Right.

10    A.    During this period, yes.

11    Q.    And so your entire testimony is predicated on the

12    fact that -- well, how many sales have there been in

13    the history of this company; do you know?

14    A.    I can't tell you about the history of this

15    company.  I can only tell you about the years that I

16    analyzed.

17    Q.    How come you didn't go back to see if gain on

18    sale is a recurring thing, because you average them;

19    how come you didn't go back and look at the company

20    from its beginnings?

21    A.    I felt it was relevant for my analysis to look at

22    the periods that I looked at.

23    Q.    And it just --

24    A.    This is my -- I -- what I did in this case is

25    what I do in all of my investment decisions.  I

```
1    don't -- I don't -- I look at the -- a reasonable time
2    frame, three years back, and then I look at the
3    forecast period going forward.  It's the way I do my
4    business.
5    Q.    How often have you valued stock?
6    A.    How often have I valued stock.
7    Q.    Stock, yeah.
8    A.    In a general way?  Every day.
9    Q.    Have you ever provided expert testimony, ever, in
10   any court in this country about valuing stock?
11   A.    No, I haven't.
12        MR. NEWMAN:  Objection to the repetition.
13        THE COURT:  I'll allow it.  Are you moving on,
14   Mr. Groff?
15        MR. GROFF:  Um-hum.
16   BY MR. GROFF:
17   Q.    Sir, is gain on sale the same as cash?
18   A.    No, it's not necessarily.
19   Q.    The cash could have been pulled out of a property
20   long before, but there would still be a gain on the
21   sale, correct?
22   A.    Well, in -- in this particular case --
23   Q.    No, I just asked a yes or a no.
24   A.    Usually a gain on sale is net of all related
25   expenses.  The only question about it is the timing of
```

1    its receipt.

2    Q.    And the timing of having cash and the timing of a

3    gain aren't -- it's not exactly always the exact same

4    time, correct?  Yes or no.

5    A.    That's correct, yes.

6    Q.    So -- sir, did you ever look at the price of this

7    company's stock over a period of time and analyze that?

8    A.    I -- I -- given my testimony in the trial, and if

9    you want me to go back and reread that for you, I would

10   be happy to.  But, yes, I looked at the stock price and

11   the Pink Sheet, and I've written about that and

12   testified to that already.

13   Q.    And is it in fact correct that when there were

14   sales that the price of the stock actually for a period

15   of time went up; is that right?

16   A.    I -- I can't remember the -- the day-to-day or

17   the month-to-month fluctuation of stock price.  All I

18   can tell you is that the stock price is not a valid

19   indicator of the true value of this company.

20   Q.    Sir, I didn't ask that.  All I want to know is

21   what you know, and if you don't know that then you

22   don't know.

23   A.    I don't know that.  I don't know that that was

24   the reason why the stock price went up, I can't --

25   Q.    I didn't ask for the reason.  I just asked if in

1   your analysis it did or it didn't.

2   A.    I --

3   Q.    And you don't know?

4   A.    I know the range of stock and I did look at

5   schedules, but I can't tell you why stock went up on

6   one day and down on another.

7   Q.    I didn't ask that question.

8   A.    Okay.

9          MR. GROFF:  I'm -- I'm done.

10         THE COURT:  All right.

11         MR. NEWMAN:  Your Honor, I just need a moment

12  off the record to check one thing.

13            (Discussion off the record.)

14         THE COURT:  Mr. Newman, before you ask your

15  questions, at the break there was some discussion about

16  Plaintiff's Exhibits 165 through 169, and -- which have

17  been offered but not yet admitted, and whether or not

18  their admission would shorten your redirect.  And I

19  understand that, subject to and without waiving their

20  Daubert and Kumho challenges, the defendants do not

21  object to the admissions of Plaintiff's Exhibits 165

22  through 169; is that right?

23         MR. NOLAN:  Correct, Your Honor.

24         MR. GROFF:  Correct, Your Honor.

25         THE COURT:  All right.  So --

1          MR. NEWMAN:  Thank you, Your Honor.

2          THE COURT:  Those will be admitted subject to

3     that condition without objection.  Go ahead,

4     Mr. Newman.

5                    REDIRECT EXAMINATION

6     BY MR. NEWMAN:

7     Q.     Mr. Aertsen, before this case had you ever had an

8     occasion to apply a -- an analysis of the

9     dividend-paying capacity of a company in connection

10    with a valuing of that company?

