UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST HARTFORD CORPORATION | ) | |
| | ) | Civil Action No. 05-144-PH |
| *and* | ) | |
| | ) | |
| NEIL ELLIS, | ) | |
| | ) | |
| Defendants | ) | |

**POST-TRIAL BRIEF OF AMICI CURIAE**

Through their undersigned counsel, amici curiae Joel Lehrer, John Filippelli and Joseph R. Paolino, Sr. (referred to hereinafter as "amici"), who are three minority stockholders of defendant First Hartford Corporation,  submit this brief concerning the issues raised by the Phase II trial on remedies, which took place over three days in July and September 2008.  The purpose of the Phase II trial, according to the Court's Findings of Fact and Conclusions of Law, Part II: Remedy (Doc. No. 116), November 7, 2007, was to determine the price at which First Hartford Corporation must buy plaintiff Richard E. Kaplan's ("Kaplan's") shares.

By order of July 22, 2008 (Doc. No. 145), this Court granted Mssrs. Lehrer's, Filippelli's and Paolino's motion to participate as amici curiae in this matter.[1]

---

[1] As noted in their petition to participate amicus curiae (Doc. No. 137), Joel Lehrer is 68 years of age, and retired.  Other than a two bedroom condominium in New Jersey and his car, his principal asset is his ownership of approximately 185,000 shares of the common stock of First Hartford Corporation.  Mr. Lehrer

The Court has recognized that the selection and administration of court-ordered remedies in this case may seriously affect the interests of minority shareholders of First Hartford Corporation.  The Court previously stated that it was "troubled by the remedy question" and by the fact that "unlike most lawsuits involving conflicts over closely held corporations, there are hundreds of company shareholders who are not parties to this suit." Findings of Fact and Conclusions of Law, April 2, 2007 (Dkt. No. 81), at 3.[2]

The litigating parties are likewise aware that the relief sought in this litigation implicates the interest of other minority shareholders.  Kaplan's complaint requests, among other things, that "the Court enter an order providing for the purchase at fair value by Ellis and/or FHC of Kaplan's shares (*and the shares of other shareholders who desire to sell*) . . ." (emphasis added).[3]   In addition, Kaplan's Brief on Remedies (Doc. No.  95), June 1, 2007, at 18, represented that "[a]ll minority shareholders have been subjected to Mr. Ellis' oppression, *and so all are entitled to the remedy. By allowing them an option, the court will eliminate the concern of an impact on remaining minority shareholders that might be present if the buy-out relief were limited to Mr. Kaplan*." (emphasis added)

---

became a shareholder of First Hartford in the mid 1980's, and has purchased shares on the open market at various times. John Filippelli  owns, or co-owns with his wife, approximately 264,000 shares of the common stock of First Hartford Corporation.   Mr. Filippelli became a shareholder of First Hartford in the mid-1980's, and has purchased shares on the open market at various times since then.  Joseph R. Paolino, Sr., a resident of Providence, Rhode Island, owns approximately 11,000 shares of the common stock of First Hartford Corporation. He acquired these shares in February 2008.  None of the amici was or is a director, officer, or employee of First Hartford Corporation.

[2] The Court also requested further briefing to address how various contemplated remedies might affect shareholders other than the parties, and asked the parties whether shareholders should be invited to intervene, noting that in an action for dissolution, shareholders are given the right by statute to do so when one shareholder seeks to dissolve the company.  *Id.* at 46-48. The Court acknowledged Kaplan's counsel's earlier representation in closing argument that "an order of dissolution decree would [not] necessarily be in the best interest of shareholders*." Id.*, at 23, n. 33

[3] The Complaint also It also seeks the appointment of a receiver and liquidation of the Company, and additional relief that is in the nature of a shareholder derivative claim --  and an order to "rescind transactions

Similarly, First Hartford Corporation's brief on remedies assumed that a court–ordered purchase of shares at "fair value." will also be available to other shareholders of the Company. First Hartford Corporation's Position on Remedies June 1, 2007 (Doc. No. 93), at 2 ("In proposing this remedy [a court order requiring plaintiff Kaplan to sell to FHC all of his shares at their fair value determined by the Court ], FHC . . . also assumes that once the Court has determined the fair value of Richard Kaplan shares, other shareholders may seek to compel FHC to purchase their shares.")

