UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | No. 05-144-DBH |
| FIRST HARTFORD CORPORATION | ) | |
| and NEIL ELLIS, | ) | |
| | ) | |
| Defendants | ) | |

**POST-HEARING MEMORANDUM OF FIRST HARTFORD CORPORATION AND
NEIL ELLIS REGARDING VALUATION OF RICHARD E. KAPLAN'S SHARES
OF FIRST HARTFORD CORPORATION**

Defendants First Hartford Corporation ("FHC") and Neil Ellis ("Ellis") (collectively,

"Defendants") submit this post-hearing memorandum of law regarding the value of the shares of

FHC owned by Plaintiff Richard E. Kaplan ("Kaplan" or "Plaintiff") as of September 15, 2005.

**I.      INTRODUCTION**

In *Kaplan v. First Hartford Corporation*, 522 F. Supp. 2d 275 (D. Me. 2007), this Court

ordered FHC to purchase Kaplan's shares based on a prior finding that he was an oppressed

shareholder.  The Court also found that September 15, 2005 was the proper valuation date.

To assist the Court in valuing Kaplan's FHC stock as of September 15, 2005, the parties

offered evidence from experts, as well as from Kaplan and David Harding, FHC's Vice President

and co-director.

FHC produced two experts, Timothy Riddiough and Nancy Fannon.

Defendants' experts appraised the fair value of Kaplan's stock as of September 15, 2005,

utilizing methodology and techniques that are generally accepted in the financial community for

calculating market, investment and net asset values, and gave each an appropriate weight as prescribed by the so-called Delaware block methodology.

Ms. Fannon, a professional business appraiser, opined that Kaplan's stock was worth $2.79 per share on the valuation date.  Riddiough, a tenured professor of real estate at the University of Wisconsin, corroborates Ms. Fannon by concluding that the fair value of FHC's stock was $3.08 per share on the valuation date.

Plaintiff's only evidence of the value of FHC's stock came from one purported expert, Guilliaem Aertsen ("Aertsen").  Initially, according to Plaintiff's First Expert Disclosure, (prepared by Aertsen) dated March 28, 2008, Aertsen based his valuation of FHC stock on "enterprise income capitalization for a multi-business company" a methodology that he later testified was based solely on "themes" or "broad themes" contained in a text by McKinsey and on his own experience.  (9/24/08 Trial Transcript (hereafter "TT") at 5, 6, 11.) (See Pl. Expert Disclosure, dated March 28, 2008, at 2, Plaintiff's Trial Exhibit 52 (hereafter "Pl. Ex.".) Plaintiff later served a Supplemental Expert Disclosure dated June 6, 2008, which provided a net asset valuation and a discussion of FHC's stock market price (*id.*); Aertsen ascribed no weight to either.  (See Pl. Supp. Expert Disclosure, dated June 6, 2008, Pl Ex. 46.)  In each of his disclosures, Aertsen concluded that the "total FHC equity value" was $48,268,862 or $15.66 per share on the valuation date.

On July 10, 2008, FHC and Ellis jointly moved to preclude testimony by Aertsen on the ground that his valuation of Kaplan's stock was based on a faulty methodology applied to unverified facts and data.  (See Dkt. No. 138.)[1]  Then, on the eve of trial, Plaintiff produced yet a third disclosure for Aertsen that purported to supplement his previous disclosures and rebut the

---

[1] FHC's Motion in Limine to Preclude the Testimony of Plaintiff's Purported Expert, Guilliaem Aertsen, dated July 10, 2008, is incorporated into this memorandum as if fully set forth herein.

testimony to be offered by FHC's experts.  (Pl. Ex. 169.)  In Plaintiff's Second Supplemental and Rebuttal Expert Disclosure, dated July 21, 2008, Aertsen claimed that his calculation of FHC's dividend-paying capacity was a cross-check on his "enterprise DCF equity valuation of FHC." (*Id.* at 4.)  FHC and Ellis moved again to preclude Aertsen from testifying as to opinions contained in Plaintiff's Second Supplemental Disclosure because that disclosure was made so close to trial as to prejudice FHC and Ellis, and contained the same methodological flaws that plagued his other valuations. (Dkt. No. 146.)

The remedy hearing was held on July 24 and 25, 2008, with cross-examination and rebuttal testimony completed on September 24 before Magistrate Judge Rich.  The Court reserved the motions to exclude Aertsen's testimony, and allowed the testimony "de bene," stating that it will "later determine[] what role the testimony should have."  (7/24/08 TT at 4.) Judge Hornby specifically stated that he would decide whether Aertsen's "methodology was so flawed that [he] should not consider it at all; or that…it is flawed to some degree, and [he should] discount the testimony, give it reduced weight…." (7/24/08 TT at 4-5.)  Judge Hornby reiterated at a later point during the trial that he considered the arguments raised in the Motions in Limine preserved. (Id. at 181-82.)

## II.    THE VALUATION STANDARD

Title 13-C M.R.S.A. §§ 1430-1434, under which this case is brought, does not define fair value nor does it describe the methodology for determining fair value.  For purposes of valuing FHC, Defendants have been guided by the principles of the Appraisal Rights Section of the Maine Business Corporation Act, Title 13-C M.R.S.A. §1301 *et seq.*  The law is settled in Maine that in a dissenting shareholder's appraisal proceeding, only "techniques or methods which are generally considered acceptable in the financial community" can be employed in determining the value of stock.  *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997 at 1003

(1989.)  These techniques must include the three elements of the Delaware block methodology "even if only to find one or more of them unreliable under the circumstances" *id*. at 1002, and may include such others as are probative.  *Id*. at 1003.

The objective is to compensate the aggrieved stockholder for "what has been taken from him, viz., *his proportionate interest in a going concern*," *id*. (emphasis in original) whether through the appropriate exercise of the merger mechanism or as a result of a breach of fiduciary duty.  *Id*., citing *Weinberger v. UOP, Inc*., 457 A.2d 701 (Del. 1983).  To this end, the Law Court has been assiduous in rejecting both valuation standards that would benefit the majority at the expense of the stockholder being bought out, such as by allowing minority or marketability discounts, and those that would benefit the aggrieved stockholder disproportionately with other stockholders, such as for "psychological" injuries or injuries to a "particular mental image of ownership rights."  *In re Valuation of Common Stock of Libby McNeil & Libby*, 406 A.2d at 62. The former "would inevitably encourage corporate squeeze-outs," *McLoon*, 565 A.2d at 1005. The latter would encourage minority stockholder litigation.  Neither would serve a socially beneficial purpose.  As the case at bar is more akin to the "involuntary change of ownership," situation than, say, a probate proceeding, *McLoon, supra,* 565 A.2d at 1004, and the methodology sanctioned in *McLoon* and *Libby* provides the seller with his proportion of the price that would be payable for the enterprise as a whole, *id.,* the *Libby/McLoon* principles should apply here.[2]

The Law Court has recognized that valuation is a difficult and imprecise process. *McLoon*, 565 A.2d at 1002.  Unconventional or idiosyncratic valuation techniques present unacceptable risks to the principle that the end result of the process should provide the aggrieved

---

[2] As FHC's stock is publicly traded, the question of who pays the costs of providing this proportion remains to be considered.

stockholder with a value that advantages neither himself nor the receiving shareholders. This risk is perfectly illustrated by the case at hand. Plaintiff's expert, a former banker whose focus has been largely on the ability of a borrower to repay a loan rather than on the enterprise value of a business entity, created a home-brewed methodology which, if accepted, would provide Kaplan with a price for his stock almost five times that which any other stockholder in the history of FHC ever received in the free and open market. Were this price paid to all stockholders, it would bankrupt FHC; and there is no reason to believe that the other stockholders would not litigate for it in view of the history of the market price of FHC stock. The prospect that FHC would incur a liability based on a valuation so out of line with one derived from conventional methodology and techniques is ample justification for the rule, settled in *McLoon*, that value can be determined only by the use of generally accepted valuation techniques and methodology. *McLoon*, 565 A.2d at 1003, *supra*. Aertsen's testimony should be excluded first, because he did not use generally accepted methodology and techniques and second, because his own methodology and techniques are so inherently flawed that his result is patently preposterous. *Infra, Section V1.*

Aertsen's testimony was not even offered with a view to compliance with the standards set forth in *Libby* and *McLoon*. To the contrary, Plaintiff's counsel proclaimed it to be a construction of the witness. "He [Aertsen] developed that [methodology] basically as a banker and a lender for Bank of Boston. . ." (7/24/08 TT at 16.) Aertsen himself confirmed that the methodology was his own creation: "Well, this is my enterprise discounted cash flow model, and it's predicated on themes that come out of the McKinsey text." (7/24/08 TT at 5.) The McKinsey text provided the "themes," or the "broad themes," (*id*. at 6), and that plus "my own business experience," (*id*. at 11), constituted the sole basis of the methodology. (*Id*. at 18-19.) Defendants' experts, on the other hand, Ms. Fannon and Professor Timothy Riddiough ("Riddiough"), unquestioned experts in the valuation field, used standard methodology and

techniques and arrived, wholly independently, at figures that are reasonable, defensible and equitable both for the minority and the majority.  We submit that the Fannon evaluation is determinative and is supported by the Riddiough valuation.

