**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **RICHARD E. KAPLAN** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 05-144-B-H** |
| | ) | |
| **FIRST HARTFORD CORPORATION,** | ) | |
| **and NEIL ELLIS** | ) | |
| | ) | |
| **Defendants** | ) | |

*CORRECTED* **PLAINTIFF RICHARD E. KAPLAN'S VALUATION POST-HEARING BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 3

    Legal Standards of Fair Value ............................................................ 4

    Valuation Methodologies .................................................................... 6

    Burden of Proof ................................................................................... 7

I.    GUILLIAEM AERTSEN VALUATION ............................................ 8

    Mr. Aertsen's Qualifications and Experience ................................... 8

    Enterprise Discounted Cash Flow (DCF) Valuation Methodology ................... 10

    Application of Enterprise DCF Methodology to FHC ...................... 12

    FHC Portfolio of Operating Properties ............................................ 14

    Management, Development, Construction, Finance Operation:  Merchant Developer Business .................................................................................................. 17

    Bangor Parkade Contract for Sale of Leasehold Interest ................. 20

    Confirming Forecasted Revenue Stream by Reference to Years After Valuation Date ................................................................................................. 20

    No Tax Claim/Deduction ................................................................. 21

Non-Operating Assets ........................................................................................ 21

    Value of Excess Cash ............................................................................ 21

    Value of Tax Shield .............................................................................. 22

    Deposits, Escrows, Prepaid and Deferred Expenses ........................... 22

Costs of Corporate Center ............................................................................... 24

II.    THE STOCK MARKET PRICE DOES NOT REFLECT FAIR VALUE ................................. 24

III.    ASSET BASED APPROACHES: NET ASSET VALUATION ...................................... 32

Hypothetical Capital Gains Taxes and Transactional Costs Should Not Be Deducted in a Net Asset Valuation ............................................................ 32

Comparing Net Asset Valuation of the Three Experts ................................... 34

IV.    PROFESSOR TIMOTHY RIDDIOUGH'S VALUATION METHODOLOGIES ......................... 36

Prof. Riddiough's Valuation Methodologies Applied Minority and Marketability Discounts in Violation of the Controlling Legal Standard ............................. 36

Riddiough Investment (Income) Approach ..................................................... 37

V.    NANCY FANNON VALUATION METHODOLOGIES – INCOME AND MARKET APPROACHES .............................................................................................. 40

Exclusion of Gains on Sale of Development Properties in Measurement of Income ....... 40

Reduction for a 33.6% Corporate Income Tax ............................................... 42

"Normalized Income" and "Invested Capital Methods" ................................. 42

Capitalization Rate ........................................................................................... 43

Market Approaches ........................................................................................... 44

VI.    CAPITALIZATION OF DIVIDEND PAYING CAPACITY METHODOLOGY ......................... 45

CONCLUSION ............................................................................................................ 49

<u>INTRODUCTION</u>

The Court has found that grounds for dissolution exist, and has ordered the alternative remedy of buy-out of the complaining minority shareholders at fair value.  The task now before the Court is to determine the fair value of the shares of First Hartford Corporation (FHC).

Plaintiff's expert, Guilliaem Aertsen, found the going concern value of FHC to be $48 Million.  **P162**.  By contrast, Defendants' experts found the value of FHC to be little more than $9 Million.[1]  **D41; D45**.  Before examining the details of the respective valuation analyses, some perspective can be garnered from a bird's-eye view of the cash flow FHC enjoyed in the period surrounding the valuation date, September 15, 2005.

For the fiscal year ended April 30, 2006, FHC:

- Distributed $1MM cash in bonuses to management (**P120 at 12-13**)
- Distributed $300K cash in dividends (first dividend in 25 years) (**P120 at 9**)
- Expended $400K cash in litigation costs for Kaplan oppression litigation (**P120 at 12**)
- Reinvested (on April 28, 2005) $6MM of cash proceeds from refinancing the Cranston shopping center to acquire an additional 25% ownership interest (**P116 at 11-2; P120 at 9 of Cranston/BVT Associates Financial Statements**)[2]
- Increased by $5.2MM its cash and marketable securities, from $2.4MM at April 30, 2005 to $7.6MM at April 30, 2006 (**P120 at 23**)

---

[1] Nancy Fannon determined an enterprise equity value of $9.3M.  Timothy Riddiough did not value the enterprise, but instead valued a single minority share at approximately $3 per share, which translates to $9.25 Million based on the 3,083,171 shares of First Hartford then outstanding.

[2] FHC chose to reinvest $6MM of the refinancing proceeds to increase its ownership interest in a shopping center property.  As reported in FHC's financial statements: "On April 28, 2005, Cranston Parkade, LLC, a 50% owned subsidiary of the company, has purchased the remaining  50% interest in the Cranston/BVT Associates, LP as well as the outstanding 50% interest in the General Partner C/BVT, Inc., giving  the Company a 50% interest in the Cranston shopping center.  Cranston Parkade paid $6,000,000 for the interest it purchased which was paid out of a refinancing of the shopping center owned by Cranston/BVT Associates LP. . . .  After all funds that the partners and/or partnership had advanced for the closing were returned, including $280,000 in advances repaid to Mr. Ellis (President of the Company), the company received a cash distribution of approximately $1,500,000."  Because Cranston/BVT Associates, LP reports on a calendar year, the April 28,2005 transaction was included in FHC's fiscal year ended 4/30/05: "Cranston/BVT  Associates reports on a calendar year and is not adjusted to the Company's April 30 year-end therefore, the April 28, 2005 transaction will not affect earnings until our second quarter ending October 31, 2005."  **P116 at 11-12.**

During the period from April 1, 2005 through March 31, 2006, FHC generated more than $16 Million of cash from actual transactions that it could have distributed to shareholders without selling any operating assets:

- $7.5MM cash from Cranston refinancing on 4/28/05 (**P116 at 11-2**)[3]
- $8.6MM cash from closing on first part of Bangor Parkade contract sale on 3/17/06 **P158** at bates # FHCREM 14618 and **P120 at 10.**

These are cash receipts from actual transactions, net of all associated expenses and taxes.[4]  In the face of these irrefutable cash figures, a valuation for First Hartford Corporation of $9 million dollars defies common sense.  Clearly, Defendants' valuation models are fundamentally flawed, because a company that could have distributed $16MM to its shareholders during a 12-month period, while retaining most of its other assets, including all of its income producing operating properties, must have a value substantially greater than $9MM.  By contrast, Mr. Aertsen's valuation was based on the actual cash flow that FHC is able to generate from its assets and operations, thereby capturing the  true fair value of FHC shares.


Legal Standard of Fair Value

The Maine Business Corporation Act, in 13-C M.R.S.A. § 1434, provides that a court can order a corporation to purchase a shareholder's shares at "fair value" in lieu of ordering dissolution.  While the Maine Business Corporation Act does not define "fair value" in the dissolution context, it does define fair value in the appraisal rights section:

"Fair value" means the value of a corporation's shares determined

    A.       Immediately before the effectuation of the corporate action to which a shareholder objects;

---

[3]See note 2, *supra*, for details of the refinancing transaction.
[4] FHC did not incur or pay any federal income tax in fiscal years ended 4/30/05 or 4/30/06.

B.      Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

C.      Without discounting for lack of marketability or minority status except, if appropriate, for amendments to the corporation's articles of incorporation pursuant to section 1302, subsection 5.

13-C M.R.S.A. § 1301(4).[5]  The Law Court has addressed what constitutes fair value in the appraisal rights context, stating that "[t]he fair value of shares is to be determined on the basis of what a reasonable and prudent observer would consider to be a price that reflects the intrinsic value of the right of stock ownership. . . ." *In re Valuation of Common Stock of Libby, McNiell & Libby*, 406 A.2d 54, 62 (Me. 1979).  This is determined by first valuing the entire company and then determining the shareholder's "proportionate interest in a going concern."  *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1003 (Me. 1989) (*quoting Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983)).

Under Maine law, so-called "minority discounts" or "marketability discounts" are not applied in determining fair value.  In *McLoon Oil*, 565 A.2d at 1004, the Law Court <u>rejected</u> the corporation's argument that the dissenting shareholders' share value should be "discounted" because they were minority shares and because there was no market for the shares.  The court stated that "[a]ny rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the

---

[5] While this statutory provision and much of the relevant case law deals with valuation in the appraisal rights context, the methods and principles of valuation in appraisal rights cases have been used in the buy-out in lieu of dissolution context.  For example, in one New York case dealing with a minority shareholder's action for dissolution where the closely held corporation elected buy-out in lieu of dissolution, the court specifically stated: "In making the necessary determination [of fair value], courts should generally look for guidance to the criteria set forth by the cases interpreting . . . the appraisal rights statute."  *Blake v. Blake Agency, Inc.*, 107 A.D.2d 139, 146 (N.Y.A.D. 1985).  Indeed, FHC's expert witness, Ms. Fannon, stated in her report that the forced buy-out statute in Maine does not define fair value, and thus she used the definition from Maine's appraisal rights statute.  **D41**.  Thus, the appraisal rights case law regarding fair value can be similarly adopted to guide the court in the instant case.

shareholders in control.  Such a rule would inevitably encourage squeeze-outs." *Id.* at 1005.  The

court agreed with the Delaware Supreme Court's statement that

> to fail to accord to a minority shareholder the full proportionate value of his
> shares imposes a penalty for lack of control, and unfairly enriches the majority
> shareholders who may reap a windfall from the appraisal process by cashing out a
> dissenting shareholder, a clearly undesirable result.

*Id.* (quoting *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1141 (Del. 1989)).  A majority of

other jurisdictions reject such discounts "because they fail to fully credit the minority owner's

percentage stake in the value of the enterprise in its entirety."  *Jahn v. Kinderman*, 814 N.E.2d

116, 126 (Ill.App. 2004).


Valuation Methodologies

The Law Court has held that "[t]he fair value of shares is to be determined on the basis of

what a reasonable and prudent observer would consider to be a price that reflects the intrinsic

value of the right of stock ownership. . . ." *Libby*, 406 A.2d at 62 (Me. 1979).  In its first decision

regarding valuation of shares, the Law Court adopted Delaware's approach to determining fair

value (known as the "Delaware block method"), which requires an appraiser and the court to

assess the following factors: (1) stock market price, (2) investment value (i.e., the corporation's

earnings capacity), and (3) net asset value.  *Id.* at 60; *see Blake*, 107 A.D.2d at 146 (applying

these same factors to a buy-out in lieu of dissolution case). As the Law Court later recognized,

the *Libby* valuation method has been criticized and broadened in subsequent cases and the

modern approach to valuation "must include proof of value by any techniques or methods which

are generally considered acceptable in the financial community, and otherwise admissible in

court." *McLoon Oil*, 565 A.2d at 1003 (quoting *Weinberger*, 457 A.2d at 712-13).  The Law

Court stressed that "the value of the business entity as a whole should be determined by the best

available valuation methods." *Id.* at 1004.  In short, although the three-pronged Delaware block approach is permitted, it is by no means required, nor should it be applied mechanically to every case.  The Law Court clarified, however, that the broadening of the three-pronged approach *does not* allow for the use of minority or marketability discounts: "*Weinberger* advocated the same definition of 'fair value' of a single shareholder's stock as did *Libby*: 'his proportionate interest in a going concern.'" *Id.* at 1004.

