1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MAINE

3    ————————————————————————————

4    RICHARD E. KAPLAN,          CIVIL ACTION

5            Plaintiff      Docket No:  05-144-P-H

6

7       -versus-

8

9    FIRST HARTFORD CORPORATION
     and NEIL ELLIS,
10          Defendants
    ————————————————————————————
11
            Transcript of Proceedings
12

13   Pursuant to notice, the above-entitled matter came on
    for **Oral Argument** held before **THE HONORABLE D. BROCK
    HORNBY,** United States District Court Judge, in the
14   United States District Court, Edward T. Gignoux
    Courthouse, 156 Federal Street, Portland, Maine, on the
15   11th day of February 2009 at 10:33 A.M. as follows:

16   Appearances:

17   For the Plaintiff:  Thomas C. Newman, Esquire
                       Sarah A. McDaniel, Esquire
18                  Robert Rothberg, Esquire
    For the Defendant
19   First Hartford:    John B. Nolan, Esquire
                       Peter W. Culley, Esquire
20
    For the Defendant
21   Neil Ellis:       Joseph H. Groff, III, Esquire

22   Amicus:          Robert S. Frank, Esquire

23           Lori D. Dunbar, RMR, CRR
            Official Court Reporter
24
      (Prepared from manual stenography and
25        computer aided transcription)

```
 1                      (Open court)

 2            THE COURT:  Good morning.

 3            MR. NEWMAN:  Good morning, Your Honor.

 4            MR. CULLEY:  Good morning, Your Honor.

 5            THE COURT:  Good to see you all again.  This

 6      is Civil No. 05-144, Kaplan versus First Hartford

 7      Corporation and Ellis.  The matter is on this morning

 8      for what I will call closing argument on the valuation

 9      portion of the case.  As you know, you presented

10      testimony and exhibits to me some months ago.  You then

11      had further testimony in front of Judge Rich, and I

12      reviewed the transcript of those proceedings.  And you

13      have briefed the issues to me, and I've read your

14      briefs, including the amicus brief.  And let me just

15      start by inquiring how you decided to allocate the

16      time.  How are we proceeding?

17            MR. NEWMAN:  Your Honor, there really hasn't

18      been any discussion except for Mr. Frank's request by

19      the amicus to have six minutes, which -- although

20      amicus usually don't speak, we both thought -- given

21      the understatement of the request, we agreed.

22            THE COURT:  A wonderfully reasonable amount of

23      time, not seven, not five, but six.

24            MR. NEWMAN:  Easily divided by two, so we

25      basically conceded three minutes each.  But other than
```

```
 1    that we don't have --
 2              THE COURT:  How long do you think you need?
 3              MR. NEWMAN:  Well, Your Honor, I think in
 4    terms of presentation very little time, 15, 20 minutes.
 5    I'm thinking to really invite the Court to ask
 6    questions, primarily because, unlike the liability
 7    phase where we had a very helpful and interactive final
 8    argument after the evidence but before extensive
 9    briefing, we've now had extensive briefing.  So we had
10    actually requested the oral arguments in our procedural
11    submission so that we could in this nonjury proceeding
12    be available to answer questions, address the concerns
13    of the Court.
14              THE COURT:  All right, that's good.  Let me
15    hear from defendants.  How long for Mr. Nolan,
16    Mr. Culley, Mr. Groff?
17              MR. CULLEY:  I think we'll need near close to
18    an hour, Your Honor, total, including Mr. Groff.
19    Mr. Nolan and I are going to divide up the argument.
20    We have two discrete areas we're going to discuss.
21              THE COURT:  If you stay under an hour that's
22    fine.  And I'll obviously give equal time here.
23              MR. NEWMAN:  I guess to clarify, Your Honor,
24    for the balance of our time we'd reserve for rebuttal
25    should there be issues we need to respond to.
```

1          THE COURT:  Let me start, then, with some

2    observations because they may be helpful to you.

3    There's an article that I think you're probably all

4    familiar with by Barry Wertheimer in the 1998 Duke Law

5    Journal on the shareholders appraisal remedy and how

6    Courts determine fair value.  And I want to read just

7    one paragraph from it at Page 630 to 31 where he's

8    talking about the use of the DCF, discounted cash flow,

9    technique.

10          As a practical matter, this means that both

11   parties to the appraisal proceeding will present expert

12   testimony of valuation.  Because of the inherent

13   subjectivity and estimation involved, the parties'

14   experts can compute dramatically different valuations,

15   even if they utilize the same methodology.  Of course,

16   each expert is handsomely paid by one side or the other

17   such that, whether consciously or unconsciously, the

18   opinions expressed by the expert witnesses

19   significantly reflect the desires of their clients.

20   Thus, the expert retained by the dissenting shareholder

21   invariably concludes that the corporation has a very

22   high fair value, while the corporation's expert

23   determines that the fair value of the corporation is

24   much lower.  It is not unusual for the opinions of the

25   experts to differ by a factor of ten.  It is therefore

1    not surprising that Courts have evidenced frustration

2    with this process.

3        Now, I suppose I should count myself fortunate

4    because you're only five times apart rather than ten

5    times apart.  But I think all of the other observations

6    that Mr. Wertheimer makes throughout the article still

7    apply.

8        And let me just mention a few concerns I have

9    here.  It appears that Mr. Aertsen spent a relatively

10   short amount of time for what took place, for this

11   evaluation, that he did very little in background

12   investigation, that he seemed to assume that the

13   profitable years of the company would be regular, and

14   at least at this point it seems to me that he took into

15   account a double tax effect.

16       Mr. Riddiough I can't fathom.  He ignores Maine

17   law, even though he knows it, and expects me to listen

18   to his opinions as an expert while simply throwing out

19   the approach that the Maine Law Court has made clear.

20       Miss Fannon seems to come up with a liquidation

21   value that's far higher than a going concern value.

22   That would surely be pertinent to somebody purchasing

23   the company.  As near as I can tell, she doesn't give

24   any effect to profitable sales.  She just takes the

25   expenses and assumes there'll never be profitable

1    sales.  And she seems to completely rely on management,

2    even though here there's a clear conflict of interest,

3    given what I have found previously and the situation in

4    front of me.

5        I also don't know what to do with the appraisals,

6    whether the original appraisals were valid or whether

7    they should be modified, because I don't have

8    introduced into evidence the modifications that were

9    relied upon, similarly for the tax opinion.  I don't

10   know what to do about the stock options, which had not

11   yet vested but were out there at the time of the

12   valuation date.

13       So those are the frustrations that I have.  I

14   think it's pretty apparent from Court decisions

15   generally that at least in recent times Courts no

16   longer say, well, I have to choose one expert.

17   Instead, given what happens in these cases, Courts, not

18   unreasonably, come down somewhere in the middle.  I

19   suggest to you that your argument would be most helpful

20   to me if it recognized that reality rather than try to

21   persuade me that I'm to accept one or other of your

22   experts.

23       I think you also need to address with me the

24   question that's come up with the post-trial briefing as

25   to whether this applies only to Richard Kaplan's

1    individually held stock or whether this applies more

2    broadly.  I'm obviously going to hear from Mr. Frank in

3    terms of the amicus issues.

4         And finally I would also make this observation

5    before we get started, and it's from the McLoon

6    decision, that the determination of fair value is more

7    akin to an artistic composition than to a scientific

8    process.  This is not physics and it's not medicine.

9    What we're trying to do here, according to McLoon, the

10   question is simple and direct, what is the best price a

11   single buyer could reasonably be expected to pay for

12   the firm as an entirety.

13        If we spend all our time looking at the academic

14   treatises and theories of value, I suggest to you we're

15   missing an important step, which is, what does a

16   corporate buyer do with those resulting numbers when he

17   or she or it then puts out an offer for an entire firm

18   or an entire company.  I don't think I heard much about

19   that from the experts.  They were all focused on the

20   theories of value in applying this text or that text

21   and what these folks say.  But this is not a scientific

22   question; this is a question of what is the value that

23   a buyer would pay.  So those inquiries are a component,

24   I agree, but at the end of the day it seems to me

25   that's the decision I have to make.

1         So there are my preliminary observations, and I'll

2    hear from you, Mr. Newman.

3         MR. NEWMAN:  Your Honor, that was very

4    helpful, and that's exactly why we asked for oral

5    argument, for that exchange.

6         We are not going to restate the written

7    submissions, which were voluminous and detailed.  But

8    picking up on McLoon, the quote that struck me was near

9    the artistic composition, and that is that business

10   valuation is a difficult and imprecise task, more art

11   than science.  The issue of what would a third party

12   pay for the business was addressed but not clearly

13   enough.  And I think that's in the net asset valuation.

14   So I wanted to start there.

15        You recall that defendant's experts used the

16   Delaware block approach and that Mr. Aertsen had not.

17   He attempted to conduct an income approach valuation,

18   but then in a supplemental did both address the stock

19   market and a net asset valuation.  The net asset

20   valuation is where we find some common ground of the

21   expert.

22        The imprecision and difficulty of a DCF income

23   analysis the Court pointed to in the Duke article I

24   think is compounded when the business at issue is in

25   the real estate development business.  Because the

1    timing and consistency of the sales of properties is

2    not there.  It's not like a company that sells widgets

3    on a regular basis each year.  And so, even though

4    First Hartford announces in its 10-Ks that it's in the

5    business of ultimately selling the properties, we don't

6    have a consistent track record.

7         So in terms of finding fair valuation, what a

8    party might pay for the whole business as a going

9    concern, I think we're on firmer ground and we find

10   common ground among the experts if we start with a net

11   asset valuation.  For Mr. Aertsen that was Plaintiff's

12   Exhibit 164.  For Ms. Fannon it was her Exhibit B-1.

13   Look at Mr. Aertsen's -- and in fact we addressed in

14   our brief a comparison.

15              THE COURT:  I remember you did.  What page was

16   it?

17              MR. NEWMAN:  I'm going to find it right now,

18   Your Honor.  Just one moment.  I believe it's at 33,

19   Your Honor, beginning at 32.

20              THE COURT:  All right.

21              MR. NEWMAN:  We begin that on Page 30 --

22              THE COURT:  And you have a table at Page 35,

23   yes.

24              MR. NEWMAN:  A table at Page 35.

25              THE COURT:  Go ahead.

1          MR. NEWMAN:  Now, interestingly, we find

2     common ground among the experts of net asset valuation

3     and yet, for some of the reasons suggested by the Duke

4     article, you find plaintiff's expert rejecting the net

5     asset valuation and giving it no weight because it's

6     too low and you find defense experts rejecting it

7     because it's too high.  But, as the Court pointed out,

8     if we just look at defense expert Nancy Fannon, she

9     found a liquidation net asset value after even all

10    hypothetical liquidation costs of taxes and transaction

11    costs, which would be inferred hypothetically of

12    13.3 million, and yet found a going concern income

13    value of only 7.6.  Under that theory the company's

14    better off dead than alive, better liquidated.

15         Mr. Aertsen, by contrast, rejected the net asset

16    valuation as being the best indicator of value because

17    it failed to capture the development business activity.

18    Admittedly the development activities are inconsistent

19    and unreliable but have some value.

20         But if we start with this common ground, at least

21    we're on firm ground that we have assets that a third

22    party could purchase and operate the business as a

23    going concern.  And if we eliminate the issue for a

24    moment of capital gains taxes and transaction costs on

25    a hypothetical liquidation, the experts are remarkably

1    close, as we show in the table.

2        Mr. Aertsen's Exhibit 164 tracks through each of

3    the assets that could be sold and for the operating

4    properties used the lender appraisals, and I think the

5    Court's right, there is no evidence that -- to in any

6    way suggest that they should be adjusted or changed.

7    Lenders lent the money to the FHC operating subsidiary

8    companies for those properties on the market conditions

9    based upon the appraisals and conditions and risks, et

10   cetera, found by those appraisers.

11       THE COURT:  Surely we've learned in the past

12   year or two that maybe those appraisals aren't worth

13   all that they're expected to be, even by the lenders.

14       MR. NEWMAN:  Well, certainly when it includes

15   forecasts of continued income in conditions, there's

16   always some risk, Your Honor.  But as of the value --

17       THE COURT:  Let me be more precise.  When a

18   lender makes a loan, they're not looking just at the

19   value of the security; they're also looking at the

20   ability of the entity to repay.  They're looking at two

21   things, surely.  And so is it necessarily the case that

22   the mortgage appraisal is the fair value of the real

23   estate?

24       MR. NEWMAN:  I would say certainly as of

25   September 15, 2005, they would be, Your Honor.  They at

1   that time were the best forecast of conditions and

2   operation of the properties.  The market conditions,

3   the number of tenants, the leased-out condition, the

4   cost of borrowing, and the capitalization rates.  We

5   don't have any evidence that even today something

6   changed that valuation or changed those conditions as

7   of September 15, 2005.  Today could conditions have

8   changed?  Perhaps there's a blip, but you recall on the

9   capitalization if it's on the discounted cash flow

10  we're looking ahead ten years, on the capitalization

11  rate they're using the then market conditions.

12          THE COURT:  Unless I misunderstand you, you're

13  using the appraisals to tell me what a buyer would pay

14  for those individual properties.

15          MR. NEWMAN:  On September 15, 2005.

16          THE COURT:  Right.  Whereas the purpose of

17  them was to decide what a lender would lend, correct?

18          MR. NEWMAN:  Yes, Your Honor.  But, I mean,

19  what a lender would lend is based upon what somebody

20  would pay for those --

21          THE COURT:  That's one element, not the only

22  element, I suggest.

23          MR. NEWMAN:  There may well be other elements.

24  I suppose that the appraisal is a necessary but not

25  sufficient condition for the loan.  In other words, the

1      appraisal must be reliable and is a necessary condition

2      for the loan but maybe not sufficient by itself.

3           THE COURT:  Okay.  Why is it that you say that

4      if I look at liquidation value I should not take into

5      account taxes and transaction costs?  If I were to

6      order liquidation of the company, which is one of the

7      options open, that would all have to happen before

8      there could be a distribution, right?

9           MR. NEWMAN:  Yes, if there are a dissolution

10     liquidation.  The theory of the net asset value,

11     though, is not a liquidation.  It's the value of the

12     assets that are retained by the company as a going

13     concern.

14          THE COURT:  But remember the end of the game

15     here is what would a purchaser pay.  And are you saying

16     to me that a purchaser looking at determination of what

17     he, she, or it would pay would ignore what would

18     transpire in a litigation?  If this were a hostile

19     takeover to sell off the assets, surely that purchaser

20     would have to look at the transaction costs and taxes.

21          MR. NEWMAN:  I think, Your Honor, that the --

22     that is a troubling issue except that the -- as the

23     First Circuit found in the Bogosian case, unless

24     there's actually a planned sale required to effect the

25     purchase, actual purchase, of minority shares, then

1    there is no deduction for the built-in capital gains or

2    transaction costs.  Why is that.

