# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 05-144-B-H |
| | ) | |
| FIRST HARTFORD | ) | |
| CORPORATION AND | ) | |
| NEIL ELLIS, | ) | |
| | ) | |
| DEFENDANTS | ) | |


## FINDINGS OF FACT AND CONCLUSIONS OF LAW PART 2:  VALUATION[1]

The current issue I must decide in this corporate oppression case is a Maine corporation's value on September 15, 2005.  The pertinent Maine statute instructs me to determine "fair value."  13-C M.R.S.A. § 1434(2)(A).  The Maine Law Court has not interpreted that particular provision, but it has interpreted the identical language in Maine's appraisal rights chapter (title 13-C, chapter 13 of the Maine statutes), available to dissenting shareholders.  In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997 (Me. 1989); In re Valuation of Common Stock of Libby, McNeill & Libby, 406 A.2d 54 (Me. 1979).  I rely on that interpretation, as do the parties.

---

[1] I conducted a bench trial on valuation on July 24-25, 2008.  By the parties' agreement, Magistrate Judge Rich presided at the taking of additional testimony from the experts on September 24, 2008, and I have read that entire transcript and examined the exhibits from all the proceedings.  I held oral argument on the parties' post-trial submissions on February 11, 2009.

Under Maine law, "[t]he question for the court becomes simple and direct: What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety?" McLoon, 565 A.2d at 1004.  The Maine Law Court instructs that there is to be no discount for minority shares, or for lack of marketability.  Id. at 1003.  The Law Court also has specified that the determination of value is not subject to "hard and fast rules." Libby, 406 A.2d at 60.[2]

The company here, First Hartford Corporation ("First Hartford" or "FHC") manages real estate development properties, primarily neighborhood or strip malls, through a number of subsidiaries.  First Hartford Corp., Annual Report (Form 10-K) (Aug. 15, 2005) (Pl. Ex. 59).  It owns both entire and partial interests in such developments.  Id. at 3-4.  Through its subsidiaries it holds and manages most of its properties for their income potential.  Id. at 2.  But some it purchases and/or develops with a view to income and/or sale.  Id.  Although it is a publicly held corporation, it is traded only thinly on the Pink Sheets,[3] and in some respects

---

[2] The appraisal rights chapter actually defines fair value, including a provision that it is to be determined "[u]sing customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal" and "[w]ithout discounting for lack of marketability or minority status" (with some inapplicable exceptions).  13-C M.R.S.A. § 1301 (4)(B)-(C).  As to the first, although I use "customary and current valuation concepts and techniques," I cannot say that they are "generally employed for similar businesses in the context of the transaction requiring appraisal" because the remedy here (compelled purchase falling under the chapter for judicial dissolution) is so unique.  In any event, business valuation is no longer limited by the old Delaware Block method, whereby the judge had to assign a percentage weight to the value arrived at by each of three approaches.  See Weinberger v. UOP, Inc., 457 A.2d 701, 712 (Del. 1983) (finding Delaware Block "outmoded"); In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997, 1003 (Me. 1989) (permitting it but no longer requiring it in Maine).
[3] "Pink Sheets" refers to a financial service that reports information about over the counter securities trading and issuers.  Pink Sheets: History of Pink Sheets, http://www.pinksheets.com/pink/about/history.jsp (on file with the Clerk of Court).  The domestic companies listed on the Pink Sheets "tend to be closely held, extremely small and/or thinly traded."  U.S. Sec. & Exch. Comm'n, Pink Sheets, http://www.sec.gov/answers/pink.htm (on file with the Clerk of Court).

it behaves much like a closely held corporation.[4]  Although it has some similarities to a Real Estate Investment Trust (REIT), there are also many differences (*e.g.*, structure; tax status; requirements as to distributing profits; more focus on developing properties for sale).  In a word, this is a difficult business to value.

At a bench trial, the parties presented opinion evidence on fair value from three experts.  Not surprisingly, the three experts disagreed with each other's opinions and/or methodologies.[5]  The defendants challenged the plaintiff's expert witness altogether under <u>Daubert</u>.[6]  Defs.' Valuation Post-Hr'g Br. at 18 (Docket Item 182).  I reject the <u>Daubert</u> challenge to both the testimony and the associated exhibits.  This is not the stuff of ordinary expert testimony, involving physics, engineering or medicine.  According to the Maine Law Court, the determination of fair value is "more akin to an artistic composition than to a scientific process."  <u>Libby</u>, 406 A.2d at 60.  My search here is for what a third party would pay for this entire company.  <u>McLoon</u>, 565 A.2d at 1004.  Each of these witnesses has the credentials and experience to speak to that issue, the plaintiff's witness through practical experience (both as a lender to, and purchaser of, businesses involving real estate), and the defendants' witnesses through study, training, writing and prior expert testimony.  Moreover, I sit here as a judge, not a jury.  Mistakes,

---

[4] See my earlier opinions in this case concerning how the company has been managed.  Nancy Fannon, one of First Hartford's experts, testified that she treated it as a closely held company for her valuation.  Videotape Testimony of Nancy Fannon, Continued Valuation Hr'g Tr. 15, Sept. 24, 2008 ("Fannon Continued Valuation Hr'g Tr.") (Docket Item 171).  But First Hartford's other expert, Timothy Riddiough, did not. Expert Report of Timothy J. Riddiough at 6 ("Riddiough Expert Report") (Def. Ex. 45).

[5] <u>E.g.</u>, Fannon Continued Valuation Hr'g Tr. 44-45 (disagreeing with Riddiough on his income approach); <u>see</u> <u>also</u> <u>supra</u> note 4.

[6] <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), imposes requirements on the acceptance of expert testimony.

3

omissions, inconsistencies or failure to follow appropriate methodology (and there are some) will affect the weight I give to their respective analyses and conclusions.

I do not decide the corporation's fair value based upon burden of proof or failure to meet the burden.[7]  I emphasize, however, that I do not have a roving commission to make an ideal determination of First Hartford's fair value.  Instead, I am bound by the record that the parties have presented me and the inadequacies it contains.  See Barry M. Wertheimer, The Shareholders' Appraisal Remedy and How Courts Determine Fair Value, 47 Duke L.J. 613, 629 (1998).  On that record, I must determine fair value, and my decision will affect all the shareholders of this corporation for good or ill, including those who are not parties.

### THE EXPERTS' TESTIMONY

According to one commentator, in disputes like these:

> [T]he expert retained by the dissenting shareholder invariably concludes that the corporation has a very high fair value, while the corporation's expert determines that the fair value of the corporation is much lower. It is not unusual for the opinions of the experts to differ by a factor of ten. It is, therefore, not surprising that courts have evidenced frustration with this process.

