UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| RICHARD E. KAPLAN, )<br>)<br>          P<small>LAINTIFF</small> )<br>)<br>v. )<br>)<br>FIRST HARTFORD )<br>CORPORATION <small>AND</small> )<br>NEIL ELLIS, )<br>)<br>          D<small>EFENDANTS</small> ) | C<small>IVIL</small> N<small>O</small>. 05-144-B-H |

**DECISION AND ORDER ON THE REPORT OF THE SPECIAL MASTER**

      In this corporate oppression case, I appointed Attorney George J. Marcus as Special Master to determine whether the corporation is financially able to purchase the oppressed shareholder's shares and under what circumstances; and, if the corporation cannot do so, whether the controlling shareholder can. The Special Master filed his Report on September 14, 2009. The primary issues now are whether the Special Master followed my Order in what he did and did not address in his Report; whether the buyout schedule he devised is appropriate; and the nature and computation of pre- and postjudgment interest. The plaintiff filed objections to the Special Master's Report; the defendants filed a motion to modify it; other shareholders as amici curiae filed a legal memorandum in support of the defendants' position.

After notice and a hearing on November 16, 2009, and upon de novo review of the issues that the parties raise,[1] I **ADOPT** the Report of the Special Master with one exception noted below. The plaintiff's Objections are **SUSTAINED IN PART** as to postjudgment interest but otherwise **OVERRULED**. I **DENY** the defendants' Motion to Modify the Report of the Special Master to strike references to prejudgment interest and **GRANT** the plaintiff's request for prejudgment interest on the terms described below.

## BACKGROUND

This case began in March 2005. Richard Kaplan, a nineteen-percent (19%) shareholder of First Hartford Corporation ("First Hartford"), sued the company and its controlling shareholder, Neil Ellis, alleging, among other things, shareholder oppression.[2] The litigation proceeded in three stages. First, after a bench trial in November 2006, I ruled that First Hartford and Ellis had treated minority shareholders oppressively.[3] Second, in November 2007, after the parties extensively briefed the remedy issue, I determined that First Hartford should buy Kaplan's shares.[4] Third, after further briefing and a bench trial at which the parties presented opinion evidence on First Hartford's fair value from three experts, I found that First Hartford was worth $15 million

---

[1] See Fed. R. Civ. P. 53(f)(3-4). The defendant Ellis's lawyer argued at the hearing on November 16, 2009 that the Master's interpretation of my Order concerning what he should consider was a procedural decision subject to review for abuse of discretion under Rule 53(f)(5), but I conclude that it is substantive and subject to de novo review.

[2] The details of the case are contained in my Findings of Fact and Conclusions of Law ("Liability Decision") (Docket Item 81) and in the Report of the Special Master (Docket Item 213). I will not repeat them here.

[3] Liability Decision at 44.

[4] Findings of Fact and Conclusions of Law Part 2: Remedy at 4 ("Remedy Decision") (Docket Item 116).

(or $4.87 per share) as of September 15, 2005, the date Kaplan filed his complaint.[5]

With liability, remedy, and valuation decided, the parties tried to reach an agreement on the mechanics of the buyout, but could not settle on a solution. After consulting with the parties and other shareholders, whom I had allowed to intervene as amici curiae, I appointed Attorney Marcus as Special Master and ordered him to determine:

> 1. Whether First Hartford Corporation has the capacity to buy outright and promptly the Richard Kaplan shares as I have defined them at the value I have assigned, without adversely impacting the corporation's ability to do business and to continue as a viable company in its business pursuits for the benefit of other shareholders.
>
> 2. If outright and prompt purchase is not possible, the most reasonably speedy schedule for doing so and commercially reasonable terms providing fair protection for Richard Kaplan to secure any delayed or extended payment.
>
> 3. If First Hartford Corporation cannot purchase the shares, whether Neil Ellis can purchase the shares and under what circumstances, with commercially reasonable assurance of payment to Richard Kaplan.
>
> 4. [T]he impact of the assessment of pre-judgment interest on the answer to question #1 and, if relevant, #2, and if relevant, #3.[6]

