UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 05-144-B-H |
| | ) | |
| FIRST HARTFORD | ) | |
| CORPORATION and | ) | |
| NEIL ELLIS, | ) | |
| | ) | |
| Defendants | ) | |

**DECISION AND ORDER ON THE PLAINTIFF'S MOTION TO MODIFY THE THIRD REPORT AND INTERIM ORDER OF THE SPECIAL MASTER**

In this corporate oppression case, the parties disagree over the scope of the buyout remedy that I have ordered.

The plaintiff shareholder, Richard E. Kaplan, argues that in March 2009, I ruled that the buyout includes not only his individually owned stock in the defendant First Hartford Corporation, but also stock where he has or shares dispositive power.[1] Together, these interests amount to roughly 19 percent of the company's outstanding stock according to its 2005 securities filings. Kaplan says that I ruled in March 2009 that First Hartford, by treating Kaplan as a 19 percent owner of the company before and during this litigation, waived arguments to the contrary.[2]

---

[1] Pl.'s Mot. to Modify the Third Report & Interim Order of the Special Master at 2-3 (Docket Item 238).
[2] See id. at 5-6.

First Hartford argues that it never made such a waiver, that the buyout remedy should be limited to Kaplan's individually owned shares, and that, in any event, under Maine law and given my use of the term "beneficial ownership" in my March 2009 decision, the buyout should include only shares in which Kaplan can show that he has a direct *economic* interest.[3]

After reviewing the parties' arguments, the Special Master, whom I appointed to supervise the buyout, issued reports. In his Second and Third Reports and Orders, he concluded that my March 2009 ruling provided that in addition to Kaplan's individually owned stock, certain indirect stock interests, including "stock [Kaplan] owns beneficially through family trusts and other business entities, and stock where he shares control with his brother," also could qualify for the buyout.[4] But he concluded that I had not specified the degree of beneficial ownership or joint control that would determine which shares actually qualify for the buyout.[5] The Special Master decided that further proceedings therefore are needed on this issue and that Kaplan must reveal more fully the nature of his and the Kaplan family's ownership and control.[6]

Kaplan now has moved to modify the Special Master's Third Report. First Hartford has objected and requested that I reconsider and clarify my

---

[3] Defs.' Opp'n to Pl.'s Mot. to Modify the Special Master's Third Report & Interim Order at 11-17 (Docket Item 239).
[4] Second Report & Order of Special Master at 5 (Docket Item 233) (quoting Kaplan v. First Hartford Corp., 603 F. Supp. 2d 195, 210-11 (D. Me. 2009)); Third Report & Interim Order of Special Master at 5 (Docket Item 237) (same). In the interest of clarity, I will refer to the initial Report of the Special Master (Docket Item 213) as the "First Report of the Special Master."
[5] Third Report & Interim Order of Special Master at 5, 8.
[6] Id. at 9-10.

March 2009 ruling on waiver. After notice and a hearing on May 4, 2010, and upon de novo review of the issues that the parties raise,[7] I **DENY** First Hartford's request for reconsideration, but I do clarify my previous rulings and **GRANT** Kaplan's Motion to Modify the Third Report, because I did not sufficiently define what I expected the Special Master to do.

## ANALYSIS[8]

### *1. Request for Reconsideration*

First Hartford asks that I reconsider my March 2009 ruling[9] and rule that First Hartford is required to buy only Richard Kaplan's individually owned 145,719 shares.[10] The request is untimely. Under this District's local rule, a motion for reconsideration must be filed within fourteen days of a ruling absent a showing of "cause" for further delay, which "includes newly available material evidence and an intervening change in the governing legal standard."[11] First Hartford does not claim that it has discovered new evidence or that there has been a change in the law. Instead, First Hartford's lawyer told me at the hearing on May 4, 2010 that First Hartford decided to wait to challenge my ruling until the record in the case was more complete. That tactical decision

---

[7] See Fed. R. Civ. P. 53(f).
[8] The details and background of this case appear in my decision on liability, Kaplan v. First Hartford Corp., 484 F. Supp. 2d 131 (D. Me. 2007).
[9] See Kaplan, 603 F. Supp. 2d at 210-11 (finding that First Hartford had waived arguments that relief should not include Kaplan's "indirectly owned interests" because First Hartford had, until the briefing and argument on the valuation of the buyout, "proceeded on the basis that the Richard Kaplan shares include Richard Kaplan's individually owned stock, stock he owns beneficially through family trusts and other business entities, and stock where he shares control with his brother").
[10] See Defs.' Opp'n to Pl.'s Mot. to Modify at 2.
[11] D. Me. Local R. 7(g).

does not justify First Hartford's delay in requesting reconsideration, especially given the travel of the case since then.