11    A.     Yes, I -- I do.

12    Q.     Okay.  Would you explain that -- describe your

13    experience, please.

14    A.     Well, you -- when you're looking at a company's

15    cash flow, its ability to generate sufficient cash that

16    can be distributed or reinvested is a key part of the

17    analysis.  And -- because it represents either payments

18    to investors, which is important to consider and value

19    their returns, if you're valuing a security, or any

20    form of security, whether it's a debt security or an

21    equity security.  But it's also important because it --

22    it indicates the amount of cash that's available to

23    reinvest in the business.  So yes, it's an integral

24    part of all analysis that's done.

25    Q.     On the first day of this hearing you described at

1    some length for the Court your experience in real

2    estate and business and in valuing companies.  And my

3    question, sir, is that in that experience have you used

4    a model, like the model for capitalization of

5    dividend-paying capacity that you've shown on

6    Plaintiff's Exhibits 165 through 169, had you used that

7    before in your business?

8    A.    Yes, I have.

9    Q.    Okay.  Why don't you just describe for the Court

10   briefly, if you could, the extent of that experience

11   and use of that model in valuing businesses.

12   A.    Well, for example, it's used in my investment --

13   I think I went through this before in my prior

14   testimony.  But in the case of a public company that

15   I'm on the board of it's routinely done whenever we're

16   going to pay a dividend or make a distribution to look

17   at the total return and the return of capital to our

18   investors, and in particular to make sure that the

19   amount of money that we pay out is -- is truly

20   distributable, but also it considers the -- in the case

21   of a partnership the investors' tax position and make

22   sure that they're not getting phantom income.

23         In the case of my own private investments in

24   real estate, it is a routine analysis that I do when

25   I'm making an investment and also when I'm -- when I'm

1    looking at the -- approving budgets for the ongoing

2    year and when I'm looking at the distributions that I

3    get as an investor.

4           When it comes to doing hold/sell analyses, in

5    my real estate advisory business we use it routinely,

6    not only to determine the value of the business but

7    then to look at, if they held the business, what could

8    they expect for future returns.  So it's a very

9    standard form of analysis, again, whether the

10   company -- I used to do it when we were building our

11   REIT portfolio.  When REITs first got started in the --

12   in the early '90s, after the real estate crisis in --

13   in the start-up REITs it was very important to

14   determine based on the portfolios that they were

15   acquiring how they were going to satisfy the various

16   investor constituencies they had and returns they were

17   going to give.  And -- and I would say that -- that,

18   even though REITs are different from -- in their

19   organizational structures in some ways from other real

20   estate entities, the fundamentals are still basically

21   the same, and it's the fundamental analysis that's

22   applied universally.

23   Q.    If First Hartford Corporation elected to shift

24   its business model from a heavy emphasis on development

25   activity and growth and instead moved to a company

1    holding properties and electing to pay div -- pay

2    regular dividends, are there financing means that would

3    enhance their ability to pay dividends?

4    A.    Yes, I mean -- well, we've -- I've explained some

5    of them, but they -- right now they -- they heavily

6    invest -- they obviously don't pay a dividend and they

7    heavily invest in the development side of their

8    business.  And -- but if they elected not to, then they

9    would stop investing in the development side of their

10   business and resize the company consistent with the

11   income properties that they had.  And -- and that's

12   something that's done all the time in the industry.

13   Q.    Specifically with respect to how they finance

14   properties, I note that there are principal payments

15   and amortization schedules of principal in the public

16   financing statements.  Are there other means of

17   financing that First Hartford would turn to if they

18   elected to enhance their ability to pay regular

19   dividends?

20   A.    Right, well, I can speak from my own experience

21   with New England Realty where we refinanced

22   significantly portion of our portfolio over the last

23   five years on an interest-only basis so that there's no

24   amortization at all.  And if they were to pool --

25   that's on an individual property basis, but if they

1    were to pool their income properties they could also

2    get financing from -- in the form of, say, a revolving

3    type credit which is against a pool of real estate,

4    which is more consistent with how the REITs finance

5    their income property portfolios.