However, this Court has not yet definitively indicated how First Hartford Corporation or other minority shareholders such as amici will be treated following the Court's determination of the value of Kaplan's shares. The Court inferred from Kaplan's and First Hartford Corporation's previous filings on remedies that parties had agreed that First Hartford Corporation would be ordered to buy Kaplan's shares " if defendant First Hartford Corporation ("FHC") is financially capable," Procedural Order, June 14, 2007 (Doc. 99) at 1. The Court indicated in a later order that if it determined that First Hartford Corporation could not purchase Kaplan's shares at the price determined by the Court, it may order Ellis to purchase the shares; and that if neither First Hartford nor Neil Ellis can buy the shares, the Court will "proceed to consider dissolution." Findings of Fact and Conclusions of Law, Part II: Remedy, November 7, 2007 (Doc. No. 116), at 4.

In a November 5, 2007 procedural order, the Court linked the valuation of Kaplan's shares with its further consideration of remedial orders. The Court requested the parties to provide evidence relating to the valuation of First Hartford Corporation and Kaplan's

---

in which FHC assets were diverted to Ellis and his related entities, [and to] recover from Ellis and his related entities all damages to which FHC is entitled on account of their wrongdoing . . ."

shares, and then to address the implications of the evidence adduced on the Court's administration of remedies:

> The parties shall be ready for an evidentiary hearing on the issues of the valuation of FHC shares, FHC's ability to purchase minority shares, and financial impact of the possible remedies by May 12, 2008. Parties will be provided an opportunity for oral argument to address the legal implications of the financial evidence on the Court's consideration of remedies, including all remedies issues as briefed in the June 1, 2007 submissions of the parties, immediately following the close of the evidentiary hearing.

Second Amended Remedies Phase Scheduling Order, November 5, 2007 (Doc. No. 115), at 2.

This post-trial brief of amici curiae responds to the issues identified by the Court's November 5, 2007 procedural order, addressing both the valuation of Kaplan's shares, and the implications of the evidence on valuation for the Court's selection and implementation of remedies,.

In various filings with the Court, Kaplan has recognized that the relief that he seeks – dissolution or alternatives to dissolution provided by Maine's Business Corporation Act, 13-C M.R.S.A. § 1334 -- invokes the equitable power and discretion of the Court, in which Court must weigh the equities in its selection and administration of any remedies. Kaplan's trial brief before the Phase I trial on liability (Doc. No. 53, at 10), noted that "[to determine whether dissolution or an alternative remedy is appropriate, the Maine [Corporation] Act sets forth *the equitable standard* to be applied by the Court:" (emphasis added)

> Pursuant to this section, the court may grant relief other than dissolution as an alternative to a decree of dissolution or *whenever the circumstances of the case are such that the other relief, but not dissolution, would be appropriate*, and the other relief should be granted when that relief would furnish greater protection of the interests of creditors and shareholders than would dissolution.

*Id. (quoting* 13-C M.R.S.A. § 1434(3) (emphasis added)). In urging the Court, albeit unsuccessfully, to value his shares in First Hartford Corporation as of the time that the

Court would order a purchase of his shares for a sum certain, Kaplan repeatedly noted that the Maine statute authorizing a court to order such a buy-out directed the court to exercise equitable discretion in selecting the remedy and its details, and that equitable considerations should influence the Court's valuation of the shares.[4]

Amici agree that equity is the controlling principle affecting the Court's remedial orders in this case. As the Court's previously expressed concerns suggested,[5] no court-ordered remedy in this case will be equitable if the remedy injures the interest of other minority shareholders of First Hartford Corporation.