### III.   THE ONLY SHARES AT ISSUE HERE ARE THE 145,719 OWNED BY KAPLAN HIMSELF.

It is black letter law that "a litigant will ordinarily not be permitted to assert the rights of absent third parties." *Flast v. Cohen*, 392 U.S. 83, 99 n.20 (1968).  Kaplan asserts in the Complaint that he brings this action individually as the owner of 145,719 shares of First Hartford stock.  (Comp. ¶ 9.)  Hence, it is only those shares that should be valued and ordered purchased in this action.[3]

The prohibition against bringing claims on behalf of others is particularly meaningful here.  As this Court has ruled, the day before the filing of the Complaint is the date as of which Kaplan's shares are valued because that is the date when Kaplan voiced his "desire to separate himself from the corporation."  (Findings of Fact and Conclusions of Law Part 2: Remedy at 7, Dkt. No. 116)  If any other shareholder, including Kaplan on behalf of a trust, decides at some future point that he or she also wishes to separate from FHC, and is found entitled to do so, that future date would be the date of the valuation – not the 2005 date as of which Kaplan's shares will be valued.

The Court recognized the possibility of a potential manipulation of the valuation date in its Findings of Fact, observing that it had "chosen a [valuation] date that does not permit Kaplan to gain if the corporate assets should improve, or lose if they should decline."  (*Id*.)  Just as

---

[3] On June 1, 2007, in its Position on Remedies, First Hartford sought an order that Kaplan sell and FHC buy all shares owned outright or beneficially by Kaplan as opposed to just those shares at issue in Kaplan's Complaint (i.e., the shares he owns outright).  Kaplan never responded, and no ruling on the request was made by the Court.  FHC made that request at that time in a practical effort to completely sever the relationship between FHC and Kaplan. Given the market changes in the intervening 17 months, and the potential impact on all other shareholders of FHC, FHC does not believe that this practical resolution is appropriate.

Kaplan's fortunes should not rise or fall based on fluctuations in the real estate market, neither should other shareholders, including trusts of which Kaplan is Trustee, be entitled to sit on the sidelines and wait to see what the valuation is in this case and what the real estate market does in the meantime.

IV.     **THE TESTIMONY OF NANCY FANNON SHOULD BE ACCEPTED BY THIS COURT AS THE MOST RELIABLE DETERMINATION OF THE FAIR VALUE OF FHC.**

    A.     **Ms. Fannon is a Highly Qualified and Credentialed Business Valuation Expert.**

Defendants' expert, Nancy Fannon, is the owner of Fannon Valuation Group and has been engaged in business valuations for over 20 years.  After obtaining her degree in accounting from the University of Massachusetts, she worked for seven years as a tax and audit staff member in a private accounting firm.  In 1987, she became a tax manager at the national public accounting firm, KPMG Peat Marwick.  While employed in this position, she became a Certified Public Accountant, initially dealing with tax matters, and then shifting her focus to business valuation.

Subsequently, KPMG sold its local practice to some of its principals.  That practice became Baker, Newman & Noyes, which then merged with the former Portland office of Ernst and Young.  Ms. Fannon remained with Baker, Newman & Noyes.  In the mid-1990s, she began to engage exclusively in business valuations.  In 2004, she left Baker, Newman & Noyes and formed Fannon Valuation Group, whose business is performing business valuations and evaluating commercial damages.

Her professional qualifications include but are not limited to the following: (1) certification by the American Society of Appraisers; (2) designation by the American Society of Appraisers as an Accredited Senior Appraiser; (3) certification by the Institute of Business

Appraisers as a Master Certified Business Appraiser, its highest designation; and (4) certification by the American Institute of Certified Public Accountants as an Accredited Business Valuator.

Ms. Fannon lectures frequently on business valuation at national conferences and seminars.  She also provides presentations for peer groups and programs concerning business valuations designed for lawyers, judges and IRS agents.  Ms. Fannon is on the Editorial Board of all four leading journals in the business valuation field and is a regular columnist for the peer reviewed publication of the American Society of Appraisers.

Ms. Fannon has published two textbooks on business valuation and has been a contributing author to a number of other textbooks in the valuation field including the Shannon Pratt volume <u>Valuing a Business</u> ("Pratt Text").  In 2007, she was awarded the Hall of Fame Award by the American Institute of CPAs for her substantial contribution to the advancement of the business valuation profession.

During her career, Ms. Fannon has completed between six and seven hundred corporate stock valuations and has testified as an expert in business valuation more than sixty times in the Maine Federal District Court and in other state and federal courts around the country.

Ms. Fannon's testimony (7/25/08 TT at 86-93) and report dated March 28, 2008 (Defendant's Trial  Exhibit. 41 at 52-53 (hereafter "Def. Ex.") provide a more extensive description of her qualifications.

### B.   Ms. Fannon Performed an Exhaustive Investigation and Evaluation of FHC's History and Financial Performance.

In her engagement in this case, Ms. Fannon valued FHC using the universally accepted methods of valuing a going concern without regard to minority or marketability discounts. (7/25/08 TT at 95)  Her evaluation of the underlying data supporting her valuation was detailed and lengthy.  She obtained and reviewed voluminous documents which, if placed in a single

stack, would be approximately ten feet high.  (7/25/08 TT at 96)  She traveled to FHC

headquarters and spoke with the officers of the Company to fully understand its operations.

From the beginning of the engagement through the preparation of Ms. Fannon's report,

Fannon Valuation Group spent 367 hours reviewing and evaluating data and report preparation.[4]

(7/25/08 TT at 97)  Ms. Fannon testified that her approach requires looking behind the publicly-

available information such as 10-K's and 10-Q's to truly understand what is going with on with a

company and what is underlying the data that is presented in its public filings.  (7/25/08 TT at

97.)  A detailed summary of Ms. Fannon's analysis of FHC history and operations is contained in

her report.  (Def. Ex. 41 at 5-10.)

In addition to her thorough review of FHC's operations and finances, Ms. Fannon

evaluated the market in which FHC is engaged to understand its competition and the risk entailed

in its operations.  (Def. Ex. 41 at 10-12) (7/25/08 TT at 99-106.)  Specifically, Ms. Fannon

assessed the risk of FHC losing tenants and not obtaining renewals of leases, the success or lack

thereof of its key tenants, rental rates, its competition for properties, and its geographic

diversification.

As she is permitted to do, Ms. Fannon based her opinion on appraisals of FHC properties

done by a real estate appraiser, Paula Konikoff.  Based on those appraisals, Ms. Fannon took into

account the following factors in assessing the risks specific to FHC with respect to some of those

properties:  The Cranston Parkade property, as of the valuation date, had two vacancies and had

lost significant tenants which reduced cash flows and lowered the valuation of the property;

Putnam Parkade had no anchor tenant, making it a riskier property than had it had been at the

time of a  previous appraisal; the Katharine Gibbs property was about to become vacant because

---

[4] This is approximately ten times the amount of time billed by Aertsen in his valuation.

the parent company was closing the business; and Main Street Parkade, also referred to as North Adams, was only 23 percent occupied. (7/25/08 TT at 102-103.)

Ms. Fannon also evaluated the regulatory risks FHC faced and learned that the Tolley Barn property, which previously was believed to be zoned for retail use, was in fact not zoned for retail use. (7/25/08 TT at 105.)  She also identified risks common to similar entities in the real estate industry; specifically that the value of real estate can fall by as much as 20 percent during recessions and that a rise in interest rates further can reduce the value of commercial real estate. (7/25/08 TT at 105-106.)

Ms. Fannon performed a detailed financial analysis of FHC. (Def. Ex. 41 at 14-21.)  She learned that in 1994, FHC's equity was a negative $23 million.  Over the next four years, FHC sold off properties in an effort to reduce its debt resulting in a $17 million increase in its equity, to a negative equity of $6 million as of April, 1998.  (Def. Ex. 41 at 14.)  From 1998 to the valuation date, FHC sold no properties except for Mount Olive, which was sold in 2004. (7/25/08 TT at 112.)