Burden of Proof

In determining the fair value of shares in a forced buy-out context, the burden of proof is neither on the shareholder nor on the corporation.  *See Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *20 (Del. Ch. Feb. 22, 1988), *aff'd* 564 A.2d 1137 (Del. 1989) (finding that, even when the parties fail to prove fair value, the court must make an independent finding of fair value); *In the Matter of Cohen*, 636 N.Y.S.2d 994, 996-97 (N.Y. Sup. Ct. 1995) (finding that the determination of fair value "defies application of a burden-of-proof approach"); *Price v. Marathon Oil Co.*, 1986 WL 807, at *4 (Ohio App. Jan. 14, 1986) ("The ultimate issue was fair cash value and neither the statute, nor practicality, placed the burden of proof on one party rather than another.").  Instead, the "primary object" for this Court must be "to provide all the affected parties an opportunity to be heard on the issue of fair cash value and for the court, based on all of the relevant evidence without consideration of burden of proof, to make a finding as to fair cash value." *Price*, 1986 WL 807, at *4.

## I.      Guilliaem Aertsen Valuation

Mr. Aertsen's Qualifications and Experience

Since shortly after his graduation from Harvard College in 1970, Mr. Aertsen has been working in the financial industry.  **Tr. (7/24/08) at 33-55**.  He completed the equivalent of an executive master's degree in business administration at the First National Bank of Boston's two year training program.  **Tr. (7/24/08) at 34:7-13**.  He worked in the commercial lending department of First National Bank of Boston (hereafter "Bank of Boston") through the 1970s and early 1980s, rising to Vice President of that department.  His commercial lending work focused on underwriting credit for client companies throughout New England, including both public and private companies, and providing financial advice to those clients.  **Tr. (7/24/08) at 34:20– 35:16**.

In the early 1980s, Mr. Aertsen trained directly under Joel Stern of the Stern Consultancy in New York on capital markets and corporate finance.  Mr. Stern was one of the first people to promote practical applications of discounted cash flow (DCF) modeling to determine enterprise value.  **Tr. (7/24/08) at 40:6-10**; **P159A at viii-ix**.  Mr. Aertsen and the other Bank of Boston officers who attended this training used this DCF methodology in virtually all aspects of their work at Bank of Boston over the years.  **Tr. (7/24/08) at 40:13-22**.  Bank of Boston was one of the first banks to apply the DCF methodology to valuing real estate, which enabled it to resume lending again after the real estate problem years of the late 1980s, since those problems in part were caused by lenders relying on accrual accounting entries in valuing companies and making lending decisions.  **Tr. (7/24/08) at 41:9–45:2**.  The DCF methodology propounded by Stern was adopted and explained in handbook fashion in the widely-recognized McKinsey text.

In the early 1980s, Mr. Aertsen was promoted to division executive of Bank of Boston's "work-out" area, charged with the primary responsibility of working with companies with

problem loans to help them repair their bad risk ratings. **Tr. (7/24/08) at 35:19-23**. During the real estate problems of the late 1980s when Bank of Boston had several billion dollars of exposure to the real estate industry, Mr. Aertsen restructured the real estate group to deal with problem real estate credits, and was designated head of Bank of Boston's commercial real estate practice. **Tr. (7/24/08) at 36:14–37:17**. When Bank of Boston reorganized, Mr. Aertsen ran the Bank's global capital market activity worldwide, underwriting debt securities. Mr. Aertsen obtained his Series 7 securities license in 1995, training with a program that utilized the then-current edition of the McKinsey text. **Tr. (7/24/08) at 37:15–38:8, 46:24–47:18; P159A** (current edition).

Following another reorganization in 1996, Mr. Aertsen took over responsibility for Bank of Boston's Global Asset Management Group, overseeing asset management activities throughout the United States, Argentina, Brazil, Europe and Asia, and also joined the Bank's Management Committee. **Tr. (7/24/08) at 47:19–48:6**. In these capacities, and in his role serving on the bank's investment approval and other approval committees, Mr. Aertsen reviewed all of the applications for credit, equity, and securities underwriting – all of which followed the DCF methodology to value the subject businesses. **Tr. (7/24/08) at 48:7-23**.

In 1991, at the request of the president of the Bank of Boston, Mr. Aertsen, together with David Spina of State Street Bank, co-founded the Massachusetts Housing Investment Corp. ("MHIC"), an entity that provides credit specifically to the affordable housing market. **Tr. (7/24/08) at 48:24–50:4**. Starting as a lender, MHIC began to syndicate tax-equity credits for low-income housing and created the "new market credit equity" product that extends the tax credit into commercial activities in low income neighborhoods. Mr. Aertsen remains chairman of the board of the MHIC, which is the largest provider of tax credit equity and new market

credit equity in Massachusetts.  In its work approving loans and credits, MHIC relies on the DCF methodology to value businesses.  **Tr. (7/24/08) at 50:7-18**.

In 1998, Mr. Aertsen left Bank of Boston to establish Aertsen Ventures, a venture capital investment company.  Aertsen Ventures invests in and advises all manner of companies, from software companies, to companies owning distressed real estate, to companies managing a major portfolio of commercial real estate in the Boston area.  **Tr. (7/24/08) at 51:6-23**.  In addition, as the chair of the audit committee of New England Realty Associates, LP,  a public company, Mr. Aertsen is responsible for reviewing the adequacy of published financial reports of public companies.  Mr. Aertsen also has an ownership interest in both AGS Realty Advisors, which provides advice to owners of single properties, and Premier Capital, which buys pools of charged-off commercial loans.  **Tr. (7/24/08) at 53:9-54:19**.  In his work for all of the companies that he now operates, Mr. Aertsen utilizes the DCF methodology to assess the value of business entities and guide his and his clients' investment decisions.  **Tr. (7/24/08) at 42:5–45:2, 54:23–55:10**.

Mr. Aertsen is not experienced in providing litigation support as a testifying  witness in valuation cases.  He is thoroughly and professionally experienced, however, in valuing businesses for actual transactions and is therefore eminently qualified to analyze and provide expert opinion on the fair value of FHC.

Enterprise Discounted Cash Flow (DCF) Valuation Methodology

Mr. Aertsen valued FHC using the enterprise discounted cash flow (DCF) valuation methodology.  The DCF valuation methodology is well-known and widely-used in the financial community to value businesses for real transactions and therefore is an appropriate methodology

to determine fair value under law.  In brief, the DCF methodology values a company as a going concern by valuing its income-producing (operating) assets based on forecasted future streams of cash flow, discounted at the company's weighted average cost of capital, and then adding to that the value of any assets not needed for the production of income since those assets could be converted to cash without diminishing the income stream.  **Tr. (7/24/08) at 55:11-22**.

This approach is set forth in the McKinsey Valuation book, **P159A**,[6] but is not unique to the McKinsey text.  It is well accepted in the financial community as a sound basis for buying, selling and financing companies, and accordingly, is frequently used in the valuation of business entities.[7]

---

[6] "Companies create value by investing capital at rates of return that exceed their cost of capital." **P 159A at 4**.  "[A] company's value is driven, first, by its ability to earn a return on invested capital (ROIC) greater than its weighted average cost of capital (WACC), and second, by its ability to grow.  High returns and growth result in high cash flows, which in turn drives value." **P159A at 101**.  The enterprise DCF model measures value by discounting future streams of cash flow at the weighted cost of capital.  **P159A at 101-02.** Mr. Aertsen relied upon the market discount rates and income capitalization rates arrived at by appraisers for operating properties and an equity rate for the FHC holding company operations, a higher/more risky discount rate than for operating properties, thus applying a weighted cost of capital to the entire enterprise. "Enterprise DCF remains the favorite of many practitioners and academics because it relies solely on the flow of cash in and out of the company, rather than on accounting-based earnings (which can be misleading)." **P159A at 101**.  "[T]he enterprise method is especially valuable when extended to a multi-business company.  . . . Using enterprise discounted cash flow . . . enables you to value individual projects, business units, and even the entire company with a consistent methodology." **P159A at 103-04.**

[7] Ms. Fannon acknowledged in her report that the discounted cash flow method is the most frequently used method by appraisers and the courts, but argued for other approaches to value FHC:  "While the discounted-cash-flow method is the most frequently used method (consistent with the notion of a going-concern valuation), the courts continue to use all methods available, depending on the facts and circumstances."  For FHC, Ms. Fannon elected to use "comparable-company or comparable-stock valuation methods (the market approach), capitalized or discounted earnings methods (the income approach), and the net-asset approach.  Depending on the facts and circumstances, the findings from these methods may be weighed appropriately.  We will consider each of these approaches in our valuation of First Hartford, as we believe each of them to be relevant to the question of value."  **D41 at 38**.

Application of Enterprise DCF Methodology to FHC

The McKinsey Valuation text, **P159A at 104**, sets out the step-by-step process to value a multi-business enterprise such as FHC with the enterprise DCF methodology:

1. Value each of the company's operations by discounting free cash flow from operations at the weighted average cost of capital (discount rate) for the respective operation.
2. Value non-operating assets.
3. Identify and value all nonequity financial claims against the company's assets.
4. Subtract the value of nonequity financial claims from enterprise value to determine the value of common stock. To determine share price, divide equity value by the number of shares outstanding.

This is the methodology that Mr. Aertsen used, as demonstrated in Exhibit P162. First, it is important to note that Mr. Aertsen based his valuation almost exclusively on real numbers derived from FHC's own public financial statements and FHC's course of business lender appraisals. Exhibit P162 is annotated to show the source for each of the numbers. For convenience, a summary table of the valuation in Exhibit P162 is set out below:

Enterprise Discounted Cash Flow (DCF) Model for Multibusiness Company
Value of the Common Stock of First Hartford Corporation
September 15, 2005

| | | EIN | MAI Appraisal Value | Debt | Equity | FHC Equity Interest | FHC Equity |
|---|---|---|---|---|---|---|---|
| First Hartford Corp | Parent | 01-0185800 | | | | | |
| First Hartford Realty Co | Operating/Management/Development | 13-2707845 | | | | | |
| **Operations** | | | | | | | |
| **Operating Properties** | | | | | | | |
| Plainfield Parkade Corp | Retail - Plainfield | 06-1285264 | 7,200,000 | 5,218,507 | 1,981,493 | 100% | 1,981,493 |
| Putnam Parkade Inc | Retail- Putnam | 06-1345287 | 7,200,000 | 5,534,738 | 1,665,262 | 100% | 1,665,262 |
| Parkade Center Inc | Retail - Lubbock, Texas | 06-1467089 | 17,000,000 | 6,904,715 | 10,095,285 | 2% | 201,906 |
| Brewery Parkade Inc | CP Associates; Cranston Parkade LLC | 06-1567236 | | | | 100% | |
| CP Associates | Ground Lease-Texas Roadhouse | 06-1567236 | 1,300,000 | | 1,300,000 | 50% | 650,000 |
| CP Associates | Office Building-Katherine Gibbs | 06-1567236 | 15,100,000 | 11,337,866 | 3,762,134 | 50% | 1,881,067 |
| CP Associates | Excess Land | 06-1567236 | 2,500,000 | | 2,500,000 | 50% | 1,250,000 |
| CP Associates | Office Building-Police Station | 06-1567236 | 1,000,000 | | 1,000,000 | 50% | 500,000 |
| CP Associates | Excess Land- Trolley Barn Site | 06-1567236 | 1,700,000 | | 1,700,000 | 50% | 850,000 |
| Cranston Parkade, LLC | Cranston/BVT Associates LP | | | | | 100% | |
| Cranston/BVT Associates LP | Retail - Cranston | | 45,750,000 | 35,979,381 | 9,770,619 | 50% | 4,885,310 |
| Tri City Plaza Inc | Dover Parkade LLC | 03-0392103 | | | | 100% | |
| Dover Parkade LLC | Retail- Dover | | 26,500,000 | 20,460,348 | 6,039,652 | 50% | 3,019,826 |
| 1150 Union Street Corp | Retail - W. Springfield | 57-1193167 | 11,800,000 | 9,142,197 | 2,657,803 | 100% | 2,657,803 |
| Main Street NA Parkade | Retail - North Adams | 04-3807725 | 13,974,298 | 10,581,000 | 3,393,298 | 50%* | 1,946,649 |
| **Sub-Total: Value of Operating Properties** | | | 151,024,298 | 105,158,752 | 45,865,546 | | 21,489,315 |
| **Other Operating Units** | | | | | | | |
| Bangor Parkade Inc Leasehold Purchase Contract (EIN 54-2106995) | | | PV of $5,250,000 contract value FHC DEP.EX.7 (3/7/08); management est. of in place value in 4/30/05 audit memo FHC 9730-36; affirmed in 4/30/06 10K; at 14% discount rate | | | | 4,917,076 |
| Management, Development, Construction, Finance | | | PV of $3,036,918 average free cash flow for Management, Development, Construction, Finance for FY 2003, 2004, 2005 at 14% discount rate; 4/30/05 10K | | | | 20,113,904 |
| **Non-Operating Assets** | | | | | | | |
| Value of Excess Cash | | | 10/31/05 10Q (net working capital) | | | | 3,850,861 |
| Value of Tax Shield | | | 10/31/05 10Q ($8,038,949 NOL in FHCREM 01294) | | | | 2,730,000 |
| Value of Other Non-Operating Assets | | | 10/31/05 10Q (deposits, escrows, prepaid and deferred expenses) | | | | 3,494,942 |
| **Corporate Center Costs** | | | | | | | -8,327,235 |
| | | | PV of corporate center costs ($1,257,296) using average of FY 2003, 2004, 2005 G&A expense load using 14% discount rate;4/30/05 10K | | | | |

| | |
|---|---|
| **Total FHC Equity Value** | **48,268,862** |
| **Total shares outstanding on 9/15/05** | **3,083,171** |
| **Total FHC Equity Value per share** | **$15.66** |

*Technically, FHC has a 100% equity interest.  However, under a participating mortgage the lender is entitled to 50% of all value above $500,000.