3            THE COURT:  Again you're talking theory.  I

4    want to talk about somebody out there who's going to

5    buy this business.  If they're going to look at the net

6    asset value, aren't they going to be concerned about

7    the transaction costs and the taxes?

8            MR. NEWMAN:  They certainly would, Your Honor.

9    They would want to look at what the built-in capital

10   gains would be, how it would affect them.  But with a

11   real estate company they could buy the entire company,

12   buy the stock, not the assets, and structure the

13   business such that sales or equity could be accessed

14   differently.  In a real estate business the owner

15   could, owning the whole company, could access equity in

16   the real estate through a refinancing, as FHC does,

17   don't have to sell the assets.  FHC routinely has

18   raised cash through accessing the equity through

19   refinancing.

20       Secondly, as all the Courts have found,

21   transaction costs may not be incurred.  They may be

22   negotiated to the buyer.  And in terms of sales, given

23   the nature of this operation and the built-up net

24   operating loss, there could be sales of properties in

25   an orderly fashion such that they don't incur any

1     income tax.  And note that actually how this business

2     is operated, in 2004 they sold the Mt. Olive property,

3     no income tax.  In fiscal year ending 2006, I believe

4     the closing was March of 2006, so for the fiscal year

5     ending April 30, 2006, they were able to sell the

6     Bangor Parkade property.  It was a cash -- cash closing

7     was over 8 million, that was Exhibit P158.  The 10-Ks

8     report the sale, no income tax.  We summarized the

9     income tax consequences that were paid in our

10    Exhibit 114, but the actual tax records are there.

11         But, Your Honor, you're right, if there were

12    actually a liquidation by this Court's order of

13    dissolution, we would have to see how it actually

14    played out and what the dissolution sale required, et

15    cetera, in terms of actual transaction costs and taxes

16    paid.

17              THE COURT:  Go ahead.

18              MR. NEWMAN:  Still looking at our table 35,

19    what explains the differences among the experts and why

20    these numbers don't match up precisely, the 31 million,

21    25 million, 27 million at the bottom of the table, is

22    largely two factors.  One is for North Adams, Mass, you

23    recall that Mr. Aertsen did an appraised -- did an

24    evaluation based upon his comparable estimate and came

25    up with 1.9 million in equity.  Defendant's experts

1    assigned zero without doing any evaluation, were told

2    it had no equity by management and they accepted that.

3    That's a 2 million dollar difference.

4        So -- it's been briefed extensively by both

5    parties, so without going through the details, the

6    North Adams property is an issue.

7        Secondly is the issue of lender appraisals versus

8    adjustments downward that defendants' experts made

9    without any inquiry or analysis of their own based upon

10   a person who did not testify, whose report is not in

11   evidence, said, well, based upon my review there should

12   be adjustments downward, no evidentiary basis and

13   actually no foundation that it's the kind of thing an

14   expert would reasonably rely upon.

15       That largely explains the difference.  Otherwise I

16   think we're on firm ground for that starting point.

17   Here's where the experts diverge.  Mr. Aertsen said the

18   net asset valuation's too low because it doesn't

19   capture the development activity.  The other two

20   experts went the other way, said no, we think it's too

21   high, we give it little weight because there's not

22   going to actually be a liquidation.  But, as I pointed

23   out earlier, if the income approaches of Ms. Fannon or

24   Professor Riddiough were correct, then the company

25   should be liquidated; from an economic theory point of

```
1    view the shareholders have no benefit from a continued
2    operation.  Clearly management doesn't believe that.
3        In an effort to capture the admittedly difficult
4    prospect of revenue from the development activity,
5    Mr. Aertsen looked at three-year historical average.
6    So if you turn to our income approach, which is
7    admittedly getting into more theory and less practical
8    numbers, as we have in the net asset valuation, clearly
9    there must be some value there.
10       THE COURT:  Don't misunderstand me, I'm not
11   saying that DCF is irrelevant.  I'm simply saying at
12   the end of the day it all has to be considered as to
13   what a buyer would pay.
14       MR. NEWMAN:  Understood, Your Honor.  As I
15   venture out from the somewhat firmer ground of NAV into
16   income, I thought I would give that introduction.  But
17   lots of ways to do it.  What I thought Mr. Aertsen's
18   approach was, fairly conservative, and looked at a
19   three-year historical average.  Certainly that's not
20   atypical.  Of course you've got a company that only
21   came into really being effectively productive in the
22   2000s, and in fact Professor Riddiough said he rejected
23   for years 2003 and before as not having yet stabilized.
24       We do have some check on that, however.
25   Mr. Aertsen used a three-year historical average for
```

1   both income and expenses and picked up the sale.  At

2   least in the immediate years after the valuation date

3   that activity continued, and you saw in the

4   dividend-paying capacity models, for example, where

5   both Professor Riddiough in his adjusted model and

6   Mr. Aertsen in reply looked at subsequent years, and

7   there was significant revenue from the gains on sale of

8   the properties, Bangor in 2006, additional parcels of

9   Bangor in 2007, and the numbers at least in the first

10  years support the forecast.  I'm sure there has to be

11  some rough justice and equity by the Court in looking

12  at that because it's not precise, but some value to the

13  development activity over and above the net asset

14  valuation.

15      Its longer term, certainly First Hartford thinks

16  that activity has value or they wouldn't continue to

17  engage in it.  Post valuation, and there's been some

18  talk about Edinburg, remember, the Edinburg property

19  has no value in Mr. Aertsen's income approach

20  valuation.  It's too far down the road.  The only

21  figure he had in there was the 50,000 dollar deposit on

22  land.  But as some check on the reasonableness of his

23  forecast is -- that in fact the First Hartford invested

24  $3.8 million in 2007, according to Mr. Harding's

25  affidavit, in the Edinburg property.  We don't have a

1    crystal ball, we can't see further down the road, but

2    in terms of value to shareholders certainly First

3    Hartford continues to put that money in.

4         On that issue, Your Honor, I did want to address a

5    mistake that we made in our initial submission, an

6    error.  It's kind of like our president going on cable,

7    I screwed up.  This is a counsel error, not the

8    experts.  But one of the big picture, we tried to step

9    back and look at this to say, does it make any sense at

10   all to say that this company has a value of only 8 or

11   9 million dollars given the amount of cash it can throw

12   off.  And we did an assessment of the fiscal year

13   surrounding the valuation date.  And you'll recall that

14   we started that in the fiscal year ending April 30,

15   2006, which straddles our 9/15/05 valuation date, that

16   First Hartford had $16 million that it could have

17   distributed to shareholders if it had chosen to do so.

18   Well, I made a mistake, that really should only be

19   13 million, and where I was in error was on the

20   Cranston refinance.

21        In the -- although it's not in evidence, in the

22   reply memorandum, and I could almost hear the voice of

23   Mr. Greenwald speaking, they describe the transaction

24   of the Cranston refinance in a way that I didn't read

25   it from the financial 10-K, making it clear that on the

1    6 million that refinanced that was invested --

2    reinvested to acquire a greater interest in the

3    property, 3 million was actually the obligation of

4    their joint venture partner and the other 3 million to

5    the FHC subsidiary.

6        The point was, though, that even if it's

7    13 million, if the company were operating strictly for

8    the benefit of shareholders without selling any of the

9    other operating properties and in a year where they

10   ended with 7.6 million in cash and marketable

11   securities in their bank account, that they had some

12   13 million that, if they had chosen to simply operate

13   for the benefit of shareholders and not grow, there's

14   13 million that could have been distributed to

15   shareholders.  It can't make any sense that their

16   theoretical economic models of the company's only worth

17   8 or 9 million in a single year they had that kind of

18   cash to distribute to shareholders had they chosen to

19   do so without selling any of the operating properties,

20   simply choosing not to grow.

21       If the concern with Mr. Aertsen's attempt to value

22   the income -- projected future income was the

23   inherently risky nature of DCF analysis, we think that

24   the flaw in Ms. Fannon's analysis, and I want to say I

25   do certainly respect her thoroughness and comprehensive

1    attempt to take and understand this company, but I

2    think the flaw and why it doesn't fit this company is

3    that she included in her income approach all of the

4    expenses of the development activity which are -- which

5    run the company in the negative every year and then

6    capitalized it with a multiplier of 24, that's her 4.1

7    capitalization rate, then dividing using it a

8    multiplier.  She's multiplying those high expenses but

9    including none of the development revenue by excluding,

10   intentionally and transparently, excluding any income

11   from the sale of properties.  That's -- according to

12   their 10-K, the raison d'etre, that's the reason

13   they're in business, it wouldn't make any sense to

14   engage in this activity which runs negative income,

15   runs in the red every year, if they didn't expect a

16   return on that, and yet she said, well, it's not

17   recurring.  We certainly can't prove it's going to

18   occur each year, but that's where the value is.

19        And so her model can't really fit this company

20   because you produce a negative income.  You capitalize

21   a negative income it doesn't in any way reflect the

22   value of that activity.  There was no check on that.

23   For example, exclude all the development activity and

24   just value what's the income coming from just the

25   operating properties, if you simply held your stable of

1   operating properties.  As with Professor Riddiough, if

2   you come back into something like that you project out

3   a value of approximately 30 million.  With Professor --

4   ending in that point.

5        With Professor Riddiough I think the problem with

6   the income approach is that, although he did try to

7   look at cash flows from the operation, did add back in

8   gains from sale of real estate, used his comparable

9   property -- comparable companies, publicly traded

10  REITs, real estate investment properties.  But as they

11  keep so far out of the sample size that it created a

12  progression model that can't use a multiple anywhere

13  within that range.

14       You recall in our brief we looked at his range,

15  and his range for multiples of comparable properties

16  was from 8.8 to 18 point company with an average of

17  12.9.  Well, for the income that he found, if you just

18  took the average multiple, 12.9, produce a valuation of

19  30 million, very close to the net asset valuation.  But

20  he -- First Hartford's metrics weren't even within that

21  sample range, asset based substantially lower than even

22  the lowest REIT, debt ratio substantially higher than

23  even the highest debt ratio of any of the REITs, and so

24  it puts them way out.  Well, without a -- without even

25  talking about the partisanship of experts, which seems

1    to be natural, the fact is that sample base -- FHC

2    doesn't fit that sample base because the metrics aren't

3    within the range, so the model can't work to accurately

4    predict future income.

5         While we're talking about the income approach,

6    Your Honor, on Mr. Aertsen's model, one of the values

7    of the adversary process is it does refine one's

8    thinking and analysis, and I think the Court's right, I

9    think there's a double counting of that tax shield.  I

10   think because the NOL was already used to shield the

11   income, when Mr. Aertsen analyzed free cash flow, he

12   was essentially doing it on an after-tax basis because

13   they weren't paying any tax.  But to then also add in a

14   value for the tax shield, I think that he did it twice.

15   And so I want to concede that point to the Court, I

16   think that we came to the same conclusion in the

17   reflection of time and the adversarial process of

18   seeing it all.

19        Taking another step back, what struck me about the

20   defendant's model, Ms. Fannon's approach, was that she

21   told us that her -- at her examination that we did in

22   September that she rejected the equity method and so

23   that her model predicts, proves, forecasts that says

24   that in all those years First Hartford had no

25   dividend-paying capacity at all, they had no ability to

1    pay dividends.  And when confronted with the prospect

2    that the actual truth is that First Hartford was

3    distributing dividends at least in one year and

4    distributing a million dollars in cash to its

5    management employees, et cetera, she said, I didn't

6    apply that because I didn't think equity was the right

7    fit for this company.

8         I think that assertion probably shows why her

9    models don't work for FHC and why they don't predict

10   value because, flying right in the face of reality,

11   this is a real estate company with equity appreciation.

12   And so there's cash to be thrown off to shareholders,

13   if you think of -- real estate companies routinely will

14   access their equity through refinancing and have cash

15   available and distribute it to shareholders, and

16   without sales they can show accounting losses or lack

17   of earnings.  And because expenses are noncash, they

18   have cash to distribute, and there's a value to

19   shareholders.  I think by rejecting equity methods Miss

20   Fannon was unable to get a model that fits a real

21   estate company.  I think in the briefing, Your Honor,

22   we addressed that most clearly on the dividend-paying

23   capacity models.

24        Just two points I wanted to respond to, Your

25   Honor, that were asserted in the reply memorandum of

1    defendants that we have not had a chance to address to

2    the Court, and this goes to the nature of the company

3    and why there needs to be some value from the

4    development activity, including evaluation of the

5    business.

6        First Hartford in the reply brief at 17 asserts,

7    quote, the reality is that FHC does not have a

8    build-and-sell strategy, and yet I think the

9    evidence -- first the evidence contradicts that.

10   Bangor Parkade, for example, was a build-and-sell

11   project exclusively.  It was -- a sale took place

12   before it was built.  I mean, they had the contract for

13   that sale ready to go before it was even built.

14       Number two is that First Hartford announces in its

15   10-K to the public each year and every year, this is

16   exactly the business they're in.  If we look at, for

17   example, Exhibit Plaintiff's 116, Plaintiff's 120,

18   which are the 10-Ks for two years, Page 2, First

19   Hartford announces, the company is engaged in the

20   purchase, development, ownership, and management of

21   real estate with the ultimate goal of selling such

22   properties when profitable opportunities arise.

23       Clearly they're in this business and, as imprecise

24   and difficult as it is, fair value requires an attempt

25   to capture some of that value of the long term, even

1    though we don't have consistency that we might like in

2    the actual sale of those properties.

3         Professor Riddiough, the Court's already

4    identified that wrong measure, that's not the law of

5    this jurisdiction, it's not the law of the state.  The

6    value of a minority share is not the issue before the

7    Court but the value of the entire enterprise, so I

8    don't see how we can use any of his model valuation.

9         Finally, Your Honor, I wanted to address the

10   question the Court raised, which frankly quite

11   surprised us to see in the submission to the Court the

12   defendants put suggesting for the first time that the

13   only issue for the Court is the valuation and purchase

14   of the shares owned exclusively in Mr. Richard Kaplan's

15   personal name.  As we addressed in the -- in our

16   submission and our reply, that's baffling given the

17   fact that these defendants have already represented to

18   the Court that the plaintiff in this action is a 19.1

19   percent shareholder.  That 19.1 percent, you only get

20   there if that includes the beneficial ownership in the

21   Kaplan shares owned by the Kaplan Family Trust over

22   which Richard Kaplan and David Kaplan have control.

23         THE COURT:  Well, that's certainly true that's

24   been the context of the discussion, but in terms of the

25   formal documentation, was it in the pleadings, has it

1    been stated at any point that the relief sought here is

2    a buyout of the entire Kaplan family interest?