Id. at 630-31.[8]  Accordingly, perhaps I should consider myself fortunate, since the experts in this case vary by a factor of only about five ($9 million at bottom; $48

---

[7] I am not even sure what burden of proof would mean in this context: zero value until the plaintiff proves something higher?

[8] The Delaware Chancery Court has observed that same problem even for discounted cash flow valuation alone.  See Cede & Co. v. Technicolor, Inc., 1990 WL 161084, at *7 (Del. Ch. Oct. 19, 1990) (experts' values "cover[ed] an astonishing range" because of different assumptions about the future, and different methods used within the model); see also Samuel C. Thompson, Jr., A Lawyer's Guide to Modern Valuation Techniques in Mergers and Acquisitions, 21 J. Corp. L. 457, 465-66 (1996) (describing the Technicolor case). Wertheimer agrees:
*(continued next page)*

million at top).  Guilliaem Aertsen, aggrieved shareholder Kaplan's expert, valued the business at $48.3 million.  Nancy Fannon, First Hartford's expert, valued it at $9.3 million.  Timothy Riddiough, First Hartford's other expert, valued it at $9.8 million (which, reversing his express or implied 25% minority discount, I correct to $13.1 million).[9]  Although terminology varies, they calculated value in three basic categories—market,[10] investment (or income-based[11]), and asset value.  Then they weighed or ignored the results as they deemed appropriate.  I summarize their respective credentials and analyses.

### *Guilliaem Aertsen*

Aertsen is the chief executive officer of a private venture capital firm that buys or co-invests in early stage companies engaged in technology, real estate and distressed financial assets. Valuation Hr'g Tr. 51:11-13, July 24, 2008 ("July 24 Valuation Hr'g Tr.") (Docket Item 162); Curriculum Vitae of Guilliaem Aertsen ("Aertsen C.V.") (Docket Item 90-3).  He is also co-chair of a Boston based real

---

> [The DCF approach] relies heavily on a guess as to the future cash flows of the enterprise. This "guess" may be informed by looking at historical data, operating trends, and other relevant factors, but it is still nothing more than a prediction of future events. Once these future cash flows are predicted, they must be discounted to a present value. What discount rate should be employed? Again, there is much room for guesswork and subjectivity. The DCF technique also requires that a terminal value be established and then discounted to a present value; both are further exercises in guess work and subjectivity.

Barry M. Wertheimer, The Shareholders' Appraisal Remedy and How Courts Determine Fair Value, 47 Duke L.J. 613, 629-30 (1998).  Easterbrook & Fischel also agree. Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law 155 (1991).

[9] As required by Maine law, McLoon, 565 A.2d at 1003, I also must account for a marketability discount in my analysis, see infra notes 24 & 37 and accompanying text.

[10] There was one exception: Aertsen did not calculate a market value.

[11] I find it unnecessary to get into the intricacies of direct capitalization versus discounted cash flow analysis, or to consider the variety of other valuation methods that are extant.  See, e.g., Thompson, supra note 8, at 460-62.

estate investment and advisory firm, Aertsen C.V.; in this role, he advises property owners on whether to hold or sell their properties, July 24 Valuation Hr'g Tr. 53:10-15.  Aertsen is also chair of the audit committee of the board of a realty company that owns and operates residential and commercial properties in New England.  Aertsen C.V.  His work requires him to utilize discounted cash flow methodology to value business entities and real estate.  July 24 Valuation Hr'g Tr. 52:4-7.  Earlier in his career, Aertsen spent twenty-five years at First National Bank of Boston, rising to executive vice president, with experience in commercial lending.  Id. at 34:14-19; Aertsen C.V.  Specifically, he "established the real estate workout effort in the late 1980s" when real estate problem loans surfaced in relation to overbuilding of commercial real estate.   July 24 Valuation Hr'g Tr. 36:14-25, 37:3-20, 41:20-22; Aertsen C.V.  There, he applied discounted cash flow methodologies to valuing real estate, which he says led to Bank of Boston's success in continuing lending to the commercial real estate industry.   July 24 Valuation Hr'g Tr. 41:24-25, 42:1-4.  This lawsuit is his first expert testimony.  Id. at 202:21-23, 218:14-17.

Aertsen arrived at his $48.3 million valuation under the investment approach by using what he called an enterprise discounted cash flow model (DCF).[12]  Pl.'s Valuation Post-Hr'g Br. at 10 (Docket Item 184).  Aertsen separated First Hartford into what he determined were its two component businesses:  first, a portfolio of stable income-producing operating properties; and, second, a

---

[12] Aertsen also performed a net asset valuation, which he determined was $31.4 million; however he gave that figure no weight in determining First Hartford's value.  Pl.'s Valuation Post-Hr'g Br. at 34 (Docket Item 184).  As previously noted, Aertsen did not calculate a market value.  See supra
*(continued next page)*

merchant building activity involving a development, construction and management business. July 24 Valuation Hr'g Tr. 97, 171.[13]

To value the income-producing category, Aertsen actually did not perform his own discounted cash flow analysis. Id. at 160. Instead, he relied on CB Richard Ellis appraisals of most of First Hartford's properties, conducted for lenders in the course of First Hartford's business within one year preceding the valuation date.[14] Aertsen believed these appraisals had already done DCF for him. Id. at 163:19-20. Because no appraisal existed for one property, in North Adams, Massachusetts, Aertsen estimated its value "based on [its] square footage and the [discounted cash flow] values per square foot" of what he believed to be the company's "three most comparable properties."[15] Pl.'s Valuation Post-Hr'g Br. at 16.

To value the other category of First Hartford's business (development), Aertsen collected income and expense information reported in First Hartford's financial statements from the three years prior to the valuation date and averaged

---

note 10.

[13] Fannon made a similar observation: She said that First Hartford was "both a development company, and an operator of real estate comprised mainly in the retail (shopping center) sector." Fannon Valuation Group, Business Valuation: First Hartford Corp. at 21 ("Fannon Expert Report") (Def. Ex. 41). Elsewhere, she grouped the business into five baskets: rental properties, entities that hold properties for sale or future development, entities that earn fees from various sources, pass-through entities that hold interests in other entities, and entities that oversee operations and development activities. Id. at 17-18, 23.

[14] There is one exception to this one-year timeframe: the Hartford Lubbock appraisal, which was prepared on May 3, 2007. Lubbock Parkade Retail Center Appraisal Report (May 8, 2007) (Pl. Ex. 133); Pl.'s Valuation Post-Hr'g Br. at 16. But First Hartford had only a 2% interest in that project, and it is an insignificant part of the total value. See First Hartford Corp., Annual Report (Form 10-K), at 8 (Aug. 15, 2005) (Pl. Ex. 59).