As detailed in the Special Master's Report, he met with the parties on several occasions in July, August, and September 2009.[7] Both parties submitted documents and information to the Special Master, responded to questions

---

[5] Findings of Fact and Conclusions of Law Part 2: Valuation at 25 and n.43 ("Value Decision") (Docket Item 192). Given this valuation and under the assumption that Kaplan owns 591,254 shares of First Hartford stock, Kaplan is entitled to $2,879,406.98. Report at 3.
[6] Order Appointing Special Master at 1-2 (Docket Item 209).
[7] Report at 4-9.

posed by him, and submitted comments and objections to the Special Master's draft report.[8] The Special Master issued his final report on September 14, 2009.

The Special Master found that while First Hartford could not buy Kaplan's shares outright and promptly (Question #1), it could pay $500,000 immediately; execute a note for and pay the remainder of the purchase price of Kaplan's shares at $4.87/share over five years, which the Special Master determined was a reasonably speedy schedule (Question #2); offer Kaplan commercially reasonable security (Question #2); and pay prejudgment interest without affecting First Hartford's ability to perform the buyout and continue in business (Question #4).[9] Since the Special Master found that First Hartford could buy Kaplan's shares on a reasonably speedy schedule with commercially reasonable security, he did not evaluate Ellis's ability to purchase the shares (Question #3).[10]

### DISCUSSION

#### (A) *The Special Master's Decision Not to Assess Ellis's Finances*

Kaplan contends that after finding that First Hartford could not buy his shares outright and promptly, the Special Master should have determined not only the most reasonably speedy schedule on which First Hartford could perform with commercially reasonable security to Kaplan, but also how Ellis's ability to purchase the shares could assist First Hartford in performing the

---

[8] Id.
[9] Id. at 18-21.
[10] Id. at 20.

4

buyout.[11]  Kaplan's objection poses two questions: whether the Special Master properly understood my Order; and, if he did, whether his conclusion that First Hartford could perform satisfies the standards that I established in my Order. I review such mixed questions of fact and law de novo.

The Special Master properly understood his duties. Once the Special Master found that First Hartford could purchase the Kaplan shares under the terms described in question two of my Order, he did not need to answer question three. That would have been necessary only if First Hartford could not purchase the shares on a commercially reasonable basis.[12]  The plaintiff's objection regarding the scope of the Special Master's duties is **OVERRULED**.

**(B)**     ***The Special Master's Finding of a Reasonably Speedy Buyout***

Kaplan objects that the Special Master's proposed five-year buyout schedule is not "reasonably speedy" given the circumstances of this case. Specifically, he contends that the Special Master settled for the "best FHC can do" rather than focus on my requirement that a buyout be accomplished with reasonable speed.[13]  Kaplan notes that there is no generally accepted definition of "reasonably speedy" in connection with applying the Maine Business Corporation Act[14] and argues that the Special Master was wrong to take guidance from standards established by Chapter 11 of the Bankruptcy Code

---

[11] Pl. Richard E. Kaplan's Objections to the Report of the Special Master at 2 (Docket Item 216).
[12] Question #4 of my Order states that the Special Master should determine how a prejudgment interest award would affect the answer to "question #1 and, if relevant, #2, and if relevant, #3." Order at 2.  Question#4 therefore clearly contemplates that the Master could stop his inquiry at Question #2, without proceeding to Question #3.
[13] Pl.'s Objections at 3-4.
[14] Oral Argument Tr., Nov. 16, 2009.