As I explain below, therefore, I do not change my ruling that First Hartford must buy more than Kaplan's individually owned shares. However, I also recognize that my use of the term "waiver" may not have been the best way to characterize the basis for the ruling.

### A. *What Happened After the March 2009 Ruling*

After my March 2009 ruling on valuation, the parties could not agree on the mechanics of a buyout remedy or even whether it was feasible. I appointed Attorney George J. Marcus as Special Master to determine whether First Hartford could buy the plaintiff's shares outright or, if a prompt buyout were not feasible, the most reasonably speedy schedule on which the buyout could take place.[12] First Hartford agreed that the scope of the Special Master's duties should include a determination of whether it could "purchase the shares . . . owned *individually and beneficially* by Richard E. Kaplan."[13] To be sure, when First Hartford represented that it could not "buy outright and promptly the shares of First Hartford stock owned individually or beneficially by [Kaplan] at $4.87 a share—which would require a payment of $2,879,406.98 in total," it included the qualification: "if it is correct that Kaplan individually or beneficially owns 591,254 shares (which, for purposes of this memorandum,

---

[12] Order Appointing Special Master at 2 (Docket Item 209).
[13] Defs.' Mem. Regarding Suggestions for Special Master, Scope of Special Master Charge, & How Cost of Special Master Should Be Allocated at 2 (Docket Item 201) (emphasis added).

First Hartford assumes to be the case)."[14] That qualification preserved a question about the share tally. It did not challenge my ruling that more than Kaplan's individually owned shares were at stake. Instead, First Hartford proposed a five-year buyout of "all shares of stock owned individually or beneficially by Kaplan" as the "fastest way to effect a buyout of all of Kaplan's stock."[15]

The Special Master ultimately adopted a five-year buyout along the lines suggested by First Hartford. Kaplan objected that five years was an "unreasonably long time for an oppressed shareholder who has had to resort to extraordinarily costly litigation over a period of years" to wait for relief.[16] First Hartford argued that "the Special Master examined all the financial evidence before him . . . [and] determined that five years was a 'reasonably speedy' period . . . [because] [f]ive years is on the shorter end of the spectrum for similar purchases."[17] The length of the buyout—a central and contested

---

[14] First Hartford Corp.'s Proposal to Purchase Pl.'s Shares at 1 (Ex. D to First Report of Special Master) (Docket Item 213-4) (emphasis added).
[15] Id. at 7; see also First Hartford Corp.'s & Neil Ellis's Resp. to Pl.'s Comments to Special Master on Effecting Court Ordered B[u]y-Out Remedy at 2 (Ex. G to First Report of Special Master) (Docket Item 213-7) (arguing that First Hartford's plan was reasonably speedy because "[w]ithin six months from the commencement of the plan . . . [First Hartford] will have paid Kaplan almost $740,000 or over 25% of the principal amount due"). First Hartford had an incentive to obtain this favorable ruling on the buyout's duration because it would directly affect the corporation's cash flow. I note that if the position that First Hartford takes now were correct, the entire buyout (exclusive of prejudgment and postjudgment interest) would have cost a bit less than $710,000 (145,719 shares at $4.87). In other words, if First Hartford had seriously considered a buyout of only Kaplan's 145,719 individually owned shares, it could have proposed a much shorter buyout, bringing a quick end to this contentious litigation.
[16] Pl.'s Objections to the First Report of the Special Master at 7 (Docket Item 216).
[17] Defs.' Resp. to Pl.'s Objection to the First Report of the Special Master at 3-4 (Docket Item 221); see also id. at 7 ("Based on his review of . . . First Hartford's highly leveraged financial position, the Special Master determined that five years was a 'reasonably speedy' schedule. That conclusion is correct."). In its Motion to Modify the First Report of the Special Master, First Hartford did not object to the Special Master's calculation of the buyout's total cost, roughly $2.8 million. Rather, it urged me to adopt the First Report of the Special Master with
*(continued next page)*

issue—obviously depended heavily on the *size* of the buyout (number of shares). First Hartford convinced me to adopt the five-year plan proposed by the Special Master over Kaplan's objection, because the issue was presented in the context of a buyout of approximately 591,254 shares. A five-year buyout would not have been necessary if First Hartford might need to buy only Kaplan's 145,719 individual shares (at a quarter of the cost on which the five-year buyout was predicated).[18]

The Special Master's and my efforts over several months in 2009 were pointless if, in fact, the buyout could be accomplished at a much lower cost and more quickly, perhaps even outright. Against this background, I conclude that First Hartford should have moved for reconsideration of my March 2009 ruling (or otherwise raised the issue of the total cost of the buyout) promptly under the time limits of the local rule, and long before now.