6    Q.    Mr. Aertsen, would you please turn to

7    Exhibit P166.  Now, in your column for sources of

8    distributable cash, you account for -- and I'm going to

9    read from the exhibit -- pretax net income,

10   depreciation, gains on sale, and distributions from

11   affiliates.  And you've testified that all of those

12   numbers as shown in footnotes below come from the --

13   FHC's 10-K.

14   A.    That is correct.

15   Q.    Now, I want to direct your attention to the FHC

16   form 10-K for the year 2006, which is marked

17   Exhibit P120, direct your attention to Page 25.  I want

18   to give counsel a chance to get it if they haven't.  I

19   have just one -- one area of questioning on this.

20          Now, to lay the foundation for this question,

21   Mr. Aertsen, in your work in this case you examined the

22   report and exhibits that First Hartford submitted for

23   Professor Riddiough as an expert opinion in this case,

24   have you?

25   A.    Yes, I have.

1    Q.    And did you examine Exhibit 4 where Professor

2    Riddiough laid out his capitalization of income model

3    with an analysis of adjusted funds from operation?

4    A.    Yes, I'm familiar with that.

5    Q.    And did Professor Riddiough include an assessment

6    of available income for capitalization, gains on sale

7    of property?

8    A.    Yes, he did.

9    Q.    Did Professor Riddiough also include as a line

10   item in assessing available income the line shown on

11   the form 10-K, Exhibit P120, Page 25, for equity in or

12   losses, earnings of unconsolidated subsidiaries?

13   A.    No, he did not.

14          MR. NEWMAN:  Just a moment.

15   BY MR. NEWMAN:

16   Q.    I'm going to show you a copy of the Exhibit 4

17   from Professor Riddiough's report, which is

18   Exhibit D45, I believe.  Double-check that.

19          MS. MCDANIEL:  Errata, 45A?

20          MR. NEWMAN:  No, just D45.  I can find it.

21   Q.    I'm going to direct your attention to what's in

22   evidence Exhibit Defendant's 45, Exhibit 4.

23   A.    Oh, okay.

24   Q.    My question, sir --

25   A.    Yes.

1    Q.    -- is on row F, did Professor Riddiough include

2    in his assessment of adjusted income for his

3    capitalization of income approach the line item, equity

4    and income or loss of unconsolidated subsidiaries?

5    A.    Yes, yes, he did.  I thought you were pointing

6    to --

7            MR. NOLAN:  Objection, Your Honor.

8            THE COURT:  Basis?

9            MR. NOLAN:  Beyond the scope of rebuttal.

10           THE COURT:  Isn't this beyond the scope of the

11   cross-examination?

12           MR. NEWMAN:  It goes -- it goes directly to

13   the issues of examining him on available cash flow,

14   distributable cash flow, and they went down through his

15   columns.  This is one that he did not include, and I

16   was going to ask him why he did not include it.

17           MR. NOLAN:  Professor Riddiough's methodology

18   was entirely different.  He wasn't doing -- using a

19   methodology that Mr. Aertsen claims he was using in his

20   rebuttal disclosure.

21           THE COURT:  I -- I'm going to sustain the

22   objection.  I think we're beyond the scope.  This is

23   redirect, should be limited obviously to the topics

24   that were -- that were discussed on the

25   cross-examination.

1          MR. NEWMAN:  If I could be heard, Your Honor,

2     briefly.  Based upon what we received for disclosures

3     from Ms. Fannon as well, this issue is going to come up

4     in her testimony, and my only question is why he did

5     not include this line item.  I was simply locating it

6     in Professor Riddiough's exhibit.  I'm not going to be

7     examining him extensively on Professor Riddiough's --

8          THE COURT:  Why who didn't include it?

9          MR. NEWMAN:  Why Mr. Aertsen did not include

10     this line item in his adjusted income showing

11     distributable cash flow.

12          MR. NOLAN:  We're now -- we were at apples and

13     oranges, and now we've added pears.  It's an entirely

14     different methodology used by Professor Riddiough.

15     It's got nothing to do with the methodologies we've

16     been testifying on cross-examination here today.

17          THE COURT:  I'm going to sustain the

18     objection.