Equitable considerations should be brought to bear not only on the selection and implementation of various remedies, but also in the valuation exercise. The statutory provision authorizing the buy-out remedy under consideration in this case, 13-C M.R.S.A. § 1434(2)(A), specifies that the buy-out of shares should occur "at their fair value." The phrasing of this provision is significant in specifying that the standard is "fair value," not "fair *market* value." Interpreting similar language in its corporation statute, the New Jersey Supreme Court noted that "fair value" imports equitable considerations that may otherwise be disregarded were the focus only on "fair *market* value:"

> Although it would be helpful to pronounce a consistent rule regarding the determination of "fair value" and the applicability of discounts under various circumstances, we cannot do so. Each decision depends not only on the

---

[4] Plaintiff Richard E. Kaplan's Brief on Valuation Date and Scope of Hearing (Doc. No. 112), October 12, 2007, at 3 ("Selection of such an alternative [ to the dissolution] remedy is particularly subject to the court's equitable discretion"); at *id.*( . .  the court must be guided by equitable principles"); at 4 ( ". . . the Legislature has allowed for a flexible and equitable approach to remedies"); at 5 ("*Equitable considerations require that any buy-out in this case be at a value that is fair as of the time of the buy-out*") (emphasis added); at 6 ("The alternative remedies [alternatives to dissolution] . . . are designed to protect all stakeholders, including *any creditors and other shareholders*, from the potential impacts of dissolution" (emphasis added);  at 7 (valuation of shares as of the date of disentanglement  "should be the equitable default rule for buyouts pursuant to § 1434(2)(A), with judicial discretion to make any adjustments equity requires in the particular circumstances").
[5] Findings of Fact and Conclusions of Law, April 2, 2007 (Dkt. No. 81), at 3, 46-48.

specific facts of the case, but also "should reflect the purpose served by the law in that context." 2 ALI Principles, comment e, to ¶ 7.22 at 312.

In both *Lawson Mardon Wheaton*, [160 N.J. 383, 407, 734 A.2d 738], and in this case, we have decided that the "equities of the case" must be considered when ascertaining "fair value" in appraisal and oppressed shareholder actions.  In *Lawson Mardon Wheaton, supra*, 160 N.J. at 389, 734 A.2d 738, as in the present case, we know who is buying the shares. In *Lawson Mardon Wheaton*, it is the company; in this case, it is the oppressed shareholder. In both cases, the shareholder is entitled to the "fair value," rather than "fair market value," of his shares.

*Balsamides v. Protameen Chemicals, Inc.*, 160 N.J. 352, 734 A.2d 721, 737 (N.J.,1999).

In this case "fair value" should mean fair not only to Kaplan, but also to First Hartford Corporation and its other minority shareholders.  Otherwise, the equitable imperative to avoid injury to the interests of other minority shareholders would be compromised.

These equitable considerations should affect the Court's assessment of the evidence at trial regarding valuation. As minority common stockholders of First Hartford Corporation, Mssrs. Lehrer, Filippelli and Paolino and other minority shareholders will be injured if, despite the best efforts of the parties and the Court , the court-determined valuation overestimates the worth of Kaplan's shares as of September 15, 2005,. The minority's interest in First Hartford Corporation would be *ipso facto* diluted in this circumstance.

This concern is heightened both by the evidentiary presentation of the parties at trial.  According to Kaplan's expert, Guilliaem Aertsen, as of the valuation date of September 15, 2005, First Hartford was worth $48,268,862.  Dividing this amount by 3,083,000 shares yields $15.66 per share.   Trial Tr. 125.   In sharp contrast, according to First Hartford's experts, the Company was then worth approximately 80% less --

approximately $10.1 million or $3.08 per share, in the opinion of Timothy Riddiough,; and
$9.3 million or $2.79 a share, in the opinion of Defendants' expert Nancy Fannon.

The magnitude of the differences between plaintiff's and defendants' experts are
attributable to fundamental methodological divergences, and different assumptions about
the nature and likely future course of business activity by First Hartford.  The parties are
sure to argue in their post-valuation-trial submissions that the other's approach is
conceptually flawed and based on erroneous assumptions.  First Hartford has already made
this point about Kaplan's expert's opinions in its motion to exclude Aertsen's testimony for
unreliability. Doc. No. 138.   But the variation in conclusions, and in the judgments
exercised by each expert, highlight the highly unscientific nature of the valuation exercise.
The numerical bottom lines proposed by each expert create an illusion of certainty that the
underlying discretionary choices by the experts will not sustain.  The selection of discount
rates, the projection of future revenues, and the allocation of certain overhead costs wholly
to one or another segment of the business are, at base, subjective judgments amounting to
exercises in professional guesswork.