Ms. Fannon next undertook a detailed adjustment and normalization of the financial data of FHC.  This step is taken in a business valuation because reviewing only a two or three year period of operations does not fully reflect the past or projected operations of a company.  In addition, it is necessary to ensure that FHC's expenses are fair and stated at an arm's length. (7/25/08 TT at 115.)  In this exercise, Ms. Fannon reviewed the financial information for every subsidiary of FHC for a two-year period and each individual company's profit and loss statement to determine what comprised the income and expenses of each.  (7/25/08 TT at 115-116.)  For example, she found that there was a settlement of a lawsuit against WalMart of approximately one million dollars.  This was a non-recurring item and so she removed the settlement net of the legal charges associated with the lawsuit.  (7/25/08 TT at 116.)  Additionally, she determined

that the compensation of the officers was below market and made an adjustment to that compensation of approximately $370,000 to take into account that a buyer of FHC would likely pay more for management salaries.  (7/25/08 TT at 117.)

Ms. Fannon also evaluated the state of the real estate industry and how it would affect FHC.  (Def. Ex. 21 at 30-36.)

All of these steps undertaken by Ms. Fannon prior to forming her opinions as to the value of FHC demonstrate her attention to detail, the thoroughness of her examination of FHC's records, and the sophisticated analysis she utilized in arriving at her valuation.

### C. Ms. Fannon Followed the Approaches to Value Recognized by Maine Law.

After reviewing and analyzing all the information essential to her valuation and following *McLoon* and *Libby*, Ms. Fannon utilized three separate approaches in valuing FHC:  the comparable company or comparable stock valuation methods (the market approach), the capitalized or discounted earnings methods (the income approach) and the net asset approach. (Def. Ex. 41 at 38.)  Each of these methods is detailed in her report and the numerous attachments and exhibits thereto.  They speak for themselves.

 Ms. Fannon calculated the net asset value of FHC as $13.3 million. (7/25/08 TT at 157.) It is important to note that Ms. Fannon took into account, in determining the net asset value, the potential capital gains tax that would be incurred in order to realize the value of the net assets of FHC.  (Def Ex. 41 at Ex. B-1.)  Of note, she also determined that management had no plans to liquidate or sell any of its properties as of the valuation date, other than Bangor and possibly Cobleskill.  She also noted that defeasance costs that would be incurred if the value of assets were realized in a sale would be substantial.  The rationale for Ms. Fannon's opinion of the net asset value of FHC is clearly set forth in her report and her testimony. (Def. Ex. 21 at 52-53) (7/25/08 TT at 147-157.)

Ms. Fannon next utilized the capitalized cash flow to invested capital method (discounted cash flow) to opine on an income approach value. She pointed out that the cash flow to be capitalized was the amount generated from annual operations of FHC. (Def. Ex. 41 at 40). She noted that FHC was highly leveraged and that it had significant debt compared to its assets. She pointed out that the primary reason FHC was able to do this was that Ellis was guaranteeing debt. (7/25/08 TT at 122.) That fact figured prominently when Ms. Fannon determined the capitalization rate of 4.1 percent required under the income approach. Taking into account the effective income tax on taxable income, Ms. Fannon determined that the capitalized cash flow value of FHC was $7.6 million as of September 15, 2005. ( Def. Ex 21 at 40-42) (7/25/08 TT at 110-128.)

As her final valuation method, Ms. Fannon employed the market approach. In doing so, she used three separate methods: the Guideline Public Company method, the Transaction Method, and the actual price of FHC public-traded stock on the valuation date.

As she stated in her report, "the conceptual underpinnings of the Guideline Public Company Method are that the best indication of the fair value of the subject company is the price at which it would be traded on an open market." (Def Ex. 41 at 42.) Based on her knowledge of the operations of FHC, she determined that a real estate investment trust (REIT) was the most comparable business model, given FHC's mix of business. After identifying a number of REITs that Ms. Fannon felt were appropriate, she considered that many of them had advantages over FHC in deal making ability and economies of scale. (Def. Ex. 41 at 45.) Accordingly, she adjusted the multiples of those companies downward to recognize that factor. She then compared FHC to the REITs she had chosen in terms of profitability, investment return and leverage. (Def. Ex. 41 at 46.) She also adjusted for the difference in tax treatment between FHC

and a REIT which is a pass-through entity and does not pay taxes.  This method yielded a valuation of $10 million.  (7/25/08 TT at 129-141.)

Ms. Fannon then turned to the Transaction Method which required her to identify similar companies and determine the selling price of the stock of those companies.  Her analysis is contained at D25, Ex. E-1.  Ms. Fannon then next calculated various financial characteristics of these global companies to FHC and found which of those matched FHC's financial performance most closely.  In that exercise, she determined that the value of FHC would be $9.6 million. (7/25/08 TT at 142-144.)

As the final step in the market approach, Ms. Fannon looked at the actual stock trans-actions of FHC and found them to yield a value of $10 million.

The final step in Ms. Fannon's valuation was to weigh each of the methods that she utilized.  Because she felt that FHC was a going concern and would continue to be, she accorded very little weight to the net asset value of FHC.  She felt that the income and market approaches should be given equal weight and, as a result, determined that the fair value of FHC was $9.3 million, which calculates to $2.79 per share.

### D.      Conclusion.

When one considers the report prepared by Ms. Fannon, which includes detailed spreadsheets and analysis, and reviews her credentials and evaluates her testimony, it is apparent that her determination of value of FHC represents a careful and detailed analysis done by a very experienced and qualified valuation expert, and should be accorded great weight by this Court.

## V.      THE TESTIMONY OF PROFESSOR RIDDIOUGH IS SUPPORTIVE OF THE VALUATION DETERMINED BY NANCY FANNON

### A.      Professor Riddiough is a Highly Qualified and Credentialed Business Valuation Expert.

Professor Riddiough holds a doctorate degree in real estate.  (7/24/08 TT at 233.)  He is currently a full-time professor and chair of the Real Estate and Urban Land Economics Department at the University of Wisconsin-Madison.  (*Id*. at 233.)  He teaches several courses at the University, including MBA classes regarding real estate finance and investment and mortgage securitization, and has taught courses on business valuation in the past.  (*Id*. at 233-34.)  Prior to joining the faculty at the University of Wisconsin, Riddiough was a tenured professor at the Massachusetts Institute of Technology where he was involved with the real estate center. (*Id*. at 234.)  He has written extensively on real estate issues and his work has been published close to fifty times.  (*Id*. at 235.)  He has served on the boards of directors of the Real Estate Institute and publicly traded and privately held REITs.  (*Id*.)  Indeed, Riddiough has spent his entire professional career analyzing, valuing and managing real estate businesses from both an academic and real-world perspective.  His qualifications, by both education and experience, to calculate the value of FHC's shares are undeniable and were not questioned.

**B.    Professor Riddiough Adhered to Valuation Standards Accepted Under Maine Law.**

Riddiough valued FHC stock utilizing the Delaware block method of valuation, which the Law Court has held to be a proper valuation method in the context of dissenting shareholder appraisals.  (*Id*. at 238; Def. Ex. 45 at 7.)  *See McLoon* and *Libby*.  Since use of this methodology gives to the dissenting shareholder his proportion of the price a buyer would pay for the enterprise as a whole without discount or premium, it is the appropriate valuation methodology to use in this case.  *Supra,* p. 4; *McLoon, supra* at 1004-1005.   The Delaware block method requires the appraiser to consider market value, investment value and net asset value of the entity, and to weigh each value according to his opinion of the entity's characteristics.  *Libby,* 406  A.2d at 60;  (7/24/08 TT at 238.)   In so doing, Riddiough afforded the largest weight to

FHC's market value as of September 15, 2005 because FHC is a publicly traded company. Weighing FHC's market value at 80% and its investment and net asset value at 10% each, Riddiough determined the fair value of FHC's common stock to be $3.08 per share.  (*Id*. at 239-40.)

> i.   *Market Value*

Riddiough's primary reliance on the market price of FHC's stock as an indicator of fair value is proper because FHC is a publicly traded company.  Since 2000, FHC's stock has traded on the Pink Sheets Electronic OTC Market. (Def. Ex. 45 at  8) (7/24/08 TT at 247.)  FHC has more than 800 stockholders, and there are more than three million shares outstanding.   FHC's stock had significant trading volume on or about September 15, 2005.  From 2000 to 2005, the average trading volume of FHC's stock was more than 5,000 shares a month and 108,000 shares of FHC stock were traded in the one-year period from October 1, 2004 through September 30, 2005.  Moreover, near the September 15, 2005 valuation date, the average monthly trading volume of FHC's shares was approximately 8,100. (Def. Ex. 45 at 6, Exhibit 1) (7/24/08 TT at 248.)   These trades were all made on an open market in arms-length transactions between disinterested buyers and sellers. (7/24/08 TT at 246.)  These facts make valuation of  FHC stock patently distinguishable from valuing stock in a closely held corporation with no trading market, as "courts and commentators alike have rejected construction of a market [in such cases] as too speculative to be helpful in the appraisal process."  *McLoon,* 565 A.2d at 1005 n.8.