In applying the enterprise DCF methodology to FHC, Mr. Aertsen first identified FHC's

multiple business units and operations.  Broadly, FHC has two lines of  business:  1) a portfolio

of stabilized income producing operating properties, and 2) a development, construction and

management business.  Each of the income-producing properties is owned in a separate entity, is

separately financed, and has its own risk characteristics based upon the nature of the property

and its location.  In view of this, Mr. Aertsen considered each to be a separate business with a

cost of capital based on its specific risk characteristics.


FHC Portfolio of Operating Properties

For most of the income producing properties, Mr. Aertsen found that FHC had

comprehensive appraisal reports prepared within one year of the September 15, 2005 valuation

date.  Each appraisal included an income capitalization approach that utilized both DCF and

direct capitalization analyses techniques,[8] as well as sales comparison, and, in a few cases, cost

approaches.  Based on his experience and a review of the appraisals, Mr. Aertsen found those

DCF valuations to be reliable and credible, because they were prepared by a knowledgeable and

---

[8] See, for example, the appraisal report for Putnam Parkade Appraisal:  "The estimate of market value by
the Income Capitalization Approach includes an analysis of market rental and expense data; analysis of
subject leases; estimation of  market rent and expenses for the subject [property]; forecast of pertinent
market parameters; and pro forma estimation of net operating income.  Both the Discounted Cash Flow
and Direct Capitalization techniques are used in this appraisal.  The Discounted Cash Flow technique
converts future benefits to present value by applying an appropriate discount rate.  After analysis of
pertinent data to select an appropriate discount rate, pro forma operating cash flow and the estimated
reversionary value are discounted to an estimation of current leased fee market value.  Direct
Capitalization converts an estimate of a single year's income expectancy into an indication of value using
an appropriate capitalization rate.  After analysis of pertinent data to select an appropriate capitalization
rate, pro forma stabilized net income is capitalized to an estimation of current leased fee market value."
**P131 at 43**.  Although the appraisers also conducted a sales comparison, it was used principally as a
check on the selected capitalization rate for the income approach valuation: "Since shopping centers are
acquired principally, if not solely, based on their income, the primary benefit from these sales is the stated
relationship between net income and sale price expressed as a going-in capitalization rate."  **P131 at 58.**

experienced appraiser[9] at the request of a commercial lender which would rely on the appraisal to make its lending decision.  It is Mr. Aertsen's practice, and in his experience the practice of commercial lenders, to rely on appraisals of this quality to make investment decisions.  **Tr. (7/24/08) at 71:20-73:11**.  Mr. Aertsen therefore used these appraisal valuations for the operating properties for his valuation of this portion of FHC's business enterprise without adjustment.  Although the property appraisals used several valuation approaches to arrive at a blended valuation, Mr. Aertsen accepted them as is, without adjustment.  In doing so, Mr. Aertsen accepted the judgment of the experienced appraiser as to the reasonable expectations for future cash flow and the appropriate discount rates for the risk relating to each property.  He did not make any adjustments to the income projections or changes to the capitalization rates that would increase the fair value of the FHC-owned operating properties, since capitalization rates and discount rates used by the appraisers reflected the cost of capital for this type of commercial real estate in the marketplace.  This was appropriate, since each of the properties was owned in a separate entity, separately financed and without recourse to FHC.  The appraisal capitalization rates and discount rates for the operating properties did not reflect FHC's cost of capital, but rather the property's cost of capital as a trading asset established in the marketplace.  **Tr. (7/24/08) at 67:14-68:9**.  The debt (non-equity financial claims) against the operating properties was determined from FHC's financial records and subtracted from the appraisal value, producing the equity value of each operating property.  Finally, FHC's percentage equity interest is identified to produce FHC's equity value for each operating property, totaling $21,489,315.  Citations to the property appraisals and FHC financial records are set out in Exhibit P162.

---

[9] Mr. Aertsen has personal knowledge of the quality of the real estate appraisal firm that prepared most of the appraisals. "In the case of CB Ellis Whittier Partners, those people, I have come to believe, based on my own experience, are as good at [appraising commercial/industrial property] as anybody in the industry." **Tr. (7/24/08) at 62:11-14.**

In the case of the Hartford Lubbock appraisal, Mr. Aertsen chose to use the appraisal although it was performed more than one year after the valuation date (5/3/07).  A key element in Mr. Aertsen's decision to do so was the fact that FHC had only a 2% interest in Hartford Lubbock, so that any change in value between the appraisal date and the valuation date would have only a very small effect on the value of FHC's interest.  Professor Riddiough did the same: "For the Lubbock shopping center [Ms. Konikoff], and therefore I, relied on the CB Richard Ellis appraisal.  In that case First Hartford only has roughly a 2 percent interest in that asset, so any adjustments that one would make probably would not make very much difference."  **Tr. (7/25/08) at 31:9-14.**

In the case of the North Adams property (Main Street NA Parkade), for which there was no real estate appraisal, Mr. Aertsen used an alternative method, one with which he is familiar from his commercial lending experience and suggested by the McKinsey text.  **P159A at 338**.  In place of an appraisal, he estimated the value based on square footage and the DCF values per square foot for FHC's three most comparable properties.  Mr. Aertsen testified that he had previously used this method at the Bank of Boston, and that in his experience (and with the benefit of hindsight) it had proved quite accurate in most instances.  **Tr. (7/24/08) at 78:16-79:25**.  In performing this comparative analysis, he considered the leasing status, that at April 30, 2005, the property was 23% leased, *see* **P116 at 5**, and by April 30, 2006 the property was 73% leased, *see* **P120 at 6,11**.  Mr. Aertsen made an appropriate valuation adjustment to reflect the lease-up status.  He started with $13,974,298 (the DCF value when leased), and subtracted $10,581,000, the full amount of the loan commitment.  This loan commitment included almost $2MM of yet to be spent lease-up and tenant improvement expenses, which were anticipated to be spent.

Effectively, this was a $2MM downward adjustment from the DCF leased value. **Tr. (7/24/08) at 80:14-81:11**. The resulting total equity value was $3,393,298. Taking into account the terms of the lender's participating mortgage, Mr. Aertsen calculated FHC's share of the equity value at $1,946,649. *See* **P162**. In Mr. Aertsen's opinion, based on his extensive experience, this method provided a reasonable estimate. It should be noted that, in the case of North Adams, because the lender had a 50% participating mortgage, even a $100,000 variation in the valuation of the North Adams property would translate to only a $50,000 variation in the value of FHC – less than 2¢ per share. Since Mr. Riddiough and Ms. Fannon elected not to attempt any valuation of the North Adams property, the value as determined by Mr. Aertsen is the most reasonable and credible valuation in evidence.[10]

Management, Development, Construction, Finance Operation: Merchant Developer Business

Having valued FHC's portfolio of operating properties, the next step was to value the stream of cash flow from FHC's real estate development, construction, and management business. To do so, Mr. Aertsen examined FHC's audited financial statements for the three most recent fiscal years as of the valuation date.[11] In accordance with the McKinsey methodology (and common sense), he adjusted the income and expenses to eliminate (rather than double count) those items that were already taken into account in the valuation of FHC's income-producing properties. For example, he eliminated all rental income, because the rental income

---

[10] FHC management told Professor Riddiough and Ms. Fannon, and Mr. Harding testified very briefly, that the North Adams property has no value. Based on management's representations to them, both Professor Riddiough and Ms. Fannon chose to value the property at zero. In Ms. Fannon's case, she also was under the mistaken impression that no leasing activity had occurred at the property between the April 30, 2005 close of FHC's fiscal year and the September 15, 2005 valuation date. **Tr. (7/25/08) at 188:13-199:11**.
[11] For variable development activity, industry standard calls for analyzing historical performance, and a 3 year look back is typical. **Tr. (7/24/08) at 108:23-109:20.** *See also* **P159A at 166-77.**

was already counted in the DCF analysis of the income producing operating properties.  He did not eliminate management fee income received by FHC from its entities, because those fees had been deducted as expenses in the DCF analysis in the commercial appraisals for each property, and were therefore properly included (without double counting) as income for FHC's management operation.  Mr. Aertsen was meticulous in assuring that no item of income or expense was counted in two places.

The revenue and expense figures for FHC's real estate development, construction, and management line of business were taken directly from FHC's public financial statements.  A comparison of FHC's financial statements for fiscal year ending 4/30/05, **P116 at 22**, to worksheet 1 of exhibit P162 shows that revenues and expenses relating to the operating properties were eliminated from the computation:

All FHC Revenues and Expenses for fye 4/30/05 (**P116 at 22.**):

Revenues:

| | |
|---|---|
| Sale of real estate | $128,500 |
| Construction | 180,455 |
| Rental income | 4,749,693 |
| Management fee income | 48,363 |
| Gain on derivatives | 15,785 |
| Other | 145,439 |
| Non-recurring items | 807,950 |
| Equity in earnings of affiliates | 389,294 |

Costs and Expenses:

| | |
|---|---|
| Cost of sales, real estate | 37,979 |
| Construction | 13,680 |
| Operating | 1,997,896 |
| Interest | 1,588,141 |
| Loss on Derivatives | 0 |
| Depreciation and amortization | 890,429 |
| General and Administrative | 1,782,750 |
| Property Taxes | 718,365 |
| Non-recurring expense | 175,169 |

18

Revenue and Expenses attributed to Management, Development, Construction, Finance Operation Activity **(P162 at worksheet 1):**

Revenues:

| | |
|---|---|
| Sale of real estate | $128,500 |
| Construction | 180,455 |
| Management fee income | 48,363 |
| Gain on derivatives | 15,785 |
| Other | 145,439 |
| Non-recurring items | 807,950 |

Costs and Expenses:

| | |
|---|---|
| Cost of sales, real estate | 37,979 |
| Construction | 13,680 |
| Loss on Derivatives | 0 |
| Non-recurring expense | 175,169 |

Expenses under Cost of Corporate Center:

| | |
|---|---|
| General and Administrative | $1,782,750 |

    A key challenge in valuing the real estate development, construction and management business is that the development income depends on transactions and is not consistent from year to year.  Mr. Aertsen's approach was to take the income and expenses as reported for the three year period, and to average them.  He did not assume any growth.  In short, his approach was simple, straightforward, and conservative.  Mr. Aertsen then projected that income forward for ten years, and applied a 14% discount rate, representing FHC's cost of capital for this type of activity, to arrive at his valuation for this segment of FHC's business.  Mr. Aertsen explained how he arrived at that discount rate and why he thought the rate appropriate for this part of FHC's business.  **Tr. (7/24/08) at 93:25–96:14**.  Mr. Aertsen's 14% discount rate (and corresponding multiple of 7) lies between Professor Riddiough's multiple of 4 (and corresponding discount rate of 25%) and Ms. Fannon's capitalization rate of 4.1% (and corresponding multiple of 24).  The 14% discount rate that Mr. Aertsen deemed appropriate for FHC's development business is considerably higher than the discount rates selected for the

operating properties by the commercial appraisers (8-9%), reflecting the riskier nature of FHC's development business as compared to the stabilized income producing retail centers.