3              MR. NEWMAN:  What the pleadings said, Your

4    Honor, and I think we also addressed that in the brief,

5    was the plaintiff asked for dissolution or, in the

6    alternative, a buyout of shares at fair value of

7    Mr. Richard Kaplan and any minority shareholders who

8    wish to sell.  So the relief sought technically in the

9    pleading was as broad as all minority shareholders.

10   And in fact that's still on the table for the Court,

11   and you'll hear from amicus.  We had two -- in the

12   pleadings at least two shareholders submitted

13   affidavits saying, no, we want to continue with

14   Mr. Ellis and the management of FHC.  But in terms of

15   the technical pleading relief sought as an alternative

16   was buyout of all shareholders who wish to sell.

17        In terms of what the Court can or should do, the

18   Court has equitable power to basically address that

19   issue, frankly, regardless of whether it's a single

20   Kaplan share or all Kaplan family members or other

21   minority shareholders who should get notice of an

22   opportunity to sell.

23             THE COURT:  Well, what is the request at this

24   point?  Does Richard Kaplan have the authority to

25   request a buyout on behalf of all and is that what he's

1    doing, or is that still uncertain?

2          MR. NEWMAN:  Well, in our submission we said,

3    Your Honor, that at this point, given the -- this

4    litigation is a drain on all shareholders because of

5    the cost of litigation, and it's a continued drain on

6    the Kaplan family.  And what we suggested is that, in

7    fairness and equity, the parties should be disentangled

8    now and submit that all Kaplan shares -- that there

9    should be -- defendants should be required to offer to

10   buy all Kaplan shares at the fair value determined by

11   this Court.

12         THE COURT:  Did that answer my question?  Does

13   Mr. Richard Kaplan, who you are representing, have the

14   authority to make a binding request on behalf of all of

15   the Kaplans?

16         MR. NEWMAN:  I believe I do, Your Honor.

17         THE COURT:  So if I make a decision -- I'm not

18   saying which way I'll rule, but if I rule in favor are

19   you going to come back and say, well, these ones don't

20   want to be part of it after all?

21         MR. NEWMAN:  Well, it's interesting, on that

22   point I'm hearing a different issue.  This -- this is a

23   remedy, not a punishment.  If the Court were to come

24   back with a valuation of -- I'm just going to make up

25   something ridiculous -- of 50 cents a share, for some

1    reason unfathomed by any of the parties, the order

2    would be that the defendants must offer to purchase

3    whatever shares the Court determines, we're asking for

4    all Kaplan shares, at 50 cents a share.  But if the

5    value is perceived as substantially higher then the

6    parties offered that remedy could decline it, I

7    suppose.  It's not an offer --

8               THE COURT:  This is one way?

9               MR. NEWMAN:  I believe it is, Your Honor, I

10   believe it is, in terms of a remedy.  In other words,

11   it's not a sanction.

12              THE COURT:  If you don't like my decision,

13   your clients walk away from it; but if you like it the

14   defense can't walk away from it.

15              MR. NEWMAN:  I believe that's my understanding

16   of how the law works, Your Honor, in terms of a remedy

17   to plaintiffs.

18              THE COURT:  That's interesting.  I hadn't

19   thought of it that way.  It's kind of unusual, isn't

20   it?

21              MR. NEWMAN:  Well, hopefully it will never be

22   an issue that will ever have to be addressed as a

23   practical matter, but I do believe that's the law.

24              THE COURT:  It wouldn't be a law of

25   dissolution, what if I decide dissolution --

1          MR. NEWMAN:  Dissolution is different because

2    everybody's out, and there's no theory about that.  If

3    there's dissolution, there's order of liquidation,

4    there's a sale --

5          THE COURT:  You don't think your -- you don't

6    think your pleadings asking on behalf of Mr. Kaplan,

7    the Kaplan family, to be bought out, for the Court to

8    set the price, you don't think those bind your clients

9    to the Court's price.

10          MR. NEWMAN:  I think it's res judicata, and if

11    they decline the remedy they'd be barred from ever

12    seeking it again.

13          THE COURT:  I see.

14          MR. NEWMAN:  Certainly res judicata.  This

15    would end the issue.

16          THE COURT:  All right.  Thank you, Mr. Newman.

17          MR. NEWMAN:  Thank you.

18          THE COURT:  Who's going first, Mr. Nolan?

19          MR. NOLAN:  Yes, I am, Your Honor.

20          THE COURT:  Good morning, go ahead.

21          MR. NOLAN:  Good morning, thank you.  We're

22    about 16 days short of the fifth anniversary of this

23    series of disputes, Your Honor; by my count this is the

24    seventh lawsuit.  There were three cases in

25    Massachusetts before -- tried before Judge Gordon that

1    resulted in two opinions.  There were the litigation

2    over the shareholders list, there were three cases, not

3    one as in the brief.  There were two cases in the state

4    court, each of which generated an opinion.  There was a

5    case before you that got withdrawn, and finally there's

6    this case, where we have two written decisions.

7         Each and every one of those cases has had one

8    single plaintiff, Richard Kaplan, an actual person.

9    There has never been any other plaintiff asking for

10   relief from any of the Courts that this dispute has

11   played out in.  And I think that's significant because

12   only a party to a lawsuit is entitled to relief.  Of

13   course, you could have a class action, you could have

14   had a derivative action, I suppose, but there is

15   nothing in -- in any of the complaints, but I'm going

16   to be more specific, of course, about this case.

17        And the complaint here is Richard Kaplan, a

18   citizen of Massachusetts, not Richard Kaplan, trustee

19   of the Kaplan family.  It's not Richard Kaplan as

20   trustee of the -- of his father's testamentary trust or

21   his family trust, not Richard Kaplan as a functionary

22   of the charitable foundation that we discussed at his

23   deposition, which is Exhibit 47 in this case, Richard

24   Kaplan as an individual.

25        And Paragraph 9 of the complaint as to which

1    relief is sought reads as follows:  Kaplan owns of

2    record 145,719 shares of common stock of FHC.  And

3    those -- those are the shares as to which relief has

4    been sought.

5         Now, under the Maine statute of 13-C, 1434,

6    Subsection 1, permits other shareholders to intervene.

7    No one has attempted to intervene in this case except

8    Mr. Frank's clients on a limited basis.  None of the

9    other Kaplan entities, David Kaplan has not sought to

10   intervene, none of these other entities have sought to

11   intervene.  Indeed, there's been a major effort, as

12   evidenced by Exhibit 47, to keep any inquiry away from

13   any of these other entities as to which Richard Kaplan

14   claims to have voting power.  So I submit that those

15   are not part of this case.

16        THE COURT:  And, if I go back through your

17   filings, I won't find references to the Kaplan family

18   or the client --

19        MR. NOLAN:  You will, you will most certainly

20   find references in the brief, for example, I think it

21   was a footnote, in our -- footnote 3, if I'm not

22   mistaken, in our first submission, we talked about the

23   possibility of the Court ordering a sale.  And you will

24   recall that there was no response on that.

25        And I'm going to turn now to your opinion on

remedies, because I think we heard a variant on the
theme that we just heard from Mr. Newman which -- this
idea of a one-way option.  You didn't order a one-way
option.  And what you did say in your complaint was, I
now conclude that FHC must buy Kaplan's shares; that's
what you said.  Didn't say FHC must offer to buy
Kaplan's shares, must offer to buy anybody else's
shares, put an offer in the Wall Street Journal,
anything to that effect.  And it doesn't give anybody,
doesn't give Mr. Kaplan the right to say no, I don't
like the price.  You -- as I read your order and
findings on the remedy, you are going to set the price
and FHC is going to buy them, and if FHC can't buy them
then you have some language in there about Mr. Ellis.

        And you also said in your opinion, and this is at
Page 8, what you did not want to permit is manipulation
of your decision.  You said that on Page 8.  And I
submit what we heard at the end of Mr. Newman's
presentation is precisely that.

        And the other fact that you have to keep -- that I
think we should be keeping in mind is how you set the
valuation date.  And you set the valuation date as
September 15th, the day before the complaint was filed
in this case, because that was the date when Kaplan,
Richard Kaplan, not any of the other Kaplan entities,

1    that's the date when Richard Kaplan finally became

2    perturbed enough by Ellis' oppression to file a

3    dissolution lawsuit demonstrating his desire to

4    separate himself from the corporation.  And under the

5    logic of that finding in that order, there is no other

6    person in the world at this point who recently could

7    have the expectation of getting their shares bought out

8    by this company as of September 15th, 2005, because no

9    one else in the world, especially, particularly, the

10   other Kaplan entities that are shareholders, they

11   didn't express any perturbation, they didn't decide

12   they wanted to be separated; they wanted to ride along

13   and say, if it's a high price, we'll sell, if it's a

14   low price, we'll continue to fight.  And that's what

15   the position is of the plaintiff this morning.

16        And I submit to you, Your Honor, that's incorrect

17   and certainly under -- not only the Maine statute but

18   the Article III of the Constitution and the ideas of

19   remedies and who's entitled to relief from a Court, the

20   Court has to decide the case that's in front of it.

21   This is the case that's in front of you.

22        People want to try to come in and become parties

23   now, I think it's probably an interesting legal

24   question as to whether they are entitled to all of the

25   findings on oppression, but clearly under your order

1    and your rule, we'd have to have another valuation

2    date, because only then have they decided that they

3    want to be separated.

4        Now, Mr. Culley and Mr. Groff are going to talk

5    about the particulars of the valuation.  I'm going to

6    make a few brief comments, having used more of my time

7    on this issue than I had anticipated.  We do renew the

8    request we made in our motion in limine.  You did take

9    the evidence that had -- under the <u>Daubert</u>.  We don't

10   believe that there's any basis for Mr. Aertsen's

11   opinions, certainly hasn't demonstrated any specialized

12   skill, and I'll get to his -- what he did submit to you

13   in a moment.

14       I should comment on this idea of net asset value

15   as somehow being a very key factor in valuing the

16   shares of this publicly traded corporation.  And

17   somehow we've overlooked the fact that Mr. Aertsen

18   discounted net asset value 100 percent, he relied on it

19   to -- as he relied on market value of the stock.  He

20   said both of those methods had no value, and he

21   insisted on relying on his version of the McKinsey

22   method.  Just thinking about net asset value and the

23   discussion between you and Mr. Newman, somebody has to

24   pay the taxes eventually.  Somebody has to pay the

25   costs if the properties are sold.  All of them are

1    mortgaged.  There are prepayment penalties, there are

2    expenses, and so forth.  Somebody's going to pay that.

3    I think Mr. Kaplan's choice would be that he would

4    leave all of those behind by his 145,000 at the price

5    above the line and he would leave all the expenses and

6    all the risk and everything else behind for the rest of

7    the shareholders.  That's not equitable, and I think

8    perhaps on this point we may agree with Mr. Aertsen

9    that net asset value is not the way to look at this

10   property.

11        We don't claim that there was anything wrong with

12   the methodologies that Mr. Aertsen said that he was

13   going to use, the McKinsey -- the McKinsey discounted

14   cash flow methodology and the Pratt guideline dividend

15   capacity.  What we do say in the 30 hours that

16   Mr. Aertsen spent doing his work in this case, we say

17   he didn't come close to following either.  He never did

18   the work.  You were given two spreadsheets, and that

19   was the sum and substance of his work.

20        Now, the McKinsey book is in evidence, that's

21   159A.  The first -- it's divided in parts and the parts

22   divided in chapters.  The first 70 pages, part one of

23   that book, talks about and gives an overview of the

24   methodology of valuation.

25             THE COURT:  Any suggestions, Lois?  The rest

1    of you have your microphones off, just Mr. Nolan's

2    going?  Go ahead.

3              MR. NOLAN:  I swear I have no devices --

4              THE COURT:  The other thing is if anyone has a

5    cell phone on that can do it.  Go ahead.

6              MR. NOLAN:  And then the book that he said in

7    his submission and in his testimony was the only thing

8    he relied on, that methodology as described in the

9    McKinsey text; 268 pages of that text, Chapters 5

10   through 12, tell the person how to follow that method.

11   And there are a couple of places, and this will be

12   picked up on by Mr. Culley and Mr. Groff, what McKinsey

13   says at Page 100 is, the first step is to reorganize

14   the accountant's financial statements into new

15   statements that separate operating items, nonoperating

16   items of financial structure.  That never happened.

17   Mr. Aertsen didn't do that; he -- he couldn't possibly

18   have done that.

19        And more importantly, and this is under valuing

20   operations, the value of operations -- and it's right

21   in the beginning of Chapter 5, the value of operations

22   equals the discounted value of future free cash flow.

23   Free cash flow equals the cash flow generated by the

24   company's operations less, less, any reinvestment back

25   into the business.  And Mr. Culley is going to tell you

how much money was reinvested back into this business.

And according to Mr. Aertsen's bible you have to deduct that, and he never did.  That's reason enough right there, those two deficiencies, to disregard his opinion in its entirety.  And in terms of the check, the so-called check, I think that the -- the discount -- the guideline dividend capacity, the $16 million, now $13 million, I think the only check that is was to validate the fact that Mr. Aertsen's first method was wrong.

But getting back perhaps to McLoon and to Libby, we have here a publicly traded corporation, and Mr. Aertsen gave zero weight to market value.  And you found -- you found in your first opinion, you will recall that you came up with some questions that you wanted discussed at the end, there were six of them, I believe, and question 3, which is on Page 47 of that opinion, at least in the version filed in the Court, not the Fed. Supp. version, you recognize Kaplan's concern that FHC shares are thinly traded and that it would be difficult to get fair value for his large block of stock in the market.  But there is no evidence that the stock is thinly traded as a result of the oppression you found.

Part of the risk of owning a minority interest in

a small public corporation is that the shares may be
difficult to sell or their market price may be
depressed due to their inherent lack of marketability
and the control of our shareholders.  In the old days
when we were trying negligence cases, you take a
plaintiff as you found them.  In this circumstance you
take the company, Mr. Kaplan takes the company in which
he owns stock that he -- that he got from wife and from
some inheritance, that's the company that it is, and
the fact that there's a thin market is sort of too bad.
It's a fact, but that's an inherent risk.

THE COURT:  Well, that's true as an economic
matter, that's true if he wants to sell, but doesn't
McLoon make pretty clear that if -- at least in the
appraisal circumstance, you all assumed that we're
talking about the same thing here -- we don't take a
minority discount, maybe you're just distinguishing
thin trading from minority.

MR. NOLAN:  I'm not -- I do not claim a
minority discount.  I'm saying, if you own 5 percent of
IBM, you can't throw 5 percent of the stock of IBM into
the New York Stock Exchange and expect to get --

THE COURT:  I understand.