[15] The parties disagree greatly as to the value of the North Adams property. Aertsen valued First Hartford's share of North Adams at $1,946,649. Guilliaem Aertsen, Going Concern Value of First Hartford Corp. ("Aertsen Expert Report") (Pl. Ex. 162). The defendants' experts said, based upon management representations to them, that the North Adams property had zero value. Valuation
*(continued next page)*

the figures.  July 24 Valuation Hr'g Tr. 109:6-20.  He then projected the resulting net income figure forward for ten years, applying a 14% discount rate that, in his opinion, "reflect[s] the riskier nature of FHC's development business as compared to the stabilized income producing [operating] properties." Pl.'s Valuation Post-Hr'g Br. at 19-20.

To determine his final valuation figure of $48.3 million, Aertsen took the values calculated for the two categories of First Hartford's business and added other miscellaneous items (for example, the value of an existing leasehold sale contract for First Hartford's Bangor Parkade Shopping Center, the value of First Hartford's excess cash, the value of its "tax shield" from a net operating loss carry-forward, and the value of various "deposits, escrows, prepaid and deferred expenses").  Id. at 20-23.  Aertsen then reduced this total by the capitalized cost of First Hartford's corporate center.  Id. at 24.  Aertsen did not reduce his valuation for income taxes, because the company has not paid federal income tax for the past seven years and maintains a large net operating loss carry-forward.  Id. at 21.

### *Nancy Fannon*

Fannon owns a valuation company and has been engaged in business valuations for over twenty years.  Fannon Valuation Group, Business Valuation: First Hartford Corp. at 52 ("Fannon Expert Report") (Def. Ex. 41).  Her professional references include the American Society of Appraisers, the Institute of Business Appraisers, and the American Institute of Certified Public Accountants ("AICPA").  Id.  Fannon has written and contributed to numerous published texts and articles

---

Hr'g Tr. 34:3-12, 188:9-12, July 25, 2008 ("July 25 Valuation Hr'g Tr.") (Docket Item 161).

on business valuation, id., including Business Valuation and Taxes: Procedure, Law, and Perspective (2005), a textbook authored by U.S. Tax Court Judge David Laro and Shannon P. Pratt.  Valuation Hr'g Tr. 91:18-22, July 25, 2008 ("July 25 Valuation Hr'g Tr.") (Docket Item 161).  Her professional awards include a 2007 induction into the AICPA Business Valuation "Hall of Fame."  Fannon Expert Report at 53.  She has testified many times as an expert witness in both federal and state courts.  Id. at 52.  Fannon is a Certified Public Accountant and holds a degree in accounting from the University of Massachusetts.  July 25 Valuation Hr'g Tr. 86:20-21, 87:5.

Fannon arrived at her $9.3 million valuation by calculating First Hartford's value under the three methodologies—asset-based, income-based, and market-based.  Fannon Expert Report at 50.

Fannon's net asset valuation of First Hartford yielded a value of $13,337,114.  Id. Ex. B-1.  To arrive at this number, Fannon subtracted capital gains taxes, transaction costs, and defeasance costs that she concluded would be incurred if a purchaser sold First Hartford's assets.  Id. at 39.[16]  For this calculation, Fannon started with a third party (Paula Konikoff)'s retrospective adjustments to the CB Richard Ellis appraisal values that Aertsen had used, ostensibly so as to reflect the September 15, 2005, valuation date.  Fannon then assessed risks specific to each property.  July 25 Valuation Hr'g Tr. 101:19-106:19.  Neither the third party Konikoff analysis nor evidence about the

---

[16] There is case law support for subtracting such items.  Bogosian v. Woloohojian, 158 F.3d 1, 6 (1st Cir. 1998) (applying Rhode Island law).

additional risks was introduced into evidence before me, but I gather the adjustments were generally downward.[17]  Drawing on this unintroduced evidence, Fannon described risks including vacancies, absence of significant tenants, costs of regulatory compliance, and instability of real estate property values.  Id. at 99:2-7, 100:1, 101:19-106:19.  She also adjusted for lack of cash flow from early-stage non-core investments, risk of recession, and interest rate risk.  Id. at 105:19-106:19.

For her income-based analysis, Fannon used what she called the capitalized cash flow to invested capital method.  Fannon Expert Report at 40. Like Aertsen, she started with the CB Richard Ellis appraisals, id. at 1, 3, but unlike Aertsen she used the income information from them, not the adjusted bottom-line appraisal, see id. at 23; Guilliaem Aertsen, Going Concern Value of First Hartford Corp. ("Aertsen Expert Report") (Pl. Ex. 162).  Fannon collected income and expense information for a two-year period, relying on the CB Richard Ellis appraisals or, if none, then "look[ing] at [FHC subsidiary companies] on an individual basis to their income and expenses."  July 25 Valuation Hr'g Tr. 116:2-17.  In using the appraisals, Fannon "relied on the net operating income as presented," and "then accounted for other entity-level expenses not included," such as debt.  Fannon Expert Report at 23.  Fannon eliminated "non-recurring" items, for example settlement proceeds from a lawsuit, for purposes of projecting the value of First Hartford.  Id. at 22-24.  Fannon also increased First Hartford's

---

[17] I am concerned about the reliance on this report without any testing of its preparer's credentials, assumptions and methods, because it was apparently prepared for this litigation, see Riddiough Expert Report ¶ 38, in which management of FHC and Mr. Ellis both have obvious self-interests.

reported expenses to reflect a need for higher executive compensation based on her determination that the company paid its officers less than market value. Id. at 24. These computations yielded an income-based or investment value of only $7.6 million, influenced by Fannon's conclusion that First Hartford has "significant debt compared to its assets." Id. at 41-42.

For her market-based analysis, Fannon employed multiple methods. First, implementing the guideline public company method, Fannon compared First Hartford to REITs, but reduced the company's value as compared to exemplar REITs because she concluded that REITs have "advantages over FHC in deal making ability and economies of scale" and do not pay corporate level income taxes. Id. at 45-46. Under this guideline public company method, Fannon valued the business at $10 million, based upon minority interest stock transfers in those public companies. She did not correct for any minority or marketability discount. Id. at 43-47.[18] Second, using the transaction method, Fannon identified what she thought were comparable companies and determined the selling price of those companies in their entireties (i.e. without minority interest discounts). Id. at 47-48. Matching those companies with First Hartford, Fannon valued the company

---

[18] Fannon cited the Pratt text that refers to this valuation as "appropriate for a marketable, minority ownership interest." Fannon Expert Report at 43 (quoting Shannon P. Pratt & Alina V. Niculita, Valuing a Business 266-67 (2008)). But Maine requires me to deal with the entire business, not a minority ownership interest. McLoon, 565 A.2d at 1004. Fannon seemed to think that the distinction is unimportant because she reached a similar valuation number under her transaction method (looking at sales of comparable businesses in their entirety which, according to Fannon, "clearly reflects entire controlling interests"), and referred to "some exuberance in the market [for the guideline public companies] at the time of the valuation" as the explanation. Fannon Expert Report at 43. I find more persuasive Riddiough's analysis that the market reflects a 25% minority discount. See Riddiough Expert Report ¶ 49. (Fannon recognized that the First Hartford stock price was slightly less than her transaction method indicated, but was content because her income approach came in even lower. Fannon Expert Report at 43.)

at $9.6 million under the transaction method.  Id. at 48.  Third, Fannon valued the company at $10 million based on sales of First Hartford's stock (minority interests) reflected on the Pink Sheets.  Id. at 48-49.