5

and voluntary private-company buyouts.[15]  Kaplan maintains that the Special Master should have determined what is reasonably speedy from Kaplan's point of view:  "an oppressed shareholder who has had to resort to extraordinarily costly litigation over a period of [four] years."[16]  Kaplan submits that from this point of view, the five-year buyout is unreasonably long because it is longer in duration than the underlying litigation and threatens to "leave Kaplan's interests subjugated to FHC and Ellis."[17]

While recognizing that Kaplan had prevailed at trial and was entitled to a remedy, I charged the Special Master with creating a remedy that recognized other interests as well.  Specifically, my Order precluded any schedule so speedy as to affect adversely "the corporation's ability to . . . continue as a viable company in its business pursuits for the benefit of other shareholders."[18]  It was therefore wholly appropriate for the Special Master to consult both the Bankruptcy Code and commercial practice for guidance on standards of commercial reasonableness.  He noted, for example, that it is customary for shareholders in close corporations to be bought out over time[19] and that it is a reasonable commercial expectation that a shareholder buyout will typically be funded over "five to ten years with no security or junior security and with modest interest if any."[20]  He also considered how current economic conditions affect First Hartford's core business and First Hartford's financial condition as

---

[15] Pl.'s Objections at 5-6.
[16] Id. at 7.
[17] Id. at 2.
[18] Order at 1.
[19] Report at 43 n.20.
[20] Id. at 23.

he assessed the schedule by which First Hartford could buy Kaplan's shares at the 2005 price, a price far above that supported by today's market. The Special Master noted that First Hartford's "operating performance . . . has been marginal and unsteady,"[21] that it has a "very thin margin of available working capital"[22] and that it must rely on "opportunistic" liquidations and refinancings to meet its "existing obligations."[23]  I agree with his conclusion that, given its business model, First Hartford needs flexibility in meeting its existing business obligations and its obligations to Kaplan.  Given current economic conditions, the Special Master found that five years would provide reasonable confidence in First Hartford's ability to perform.[24]  He quite reasonably did not speed up the buyout by assigning net sales proceeds to Kaplan because of the consequences for First Hartford's operations and because the five-year schedule is already on the speedier end of the spectrum of shareholder buyouts.  I agree with the Special Master that the five-year buyout is reasonably speedy for a shareholder buyout, and I conclude that the Special Master has crafted a reasonably speedy, commercially reasonable buyout schedule.  The plaintiff's objection to the five-year term is **OVERRULED**.

---

[21] Id. at 15.
[22] Id. at 17.
[23] Id. at 18.
[24] Id. at 43 n.20.  Kaplan has argued that the Special Master has failed to consider how the proceeds from a recent sale of property in Bangor could speed up the buyout.  Pl.'s Mem. in Opp'n to Defs.' Mot. to Modify Report of the Special Master at 3-5 (Docket Item 222).  Kaplan no longer contends that First Hartford failed to disclose the sale.  Oral Argument Tr., Nov. 16, 2009.  But he suggests that First Hartford's initial payment of $500,000 could be increased with the $900,000 net on the Bangor sale.  Pl.'s Mem. in Opp'n at 5.  The Special Master not only had access to First Hartford's disclosure of the sale but also assumed that the company was already using the proceeds of the sale to fund the initial payment.  See Report at 36 n.10.  There is thus no need to ask the Special Master to consider how the Bangor sale could affect the speed of the buyout.

### *(C)   The Special Master's Finding of Commercially Reasonable Security*

Kaplan contends that he is entitled to "the kind of protections that any lender would reasonably require"[25] and that the Special Master has failed to provide them.[26] Specifically, since First Hartford cannot provide security liens in the equity of its operating properties because of restrictions on its mortgages, Kaplan wants Ellis to pledge his shares as security for the promissory note to Kaplan.[27] First Hartford and Ellis counter that a pledge of the Ellis shares would hamstring First Hartford's ability to get necessary operating loans from other lenders,[28] because other lenders are likely to require the Ellis shares as security for loans during the buyout term. I agree with the Special Master's determination that First Hartford's business model requires flexibility and that it can perform the buyout only if it has the latitude it needs to continue its operations. Thus, it is commercially reasonable not to require Ellis to pledge his shares as security for Kaplan's note. It is also reasonable to require Kaplan to release his security interest in any asset upon tender of the fair market value of that asset by First Hartford, so that the company can continue with its business of disposing of its real estate from time to time.[29]

I also find that the Special Master has provided Kaplan with commercially reasonable security. Kaplan will receive first priority interests in: (a) First Hartford's 50% interest in CP Associates, which is worth more than

---

[25] Pl.'s Objections at 6.
[26] Id. at 10.
[27] Oral Argument Tr., Nov. 16, 2009.
[28] Id.
[29] Report at 42.