---

the exception of the sections regarding prejudgment interest. Defs.' Mot. to Modify the First Report of the Special Master at 1 (Docket Item 214). I note that First Hartford argued against an award of prejudgment interest on the ground that Kaplan had received a dividend of approximately $60,000 during the litigation. Defs.' Resp. to Pl.'s Objection at 14. Based on the stated dividend of ten cents per share, this argument assumes that Kaplan owned approximately 600,000 shares, in other words all the shares over which he has control.

[18] When the Special Master originally reported his findings to this Court, he noted that "for the purposes of [his report], the parties ha[d] assumed that Mr. Kaplan owns, directly and beneficially, 591,254 shares, resulting in a total value of Mr. Kaplan's shares of $2,879,406.98." First Report of the Special Master at 3. He stated that he was "*unaware of any claims* that would challenge the assumption made regarding the amount of Kaplan's share ownership." Id. at n.3. He also recognized that the issue was "beyond [his] current charge" and that "any material change in the number of shares that [First Hartford] is required to purchase could have a material impact on its ability to accomplish the purchase, a matter which is within the current charge of the Special Master." Id. I take that to mean that First Hartford had not indicated to the Special Master that the total cost of the buyout might be one quarter of the cost that he reported.

### B. Terminology of the March 2009 Ruling

At oral argument on the Third Report on May 4, 2010, the lawyers and I discussed whether my March 2009 ruling properly used the term "waiver." The Order stated that "the parties have continuously proceeded . . . on the understanding that Kaplan's beneficial ownership, including shares where he shares dispositive power with another, is at stake" and that First Hartford had "waived any argument" that indirectly owned shares were not subject to the buyout.[19] In briefing and at oral argument, First Hartford's lawyer argued that my "waiver" ruling was legally incorrect. Kaplan's lawyer, on the other hand, stated that he assumed that I had relied on estoppel principles. In fact, in the briefing before my March 2009 ruling, Kaplan had not argued that First Hartford had *waived* arguments about his ownership. Instead, he had argued: "After all of the time, effort, and expense that the parties and the Court have invested in this case, it would not be *equitable* or practical to leave the parties entangled any longer."[20] Therefore, I explore whether the ruling was justifiably based upon estoppel, waiver, or something else.

Equitable estoppel applies when a party has made a "definite misrepresentation of fact to another person having reason to believe that the other person [would] rely upon it" and the person reasonably relies on it to its detriment.[21] As Kaplan pointed out recently, First Hartford has been on notice since at least 2005 that, while Kaplan claimed to control 591,254 shares, he

---

[19] Kaplan, 603 F. Supp. 2d at 210-11.
[20] Pl.'s Valuation Post-Hr'g Reply Br. at 16-17 (Docket Item 185) (emphasis added).
[21] Mimiya Hosp., Inc. SNF v. United States HHS, 331 F.3d 178, 182 (1st Cir. 2003) (quoting Heckler v. Community Health Servs., 467 U.S. 51, 59 (1984)).

7

had a direct economic interest in only 145,719 shares.[22] First Hartford accepted Kaplan's claim to be a 19 percent shareholder (controlling more than his individually owned shares) and represented him as such in securities filings and in litigation.[23] It was reasonable for Kaplan to assume, therefore, that First Hartford did not contest that Kaplan's interests included more than the 145,719 shares that he owned (and owns) outright.