19          THE WITNESS:  May I be able to ask a question?

20          THE COURT:  There's no question pending.

21          MR. NEWMAN:  No, no, no question pending.

22     BY MR. NEWMAN:

23     Q.   I'll just ask you for your Exhibit 166,

24     Plaintiff's 166, when you assessed and analyzed the

25     sources of distributable cash and available cash for

1    the dividend-paying capacity of First Hartford

2    Corporation, did you include the line item for equity

3    and losses and earnings of unconsolidated subsidiaries?

4    A.    I did not include a line for equity and losses.

5    I did include a line for distributions from

6    unconsolidated affiliates but not the equity.

7             MR. NOLAN:  Your Honor, could I ask that the

8    last part of that be stricken as nonresponsive.  He

9    asked him what he -- he asked him what he did and now

10   he's telling you what he didn't do.

11            MR. NEWMAN:  It's all part of the same

12   analysis.

13            THE COURT:  I'll allow it.

14   BY MR. NEWMAN:

15   Q.    Could you explain to us, Mr. Aertsen, why did you

16   include distribution from affiliates but not -- but

17   exclude the equity and losses, earnings of

18   unconsolidated subsidiaries?

19   A.    Well, those -- that's -- I've already testified

20   to this, but again this is a --

21            MR. NOLAN:  And I object to it.

22            THE COURT:  Objection's overruled, since we're

23   talking about Mr. Aertsen's document.  Go ahead,

24   Mr. Aertsen.

25   Q.    Okay.  I'm going to ask a very clear question

1    because I -- that may have been too jumbled.

2            Mr. Aertsen, could you describe for us why in

3    your assessment of sources of distributable cash as

4    shown on Plaintiff's 166 you did not include the line

5    item on Page 25 of the form 10-K, which is P120, for

6    equity in or losses, earnings of unconsolidated

7    subsidiaries?

8    A.    That's an accounting entry but it's not cash

9    flow, and in my analysis of dividend-paying capacity

10   I'm looking for cash flow.

11   Q.    Well, relating to the unconsolidated

12   subsidiaries, what did you include for cash flow?

13   A.    I included on Page 30 the cash flow from

14   investing activities, the distributions from affiliates

15   net, which is on Page 30 at the top.

16            THE COURT:   Page 30 of Exhibit P120.

17   A.    Which is the actual cash flow that they received

18   from --

19   BY MR. NEWMAN:

20   Q.    Page 30 of Exhibit P120?

21   A.    Yes.

22   Q.    Which is what, sir?

23   A.    Which is the actual cash flow they received,

24   distributions from affiliates.  That's a net number, so

25   there's money flowing both ways, but that's the net

1    receipt that they got.

2         MR. NEWMAN:  That's all I have, Your Honor,

3    thank you.

4         MR. NOLAN:  I have three questions.

5                   RECROSS EXAMINATION

6    BY MR. NOLAN:

7    Q.    Mr. Aertsen, you have never, ever valued a

8    publicly held C corporation engaged in the real estate

9    business, have you?

10   A.    I have -- I have analyzed many C corporations,

11   many of which have some real estate, but none that look

12   like First Hartford Corporation.

13   Q.    You may have analyzed the company, sir.  My

14   question was whether you have ever valued a publicly

15   held C corporation engaged in real estate.

16   A.    Valued in what way?

17   Q.    In -- in preparing a report and coming to a --

18   coming to a valuation.

19   A.    I have valued, and I -- I valued many C corps.

20   Q.    Engaged in real estate.

21   A.    Not exactly the way this company is, but many

22   that are engaged in real estate, yes.

23   Q.    Publicly held C corporations engaged in real

24   estate.

25   A.    Yes, I have, in my business practices.

1   Q.    When?

2   A.    When I was at the First National Bank of Boston.

3   Q.    Was that when you were lending them money or

4   trying to collect it?

5   A.    Both.

6   Q.    Would you name one of the corporations?

7   A.    Yes, Wang Laboratories, I went through that

8   before.

9   Q.    Wang Laboratories is a company that's engaged in

10  the real estate business?

11  A.    Wang real -- Wang Laboratories had at the time of

12  the analysis significant real estate holdings.

13  Q.    Was that before or after it went into bankruptcy?

14  A.    It was before.

15  Q.    And its primary line of business was making

16  computers?

17  A.    No, I -- in my prior testimony I had talked about

18  a sale leaseback transaction where we were the advising

19  agent for Wang Laboratories on -- on the sale and

20  leaseback of its prime manufacturing facility.