Therein lies part of the rub.  Relative to what an arms-length buyer would in fact
have paid – or would pay -- for the assets less the liabilities of First Hartford Corporation,
the price that the experts predict, and that a court would find based on those predictions, is,
at best, an educated guess.  But the consequences of inaccuracy to the other minority
shareholders may be seriously adverse, if in the first instance First Hartford Corporation is
required to buy Kaplan's shares.  If First Hartford Corporation overpays for Kaplan's
shares, then through no fault of the other minority shareholders, the Company and its

remaining shareholders will be injured, even if it turned out that First Hartford Corporation alone has sufficient resources to buy out Kaplan's share at the court-determined price.[6]

This argues for a conservative and sobering view of the valuation evidence adduced at the Phase II trial, one that discounts substantially valuations based on hypothetical transactions or suppositions about a future that may never come to pass. There is evidence in the record concerning the trading price of First Hartford Corporation in an over-the-counter market. The Court will have to assess the extent to which transactions in that market are a fair indicium of the value of a share in First Hartford Corporation. Whatever criticism may be made of the market price in this regard, it is at least an objective historical indication of what a willing buyer did pay for an interest in the Company. None of the other evidence is of this quality.

Equitable considerations must also inform the manner in which the Court fashions a remedy, once a valuation of Kaplan's shares is made. The Company and its other minority shareholders will be injured not only if the Court-determined valuation overestimates the value of Kaplan's shares as of September 15, 2005, but also if the valuation as of September 2005 substantially exceeds its current value. Moreover, regardless of the valuation set, if First Hartford is unable to purchase Kaplan's shares without liquidating some of its real estate holdings under unfavorable market conditions, First Hartford Corporation and its other minority shareholders will be injured. .

These concerns are of serious moment. The Court may take judicial notice of recent events -- the enactment of the so-called "bail-out" measure known as the Emergency

_____

[6] Kaplan recognized this point when he argued unsuccessfully to the Court that his shares should be valued more currently: "Only a current valuation of FHC shares will protect the interest of minority shareholders and provide a fair return of their investment money. Under the circumstances of this case, only a current valuation

Economic Stabilization Act of 2008 (Pub.L. 110-343), which authorized the U.S. Department of Treasury to inject as much as $700 billion into the financial services sector to reverse the dry-up of commercial credit in the wake of the failures or near-failures of major financial institution following the precipitous decline in the mortgage-backed securities markets beginning in August 2007.

Whatever First Hartford's assets may have been worth in a "fair market" sense in 2005, they surely must be less – significantly less – under current conditions.[7]  Objective financial indicators imply a substantial decline in the value of commercial real estate assets of company's like First Hartford Corporation relative to 2005.  The widely-cited financial indices for REITs over the last year and one-half reflect a material decline in the value of REITs' assets.[8]  Below is a graph charting the Dow Jones composite REIT index for the period September 15, 2005 to October 15, 2008, showing a drop-off of over 25%:[9]

---

is equitable."   Plaintiff Richard E. Kaplan's Reply Brief on Valuation of Shares, October 19, 2007 (Doc. No. 114),  at 1.

[7] "Credit Downturn Hits the Malls," Wall Street Journal, December 26, 2007 ("The credit crunch triggered by the downturn in the housing market is creating problems in commercial real estate, driving down prices of office buildings, shopping malls and apartment complexes, and leaving some owners scrambling for cash.") (available at http://online.wsj.com/article/SB119862576458749597.html?mod=hpp_us_whats_news )./

[8] The Court heard testimony from experts at the Phase II trial on valuation drawing comparisons, albeit imperfect ones, between a segment of First Hartford Corporation's business and that of real estate investment trusts ("REITs").