Because of FHC's trading volume and number of outstanding shares, the market value of FHC's stock is a reliable indicator of its fair value. *See Libby*, 406 A.2d at 63-64 (approving expert appraiser's decision to assign the stock market price a 40% weight where the company was publicly traded, had 3.768 million outstanding shares, and considerable trading volume); *see also Application of Marcus,* 273 A.D. 725, 727-28 (N.Y. App. Div. 1948)  ("[M]arket value is

the controlling consideration where there is a free and open market and the volume of trans-

actions and conditions make the market a fair reflection of the judgment of the buying and

selling public.").  Moreover, Riddiough's calculation of FHC's market price as $3.25 a share on

September 15, 2005, is $0.75 higher than what FHC paid per share for 36,892 shares in a

negotiated purchase from Lehman Brothers one week later, on September 22, 2005.  (Def. Ex. 45

at 10.)

ii.     *Investment Value*

Riddiough undertook a three-step method to calculate FHC's investment value. (7/25/08

TT at 7.)  First, he calculated FHC's stabilized cash flow based on a measure of FHC's funds

from operation. (*Id.*)  Next, he calculated a multiplier, adjusted to reflect the specific

characteristics of FHC, that appropriately captures FHC capitalization rate. (*Id.*)  Finally, he

multiplied FHC's stabilized cash flow by the appropriate, adjusted multiplier to determine the

equity value of FHC as a going concern. (*Id.*)

The neutrality with which Riddiough calculated FHC's investment value is apparent from

step one.  To determine FHC's stabilized cash flow, Riddiough calculated its funds from opera-

tions ("FFO"), which is a widely accepted method of calculating the cash flow of REITs that are

comparable in some respects to FHC.  (Def. Ex. 45 at 11, 13, 17.)  He calculated the FFO of

FHC by analyzing FHC's after-tax income from 2004 through 2007. (*Id.* at 10-11, 14.)  He

excluded the income from years prior to 2004 because FHC's "income was much lower" and that

fact did not "suggest that the income was stabilized." (*Id.* at 11.)   As a result, Riddiough "ended

up using some fairly high-income years" to calculate FHC's cash flow.  (*Id.*)   He then added

back depreciation and amortization to FHC's income to calculate traditional FFO. (*Id.* at 11-12.)

He also added back roughly $500,000 of one-time transaction costs associated with FHC's

refinancing of most of its mortgage debt, (*id.* at 12, 16) and adjusted the FFO again to account

16

for FHC's gains from the sale of real estate. (*Id*. at 14.)  Each addition inflated the value of FHC's cash flow. (*Id*. at 16.)

To calculate the appropriate multiplier for step two of his investment analysis, Riddiough took the multiples of 31 comparable REITs and then adjusted those multiples, using a regression analysis, "to reflect the risks of [FHC]." (*Id*. at 17.)  He was careful to use REITs "that held retail property throughout the United States" so that they would be the most comparable to FHC. (*Id*. at 18; Def. Ex. 45 at Exhibit 5.)  Recognizing that REITs do not have comparable risk characteristics as FHC, he performed a regression analysis, whereby he considered the leverage, size, type of retail property held and location of assets of each REIT he referenced. (*Id*. at 19-20; Def. Ex. 45 at Exhibit 6.)  Based on these factors, he prepared a statistical model to calculate the appropriate multiple for FHC based on its assets, debt ratio, and location in the Northeast and its investment in large retail centers.  (*Id*. at 23-24.)  Using his regression model, he determined that the proper multiple for FHC was 4.1. (*Id*. at 24.)  By multiplying FHC's adjusted FFO by the 4.1 multiplier, Riddiough calculated the investment value of FHC to be $9.4 million or $3.05 per share.

Riddiough's investment value reinforces his reliance on FHC's stock price of $3.25  (*Id*. at 25.)  Moreover, his regression analysis increases vastly the reliability of his market comparable approach because it recognizes that strictly comparing FHC to REITs is not an "apples-to-apples" analysis.  (*Id*. at 19.)

C.    **Conclusion.**

Professor Riddiough's evaluation is a patently competent exercise, utilizing well recognized and accepted methodology, with a result that is wholly credible, and should support the conclusion reached by the local appraiser, Ms. Fannon.

**VI.    THIS COURT SHOULD EXCLUDE OR DISREGARD THE VALUATION OF
PLAINTIFF'S PURPORTED EXPERT WITNESS, GUILLIAEM AERTSEN, AS
INHERENTLY UNRELIABLE AND NOT SUPPORTED BY GENERALLY
ACCEPTED STANDARDS OF BUSINESS VALUATION.**

Under the Federal Rules of Evidence, this Court is required to perform a "gatekeeper"

role with respect to expert testimony.  *See Fed.R.Evid. § 702, Advisory Committee Notes, 2000

Amendments.*  Section 702 requires that expert testimony fulfill three requirements before it can

be properly admitted:  (1) the expert must be qualified to testify by knowledge, skill, experience,

training or education; (2) the testimony must concern scientific, technical, or other specialized

knowledge; and (3) the testimony must assist the trier of fact in understanding or determining a

fact in issue.  *Correa v. Cruisers,* 298 F.3d 13, 23 (1st Cir. 2002) (*citing Daubert v. Merrell Dow

Pharms.*, 509 U.S. 579, 589, 592 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141

(1999), *Diefenbach v. Sheridan Transp*., 229 F.3d 27, 29 (1st Cir. 2000)).  Moreover, the

testimony of a qualified expert will be admissible only if "(1) the testimony is based upon

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods reliably to the facts of the case." *Fed. R.

Evid. § 702 (2008).*

As the gatekeeper, this Court should exclude Aertsen's calculation of FHC's fair value.

His experience and education are insufficient to qualify him as an expert in this case and his

methodologies lack the requisite reliability to assist this Court in determining the value of FHC

on the valuation date.  His opinion that FHC's fair value on September 15, 2005 was almost five

times higher than the highest price FHC ever fetched in the market is inherently incredible.  He

reached this unreasonably inflated number because he failed to use or properly apply a generally

accepted methodology that could capture all aspects of FHC's business over several years.  By

his own testimony, Aertsen billed 32 hours and worked no more than 60 hours in arriving at his

opinion.  (7/24/08 TT at 202-03.)  His work product, consisting of two tables and two

worksheets, demonstrates his lack of serious application of reliable methodologies to the

operations of a complex business.

> **A.      Aertsen is Not Qualified or Credible as an Expert, as His Prior Relevant
> Experience was in His Role as a Banker, Concerned with Making and
> Collecting Loans Rather Than on the Valuation of Corporate Stock.**

Although a trial court has broad discretion to determine whether a proposed expert is

qualified, *see United States v. Sepulveda,* 15 F.3d 1161, 1183 (1st Cir. 1993), "[a]n expert's

qualifications must relate to the subject matter of the proposed testimony." *Watson v. Electrolux*

*Prof'l Outdoor Prods*., No 04-11782-DPW, 2006 U.S. Dist. LEXIS 54386, *7 (D. Mass. Aug. 4,

2006).  "An expert's qualifications, like other issues addressed to the admissibility of an expert's

opinions, 'should be established by a preponderance of proof.'" *Darling v. Indymac Bank,*

F.S.B., No. 06-123-B-W, 2007 U.S. Dist. LEXIS 88931, *9 (D. Me. Dec. 3, 2007) *(citing*

*Daubert,* 509 U.S. at 592 n.10).  The burden of proof on this issue is on the proponent in this

case, Kaplan.  *Id.* at *18.  Kaplan did not meet that burden.

Aertsen does not have the requisite "experience, training or education" to qualify him to

value the stock of a public company such as FHC.  He graduated from Harvard University with a

Bachelors of the Arts degree in history.  (7/24/08 TT at 33-34.)  He claims no formal education

in business or business valuation and fully admits that the "rest of [his] education came from

[his] actual work experience."  (*Id*.)  By his own admission, he has no experience valuing the

stock of any company similar to FHC.  (9/24/08, TT at 108, 121.)  His primary work experience

has involved commercial <u>lending</u>, at The First National Bank of Boston (later called Bank of

Boston), where he worked from the 1970s until 1995. (*Id*. at 34, 51.)  Thus, Aertsen's experience

in valuing corporations, specifically real estate corporations, has focused on lending, financing

and the ability of a company to repay debt.  (See generally *id*. at 34-51.)  Even as part of Bank

of Boston's global asset management group, Aertsen's primary purpose in valuing a business was because he "wanted to know how the company was going to pay its loan back, how it was going to service the debt."  (*Id.* at 48.)  The ability of a company to pay back a loan, however, has little to do with valuing stock, from the point of view of a stockholder or an investor in the company as a going concern.