Bangor Parkade Contract for Sale of Leasehold Interest

As shown in Exhibit P141, as of the valuation date, FHC, through its wholly owned subsidiary Bangor Parkade, Inc., had a contract dated December 8, 2004, for the sale of a leasehold interest in Bangor Parkade Shopping Center for $31,378,121, a project developed for sale. Although listed in Exhibit P162 under "other operating units," the Bangor Parkade leasehold purchase contract was essentially a non-operating asset scheduled to produce cash at a closing on a portion of the contract a few months after the valuation date, in March, 2006. Mr. Aertsen valued the contract as of the date of valuation (9/15/05) based on management's estimated gain from closing, discounted back to the valuation date using the same discount rate (14%) as that used for FHC's development business. As shown on Exhibit P162, the estimated cash gain was $5.2M, discounted at 14% to $4,917,076.[12]

Confirming Forecasted Revenue Stream by Reference to Years After Valuation Date

A common check on valuation forecasts is to examine financial data for periods after the valuation date. The fiscal year ended April 30, 2007 is the first full fiscal year after the September 15, 2005 valuation date. Notably, for fye 4/30/07, FHC's net cash flow from its development, construction, and management business (as defined in Mr. Aertsen's valuation) was $3.3MM, exceeding the forecast of $3MM based on the average of the three fiscal years ending 2003-05. **P124 (10-K fye 4/30/07).**

---

[12] The actual closing on this portion of the Bangor Parkade contract produced $8,646,242.31 in cash proceeds, net of loan repayments, and a reported gain of $5.4MM. **P158** (closing statement); **P120 at 32** (4/30/06 10-K).

<u>No Tax Claim/Deduction</u>

In valuing free cash flows from operations, claims against the cash flow must be deducted, including claims for federal income taxes. FHC's federal income tax returns, **P107-P114**, however, reveal that as a result of real estate depreciation and high development operating expenses, FHC carries a large net operating loss carry-forward and therefore does not incur (or pay) federal income tax. But for a small alternative minimum tax ($114,000) in fiscal year ended 4/30/04, FHC has not paid any federal income tax for the last seven years, and continues to maintain a large net operating loss (NOL) carry-forward. *See* summary in **P114**. Indeed, the summary in Exhibit P114 reveals that FHC's NOL increased from $6,122,061 at April 30, 2005 to $8,038,950 at April 30, 2006, and held at $7,922,778 as of April 30, 2007.

Mr. Aertsen, therefore, did not reduce his valuation for income taxes that FHC neither incurred nor paid.[13]

<u>Non-Operating Assets</u>

Mr. Aertsen then, in accordance with the McKinsey methodology, added the value of non-operating assets to arrive at the total valuation of FHC:

<u>Value of Excess Cash</u>

Excess cash is simply the excess working capital over that needed for operation of the business. P162, Worksheet 2 sets out the figures for working capital (current assets less current liabilities) and the resulting working capital taken directly from FHC's balance sheet in its public financial statement, 10-Q for 10/31/05. **P118 at 3-4.**

---

[13] The NOL arises from substantial depreciation on the retail operating properties, as well as FHC's high expenses for development activity and is therefore forecasted to continue.

This is the excess over the working capital required to support the income-producing operations.  As such it is available to distribute as a dividend, or for reinvestment in development activity, as the company elects, and represents value available to shareholders in addition to the value of the income producing operations.

Value of Tax Shield

The line item in FHC's balance sheet for "deferred tax assets, net of valuation allowance of $800,000" in the amount of $2,730,000, **P118 at 3 (10-Q 10/31/05)**, represents FHC's own valuation of its approximately $8 Million Net Operating Loss Carry Forward (NOL) as of the valuation date.  In the discounted cash flow analysis of FHC's development, construction, and management business, Mr. Aertsen assumed no growth and forecasted only a steady average revenue stream out 10 years.  At such a steady state, the NOL will be replenished year after year as a result of real property depreciation and high development activity expenses that exceed operating income. As the stable income cash flow forecasted, therefore, there will be an unused residual net operating loss carry forward at the end of the 10 year forecast period.  If FHC were to grow beyond this steady cash flow forecast, however, the tax shield would shield the increased income, producing additional cash flow.  Thus, the tax shield is an asset that could support the company's growth.

Deposits, Escrows, Prepaid and Deferred Expenses

The line item in FHC's balance sheet for "deposits, escrows, prepaid and deferred expenses" in the amount of $3,494,942, **P118 at 3 (10-Q 10/31/05)**, represents cash deposits or expenditures for future development activity not otherwise accounted for on FHC's financial statements.  Once development begins, the related expenses are transferred to the account for the respective property, and treated as capitalized costs.  Until then, the costs are carried as an asset

on FHC's balance sheet since FHC believes such costs in fact represent value, and under

accounting rules are carried at the lower of cost or FHC's best estimate of that value.  The notes

to FHC's public financial statements explain the entry as follows:

> Expenditures directly related to real estate under consideration for development
> are deferred and included in deposits, escrows, prepaid and deferred expenses in
> the consolidated balance sheets. These costs would include option payments,
> attorney's fees, architect and engineering fees, consultants, etc., but only to the
> extent they are from outside sources.  If development of the real estate
> commences, all of the accumulated costs are reclassed to the property under
> construction in the consolidated balance sheets. If the project is later abandoned,
> all of the accumulated costs are charged to expense.

**P120 at 32 (10 K  4/30/06)**.  These costs represent cash investments in development activity that

are recovered at closing on the properties (sale or permanent financing) or which could be sold to

third parties.  **Tr. (7/25/08) at 229:20-230:4**.  Consider, for example, the $50,000 that FHC paid

in early September 2005 for an option on land in Edinburg to be acquired and developed in the

future.  It is true that the $50,000 had been spent, and FHC had no right to get it back.  But it was

spent to purchase an option, which had great value, as it was key to what is now FHC's

$48,000,000 Shoppes at Rio Grande development.  **P143**.  This is why such cash investments

were carried by FHC in this account as an asset pending commencement of development, and

why it was appropriate for Mr. Aertsen to include such items in his valuation at the values

assigned to them by FHC management.

Nor is this double counting, as it is captured nowhere else in Mr. Aertsen's analysis.

Upon financing the land acquisition, the $50,000 would be included in the land costs.

Ultimately, on the sale of the real estate, $50,000 would be treated as recovery of costs.  It would

not be counted in the revenue stream for FHC's Development activity, which is only the <u>gains</u> on

sale, net of the cost of investment. **Tr. (7/25/08) at 231:12-18**.

Costs of Corporate Center

The capitalized cost of the FHC corporate center is then deducted from the values

determined above.  The $8,327,235 capitalized corporate center value is determined by averaging

corporate center costs for the same three year historical period (fiscal years 2003-05) as used to

forecast revenues, and at the same discount rate of 14%.  **P162,** worksheet 1 and Schedule of

Prospective Cash Flow.

## II.    The Stock Market Price Does Not Reflect Fair Value

In his valuation, Mr. Aertsen gave no weight to the stock market price for FHC shares.  In

contrast, Ms. Fannon and Professor Riddiough both gave great weight to the stock market price

as the best indication of the true value of FHC.  In fact, Professor Riddiough weighted it at 80%,

giving his own analysis of the company only a 20% weighting.  **D45 at 21; Tr. (7/24/08) at**

**240:3-11**.

As discussed below, the stock market trading price for FHC is not a reliable indication of

value.  But even if it were, given the facts of this case, it would not be an indication of the *fair*

*value* of FHC as defined under Maine law.  Assuming *arguendo* that the stock market valued

with precision the 100 shares that were traded on September 12, 2005 (the single trade used by

Ms. Fannon and Professor Riddiough as their "stock market price"[14]), those 100 shares would

have been valued as minority shares in a company controlled by an oppressive management.

Accepting the stock market value would burden the Plaintiff with not only a minority discount

(which is not permitted under Maine law), but also another discount for the harmful effects of

---

[14] Given all of the time and effort they devoted to valuing FHC, Ms. Fannon's and Professor Riddiough's
deference to the pricing decision in a single $325 transaction is remarkable.

management's oppression.[15]   Neither of FHC's experts provided any basis, in evidence or

argument, for determining what the market trading price would have been if FHC had not been

under the control of oppressive management.   The only evidence is a very small stock trade some

days before the valuation date at a price that reflects a minority discount and oppressive

management, rather than the *fair value* under Maine law.   Under these circumstances, the Court

should not give the stock market price any weight at all, because to do so would be to ratify,

rather than remedy, the effects of the oppression.

Even in the absence of oppression, the stock market price for FHC does not provide an

accurate indication of value because of the illiquidity of the market and management control.

While courts have generally recognized the stock market price as providing some indication of

value for publicly traded stocks, they have also identified situations in which the stock market

price is not a reliable indication of value and therefore should be disregarded.   The Law Court in

*Libby* recognized that although the market price of shares is entitled to consideration in "normal

times" where the stock is "widely held," "[c]ourts have reduced the weighting assigned to stock

market price in cases where evidence of a 'thin' market is present."   *Libby,* 406 A.2d at 63-64.

The court defined a thin market as one "characterized by a low volume of public trading."   *Id.* at

64.[16]   As a Maine Superior Court summarized:

---

[15] The reasoning of *McLoon* with respect to minority discounts is equally applicable to the effects of oppression.   A rule that gave a buy-out remedy at the oppressed price would result in a transfer of wealth from the oppressed minority to the oppressive majority, and would be no remedy at all.

[16] It is instructive to compare the thin market for FHC shares with the market that the Court found adequate in *Libby*.   406 A.2d at 64.   Libby was listed on three securities exchanges: the New York Stock Exchange, the Midwest Stock Exchange and the Pacific Stock Exchange.   By contrast, FHC is not listed any stock exchange.   Instead, brokers place offers on the Pink Sheets, an electronic bulletin board.   Libby had an average <u>daily</u> volume of 2,700 shares, almost as much as FHC's average <u>monthly</u> volume.   Libby had a public "float" of 3,768,000 shares.   According to 10-K for the year ended April 30, 2006, FHC had 3,046,279 shares outstanding 10-K at p.2, leaving a public float of only 652,393 shares after excluding the nearly 2,393,887 shares held by Mr. Ellis and the 13D filers.   **P120 at 53**.   Libby had 15,700 shareholders

> [T]he stock market price of a publicly traded corporation gains significance in the valuation of the business when the corporate shares are traded 'in a free and open market, characterized by a substantial volume of transactions that makes the market a fair reflection of the judgment of the investing public . . . .' ***On the other hand, if the corporation's trading market is thin (that is, of a low volume) or where ownership of the stock is not widely dispersed, then the fair value of the corporation may not be accurately reflected in its stock price due to those transactional limitations.***

*In re: Valuation of Common Stock of Penobscot Shoe Co.*, 2003 WL 21911141 at *2 (Me. Super. 2003) (quoting and citing *Libby*, 406 A.2d at 63-64) (emphasis added).  The Court in *Libby* had noted that an appraiser could use a "willing buyer/willing seller" approach to determine the stock market price.  *Libby*, 406 A.2d at 61 n.8.  The Law Court in *McLoon Oil* clarified that the Court

> did not, however, equate the price at which a willing seller would sell and a willing buyer would buy a minority block of stock with its fair value under the appraisal statute.  The willing seller/willing buyer price is indicative only of stock market price, and that is only one of the three factors used in the Libby analysis of the fair value of stock listed on the New York Stock Exchange.  Especially in fixing the appraisal remedy in a close corporation, the relevant inquiry is what is the highest price a single buyer would reasonably pay for the whole enterprise, not what a willing buyer and a willing seller would bargain out as the sales price of a dissenting shareholder's shares in a hypothetical market transaction.