MR. NOLAN:  -- the price -- and that's -- and
I think you -- the reason I referred you back to those

1    words was that that's a risk that you identified,

2    that's inherent, and that goes to the value.

3         Now, I can't remember whether the Duke article

4    gave proper credit to where it should be, which in my

5    view is Judge Easterbrook and Judge Fischel's report.

6              THE COURT:  I've read them anyway.

7              MR. NOLAN:  And just two more brief points,

8    and this follows up -- the first one follows up the

9    point I just made that you made, that a liquid market

10   should not be a prerequisite for using the market

11   price.  Isolated trades, if at arm's length, are an

12   unbiased indicator of value and can obviate the need

13   for other inquiries.  That's Easterbrook and Fischel

14   and this is the Harvard version of that, that's at

15   Page 154.

16        Now, at Page 155, Judge Easterbrook apparently

17   anticipated the difficulty identified in the 1998 Duke

18   piece.  Because -- and I would think that this was

19   probably part of it that Judge Easterbrook himself

20   wrote.  Cash flows are subject to a wide range of

21   disagreement.  This means that almost any value may be

22   propounded with a straight face, as the Supreme Court

23   of Delaware recently acknowledged --

24             THE COURT:  Let me interrupt.  Does anybody

25   have a cell phone on inside the courtroom?  If you've

```
1    got a cell phone --
2           MR. NEWMAN:  I just checked mine to make sure,
3    no, Your Honor.
4           THE COURT:  Go ahead.
5           MR. NOLAN:  The uncertainty of this process
6    underscores the superior of the market price when it's
7    available.  The collective judgment of thousands of
8    self-interested investors --
9           THE COURT:  Mr. Nolan, I suggest you turn off
10   your lapel microphone; let's just use the one at the
11   podium.
12          MR. NEWMAN:  Perhaps that's the microphone
13   reserved for out-of-state counsel, Your Honor.
14          THE COURT:  Just stay close like I am and
15   we'll hear you fine.  Go ahead.
16          MR. NOLAN:  The collective judgment of
17   thousands, and I grant there are not thousands, but
18   there are self-interested investors, voting their
19   wallets is more likely to be accurate than a guess by a
20   single appraiser hired to serve the party's cause.
21   There is unbiased evidence here, and it's been -- it's
22   in the record, and there's no dispute about it.
23          THE COURT:  Well, if I take the market, which
24   I think 3.25 a share was the closest transaction
25   Mr. Riddiough came up with, and if I use his 25 percent
```

```
 1   minority discount, which will be reflected in that,

 2   that would at least give me value, would it not, of

 3   4.33 a share and a value of the company of over

 4   13 million.

 5           MR. NOLAN:  I don't think so.  I think the

 6   3.25 is the market price.

 7           THE COURT:  But that's for minority interest;

 8   is it not?

 9           MR. NOLAN:  Which is -- by definition every

10   share in a market -- of market price and the -- the

11   Supreme Court in this state has said market price, and

12   we go back to Libby.

13           THE COURT:  Says for the entire company.

14           MR. NOLAN:  For the entire company.

15           THE COURT:  But the market for a small

16   quantity of shares surely reflects a minority interest.

17           MR. NOLAN:  Perhaps.

18           THE COURT:  So don't I have to increase it by

19   the value that at least Professor Riddiough assigns to

20   the discount?

21           MR. NOLAN:  No, I don't believe so.

22           THE COURT:  Why not?

23           MR. NOLAN:  Well, because we have Miss Fannon,

24   you have the --

25           THE COURT:  Just stay with the -- market is
```

```
 1    the thing that does it.
 2              MR. NOLAN:  Right.
 3              THE COURT:  If we start with the market, then
 4    the transactions are those of a minority shareholder,
 5    so surely, to recognize McLoon, I've got to inflate
 6    that value to recognize the minority transaction.
 7              MR. NOLAN:  Well, I think if you're selling
 8    the whole company it would probably sell for less.
 9              THE COURT:  But then you're going away from
10    the share trade.
11              MR. NOLAN:  I'm not.  I think if you're buying
12    the whole company you would have to speculate on what
13    someone would pay for the whole company.  You have to
14    look at the market price, and you're selling an
15    interest here and --
16              THE COURT:  So I should just ignore Professor
17    Riddiough all together.
18              MR. NOLAN:  No, I'm not saying that.
19              THE COURT:  He said 3.25, where he started, he
20    then brought it down some, I think, and he said there
21    was a 25 percent minority discount that he applies.
22              MR. NOLAN:  Not on that, I don't believe, Your
23    Honor.  Not on that.  And I -- the 3.25 was the trade
24    on --
25              THE COURT:  He assumed close to that.
```

1          MR. NOLAN:  It's in the range.

2          THE COURT:  Go ahead.

3          MR. NOLAN:  That's all I have.

4          THE COURT:  Thank you very much.  Mr. Culley?

5          MR. CULLEY:  Your Honor, I intend to use some

6    graphic aids just to demonstrate some of the testimony,

7    and Mr. Newman had raised concern, we hadn't shown them

8    to him previously.  I'm happy to show them to him now

9    and proceed to using them.

10          THE COURT:  Go ahead.

11          MR. NEWMAN:  Your Honor, if I can be heard.

12   We do object to the use of what I've just been handed,

13   which is an extensive package of texts and numbers and

14   charts and writings and assertions that I've had no

15   opportunity to review or verify or respond.  We tried

16   this case, valuation hearing, in July and September,

17   extensive written briefing in November and December.

18   We've had since December knowing that we'll have oral

19   argument today, February 11th.

20       I got first wind that defendants might intend to

21   make a presentation with something we hadn't seen

22   before when we called yesterday to find out about

23   whether the ELMO would be available just if we wanted

24   to put an exhibit or two on the screen.  And I called

25   Mr. Culley, and I asked, he said, well, we'll have a

1    visual presentation.  I said, well, is it limited to

2    exhibits or things used at trial, something I've seen,

3    something in evidence, he said no.  So I asked for it

4    and, without casting any dispersions, the tactical

5    decision was that I should not receive it, I should not

6    have it.  And so I've had no opportunity to respond.

7         This is complex, detailed information.  We have

8    all addressed it at great length in the briefings.  If

9    it's not in the briefs or it wasn't in evidence, I just

10   don't have fair notice or fair opportunity to verify

11   and respond in the time we have for oral argument.  So

12   I object on those grounds, Your Honor.

13        MR. CULLEY:  Your Honor, this is oral argument

14   to the bench, to the Court.  There is no jury present.

15   If I were to get out an easel, I could draw most

16   anything I wanted to as long as I didn't take liberties

17   with what was in the record.  And I would be entitled

18   to do that.

19        All the charts that I have here are taken from

20   exhibits, every one of them has reference to an

21   exhibit, many of them are merely portions of an exhibit

22   that we have pulled out.  And the effort here and the

23   reason is to take what we all agree has been a very

24   complex evaluation by various witnesses and to try to

25   break it down into its components.  The portion of my

1   comments today to the Court will reflect solely on what

2   we believe are errors Mr. Aertsen made in his

3   calculations.  And that is the sole effort here is to

4   enlighten the Court on why we believe Mr. Aertsen's

5   valuation is too high, and we want to point out as

6   graphically and as clearly as we can by using some

7   graphic aids taken off these exhibits to explain it.

8   That's the sole effort.  And there's no reason in the

9   world why we shouldn't be entitled in oral argument

10  before this Court to make that presentation.

11          THE COURT:  All right, the objection is

12  overruled.  I will hear it.  If there's prejudice, I'll

13  hear from Mr. Newman on that in rebuttal.  Go ahead.

14          MR. CULLEY:  Your Honor, I have paper copies,

15  would the Court prefer a paper copy?

16          THE COURT:  Yes.

17          MR. CULLEY:  Your Honor, I wanted to just

18  comment briefly on a couple of things that the Court

19  stated earlier in response or when you shared your

20  observations with us.  And those have to do with the

21  testimony and evaluation of Ms. Fannon.  And I believe

22  you expressed concern that she had disregarded

23  profitable sales.

24          And my response to that, Your Honor, is Ms. Fannon

25  did not disregard the profitable sales, and by that the

1    only -- well, there are two, there's a Bangor -- funds
2    from Bangor and there's the Mt. Olive sale that I'll
3    talk about in more detail.  Ms. Fannon took into
4    account the receipts and the gain from those sales.
5    What she did not do is capitalize those sales going
6    forward, because her view is that the sales will not be
7    repeated on a regular basis.  So she did take into
8    account the event of those sales and the profit.  What
9    she did determine and did conclude is, based on the
10   past history and what was in the pipeline, that First
11   Hartford would not sell a property every three years,
12   as Mr. Aertsen did.
13        THE COURT:  Well, even if every three years is
14   excessive under Mr. Aertsen, Mr. Newman's arguing that
15   it's not recognizing the nature of this business to
16   project no future sales at the same time that you're
17   projecting all the costs that are associated with
18   trying to generate those sales.  How do you respond to
19   that?
20        MR. CULLEY:  Well, first, with respect to the
21   costs, the costs are built into the structure of First
22   Hartford.  And one of the problems here is that I think
23   Mr. Aertsen and Mr. Kaplan views the development side
24   of the company as a discrete enterprise that is solely
25   devoted to developing and selling properties.  And

1    that's not accurate.  The development side of the

2    property is primarily, in fact almost exclusively,

3    devoted to First Hartford developing properties to

4    manage and operate and own.

5              THE COURT:  But there is the 10-K reference

6    that Mr. Newman quoted as well.

7              MR. CULLEY:  The 10-K reference is I think --

8    states that the company's business is developing,

9    building, and operating these, and selling if a

10   profitable opportunity presents itself.  So

11   certainly --

12             THE COURT:  And they do sometimes.

13             MR. CULLEY:  Well, there were two sales in a

14   ten-year period, Bangor and Mt. Olive, and that is

15   almost -- that is exclusively it, I believe.  So, yes,

16   they occasionally sell a property.

17             THE COURT:  But does that discount the costs

18   that are associated with that part of the business in

19   any respect?

20             MR. CULLEY:  No, because those costs exist

21   regardless, Your Honor.  If they develop a property to

22   own and operate it, it is done by the same people with

23   the same cost structure as if they ended up selling the

24   property.  So that -- that aspect of a company is a

25   fixed cost.  They don't have people whose sole function

1    is to develop a property to sell.  They have the same

2    people doing the same thing whether or not they sell

3    the property.

4         THE COURT:  But I take it Mr. Newman's

5    argument is that somebody trying to buy the whole

6    business would also be taking into account that some of

7    these might ultimately be salable, and Ms. Fannon did

8    not take that into account.

9         MR. CULLEY:  No, I don't believe that it's

10    accurate she did not take it into account.

11         THE COURT:  How did she take it into account?

12         MR. CULLEY:  Well, she certainly recognized

13    the sale.  What she concluded is that someone looking

14    at the company would not buy it with the idea that it

15    was going to sell a property every three years.

16         THE COURT:  I would agree, three years is the

17    wrong number, but how about every seven years, how

18    about every ten years, how about every eight years?

19         MR. CULLEY:  Well, I think when you get

20    into -- that is too speculative, Your Honor, for

21    someone looking at the company as someone who would buy

22    it, and I think that she felt that there wasn't a

23    history here --

24         THE COURT:  Did she tell me that or did she

25    simply say the theories of what she applies doesn't let

1    her put that in?  Did she tell me that a takeover

2    specialist would not take that into account?

3             MR. CULLEY:  I don't know that she testified

4    specifically, Your Honor.  I can't recall chapter and

5    verse what she testified.  I believe she gave her

6    opinions as to why she felt from a valuation standpoint

7    it was not appropriate to capitalize the income.

8             THE COURT:  Right.

9             MR. CULLEY:  You also were concerned that

10   Ms. Fannon spent a significant amount of time with

11   management, I believe were your words.  And --

12            THE COURT:  Well, my concern was that she

13   relied solely on management in terms of the information

14   that she added to the statements.  Obviously it's not

15   inappropriate to consult with them, but this is a

16   conflict situation between management and the

17   shareholder.

18            MR. CULLEY:  And I'm not sure what you're

19   referring to.  She certainly spoke with management to

20   fully understand the business, I would submit.

21            THE COURT:  They told her about one particular

22   shopping center's value; she accepted that.  I think

23   they told her some other things that she accepted

24   without independent verification.

25            MR. CULLEY:  And specifically do you recall

1        which one that was, sir?

2                THE COURT:  I don't.

3                MR. CULLEY:  Well, I would submit to you that

4        anyone doing a thorough business valuation is going to

5        have to seek explanation for some of the things that

6        are in the financial records.  And I believe that she

7        did that on occasion, and I believe that it was

8        reasonable for her to accept the information she

9        received from the company.  I think on most -- most

10       significant matters she did verify independently to the

11       extent that the information she received was

12       verifiable.

13               THE COURT:  I'm not challenging what she did

14       professionally, please understand that.  What I'm

15       saying is that in this particular conflict situation

16       where there's been an accusation of oppression and I

17       found it occurred that the statement of management need

18       at least to be considered by me with greater care than

19       in a different context.

20               MR. CULLEY:  And I think we would welcome

21       that, Your Honor.  I don't know what the specific

22       statements are, but I believe that Ms. Fannon's very --

23               THE COURT:  How about the appraisals, the

24       reappraisals, how might I value those?

25               MR. CULLEY:  Well, there's very little

1    difference between the original and the revised

2    appraisals.

3              THE COURT:  Well, a lot was made by Ms. Fannon

4    about the significance of overlooking them by

5    Mr. Aertsen.

6              MR. CULLEY:  But those appraisals were done by

7    an independent appraiser; they weren't done by the

8    company.

9              THE COURT:  What do I know about that?  How --

10   do I know the relationship; do I know the nature of the

11   engagement?

12             MR. CULLEY:  I can't recall what the testimony

13   was, Your Honor.

14             THE COURT:  I don't know what management said

15   to that re -- that new appraiser, do I?

16             MR. CULLEY:  When management -- I'm sorry?

17             THE COURT:  I don't know what instructions

18   management gave to the person doing the new appraisals,

19   do I?

20             MR. CULLEY:  You do not.  But I believe again

21   it is appropriate for a business appraiser to review

22   appraisals and review them to make sure that at least

23   facially they appear to be accurate and reasonable

24   appraisals done by a competent appraiser.

25             THE COURT:  Again, I'm not challenging what

1   Ms. Fannon did in terms of the standards of her

2   industry.  I'm simply saying that in this case, given

3   the findings and the history, I can't as easily accept

4   those, as might be the case in some kind of a corporate

5   takeover where Ms. Fannon was coming with a value.

6          MR. CULLEY:  I understand that you should view

7   those with healthy skepticism, Your Honor.  I would

8   submit that there is no evidence in front of you upon

9   which you could conclude that those appraisals were not

10  anything other than fair arm's length appraisals.