To arrive at her final valuation of $9.3 million for the company, Fannon accorded little weight to the net asset valuation, but apparently gave one-quarter weight to each of the one income-based and three market-based approaches.[19]  Id. at 50.

### *Timothy Riddiough*

Riddiough is professor and chair of the Real Estate and Urban Land Economics Department at the University of Wisconsin-Madison, where he teaches courses in commercial real estate finance and investment.  Curriculum Vitae of Timothy J. Riddiough ("Riddiough C.V.") (App'x A to Expert Report of Timothy J. Riddiough ("Riddiough Expert Report") (Def. Ex. 45)).   Prior to becoming a professor at UW-Madison, Riddiough was a tenured professor in the Urban Studies and Planning Department of the Massachusetts Institute of Technology, where he held the Edward H. Linde Career Development Chair.  July 24 Valuation Hr'g Tr. 234:12-16; Riddiough C.V.  Outside of academia, Riddiough has served on the boards of publicly traded and privately held REITs, and he has performed real estate valuations, including those of malls and other forms of retail property. July 24 Valuation Hr'g Tr. 236:10-11, 237:1-2.  Riddiough has also published

---

[19] Fannon said that she gave "equal weight to the Income and Market Approaches," Fannon Expert Report at 50, but the math works only if she gave equal weight to each of the income approach figure of $7.6 million, the guideline public company method figure of $10 million, the transaction method figure of $9.6 million, and the $10 million figure based on sales of First Hartford's stock (minority interests) reflected on the Pink Sheets.

numerous articles on real estate finance and valuation issues.  Riddiough C.V.  He holds a doctorate degree in real estate.  Id.  He has given previous expert testimony concerning real estate finance.  Id.

Riddiough calculated First Hartford's net asset value, investment value, and fair market value, and then used the Delaware Block method to weight those respective values to come to his ultimate valuation of $9.8 million.  Riddiough Expert Report ¶ 6.  Under all three methods, however, his total valuation for the company was based upon a minority discount because he believed that to be his assignment.  July 25 Valuation Hr'g Tr. 46:18-47:5.  He also did not adjust for lack of marketability.  Riddiough Expert Report ¶¶ 13, 20.  Removing the minority discount alone (which Riddiough calculated at 25%) would yield a value of $13,066,667.

First, Riddiough concluded that the market value of First Hartford was $10 million, based upon his review of the history of Pink Sheet trading in First Hartford's stock.  Riddiough Expert Report ¶ 20.  That value, he said, reflects a minority discount.  Id. ¶ 48.

In determining First Hartford's investment value, Riddiough like Fannon relied on financial information of publicly traded REITs.  Id. ¶ 21.  After adjusting for "post-tax capital gains/losses" from purchase and sale of real estate, and expenses incurred by First Hartford in connection with this lawsuit, Riddiough found its investment value to be $9.4 million, again with a built-in minority discount.  Id. ¶¶ 24-26, 33, 48.

Finally, to determine FHC's net asset value, Riddiough based his valuation on the same third-party reduced appraisals that Fannon used.  Id. ¶ 38; July 25 Valuation Hr'g Tr. 27:17-20.  After deducting the taxes that would be payable upon liquidation, he found the net asset value of the *entire* company to be $15,543,384.  Riddiough Expert Report Ex. 11.[20]  Then, he applied a 25% minority discount to yield a total net asset value of $11.66 million.[21]  Id. ¶¶ 48-49.

To arrive at his final valuation of $9.8 million (reflecting a minority discount), Riddiough accorded 10% weight each to the net asset valuation and investment value, assigned 80% weight to the Pink Sheet prices, and then further reduced the value by the amount of a 2006 cash dividend.  Id. ¶¶ 52-53.

## MY ASSESSMENT

My role is to apply Maine law as it is now, and determine the "best price" a single buyer would pay for the entire firm, without a minority or marketability discount.  McLoon, 565 A.2d at 1004.  In that regard, I comment first upon the

---

[20] Elsewhere, he says $15.82 million.  Riddiough Expert Report ¶ 46.
[21] Riddiough reasoned:

> I understand that the statutory definition of fair value for appraisal purposes adopted by Maine does not allow for discounts for lack of marketability or for a minority stake. However, in my opinion it is necessary to apply a minority discount to FHC's NAV in order to make the NAV comparable to the values based on the other two methods—market value and investment value. This is because both the market value and investment value per share of FHC represent the value of owning one minority share in FHC. In other words, FHC's NAV per share represents the amount that someone may be willing to pay in order to acquire a hundred percent stake in the FHC, while the market value and investment value represent the amount an investor may be willing to pay to acquire a minority stake in FHC.

Id. ¶ 48.  I conclude that these express or implicit discounts, in all three categories, are expressly contrary to Maine law, because I am determining the value of 100% of the business to a single third-party purchaser.  McLoon, 565 A.2d at 1004.

14

experts' testimony, then proceed to apply the elements I find most persuasive to determining valuation.

I have considered Riddiough's insistence on the preeminent significance ("heavy (if not exclusive) weight"), of the Pink Sheets price as a guide to value. Riddiough Expert Report ¶ 17. Certainly he has substantial academic backing for this insistence on market price. E.g., Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law (1991); Albert O. Hirschman, Exit, Voice, and Loyalty (1970).[22] Since Riddiough said that the Pink Sheet trades reflect a minority discount of 25%, Riddiough Expert Report ¶¶ 48-49, reversing that discount to reflect the Maine requirement that I value the business as if someone were purchasing a 100% ownership ("the best price a single buyer could reasonably be expected to pay for the firm as an entirety," McLoon, 565 A.2d at 1004), certainly provides a valuation number that I should consider.

Kaplan objects to any use of the market value as established by the Pink Sheets, arguing that the stock is too thinly traded to make that number useful, that the Pink Sheets do not have the reliability of a listed stock exchange,[23] and that they hugely undervalue the business on account of Ellis's control position and his oppression. Pl.'s Valuation Post-Hr'g Br. at 24-32. It is true that the stock has been thinly traded as publicly held corporations go, but that does not necessarily mean that the Pink Sheet trades severely undervalue the stock. I have

---

[22] On the other hand, some of the academic commentary is also critical of the valuation standards endorsed by the Delaware court and followed by Maine. See, e.g., Daniel R. Fischel, The Appraisal Remedy in Corporate Law, 1983 Am. B. Found. Res. J. 875, 877 (criticizing Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983)). I must follow Maine law regardless of the criticism.