8

$3.2 million; (b) First Hartford's 50% interest in Trolley Barn Associates, which is worth at least $225,000 just in the value of unencumbered land; (c) First Hartford's rights to service and fee income from its agreements with CVS, which was $1.47 million in 2008 and $3.02 million in 2009, yielding a net income of $407,000 and $964,000 respectively; (d) an estimated $600,000 per year from three cash-generating properties; and (e) Kaplan's own beneficially owned stock.[30]  Kaplan therefore receives security in assets far exceeding the value of his promissory note, sufficient to give him reasonable confidence that First Hartford will be able to pay the estimated $470,000 annual payments on his note.  I note that in addition Ellis has personally guaranteed the payments on the note.  Without disclosure of the Ellis financial statements, I cannot place a value on the guarantee,[31] but it does create some incentive to paying the note.  Second, the proposed escrow account provides confidence-building transparency.  Kaplan will be able to see that First Hartford has made contributions to the account to service his note, and First Hartford cannot withdraw money from the account once it is deposited.

I conclude that Kaplan will receive commercially reasonable security, and his objections on this issue are **OVERRULED**.[32]

---

[30] Defs.' Resp. to Pl.'s Objection to the Report of the Special Master at 8 (Docket Item 221); see also Report at 38-43.

[31] The Special Master did not consider Ellis's guarantee to be part of the commercially reasonable security.  Report at 35.  The plaintiff's objection to the guarantee is therefore inapposite.

[32] This includes Kaplan's request to be able to participate in the sale or merger of First Hartford on equal terms with other shareholders.  Pl.'s Objections at 11-12.  Whatever happens to the value of First Hartford's stock, Kaplan is guaranteed a value of $4.87 per share.

### *(D)    Prejudgment Interest*

Prejudgment interest is controlled by Maine law.[33] The parties agree that, under Maine law, I have discretion to award prejudgment interest[34] and that Maine law has a presumption in favor of such awards.[35] The defendants do not challenge the Special Master's finding that First Hartford can pay prejudgment interest,[36] but they do contend that an award of prejudgment interest would be inequitable in this case and that to the extent that there is a presumption in favor of the award, either Kaplan has lost the benefit of the

---

[33] 14 M.S.R.A. § 1602-B; see also Crowe v. Bolduc, 365 F.3d 86, 91 (1st Cir. 2004) (noting that in a diversity action, "[state] law governs the plaintiff's entitlement to prejudgment interest"). The Maine statute allows prejudgment interest at 3% above the one-year Treasury bill rate from the last full week of the calendar year immediately prior to the year in which a notice of claim is served. 14 M.R.S.A. § 1602-B(3). On petition of a non-prevailing party and a showing of good cause, I may fully or partially waive an award of prejudgment interest. 14 M.S.R.A. § 1602-B(5).

[34] Defs.' Mot. to Modify the Report of the Special Master Pursuant to Fed. R. Civ. P. 53(f)(2) at 2 (Docket Item 214); Pl.'s Mem. in Opp'n at 2.