However, it is not clear that by March 2009, Kaplan had *detrimentally relied* on First Hartford's representations. At that time, the various family trusts and business entities over whose shares Kaplan says that he has dispositive and voting power could have asked to intervene in the case.[24] Moreover, the inclusion of the larger number of shares in the buyout remedy did not hinge on intervention. Under Maine law, a court has broad equitable power to order relief other than dissolution, including "the purchase at their fair value of shares of *any* shareholder either by the corporation or by other

---

[22] Kaplan's 2004 Schedule 13D informed First Hartford that he did not have a direct economic interest in 445,535 of the 591,254 shares that he beneficially owned. See Richard E. Kaplan's Schedule 13D (Jan. 20, 2004) at 6 (Ex. B to Pl.'s Mot. to Modify the Third Report & Interim Order of the Special Master) (Docket Item 238-2) ("The shares as to which Richard E. Kaplan and David E. Kaplan have shared voting and disposition power are owned in various family trusts and family entities, which have the right to receive the dividends, if any, paid on those shares, and if such shares are sold, to receive the proceeds of such sale.").

[23] See Form 10-K (fiscal year-end Apr. 30, 2005) at 43 (Ex. A to Pl.'s Mot. to Modify the Third Report & Interim Order of the Special Master) (Docket Item 238-1); see also Def.'s Am. Proposed Findings of Fact ¶ 10, Kaplan v. First Hartford Corp., No. 04-CV-10402 (D. Mass.) (PACER Docket Item 53, May 23, 2006) ("Richard E. Kaplan . . . is the beneficial owner of approximately 19.1% of FHC's common stock, i.e., 591,254 shares. Kaplan and his brother, David Kaplan, share voting power over 445,535 shares, which are owned by one or more trusts . . . ."); Kaplan v. First Hartford Corp., 447 F. Supp. 2d 3, 4 (D. Mass. 2006) (finding that "Richard Kaplan . . . is (and was at all relevant times) a shareholder of the defendant, First Hartford Corporation . . . [and] is the beneficial owner of approximately 19.1% (591,254 shares) of [First Hartford's] outstanding common stock").

[24] See 13-C M.R.S.A. § 1434(1) ("Any shareholder of a corporation may intervene in an action brought by another shareholder under section 1430, subsection 2 to dissolve the corporation in order to seek relief other than dissolution.").

shareholders."[25]  Thus, in March 2009, I could have found that, as a matter of equity, the full disentanglement of Kaplan and First Hartford required First Hartford to buy all the shares that First Hartford had recognized as constituting Kaplan's 19 percent ownership of the company.[26]  In that light, I cannot conclude that, by March 2009, there had been any detrimental reliance. Therefore, equitable estoppel did not apply.

So, was it waiver?  First Hartford argues that a waiver must be knowing and voluntary and does not occur when an issue has not been directly presented.[27]  Fair enough.  A party waives an argument when it "intentionally relinquishes or abandons it."[28]  Giving First Hartford the benefit of the doubt, I agree that I cannot say that it intentionally abandoned or relinquished arguments about the scope of the equitable remedy before March 2009.

However, "[n]o procedural principle is more familiar . . . than that . . . a right of any . . . sort, 'may be forfeited in . . . civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine

---

[25] 13-C M.R.S.A. § 1434(2)(A) (emphasis added); see also Napp v. Parks Camp, Ltd., 932 A.2d 531, 539 (Me. 2007) ("[P]ursuant to 13-C M.R.S.A. § 1434(3) (2006), the court does have the discretion to grant relief other than dissolution 'as an alternative to a decree of dissolution or whenever the circumstances of the case are such that the other relief, but not dissolution, would be appropriate.'"); James B. Zimpritch, Maine Corp. Law & Prac. § 14.12(d) (2d ed. 2004) ("[I]n any judicial dissolution proceeding, the Act provides [the court] with virtually unlimited power in its discretion to fashion relief other than dissolution.").  Thus, First Hartford is wrong in arguing that relief must be limited to the 145,719 shares that gave Kaplan standing to bring this lawsuit.

[26] As Kaplan then argued, to do otherwise would leave his interests exposed to First Hartford's and Neil Ellis's oppressive conduct.

[27] Defs.' Opp'n to Pl.'s Mot. to Modify at 13-14.

[28] United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) (citations omitted); see also United States v. De La Rosa-Ramos, 2010 U.S. App. LEXIS 3084, at *6-7 (1st Cir. P.R. Feb. 17, 2010) (discussing difference between waiver and forfeiture of arguments in the context of challenges to a trial court's sentencing calculations).