21  Q.    Sir, Wang Laboratories was a publicly held C

22  corporation that's primary business was manufacturing

23  computers and selling them, correct?

24  A.    That is correct.

25  Q.    And was your analysis before -- was it -- your

1    analysis in connection with loaning them money or

2    collecting money?

3    A.    It was -- my analysis was in connection with

4    valuing the company equity so that they could use that

5    equity as compensation for the sale leaseback.

6    Q.    Were you loaning them money or were you --

7    A.    I was a financial advisor.

8    Q.    Okay.  And was that before or after Wang went

9    bankrupt?

10    A.    It was well before.

11    Q.    Is it a true statement that you have never valued

12    anything using the guideline publicly traded company

13    method of valuation?

14    A.    I don't know what that method is.

15    Q.    That would be the subject matter of Chapter 11 of

16    the Pratt book.

17    A.    I -- I -- I'm not an expert on the Pratt book.

18    I don't know --

19    Q.    My question -- I understand you're not an expert

20    on the Pratt book.  My question was a different one,

21    sir.  My question was, have you ever valued a company

22    using the guideline publicly traded company

23    methodology?

24    A.    I don't know what that -- I -- I don't know what

25    that definition is.

1    Q.    So you don't know what the subject matter of

2    Chapter 11 of the Pratt book is.

3    A.    I would have to read it and I can probably answer

4    your question.

5    Q.    I thought you had read it or -- excuse me, you

6    only read one page of it; is that right?

7              MR. NEWMAN:  Objection, misstates his prior

8    testimony.

9              THE COURT:  Sustained.

10   BY MR. NOLAN:

11   Q.    And is it a true statement that today First

12   Hartford Corporation couldn't borrow a nickel from

13   anybody for anything?

14             MR. NEWMAN:  Objection, foundation.

15             MR. NOLAN:  That's the question Mr. Newman

16   asked him about changing the company around and

17   borrowing money.

18             THE COURT:  I'll allow it.  You can answer,

19   Mr. Aertsen.

20   A.    I think they're -- yes, anybody that has an

21   income property portfolio can borrow money today, even

22   in today's market, yes.

23   Q.    You think that's true.

24   A.    I do believe that's true.

25   Q.    You think there's money available to loan, in --

1    in the real estate business to a company that's at

2    least balance sheet insolvent.

3    A.    That's not what you asked me.

4    Q.    I asked about First -- First Hartford

5    Corporation.  Isn't it balance sheet insolvent at the

6    present time?

7    A.    I don't believe that it's -- it's -- well, when

8    lenders lend against commercial real estate they're not

9    looking at the holding company balance sheet; they're

10   looking at the underlying assets.  And as long as the

11   ratios that First Hartford Corporation is maintaining

12   or at least was maintaining at the time I did the --

13   for the period I looked at the analysis, if those

14   continue to be true, and I believe they do, then yes,

15   they could borrow money from a variety of lending

16   institution sources because their loan-to-value and

17   their debt service coverages are adequate.

18   Q.    I didn't ask you about subsidiaries, sir.  I

19   asked you about First Hartford Corporation.

20   A.    The holding company.

21   Q.    Yes.

22   A.    Oh, then -- then probably without Mr. --

23   somebody's outside guarantee they probably couldn't at

24   the holding company.

25   Q.    And the holding company is the company that

1    brings us here together today and brought us together

2    in July, correct?

3    A.    No, we're annualizing the entire entity of First

4    Hartford Corporation, including the parent and all of

5    its subsidiaries and including its unconsolidated

6    subsidiaries.

7              MR. NOLAN:   Thank you.

8              THE COURT:   Mr. Groff, recross?

9              MR. GROFF:   No, Your Honor.

10             THE COURT:   Mr. Newman?

11             MR. NEWMAN:   Nothing further, Your Honor.

12             THE COURT:   Thank you, Mr. Aertsen.

13                  (Time noted:   11:25 A.M.)

14                   **C E R T I F I C A T I O N**

15   I, Lori D. Dunbar, Registered Merit Reporter, Certified

16   Realtime Reporter, and Official Court Reporter for the

17   United States District Court, District of Maine,

18   certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20   Dated:   September 30, 2008

21             /s/ Lori D. Dunbar

22             Official Court Reporter

23

24

25