[9] Source: http://www.djindexes.com/mdsidx/index.cfm?event=showReitIndexData



This general decline suggests strongly that if First Hartford Corporation must liquidate its real estate holdings under the current market conditions in order to buy Kaplan's shares, it is highly likely that it will do so at prices far below those implicit in the 2005 valuation of Kaplan's shares.  Bankruptcy for First Hartford cannot be ruled out.

The facile response to these concerns – that the problem will be solved if defendant Neil Ellis rather than First Hartford Corporation is forced to buy Kaplan's shares –  may be more illusory than real.  Ellis' resources are entwined with First Hartford's. The converse is also true, Ellis having guaranteed First Hartford's obligations.  Ellis may have to cause First Hartford to liquidate some of its holdings in to order provide him with the cash to buy Kaplan's shares.  If this occurs, then the Company and its remaining minority shareholders are likely to be injured, because First Hartford will likely receive historically low values for its commercial property in the currently depressed liquidity-scarce market.  In addition, if Ellis is forced to liquidate other holdings in order to finance a purchase of Kaplan's shares the fate of Ellis' guarantees of First Hartford's obligations is, at the least, uncertain.  And if

Ellis' guarantees of First Hartford's obligations are undermined, the consequences to First Hartford could be calamitous.

For essentially the same reasons, Kaplan's erstwhile solution, still held in reserve by the Court  –  to force a liquidation of First Hartford for the "benefit" of all shareholders – could be a medicine worse than cure, given current market conditions for commercial real estate.  In that case, all minority shareholders may be treated equally, but equally miserably.

Given that this proceeding is, at its foundation, an equitable proceeding, the Court should reserve the full array of equitable power to avoid injurious remedies. It may turn out that the best solution for all of First Hartford Corporation's shareholders is one that avoids any immediate sale of First Hartford Corporation's assets in the currently depressed market. The Model Business Corporation Act, for example, provides that in the event that one or more shareholders opts for the purchase of shares in lieu of dissolution [a self-executing procedure not incorporated into Maine's version of the Act) , the court, after determining the fair value of the shares, may include in its order directing the purchase of shares "such terms and conditions as the court deems appropriate, which may include payment of the purchase price in installments, where necessary in the interests of equity . . ."[10]   In this case, for example, the Court could ultimately determine that the most equitable form of buyout for the shares of Kaplan and other opting minority shareholders would be payment in the form of a long term (10 year) debenture, payable in installments and at an interest

---

[10] Model Business Corporation Act (3rd ed.), § 14.34(e) (2002 rev.)  The Maine Business Corporation Act of 2002 does not expressly contain a similar provision for self-executing buyouts of dissenting majority shareholders, but there is no indication that the draftsmen of the Maine Act intended to reject the idea of conditions attached to a court-ordered buy out of shares. The power to place such conditions on a court-ordered sale should be regarded as implicit in the equitable power generally accorded to the court by 13-C M.R.S.A. § 1434.

11

rates prevailing at the time of the order.  This could avoid the necessity for a precipitous sale of Company assets at depressed prices.

At all events, equitable considerations should govern the Court's further orders. The Court should not order any relief unless it determines, first, that all minority shareholders will be treated equitably in the process; and second, that the relief is the least damaging to First Hartford Corporation and its minority shareholders.  Before making these determinations, the Court should invite First Hartford Corporation and any other party to propose a plan leading to a proposed order that meets these objectives.


Date:   November 14, 2008

/s/ Robert S. Frank

Robert S. Frank

**HARVEY & FRANK**
Two City Center
Fourth Floor
Portland, Maine 04112-0126
(207) 775-1300

*Attorney for Amici Curiae*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST HARTFORD CORPORATION | ) | |
| | ) | |
| *and* | ) | Civil Action No. 05-144-BH |
| | ) | |
| NEIL ELLIS, | ) | |
| | ) | |
| Defendants | ) | |

**Certificate of Service**

The above-signed counsel certifies that this paper and any incorporated papers were filed electronically and served on all counsel of record by means of the Electronic Case Files system maintained by the United States District Court for the District of Maine. The above filing is available for viewing and downloading at http://www.med.uscourts.gov/.