Aertsen lacks experience with corporate equity valuation, as opposed to corporate asset valuation, that is required to calculate FHC's fair value and his methods and calculations demonstrate that fact.  Although he may have years of business valuation experience for the purpose of commercial lending, he does not have experience with, and has never offered an expert opinion as to, the value of any business, let alone a company similar to FHC.  (See 9/24/08 TT at 108; 121.)  Thus, his experience is not sufficiently related to the task at hand to qualify him as an expert on the value of FHC.  *See Watson,* 2006 U.S. Dist. LEXIS 54386 at *7.

Aertsen's lack of qualifications and experience is best demonstrated by his attempt to calculate FHC's dividend-paying capacity as a "check" on what he called his discounted free cash flow analysis.  (Pl. Ex. 169.)  He claims to rely on Chapter 11 of the Pratt Text as support for his dividend-paying capacity calculation. (*Id.* at 2.)  Yet, he freely admitted during trial that he had never heard of the Pratt Text until he heard FHC expert, Ms. Fannon, discuss that text in her testimony (9/24/08 TT at 23) and that he "is not an expert on the Pratt book" but only read it quickly.  (*Id.* at 24-25, 28.)  Apparently, his analytical approach was to look at the index of Pratt Book to find "pertinent" sections to a cross-check on his valuation under the McKinsey method. After locating a "reference" to "dividend paying capacity," he spent five or ten minutes reading page 294 and attempted a calculation.  Indeed, given his repeated testimony that his experience in valuing companies was based on the discounted cash flow approach set out in McKinsey & Company's <u>Valuation, Measuring and Managing the Value of Companies</u>, (the "McKinsey

Text") it is clear that he has little, if any, experience valuing companies by analyzing dividend payments or dividend-paying capacity.

**B.      Aertsen's Fair Value Calculation Does Not Rest On a Reliable and Accepted Methodology.**

As demonstrated in FHC's Motion in Limine, Aertsen's methodology and conclusions concerning the "fair value" of FHC are so unreliable as to make his testimony irrelevant, and inadmissible.  Expert testimony is only admissible if (1) the methodology rests on a reliable foundation; and (2) the testimony is relevant to the task at hand.  *Beaudette v. Louisville Ladder, Inc.,* 462 F.3d 22, 25 (1st Cir. 2006).  The reliability of a proposed expert's testimony depends on whether the expert's methodology has or can be tested, whether it has been subject to peer review, the potential error rate of the methodology and the level of acceptance of the expert's method within the discipline. *Beaudette*, 462 F.3d at 25.  The burden is on the expert to "vouchsafe the reliability of the data on which he relies and explain how the accumulation of that data is consistent with the standards of the expert's profession." *Zachar v. Lee,* 363 F.3d 70, 76 (1st Cir. 2004).

This Court should exclude or afford no weight to Aertsen's valuation of FHC in this case. He utilized a piecemeal methodology to calculate FHC's fair value that is wholly unreliable, is unsupported by a single authoritative source or by others in the valuation industry and improperly inflates the value of FHC by combining portions of various, mutually excusive, methods of calculating value.  Aertsen claims in the first instance that he calculated the "fair value" of FHC's stock by implementing an "enterprise discounted cash flow model" using themes set forth in the McKinsey Text. (Def. Ex. 46 at 2 [supplemental disclosure]; 7/24/08 TT at 136.)  He did not even purport to offer evidence that this is a generally accepted methodology, as required by the substantive law of Maine.  *Libby*; *McLoon, see supra,* at 3-6.  And even if it

were a matter not of Maine Substantive Law, but solely one of evidence under the Federal Rules, his claim is simply wrong as he diverged from the McKinsey Text at step one of the discounted cash flow analysis and never looked back.

The first step of the enterprise discounted cash flow analysis required by the McKinsey Text is valuation of "the company's operations by discounting free cash flow from operations at the weighted average cost of capital." (7/24/08 TT at 136; Pl. Ex. 159A at 104.)   According to Aertsen, FHC has two operations: ownership and operation of income producing properties; and development and sale of properties. (*Id*. at 56, 96-97.)  Leaving aside the validity of the one/two business conclusion, Aertsen did not calculate the free cash flow (FCF) at the weighted average cost of capital for either operation.  Rather, by his own admission, he simply transferred the values listed in the lender appraisals[5] for operating properties owned by entities other than FHC and "pulled" figures from FHC's 10-K filings instead. (*Id.* at 137; 98, 170.)

Aertsen's assumption that the appraisals contained a FCF analysis is erroneous because the appraisals are based on the net operating income of the operating properties themselves, and not of the entities which owned them.  As the McKinsey Text points out, net operating income is not synonymous with FCF because FCF includes deductions for taxes and net operating income does not.  (*Id.* at 156-57; Pl. Ex. 159a at 166.)  Ultimately, Aertsen conceded at trial that neither he, nor the appraisers, calculated FCF in accordance with the McKinsey Text. (*Id*. at 162-63.)

---

[5] Aertsen's failure to verify and discount the <u>actual</u> cash flow from each entity which owned the individual properties described in the appraisals not only a shows that Aertsen ignored the methodology in the McKinsey Text, but it also demonstrates the inherently unreliability of his ultimate conclusions.  *See Irvine v. Mudrad Research Lab.,* 194 F.3d 313, 321 (1st Cir. 1999) (excluding expert testimony not based on sufficient facts or data); *Rivera-Cruz v. Latimer, Biaggi, Rachind & Godreau, LLP,* No. 04-2377 (ADC), 2008 U.S. Dist. LEXIS 46562, *21-22 (D. P.R. June 16, 2008) (same).  Aertsen himself recognized the need to review individual financial information for the operating properties because he specifically requested and received base year tax returns, financial statements, insurance binders and lease terms for each of FHC's operating properties. (See 7/24/08 TT at 138-43; Def. Ex. 67.)  Ultimately, however, he relied solely on the property appraisals that were based on *pro forma* estimates of income and expense data. (7/24/08 TT at 160.)  Aertsen never attempted to justify this practice.

That admission alone is sufficient basis for the Court to exclude all of Aertsen's opinions on value.

Aertsen deviated further from the McKinsey Text by not calculating the weighted cost of capital for each operating entity and for FHC.  Again, he relied on the appraisals when available, and assumed, without any basis in fact, that the discount rate and capitalization rate used by the appraisers captured the weighted cost of capital.  (*Id*. at 159-60.)  By failing to calculate the average weighted cost of capital, Aertsen disregarded yet another fundamental step in the enterprise DCF analysis outlined in the McKinsey Text.  By relying exclusively on the property appraisals, Aertsen did nothing more than extrapolate the individual market valuations of real estate owned by FHC subsidiaries.  He similarly ignored the McKinsey Text in his valuation of FHC's supposed "development operation," which he describes as "management, development, construction and finance." (See Def. Ex. 46 at Worksheet 1.)  He did not calculate FCF at the weighted cost of capital, but simply submitted expenses for revenues listed on FHC's 10-K from April 30, 2005 and substituted the result for free cash flow.  (7/24/08 TT at 174-75.)  Simply put, Aertsen failed to build FHC's FCF as required by the McKinsey Text.

Aertsen's failure to calculate free cash flows from the operating properties is not an insignificant deviation from the McKinsey Text.  Appraisal value is separate and distinct from income value and by relying exclusively on appraisal value, Aertsen ignores changes to the operating properties occurring after the date of the CB Richard Ellis appraisals as well as any inaccuracies in the appraisals that would impact cash flow.  For example, the lender appraisals do not reflect the fact that as of the valuation date, the Putnam Parkade had no anchor tenant, the Trolley Barn site was found not zoned for retail space, the parent of Katherine Gibbs determined to shut down that operation, and the Cranston Parkade was facing significant vacancies.  (7/25/08 TT at 102-106.)  Each of these negative developments directly impact anticipated cash flow,

which is what Aertsen claimed to be valuing, yet he made no effort to adjust the appraisal values accordingly.  Moreover, the only way for FHC or its subsidiaries to realize the appraisal values that he adopts wholesale is to sell the properties.  Nevertheless, Aertsen does not reduce the appraisal values to account for anticipated transactional costs and taxes. (See *id*. at 155.)  In sum, Aertsen completely fails to perform the McKinsey DCF calculation and he only selectively conducts an asset valuation that makes no deductions for the costs of liquidation.  The result is a substantially inflated value of FHC's operating properties.