*McLoon Oil*, 565 A.2d at 1004-1005.

Applying the Law Court's analysis to this case, the stock market price should be disregarded in determining the fair value of FHC.  On the September 15, 2005 valuation date, there was <u>no</u> stock market price as <u>no</u> shares were traded on that day.  In the two weeks preceding the valuation date, there was only one trade in FHC shares, namely 100 shares traded

---

of record, while FHC has fewer than 900.  By any standard, the trading that the Court found adequate in *Libby* dwarfs the trading in FHC.  If we take into account the fact that *Libby* was in 1975, when the Dow Jones average was around 800, less than one-tenth of where it stands today, even after the recent plunge, it is clear that the trading in FHC is on a scale that the *Libby* court would have characterized as too thin to be a reliable indication of value.

on September 12, 2005 at $3.25.  **P79 at K125-126**.  Both Ms. Fannon and Professor Riddiough

chose to rely on that single trade as the best indication of the true value of FHC.  **Tr. (7/24/08) at**

**238:9–240:11**.  While markets with many players and many transactions may be efficient

sources of information, that is not what we have here.  Here we have two unidentified people

engaging in one isolated transaction with a total value of $325.[17]

    Both Ms. Fannon and Professor Riddiough have struggled unsuccessfully to fit the FHC

trading square peg in the round hole that the academic literature gives to efficient stock exchange

markets.  As a basis for his reliance on the stock market price, Professor Riddiough cited Fischel:

"The more liquid the market, the more justified is reliance on the market price to the exclusion of

other factors."  **D45 at 8, par. 16**.  Given Professor Riddiough's 80% weighting of the stock

market price, one would expect to find quite a liquid market for FHC stock.  However, the

market for FHC stock is not liquid at all.  It is thinly traded.  In its SEC filings for the period

including the valuation date, FHC described the market for its shares as follows: "Sales of

common stock have occurred from time to time," **P120 at 9**, and warned investors:

> **Risk associated with thinly traded stock.**  There is a limited amount of
> Company shares that are traded over the counter on the National Daily Quotation
> Services of the National Association of Securities Dealers 'Pink Sheets.'  The
> market is controlled by market makers, which usually causes a large spread

---

[17] Both Professor Riddiough and Ms. Fannon gave great weight to a single trade of 100 shares by unknown parties a few days before the valuation date.  Neither of them seem to notice a far more significant transaction on December 16, 2005, only three months after the valuation date, when Neil Ellis (or his wife) purchased 1,000 shares at $4 per share.  **P128**.  This does not suggest that the value was $4.  Rather, it suggests that Neil Ellis considered the value to be considerably more than $4.  After all, in his dealings with Lehman Brothers, Mr. Ellis demonstrated quite clearly that he would not pay what he thought the Lehman shares were worth, but only what he thought he needed to pay to purchase them.  **P35E**.  While the December 16, 2005 Ellis trade does not put a value on FHC, it is a good indication that the September 12, 2005 "market price" on which Professor Riddiough and Ms. Fannon chose to rely was not a reliable indication of fair value.

between bid and ask prices.  As a result the market price of our common stock has been volatile.

**P120 at 5**.  As acknowledged by Professor Riddiough, a "liquid market" is one where a shareholder can convert a position to cash within a reasonable period of time.  **Tr. (7/25/08) at 59:7-10** (Prof. Riddiough defining an illiquid market as "one where it's difficult to convert an asset to cash.").  Such illiquidity certainly applied to FHC shares.  On September 22, 2005, a week after the valuation date, Lehman Brothers, which was one of the most sophisticated investment firms (regardless of its recent woes), was trying without success to convert its 36,892 share FHC position to cash, finally selling those shares to FHC at a deep discount to the then stock trading price.  It was not that the "market" had been heavily saturated.  Only 200 shares had traded in four weeks preceding the Lehman Brothers sale.  **P79 at K125-126**.  A market in which there is virtually no trading, and in which a sophisticated investment firm cannot dispose of a $120,000 position, is an illiquid market under any definition.

Professor Riddiough's description of the market for FHC shares was also misinformed, perhaps as a result of his reliance on the unidentified people at the Analysis Group who had hired him to prepare his report and who furnished him with statistics.  A quick look at the trading volume chart that the Analysis Group prepared for Professor Riddiough's report (included as Exhibit 2) shows that it was a piece of advocacy rather than a true analysis.  The chart reports that there were an average of 5,374 shares per month traded in the market, for a total of 370,806 shares for the entire 69 month period ended September, 2005.  One must assume that the Analysis Group chose to use the 69 month period rather than a 5 year period in order to include the more than 90,000 shares (approximately one-fourth of the volume for the entire period) traded in January, 2000.  There is no reason to believe that those shares were traded in open market transactions.  In its report to the SEC, describing the trading of FHC shares during that

period, FHC said:  "Small sales of the common stock have occurred from time to time, we

believe the range to be 1/8 to 1/2."  **P21 at 5**.  A reasonable explanation is that the 90,000 share

trade, like the 36,892 share Lehman sale to FHC in September, 2005 (when there was no market

for even that size block), **Tr. (7/24/08) at 250:21–252:9**, was not an open market transaction.

Together, those two transactions account for more than one-third of the volume for the 69

months on Professor Riddiough's Exhibit 2.  Excluding them, the average <u>monthly</u> trading

volume for the period was not even an anemic 5,374 shares, but a paltry 3,535 shares.  To put

this in perspective, at 3,535 shares per month, it would take the Kaplans 15 years to sell their

position, assuming that trading volume would be maintained and no other shareholder elected to

sell during the next 15 years.  That is not a liquid market.

 Professor Riddiough was also quite insistent that FHC shares are traded on an exchange,

**Tr. (7/24/08) at 247:5-18; Tr. (7/25/08) at 56:4-15**, apparently because the literature on which

he relies refers to exchange traded stocks.  The Pink Sheets on which FHC shares are traded,

however, are not an exchange, and there are substantial differences.  Exchanges have rules

intended to require transparency, which improves market efficiency.  For example, since

Sarbanes-Oxley ("SOX") was passed, a company cannot be listed on an exchange unless it has

independent directors and an appropriately constituted audit committee.  15 U.S.C. 78f, *as

amended by* Pub. L. No. 107-204, 116 Stat. 745, 776 § 301 (2002).  That is the reason why, as

noted by Professor Riddiough, some foreign companies do not qualify for listing on an exchange

and must trade, instead, on the Pink Sheets.  It is also one reason why FHC does not qualify for

listing on any stock exchange.  As stated by FHC:

> The listing standards for NYSE companies require that a majority of the directors be
> independent.  <u>First Hartford's shares are not listed on any stock exchange</u>, and the
> composition of First Hartford's Board of Directors is in full compliance with all
> applicable legal requirements.

**P34 at 14 (emphasis supplied)**.

Ms. Fannon, for her part, sought to explain the movement of FHC stock price over time, basing her theory entirely on the market reaction to the Mt. Olive and Bangor transactions. **Tr. (7/25/08) at 146:3-12**. An examination of the actual trading activity, however, shows no market reaction whatsoever to the Mt. Olive transaction. The Mt. Olive transaction occurred on January 24, 2004. It was announced to the "market" by FHC in an 8-K dated January 23, 2004, filed with the SEC on January 27, 2004. **P170**. By way of background, not a single share of FHC stock had traded in November 2003, December 2003 or through the announcement on January 27, 2004. **P80 at K274-275**. No shares were traded on the day of the Mt. Olive announcement or the following day. **P80 at K275**. The first trade after the Mt. Olive announcement was a trade of 500 shares on January 29, 2004. This was the day that Richard and David Kaplan filed their Schedule 13D, stating their concerns about FHC and the possibility that they might propose actions to improve shareholder value.[18]

---

[18] The Schedule 13D states:

Richard and David Kaplan intend to obtain more information concerning FHC, its assets, and how it has been managed, including the terms of transactions between FHC and Neil Ellis over the years. Based on the information obtained, Richard and David Kaplan anticipate that they may present (to management or, more likely, to other shareholders) proposals to improve the value of the FHC shares. Such proposals would likely include:

(a)  An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the FHC or any of its subsidiaries;

(b)  A sale or transfer of a material amount (or all) of assets of FHC or any of its subsidiaries; and/or

(c)  Changing (probably completely) the present board of directors and executive officers of FHC.

It is also possible that such proposals could include a material change in the present capitalization of FHC, changing the dividend policy to pay a dividend, and/or the acquisition by another person of additional securities of FHC, or the disposition of securities of FHC, changes in FHC's business or corporate structure, causing the FHC shares to cease to be publicly traded (even to the limited extent they are now traded).

**P171 at 5.**

After the 500 shares traded on January 29, 2004, no shares were traded during the next 5 trading days.  The purchaser of the 500 shares on January 29, 2004 may have considered the book value effect of the Mt. Olive sale, or yet more likely, considered the possibility of the Kaplans taking actions that would cause dividends to begin flowing.  Whatever precipitated the purchase of the 500 shares, it is fair to say (a) the market trading (a total of $525 in the two weeks following the Mt. Olive sale) was not impressive, and (b) there is no evidence of what was in the mind of that single purchaser.

An examination of the actual trading following the Bangor Parkade transaction similarly reveals no basis for concluding there was a "market reaction."  The closing of the transaction occurred on March 17, 2006 and was known to the market no later than March 20, 2006, when FHC reported it in an 8-K.  **P172**.  The last trade prior to this was 500 shares traded at $1.85 on February 27, 2006.  **P79 at K128-129**.  The first trade after the announcement was for a total of 2,287 shares on March 23, 2006 at prices ranging from $1.25 to $2.00 per share, with the market closing at $1.75 per share.  **P79 at K129**.  Several market participants, trading a total of less than $5,000, clearly had different motivations.  One was willing to part with his shares at $1.25, while another was willing to pay $2.00 (perhaps hopeful that the Kaplan litigation would help to unlock the inherent value).  The one thing we do know is that the Bangor Parkade transaction did not bring a reaction for at least a few days, and that if the March 23 trading was based on the Bangor Parkade transaction, the total of under $5,000 showed a clear lack of market interest, and the range of price showed a clear divergence of opinion (or other factors entirely unrelated to FHC).

As documented in detail above, had Mr. Ellis elected to distribute to shareholders the net proceeds available to FHC from just two transactions within 6 months of the valuation date, the

distributions would have amounted to $5 per share, and FHC would have still retained much of its value.  Clearly the fair value must be considerably more than $5.00, and yet the "market price" was only $3.25 per share.  How can this be?  At least three reasons provide an explanation:

(a) market pricing, even if accurate, reflects an unquantified discount for control by oppressive management, and therefore is not an indication of fair value free of oppression;

(b) market pricing, even if accurate, reflects an unquantified minority discount due to control by Mr. Ellis, and therefore is not an indication of fair value; and

(c) the market for FHC shares is extremely illiquid, and therefore the academic theories about pricing in liquid markets are inapplicable.

It is clear that the "market price" for FHC shares does not provide an accurate indication of value, and accordingly the Court should give it no weight in making its determination of *fair value* under Maine law.