11         THE COURT:  Go ahead.

12         MR. CULLEY:  Your Honor, what I wanted to do

13  was to speak specifically to what we believe were

14  significant errors made by Mr. Aertsen, because, as you

15  point out, you have some --

16         THE COURT:  Can I interrupt you since you're

17  leaving Ms. Fannon, there's one other question I

18  raised, and I don't think Mr. Nolan addressed it and

19  maybe you will, but is it logical to think that the

20  fair value of this company is so much lower than the

21  liquidation value that Ms. Fannon comes up with?

22         MR. CULLEY:  I think in this case it is, Your

23  Honor, and obviously the -- and it wasn't a liquidation

24  value, it was a going concern net asset value that she

25  valued.  And I believe a liquidation value would be a

```
 1    different -- a different value.
 2              THE COURT:  Explain that to me.
 3              MR. CULLEY:  Well, I think if you were in a
 4    liquidation mode then the ability to maximize the
 5    revenue from properties might be very different.  In
 6    other words, I think her -- her analysis was, as a
 7    going concern, if one were to engage in an orderly
 8    selloff of the properties, she determined that the net
 9    asset value would be higher than the going concern
10    value.
11              THE COURT:  But then wouldn't a purchaser take
12    that into account?
13              MR. CULLEY:  Certainly could, yes, Your Honor,
14    they could.  But it would not be a liquidation; it
15    would be owning, operating, and over a fairly lengthy
16    period of time selling off -- selling off properties.
17              THE COURT:  All right.  But then back to the
18    question, is it logical to think that there should be
19    such a difference?
20              MR. CULLEY:  I believe it is, Your Honor,
21    because I think when one looks at a company, one can
22    look at a variety of things, and one would look at a
23    company as what are the opportunities here to come in
24    and operate this company.  And the -- a prospective
25    buyer could look at it as, if I wanted to operate this
```

1    company in its current condition, it may be worth less

2    than what I could get if I sold off the properties; but

3    there are opportunities for a buyer to come in and

4    operate the company so that it might have a greater --

5    a greater value.  In other words, does somebody want to

6    buy an operating company, or does someone want to buy

7    some assets and break them up and sell them over time.

8    So you have different buyers who might have very

9    different views of what they wanted to do in terms of

10   purchasing a company.  So I think the -- the breakup, I

11   think there are many companies that are valued less

12   than what would be the breakup value of the company.

13        THE COURT:  And if it's enough, then there's

14   usually a takeover and a sale of some or all of those

15   assets.

16        MR. CULLEY:  That certainly happens.  That

17   hasn't happened here, but that doesn't happen in

18   every -- in every situation, Your Honor.

19        THE COURT:  But that's surely one of the

20   reasons why you have to look at the net asset value in

21   adjusting for what would the total company bring to a

22   third party by way of an offer from a third party.

23        MR. CULLEY:  It is a factor that a buyer would

24   take into account.  I would state, Your Honor, and this

25   is obvious, that Mr. Aertsen gave no value, Ms. Fannon

1   gave very little value, as did Mr. Riddiough.  So all

2   the experts who looked at this for different reasons

3   have said that they believe the net asset value should

4   be a very limited component of the total value of the

5   company.

6          THE COURT:  Because it was too low for

7   Mr. Aertsen and too high for Ms. Fannon and

8   Mr. Riddiough.

9          MR. CULLEY:  Well, that would be a view you

10  could take or you could take the view that for a

11  variety of reasons these appraisers felt that the net

12  asset value of the company really didn't truly reflect

13  its value for whatever reason.

14         THE COURT:  Go ahead.

15         MR. CULLEY:  Mr. Aertsen made one major

16  mistake, Your Honor, and that is taking a three-year

17  snapshot, 2003 through 2005, and concluding that that

18  performance of the company would be replicated over

19  into the future.  In fact, Mr. Newman called it an

20  historical analysis.  And it really isn't an historical

21  analysis, because an historical analysis would require

22  someone to go back into the past and see what happened

23  with the company.  So it wasn't an historical analysis,

24  it was looking at a three-year period of time and

25  concluding that that three-year period of time was

1    exemplary and was a -- an indicator of what one could

2    expect in the future for that company every three

3    years.  And I wanted to just highlight what we believe

4    are the fundamental valuation errors, Your Honor, and

5    perhaps we could -- and you have this in front of you,

6    I believe, but I wanted to just identify these, and I

7    will speak to each of these separately.

8         First, he assumed that there would be every three

9    years the sale of a property, unspecified as to which

10   one, and by then capitalizing that he concluded that of

11   the value of the operating company $14 million would be

12   a result of these sales every three years.  He also

13   assumed that every three years the company would settle

14   a lawsuit that would result in significant revenue to

15   the company, again based on his view of the history of

16   the company.  He assumed that -- not assumed, but he

17   capitalized the general and administrative costs of the

18   company, taking into account figures that were restated

19   in a subsequent 10-K.  And by substantially

20   understating the operating expenses or the expenses of

21   the company, the general and administrative expenses,

22   he inflated the value of the business by over

23   $11 million.

24        He also erred by double counting cash and other

25   working capital items to the extent of $3.8 million.

He valued a tax shield, which now Mr. Newman concedes

he shouldn't have done.  And he also double counted

other assets to the extent of $3.4 million.  The

accumulation of these fundamental errors is

$38 million.

What I'd like to do, Your Honor, is explain each

of these, and by doing that I go to the next slide,

which is a work sheet, and this is work sheet number

one from Mr. Aertsen's Exhibit P160 -- I think that

should be 162, I'm sorry.

MR. NEWMAN:  That's correct.

THE COURT:  162?

MR. CULLEY:  162, that's a mistake, Your

Honor.  And I direct your attention to the net gain of

real estate sales, which is the line right above total

revenues under the revenue section.  And as you can

see, Mr. Aertsen found $143,000 from sales in 2003,

6.4 million in 2004, which was Mt. Olive, and nothing

in 2005.  What he then did was take the total revenue

figure and divide that by three, coming up with average

revenues of $3,295,000, and that figure is the average

of the 1.4 million revenues in 2003, the 7 million in

2004, and the 1.3 million in 2005.  So he came up with

an average, deducting expenses, finding an average free

cash flow of $3 million.

1          If you turn to the next slide, I will explain why

2     that is a significant overstatement.  And that is

3     because of Mr. Aertsen assuming the sale every three

4     years, the total capitalized revenue stream is

5     $20 million, and Mr. Aertsen did that by running it out

6     over a 10-year period, finding a termination value, and

7     then discounting it back to -- by a discount factor of

8     14 percent to $20 million.  So the $20 million reflects

9     $3 million a year in revenue every year discounted.  A

10    portion of the -- the portion of the $3 million is

11    found in the third line of this slide, which is

12    $2.1 million.  That's the $6.4 million from the sale of

13    Mt. Olive divided by three.  If we take that sale out

14    of this capitalized amount, then we realize that the

15    capitalized amount of the $2,152,000 is $14.258

16    million, which is the capitalized amount solely of the

17    real estate sales.  So if we conclude, as we believe

18    the record reflects you should, that there would not be

19    those real estate sales every three years, then we have

20    an overstatement of $14 million of the capitalized

21    revenue stream of First Hartford.

22         Now, Mr. Aertsen compounded his error here in a

23    significant way.  And what Mr. Aertsen did was assume

24    there was going to be a sale every three years, which

25    gets into this inflated figure for the capitalized

1    value of the income.  But then -- and I will show this

2    on another exhibit -- he added back in this revenue

3    from the Bangor sale, and you can't have it both ways.

4    You either have a sale every three years and you don't

5    then add in the revenue from a -- one of those

6    hypothetical sales or you exclude the revenue.  So if

7    it were merely a question of either/or, then you could

8    conclude, okay, I will deduct $4.9 million or I will

9    deduct $4.25 million.  But he can't do both.  And in

10   this case there is really no reason to assume that

11   there were going to be these sales, so it overstates

12   the revenue by $14 million if you allow the Bangor

13   amount to be included.

14        If you turn to the next slide, Your Honor, and

15   this is from an exhibit from Ms. Fannon's report, which

16   is Exhibit 41, you look at the actual income of First

17   Hartford from April 30th, 1999, through the valuation

18   date.  And as you can see, the only year there was any

19   significant income, in fact, the only year of a

20   positive income was the year of the sale of Mt. Olive.

21   So there is no basis from an historical perspective to

22   assume that there was going to be a sale with the

23   regularity that Mr. Aertsen concluded.

24        Now, the second area is his overstatement of -- or

25   understatement, excuse me, of the expenses.  And if we

1    go back to slide 2, this work sheet of -- from the

2    Exhibit 162, we see that the expenses -- excuse me, I

3    misspoke.

4         The next item is the lawsuits, I'm sorry, I got

5    ahead of myself.  If you look at work sheet 2 at the

6    item nonrecurring, which is two lines up from the total

7    revenue, you can see in 2005 there was $807,950.  And

8    that was the settlement of a lawsuit in that year.

9    Mr. Aertsen then assumes by averaging that in that

10   every three years there's going to be a lawsuit.  And

11   in so doing he overstates by this $807,000 the annual

12   expected revenue from a lawsuit.  And again, using the

13   same factor that he used to capitalize the revenue,

14   which he did, the 14 percent discount factor, that he

15   assumes there will be revenue of $1.7 million from

16   lawsuits that will occur on a regular basis.  And we'd

17   submit, Your Honor, that you better than anyone knows

18   the vagaries of lawsuits and the likelihood of success

19   or failure or expense in lawsuits, and to factor in

20   every three years an 807,000 dollar recovery from a

21   lawsuit just is not anything that any prudent business

22   evaluator would do.

23        The next slide, Your Honor, lawsuit -- we have to

24   go forward now, the lawsuit settlements, after the

25   slide I just showed you, demonstrates the reality of

1    the -- and the history of First Hartford with respect

2    to lawsuits.  And these numbers are all taken from

3    10-Ks that are in an exhibit, I have the source beside

4    them, and as you can see, including the 807,000 dollar

5    recovery on the Walmart settlement, over a 10-year

6    period First Hartford actually lost $912,000 or had a

7    $912,000 of expense relating to litigation.  So to

8    assume that it is a revenue producer and adds

9    $1.7 million to the value of First Hartford defies

10   common sense.

11        Next, Your Honor, there was testimony in this

12   case, and I think it's very clear, that the 2004 and

13   2005 expenses in the 10-K were restated in a subsequent

14   10-K.  And Mr. Aertsen did not take into account those

15   increased expenses.  He looked at the three-year

16   period, the original expense items in the 10-Ks, and

17   took those as what he felt were the average general and

18   administrative expenses of the company.  And so he

19   averaged those three years and then capitalized that

20   amount, and that amount turned out to be 8,327 --

21   excuse me, $8,327,000.

22        If he had done what he did by just averaging the

23   restated income, then the capitalized value of the

24   restated income, the average being 1.9 million as

25   opposed to 1.2 million, then the capitalized general

1    and administrative expense would have been $13 million.

2    So there's an error, assuming that the averaging

3    approach was correct, of understating the expense by

4    $4.7 million.

5         He then compounded his error by doing something

6    entirely different in that he should have looked at the

7    trend and decided that averaging wasn't appropriate.

8    If you can see, Your Honor, from -- in 2003 in the

9    restated the expenses were 662,000, 2004 they were 2.2

10   million, 2005 they were 3 million.  With this kind of a

11   trend of increasing expenses it is not appropriate to

12   average those three.  And what Ms. Fannon did was she

13   took the 2005 expense and carried that forward.

14        If you turn to the next page, then you will see

15   that if the $3 million of general and administrative

16   expense for 4/30/05 was capitalized at the same rate as

17   everything else that Mr. Aertsen did, then the true

18   capitalized value or cost of the G and A cost would be

19   $20 million.  And comparing that to the 8 million that

20   Mr. Aertsen found, we have an 11.9 million dollar

21   understatement of the administrative and -- general and

22   administrative costs.

23        Then, Your Honor, finally in terms of these costs,

24   if you would turn to the next exhibit, the next chart,

25   which is the going concern value, this is a portion of

1    162, it's a large exhibit.  I just broke out a -- what

2    I think are the key sections here; because, in addition

3    to these other errors that we have pointed out -- and

4    here, Your Honor, is on this second line where there is

5    numbers in the far right column of FHC equity is where

6    Mr. Aertsen added in the Bangor sale, and again I will

7    point that out to you soon.  By assuming a sale every

8    three years and capitalizing that amount, you can't

9    then take one of those sales, which is the Bangor sale,

10   and add that back in.  So that is just -- it's a

11   fundamental error; but, as we point out, the more

12   appropriate and more significant error is not the

13   matter of 4.9 million, it's really 14 million, because

14   Mr. Aertsen should not have taken into account and

15   assume there would be a sale every three years because

16   there's no evidence in this case, either past or in the

17   future, that shows that would happen.

18        The three areas of expense that I wanted to -- I

19   mean, excuse me, of income that Mr. Aertsen recognized

20   are the three lines starting with 3.8 million for net

21   working capital, the $2.7 million, which is the tax

22   shield which we now know is out of the case because

23   Mr. Newman has recognized Mr. Aertsen's error, and then

24   finally this $3.4 million of deposits, escrows, and

25   deferred expenses.

1          The first is this net working capital.  What
2    Mr. Aertsen has done repeatedly is whenever the company
3    has some cash then he assumes that that is cash that is
4    available, cash that can be distributed or used.  And
5    when a valuation is conducted, the operating aspects of
6    the company are valued in the enterprise method that
7    Mr. Aertsen used.  And you evaluate the ability of
8    those companies to generate revenue, that is what you
9    are valuing.  And what you can't do is to take a
10   financial statement with a snapshot on one particular
11   date and say, okay, there's $3.8 million worth of cash
12   today, I add that into my valuation.  Because what you
13   are valuing is the ability of the company to generate
14   cash.
15         Now, there's one problem with this at the outset,
16   that this $3.8 million was from a financial statement
17   of October 31, 2005.  It was six weeks after the
18   valuation date.  But it points out the problem of
19   taking a financial statement, one financial statement
20   in isolation, and pointing to $3.8 million that was
21   cash on that day.  Might not have been there the day
22   before; it might not be there the next day.  So prudent
23   valuation requires ignoring what a cash situation was
24   on a particular day, rather valuing the business'
25   ability to generate revenue.  I won't comment on the

1    tax shield because that's out of the case.