[23] See supra note 3.

previously found that the oppression is not the cause of the thin trading. Findings of Fact and Conclusions of Law at 47 (Docket Item 81). I also conclude that the oppression is not the cause of any lowered market price, because a good part of the oppression I found was associated with this particular family dispute. See id. There should be some modest adjustment for the lack of marketability. That lack of marketability is reflected in the thinness of trading, and confirmed by Lehman Brothers' inability to trade a block of approximately 35,000 shares on the open market just one week after the valuation date. See note 27 infra.[24] But those factors do not make the market value irrelevant.

Other things about Riddiough's testimony give me pause in adopting many of his conclusions: he seemed to think that his assignment was to value a minority interest, July 25 Valuation Hr'g Tr. 46:18-47:5, which makes me question the rest of his instructions; all his information and instructions seemed to come from the Analysis Group of Boston, an entity not otherwise presented to the court, and he relied extensively on what they did, ostensibly under his tutelage, id. 37:22-24, 40:19, 54:24-56:3; the officers of First Hartford told him of a $4 million error the morning of his deposition, but he did not disclose it because he was not asked specifically about it, then the error was disclosed to the

---

[24] Pratt defines marketability as "the ability to convert the business ownership interest (at whatever ownership level) to cash quickly, with minimum transaction and administrative costs in so doing and with a high degree of certainty of realizing the expected amount of net proceeds." Pratt & Niculita, supra note 18, at 417. He also notes that a greater spread between bid and asked prices reveals lower marketability. Id. (quoting Charles J. Woelful, Encyclopedia of Banking & Finance 729 (10th ed. 1994)). According to First Hartford's 10-K for the fiscal year ending April 30, 2006, only a "limited amount of Company shares . . . are traded," and "[t]he market is controlled by market makers, which usually causes a large spread between bid and ask prices. As a result the market price of [the] common stock has been volatile." First Hartford Corp., Annual Report (Form 10-K), at 5 (Aug. 31, 2006) (Pl. Ex. 75). I reject Riddiough's conclusion that no marketability *(continued next page)*

plaintiff's lawyer only the evening before Riddiough's courtroom testimony, and Riddiough could not recall who at First Hartford gave him the corrective information or explain the late date of the errata sheet, id. at 70:15-72:20; nothing in his report shows any attention to the net operating loss carry-forwards although Riddiough is sure they were taken into account, id. at 77:11-23.

Fannon, the other defense expert, performed the most thorough valuation among the three experts.  But I find troubling the fact that her going concern value ($9.3 million), id. 157:220-159:5, is so much lower than the net asset value ($13.337 million) she calculated from the real estate appraisals, and yet she assigned the net asset value so little weight.[25]  For a company like this, dependent heavily on real estate, the ability to liquidate some of its holdings could play an important part in a third party's decision how much to pay for the business, id. at 147:1-5; 12B William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5906.140 (2000), even while it is a going business.[26]  After all, third parties do sometimes purchase businesses and liquidate portions of their assets.  I am also troubled that Fannon's income-based approach yielded a

---

adjustment is necessary.  See Riddiough Expert Report ¶¶ 13, 20.

[25] Both Riddiough and Fannon appear to have been influenced by my comments that in choosing the remedy of buyout rather than liquidation I assumed that the company would continue to operate for the benefit of its other shareholders.  See Findings of Fact and Conclusions of Law Part 2: Remedy at 5 (Docket Item 116).  They seemed to think that statement was an additional reason to discount net asset value.  But my comment on the choice of remedy does not affect Maine law as to how fair value is determined, and of course it was and is open to the company management to choose liquidation if in the best interests of the shareholders.

[26] The Maine Law Court's counsel against too heavy a reliance on net asset value was in a case where the appraiser had actually used book value and had no appraisals.  In re Valuation of Common Stock of Libby, McNeill & Libby, 406 A.2d 54, 61 (Me. 1979).  The Court reiterated that "[t]he relative weight to be given to those three elements depends much upon the facts of the individual case, including the relative confidence that the weighting tribunal has in the accuracy of those three subsidiary determinations themselves."  Id. at 67.

valuation ($7.6 million) so far below the market value reflected by the Pink Sheet trades, once the minority discount correction is considered,[27] even overlooking any further correction for lack of marketability.   Perhaps that is because Fannon excluded from her income stream calculation any future sales of real estate, Fannon Expert Report Ex. C-1; July 25 Valuation Hr'g Tr. 198:12-16, even though First Hartford's 10-Ks recognize that they are an important part of its business. First Hartford Corp., Annual Report (Form 10-K), at 1 (Aug. 15, 2005) (describing FHC's business as "the purchase, development, ownership and management of real estate with the ultimate goal of selling such properties when profitable opportunities arise"); see also July 25 Valuation Hr'g Tr. 75:1-2 (Riddiough explains that "purchase and sale of real estate represents a primary component of [FHC's] business"); Fannon Expert Report at 22 (noting FHC "does not expect to be profitable except upon the occasional sale of properties").   Certainly Aertsen was unrealistic in his projections as to this part of the business. He took a three-year period containing a major real estate sale and projected that as an average into the future, July 24 Valuation Hr'g Tr. 171:4-8, whereas a review of First Hartford's longer timeline reveals that major sales do not happen every three years, July 25 Valuation Hr'g Tr. 112:2-11.   On the other hand, these sales cannot be ignored

---

[27] The $3.25 minority trade three days before the valuation date, see Riddiough Expert Report Ex. 3 (citing NASDAQ.com), yields a market value of $10,020,533, which, corrected solely for the 25% minority discount, is $13,360,711.  Even a block sale to the company, when Lehman Brothers could find no purchaser a week after the valuation date (a sale that all parties seem to agree was at a discount ($2.50)), yields a total of $7,708,103.  See Special Meeting of the Board of Directors of First Hartford Corporation (Sept. 22, 2005) (Pl. Ex. 35E) (describing Lehman Brothers' concern that "due to the lack of shares traded and the large block they held, Lehman would only get about $2.00 a share" selling on the market, and thus Lehman Brothers solicited an FHC buy-back of the stock).  Correcting solely for the minority discount and not for the lack of a market, the adjusted number there is $10,277,470.

altogether in deciding what a purchaser would pay for this business.[28]   And Fannon did not adjust the market value number she derived from the Pink Sheet trades to reflect any minority discount.[29]