[35] Defs.' Reply to Pl.'s Opp'n to Mot. to Modify Report of the Special Master at 2 (Docket Item 226); Pl.'s Mem. in Opp'n at 2; see also Pierce v. Central Maine Power Co., 622 A.2d 80, 85 (Me. 1993) (interpreting 14 M.R.S.A. § 1602 "as presuming that the prevailing party is entitled to prejudgment interest on the rationale that the presumption 'encourages the defendant to conclude a pretrial settlement of clearly meritorious suits' (quoting Simpson v. Hanover Ins. Co., 588 A.2d 1183, 1185 (Me. 1991)); Crowe, 365 F.3d at 91 ("Maine law broadly entitles prevailing civil plaintiffs to prejudgment interest as a matter of right." (citing 14 M.R.S.A. § 1602-B and Sawyer v. Walker, 572 A.2d 498, 499 (Me. 1990)). Under Maine law, an award of prejudgment interest serves two purposes. First, it "compensates an injured party for the inability to use money rightfully belonging to that party between the date suit is filed and the date judgment is entered." Jasch v. Anchorage Inn, 799 A.2d 1216, 1219 (Me. 2002) (quoting Guiggey v. Great N. Paper, Inc., 704 A.2d 375, 377 (Me. 1997)). Second, the possibility of a prejudgment award "encourages the defendant to conclude a pretrial settlement of clearly meritorious suits." Id. A plaintiff's right to prejudgment interest "is not absolute" and may be lost if, for example, a plaintiff "causes delay" or otherwise acts unreasonably. Pierce, 622 A.2d at 85 (quoting Simpson v. Hanover Ins. Co., 588 A.2d 1183, 1185 n.3 (Me. 1991)).

[36] The defendants do argue that the prejudgment interest award would deprive First Hartford of "badly needed cash, which could be used to run and grow the business for the benefit of all." Defs.' Resp. at 14.

presumption by virtue of his conduct during litigation or the circumstances of the case provide good cause for waiving it.[37]

The defendants say that Kaplan should not receive prejudgment interest because his unreasonable valuation of the company "made settlement impossible."[38] Thus, they say, an award of prejudgment interest does not serve the purpose of encouraging early settlement of meritorious cases. Kaplan asserts that First Hartford never made a settlement offer,[39] a contention that the company has not disputed, and points to my earlier observation that prejudgment interest is a crude measure of the "investment value of his shares" during the lawsuit.[40] Having observed the conduct of the parties in this case for more than four years, I cannot conclude that Kaplan is primarily responsible for the length of this highly contentious litigation.[41]

The defendants also argue that it would be inequitable to award Kaplan prejudgment interest because he enjoyed his full rights as a shareholder throughout the litigation, could have sold his shares at any time, received a dividend of ten cents per share in 2006, and obtained the time value of his

---

[37] The amici curiae argue that an award of prejudgment interest would "amount to an extraordinary, unfair windfall to one minority stockholder" that would be inequitable given the plaintiff's recovery and inappropriate since "none of the policy interests under lying prejudgment interest" are implicated here. Reply Mem. of Amici Curiae in Support of Report of the Special Master at 2 (Docket Item 225).
[38] Defs.' Resp. at 12.
[39] Pl.'s Reply Mem. in Support of Objections to the Report of the Special Master at 3 (Docket Item 229). Morales v. Rosenberg, 919 So. 2d 476 (Fla. Dist. Ct. App. 3d Dist. 2005), is therefore inapposite.
[40] Remedy Decision at 8.
[41] As the Law Court has explained, the Maine legislature did not intend prejudgment interest to be a measure of damages in a particular case but rather "a procedural device to control the parties' conduct of the trial." Ginn v. Penobscot Co., 342 A.2d 270, 281 (Me. 1975).

11

money by not sharing in the losses suffered by other shareholders.[42] The first two arguments are unconvincing. Kaplan was a minority shareholder who suffered oppression and who was actively suing First Hartford for relief as a result. The defendants' argument that Kaplan could simply have sold his shares amounts to saying that Kaplan could have abandoned his pursuit of the actual value of his investment. The fourth argument is also unpersuasive. Kaplan filed his Complaint in 2005, but was unable to withdraw his investment in the company and place it at work elsewhere as I have ruled he was entitled to do. Running prejudgment interest from the Complaint's filing is a crude measure of what Kaplan could have done if he had obtained immediate relief. I do agree, however, that the award of prejudgment interest should be reduced by the amount of the dividend Kaplan received in 2006; the dividend flows from ownership of the stock; the interest flows from what hypothetically would have happened if he had been able to rid himself of his stock. He cannot have it both ways.