9

it."[29] It is true that before the briefing and argument on valuation in the late fall of 2008 and early spring of 2009, neither party had squarely addressed or briefed the issue whether the buyout remedy should be limited to Kaplan's individually owned shares.[30] But as I explained in my March 2009 order, First Hartford had continuously contributed to the understanding that *all* of Richard Kaplan's First Hartford shareholdings, direct and indirect, were at stake.[31] The question that I resolved in March 2009 was whether, given the history of this litigation, First Hartford should have raised sooner its contention that only Kaplan's individually owned shares were affected. The answer plainly was yes. When First Hartford proposed in its June 2007 briefing on remedies that Kaplan sell and First Hartford buy, "to the extent it has the financial capacity to do so," "all shares which [Kaplan] owns outright *or beneficially*,"[32] it treated him as controlling more than just his individually owned shares and linked his larger share ownership to the issue of its financial capacity to buy him out. Moreover, First Hartford asked me to order Kaplan not to buy or sell *any* shares of its stock until the case was concluded[33] and to enjoin him *permanently* from purchasing any First Hartford stock in the future.[34] Neither of those requests was limited to individual ownership; they made sense only in

---

[29] United States v. Olano, 507 U.S. 725, 731 (1993) (quoting Yakus v. United States, 321 U.S. 414, 444 (1944)).
[30] In November 2008, First Hartford argued that the buyout should be limited to the shares that gave Kaplan standing to sue. Defs.' Br. Regarding Valuation at 6-7; see also Post-Trial Oral Argument Tr. 30:21 – 35:3, Feb. 11, 2009 (Docket Item 191); Pl.'s Valuation Post-Hr'g Reply Br. at 15 (noting that the "Defendants now assert for the first time that 'the only shares at issue here are the 145,719 owned by Kaplan himself.'" (citation omitted)).
[31] See Kaplan, 603 F. Supp. 2d at 210-11.
[32] Def.'s Mem. (Position on Remedies) at 1 (Docket Item 93) (emphasis added).
[33] Id. at 3.
[34] Id. at 2.

the context of separating Richard Kaplan's interests totally from First Hartford, not just his individual ownership. As a result of that briefing, I recognized the parties' "conceptual agreement on the general form of relief to be ordered (buy-out of the plaintiff Kaplan if the defendant First Hartford Corporation . . . is financially capable)."[35] In doing so, I was referring to the buyout of all shares where Kaplan had a control interest, precisely those shares contemplated in First Hartford's briefing on remedies.[36] It was for this reason that I expressed surprise when First Hartford later (in its briefing and argument on valuation) raised the issue of what Kaplan shares were covered.[37] I found then that the argument was untimely, given First Hartford's previous representations to Kaplan and to me.[38] As a result, I ruled that First Hartford could not pursue (instead of saying that it *waived*, perhaps I should have said *forfeited*[39])

---

[35] Procedural Order at 1 (Docket Item 99).
[36] This treatment of Richard Kaplan's interests collectively was consistent with previous proceedings. In its Trial Brief on liability, First Hartford referred to Kaplan as "owning roughly 19% of First Hartford's shares," Def.'s Trial Br. at 2 (Docket Item 49), and said that he "seeks a buyout of his shares of stock," id. at 9 n.4. It did not suggest that only a subset of Kaplan's 19 percent interest, i.e., only Kaplan's individually owned shares (a quarter of his total interests), would be subject to a buyout. It also argued that a previous lawsuit that Kaplan brought in the District of Massachusetts amounted to issue preclusion for this lawsuit. Id. at 7. In that previous lawsuit, Kaplan was also characterized as a 19 percent shareholder. See Kaplan, 447 F. Supp. 2d at 4. First Hartford made no suggestion that its issue preclusion argument in this case applied to Kaplan only with respect to his individually owned shares. Likewise, in its Post-Trial Brief, First Hartford indicated that it understood Kaplan's "motivation in pressing [his] position" as "Plaintiff simply 'wants out,'" envisioning the contest as whether Kaplan could divorce himself from First Hartford entirely. Def.'s Post-Trial Br. at 2 (Docket Item 76).
[37] See Post-Trial Oral Argument Tr. 101:24 – 102:5.
[38] At that point, judicial estoppel may also have applied. Judicial estoppel typically applies "when a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (citation omitted). Judicial estoppel may also apply based on what has happened after March 2009. Since I deny First Hartford's request for reconsideration on other grounds, I do not decide the judicial estoppel issues.
[39] See United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009) ("At bottom, then, waiver implies an intention to forgo a known right, whereas forfeiture implies something less deliberate—say, oversight, inadvertence, or neglect in asserting a potential right." (citing United States v. Staples, 202 F.3d 992, 995 (7th Cir. 2000))). Practically, for the purposes of
*(continued next page)*

11

arguments that the buyout remedy should not include all shares controlled by Kaplan.