For certain operating properties, Aertsen did not even attempt to calculate their DCF value.  To the contrary, he used a set of immediately available substitutes and came up with a cash flow to which he applied a discount rate of his own choosing without attempting to do any of the work called for by McKinsey.  In valuing FHC's North Adams property, for which there was no appraisal, Aertsen calculated the average appraised value of three purportedly "comparable" FHC properties on a square footage basis and multiplied that average by the square footage of the North Adams property. (7/24/08 TT at 163-64.)  Leaving aside whether such a calculation is prudent or reliable, it is a complete disconnect with the enterprise DCF model which Aertsen claimed to be applying.  He testified originally at trial that Chapter 11 of the McKinsey Text supports this market comparable approach, (see *id*. at 80-81,) but later admitted that the language he relied upon related solely to "[e]xcess real estate and other unutilized assets" and not to an operating property such as North Adams.  (*Id*. at 183-85; see Pl. Ex. 159A at 338.)  Moreover, Aertsen chose to use his version of a "market comparable approach" without even attempting to calculate the FCF of the entity which owned that property, ignoring the actual financial information available, including revenue, net operating income, occupancy, balance sheet information, all provided to him, and which, even to a casual observer demonstrates the utter fantasy of his valuation. (*Id*. at 164-66.)

Rather than making even a stab at valuing FHC by discounting its free cash flow by its average cost of capital, as prescribed by the McKinsey Text, Aertsen cobbled together various valuation concepts:  appraised value for operating properties; market comparables; and net income figures from FHC's 10-K, (*id*. at 17) with no coherent, generally accepted rationale to establish that such a hodgepodge would produce a valuation that is reliable.

Aertsen's methodology, in short, does not apply the McKinsey Text at all.  He employed a methodology of his own creation, which is not supported by any valuation text or literature and never subjected to peer testing.  *See Beaudette,* 462 F.3d at 25; *Baldwin v. Bader,* 2008 U.S. Dist. LEXIS 23435, *11-13 (D. Me. March 24, 2008) (excluding expert testimony on business valuation where the expert's opinions were not supported by the professional literature upon which he based his methodology).  Moreover, Aertsen's methodology is considered "very nonstandard" among business valuation professionals because it leads to double counting. (7/25/08 TT, at 51, 171-72.) *Compare CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 888 F. Supp. 192, 199 (D. Me. 1995) (admitting expert testimony so long as the "testimony will be based on information provided by CMM's principals of a type that financial experts typically use in calculating profit and loss").  Aertsen, in fact, offered nothing to support his contention that the methodology he applied is an appropriate way to determine the "fair value" of a corporation such as FHC.  *See Reali v. Mazda Motor of America,* 106 F. Supp. 2d 75, 77-78 (D. Me. 2000) (excluding expert testimony where the plaintiff failed to produce any evidence supporting the expert's methodology).  Aertsen's valuation methodology rests on nothing firmer than his own *ipse dixit* that it is reliable.  That does not meet the requirements of Rule 702, or of the principles set forth in *Libby* and *McLoon,* and accordingly, this Court should exclude Aertsen's fair value calculation.

**C.      Even if Aertsen's Testimony Were Admissible, His Alleged Methodology Substantially Inflates the Actual Fair Value of FHC and Therefore Should be Disregarded.**

Aertsen's home-brewed methodology finds no support in the relevant business literature or among others in the profession because it cannot produce a reliable and accurate valuation of a business. He concludes that the fair value of FHC's stock is $15.66 a share. This number is three hundred and eighty percent above the stock's market price as of September 15, 2005 and in order of magnitude five times greater than the values calculated by both Professor Riddiough and Ms. Fannon utilizing different, but reliable, tested valuation methodologies. Ms. Fannon presented a clear critique at trial (which was coupled with marked chalks) that detailed her criticism of the Aertsen method and his factual application of his method. (7/25/08 TT at 162-182.) Additionally, Ms. Fannon testified that Aertsen's opinion that the stock was undervalued by 80% was not a realistic assessment (7/25/08 TT at 159.) She further testified that: "[I]f that were true in a publicly listed stock, anyone in the market could have had the properties appraised, anyone could have – if his method was in fact a valid method, which I seriously disagree that it is, anyone could have duplicated that methodology. The properties were all listed in the 10-K and the methodology that he uses, uses nothing more than information that's available in the 10-K. It would be very transparent and easily – easy to duplicate. So it begs the question, then, why wasn't the stock priced up like that, why wasn't there a run on the stock." (7/25/08 TT at 160.) The reasons for value inflation are evident from even a cursory review of Aertsen's disclosures, worksheets and testimony. He double counts assets and income streams by adding to the appraised value of FHC's individual properties: (1) the anticipated gains on the sale of the properties; and (2) deferred expenses. By definition, appraised values already include projected cash flows, anticipated gains from sale and the value of deferred expenses. Aertsen also used erroneous data and made unsubstantiated assumptions to support the notion of further

gains from the sale of real estate as part of FHC's prospective cash flow.  He inflated the fair

value of FHC further by failing to consider, let alone account for, taxes and other non-equity

claims that directly impact the value of FHC as a going concern.

<em>i. Double Counting</em>

In his fair value methodology, Aertsen calculated the value of FHC using appraisals and

"market comparables," and FHC's supposed prospective cash flow from its development

activities.  (Def. Ex. 46 at 2-3.)  As Riddiough testified, without challenge, Aertsen's calculation

reflects a "mixing [of] a liquidation [net asset value] approach where he was valuing the assets

individually," and an attempt to "account for the merchant development portion of the

company…on an investment value basis." (7/25/08 TT at 51.)  Aertsen prescribes a value of $21,

489,315 to FHC's equity interest in operating properties and prescribes an additional value of

$20,113,904 to FHC's prospective cash flow from "management, development, construction,

finance" activities. *(*Def. Ex. 46 at Going Concern Value Worksheet.)   Both values, however,

are the result of significant double counting.  For instance, Aertsen calculates FHC's future cash

flow from development activity by averaging three years of net revenues. (Def. Ex. 46 at 3; see

*id*. at Worksheet No. 1.), including a $6,458,395 net gain from the sale of the Mount Olive

property in 2004.  (*Id*. at Worksheet No. 1; 7/24/08 TT at 177.)  Thus, Aertsen's calculation of

prospective cash flows from FHC's development activity necessarily assumes substantial gain

from a sale of real estate every three years.  Furthermore, gains from the sale of real estate are

already included in the market values of the properties.  Combining the two elements of FHC's

operating properties, therefore, results in double counting.

Aertsen also pumped up the supposed value of FHC by adding what he called non-

operating assets to his valuation.  Included in these "non-operating properties" are supposed

"excess" cash, a tax shield and "deposits, escrows, prepaid and deferred expenses."  (Def. 46 at

3-4; see *id*. at Worksheet No. 1.)  In total, Aertsen values these non-operating assets at more than $10 million. (*Id*.)  This $10 million should be deducted, not added.  As Ms. Fannon testified, a company must be valued by its ability to produce income or by asset value. (7/25/08 TT at 171-72.)  Adding both together is double counting.  (*Id*.)  Because Aertsen purported to have performed an "enterprise income capitalization method," the value of non-operating assets should be zero because these assets produce no income.  (*Id*.)

Finally, Aertsen double counts by ascribing a $2.7 million value to FHC's tax shield without actually making a deduction for FHC's tax liability.  He testified that he did not take any deductions for taxes because he assumed FHC's net operating loss ("NOL") carry forward would offset any taxes. (7/24/08 TT at 187.)  As discussed below, his assumption that the NOL carry forward would continuously offset FHC's tax liability is completely erroneous.  Nevertheless, even assuming, *arguendo*, that he is correct about FHC's tax shield, he cannot refuse to deduct for taxes while at the same time adding back the value of the tax shield.  By not discounting for taxes, but crediting the value of the tax shield, he effectively double counts the value of the tax shield.  This error alone results in an overvaluation by at least $2.7 million.

ii.     *North Adams Property*

Aertsen had or had available to him the financial information to conduct his enterprise DCF analysis on North Adams, and, had he followed that method correctly, he would have calculated the value of North Adams to be zero. (7/24/08 TT at 159.)  Instead, he utilized a wholly separate market comparable method, thus calculating the value of North Adams to be almost $14 million.

To calculate the square footage value of North Adams, Aertsen took the appraisal values of FHC's Plainfield, Putnam and West Springfield properties, calculated the per square foot value of each and divided the sum of those values by three. (Def. Ex. 46 at 2.)  Based on this method and the chosen

comparables, he calculated FHC's equity value in North Adams to be $1,946,649.  (Def. Ex. at Going

Concern Value Worksheet; 7/24/08 TT at 166-68.)  In fact, however, the "comparables" are

anything but comparable.