### III.    Asset Based Approaches:  Net Asset Valuation

<u>Hypothetical Capital Gains Taxes and Transactional Costs Should not be Deducted in a Net Asset Valuation</u>

When assessing the value of shares in a forced buy-out context, this Court should not consider the hypothetical taxes that would be incurred in a hypothetical sale of assets.  In *Bogosian v. Woloohojian*, 158 F.3d 1, 6 (1st Cir. 1998), the First Circuit Court of Appeals held that if a sale of a corporation's assets is merely hypothetical, there is no need to deduct a hypothetical tax liability in valuing shares.  A number of courts in other jurisdictions have addressed this question and have held that the value of shares should not be reduced because of potential tax liabilities, as long as the corporation will continue as a going concern.  In *Hansen v.*

*Ranch Co.,* 957 P.2d 32. 42-43 (Mont. 1998), the court held that capital gains should not be considered in a dissenter's-rights case because the corporation was to be valued as a going concern and not a potential liquidation. Similarly, in *Matthew G. Norton Co.,* 51 P.3d at 169, the court held that "a wholesale discount for built-in capital gains on all the appreciated assets of the companies based on hypothetical liquidation at some indefinite time in the future is not appropriate." The court in *In re Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d 927, 934 (Vt. 1999), likewise held that capital gains taxes should not be considered "unless the corporation is undergoing an actual liquidation." The court specifically rejected the corporation's argument that it will have to sell assets in order to pay the dissenters for their shares, finding that "it would be inappropriate to consider a future sale of assets to determine the fair value . . . ." *Id.* Finally, in *Paskill Corp. v. Alcoma Corp.,* 747 A.2d 549, 554-55 (Del. 2000), the court rejected a discount for built-in gains because the dissenting shareholders were entitled to a share of the corporation as a going concern.

Similarly, estimated transactional costs should not be deducted from a hypothetical sale of a corporation. The court in *Paskill Corp.*, 747 A.2d at 552, recognized this and held that in a dissenter's rights case, no deduction should be made from the net asset value for speculative expenses for future sales not contemplated at the date of the objected-to merger. Additionally, the court in *Hansen*, 957 P.2d at 43, held that because fair value in a dissenter's rights context is to be determined immediately before the corporate action to which the dissenter objects, any costs incurred in effectuating the corporate action should not be assessed against the dissenting shareholders.

Based on this precedent, neither transaction costs nor tax liability on capital gains realized when assets are sold should be used to reduce the fair value of a shareholder's shares

unless a liquidation of assets is scheduled in the foreseeable future or unless assets must be sold in order to fund the buyout.  If the corporation will continue as a going concern, hypothetical transaction costs and speculative future tax liability on appreciation/capital gains should not be deducted to reduce fair value.

This not only is legally sound, but entirely fair.  Since this action was commenced on September 15, 2005, FHC has generated more than enough cash from its Bangor Parkade transactions alone to repurchase the Kaplan shares.  The first closing of Bangor Parkade, on March 17, 2006, yielded $8,646,000 in cash after all expenses and payment of all related debt. "In 2007 additional stores were sold for $3,798,376 which had a book basis of $1,005,737." **P124 at 30**.  These transactions were not entered into in order to purchase the Plaintiff's shares, but the proceeds could have been applied to do so.  Had Mr. Ellis elected to do so, there would be no need to speculate about taxes or transaction costs.


Comparing Net Asset Valuations of the Three Experts

Mr. Aertsen performed a Net Asset Valuation, though he gave it no weight.  This is because the Net Asset Valuation gives no value to the Development, Construction and Management business, and therefore ignores a substantial portion of the fair value of the Company.

Nevertheless, the net asset base of a company supports the income generating operations of the company, and in that sense serves as a floor to valuation, and a comparison of the Net Asset Valuations of the three experts is useful in determining that floor.  In Ms. Fannon's report, her Adjusted Net Asset Value totaled $13,337,114.  **D41, at Exhibit B-1**.  After adding back in the amounts improperly deducted for hypothetical capital gains tax liability and transaction costs

34

($12,600,000), however, her Adjusted Net Asset Value becomes $25,937,114. **Id.** In Mr.

Riddiough's report, his Net Asset Value calculation totaled $11,657,538. **D45, at Exhibit 11**.

Again, if one adds back in the amount improperly deducted for hypothetical capital gains taxes

($2,276,025 + $7,351,082), transaction costs ($2,601,125) and a minority discount ($3,885,846),

his Net Asset Value calculation becomes $27,771,616. **Id.** Compare these numbers to the Net

Asset Value determined by Mr. Aertsen to be $31,417,595, without any capital gains tax

liability, transaction costs, or minority discount. **P164**. Thus, if Ms. Fannon and Mr.

Riddiough's appraisals were to exclude improper deductions and discounts, the total Net Asset

Value numbers would be much closer, as shown in the following table:

|  | Aertsen | Fannon | Riddiough |
|---|---|---|---|
| Total Net Asset Value | $31,417,595 | $13,337,114 | $11,657,538 |
| Capital Gains Tax Liability | $0 | +$12,600,000 | +$2,276,025 +$7,351,082 |
| Transaction Costs | $0 | (included in capital gains tax liability total) | +$2,601,125 |
| Minority Discount | $0 | $0 | +$3,885,846 |
| Total | $31,417,595 | $25,937,114 | $27,771,616 |

Two factors explain most of the approximately $5 million difference in the Net Asset

Value totals between Mr. Aertsen and the other experts, after the capital gains tax liability and

minority discounts are added back into Ms. Fannon's and Mr. Riddiough's NAV. First, for the

operating properties, Mr. Aertsen relied upon the course of business lender appraisals without

adjustment. By contrast, Ms. Fannon and Ms. Riddiough used the "adjusted" property values

contained in the hearsay report of a person (Paula Konikoff) who did not testify and who was not

designated as an expert who may testify at trial.  *See* **D41 at 1;  D45 at 16, Par. 38** ("I use values estimated by Ms. Konikoff for the selected properties, and for properties that were not reviewed by Ms. Konikoff, I use the values per appraisals that were done for FHC during the normal course of business.").  Ms. Konikoff did not conduct an appraisal herself, but rather <u>reviewed</u> the MAI appraisal, and applied a downward adjustment to a number of the appraised properties.  Ms. Konikoff's report is not in evidence because it does not meet the evidentiary standards of reliability.  There is no evidence before the Court (or available to Plaintiffs) to explain or justify the revisions Ms. Konikoff made to the course of business lender appraisals.

Second, neither Ms. Fannon nor Mr. Riddiough included any value for the Main Street Parkade property in North Adams, Massachusetts, which Mr. Aertsen valued at $1,946,649. **P164; D45 at 17 n.44.; D41 at 42**.  The exclusion of this property by Fannon and Riddiough was improper, and accounts for nearly half of the $5 million gap.


## IV.    Professor Timothy Riddiough Valuation Methodologies

<u>Prof. Riddiough's Valuation Methodologies Applied Minority and Marketability Discounts in Violation of the Controlling Legal Standard</u>

Professor Riddiough proposed three methods or approaches to valuation:

1) "market value," for which he simply used the last trading price on the pink sheet OTC before the valuation date (to which he assigned an 80% weight);
2) "investment value," an income approach comparing FHC to a sample of REITs for the years 2004-2007 (assigned 10% weight); and
3) "net asset value" (assigned 10% weight).

**D45**.  In describing his net asset valuation, Professor Riddiough acknowledges that Maine law prohibits application of minority or lack of marketability discounts, but states that he does so

anyway, because his "market value" and "investment value" approaches also have incorporated a minority discount:

> I understand that the statutory definition of fair value for appraisal purposes adopted by Maine does not allow for discounts for lack of marketability or for a minority stake. However, in my opinion it is necessary to apply a minority discount to FHC's NAV in order to make the NAV comparable to the values based on the other two methods— market value and investment value. This is because both the market value and investment value per share of FHC represent the value of owning one minority share in FHC. In other words, FHC's NAV per share represent the amount that someone may be willing to pay in order to acquire a hundred percent stake in the [sic] FHC, while the market value and investment value represent the amount an investor may be willing to pay to acquire a minority stake in FHC.

**D45 at 19-20**. As a result, Professor Riddiough's entire valuation fails to meet the applicable legal standard and therefore should be given no weight by this Court. Significantly, Professor Riddiough acknowledges that the share trading price reflects a minority discount. This is especially noteworthy as to FHC, where management control (Mr. Ellis as controlling shareholder) prevents shareholders from obtaining distributions of value for their shares. Accordingly, in addition to the reasons outlined in section II, *supra*, the share trading price for FHC near the valuation date should be rejected because by definition it incorporates an impermissible (and unquantified) minority discount.

Riddiough Investment (Income) Approach:

Professor Riddiough's investment/income approach utilized a model that compares the cash revenues of FHC to a selection of publicly traded Real Estate Investment Trusts (REITs). **D45 at 10-15 and Ex. 4**. Recognizing that FHC has two lines of businesses, (1) owning and operating a portfolio of stabilized income producing properties, like a REIT; and (2) a significant development business, Professor Riddiough adopted a cash flow metric he called "Adjusted Funds from Operation":

24. The cash flow metric that I use for purposes of valuation is Funds from Operations ("FFO"). FFO is a widely used measure of cash flow to equity holders for REITs, and it is similar to the earnings measure used to compute price-to-earnings multiples. However, I adjust the standard FFO calculation to incorporate gains/losses from the sale of real estate. FFO calculations for REITs typically exclude gains/losses from the sale of real estate because income from the sale of real estate is not the primary business activity for REITs. For FHC, the ongoing purchase and sale of real estate represents a significant portion of its business operations; therefore I adjust the FFO for FHC to include post-tax capital gains/losses from such sales.

25. Exhibit 4 shows FHC's adjusted FFO from 2004 through 2007. I ignore years prior to financial year 2004, because for a number of years prior to 2004, FHC was not profitable and it was cash-constrained. Finance theory suggests that valuation multiples are best applied to reflect expectations about future financial performance rather than past performance that is not indicative of the future. With that in mind, and because business operations stabilized substantially after 2003, I use cash flows actually realized after the valuation date to proxy for expected cash flows.

**D45 at 11-12**. As shown in Exhibit 4 to his report, Professor Riddiough found the average (2004-07) adjusted funds from operations for FHC to be $2,281,559. This figure, however, reflects a 20% reduction of the actual adjusted FFO cash figure for a "capital gains tax" that FHC in fact did not pay. In other words, Prof. Riddiough reduced the cash FFO for FHC by 20% because in his opinion (although not in the opinion of the Internal Revenue Service) a capital gains tax should apply. FHC's tax returns make clear that FHC in fact did not pay such a tax, because the company's net operating loss (NOL) shielded the revenue from taxation.

To calculate an appropriate multiplier for FHC, Professor Riddiough selected 31 publicly traded REITs. As of the end of September, 2005, the FFO multiple (ratio of stock price to 2006 consensus FFO estimates) for the 31 selected REITs ranged from 8.2 to 18.4, with an average of approximately 12.9. **D45 at 13, Par. 29, and Ex. 5.** The average multiple (12.9) for the REITs selected by Prof. Riddiough as comparable to FHC, when applied to the adjusted FFO he computed ($2,281,559), produces an investment/income value for FHC of nearly $30 million dollars (12.9 X $2,281,559=$29,432,111). The result would be substantially higher if Prof.

Riddiough had not reduced the adjusted FFO by a phantom 20% capital gains tax that was never incurred.  If Prof. Riddiough had not reduced gains on sale of real estate by 20%, the average (row D) for gain on the sale of real estate would be $3,735,418 ($2,988,335 divided by 80%), resulting in adjusted FFO of $3,028,647.  Applying the 12.9 average multiplier from the REIT comparables produces a valuation of  $39MM ($3,028,647 x 12) in Professor Riddiough's income approach model.