2         And then the 3.4 million, which Mr. Aertsen

3    concluded was an asset of the company, were really

4    things that were nonsalable.  They were items that

5    accounting convention requires to be amortized, and

6    Ms. Fannon testified about this on -- and I put the

7    citation to her testimony.  These are things that have

8    to be amortized; they are amounts to be written off;

9    they have prepaid fees.  They have no marketability, no

10   market value whatsoever.  So it is inappropriate to

11   include those as -- as an expense or, excuse me, as

12   revenue.

13        So, Your Honor, those are the errors that are not

14   an exclusive -- inclusive list but I think highlight

15   some of the fundamental flaws in Mr. Aertsen's exercise

16   that should cause this Court to give great scrutiny to

17   his evaluation and to -- and should give the Court

18   great pause as to whether to accept any of it because

19   of a number of what we believe are very fundamental

20   flaws.

21        Your Honor, I'd like to comment finally on some of

22   the things that Mr. Aertsen and the plaintiff have used

23   as support for his opinions.  And much of that has to

24   do with the dividend-paying capacity and future events.

25        The next chart, Your Honor, is capitalization of

dividend-paying capacity.  What Mr. Aertsen did was he took this distributable cash and averaged it and then concluded that at a 59 percent payout ratio First Hartford had $2.4 million of distributable cash on an ongoing basis.  Now, plaintiffs are all over the lot in terms of this distributable cash, because Mr. Newman in his brief stated that -- and -- there was $16 million of distributable cash.  Now, he says there was a mistake, it's really only $13 million.  But the view that the plaintiff has taken of First Hartford's balance sheet and of its operations is that any time there is a -- there is a sum of cash that it doesn't have to go for expenses, it doesn't have to be reinvested, it doesn't have to pay off debt.  It's free cash that can just be distributed.

Now, if you turn to the next slide, Your Honor, I pointed out the previous slide how Mr. Aertsen calculated his cash.  If we take the two-year period 2005-2006 and Mr. Aertsen's opinion that 59 percent of the cash could be distributed, you could see that the total distributable cash, 2005 to 2006, in that two-year period is $3 million.  Now, we maintain that is too high because it ignores corporate expenses, reinvestment, means of debt, but that's what Mr. Aertsen testified to.  Contrast that with the

1    plaintiff's position, contrary to their expert, that

2    there was $13 million of cash that could have been

3    distributed.  That's over four times what their own

4    expert said could have been distributed.

5         Now, this $13 million, Mr. Newman has identified

6    that there was an error made in part of the $16 million

7    which had to do with the Cranston project.  And he's

8    partway there but he still understates the --

9    overstates the amount of cash that actually resulted

10   from the Cranston refinancing.  And if you turn to the

11   next page, Your Honor, I have prepared a chart of

12   Cranston.  And this is -- there are several sources,

13   Your Honor, that the Court can look to to verify this.

14   We refer to it extensively in our valuation reply

15   brief, it's in Ms. Fannon's exhibit, and it's also in

16   P59, which is a 10-K, Pages 29 and 30 lays out the

17   transaction.

18        And what took place with Cranston is Cranston/BVT

19   Associates was owned in -- 50 percent by Cranston

20   Parkade LLC and 50 percent by BVT Associates.  BVT

21   Associates is an unrelated entity.  They refinanced the

22   debt on the Cranston/BVT property and borrowed

23   $36 million.  Of the $36 million, 24,633,000 went to

24   pay off the old mortgage.  There were 2,267,000

25   defeasance costs, leaving a net from the refinancing of

1   $9 million.

2       The $9 million was then used as follows:  50 --

3   excuse me, $6 million was paid to this unrelated

4   entity, BVT Associates, for its 50 percent ownership in

5   Cranston/BVT Associates -- excuse me, Cranston/BVT

6   Associates LP was owned 50 percent by Cranston Parkade

7   LLC and 50 percent by BVT Associates.  So $6 million

8   was given to BVT Associates.  It conveyed its

9   50 percent interest to Cranston Parkade LLC, so that

10  Cranston Parkade LLC then owned the entirety of the

11  Cranston/BVT Associates shopping center.  $6 million

12  goes to pay off BVT Associates, leaving a little over

13  $3 million.  Of the $3 million, one and a half million

14  was distributed to Brewery Parkade, which is an

15  FHC-owned entity, and one and a half million was

16  conveyed to Cranston Brewery LLC, which has no

17  relationship or no ownership of First Hartford.  So the

18  net effect of the entire transaction was that

19  $1.5 million ended up in an FHC entity.

20      It's a little complicated, Your Honor.

21          THE COURT:  I follow it.  I'll need to look at

22  the record.  I guess I don't understand what these

23  unrelated entities are and why amounts went there, but

24  I guess I'll find that from the record.

25          MR. CULLEY:  Well --

```
 1              THE COURT:  I understand why BVT was bought
 2     out, but I don't understand who Cranston Brewery is and
 3     why they got money out of this.
 4              MR. CULLEY:  Cranston Brewery LLC?
 5              THE COURT:  Yes.
 6              MR. CULLEY:  Because it is a 50 percent owner
 7     of Cranston Parkade.
 8              THE COURT:  All right, so the ownership starts
 9     at -- equally divided between Brewery Parkade, Inc.,
10     which is all owned by FHC --
11              MR. CULLEY:  Correct.
12              THE COURT:  -- and Cranston Brewery LLC, which
13     has no ownership by FHC.
14              MR. CULLEY:  Correct.
15              THE COURT:  And no ownership by Mr. Ellis.
16              MR. CULLEY:  Correct.
17              THE COURT:  All right.
18              MR. CULLEY:  So when all is said and done,
19     both Brewery Parkade and Cranston Brewery have
20     increased their ownership in the shopping center at the
21     top of the chart.
22              THE COURT:  Go ahead.
23              MR. CULLEY:  And they bought out an unrelated
24     entity.
25          The next chart, Your Honor, it should be corrected
```

1    because this was just to highlight what would have

2    taken place with FHC had it distributed $16 million, as

3    the plaintiff has said it could.  And if we just change

4    that to $13 million, what that means is, if $13 million

5    had been distributed during the period of time

6    plaintiff said it could have been distributed, then it

7    would have left First Hartford with a negative equity

8    of $13,874,647.  So the height of imprudence, the

9    height of business irrationality to suggest that

10   somehow $13 million was available to be distributed to

11   shareholders when it would have put the company at a

12   significant negative worth.

13        Mr. Aertsen makes much of Edinburg as confirming

14   his valuation of the company as this entity that was

15   going to generate significant revenue for First

16   Hartford and gave him, in his words, great comfort that

17   his analysis and valuation was correct.  And what I've

18   done here is just point out the testimony of

19   Mr. Harding and the testimony of Mr. Aertsen as to what

20   really took place with First Hartford.

21        Mr. Aertsen testified that he wasn't sure what

22   they had but whatever he thought it would have been

23   significant value.  But at the time of the valuation

24   all that had happened is that First Hartford had

25   purchased an option for $50,000.  Mr. Aertsen stated it

1    had been permitted in its preleasing.  Mr. Harding

2    testified, no, they had no permits nor were there any

3    tenants.  Mr. Aertsen testified that if -- in my

4    valuation if all they did was stop after Edinburg they

5    would have made -- more than made the value I've

6    represented here.  Edinburg would have quite a lot of

7    value to a developer.  Mr. Harding testified that First

8    Hartford hoped to break even with respect to Edinburg

9    in a few years to positive cash flow.

10        Finally Mr. Harding responding to Mr. Aertsen's

11   taking great comfort, the situation is scary, retailers

12   are getting more and more scarce, and people who have

13   indicated that they were ready to commit to us have

14   backed away.  We've had no real substantive leasing

15   progress except to Academy in the last year, and we

16   don't see a lot of -- over the next six months.  I

17   think we'll be lucky to sign maybe one or two more

18   leases.  And that's all from Mr. Harding's testimony,

19   which is represented here took place -- can be found at

20   Pages 211 through 216 of the testimony on July 25th.

21        The next chart, Your Honor, Mr. Aertsen believes

22   every option is great.  This just shows from

23   information in the record the number of projects that

24   First Hartford wrote off in 2004 and 2005.  And the

25   purpose of that, Your Honor, is just to demonstrate the

1    uncertainties in these properties and that it's not

2    quite like wildcatting in Texas but there are a number

3    of dry holes that come up when a company like First

4    Hartford is trying to identify opportunities where they

5    might be able to develop and own a property.

6         And finally, Your Honor, I want to point to the

7    next chart, which is -- takes a quote from the

8    plaintiff's brief on Page 20 of how the cash flow as of

9    4/30/07 confirmed Mr. Aertsen's opinion as to the cash

10   flow.  And what he did in this case was take some

11   figures from the 4/30/07 10-K and conclude that as of

12   4/30/07 there was total development income of

13   $3,357,688.  But what he did is he ignored all the

14   G and A costs of the company of some $5 million.  He

15   only used 1.2 million.  So he cherry picked numbers

16   from the April 30th, '07, 10-K to opine that there

17   would be development income of 3.3 million, where in

18   reality there was a negative income because of the

19   G and A costs.  And those are found, Your Honor, on the

20   next page, and I've highlighted in yellow because the

21   numbers Mr. Aertsen uses are adding all the numbers in

22   yellow.  And 3.7 is apparent, the 1.8 million is the

23   service income of 1.1, and then the service -- no,

24   excuse me, and the other income, the next two lines for

25   the 1.8.

1      But what he ignores is the $5 million of general

2  and administrative expense.  And, again, it's

3  representative of what Mr. Aertsen does, which is to

4  selectively go through these financial records, find

5  some items that support an evaluation, without the kind

6  of thorough, complete analysis that a truly

7  comprehensive and accurate business valuation requires.

8      Mr. Groff I think is going to go next, Your Honor.

9      THE COURT:  There's one question I raised at

10  the outset which you haven't addressed nor Mr. Newman

11  actually, and that is the option question which figured

12  into Ms. Fannon's analysis, options that had not yet

13  been exercised as of the valuation date, had not yet

14  vested.  How do you maintain that should be treated?

15      MR. CULLEY:  I --

16      THE COURT:  Why should I -- why should I

17  include them, I guess is the question, or should I not?

18      MR. CULLEY:  Ms. -- I'm sorry, Your Honor,

19  because I haven't focused on this --

20      THE COURT:  Perhaps -- I thought it was

21  Ms. Fannon, somebody referred to the fact that options

22  had been issued to certain employees in management

23  prior to the valuation date but would not vest until

24  after the valuation date.  And there was disagreement

25  among the lawyers and the experts as to whether I

```
 1    should include them in valuing the company in terms of
 2    the outstanding shares.
 3            MR. CULLEY:  Could I take a moment to confer
 4    with my co-counsel here?
 5            THE COURT:  Sure, absolutely.
 6            MR. NEWMAN:  While they're conferring, Your
 7    Honor --
 8            THE COURT:  Let's wait.  I'm sorry, I think we
 9    should wait, unless you need to use the bathroom.
10            MR. NEWMAN:  No, I was going to address the
11    time clock.  I'll wait, Your Honor.
12            MR. CULLEY:  Your Honor, I -- as I understand
13    it now, the McKinsey text says -- requires that they be
14    included, so we believe they should have been taken
15    into account.
16            THE COURT:  All right, thank you.  I think
17    next I should probably hear from Mr. Frank, Mr. Newman.
18            MR. NEWMAN:  Yes, that's fine, Your Honor,
19    except that defendants have now gone over an hour, an
20    hour and five minutes, and I don't know how delicate
21    the time --
22            THE COURT:  Well, we're over but we're going
23    to continue.  Mr. Groff, I'll hear you.  You won't be
24    prejudiced, don't worry.  Mr. Groff.
25            MR. GROFF:  Thank you, Your Honor.
```

1        Your Honor, I obviously know that the purpose of

2   this hearing is to attempt to assist the Court in

3   determining the value and I would suggest coming down

4   to a share price as of September 15, 2005.  I'm

5   speaking on behalf of Mr. Ellis, and his view of all

6   this obviously is a little different than perhaps the

7   company's, and I want to highlight where those

8   differences are.

9        From Mr. Ellis' point of view, if you determine a

10  stock price that is too high, what you will do is you

11  will obviously hurt Mr. Ellis.  But Mr. Ellis has given

12  his life to this company, and you will hurt every other

13  shareholder, other than Mr. Kaplan's 145,000, if this

14  company is forced to overpay.

15       But even more importantly to Mr. Ellis, he's had

16  employees for a long, long time.  And if you set a

17  share price too high, there is no way in his view that

18  these employees are going to be able to continue

19  where -- as they're continuing now, and I think that's

20  what's making him lose sleep.

21       Now, this is a public company, and that makes it

22  very different.  You had some issues about if Nancy

23  Fannon was looking at reported figures or what was

24  being reported or talking to management.  There are

25  very different requirements with a public company on

1    management and their reporting than a small, privately

2    held company.  They have SEC issues; they have all

3    sorts of compliance issues.  And so, from Mr. Ellis'

4    point of view, the fact that the 10-Ks can't be relied

5    on or what management is saying can't be relied on

6    strikes him as a double standard because it's very --

7    he believes that he has all these fiduciary

8    responsibilities and there's more checks and balances

9    in a public company than conceivably on a small,

10   private company.

11         THE COURT:  Well, let me just be clear.  I

12   didn't challenge the 10-Ks.  What I said is that in the

13   absence of evidence about what was told to the person

14   doing the reappraisals or told to the person who was

15   doing the tax value, given these circumstances, that

16   leaves me with questions that the record doesn't reveal

17   in a circumstance where there's self-interest at work,

18   notwithstanding whatever the requirements might be.

19         MR. GROFF:  Well, I understand, Your Honor,

20   and we would have to go through specifically one by one

21   that we're not doing here today.  But I would suggest

22   to you, when you look at Ms. Fannon's report, she very

23   rarely ever took anything at face value.  Nancy Fannon

24   spent more time looking at this company and the records

25   of this company and talking to numerous sources as --

1    at this company than anyone could possibly expect.

2            THE COURT:  Go ahead.

3            MR. GROFF:  Now, Your Honor, I'm not going

4    to -- because I'm going to try very hard not to repeat

5    anything anybody else has said.  Mr. Ellis certainly

6    believes that this case has been going on a long time

7    with -- for very specific personal reasons.  He thinks

8    it's very important that this Court understand that

9    Judge Gordon, as you're aware, after extensive

10   litigation, only ordered prospective relief and that

11   the company has complied with that order, that Justice

12   Gordon only ordered, when it came to the legal fees,

13   one-eighth of what was requested because most of the

14   things that were contended in that suit Judge Gordon

15   found didn't happen.

16       Now, Mr. Ellis believes that that suit is

17   illustrious of our current situation where what has

18   happened is that there have been numerous theories and

19   incredible reaches by the plaintiff to try to come to

20   some large number, and it's the same style of

21   litigation of just throwing things against the wall and

22   seeing what sticks rather than a measured attempt to

23   value the company.