I am also troubled that, although the defendants had both Riddiough and Fannon rely on the Konikoff adjustments, they did not introduce that report into evidence, and thus I did not get to hear Konikoff's information, assumptions and conclusions tested.  The earlier CB Richard Ellis real estate appraisals were made in the ordinary course of business.  See, e.g., Lubbock Parkade Retail Center Appraisal Report (May 8, 2007) (Pl. Ex. 133); Putnam Shopping Parkade Appraisal Report (Sept. 10, 2004) (Pl. Ex. 131).  The Konikoff adjustments, on the other hand, were made precisely for this litigation valuation.  Riddiough Expert Report ¶ 38.  Based upon this later report, Fannon testified at length about changes in the properties or later qualifications to the earlier valuations, July 25 Valuation Hr'g Tr. 100:1-4, 101:19-105:5, and I have no way to assess the reliability of her reliance.   Finally, I am concerned too at Riddiough's and Fannon's ready acceptance of oral statements from management that North Adams Main Street Parkade had zero value.  Id. at 164, 188:9-12, 191-92.[30]  (There was no appraisal of that property.  Id. at 191:20-22.)  Cross-examination of Fannon established that

---

[28] Fannon recognized that the company states that it has the "ultimate goal of selling [its] properties when profitable opportunities arise," Fannon Expert Report at 6, and that there is no expectation of profitability except when it occasionally makes such sales, id. at 22.

[29] Fannon seems to have thought that this would improperly apply a control premium, id. at 48, but I see no other way to interpret what the Law Court has said, since I must value the company based upon what a single buyer would pay for the *entire* company.  See McLoon, 565 A.2d at 1004.   Alternatively, Fannon appears to have concluded that the market price is the control price because her investment analysis gives a still lower value.  Fannon Expert Report at 43; see also supra note 18.

[30] Fannon's report made clear that for purposes of her valuation she accepted without question *(continued next page)*

its actual mortgage debt was $3 million less than the full mortgage financing, and that the leasing process was proceeding apace.  Id. at 188:13-191:19.[31]

I have many difficulties with the value opinion of Guilliaem Aertsen, although he has abundant experience conducting business valuations in real-world settings (bank loan portfolios; venture capital firm real estate companies). July 24 Valuation Hr'g Tr. 45-46.  In relying on the real estate appraisals prepared for First Hartford lenders before the valuation date, Aertsen treated them as essentially discounted free cash flow analyses, thus obviating the need for him to perform such analyses.  Id. at 159-60.  In fact, their bottom lines (which he used, id. at 71:20-72:19) were based upon a combination of income capitalization, comparable sales, and cost.[32]  See, e.g., Lubbock Parkade Retail Center Appraisal Report; Putnam Shopping Parkade Appraisal Report.  Second, although I reject the decision by Riddiough and Fannon to assign the North Adams property zero equity value, I find Aertsen's valuation of First Hartford's equity in that property ($1,946,649) unconvincing.  See Aertsen Expert Report.  He found "comparables" to North Adams by looking at other properties in the First Hartford portfolio, July 24 Valuation Hr'g Tr. 79-80, but they were not really comparable, being fully

---

statements by management and the appraisal adjustments.  Fannon Expert Report at 3.

[31] As of the April 30, 2005, 10-K, the North Adams property was reported as 23% leased, First Hartford Corp., Annual Report (Form 10-K), at 4 (Aug. 15, 2005); as of the April 30, 2006, 10-K, it was 73% leased, First Hartford Corp., Annual Report (Form 10-K), at 6 (Aug. 31, 2006).  Therefore as of the September 15, 2005, valuation date it seems likely that the percentage was somewhere between these two numbers.  July 25 Valuation Hr'g Tr. 188:13-190:11.

[32] Fannon used them, but specifically their income calculations, and then she adjusted them for other expenses.  Id. at 23.  The differences between the values Fannon used for the various properties and the CB Richard Ellis values used by Aertsen range from miniscule to immense; for example, there is no difference in value for Plainfield Parkade, a $325,000 value difference for Putnam Parkade, a $800,000 difference for Trolley Barn, a $1.3 million difference for Parkade Center, and a $2.25 million difference for Cranston BVT.  See Fannon Expert Report Ex. B-2; (continued next page)

leased and with higher net operating incomes.  See Aertsen Expert Report; Fannon Expert Report Exs. B-2, C-1.[33]  Aertsen testified that his bank experience taught him that, on average, using other properties in a portfolio worked out most of the time.  July 24 Valuation Hr'g Tr. 164:1-13.  But here we are not dealing with "most of the time," as a bank might do in considering its entire lending portfolio, but valuing one particular business.  Aertsen improperly treated a lawsuit settlement for $807,950 in First Hartford's favor as a recurring item.  See id. at 176:5-20; July 25 Valuation Hr'g Tr. 175:3-6.  As the plaintiff's lawyer conceded at closing argument, Aertsen also double-counted the tax loss carry-forward, and there was a $3 million error calculating the cash First Hartford could have distributed to shareholders in the timeframe of the valuation date.[34]  Valuation Oral Argument Tr. 19:4-20, 23:5-18, Feb. 11, 2009 (Docket Item 191).  I find also that he did not adequately consider Ellis's personal guarantees in valuing the business, guarantees that a new buyer well might not be willing to make.  (Aertsen assumed that Ellis's estate—Mr. Ellis is in his early 80s—will continue to do what Ellis has done, an unfounded assumption.  See July 24 Valuation Hr'g Tr. 217:4-

---

Aertsen Expert Report.

[33] Aertsen used FHC's Plainfield, Putnam, and West Springfield properties as comparables. Aertsen Expert Report.  It is uncontested that the net operating income and leasing status of these comparables on the valuation date are as follows:  (i) for Plainfield, a net operating income of $591,215, id., and a leasing status of 100%, Fannon Expert Report Ex. B-2; (ii) for Putnam, a net operating income of $571,531, Aertsen Expert Report, and a leasing status of 100%, Fannon Expert Report Ex. B-2; and (iii) for West Springfield, a net operating income of $1 million, Aertsen Expert Report, and a leasing status of 100%, Fannon Expert Report Ex. B-2.  On the other hand, North Adams had a net operating income of ($1,463), Fannon Expert Report Ex. C-1, and a leasing status of somewhere between 23% and 73%, July 25 Valuation Hr'g Tr. 188:13-190:11.

[34] I also find that in Aertsen's net asset value analysis, he improperly treated prepaid expenses as items that could be recognized on liquidation.  Valuation Hr'g Tr. 205:21-206:3, July 24, 2008 ("July 24 Valuation Hr'g Tr.") (Docket Item 162).  (But ultimately, Aertsen placed no reliance on his net asset valuation.  Id. at 204:18-20.)

218:13.)   In sum, Aertsen actually spent precious little time on valuing this complex corporation, his first time as an expert witness.  Id. at 202:21-203:9.  In his final opinion, he also gave *no* weight to net asset value or stock market value. Id. at 204:15-20.