The parties agree that any prejudgment interest should accrue at the fixed statutory rate,[43] but differ as to whether the interest should be compound. The prejudgment interest statute[44] does not address compounding but Kaplan argues that Maine case law and one of my previous cases show that prejudgment interest should be compound.[45] McLoon, the Maine case, dealt

---

[42] Defs.' Resp. at 11, 13, 14.
[43] See Defs.' Resp. 15. The plaintiff initially argued that the interest rate should be floating, Pl.'s Objections at 13, but abandoned this argument at oral argument on November 16, 2009.
[44] 14 M.S.R.A. § 1602-B.
[45] Pl.'s Objections at 12-13.

with prejudgment interest pursuant to a previous statute governing shareholder's appraisal rights that the Supreme Judicial Court explicitly distinguished from the kind of prejudgment interest at stake here.[46] McLoon held that prejudgment interest under the appraisal rights statute was a substantive right rather than a "procedural device to encourage expeditious litigation."[47] McLoon's logic therefore has no application here. It is true that in Warren v. United Parcel Service, Inc.,[48] I awarded compounding under the circumstances, but I made no ruling that the statute required compounding, and I had already partially waived interest to avoid giving the plaintiff interest on backpay during the periods when he had not yet earned it.[49] Here, I find that compounding is not appropriate. The Special Master determined that First Hartford could afford prejudgment interest on the assumption that it would be simple.[50] An award of compound interest could upset the balance the Special Master has worked so hard to achieve,[51] and fairness to the other minority shareholders requires that Kaplan receive no more than equity requires.

The plaintiff's request for prejudgment interest, but without compounding, is **GRANTED**.

---

[46] In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997, 1007 (Me. 1989).
[47] Id.
[48] 495 F. Supp. 2d 86 (D. Me. 2007).
[49] Id. at 90.
[50] Report at 20 n.8.
[51] The Special Master could "not articulate a precise pathway for FHC to raise [the] funds" to pay prejudgment interest, but he concluded that since the "the obligation is deferred for a significant period of time and . . . is not terribly large in context of all of [FHC's] assets," it could likely pay a balloon payment of prejudgment interest at the end of five years. Report at 38 n.15. I am unwilling to impose an additional burden that may limit the company's ability to meet its obligations.

### *(E)* *Postjudgment Interest*

Postjudgment interest is controlled by federal statute.[52] The Special Master has proposed that First Hartford pay postjudgment interest at the legal postjudgment rate for twelve (12) months as an incentive for First Hartford to pay as much of the note as much as possible in the first year.[53] He has proposed that thereafter First Hartford pay interest based on the average rate then payable to its first mortgage creditors.[54] The Special Master has also proposed that the company pay no interest on the award of prejudgment interest.[55] Kaplan objects that the interest rates are not commercially reasonable and that First Hartford should pay interest on the full amount of its obligations, including prejudgment interest.

First, I find that the Special Master's proposal for postjudgment interest is reasonable. The first year is the statutory rate and given its low level, First Hartford has a strong incentive to pay as much of the note as possible during the first year to avoid paying the higher mortgage-based rate thereafter. Second, it is hard to imagine a rate more commercially reasonable than the one the Special Master has devised for interest after the initial year: Kaplan will

---

[52] See 28 U.S.C. § 1961; see also Fratus v. Republic Western Ins. Co., 147 F.3d 25, 30 n.5 (1st Cir. 1998) (applying Section 1961 in a diversity case).

[53] Report at 36. It is an "incentive" because the current rates for Treasuries make postjudgment interest so low, given the statutory formula—"[Postjudgment] interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

[54] Report at 37. The defendants have not objected to the use of an interest rate higher than that provided for by the federal postjudgment interest statute, 28. U.S.C. § 1961. See Def.'s Mot. to Modify at 1-2; Def.'s Resp. at 10 (referring to the mortgage-based rate as "entirely reasonable").

[55] Report at 36.

14

receive an interest rate based on what is commercially available to First Hartford.

But Kaplan is correct that First Hartford should pay interest on the full amount of its debt including prejudgment interest. Although Maine does not allow for postjudgment interest on prejudgment interest,[56] federal law does.[57] Accordingly, the plaintiff's objections to the interest rates are **OVERRULED**, but his objection to the non-payment of postjudgment interest on prejudgment interest is **SUSTAINED**.