Therefore, I **DENY** First Hartford's request for reconsideration.

## 2. *Clarification of My March and November 2009 Orders*

First Hartford argues that Kaplan's objection to the Special Master's Third Report is premature because the parties agreed to hold all objections until the Special Master completes his determination of the "precise number" of shares eligible for the buyout pursuant to my November 2009 Decision and Order on the Report of the Special Master.[40] It is apparent, however, that the Special Master cannot effectively complete his current task unless I clarify my March 2009 and November 2009 rulings.

In my November 2009 ruling on the First Report of the Special Master, I ordered that "[f]or the purposes of calculating prejudgment and postjudgment interest, final judgment shall enter when the parties have determined the precise number of shares owned by Kaplan."[41] In my March 2009 ruling, I had said that "relief in this case will be limited to Richard Kaplan's individual, beneficial and joint interests."[42] I did not imagine in November that my request

---

proceedings before me, the distinction makes no difference. But for appellate purposes, while a "waived claim is dead and buried" and "cannot thereafter be resurrected on appeal," a forfeited claim "can be pursued on appeal under a hard-to-satisfy standard of review (plain error)." Id.; see also Freytag v. Commissioner, 501 U.S. 868, 895 n.2 (1991) (Scalia, J., concurring) (noting that waiver is a species of forfeiture and that while waiver and forfeiture are different, "our cases have so often used them interchangeably that it may be too late to introduce precision").

[40] Defs.' Opp'n to Pl.'s Mot. to Modify at 3; Joint Mot. to Adopt with Qualifications the Second Report & Order of the Special Master at 2 (Docket Item 234).
[41] Kaplan v. First Hartford Corp., 671 F. Supp. 2d 187, 199 (D. Me. 2009).
[42] Kaplan, 603 F. Supp. 2d at 211.

for a precise number was an issue that would materially affect the structure or size of the buyout. That, I thought, was what I had already decided.

My decision to order a determination of the precise number of Kaplan's shares was sparked by First Hartford's lawyer's discussion of the shares subject to the buyout at the hearing on the Report of the Special Master in November 2009. He said:

> MR. CULLEY: There is one other item, Your Honor, *that is not with us today*, but I just wanted to raise, and as this Court is well aware, depending on what the Court does with the Special Master's report, there will be a time when First Hartford will need to begin redeeming Mr. Kaplan's shares, and *this Court has ruled that [] Mr. Kaplan is [even] entitled to redeem all those shares in which he had a beneficial interest[]*. I only raise that at some point, there needs to be a mechanism to assure that those shares of stock were, in fact, beneficially owned by Mr. Kaplan on September 15, 2005.
> THE COURT: Well, since you've raised it, why don't you tell me what your thought is as to how it should work.
> MR. CULLEY: Well, I think as those shares are tendered, it will only be—it will important to understand what Mr. Kaplan's interest in those shares—does he have a voting interest, are they shares of a trust in which he is a beneficiary of, are they shares in a foundation where he may not have any economic interest.[43]

I realize now that First Hartford's lawyer was alluding to the official comments on the definition of "beneficial owner" in the Model Business Corporation Act § 13.01(2), which underlies First Hartford's argument that the buyout should be limited.[44] At the time, however, First Hartford's lawyer did not alert me that he was forecasting what would clearly be a hotly contested issue. Nor did he then question the meaning of my March 2009 ruling. Instead, he assured me

---

[43] See Hr'g on First Report of the Special Master Tr. 28:5 - 29:1, Nov. 16, 2009 (Docket Item 236) (emphasis added).
[44] See Defs.' Opp'n to Pl.'s Mot. to Modify at 12-13.

13

that any issue regarding the number of shares subject to the buyout was "something that hopefully can be resolved by the parties, and/or with the assistance of the Special Master if the Special Master retains jurisdiction."[45] When I pressed him, he referred to the entire question as an outside possibility.