As Mr. Harding, the Vice President and director of FHC, testified, North Adams was a

distressed property as of September 15, 2005 and had an occupancy rate of only 23%. (7/25/08

TT at 206.)  The property had no anchor tenant and a large amount of the space had been vacant

for four or five years and was in need of "an entire rehaul." (*Id*.)   On the other hand, FHC's

operating properties in Plainfield, Putnam and West Springfield were fully occupied and had

anchor tenants on September 15, 2005. (7/24/08 TT at 166; 7/25/08 TT at 164.)  Yet Aertsen

made no adjustment to account for the lack of an anchor tenant in North Adams even though he

fully recognized the significance of an anchor tenant in valuing retail space.  (7/24/08 TT at 63.)

He also made no adjustments to his value of North Adams to account for the fact that, as of the

valuation date, North Adams had a net operating income of approximately $20,000, whereas the

net operating incomes for Plainfield, Putnam and West Springfield in 2005 were $591,000,

$571,000 and $1,034,000 respectively (7/24/08 TT at 165.)[6]  Thus, not only is Aertsen's use of

the market comparable approach suspect because it ascribes a value to the North Adams property

where there would be no value under the enterprise DCF analysis, but, in addition, his calcula-

tion is based on a demonstratibly false assumption that other properties with full occupancy and

---

[6] Aertsen claims that by deducting the amount of the loan commitment that exceeds the outstanding loan amount ($10,581,000 less $7,861,784) from the value of North Adams, he fully accounts for the cost of bringing North Adams to "lease-up." (7/24/08 TT at 83-84.)  This is yet again another of Aertsen's assumptions that is incorrect as a matter of fact.  If Aertsen had wanted to determine the amount it would cost FHC to fully lease the North Adams property, he should have made the proper inquiries.  In reality, FHC has spent far in excess of the face amount of the debt to revitalize North Adams and, even as of the date of trial, North Adams was still only 70% occupied. (7/25/08 TT at 208.)  Aertsen's deduction, therefore, does not accurately account for the cost of leasing-up North Adams and his valuation of that property is unreasonably inflated as a result.

vastly greater net operating incomes are comparable.  Aertsen's value of North Adams is inherently unreliable and must be disregarded.

### iii.        Calculation of Prospective Cash Flow from "Development" Activity

Attempting to value FHC's purported "merchant development" business, Aertsen dared to calculate the prospective cash flow of FHC's "management, development, construction and finance" activities.  (Def. Ex. 46 at 3.)  To do so, he simply exports figures for 2003-2005 from FHC's April 30, 2005 10-K.  (*Id.*)  Utilizing nothing more than select figures in FHC's 10-K, Aertsen assigns a $ 20,113,904 value to FHC's development revenue based on FHC's purported "average free cash flow." (Def. Ex. at Worksheet No. 1.)   This value is completely unreliable and unsupported by the history, business activity and prior bankruptcy of FHC.  As Ms. Fannon testified repeatedly, until the 2004 sale of the Mt. Olive property, FHC was still recovering from bankruptcy in the 1990s and was operating at negative $6 million in equity. (7/25/08 TT at 121-22.)   When the sale of Mt. Olive occurred in 2004, FHC's equity improved to negative $1 million. (*Id.* at 122.)  Given the financial history of FHC, it is difficult, if not impossible, for this Court to credit Aertsen's calculation of FHC's "average free cash flow" as more than $3 million, with a present day value of more than $20 million. (Def. Ex. 46 at Worksheet No. 1.)

Further degrading the reliability of Aertsen's free cash flow calculation is his inclusion of non-recurring revenues that FHC cannot reasonably expect to incur on an on-going basis. (7/25/08 TT at 174-75.)  These include, for instance, litigation proceeds and short-term heightened management fees from Lubbock retail property.  (*Id*. at 175-176.)  Including these one-time revenues improperly distorts FHC's free cash flow.  The largest distortion of FHC's free cash flow, however, comes from Aertsen's inclusion of a purported net gain of $6,458,395 from the sale of the Mt. Olive property in 2004.  Aertsen included this full amount as part of the free cash flow analysis despite recognizing that this value represents the gain, and not FHC's

proceeds from the sale.  (7/24/08 TT at 177.)  Thus, FHC did not, contrary to Aertsen's

calculation, have access to the full amount of the more than $6 million gain.  (7/25/08 TT at 112-

13.)  Indeed, Aertsen noted at trial that any gain from the Mt. Olive sale "may very well have"

gone to fund the Bangor development, in which case the gain would already be included in the

value of Bangor, and should not be considered again in the free cash flow calculation.  (7/24/08

TT at 177-79.)

Moreover, by including gain from the Mt. Olive sale as an element of free cash flow,

Aertsen is assuming that FHC will have multi-million dollars in free cash flow every three years

from the sale of real estate.  As demonstrated by its historical business activities described by

Ms. Fannon, however, FHC is not in the business of regularly selling real estate, and there is no

basis to assume that a sale would take place every three years. (7/25/08 TT at 177.)   The Mt.

Olive sale, in fact, was the first time FHC had sold real estate since 1998. (*Id*. at 112.)  Aertsen's

calculation fails to consider the realities of FHC's business.  As a result, his "fair value" calcula-

tion greatly exceeds the actual value of FHC.

Furthermore, because Aertsen relied exclusively on figures from FHC's 10-K to value its

supposed "development" activity, and performed no due diligence to confirm the whether the

book value was accurate and realistic, he included a considerable amount of projected income

from assets that had no current income stream, but could, possibly, produce income in the future.

Specifically, he testified that he considered FHC's income from 2003-2005 as "being a precursor

of the future," stating:

> I looked at the pipeline that they have, and in particular Edinburg, and I felt
> that the assumptions I made in the cash flow analysis were reasonable.  I think
> Edinburg alone has the potential of achieving, because of the size of it, what
> their entire income property portfolio is at this point in time.

(7/24/08 TT at 215.)  This practice is speculative and is unrelated to the valuation date set by this

Court.  Although Aertsen puts great stock in the development of the Edinburg property, he did

not have any information as of 2005 to support the view that Edinburg would ever be worth more

than the $50,000 purchase option that FHC held on the property on the valuation date. (7/25/08

TT at 211.)  Aertsen admitted as much during trial when, discussing Edinburg, he stated, "I'm

not exactly sure what they had at that point, but whatever – whatever arrangement they had to

acquire that parcel, 130 acres would have a significant value." (7/24/08 TT at 128.)  His

assumption is not supported by a single fact, and he made no attempt to verify his projection for

Edinburg.  If he had done so, he would have learned, as Mr. Harding testified, that as of

September 15, 2005, FHC did not know if they would be able to purchase sufficient acreage to

develop the Edinburg site and it had no permits to even begin the development process. (7/25/08

TT at 212.)

        The great "comfort" that Aertsen finds in FHC's development of the Edinburg property,

(7/24/08 TT at 111), is perplexing given Mr. Harding's testimony that unless FHC signs one or

two more leases, it will lose money on that property. (7/25/08 TT at 216-17.)  Thus, FHC's

projected cash flow from Edinburg is still uncertain.  Despite this, Aertsen would have this Court

believe that as of September 15, 2005, he could predict that the value of Edinburg would exceed,

in the future, the value of a $50,000 purchase option.  Aertsen used his "crystal ball" further by

including projected incomes from other FHC assets, including the Rockland property which FHC

had no equity value in as of September 15, 2005. (7/25/08 TT at 210-11.)  His value of FHC's

"development" business as of September 15, 2005, therefore, is nothing more than speculation

and guesswork and this Court must disregard it entirely.  *See GE v. Joiner,* 522 U.S. 136, 146

(1997) (affirming the exclusion of expert testimony because there was "too great an analytical

gap between the data and the opinion proffered of the expert").

iv.    *Non-operating Assets*

Aertsen includes in his fair value calculation approximately $10 million for the value of certain non-operating assets of FHC.  Included in this category are the values of excess cash, FHC's tax shield and the other non-operating assets (deposits, escrows, prepaid and deferred expenses).  As discussed previously with regard to double counting, *see supra* at 26-28, the nearly $3.5 million value of "other non operating assets" should not be included in this $10 million item because the value of those assets is embedded in the market value of FHC's operating properties.  Aertsen's calculation of excess cash and his use of FHC's tax shield are further evidence of his erroneous methodology, lack of diligence in overriding the accuracy and reliability of his data, his general misconception of FHC's business operations and goal of creating a high valuation for FHC.