Recognizing that the range of multiples generated by the selected REITs was too high for the desired end result, Prof. Riddiough created a "regression analysis" for this case to arrive at a multiple of 4.1, completely out of the range of multiples (8.2-18.4) from the 31 selected REITs, to compute an investment/income value of $9.4 million dollars.  **D45 at 13-15 and Ex. 6**. Professor Riddiough freely admitted that he created this "regression analysis" model expressly for this case, and that it has never been published or used in any other context, by him or anyone else.  **Tr. (7/25/08) at 81:1-17**.  While Professor Riddiough opined that his formula explained "quite a bit" of the variations for the REITs in his chart of "comparables," he did not claim to have tested the formula on any other company, and there is no reason at all to believe that his specially crafted formula would be a reliable predictor for any company outside the size or other ranges of his chart.  **Tr. (7/25/08) at 23:11-14**.  Neither in his report nor his testimony at trial did Professor Riddiough provide any compelling reason or analysis that would justify abandoning the range of multiples from the pool of REITs to use a multiple that is seventy percent (70%) below the average multiple of the REITs he selected.

**V.     Nancy  Fannon  Valuation Methodologies—Income and Market Approaches**

Ms. Fannon's income capitalization model contains two fundamental flaws in the measurement of  annual income to be capitalized:  (1) her measure of net income includes all of the expenses from FHC's development activities but none of the corresponding revenue from sale of development properties; and (2) she reduces the income figure for a hypothetical 33.6% income tax that FHC did not (and does not) pay.

Exclusion of Gains on Sale of Development Properties in Measurement of Income

Ms. Fannon's expert report can be found in Exhibit D41.  Exhibit C-1 to the report sets out the elements included in her "normalized year" of consolidated net income, and Exhibit C-2 sets out her capitalization of income calculation.  **Tr. (7/25/08) at 193:2-5**.  Ms. Fannon freely acknowledged that First Hartford Corporation operates essentially two businesses: "one, like a REIT, owning and operating a portfolio of income-producing properties," and second, "a development business."  **Tr. (7/25/08) 196:17-25**.  Ms. Fannon also recognized that FHC depends upon the sale of development projects for revenue and that "it's only by the sale of development properties that First Hartford Corporation shows a net profit."  **Tr. (7/25/08) at 195:22-196:5**.  In deriving an annual net income figure to be capitalized, however, Ms. Fannon included all of the FHC expenses for its development activity, but none of the development revenue, because she deemed the sale of development properties "non-recurring," or too occasional to be included in a "normalized" year of income.  **Tr. (7/25/08) 196:17-199:9**. As a result, her model showed a negative income number for capitalization.  **Tr. (7/25/08) 196:17-199:9; D41 at Exhibit C-2.**  As shown on Exhibit C-2 to her report, capitalizing the negative income figure resulted in an income approach valuation of negative $3,390,828.  The

only way she could move the valuation under this capitalization of income approach to a positive number was to then add in the one-time value of development projects and contracts that happened to be ready for sale ("underway") as of the date of valuation, September 15, 2005. **Tr. (7/25/08) at 199:20-24; D41 at Exhibit C-2.** The effect of this model was to multiply the development expenses by 24 (based on Ms. Fannon's selected 4.1% capitalization rate), while counting only once the resulting development revenues that Ms. Fannon felt were assured. That is, she capitalized the negative net income figure that resulted from including development expenses but not development revenue, but did not capitalize the expected revenue from projects "underway" as of the valuation date, but instead simply added their one-time value to her valuation.

This approach misses entirely the revenue stream from on-going development activity and consequently substantially understates the valuation of First Hartford Corporation, effectively declaring FHC's ongoing development activities to be losses until proven otherwise. At the very least, since Ms. Fannon's income valuation model excludes revenue from the development business, it should exclude (rather than multiply by 24) the development expenses as well. At its core, Ms. Fannon's exclusion of revenues from development projects does not value FHC fairly because it ignores the recent historical performance of FHC, and treats as having no value the on-going development activity in which FHC has been investing substantial cash and management resources. *See*, *e.g.*, The Shoppes at Rio Grande Valley development project in Edinburg, Texas. The July 5, 2007 MAI appraisal for this project reports a "prospective as complete" valuation for this operating property of $48,000,000 effective December 22, 2008. **P143 at 2**. The land alone that FHC acquired for this project has a market value of $17,760,000. **P144 at 1**. Instead of distributing equity in the form of dividends to

shareholders, FHC has been reinvesting in the company with projects such as Edinburg.  Ms. Fannon's income approach model omits (or severely understates) this substantial source of company value.

Reduction for a 33.6%  Corporate Income Tax

The second fundamental flaw in Ms. Fannon's income approach valuation, further reducing the income figure to be capitalized, is her reduction of income by 33.6% for "corporate tax."  Ms. Fannon acknowledged that she "normalized" income for a single year, and had reviewed only a single FHC income tax return, for the fiscal year ended 4/30/05.  **Tr. (7/25/08) at 193**.  FHC, however, did not pay any federal income tax that year, **P111**, or in any other year for the seven year period for which we have FHC's federal income tax returns (2001-2007), although it paid $111,321 in alternative minimum tax in fye 2004.  **P107-P114**.  Ms. Fannon's income valuation model, therefore, does not reflect the actual cash flow enjoyed by First Hartford, but instead a fictional number, artificially reduced by 33% for a phantom tax that FHC did not, and does not, pay.  Similarly, when adding the one-time value of development projects "underway" as of the valuation date, Ms. Fannon's model reduces the value for each project by a hypothetical capital gains tax, even though the properties in fact were not sold and no tax incurred.  **D41 at Exhibit C-2**.

"Normalized Income" and "Invested Capital Methods"

For her income approach, Ms. Fannon examined FHC's financial records for the fiscal years ended 4/30/04, 4/30/05, and the three months ended 7/31/05.  **D41 and Appendices A1-A14**.  Rather than tracking cash flow, Ms. Fannon used accounting book entries.  Discounting

cash flow would be an equity method, and Ms. Fannon chose instead to use "invested capital methods." **D41 at Exhibit C-2; Tr. (9/24/08) at 51**.[19]  Moreover, Ms. Fannon then "adjusted" the income numbers as reported in FHC's financial statements to a fictional income figure that rejected as "non-recurring" various income sources.  She also "adjusted" the actual expenses, with a net increase to higher amounts she deemed appropriate.  For example, Ms. Fannon eliminated as "non-recurring" the Walmart litigation recovery, which Ms. Fannon concluded, based on her conversations with Management, was a one-time event.  But on March 21, 2008, (while Ms. Fannon was preparing her report), FHC announced that it had "terminated the Simon Litigation… for which the Company received from Simon a one-time payment of $4.0 million." **P127 at 14**.  This resulted in a "gain of $1,636,103, net of current year legal fees incurred."  On the expense side, Ms. Fannon increased expenses because she believed, based on what Messrs. Ellis and Greenwald told her, that management was being paid too little.[20]  In short, Ms. Fannon made significant "adjustments" to the numbers from FHC financial records in reliance upon what FHC management told her and not by independent investigation and corroboration.


Capitalization Rate

Since FHC's development activity is understandably significantly more risky than the operation of its retail centers with stabilized rental income, one would expect a capitalization rate for FHC's development business to be significantly higher than the capitalization rates used by appraisers for the operating properties.  The appraisals selected capitalization rates for FHC's operating properties in the range of 7%-8%.  **P129, P131, P133, P135, P137, P138, P139**.  For

---

[19] This topic is discussed further in section IV, *infra*.
[20] There is an inherent contradiction between Ms. Fannon's conclusion that FHC under the management of Messrs. Ellis and Greenwald is worth substantially less than its liquidation value, and her determination that Messrs. Ellis and Greenwald are undercompensated.

FHC, however, Ms. Fannon determined as appropriate an income capitalization rate of only 4.1%.
Given the riskier nature of development activity, this does not make sense.  She acknowledged
that her capitalization rate of 4.1% translates to an income multiplier of 24.  **Tr. (7/25/08) at
199:10-17**.  Contrast Ms. Fannon's 24 multiplier with the income multiplier of 4.1 that Professor
Riddiough deemed appropriate for FHC.  Where Professor Riddiough's multiplier was off the
charts on the low side, Ms. Fannon's is off the charts on the high side.  In any event, perhaps the
clearest indication that Ms. Fannon's income approach model is fundamentally flawed, or at the
very least that it does not fit well with the actual operation of FHC, is that it produces a valuation
that shows FHC would be worth much more if it were liquidated ($13,337,114 **D41 at Ex. B-1**)
than if it continues as a going concern ($7,614,903 **D41 at Ex. C-2**).

Market Approaches

The flaws in Ms. Fannon's income capitalization approach carry over into her two market
approach methodologies, for she uses the same "adjusted" income figure (negative annual
income plus the one-time value of "projects underway") in the Guideline Public Companies and
Market Transaction Company approach models.  An additional flaw undercutting the Guideline
Public Companies approach is that it uses trading data based on minority shares.  As a result, it
predicts the value of a single minority share, not the value of the entire company, **D41 at 43**, and
therefore fails to provide the fair value measure required under Maine law.  Finally, as in her
income approach model, Ms. Fannon rejected equity methods in favor of "invested capital
methods."  **Tr. (9/24/08) at 50:25-51:22**.  That is, she compared FHC to a number of REITs
looking at the ratio of invested capital (depreciated book value costs) to market price.  As
discussed further below, such invested capital methods risk substantially undervaluing real estate
companies, because they fail to capture the value in appreciated real estate.

44

VI.     **Capitalization of Dividend Paying Capacity Methodology**

In support of their valuations of the common stock of First Hartford Corporation, Ms. Fannon and Professor Riddiough selected a number of Real Estate Investment Trust companies (REITs) for comparison.  Utilizing the Guideline Publicly Traded Company method as described in a text by Shannon Pratt, **P160**, Ms. Fannon examined a number of valuation multiples for comparison in deriving an opinion of the equity value of FHC.  One of the valuation multiples described by Pratt under Guideline Publicly Traded Company method that Ms. Fannon did not examine is the capitalization of dividends or dividend-paying capacity.  **P160 at 294**.  The dividend paying capacity of FHC can be assessed by comparing dividend yields on the REITs selected by Ms. Fannon and Mr. Riddiough as to FHC.  The capitalization of FHC's dividend paying capacity thus provides a cross-check of Mr. Aertsen's enterprise discounted cash flow equity valuation.

Pratt describes the use of the capitalization of dividend-paying capacity method:

An estimate of dividend-paying capacity may be based in part on typical payout ratios of publicly traded companies in the subject company's industry.  For example, if public companies in that industry typically pay out 30 percent of their earnings in dividends, 30 percent of earnings might be a good starting point from which to estimate the subject company's dividend-paying capacity.

**P160 at 294**.  REITs must distribute a minimum of 90% of net income to avoid paying federal income taxes, but typically distribute more since their distributable cash flow generally exceeds their net income.  **Tr. (7/25/08) at 233**.  By contrast, FHC, managed by a controlling shareholder, is not required to and generally does not pay dividends to shareholders.  To measure the dividend paying capacity of REITs, REIT analysts use the term "Funds from Operations" ("FFO") which is equal to net income, excluding gains or losses from sales of property, and adding back real estate depreciation.  FHC, which not only owns and operates a portfolio of real

properties from which it derives rental income, but also develops projects for sale, has three sources of distributable cash flow: funds from operations, net proceeds from asset sales and refinancings, and distributions (i.e. cash FHC receives) from its non-consolidated subsidiaries. **Tr. (7/25/08) at 233-36**.  Since gains on sale are added back to net income, Mr. Aertsen terms the resulting Funds from Operations the "Adjusted Funds from Operations."  In his income approach, Mr. Riddiough uses similar nomenclature.