24       Now, you obviously don't start this determination

25   of valuation with a clean slate.  You have already made

1    some findings of fact that relate to this valuation.

2    You've found specifically that in the early '80s FHC

3    was in poor financial condition and filed a Chapter 11

4    reorganization in '81.  You found that FHC emerged from

5    Chapter 11 in 1987 with a negative net worth of

6    $6 million.  You found that -- as a fact that Mr. Ellis

7    nursed FHC back to profitability and often used his own

8    funds and credit and personally guaranteed FHC debt.

9    And you found already in this case as fact that the --

10   that by the year 2000 there was a market for FHC shares

11   and the stock price since has trended upward, tracking

12   the company's viability.

13        Now, plaintiffs have contended that market price

14   is meaningless for valuation purposes here.  You have

15   asked specific questions about Mr. Riddiough.  It is

16   Mr. Ellis' view that there is not a specific number of

17   picking the 3.25.  The reason that stock -- the stock

18   measurement is important is that that gives a range.

19   And, as the Court knows, after that 3.25 there was a

20   block sold, within a week later, down 50 cents.  But it

21   certainly has relevance and should be considered.

22   Now --

23            THE COURT:  Do you want to deal with the

24   minority aspect that I questioned your colleagues on?

25   If I use the stock value would I have to take into

```
 1     account that it reflects a minority discount?
 2              MR. GROFF:  Well, that's an interesting issue,
 3     and I'm not prepared in this particular case to say
 4     that, because Mr. Ellis owns 43 percent of this
 5     company.  And what happens then is, where there would
 6     be in this particular case the record shows, that there
 7     is higher price paid for individual shares than there
 8     are for blocks.  And if you're suggesting that what
 9     would have to happen is for the minority share to be
10     adjusted, the whole company would have to be bought
11     out, well, that's an issue that really is going to take
12     some thought because Mr. Ellis has all sorts of
13     guarantees, he's put on notes because they want the
14     active person that owns 43 percent to have a stake in
15     what happens with loans.
16              THE COURT:  Let's not get too far afield.  I
17     was only dealing with Professor Riddiough's analysis
18     that said the stock value reflects minority discount.
19              MR. GROFF:  And I understand what Professor
20     Riddiough said.  He was speaking on behalf of the
21     company.  Mr. Ellis just doesn't believe that.
22              THE COURT:  Okay.
23              MR. GROFF:  And -- for the reasons that I was
24     just explaining.
25              THE COURT:  Okay.
```

1          MR. GROFF:  Now, in the plaintiff's valuation

2    post-hearing brief, they say that the market price has

3    no relevance because FHC has a long history of Ellis

4    family control and oppression of minority shareholders,

5    as confirmed by one -- only one dividend of 10 cents in

6    20-1/2 years and that the shareholders cannot compel

7    Mr. Ellis to make further distributions to

8    shareholders.

9          Now, of course, this Court has already found as a

10   fact that there's no evidence the stock is thinly

11   traded as a result of the oppression that this Court

12   found.  This Court has already found that the risk in

13   owning a minority interest in a small public company is

14   that the shares may be difficult to sell.  But let's

15   look at this and try to address about this dividend

16   issue that they've raised and this whole concept of the

17   stock is depressed because Mr. Ellis won't distribute

18   money out of the company.

19         Well, you've already found that the stock has gone

20   upward since 2000 and it tracks the company's financial

21   viability.  I'd like to -- I have one chalk and only

22   one, Your Honor.  And I think you have a copy yourself;

23   it was in the package I think that Mr. Culley gave you.

24          THE COURT:  Yes.

25          MR. GROFF:  It's First Hartford total return

1     over the years.

2          THE COURT:  Yes.

3          MR. GROFF:  Now, what's interesting here is

4     let's compare stock price to stock price at different

5     times and the company's performance.  Well, what's

6     fascinating is that we would all -- and the Court I

7     think has already found, coming out of the early days

8     when there's $6 million in debt, the share price is

9     31 cents, you can make it 29, you can make it whatever

10    you want, but it's a -- it's -- I think you found that

11    it's relevant and rational that coming out of those

12    early years with a 6 million dollar negative equity

13    that the stock price was low.  And there's nothing --

14    nothing to dispute that that was appropriate.

15         Well, then if you look at Mr. Ellis' stewardship

16    over the years and you look at how the relationship

17    between liabilities, how much they exceed assets,

18    because it goes down, you will see that the stock

19    trends up.  And in fact what's fascinating is that, if

20    you take this period of time, the stock price goes up

21    739 percent at this valuation that the market's made,

22    which is a cumulative return of 24.9 percent a year.

23         Now, let's take what Mr. Aertsen says.

24    Mr. Aertsen says that the value now, if you take his

25    value of what he -- of what he says, that would have

1    this company go up in value 5,048 percent, a cumulative

2    return of 63.3 percent a year.  I would suggest to you,

3    Your Honor, that this alone causes plaintiff's report

4    and opinions not to pass the straight face test.  This

5    would be unbelievable.  Look at the return that

6    actually happened on the stock, and you can see in the

7    box on the right side of what happened, and that's

8    astronomical.  You take Mr. Aertsen's valuation and

9    it's just incredibly unrealistic.

10        Now, the other thing that is crazy about dividends

11   is this Court has had discussions about the fact that

12   Mr. Aertsen -- Mr. Ellis had a bonus.  And I would

13   suggest -- I would ask the Court to go back and look at

14   the 10-K that discusses that at Plaintiff's 124 and

15   think about -- think about what was actually going on.

16   There were long-term employees that salary had been

17   frozen for years.  There was a million dollars in

18   bonuses and, yes, 400,000 went to Mr. Ellis, but what

19   happened is the -- the money went -- the rest of the

20   money went to long-term employees which, rightly or

21   wrongly, Mr. Ellis cares dearly about and believed that

22   they stuck with him in the hard times at below market

23   rates, and he stretched and did this.

24        Now, what could have Mr. Ellis done?  Well, he

25   could have taken that one million dollars and paid a

dividend, and the theory is that that shows that he's

just trying to gyp the shareholders.  Well, if he had

done that, what the Court needs to understand is

$430,000 would have gone into his pocket, and when it's

dividends there's a 15 percent tax rate, not what --

not the tax rate on earnings but a 15 percent tax rate.

And he would have been better off doing that than he

would have been by paying the bonuses.  But his

employees wouldn't have gotten the money.  And he was,

rightly or wrongly -- and I think it's certainly within

his discretion -- felt that the company in large part

succeeded because of the employees.

Then let's take -- let's take the next scenario

that makes even less sense, that plaintiffs are

complaining that the 16 million, now 13 million, which

of course would have produced a negative equity for the

company, but they're saying, see, that should have been

distributed to shareholders.  Well, what would have

happened if the 16 million was distributed?  Almost

$7 million would have gone right to Mr. Ellis.  Again,

only 15 percent tax rate, more money than he's ever

going to see out of this company, now, that would have

been a case.  But to have that be their position of why

there is all this value locked into this company that

can't be tapped because of Mr. Ellis' management, it's

1     just wrong.

2          And, in fact, the other thing that's incredibly

3     wrong is, if you look at Mr. Aertsen's deposition,

4     Mr. Aertsen's position is that, to cash out on one

5     shareholder, that he -- he -- that shareholder

6     shouldn't pay any transaction costs.  Now, where the

7     company is supposed to get the money to cash people

8     out, I don't know.  But I -- and the deposition goes

9     more along the lines when you read it, well, how can

10    that be?  I mean, your person that you're opining for

11    doesn't pay their share of the transaction costs?  What

12    about -- what about Mr. Ellis' guarantees, what about

13    all the other shareholders?  Now, all the other

14    shareholders, including the shareholders represented by

15    Mr. Frank, under their theory they pay all the

16    transaction costs and Mr. Kaplan just skates with the

17    gross.

18         Now, I don't want this presentation to leave you

19    with the impression that all Mr. Ellis wants you to

20    take into consideration is the stock market price.

21    Mr. Ellis believes that Ms. Fannon knows that business

22    as well as anybody could possibly know it.  I stated

23    before to you, Your Honor, in this trial that

24    Mr. Ellis, and the record is clear, cooperated

25    completely, made sure this company cooperated

1   completely, and gave everybody access to records.

2   Mr. Ellis is of the firm belief that the market price

3   is relevant and -- but Mr. Ellis is also of the firm

4   belief that when you really look at the finances and

5   the various methods -- and remember, Nancy Fannon

6   didn't just use the stock market, her market value

7   consisted, that method, consisted of three different

8   measurements, one of those measurements being

9   attempting to find companies that could be sold in

10   toto.  So I would ask the Court to look at that whole

11   section of Nancy Fannon's --

12          THE COURT:  I will.

13          MR. GROFF:  Mr. Ellis on behalf of the

14   employees asks you to really think about this company.

15   He believes -- he wants this company to continue, his

16   employees want this company to continue, and all the

17   other shareholders want this company to continue.  He

18   will do everything he can to have this company

19   continue, but obviously now all -- he understands that

20   now whether this company can continue will rest in your

21   hands exclusively, and he asks -- and I know you

22   will -- that you very carefully analyze the testimony

23   of the experts and also consider what Mr. Ellis asked

24   me to tell you this morning.  Thank you.

25          THE COURT:  Thank you, Mr. Groff.  Mr. Frank.

1          MR. FRANK:  Thank you, Your Honor.  I hope to

2    be less than six minutes.

3          THE COURT:  Who's counting.

4          MR. FRANK:  Just to review, my clients are

5    Joel Lehrer, who has 885,000 shares, and those were

6    open market purchases, and John Filippelli, who has

7    264,000 shares of First Hartford, also open market

8    purchases, and Mr. Paolino, who has 11,000 shares.  Our

9    capacity here is as amicus.

10         This is an equitable proceeding, and our position

11   is -- as friend of the Court is to suggest that a

12   remedy that the Court ultimately adopts and enforces

13   here has to be equitable not only to the parties but to

14   all shareholders.  We think that's the nature of the

15   proceeding, and we think also the statute that the

16   Court has invoked requires that, referring to Section

17   1434(3) of Title 13-C of the Maine Revised Statutes,

18   which says that when the Court chooses an option

19   afforded by the statute other than dissolution, that

20   other option should be granted, quote, when that relief

21   would furnish greater protection to the interest of

22   creditors and shareholders than would dissolution.

23         In the Court's original findings of fact, Docket

24   No. 81, it asked counsel to address a number of

25   questions about the impact of various remedies on other

1    shareholders.  I'm referring to Pages 46 through 48 of

2    Docket No. 81, when the Court asked whether or not the

3    proposed independent receiver, how that would affect

4    the interests of the 800 or more other shareholders or

5    how an injunction might affect the other shareholders,

6    and in fact it asked counsel to address whether or not

7    there should be notice to all other shareholders of

8    their right to intervene in the proceeding.  I think

9    the Court is very much aware that it needs to take into

10   consideration the interests of minority shareholders in

11   this case that are not parties before the Court.

12        Our position as amicus is that equitable

13   consideration should be brought to bear in two

14   immediate contexts, first in the valuation exercise and

15   then second what is done with the valuation.  With

16   respect to the valuation exercise, the point that we

17   made in our amicus brief, and which I will only restate

18   and I don't think requires defense, is that the Court

19   in cases of uncertainty should err on the side of being

20   conservative so as not to injure the interests of

21   minority shareholders.  If the Court were to do

22   otherwise, it could threaten to dilute the interests of

23   minority shareholders.

24        The second point which I want to give a little bit

25   more attention to is how the Court deals with remedy in

```
 1    light of the order that it issues with respect to
 2    valuation.  Once the Court does set a valuation for
 3    Mr. Kaplan's shares, I think it will have to still ask
 4    itself whether a buyout and whether a buyout of his
 5    shares as of September 15th, 2005, is still an
 6    equitable remedy under the circumstances, in the words
 7    of the statute, whether or not it would furnish greater
 8    protection to creditors and shareholders than would
 9    dissolution.  And as part of that exercise, I think the
10    Court will be asking itself the question and ultimately
11    may be asking counsel to address this question, will
12    the buyout at the Court-determined price require the
13    sale of First Hartford assets at distress prices in
14    order to make it happen?  Will it force a liquidation
15    or bankruptcy of the company?  And if the latter were
16    to give unfair preference to Mr. Kaplan over all of the
17    other minority shareholders because it would elevate
18    him to the status of creditor, whereas the other
19    minority shareholders would still be treated as
20    shareholders.
21         The second major question I think that the Court
22    should address again either in its order or by
23    requesting the parties to address it in following the
24    order is whether any of these effects can be avoided by
25    conditions or terms in the buyout.  We had suggested in
```

1    our amicus brief that under the Model Business Act it

2    is possible to establish a payout term.  And we think

3    the Court has the power under Maine law, using the

4    example of the Model Business Act, to go ahead and

5    extend the time for payment of the buyout.

6         And finally I think the Court would want to

7    address whether or not all shareholders should have the

8    same rights.  That was the way that the complaint was

9    originally presented in this Court.  I think it is

10   raised again on the issue of whether or not the Kaplan

11   trusts or other members of the Kaplan family should get

12   the same relief that the named plaintiff, Richard

13   Kaplan, does.  My client's position, and I think all

14   minority shareholders would want to take the position,

15   that certainly they should be treated no less favorably

16   than the other Kaplan interests here.

17        Your Honor, those are the only points I have.

18             THE COURT:  Mr. Frank, I appreciate your

19   appearance as amicus, but let me address you on a

20   couple of these, if you're authorized to answer them.

21   Obviously I will -- I am concerned about the equity of

22   the situation, but what practically are you suggesting?

23   Are you suggesting that once I identify a value that we

24   reopen the record to take in new testimony and evidence

25   about how this will be paid for, how the sale will take

1  place if there is, whether liquidation's appropriate,

2  whether there's to be a payout?  Do I at that point

3  invite all the other shareholders to intervene?  As you

4  know, this is already a little bit like *Bleak House*.

5  What is it you're proposing?

6          MR. FRANK:  I think the Court should ask the

7  parties and the amicus to address those points and

8  address them very short order following your ruling.  I

9  don't think I could stand here right now and tell you

10  what the Court should do unless we really know what the

11  number is.

12          THE COURT:  And what -- you've said that you

13  think all the shareholders should be entitled to

14  whatever relief goes to the individual; is that

15  correct?

16          MR. FRANK:  I think -- yes, I think that is

17  correct, and that may mean dissolution.

18          THE COURT:  I understand.

19          MR. FRANK:  That may be the only way to make

20  sure that the remedy is not -- is not preferential as

21  to some shareholders.

22          THE COURT:  And you think that would be

23  determined based upon, what, new evidence as to the

24  value of the company now versus the buyout?