In the end, based upon the information given me, I find the following.

Starting with the stock market price as a guide to fair value, I have a 100-share trade of $3.25 just three days before the valuation date (the trade was September 12, 2005).  See Riddiough Expert Report Ex. 3 (citing NASDAQ.com). That number, although small in volume, seems to be fairly consistent with earlier trades.  Fannon reported the following weighted average prices before that date, on a monthly basis during calendar year 2005: beginning February 1, $3.25; beginning March 1, $2.00; beginning April 1, $3.95; no May 1 entry; beginning June 1, $3.50; no July 1 entry; beginning August 1, $3.25; beginning September 1, $3.15.  Fannon Expert Report Ex. E-2.[35]

Although I find a marketability adjustment is appropriate, none of the three experts has suggested a number.  On the separate question of minority ownership discount, Riddiough said that the relevant range for similar companies is up to 30%, and he used a 25% minority discount,[36] July 25 Valuation Hr'g Tr. 4-5;

---

[35] A week after the valuation date, Lehman Brothers could not find a market for a large block of stock (36,892 shares) and had to sell the block back to the company at a discount, $2.50 per share. See Special Meeting of the Board of Directors of First Hartford Corporation (Sept. 22, 2005).
[36] For a discussion of minority discount, see Wertheimer, supra note 8, at 640.  Pratt says that when a private company operates like a publicly held company, "the lack of control discount is usually less than it would otherwise be.  One reason is that in such a case the controlling stockholder is (presumably on a voluntary basis) not exercising all of the prerogatives of control." Pratt & Niculita, supra note 18, at 403.  Although First Hartford is a public company operating like a privately held company, I have found that the largest shareholder, Neil Ellis, is exercising all the prerogatives of control.

Riddiough Expert Report ¶ 49, (the other two experts did not give me a minority discount figure).  I start with the higher number, 30%, given the need to recognize both discounts.[37]  The adjusted share price to correct for the discounts is thus $4.64.  Since the number of outstanding shares on the valuation date was 3,083,241,[38] that share price yields a total value of $14,306,238 for the company, which I round to $15 million to ensure full recognition of the necessary marketability adjustment.  That number exceeds Fannon's net asset valuation of $13,337,000, a value that reflects subtractions for taxes, defeasance and transaction costs if all the properties were liquidated.[39]  Fannon Expert Report at 39.  (Remember too that I found that net asset value to be too low because of failure to assign any value to the North Adams property and that I have misgivings about the Konikoff downward adjustments.)  It is below Riddiough's total net asset value of $15,543,384 (or $15.82 million), Riddiough Expert Report ¶ 46 & Ex. 11,

---

[37] Pratt says that "[t]he levels of [nonmarketability] discounts allowed in most judicial decisions still seem to be below what the empirical evidence related to arm's-length transactions tends to suggest," Pratt & Niculita, supra note 18, at 452, and says that the empirical evidence suggests discounts clustering "in the range of 30 percent to 50 percent from their publicly traded counterparts." Id. at 419.  But he also states that the individual facts and circumstances need to be considered, id., and unfortunately none of the three experts has adequately analyzed the appropriate nonmarketability discount here.

[38] The 10-K for fiscal year ended April 30, 2005, says that as of August 8, 2005, this was the number of outstanding shares.  First Hartford Corp., Annual Report (Form 10-K), at 1 (Aug. 15, 2005).  This is also the number that Fannon used.  Fannon Expert Report at 5.  The 10-Q for October 31, 2005, says that the number of shares outstanding as of December 9, 2005, was 3,046,279.  First Hartford Corp., Quarterly Report (Form 10-Q), at 1 (Dec. 19, 2005) (Pl. Ex. 118).  Aertsen used the number 3,083,171, Aertsen Expert Report, which seems to be the latter number adjusted for the Lehman sale back to the company just after the appraisal date.  Riddiough used the number 3,064,725, an average of the number reported in the 10-Qs for July 31 and October 31, 2005.  See Riddiough Expert Report Ex. 11 n.8.  Although there was some discussion about whether to include as shares stock options that had not yet vested (250,000 were outstanding according to the 10-K for April 30, 2005), I do not include them for purposes of this valuation as of September 15, 2005.

[39] Fannon also said that the number might be lower because some of the properties are held through subsidiaries that First Hartford does not control or because of other defeasance costs.  Fannon Expert Report at 39.

before Riddiough reduced that figure on the mistaken belief that he should adjust for a minority ownership discount.

I find net asset value to have significance for this company whose assets largely are real estate holdings.   See 12B Fletcher, supra, at § 5906.140; Wertheimer, supra, at 673 n.312 (critiquing the opposing viewpoint and citing cases); Don S. Clardy, Valuation of Dissenters' Stock Under the Appraisal Remedy, 62 Tenn. L. Rev. 285, 297 & n.78 (1995); Note, Front-End Loaded Tender Offers: The Application of Federal and State Law to an Innovative Corporate Acquisition Technique, 131 U. Penn. L. Rev. 389, 417 n.162 (1982) ("Net asset value is usually an important factor only in valuing corporations such as natural resource and real estate companies, which are sometimes thought to be undervalued by the stock market because they produce low reported earnings relative to their cash flow.").[40] Therefore, net asset value fortifies my confidence in the stock market value, after adjustment for minority and marketability discounts.

I recognize that these market and net asset values are much higher than the numbers the two defense experts derived from their investment or income-based approach.  But they are also much lower than the number the plaintiff's expert derived from his version of the same approach.  The Maine Law Court has said that the investment method of valuation has weaknesses as a measure of fair value when determination of the capitalization ratio is highly subjective and when

---

[40] Easterbrook and Fischel say there is no empirical support for believing that market value would not include appropriate recognition of net asset value in businesses with these types of holdings. Easterbrook & Fischel, supra note 8, at 156, Fischel, supra note 22, at 892.  But here I am not using net asset value to increase the market value, the major focus of that criticism, only to support the market value conclusion.