As a practical matter, it is necessary to set a date on which prejudgment interest stops accruing and postjudgment interest starts. Under Kaiser Aluminum, post-judgment interest runs from a "date certain" on the entry of judgment.[58] "[A] finding of liability alone without a corresponding determination on damages does not suffice to start the clock on postjudgment interest."[59] Rather, postjudgment interest begins to accrue when it becomes possible to ascertain money damages in a "meaningful way."[60] "[D]amages are considered to have been ascertained when all that remains is a 'mechanical task of computing' the exact sum based on the court's orders."[61] Here,

---

[56] 14 M.R.S. § 1602-B(6).
[57] See, e.g., Buckley v. Brown Plastics Mach., LLC, 368 F. Supp. 2d 167, 174 (D.R.I. 2005).
[58] Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990).
[59] Radford Trust v. First Unum Life Ins. Co. of Am., 491 F.3d 21, 24 (1st Cir. 2007) (citing Happy Chef Sys., Inc. v. John Hancock Mut. Life Ins. Co., 933 F.2d 1433, 1435, 1437 (8th Cir. 1991)).
[60] Id. (quoting Kaiser Aluminum, 494 U.S. at 836).
[61] Id. at 25 (quoting EEOC v. Gurnee Inns, Inc., 956 F.2d 146, 149 (7th Cir. 1992)). In Gurnee Inns, the defendant argued that a judgment entered by a magistrate judge "was not a money judgment but an injunctive judgment for specific performance (the delivery to certain individuals of certified checks in specified amounts), which when modified to allow [the defendant] to compute the applicable payroll deductions, did not set forth specific amounts for
*(continued next page)*

although it is clear that Kaplan is entitled to a money judgment, it will not be possible to specify the fixed amount of his award until the parties determine the number of shares that Kaplan owns. Once the parties know how many shares Kaplan owns, the amount of his money judgment can be calculated using the $4.87/share valuation, and judgment can be entered. Until such time as Kaplan's award can be calculated, therefore, prejudgment interest will continue to accrue.

For the reasons stated above, I hereby **ORDER** as follows:

1. The plaintiff's Objections to the Report of the Special Master are **OVERRULED IN PART** and **SUSTAINED IN PART**.

2. The defendants' Motion to Modify the Report of the Special Master is **DENIED**.

3. A standing special master shall be appointed with the powers and duties described in the Report of the Special Master. I will appoint Attorney George J. Marcus unless, within ten (10) days of this Order, the parties show good cause why he should not be appointed.

4. The plaintiff's request for prejudgment interest from September 15, 2005, until the entry of final judgment is **GRANTED**, subject to an offset for the 2006 dividend he received. Such interest shall be simple.

---

the checks." 956 F.2d at 149. The defendant contended that postjudgment interest was improper "because 28 U.S.C. § 1961 allows interest only on 'money judgments' in a sum certain, and the checks it was ordered to deliver were not for a specific amount." Id. The Seventh Circuit found that "[n]either argument survived even minimal scrutiny" because an order for back pay was a money judgment, even though "equitable in nature," and because "the award[] did not lose [its] character as [a] sum[] certain simply because [it was] subject to the mechanical task of computing the payroll deductions." Id.

16

5. The clerk shall determine the fixed rate for prejudgment interest pursuant to 14 M.R.S.A. § 1602-B(3).

6. Postjudgment interest shall be calculated at the rates specified by the Report of the Special Master on the entire money judgment, including prejudgment interest.

7. For the purposes of calculating prejudgment and postjudgment interest, final judgment shall enter when the parties have determined the precise number of shares owned by Kaplan. If, within three weeks of this Order, the parties cannot agree upon a procedure for making this determination, the standing special master shall resolve it.

8. First Hartford shall begin performing the buyout on the terms laid out in the Report of the Special Master upon entry of final judgment.

**SO ORDERED.**

**DATED THIS 23RD DAY OF NOVEMBER, 2009**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**