> THE COURT: So you're not saying there is a procedure. You're simply saying—
> MR. CULLEY: We may have to have a procedure, yes, Your Honor. I just wanted to alert the Court to that. As the Court, I think, has heard from the parties, it may be necessary for there to be continuing jurisdiction. I just wanted to make it clear that that might be something that would arise in the future.[46]

Based on these statements, I understood First Hartford's lawyer to be raising an issue as to the method of verifying which shares First Hartford would be purchasing. I did not understand him to be seeking a way to remove part of the stock Kaplan controls from the buyout.[47] Since First Hartford did not squarely raise the issue of limiting the buyout at that time and, in fact, had not raised the issue with either the Special Master or me after the March 2009 ruling, I understood First Hartford to be discussing a matter of accounting. First Hartford had characterized Kaplan as owning "roughly"[48] 19 percent of its stock, and it was reasonable to conclude that perhaps his holdings were fractionally different from the 19.1 percent referenced in the 2005 Form 10-K,[49] but not that the remedy was limited to Kaplan's direct economic interests, as

---

[45] Hr'g on First Report of the Special Master Tr. at 29:2-5.
[46] Id. at 29:6-13.
[47] See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). As the First Circuit has noted, it "is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Id.
[48] Def.'s Trial Br. at 2.
[49] Form 10-K (fiscal year-end Apr. 30, 2005) at 43.

First Hartford now argues. In sum, when I ordered the parties to determine the "precise number of shares owned by Kaplan,"[50] I had in mind a narrow, ministerial process to be completed quickly without further litigation.

Elsewhere in the March decision, I referred to First Hartford treating "Kaplan's ownership in the aggregate" and stated that Kaplan's shares include his "individually owned stock, stock he owns beneficially through family trusts and other business entities, and stock where he shares control with his brother."[51] These references to ownership in the aggregate and beneficial ownership were, I admit, imprecise. I had adopted the usage long employed by the parties. For example, in its Post-Trial Brief, First Hartford argued against a buyout on the ground that it could put the company back into financial distress and become the functional equivalent of dissolution.[52] It did so because it viewed Kaplan as "a shareholder, holding roughly 19% of the company's shares."[53] First Hartford now argues that when it referred to Kaplan as a 19 percent owner, it was simply passing on unverified information from his 2004 Schedule 13D.[54] But that Schedule 13D fully disclosed and put First Hartford on notice that Kaplan claimed no direct economic interest in 445,535 shares.[55] Nevertheless, First Hartford, in its post-trial argument against a buyout remedy, treated the shares Kaplan *owned* as being equivalent to shares he *controlled* and therefore subject to any buyout order. This was the

---

[50] Kaplan, 671 F. Supp. 2d at 199.
[51] Kaplan, 603 F. Supp. 2d at 210-11 (emphasis added).
[52] Def.'s Post-Trial Br. at 16-17.
[53] Id. at 2.
[54] Defs.' Opp'n to Pl.'s Mot. to Modify at 17.
[55] Richard E. Kaplan's Schedule 13D (Jan. 20, 2004) at 6.

same understanding in play in 2007 when First Hartford first proposed to buy "all shares which [Kaplan] owns outright or *beneficially*" in its Position on Remedies.[56] The parties subsequently agreed that they "reserved all rights as to remedies,"[57] but before they did, I recognized their "conceptual agreement" on a buyout of the shares that Kaplan controlled.[58]

Thus, when I discussed Kaplan's individual, beneficial, and joint interests in my March 2009 ruling, I adopted what had been the parties' established practice of not specifying the nature of Kaplan's ownership, but referring to his dispositive and voting control of shares when discussing the stakes of the case. I used "beneficial" not as a statutory term or a term of art but as the parties had used it, i.e., as a term that included all Kaplan's control interests. To be sure, Kaplan sued for dissolution based on his individual ownership of 145,719 shares rather than his "beneficial" and joint interests.[59] But my March 2009 ruling on remedy did not depend on Kaplan's standing to sue for dissolution as a "beneficial owner," whether defined by federal securities regulations[60] or the Maine Business Corporation Act[61] or otherwise. Maine law allows me to order the buyout of the shares of "any shareholder" as

---

[56] Def.'s Mem. (Position on Remedies) at 1 (emphasis added).
[57] Joint Agreed-To Scheduling Order at 2 (Docket Item 102).
[58] Procedural Order at 1.
[59] See Compl. ¶ 9 (Docket Item 1); 13-C M.R.S.A. § 1430(2). I do not reach the issue of whether Kaplan would also have standing to sue as a trustee.
[60] See 17 CFR 240.13d-3.
[61] As First Hartford notes, Maine's corporate dissolution statute does not define beneficial ownership. Defs.' Opp'n to Pl.'s Mot. to Modify at 12. First Hartford argues that I should look to the definition in the appraisal rights statute, 13-C M.R.S.A. § 1301(2), and indeed, beyond it to the comments on the Model Business Corporations Act. But I was not using the statutory terminology.