Aertsen calculates the value of FHC's excess cash on September 25, 2005 to be $3.8 million based on the assets and liabilities (non-equity claims in the parlance of McKinsey) listed in FHC's 10Q from October 31, 2005.  (Def. Ex. 46 at Worksheet No. 2; 7/24/08 TT at 189.)  Relying exclusively on the cash line in FHC's balance sheet, Aertsen jumps to the erroneous conclusion that all cash is excess cash, making no effort at all to calculate the actual working capital needs of FHC.  As a result, his calculation substantially inflates FHC's actual excess cash at that time because he fails to account for the corresponding liabilities on FHC's "excess" cash.  A telling example is his inclusion of approximately $5 million in proceeds from the Bangor Parkade construction loan, funded on October 31, 2005, in his excess cash basket.[7]  By calling the full $5 million as excess cash, Aertsen ignores the description in FHC's 10-Q that

---

[7] Aertsen testified that on FHC's quarterly financial statement from October 31, 2005 to calculate excess cash.  Thus, he assumes, without confirming, that FHC had realized the $5 million in loan proceeds on September 15, 2005.  There is no evidence in the record to suggest that this is true.  In fact, as Ms. Fannon testified, FHC's records from July through October of 2005 do not reflect the type of increase in equity that would have occurred had FHC realized a $5 million cash asset.  (7/25/08 TT at 169-70.)

points out that roughly $4.02 million from the loan amount was required to be paid to a tenant in December 2005. (7/24/08 TT at 189-93; 7/25/08 TT at 167.)  Thus, Aertsen's excess cash calculation overvalues FHC by more than $4 million.  Had Aertsen accounted for the outstanding liability on the Bangor loan (as McKinsey required him to do), FHC's cash position would have been negative.

Aertsen further distorts the true value of FHCs non-operating assets by including more than $2.7 million as the value of FHC's tax shield.  Again, Aertsen did not actually calculate the tax shield, but simply took a page from FHC's 10-Q for October 31, 2005. (7/24/08 TT at 115.) He testified that he assumed for purposes of his analysis that FHC would always have a Net Operating Loss carry forward ("NOL carry forward") to offset any taxes. (*Id.* at 187.)  He made this assumption despite acknowledging that if FHC's continues at no growth, as he predicted, FHC will eventually run out of depreciable assets and the ability to produce NOL's. (*Id*. at 188-89.)  Nor in his testimony did he consider if NOL's will expire.  Moreover, he never actually calculated the tax liabilities of FHC to confirm that the NOL carry forward would, in fact, provide a sufficient offset.  Instead, he assumed, based on FHC's past income tax experience, that its tax obligation would never exceed its tax shield.  This assumption is unverified and, when tested, clearly incorrect.

Aertsen incorrectly assumes any liability of FHC for taxes will be offset by the NOL.  As Ms. Fannon pointed out, because Aertsen valued FHC's operating properties based on appraisals, he essentially performed a net asset valuation and <u>not</u> an enterprise DCF calculation.  (7/25/08 TT at 163-65.)  A net asset valuation is the value of assets in liquidation and this valuation method requires deductions for all expenses of liquidation, including taxes. (*Id.*; see *id*. at 43-45.) Thus, while FHC's NOL as of September 15, 2005 may have offset income taxes, it did not offset projected capital gains taxes.  (*Id*.)  As a result, Aertsen's fair value calculation overvalues

FHC's operating properties by not considering the taxes associated with the sale of those properties, while at the same time affording a substantial value to a tax shield that does not offset all of FHC's anticipated tax liability.  Crediting the tax shield without deducting for all tax liabilities is highly selective and it improperly drives up the value of FHC. (*Id*. at 171.)

> **D.    Aertsen's Calculation of FHC's Dividend Paying Capacity as a "Check" Simply Highlights the Flaw in Aertsen's Entire Valuation Technique.**

In the days leading up to trial, Aertsen claims to have "analyzed" FHC's dividend-paying capacity as a purported "cross check" on his enterprise DCF analysis.  Rather than offering support for his initial valuation, however, his dividend-paying capacity calculation results in numerous possible valuations, none of which match up with his enterprise DCF valuation.  Specifically, his valuations of FHC's dividend-paying capacity range anywhere from $27.6 million to $63.6 – both drastic deviations from his $48 million enterprise DCF valuation. (Pl. Exs. 167, 168.)  Moreover, he again fails to apply an accepted methodology to calculate FHC's dividend-paying capacity, choosing instead to rely on selective excerpts from the Pratt Text in combination with his own experience.  His supplemental valuation rests also on irrelevant data that he happened to have access to at the time of his calculations. The "cross-check" performed by Aertsen, therefore, serves only to highlight the inherent unreliability of his conclusions and methodologies in this case.  He makes no effort to properly adjust for the differences between REITs and an entity with the form and characteristics of FHC as was done by both Riddiough and Ms. Fannon.

Aertsen's methodology for calculating FHC's dividend-paying capacity is flawed and unsupported by a single authority.  He relied on two sentences from Chapter 11 of the Pratt Text to support his dividend-paying capacity method. (Pl. Ex. 169 at 2; 9/24/08  TT at 23.)  Chapter 11 sets forth the Guideline Publicly Traded Company valuation method of which dividend-

paying capacity is but a small part of that overall method of valuation. (Pl. Ex.160.)  Yet Aertsen testified that he never read Chapter 11 in full and is generally unfamiliar with the method of valuation described in that chapter.  *(Id.* at 24-25.*)*  It is no surprise, therefore, that he failed properly to apply the Guideline Publicly Traded Company Method. (9/24/08 TT at 5.)  As with his version of DCF analysis, Aertsen could point to no published or generally accepted authority to support his contrived dividend-paying capacity calculation. (9/24/08 TT at 103-04.)

Aertsen deviates from the Guideline Publicly Traded Company method in a number of respects.  Most notable is his failure to deduct gains from the sale of real estate when calculating FHC's dividend-paying capacity.  The primary method for calculating the dividend-paying capacity of an REIT is to calculate the company's Funds from Operation ("FFO"). (*Id*. at 44-45; Def. Ex. 74.)  A company's FFO is "equal to a REIT's net income, excluding gains or losses from sales of property, and adding back real estate depreciation." (*Id*.)  Despite avowing complete agreement with those fundamental principles, Aertsen nevertheless included gains from the sale of real estate because he claimed he was calculating FHC's Adjusted Funds from Operations ("AFFO").  (9/24/08 TT at 55-56; Pl. Exs. 166, 167, 168.)  Whether he was calculating FFO or AFFO for FHC, however, gains from the sale of real estate should have been excluded. (Def. Ex. 74.)

Moreover, he failed to use FHC's actual capitalization rate as required by the Pratt Text. (Pl. Ex. 160 at 294.)  By not considering FHC's capitalization rate and making the appropriate adjustments, Aertsen simply equated FHC with the REITs used by him, when, in actuality, FHC was operating with a higher debt ratio. (9/24/08 TT at 20.)  Application of an improper capitalization to an FFO figure grossly inflated by inclusion of sales from real estate resulted in a wildly overstated, unrealistic and irrational value.

Aertsen's dividend-paying capacity analysis is unreliable for the additional reason that it rests on irrelevant data.  The Morningstar reports upon which Aertsen relies include financial information as of July 2008, thereby offering little, if any, guidance as to the financial characteristics of the REITs as of September 2005. (*Id*. at 36-37.)  Aertsen, nevertheless, relied on the financial information in the July 2008 Morningstar reports without any adjustments, hardly a reasonable or reliable basis upon which to calculate dividend-paying capacities of companies in 2005.

**VII.    CONCLUSION**

For all of the foregoing reasons, Defendants respectfully submit that the Court should exclude the proffered testimony of Plaintiff's expert, or on consideration, attribute to it no probative value, and accept the conclusion of the expert Nancy Fannon and find that the per share value of the stock of First Hartford Corporation on September 15, 2005, was $2.79.


DATED:  November 14, 2008

/s/ Peter W. Culley
Peter W. Culley
PIERCE ATWOOD LLP
One Monument Square
Portland, ME  04101-1110
207-791-1100
pculley@pierceatwood.com
*Attorneys for Defendant*
*First Hartford Corporation*


/s/ Joseph H. Groff III
Joseph H. Groff III
JENSEN BAIRD GARDNER & HENRY
Ten Free Street, P.O. Box 4510
Portland, ME  04112
207-775-7271
jgroff@jbgh.com
*Attorneys for Defendant Neil Ellis*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing Post-Hearing Memorandum of Defendants with the Court's CM/ECF system, which will distribute copies to all counsel of record.

DATED:  November 14, 2008

<u>/s/  Peter W. Culley</u>
Peter W. Culley
Pierce Atwood LLP
One Monument Square
Portland, ME  04101
(207) 791-1100