Exhibit P165 sets out a compilation of the payout ratios for 13 REITs (from the REITs identified by Ms. Fannon and Mr. Riddiough as comparable to FHC) for which Morningstar Reports discloses pay-out ratios.  Morningstar reports payout ratios on REITs that are followed by their analysts.  The payout ratio is the dividend distribution amount as a percentage of total cash available for distribution.  The payout ratios for the 13 REITs range from a low of 51% to a high of 95%, with an average payout ratio of 72%.

Exhibit P167 shows the sources of FHC's distributable cash for the years 2004 -2007 (the same years used by Professor Riddiough in his Adjusted FFO model) as reported in FHC's 2006 and 2007 10K filings.  **P120; P124.**  FHC's FFO is negative due to a very high level of administrative expenses relative to revenues.  This creates both a tax loss and a net operating loss (NOL).  Property sales and distributions from non-consolidated operating properties provide the principal sources of distributable cash from which FHC could (but rarely does) pay a dividend. REIT dividends would typically be consistent year to year as they would be paid from FFO, and REITs must distribute dividends annually for tax purposes.  FHC's dividend-paying capacity is more variable year to year due to the cyclical aspect of its development business model.  As is the case with REITs, dividend paying capacity is measured over a number of years.

Morningstar reports industry average dividend yields for REITs of 5.4%.  **P165.**  Ms. Fannon's Exhibit D-2 (**D41**) reports an average dividend yield of 5% for the REITs she selected as comparable to FHC.  As shown on Exhibit P167, at a payout ratio of 71.6%, FHC has an average annual dividend-paying capacity of $2,393,030.  At a 5% dividend yield, FHC's capitalized dividend-paying capacity translates to an equity value of $48 Million ($2,393,030 divided by 5%).  The 71% payout ratio and 5% dividend yield are well within the industry averages and the averages of the REITs selected by Ms. Fannon and Mr. Riddiough as comparable to FHC.  Thus, the capitalization of dividend-paying capacity multiple method provides a supporting cross-check on Mr. Aertsen's enterprise DCF equity valuation of FHC.  Exhibit P167 shows that over a range of pay-out ratios, FHC's substantial dividend paying capacity would support valuations from $34,176,140 at the 51% low end of  payout range for the selected REITs to $63,661,420 at the 95% high end payout ratio.  Of course the higher the payout ratio, the less capital available for growth through re-investment in new properties.  The average payout ratio, 72%, would permit growth and significant dividend payments to shareholders, supporting a valuation of nearly $48M and confirming the reliability of Mr. Aertsen's discounted cash flow methodology.[21]

Perhaps the clearest evidence that Ms. Fannon's valuation methodologies do not fit the facts of FHC's business operation and financial reporting is her sur-rebuttal testimony that FHC did not have <u>any</u> dividend paying capacity in the years 2004-07.  In response to Mr. Aertsen's

---

[21] Defendants have criticized Mr. Aertsen's model of dividend paying capacity for including in adjusted funds from operations "distributions from affiliates" rather than the accounting entry for "equity in (losses) of unconsolidated subsidiaries" and "minority interest in income of consolidated joint ventures." Distributions from affiliates, however, is the cash flow actually distributed to FHC from its unconsolidated subsidiaries, while the "equity in (losses) of unconsolidated subsidiaries" is a non-cash accounting entry.  There were a number of further adjustments that could have been made, such as including the cash proceeds from refinancing, the net effect of which would be to increase the average cash available for distribution.  Mr. Aertsen, however, took a conservative approach and did not make such adjustments.

capitalization of dividend paying capacity model in exhibit P167, Ms. Fannon prepared a chart

making what she considered appropriate adjustments to funds from operations, **D75 at 7**, and

showing that FHC did not have any funds available for distribution to shareholders in these

years:

> Q. And in 2004 did First Hartford Corporation, based upon your analysis, have any dividend-paying capacity?
> A. Under this calculation it shows a negative million 3—1.3 million.
> Q. What's the significance of that?
> A. I would have concluded—I think I would have concluded—I did conclude from this method that it doesn't have a dividend-paying capacity.
> Q. In 2004.
> A. Yes.
> . . .
> Q. What is your opinion as to the dividend-paying capacity First Hartford had in the fiscal year ending 2005?
> A. I didn't do this method, and I don't –I wouldn't have done this method.  I chose other methods to use a guideline public company approach because I felt they were more appropriate.  I chose—I didn't choose an equity method under the guideline public company method because I don't feel the equity method is the best representation of value for First Hartford.  That's why I—I chose invested capital methods.  I don't think this approach is appropriate at all for valuing First Hartford.
> Q. What approach?
> A. An equity method.  The dividend-paying capacity method is an equity method of valuation after satisfaction of all debt holders.  I chose invested capital methods under the guideline public company methods, which I believe are the appropriate—is the appropriate method to use for First Hartford because it has such a heavy weighting of debt and equity in its capital structure . . .
> . . .
> Q. Do you have an opinion as to what their dividend-paying capacity was in 2006 or whether they could pay a dividend?
> A. It doesn't appear they could.
> Q. Okay, tell me why.
> A. Well, by this calculation they didn't have funds from operations.
> Q. And when you say this calculation, you mean your calculation shown on the illustrative aid, page 7?
> A. Yes.
> . . .
> Q. Now under your chart on Page 7 of your illustrative aid, Exhibit d75,  under your corrected FFO analysis that would—that would suggest that First Hartford didn't have any dividend-paying capacity in the year 2006, right?
> A. Right.

Q. And yet in 2006 they paid a million dollars in bonuses to management and employees; isn't that right.
A. Right.
Q. And in fact First Hartford in the year 2006 did pay a dividend of some 300,000 to shareholders.
A.  Yes.
Q. And in the year 2006 First Hartford spent some $400,000 in litigation costs for this litigation, the Kaplan litigation.
A. Yes.
. . .
Q.  And your chart shows that at the end of fiscal year 2006 First Hartford company had cash and marketable securities per the balance sheet of 7.6 million; is that right?
A. Correct.
Q. And that would have been after payment of the bonuses, the litigation costs, and the dividends.
A. Yes.

**Tr. (9/24/08 Fannon) at 45:6-57:18 and chart D75 at 7**.

Ms. Fannon could not deny the actual cash dividend paying capability of FHC or the model presented by Mr. Aertsen.  She could only reject it as "not appropriate" for FHC.  FHC's available cash and cash generating capability from its assets and operations reflects the true fair value of the company, whether that cash is distributed to shareholders, distributed to management, or re-invested in the company.  By adopting "invested capital" (cost, or book value) methods of valuation, rather than ones that recognize the equity in assets and operations and the actual cash flow of the company, Ms. Fannon's valuation methodology fails to measure the fair value of FHC.

## CONCLUSION

In order to be reliable, a valuation methodology must fit the facts of the company being valued.  As all have acknowledged, FHC has broadly two lines of business: 1) a portfolio of income producing operating properties, and 2) a development business.  Only Mr. Aertsen's

methodology, which identifies these different lines of business and values them separately, applying a discounted cash flow methodology to all components of the enterprise, fits the facts of FHC's business operation.

Nancy Fannon's valuation methodology fails to fit the facts of FHC for a number of reasons.   First, although she readily acknowledges that FHC has both a development business and a portfolio of income producing properties, in deriving an annual net income figure for capitalization, her model included all of the development activity expenses, but none of the corresponding revenue.  As a result, her income approach model failed to capture the revenue stream from development business, substantially understating the value of FHC.  Second, her income model failed to fit the facts of FHC when it reduced the income to be capitalized by a fictional corporate income tax that FHC has not incurred and does not pay.  These flaws are carried over into her market approach models which use the same adjusted income figures in market comparisons.

The clearest evidence that Ms. Fannon's valuation methodologies do not fit the facts of FHC's business operation and financial reporting is her opinion that FHC did not have <u>any</u> dividend paying capacity in the years 2004-07.   As the facts clearly show, FHC had $16MM in cash available for distribution to shareholders in the 12 month period surrounding the valuation date and chose instead to reinvest cash in its business projects.  Indeed, in the very years Ms. Fannon's model indicates that FHC had no dividend paying capacity, *FHC in fact distributed $1M in bonuses to management, distributed $300,000 in dividends, and reinvested $6MM to acquire an additional 25% interest in a property.*  Ms. Fannon's valuation methodologies do not fit the facts of FHC.

Professor Riddiough's methodologies similarly fail to fit the facts of FHC.   His heavy reliance on the stock market trading price fails to recognize the illiquidity of the thinly traded market or the impact of management control and shareholder oppression.  Moreover, his valuation of a single minority share, rather than the entire enterprise, fails to comply with Maine law.  Professor Riddiough's income approach again ignores the facts of FHC.

Professor Riddiough's income approach comes closer to matching the actual operation of FHC.  His adjusted funds from operation model purports to determine distributable cash and capitalize it with an appropriate multiplier.  But he again fails to match his model to FHC, first by reducing the adjusted funds from operation by a hypothetical 20% capital gains tax that FHC did not incur or pay in the years measured (or since).  To determine an appropriate multiplier, he compared FHC to 31 REITs having multipliers in a range of 8-18, with an average of 12.9, but then chose a multiplier of 4.1, completely outside the range.  Had he used even the average multiplier for the REITs he selected, his model would produce a value for FHC of $30MM.  If he had not reduced for a 20% phantom tax FHC did not incur, his model produces a value of $39MM.  His choice of a multiplier of 4.1, well below the range, does not fit the facts.   Indeed, it contrasts sharply with the income multiplier of 24 that Ms. Fannon deemed appropriate.  They cannot both be right, but they can both be wrong.

The experts find some common ground in their net asset valuation (Aertsen $31.4 million, Riddiough  $27.7 million, Fannon $25.9 million), but this asset base can only set the floor of fair value.  If the value of FHC as a going concern were actually less than its liquidation value, then there would be no economic reason to remain in business.  Based on the facts of this case, the net asset valuation fails entirely to capture any of the substantial value from FHC's development business.

Only Mr. Aertsen's valuation methodology fits the facts of FHC's business operation, distinctly valuing the separate lines of operating properties and development business, applying a discounted cash flow analysis to each unit of the enterprise.  Unlike Ms. Fannon's model, which used accounting principles and adjusted entries to create a fictional income for capitalization, Mr. Aertsen's model used the actual cash flow numbers as recorded in FHC's financial statements and reporting.   Whereas Ms. Fannon's model predicted no dividend paying capacity in a year when FHC had $16MM in cash available for distribution to shareholders, Mr. Aertsen's methodology captures FHC's substantial cash flow, confirming the reliability of his enterprise valuation.   Mr. Aertsen's enterprise valuation of $48MM fits the facts of FHC, and we urge the Court to adopt it in determining the fair value of the shares of First Hartford Corporation.

Dated:  November 15, 2008                       /s/ Thomas C. Newman_____
                                                Thomas C. Newman
                                                /s/ Nicole L. Bradick_____
                                                Nicole L. Bradick
                                                MURRAY, PLUMB & MURRAY
                                                75 Pearl Street, P.O. Box 9785
                                                Portland, ME  04104-5085
                                                (207) 773-5651
                                                 tnewman@mpmlaw.com
                                                *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing *Plaintiff Richard E. Kaplan's Valuation Post-Hearing Brief* with the Court's CM/ECF system on November 14, 2008 at or about 5:00p.m., but without signature or certificate of service which I inadvertently omitted.  I hereby file the foregoing *Corrected Plaintiff Richard E. Kaplan's Valuation Post-Hearing Brief,* the only correction being inclusion of signature and certificate of service, with the Court's CM/ECF system, which will serve copies to all counsel of record.

Dated:  November 15, 2008

/s/ Thomas C. Newman
Thomas C. Newman
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
*E-mail:  tnewman@mpmlaw.com*