25          MR. FRANK:  Yes, and possibly also what would

1    have to be liquidated in order to fund the buyout.

2              THE COURT:  All right.  Thank you.

3              MR. FRANK:  Thank you, Your Honor.

4              THE COURT:  Mr. Newman.

5              MR. NEWMAN:  Your Honor, I would request just

6    a very brief recess now, three or four minutes, so I

7    have a chance to --

8              THE COURT:  How long do you think you need?

9              MR. NEWMAN:  What I'll do is take the

10   15 minutes I requested and sculpt it down to --

11             THE COURT:  Very good.  We'll take a

12   five-minute recess and then return, thank you.

13                   (A recess was taken.)

14             THE COURT:  Five minutes is up and passed.

15   Well, Mr. Nolan's here, Mr. Newman, so I'll let you

16   start.

17             MR. NEWMAN:  Your Honor, I'd asked for the

18   recess in order to have an opportunity to confer with

19   my clients to address with authority a question the

20   Court had raised earlier.  Whatever the law may be in

21   terms of how a remedy of buyout goes, whether it's

22   binding on both parties or one way, as I suggested I

23   thought the law was, I want to represent to the Court

24   that I have conferred with my clients, Richard and

25   David Kaplan, and I have authority to represent that

1    Richard Kaplan and David Kaplan and all of the Kaplan

2    family trusts already identified in the record for

3    which they have control want disentanglement, want a

4    clean break, and would accept whatever the Court's

5    determination is for the fair value of the shares of

6    First Hartford Corporation in a buyout.

7            THE COURT:  Thank you.  Go ahead.

8            MR. NEWMAN:  To address some of the points

9    raised by defendants of the various counsel, on the

10   issue of stock options, both the McKinsey text and

11   Mr. Aertsen's opinion were that the stock options

12   should not be considered at all in the valuation

13   because as of the asset valuation date they had not

14   vested.  And so the Court had raised the question with

15   other counsel, had not addressed it with us.  That's

16   clear from the McKinsey text, clear from common sense,

17   I believe.  But anyway, that's our position, Your

18   Honor, is that, because they had not vested, they don't

19   bear on the valuation as of the valuation date.

20       In terms of the lengthy slides presented by

21   defendants, we simply don't have time or ability to go

22   through each of those, except for one point, and the

23   only reason we can respond to that is because it was

24   actually raised in their reply memorandum.  And it's

25   one I do want to address, Your Honor, because I think

1    it's emblematic of some of the assertions and

2    criticisms we've had to face.

3        Both in the First Hartford company reply

4    memorandum as well as the slides presented by

5    Mr. Culley, they contend that Mr. Aertsen was

6    completely careless and erred because he used the

7    figures for general and administrative expense as

8    reported in the 10-K for 4/30/2005, that they were in

9    fact restated in 2006 and he should have used those

10   figures.  So I want to take a moment to look at those.

11       I'll walk over here to the overcam.  For the --

12   let me get this up so we can see.  This is the --

13   looking at Plaintiff's 116, is the 10-K for 4/30/2005.

14   I don't know if it's going to be legible up here, Your

15   Honor.

16            THE COURT:  You can enlarge it, you can zoom.

17            MR. NEWMAN:  Let's see if we can zoom in on

18   this.  Okay.  Just get the one year.  I don't think I'm

19   going -- I'm not going to read the figures, Your Honor.

20   But anyway, looking at the 4/30/2005 10-K, which is

21   Exhibit Plaintiff's 116, these are the figures

22   Mr. Aertsen used, and there's a line item for general

23   and administrative expenses.  And for 2005 you can see

24   that that figure was 1,782,000, and for 2004 it was

25   1,326,000.  And defendants argued in their reply, oh,

1    no, no, that was complete error and carelessness by

2    Mr. Aertsen, because if you turn to the 10-K for

3    4/30/2006, which is Plaintiff's 120, you see the

4    numbers were restated.  And they argued and they used

5    the term that the general and administrative expenses

6    were restated and they were much higher and would wipe

7    out all the income -- development activity income

8    revenue Mr. Aertsen had projected.

9        But if you look at the 10-K for 4/30/2006, which

10   is Exhibit P120, only the year 2005 was restated.  2004

11   wasn't restated at all.  The numbers -- it's reported

12   that there's been no correction or change.  What

13   happened was there's a -- the complete change on the

14   line item, and there's no more -- there's no longer a

15   line item for general and administrative, it's for

16   selling general and administrative, and all the numbers

17   go up because there's a new category and it's a

18   reclassification.  It's not the same -- it's not

19   comparing apples to apples.  And so even 2004 where

20   there was -- doesn't say restated, it only says 2005 is

21   restated, even in 2004 there's a dramatic jump in that

22   number because there's an additional category of

23   selling added.

24       So it's a completely false criticism of

25   Mr. Aertsen.  There would be no reason or ability to

1    use the 2006 numbers as stated there because it's a

2    different line item all together.  Mr. Aertsen used all

3    the expenses from the 10-K for all of these years as

4    reported in 2005.

5         And that's the level of detail it takes to show

6    the false criticism.  And that's the only one we can

7    respond to because that one was addressed in the reply

8    memorandum.  The rest we just have no opportunity to go

9    through the numbers.  That's completely groundless for

10   that reason.  I wish I could have blown it up on the

11   screen, but it's easy for the Court to see.

12        I want to return to I think the legitimately

13   difficult issue the Court had raised early on about the

14   net asset valuation.  If the theory is a hypothetical

15   sale to a third party, the Court raised the question,

16   well, why don't we have to deduct for capital gains

17   taxes and transaction costs.  And hearing the arguments

18   of counsel, it prompted me to try to capture that.

19        The theory is the sale to a third party, if

20   there's a purchase of all the stock, just as if the

21   company keeps continuing, the assets themselves are

22   available to the owner of the company to be -- to

23   access the value whenever they please.  That could be

24   with an orderly sale of properties over time or they

25   may negotiate away the sales costs or may sell at a

1    time when, given their operating costs and deductions,

2    they won't have any, they won't incur the capital gains

3    tax, just as First Hartford's been able to do so far

4    with sales of Mt. Olive, sales of Bangor Parkade.  So

5    there's the stock purchase.  The value of the assets is

6    the proper value of what the company's worth, and the

7    new owner will have that value.  Particularly in a real

8    estate company also the owner with control can access

9    the value without sale at all simply by refinancing and

10   taking the equity out, as real estate owners do all the

11   time.

12        The First Circuit seems to have adopted that, and

13   that's the Bogosian decision, which frankly neither

14   party addressed at any great length, but I believe the

15   First Circuit's ruling in Bogosian was that there

16   should be no deduction for capital gains or sales tax

17   in the asset valuation unless and until there's a plan

18   for a sale to fund the purchase.  And if we follow not

19   only the First Circuit decision but then what the Rhode

20   Island District Court did afterwards, that's how it

21   played out was that only the transaction or sales costs

22   actually occurred under the plan.  We have the plan, we

23   don't have the valuation yet, so we don't have a plan

24   for the acquisition.

25        But we do have an opportunity for -- to avoid any

1  adverse consequence to any of the shareholders and the

2  company, and that's by ordering the oppressor to make

3  the purchase or, if the plan produced by FHC shows a

4  certain amount of adverse consequence, to order

5  Mr. Ellis to pay whatever that adverse consequence is.

6  We already have findings by the Court that, for

7  example, the 400,000 dollar bonus was a self-dealing

8  transaction that Mr. Ellis could not show the fairness

9  of.  There are other issues out there of cash in the

10  Court's findings already, as well as the -- who's the

11  source of the oppression.  And if, as the amicus point

12  out, there may be adverse consequences to shareholders

13  when we have a valuation and there is an order for a

14  purchase, we need a plan from FHC; and, if the plan

15  shows adverse consequences, that could be remedied in

16  this equitable proceeding by order that Mr. Ellis pay

17  that consequence.

18      That actually takes us to the comments of

19  Mr. Frank that somehow we have to look further at

20  possible dissolution or liquidation depending upon

21  impacting value.  As I indicated before, I have

22  authority to represent all the Kaplans want a complete

23  break and disentanglement, but I would call the Court's

24  attention to the ruling on remedy which provided that,

25  if First Hartford complains that they can't afford the

1    purchase, can't afford the buyout, or that Mr. Ellis in

2    turn then persuades the Court that he cannot and the

3    Court's forced to go to dissolution, as now being

4    suggested as a possibility by Mr. Frank, that the Court

5    would nonetheless order Mr. Ellis to pay the

6    differential.  And I think that, given the fact that

7    Mr. Ellis completely controls exercising peremptory

8    control over First Hartford, he's in every position to

9    control how First Hartford would develop a plan for

10   making that acquisition.

11       Finally I would suggest, Your Honor, we're not

12   arguing now for the order to address all minority

13   shareholders, but that is relief that we asked for.

14   And, frankly, if the Court determines as a matter of

15   equity that the buyout remedy should be awarded to all

16   shareholders that -- for my clients, I would ask for an

17   opportunity to be heard on petition for attorneys' fees

18   because that would be a common benefit to all minority

19   shareholders and for which this cost of litigation Your

20   Honor order the company pay those fees.  But I think we

21   are jumping ahead.  These issues were invited by

22   amicus, but I think they probably should be addressed

23   after we have the valuation.

24       Mr. Groff addressed at some length the stock

25   market price.  The Court had raised an issue as to --

1    well, first of all, a stock market price by definition

2    incorporates the minority discount, and it's Professor

3    Riddiough who had subtracted it, so at least there's

4    one person who's identified some amount for minority

5    discount.  Of course, you'd have to add that back up if

6    you were going to use the stock market price at all.

7    But what wasn't addressed was the other discount, the

8    other type discount for lack of marketability, and the

9    evidence in the record was one of extreme liquidity for

10   the stock.  We went through it on the liability trial

11   but also again in valuation and addressed extensively

12   in our submission is that so few trades so infrequently

13   with such low volume, to discharge the Kaplan shares it

14   would take anywhere from 10 to 15 years on that

15   discount also.  There's nothing in the record for it.

16       Some of the Courts have found that, even if

17   applying the Delaware block approach, if trading is so

18   thin or such low volume, even putting aside the

19   minority discount issue, the Court -- the stock market

20   price could be disregarded all together.  Here we have

21   not only lack of marketability with an extremely

22   illiquid market but we have a steep discount for

23   peremptory control and oppression.  And I think those

24   factors would leave the Court, although not preclude

25   the Court as a matter of law from considering the stock

1  market price, but argue strongly in favor of giving it

2  essentially no weight, literally no weight.

3       Just a moment, Your Honor.  Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. Newman.  We're

5  reaching the end of the road, counsel and the parties

6  who I see are present, so let me just say a few things.

7       One, after I leave the courtroom I want the

8  lawyers to assemble with the clerk and to set up an

9  expedited briefing schedule to follow my ruling on

10 value.  You had raised that with me earlier that we

11 would need such a schedule in terms of ability to pay

12 on behalf of the corporation or Mr. Ellis.  There's now

13 some other issues that have been raised by the

14 appearance of Mr. Frank on behalf of the amicus.  I

15 don't want that to drag on.  I want it to be a short

16 briefing schedule as to what I should do in light of

17 the value that I find.

18      A couple of comments about what I've heard here

19 this morning, and obviously I'll issue a written

20 decision.  Mr. Newman has clarified the question of

21 what relief is appropriate.  He agrees here on behalf

22 of his clients that it is mandatory, not a one way.

23 There's still open the question of who is entitled to

24 the relief.  I will say to you candidly that I had

25 thought all along we were talking about all the Kaplan

1    interests, and I will have to go back through the

2    record to see whether that has been everyone's

3    assumption or whether it's been limited simply to

4    Richard Kaplan alone.  But I was surprised by that

5    assertion or argument.

6        I think what's most important here is what I said

7    to you at the beginning, and the arguments have been

8    thoughtful and well presented and I appreciate them.

9    But at the end of the day it is still the case that I

10   know I'm not going to agree with any one of the three

11   experts.  It's going to be somewhere in between.  And

12   many of the reasons have been laid out here during the

13   arguments on one side or the other as to what the

14   problems are with each one of the three experts and

15   what the Court's role is to try to find that position

16   which fairly represents the company's value.

17       I'll say to you again, as I have before but it's

18   more pressing now, once I decide it, it's decided.  Of

19   course, I can be reversed but, quite candidly, in this

20   kind of an area there's a lot of discretion, and so I

21   think your appellate opportunities are fairly limited.

22   And so I say again to your clients, you can gamble on

23   what Judge Hornby will do and see whether it favors

24   your position or your opponent's or you can come to a

25   decision where you know what it is and you know what

1    the consequences are and you aren't paying the risk and

2    also stop the bleeding of legal fees on both sides,

3    which will go forward.  Because if I make a decision

4    we're going to have further briefing as to then whether

5    it can be paid for and who can participate and how all

6    of that should be structured.

7        I'm not going to decide this tonight.  I've been

8    working on it with my law clerk with all your materials

9    over the past several weeks.  And you can tell, I

10   think, going in that I've been studying the experts'

11   opinions.  And it will be somewhere there, I'm not

12   going to say in the middle, I don't mean it to be

13   anything like that, but somewhere among them is where

14   it's going to end up.  And I can't tell you where it is

15   and you don't know where it is, but you could agree to

16   where it should be.

17       And so I thank you all again for the very careful

18   presentations, for the thoughtfulness of it.  I

19   encourage your clients that -- I know what a bitter

20   dispute this has been, I know there's been history here

21   which can never be overcome or overlooked, and yet at

22   the end of the day it's still money that's going to be

23   the outcome here, and I suggest it's better within your

24   control than within my control, particularly because,

25   even though I don't think an appeal would be

1    successful, it can still be taken, and so there can

2    still be more expenses and attorneys' fees that go on

3    thereafter.

4         So I urge you once again, think about it.  I'm

5    going to proceed to decide the case.  It will take a

6    little while to write up, but it won't be as long as in

7    the past because, although the concepts are technical

8    and difficult, the actual decision part of it here is

9    not nearly as difficult in what takes place.  So I

10   think you should probably expect a decision within the

11   next couple of weeks.  And I urge you to use that time

12   in the interim to preempt it because then you have a

13   final outcome and you know where it is.

14        So thank you again.  I'm going to recess, but

15   counsel, visit with the clerk, come up with a proposed

16   expedited briefing schedule and remaining questions.

17   Thank you.

18                  (Time noted:  1:13 P.M.)

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2    I, Lori D. Dunbar, Registered Merit Reporter, Certified

3    Realtime Reporter, and Official Court Reporter for the

4    United States District Court, District of Maine,

5    certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7    Dated:  February 17, 2009

8                    /s/ Lori D. Dunbar

9                    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25