24

earnings history is erratic.  <u>Libby</u>, 406 A.2d at 61.  That is certainly true here.  As to earnings history, Fannon stated repeatedly that revenue and return for First Hartford were "volatile."   Fannon Expert Report at 13, 15-16, 23.   As to capitalization ratio, all the experts had to deal with the fact that First Hartford appears to be a unique corporation, engaging in its two lines of real estate business as a Subchapter C corporation, not as a REIT.[41]   First Hartford's uniqueness made it difficult to select an appropriate capitalization rate.  Each of the experts had to make subjective adjustments in their valuation approaches accordingly.[42]

Taking into account the market value reflected in the Pink Sheets and adjusting upward for an implicit marketability and minority discount, I conclude that the fair value of First Hartford's entire business on September 15, 2005, was $15 million.[43]  That value, derived from the market trade (on a per share basis) just before the valuation date, and corrected for minority and marketability discounts, is modestly above Fannon's net asset value of $13,337,000, and

---

[41] As a C corporation, First Hartford does not have to pay dividends, whereas REITs must distribute 90% of their profits; indeed, there are negative tax consequences when it does pay dividends, whereas REITs are exempt from federal income tax.  July 25 Valuation Hr'g Tr. 129:23-130:16.  Fannon also found it unique in its debt structure, being highly leveraged with the advantage of the Ellis personal guarantees.  Fannon Expert Report at 29, 31.  Also, as plaintiff's counsel noted, First Hartford's merchant building component is uncommon among REITs.  July 24 Valuation Hr'g Tr. 11:12-16.  Aertsen testified that for REITs with a development aspect to their business, the industry performs a distinct valuation for that component that is not reflected in the treatises.  Videotape Testimony of Guilliaem Aertsen, Continued Valuation Hr'g Tr. 58:13-23, Sept. 24, 2008 ("Aertsen Continued Valuation Hr'g Tr.") (Docket Item 170).

[42] For example, Riddiough used the REIT funds from operations (FFO) approach and adjusted it.  For his multiplier, he had to use a basketful of REITs and perform adjustments because there was nothing comparable to First Hartford, and he ended up developing a regression analysis unique to this case.  July 25 Valuation Hr'g Tr. 7-8, 81:1-17.  Recall the discussion in note 8, <u>supra</u>, concerning the wide variations in value that DCF analysis can produce.

[43] This $15 million value translates to $4.87 per share.

modestly below Riddiough's net asset value of $15.82 million or $15,543,384.[44]
The wildly divergent figures the experts generate using an income-based approach
(Fannon $7.6 million; Riddiough $13.43 million after correcting 30% for minority
and marketability discounts; Aertsen $48.3 million) explain my conclusion to rest
instead upon this valuation deriving primarily from the stock trades, corrected for
the minority and marketability discounts; the net asset valuations give me
confidence in doing so.

### REMAINING ISSUES

At closing argument and in the final legal memoranda, the defendants
argued that any relief should go solely to the plaintiff Richard Kaplan individually
and not include his beneficially or jointly owned shares.  Although it is true that
Kaplan's Complaint dated and filed September 15, 2005, listed only his
individually owned 145,719 shares, Compl. ¶ 9, the parties have continuously
proceeded since then on the understanding that Kaplan's beneficial ownership,
including shares where he shares dispositive power with another, is at stake.  See,
e.g., Pl.'s Trial Br. at 1 (total of 591,254, 19.1% of the outstanding shares) (Docket
Item 53); Def.'s Trial Br. at 2 ("roughly 19%") (Docket Item 49); First Hartford
Corporation's Position on Remedies at 1 (proposing that the court order Richard

---

[44] Interestingly, it is lower than an adjusted value for a trade three months later involving
controlling shareholder Ellis.  On December 16, 2005, he bought for the benefit of his wife 1,000
shares at $4.00 per share.  First Hartford Corp., Statement of Changes in Beneficial Ownership
(Form 4) (Jan. 4, 2006) (Pl. Ex. 128).  Adjusting that price 30% upward to correct for the minority
and marketability discounts yields a share price of $5.71 and a total value of $17,605,306.
(Although Ellis is a controlling shareholder, the seller necessarily would have been a minority
shareholder.  I see no reason, therefore, not to conclude that the price was affected by the minority
discount.)  I do not use this post-valuation transaction as proof of value, but it is a useful check on
whether the value already selected can be confirmed.  Fannon Expert Report at 49 (quoting David
Laro & Shannon P. Pratt, Business Valuation and Taxes: Procedure, Law, and Perspective (2005)).

Kaplan to sell to the company "all shares which he owns outright or beneficially")
(Docket Item 93).  Prior to this litigation, First Hartford treated Richard Kaplan's
ownership in the aggregate.  <u>See</u>, <u>e.g.</u>, First Hartford Corp., Annual Report (Form
10-K) (Aug. 15, 2005) (listing Richard Kaplan as the owner of 19.1% of First
Hartford's outstanding stock, including Richard Kaplan's individually owned
shares and shares over which both he and his brother, David Kaplan, have shared
dispositive power).[45]   Therefore, because the defendants have, until recently,
proceeded on the basis that the Richard Kaplan shares include Richard Kaplan's
individually owned stock, stock he owns beneficially through family trusts and
other business entities, and stock where he shares control with his brother, <u>see</u>
Def.'s Trial Br. at 2; Def.'s Post-Trial Br. at 2 (Docket Item 76), the defendants
have waived any argument that those indirectly owned interests are not subject to
today's ruling.

The shares owned by David Kaplan individually, however, are another
matter.  David Kaplan has not been a party to this lawsuit, and therefore stands
in the same position as any other shareholder.   The parties' previous legal
memoranda do not reflect any understanding that David Kaplan's shares will be
directly affected by my decision.[46]   Unless I determine ultimately to extend relief

---

[45] In an earlier lawsuit in the District of Massachusetts, Judge Gorton likewise referred to Kaplan as "the beneficial owner of approximately 19.1% (591,254 shares) of FHC's outstanding common stock." <u>Kaplan v. First Hartford Corp.</u>, 447 F. Supp. 2d 3, 4 (D. Mass. 2006).

[46] It is true that in a parenthetical comment in my Findings of Fact and Conclusions of Law on oppression I mentioned David Kaplan's shares, <u>see</u> Findings of Fact and Conclusions of Law at 4-5, but even there, I referred to the plaintiff as "a 19% shareholder," thereby disregarding David Kaplan's individually owned shares, <u>id</u>. at 1.

more broadly to shareholders,[47] or determine that neither First Hartford nor Neil Ellis has the financial ability to purchase the Rickard Kaplan stock and that dissolution of First Hartford is required, my decision ordering relief in this case will be limited to Richard Kaplan's individual, beneficial and joint interests.

As previously agreed upon by the parties, the expedited briefing schedule on the remaining issues with respect to First Hartford's ability to pay, who can participate, and how the payment should be structured, is as follows:  The parties are to meet and confer within five business days after the date of this Order, the defendants are to file their responses within eleven business days from the Order date, and the plaintiff and amicus parties are to file their replies within eleven days after the filing of the defendants' responses.

SO ORDERED.

DATED THIS 20TH DAY OF MARCH, 2009

/S/D. BROCK HORNBY
D. BROCK HORNBY
UNITED STATES DISTRICT JUDGE

---

[47] Although they have not sought to intervene as parties, some shareholders have filed an amicus brief that expresses concern about remedy because of the general economic downturn in recent months and its likely effect on the value of the business.  Post-Trial Br. of Amici Curiae at 8-12 (Docket Item 181).