a remedy for corporate oppression.⁶² In terms of the equitable remedy here, it was then, and is now, immaterial whether Kaplan has a direct economic interest in the 445,535 shares that he controls or over which he shares control with his brother. From the outset, Kaplan sought a buyout remedy for himself individually and for "other shareholders who desire to sell."⁶³ When it comes to buying, selling, and voting, Kaplan speaks for the beneficiaries of the 445,535 shares held at Merrill Lynch.⁶⁴ I find that the buyout must include all such shares in order to disentangle the parties fully.⁶⁵ Anything less will not end the basic conflict. That would be unfair to First Hartford's remaining shareholders, who plainly deserve to have this matter resolved once and for all. The stock subject to the buyout remedy therefore includes *all* the stock over which Richard Kaplan has dispositive and voting power, including his individual, beneficial, and joint interests.

Based on Kaplan's submissions, it appears that from September 2005 to the present, Kaplan has had such power over the 445,535 shares of First Hartford stock that Merrill Lynch holds in street name for the benefit of various

---

⁶² See 13-C M.R.S.A. § 1434(2)(A). Because I have concluded that the proper remedy under the statute is for First Hartford to buy all the shares that Kaplan controls, the previous discussion about estoppel, waiver, and forfeiture is to some degree superfluous.
⁶³ Compl. at 3 (Prayer for Relief).
⁶⁴ At oral argument, First Hartford's lawyer told me that the concern is not that there may be others who have rights to these shares who could later attack First Hartford for having bought them. Instead, the concern seems to be simply to reduce the number of Kaplan shares that First Hartford must buy.
⁶⁵ First Hartford's suggestion that Kaplan can disentangle himself merely by stepping down as trustee of the various Kaplan family trusts holding the 445,535 shares at issue here, Defs.' Opp'n to Pl.'s Mot. to Modify at 20, demonstrates the continuing antagonism between the parties and confirms my view that the buyout will not be a lasting and equitable remedy unless it includes all of Kaplan's interests.

Kaplan trusts and business entities.[66] Thus, subject to verification, the buyout will include the stock that the parties have long assumed to be at issue—the 591,254 shares referenced in the First Report of the Special Master that I adopted in November 2009.

## Conclusion

The defendant's request for reconsideration is **DENIED**. The plaintiff's motion to modify the Third Report of the Special Master is **GRANTED**. After my Order of November 23, 2009, the only issue remaining open was the precise number of shares subject to the buyout. By this decision, I have resolved the ambiguities that understandably perplexed the Special Master. The sole issue is whether Kaplan has dispositive control of 445,535 shares in addition to his individually owned 145,719 shares. By June 12, 2010, the parties shall report any reason for me to reject these numbers. I will then determine whether I need the Special Master's assistance on the matter. In the absence of reporting any such reason, the parties shall jointly submit a proposed form of final judgment by June 19, 2010, that reflects my Order of November 23, 2009, and today's Order.

In my Order of November 23, 2009, I also said that I would appoint Attorney George J. Marcus as standing special master with the powers and duties described in the original Report of the Special Master, unless there was

---

[66] See Letter from Deborah Y. Grant, Admin. Manager, Vice Pres. Merrill Lynch Global Wealth Mgmt. to Richard E. Kaplan, Manager & Managing Tr. (Jan. 21, 2010) (Ex. E to Pl.'s Mot. to Modify the Third Report & Interim Order of the Special Master) (Docket Item 238-5).

18

objection within ten (10) days. There was no objection, and now I do so **APPOINT** him.

At oral argument, Kaplan requested attorney fees for this particular dispute before the Special Master and before me. I decline to rule on the request at this time. The initial appointment of the Special Master, consistent with Rule 53(g)(3), provided for allocation and reallocation of fees if appropriate. If there is to be a request for reallocation, I prefer to have first the recommendation of the Special Master on the request, as to both proportions and amounts, within the overall context of the entire proceedings before him.

**SO ORDERED.**

**DATED THIS 1ST DAY OF JUNE, 2010**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**